**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, )<br><br>and )<br><br>COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, )<br><br>*Plaintiffs*, )<br><br>v. )<br><br>KEN PAXTON, in his official capacity as Attorney General of Texas )<br><br>*Defendant*. )<br>_____ ) | Civil Action No. 1:21-cv-00840 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      Plaintiffs are two trade associations whose members have First Amendment rights to engage in their own speech and to exercise editorial discretion over the speech published on their websites and applications. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also, e.g.*, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 575-76 (1995); *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 12 (1986) (plurality op.) ("*PG&E*"). Put simply, "the Government may not . . . tell Twitter or YouTube what videos to post; or tell Facebook or Google what content to favor." *United States Telecom Association v. FCC*, 855 F.3d 381, 435 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from the denial of rehearing en banc) ("*USTA*"). *See also Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct.

1921, 1932 (2019) (recognizing "private entities' rights to exercise editorial control over speech and speakers on their properties or platforms").

2.     Yet that is precisely what Texas House Bill 20 ("H.B. 20," enacted September 9, 2021)[1] does by prohibiting a targeted list of disfavored "social media platforms"[2] from exercising editorial discretion over content those platforms disseminate on their own privately owned websites and applications. Tex. Civ. Prac. & Rem. Code §§ 143A.001(1), 143A.002.[3] At bottom, H.B. 20 imposes impermissible content- and viewpoint-based classifications to compel a select few platforms to publish speech and speakers that violate the platforms' policies—and to present that speech the same way the platforms present other speech that does not violate their policies. Furthermore, H.B. 20 prohibits the platforms from engaging in their own expression to label or comment on the expression they are now compelled to disseminate. And in light of the statute's vague operating provisions, every single editorial and operational choice platforms make could subject those companies to myriad lawsuits.

3.     These restrictions—by striking at the heart of protected expression and editorial judgment—will prohibit platforms from taking action to protect themselves, their users, advertisers, and the public more generally from harmful and objectionable matter. At a minimum, H.B. 20 would unconstitutionally require platforms like YouTube and Facebook to disseminate, for example, pro-Nazi speech, terrorist propaganda, foreign government disinformation, and

---

[1] H.B. 20's enacted text is attached as Exhibit A and will be codified in relevant part at Tex. Bus. & Com. Code §§ 120.001-003, 120.051-053; 120.101-104, 120.151; Tex. Civ. Prac. & Rem. Code §§ 143A.001-008.

[2] H.B. 20 covers "social media platforms," so this Complaint will refer to "platforms." But the plain text of the "social media platform" definition is vague and thus may include websites and applications not generally understood as "social media."

[3] H.B. 20's provisions have not yet taken effect, but this Complaint cites H.B. 20's provisions as they are codified.

medical misinformation. In fact, legislators rejected amendments that would explicitly allow platforms to exclude vaccine misinformation, terrorist content, and Holocaust denial.

4.      Additional H.B. 20 provisions will work to chill the exercise of platforms' First Amendment rights to exercise their own editorial discretion and to be free from state-compelled speech. H.B. 20 will impose operational mandates and disclosure requirements designed to prescriptively manage—and therefore interfere with and chill—platforms' exercise of editorial discretion. In a series of intrusive provisions, H.B. 20 requires "social media platforms" to publish how they intend to exercise their discretion, document in excruciating detail how they exercise their editorial discretion over potentially billions of pieces of content, and operate inherently burdensome and unworkable individualized complaint mechanisms—all of which together work to compel or otherwise challenge the platforms' countless daily uses of editorial discretion.

5.      To enforce these onerous anti-editorial-discretion prohibitions, operational mandates, and disclosure requirements, H.B. 20 threatens platforms with myriad lawsuits from their users and the Texas Attorney General. The hopeless indeterminacy of many of H.B. 20's provisions will only invite arbitrary—and potentially discriminatory—enforcement by the Attorney General and by private plaintiffs.

6.      The Northern District of Florida recently enjoined similar provisions of a Florida law based upon similar First Amendment infirmities. *NetChoice, LLC v. Moody*, No. 4:21cv220-RH-MAF, 2021 WL 2690876, *6, *12 (N.D. Fla. June 30, 2021). Though the laws differ in their specifics, Florida's law and H.B. 20 here both infringe on the editorial discretion that the First Amendment protects, and the Texas Attorney General himself has called the two laws "similar."[4]

---

[4] Brief of the State of Texas, et al., *NetChoice, LLC v. Attorney General, State of Florida*, No. 21-12355, 2021 WL 4237301, at *2 (11th Cir. Sept. 14, 2021); *see also infra* ¶ 31-32.

7.     The Northern District of Florida also concluded that the Florida law is partially preempted by 47 U.S.C. § 230 ("Section 230"). This Court should do the same here. Plaintiffs' members are protected by federal statute from state laws exposing them to liability for moderating users' content on their sites. Under Section 230(e)(3), a state law is expressly preempted insofar as it purports to restrict good faith editorial discretion. Accordingly, those portions of H.B. 20 that expose platforms to liability for their good faith content moderation decisions are expressly preempted by 47 U.S.C. § 230(e)(3).

8.     Furthermore, the anti-editorial-discretion provisions, operational mandates, and disclosure requirements of H.B. 20 also violate the Commerce Clause, the Due Process Clause, the Full Faith and Credit Clause, and the Equal Protection Clause.

9.     This civil action therefore seeks declaratory and injunctive relief on behalf of Plaintiffs and their respective members who are covered under H.B. 20 against H.B. 20's unconstitutional and federally preempted requirements.

10.     Accordingly, Plaintiffs seek a declaration that Sections 2 and 7 of H.B. 20 are unconstitutional, unlawful, and unenforceable, and an injunction prohibiting the Attorney General from enforcing Sections 2 and 7 against Plaintiffs and their members.

## PARTIES AND STANDING

**Plaintiffs NetChoice and CCIA**

11.     Plaintiff NetChoice, LLC is a non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code created in, and existing under, the laws of the District of Columbia. A list of NetChoice's members is publicly available at https://bit.ly/389bD0V. For over two decades, NetChoice has worked to promote online commerce and speech and to increase consumer

access and options through the Internet, while minimizing burdens on businesses that are making the Internet more accessible and useful.

12.     Plaintiff Computer & Communications Industry Association ("CCIA") is a non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code incorporated in the Commonwealth of Virginia. A list of CCIA's members is publicly available at https://bit.ly/3D6S87G. For almost fifty years, CCIA has promoted open markets, open systems, and open networks.

13.     Plaintiffs have associational standing to bring this suit on behalf of their members. As described below, Plaintiffs' members have standing to challenge the statute. H.B. 20 is fundamentally at odds with Plaintiffs' policies and objectives, and challenging H.B. 20 is germane to Plaintiffs' respective missions. The claims and relief sought do not require proof specific to particular members and, in any event, Plaintiffs are able to provide evidence about H.B. 20's impact on the companies they represent. The members' individual participation is thus not required.

14.     Likewise, Plaintiffs have organizational standing. They have already incurred and will continue to incur significant organizational expenses because of the enactment of H.B. 20. Due to the passage of H.B. 20, Plaintiffs have already incurred costs and will continue to divert their finite resources—money, staff, and time and attention—away from other pressing issues facing their members to address compliance with and the implications of H.B. 20 for Internet companies. If the operative provisions in Sections 2 and 7 of H.B. 20 were declared unlawful and enjoined, then Plaintiffs would no longer divert those finite resources to address H.B. 20.

15.     Plaintiffs' members (1) are the direct targets of H.B. 20 as reflected in statements by state officials (*see infra* ¶¶ 34, 63-64, 66, 73-74), (2) exercise editorial judgments that are

prohibited by H.B. 20, and (3) will face serious legal consequences from failing to comply with H.B. 20's requirements.[5]

16.     Many of Plaintiffs' mutual members, including Facebook and Google (and its video platform YouTube), are directly subject to and regulated by H.B. 20 because they qualify as "social media platforms" within H.B. 20's definition of the term. Plaintiffs' members thus include companies that are the intended targets of regulation by the Texas Legislature.

17.     For instance, Facebook and YouTube each far exceed H.B. 20's threshold of 50 million monthly active users in the United States. As of July 28, 2021, Facebook has 2.9 billion monthly active users, more than 50 million of which are in the United States.[6] YouTube also has over 2 billion monthly users, more than 50 million of which are in the United States.[7]

18.     Most pertinently, Sections 2 and 7 of H.B. 20 injure the constitutional and statutory rights of Plaintiffs' members by restricting members' editorial judgment and freedom of speech. These sections also compel Plaintiffs' members to publish on their platforms and through their services third-party content that may violate their policies and otherwise be removed. At a minimum, such speech appearing on a platform has been interpreted to reflect that platform's tacit approval of that content being on the platform.[8] In addition to direct prohibitions on members'

---

[5] Members of one or both Plaintiff organizations include Airbnb, Alibaba.com, Amazon.com, AOL, DJI, DRN, eBay, Etsy, Expedia, Facebook, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Nextdoor, Lyft, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, TikTok, Travelocity, TravelTech, Trivago, Turo, Twitter, Verisign, Vimeo, VRBO, Vigilant Solutions, VSBLTY, Waymo, Wing, and Yahoo!.

[6] *Facebook Reports Second Quarter 2021 Results*, Facebook Investor Relations (July 28, 2021), https://bit.ly/3EzU21k.

[7] *YouTube for Press*, https://bit.ly/3jTGqEP (last visited Sept. 22, 2021).

[8] *See, e.g.*, Steve Rathje, Jay Van Bavel, & Sander van der Linden, *Why Facebook really, really doesn't want to discourage extremism*, Wash. Post (July 13, 2021), https://wapo.st/2XMV09C; Becca Lewis, *I warned in 2018 YouTube was fueling far-right extremism. Here's what the platform should be doing*, The Guardian (Dec. 11, 2020), https://bit.ly/3D7GWrd.

editorial discretion and compelled-speech requirements, H.B. 20's highly burdensome disclosure and operational requirements will chill members' exercise of editorial judgment.

19.     Furthermore, those portions of H.B. 20 that prohibit editorial discretion are expressly preempted by Section 230, which protects Plaintiffs' members from liability for restricting third-party content on their "platforms."

20.     Beyond the grave harms to their constitutional rights, Plaintiffs' members will incur significant costs to comply with the provisions in Sections 2 and 7 of H.B. 20. The statute will force members to substantially modify the design and operation of their platforms. The necessary modifications will impose onerous burdens upon members' respective platforms and services, interfering with their business models and making it more difficult for them to provide high quality services to their users. For example, members would have to stop offering parents the ability to choose products that protect young children from access to certain inappropriate content (known as "age gating").

21.     H.B. 20's disclosure requirements will also force members to disclose highly sensitive, confidential business information and trade secrets, such as the "algorithms or procedures that determine results on the platform," which include all the tools, practices, actions, and techniques used to enforce a platform's policies. Tex. Bus. & Com. Code. § 120.051(a)(4). These disclosures will result in competitive harm, as covered platforms will have to disclose confidential information not only to other covered "platforms," but also to other competitor websites and applications that are not covered by H.B. 20 and thus not required to disclose their own confidential information.

22.     Moreover, providing detailed information about how members exercise their editorial discretion to police pornography, excessive violence, and other harmful and dangerous

content will give bad actors—such as scammers (fake charities and supposed Nigerian princes), spammers (including peddlers of pornography), predators, and criminals—a roadmap for evading even the minimal editorial discretion permitted under the statute, making it more difficult and costly to keep harmful content off members' platforms.

23.     Compounding the costs of complying with H.B. 20, advertisers will not permit their products and services to be displayed in an editorial context of harmful or offensive content. And the proliferation of such objectionable content will cause many users to use the platforms less, or stop using them entirely. All of this will injure the businesses of Plaintiffs' members, irreparably damage their brands and goodwill, and weaken their business models and competitiveness.

24.     In addition, because of sovereign immunity, Plaintiffs' members may not be able to recover the resulting financial losses as monetary damages from either Defendant or from the State of Texas. If Sections 2 and 7 of H.B. 20 were declared unlawful and its enforcement enjoined against Plaintiffs' members before H.B. 20's effective date, then Plaintiffs' members would not have to incur those costs.

25.     The enforcement provisions in H.B. 20 also expose Plaintiffs' members to civil litigation by Defendant (including lawsuits for *potential* violations of Section 7), thus threatening attorneys' fees and other litigation-related costs. The threat of enforcement and significant costs will chill Plaintiffs' members from the exercise of their First Amendment rights to speak, publish, edit, and associate. A declaratory ruling that H.B. 20 violates the First Amendment and an injunction of its enforcement against Plaintiffs' members would remedy those constitutional violations.

26.     H.B. 20 also injures the constitutional rights of Plaintiffs' members under the Commerce Clause and the Fourteenth Amendment by regulating conduct occurring outside Texas,

discriminating against out-of-state companies engaged in interstate and foreign commerce, and compelling such companies to engage in commerce with Texans. H.B. 20 at a minimum has the practical effect of regulating conduct beyond Texas's borders and threatens Plaintiffs' members with inconsistent regulations from other States.

27.    H.B. 20 further harms Plaintiffs' members by putting them to the choice of either complying with state law preempted by Section 230 or otherwise facing potentially huge liability under H.B. 20.

28.    For all these reasons, Plaintiffs and their members also will suffer irreparable harm if the challenged portions of H.B. 20 are not enjoined before they take effect and are enforced.

**Defendant Ken Paxton, Attorney General of Texas**

29.    Defendant Ken Paxton is the Attorney General of Texas. He is a resident of Texas. Attorney General Paxton is sued only in his official capacity. The Attorney General is responsible for enforcement of H.B. 20. Tex. Bus. & Com. Code § 120.151; Tex. Civ. Prac. & Rem. Code § 143A.008.

30.    Defendant Paxton poses a "credible threat of enforc[ing]" H.B. 20. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). Defendant Paxton has given every indication that he intends to use all legally available enforcement tools against Plaintiffs' members.

31.    Indeed, Texas (and a group of other States) filed an amicus brief in support of Florida's "similar" law restricting Plaintiffs' members' constitutional and statutory rights.[9] Texas submitted that amicus brief because the "legal theories [the district court] endorsed" to enjoin

---

[9] Brief of the State of Texas, et al., *NetChoice, LLC v. Attorney General, State of Florida*, No. 21-12355, 2021 WL 4237301, at *2 (11th Cir. Sept. 14, 2021).

Florida's unconstitutional and (partially) preempted law "could be adopted by other courts around the country and imperil similar laws such as Texas's H.B. 20[.]"[10]

32.     In a press release touting the amicus brief (and linked on Twitter), Defendant Paxton declared, "I will defend the First Amendment and ensure that conservative voices have the right to be heard. Big Tech does not have the authority to police the expressions of people whose political viewpoint they simply disagree with," and the press release noted that he has authority under H.B. 20 "to sue on behalf of a Texas resident or residents that were banned or blocked by a platform due to discrimination based on their political views."[11]

33.     Furthermore, in a video later retweeted on his Twitter account, Defendant Paxton said that "we are going to continue the fight to make sure that these companies are not using their super algorithms and their artificial intelligence to manipulate your . . . political activities."[12]

34.     In a January 9, 2021, tweet criticizing Twitter, Facebook, and Google for allegedly targeting "conservative" speech, Defendant Paxton vowed, "As AG, I will fight them with all I've got."[13]

35.     As a result, there is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of Plaintiffs and their members to warrant relief. The harm to Plaintiffs and their members as a direct result of the actions and threatened actions of Defendant is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment and prospective injunctive relief.

---

[10] *Id.* at *3.

[11] Texas Attorney General (@TXAG), Twitter (Sept. 20, 2021, 3:10 PM), https://bit.ly/2ZdAzmN; Press Release, Attorney General Paxton Joins 10-State Coalition to Regulate Big Tech Censorship (Sept. 20, 2021), https://bit.ly/3u1Njs3.

[12] YAF (@YAF), Twitter (Sept. 2, 2021, 12:30 PM), https://bit.ly/3BAJm0b.

[13] Attorney General Ken Paxton (@KenPaxtonTX), Twitter (Jan. 9, 2021, 2:58 PM), https://bit.ly/3nXriJY.

## JURISDICTION AND VENUE

36.     This Court has subject-matter jurisdiction over this federal action under 28 U.S.C. §§ 1331 and 1343(a) because Plaintiffs' claims arise under the U.S. Constitution and federal law. Plaintiffs' claims arise under the First and Fourteenth Amendments, the Commerce Clause, and the Civil Rights Act, 42 U.S.C. § 1983. Plaintiffs also seek relief because certain provisions of H.B. 20 are preempted by 47 U.S.C. § 230.

37.     This Court has authority to grant legal and equitable relief under the Civil Rights Act, 28 U.S.C. § 1343(a); 42 U.S.C. § 1983. In enforcing, administering, and adhering to H.B. 20, Defendant Paxton and those subject to his supervision, direction, or control will at all relevant times act under color of state law. And H.B. 20 violates the constitutional rights of Plaintiffs' members under the First and Fourteenth Amendments, the Commerce Clause of Article I, Section 8 of the Constitution, and the Supremacy Clause of the Constitution.

38.     In addition, this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the enforcement of H.B. 20 by the Defendant would violate the Supremacy Clause, and thus may be enjoined under established principles of federal equity. *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1384 (2015).

39.     This Court also has authority to issue injunctive relief under the All Writs Act, 28 U.S.C. § 1651.

40.     This Court similarly has the power under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to "declare the rights and other legal relations of any interested party seeking such declaration."

41.     This Court's jurisdiction is properly exercised over Defendant Paxton in his official capacity, *Ex parte Young*, 209 U.S. 123 (1908), as Plaintiffs are seeking declaratory and injunctive relief against enforcement of H.B. 20.

42.     This Court has personal jurisdiction over Defendant Paxton, in his official capacity, because he resides within the Western District of Texas and performs his official duties within this District.

43.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because the only Defendant, the Attorney General of Texas, resides in Austin, Texas. Venue is also proper in this District and Division under § 1391(b)(2) because the events giving rise to this civil action occurred in Austin, Texas.

## INTERNET SPEECH AND EDITORIAL DISCRETION

### The Need for Editorial Discretion

44.     With billions of users, the platforms operated by Plaintiffs' members host, curate, and generate an enormous amount and variety of user-submitted content, including text, videos, audio recordings, and photographs. The content that users submit to those platforms comes from all over the world and is incredibly diverse. It often reflects the best of human thought: material that is endlessly creative, humorous, intellectually stimulating, educational, inspirational, and politically engaging.

45.     Social media facilitates immensely valuable expression. Facebook, for instance, provides a platform for staying in touch with family and friends, building community, and for discussing local, state, and national events. YouTube provides a platform for creating, sharing, viewing, and discussing videos, on a wide array of topics including educational, instructional and hobby videos, children's entertainment, news, comedy, and much more.

46.     Despite this valuable expression, the Internet also attracts some of the worst aspects of humanity. Any online service that allows users to easily upload material will find that some users attempt to post highly offensive, dangerous, illegal, or otherwise objectionable content, such as: medical misinformation, hardcore and illegal "revenge" pornography, depictions of child sexual abuse, terrorist propaganda (like pro-Taliban expression), efforts by foreign adversaries to foment violence and manipulate American elections, efforts to spread white supremacist and anti-Semitic conspiracy theories, disinformation disseminated by bot networks, fraudulent schemes, malicious efforts to spread computer viruses or steal people's personal information, spam, virulent racist or sexist attacks, death threats, attempts to encourage suicide and self-harm, efforts to sell illegal weapons and drugs, pirated material that violates intellectual property rights, and false and defamatory statements.

47.     Without serious and sustained effort by Plaintiffs, their members, and other online services to stop, limit, and exercise editorial discretion over such content—and the people or entities who seek to disseminate harmful content—these services could be flooded with abusive and objectionable material, drowning out valuable content and making their services far less enjoyable, useful, and safe.[14]

48.     That is why the social media platforms operated by Plaintiffs' members—and nearly every online service hosting user-submitted content—have rules and policies providing what content and activities are, and are not, permitted on their platforms.[15] And it is why those

---

[14] *See, e.g.*, Mark Scott & Tina Nguyen, *Jihadists flood pro-Trump social network with propaganda*, Politico (Aug. 2, 2021), https://politi.co/3j5ivTu; Natalia Colarossi, *Trump-Friendly Gettr App Marred by Porn, Hacked Accounts and Sonic the Hedgehog Upon Launch*, Newsweek (July 4, 2021), https://bit.ly/3D6OzhO.

[15] *See, e.g.*, Texas Attorney General, Site Policies, https://bit.ly/3nHBwxX (last visited Sept. 22, 2021) ("Members of the public should not post or share information on an OAG social

platforms devote enormous amounts of time, resources, personnel, and effort to engaging in editorial discretion through content moderation. And as new kinds of harmful conduct arise, Plaintiffs' members must continually evaluate their policies and update them when appropriate.

49.    As is clear from the above discussion of their moderation (*i.e.*, editorial) practices, Plaintiffs' members do not host content indiscriminately. Instead, they are private speech forums operated by private companies that "exercise editorial control over speech and speakers on their properties or platforms." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1932.

50.    Content moderation can take many different forms, involving both human review and algorithmic or other automated editorial tools.

51.    Algorithmic curation of content allows websites and applications to create an individualized and (often) non-linear "feed" of content according to what those platforms' users will find most useful and relevant based upon their activities and demonstrated preferences on the platforms. The algorithms encode the websites' and applications' editorial judgment and enable them to apply those judgments at scale. Editorial discretion and content curation often involves nuanced decisions about how to arrange and display content, what content to recommend to users based on their interests, and how easy or difficult it should be to find or search for certain kinds of content.

52.    Platforms sometimes exercise editorial discretion through "zoning" or "age gating," whereby certain content is made accessible to adults but not minors, or to teenagers but not younger children. In other instances, platforms choose to empower users with tools so they can decide for themselves what content to avoid, such as by blocking or muting others, making certain content

---

media page if that information is personal, sensitive, obscene, threatening, harassing, discriminatory, or would otherwise compromise public safety or incite violence or illegal activities.").

inaccessible to their children, or opting into special sections of an online service that exclude material likely to offend or upset certain users (such as content depicting violence).

53.     Platforms also exercise editorial discretion through warning labels, disclaimers, or commentary appended to certain user-submitted material. For example, an online service provider might inform users that the relevant content was posted by a state-controlled media entity (including those from hostile foreign governments), that it has not been verified by official sources, that the information has been found to be false, or that it contains sensitive or potentially upsetting imagery that may not be appropriate for everyone. It would then be up to the user to decide whether to review the content.

54.     Platforms exercise editorial discretion over even the most basic online functions that users may take for granted, such as searching for local businesses, movie showtimes, or weather reports based on what they predict is likely to be most relevant and useful.

55.     Without organizing and curating the unfathomable volume of online content, online services would have no way to identify and deliver to users the content that they want—or may critically need—to see.

56.     Editorial discretion, in these myriad forms, serves many significant functions. Most importantly, it is the means by which the online service expresses itself. Just as a newspaper or magazine's decision about what to publish and what to leave out conveys a message about the newspaper's editorial judgments, a platform's decision about what content to host and what to exclude is intended to convey a message about the type of community that the platform hopes to foster.[16] Requiring a platform to host speech that it does not want to host forces the platform to

---

[16] *See, e.g.*, Facebook, Facebook Community Standards, https://bit.ly/3nI35av (last visited Sept. 22, 2021) ("Our commitment to expression is paramount, but we recognize the internet

alter the content of that expression. *See, e.g.*, *Miami Herald Publ'g Co.*, 418 U.S. at 258; *Hurley*, 515 U.S. at 575-76; *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). A platform that is typically family friendly would be a very different platform if forced to host graphic or viscerally offensive posts.

**Exercise of Editorial Discretion by Plaintiffs' Members**

57.     In furtherance of their varying community standards and terms of service, Plaintiffs' members prohibit all sorts of speech that they deem harmful or objectionable or against their policies, including medical misinformation, hate speech and slurs (spanning the spectrum from race and religion to veteran status), glorification of violence and animal abuse, and impersonation, lies, and misinformation more broadly.

58.     These policies are embodied in the members' terms of service and community standards. Users must agree to those terms to use the service. Nor are all users welcome as a general matter. Many covered members' terms of service require that all users be at least 13 years old before creating accounts on their platforms.

59.     Plaintiffs' members have exercised editorial discretion over user content and access from the very start. Their platforms have experienced dramatic growth with their editorial policies in place—and have grown as those policies have evolved over time. Plaintiffs' members have *never* purported to be forums for any and all types of content.

60.     Because editorial discretion is necessary to maintain a social media platform, other social media platforms not covered by H.B. 20 by virtue of their size—including Parler, Gettr, and

---

creates new and increased opportunities for abuse. For these reasons, when we limit expression, we do it in service of one or more of the following values . . . ."); YouTube, Community Guidelines https://bit.ly/3CbToFY (last visited Sept. 22, 2021) ("Our policies aim to make YouTube a safer community while still giving creators the freedom to share a broad range of experiences and perspectives.").

Rumble—all exercise varying degrees of editorial discretion over their platforms.[17] In fact, as referenced *supra* ¶ 48 n.15, the Texas Attorney General himself purports to restrict some types of content from his social media sites.

## TEXAS'S LAW RESTRICTING AND BURDENING EDITORIAL DISCRETION

61.     On March 4, 2021, Texas State Senator Bryan Hughes first introduced Senate Bill 12, which Sen. Hughes tweeted would "allow Texans to participate on the virtual public square free from Silicon Valley censorship."[18]

62.     In parallel, a group of State Representatives introduced House Bill 2587 on March 2, which included similar provisions restricting covered platforms' exercise of editorial discretion.[19]

63.     On March 4, Texas Governor Greg Abbott announced his support for Senator Hughes' bill, which the Governor helped develop: "I am joining @SenBryanHughes to announce a bill prohibiting social media companies from censoring viewpoints. Too many social media sites silence conservative speech and ideas and trample free speech. It's un-American, Un-Texan, & soon to be illegal."[20] The Governor decried a "dangerous movement" to "silence conservative ideas."[21] And the Governor's tweets indicate he had been working with Senator Hughes since at

---

[17] *Terms of Service,* Parler (Aug. 25, 2021), https://bit.ly/3hW3QZL; *Elaboration on Guidelines*, Parler, https://bit.ly/2TBKrnW; *Terms of Use*, GETTR (June 30, 2021), https://bit.ly/3tGXrGK; *Terms of Service*, Rumble, https://bit.ly/3m5cLuX/.

[18] Senator Bryan Hughes (@SenBryanHughes), Twitter (Mar. 5, 2021, 11:48 PM), https://bit.ly/3zb2eSK.

[19] H.B. 2587, 87th Leg., Reg. Sess. (Tex. 2021), https://bit.ly/3zzls4w. This was one of a handful of proposed bills in the House.

[20] Greg Abbott (@GregAbbott_TX), Twitter (Mar. 4, 2021, 11:52 PM), https://bit.ly/3jqSwWP.

[21] Shawn Mulcahy, *Gov. Greg Abbott backs bill to stop social media companies from banning Texans for political views*, Texas Tribune (Mar. 5, 2021), https://bit.ly/3zI9dCV.

least February on H.B. 20: "We are working with Sen. Hughes on legislation to prevent social media providers like Facebook & Twitter from cancelling conservative speech."[22]

64.    On March 5, the Governor again voiced his support for Senator Hughes' bill after a press conference with Sen. Hughes, calling Senate Bill 12 a way to "protect Texans from being wrongfully censored on social media for voicing their political or religious viewpoints."[23] On Twitter that same day, Governor Abbott again tweeted, "Silencing conservative views is un-American, it's un-Texan, and it's about to be illegal in Texas."[24]

65.    On August 5—after the Legislature failed to pass the Senate Bill (or its successor, "Senate Bill 5," or any House companion bills) in the regular legislative session and in a first special legislative session—the Governor called a second special legislative session, directing the Legislature to "consider and act upon . . . [l]egislation safeguarding the freedom of speech by protecting social-media and email users from being censored based on the user's expressed viewpoints, including by providing a legal remedy for those wrongfully excluded from a platform."[25]

66.    When introducing his bill (Senate Bill 5) anew in the second special session, Senator Hughes tweeted: "Texans must be able to speak without being censored by West Coast oligarchs."[26]

---

[22]   Greg   Abbott   (@GregAbbott_TX),   Twitter   (Feb.   7,   2021,   4:35   PM), https://bit.ly/3t0aeU0.

[23] Office of the Texas Governor, Press Release: Governor Abbott Supports Bill Protecting Texans From Wrongful Social Media Censorship (Mar. 5, 2021), https://bit.ly/2UY3Gc3.

[24]   Greg   Abbott   (@GregAbbott_TX),   Twitter   (Mar.   5,   2021,   9:35   PM), https://bit.ly/3mndV5e.

[25]   Proclamation   by   the   Governor   of   the   State   of   Texas   (Aug.   5,   2021), https://bit.ly/37uTuuw.

[26]  Senator  Bryan  Hughes  (@SenBryanHughes),  Twitter  (Aug.  9,  2021,  5:34  PM), https://bit.ly/3lQTpJY.

67.     On August 11, 2021, the Texas Senate passed Senate Bill 5 by a 17-12 vote. In parallel, Rep. Briscoe Cain introduced H.B. 20, which was substantially similar to Senator Hughes' proposed legislation, but Rep. Cain's H.B. 20 included, among other things, (1) an expanded definition of prohibited editorial actions, expressly encompassing even platforms' own direct speech; and (2) certain prohibitions on email providers. H.B. 20 was entitled, "AN ACT relating to censorship of or certain other interference with digital expression, including expression on social media platforms or through electronic mail messages."

68.     The House passed H.B. 20 on August 30, 2021, by a 77-49 vote.

69.     While the House considered H.B. 20, Rep. Alex Dominguez introduced an amendment that would have created a state-run public forum for speech at "Publicforum.Texas.gov."[27] Instead of voting to create a true public square subject to the First Amendment's robust protections for objectionable content, the House rejected the amendment in favor of encumbering private platforms with objectionable speech.

70.     The Senate then passed an amended version of H.B. 20 on August 31, 2021, by a 17 to 14 vote.

71.     After the House concurred in the Senate's amendment, both Houses signed H.B. 20 on September 2, 2021.

72.     The enrolled bill was presented to Governor Abbott, and he signed H.B. 20 into law on September 9, 2021. H.B. 20 is set to take effect "the 91st day after the last day of the legislative session"—or, December 2, 2021.

---

[27] Tex. H.R. Journal, 87th Leg., 2d Spec. Sess. at 217-18 (2021), https://bit.ly/3t2JgLw.

73.     Representative Matt Shaheen—one of H.B. 20's joint authors—posted on Facebook on September 1: "Liberal Democrats want to suppress speech they don't like. That's why I fought for House Bill 20, to protect your digital expression on social media."[28]

74.     After signing H.B. 20 into law, Governor Abbott declared, "[T]here is a dangerous movement by social media companies to silence conservative viewpoints and ideas. That is wrong, and we will not allow it in Texas."[29] During H.B. 20's signing ceremony, Governor Abbott explained, "It is now law that conservative viewpoints in Texas cannot be banned on social media."[30]

75.     As enacted, H.B. 20 states the findings of the Legislature, which include "social media platforms function as common carriers, are affected with a public interest, are central public forums for public debate, and have enjoyed governmental support in the United States" and "social media platforms with the largest number of users are common carriers by virtue of their market dominance."

76.     H.B. 20 contains two sets of provisions that stem from the flawed premise that "social media companies" are "common carriers." Section 7's anti-editorial-discretion provisions impose unprecedented burdens on the exercise of editorial judgment by "social media platforms." And Section 2 imposes numerous speech-chilling disclosure and operational obligations upon those platforms.

77.     Both of H.B. 20's operative provisions share the same definitions of "social media platform" and "user."

---

[28] Matt Shaheen, Facebook (Sept. 1, 2021, 8:36 AM), https://bit.ly/3Avlyuu.
[29] Office of the Texas Governor, Press Release: Governor Abbott Signs Law Protecting Texans From Wrongful Social Media Censorship (Sept. 9, 2021), https://bit.ly/38ZEkxQ.
[30] Office of the Governor Greg Abbott, Facebook, WATCH: Signing House Bill 20 into Law—Relating to censorship on social media platforms (Sept. 9, 2021), https://bit.ly/3z0Ysub.

78.     A "social media platform" is an "Internet website or application" that "functionally has more than 50 million active users in the United States in a calendar month" that is "open to the public" and that "allows a user to create an account" to "communicate with other users for the primary purpose of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.003(c).

79.     Notably, this arbitrary 50-million-user threshold is unsupported by any real legislative findings and was amended at various points in the legislative process without much consideration. In the regular legislative session, the Senate approved a bill that applied to platforms with 100 million monthly users *worldwide*.[31] In that regular session, State Senator Roland Gutierrez moved to amend the bill to cover platforms with 25 million monthly users, in an effort to include "websites such as Parler and Gab, which are popular among conservatives."[32] Sen. Gutierrez's amendment failed.[33] Later, during the first special legislative session, Senate Bill 5 as introduced in the Senate included a 65-million-user threshold.[34] When the Senate Committee on State Affairs adopted the 50-million-user threshold in the first special session, it did so with no substantive discussion or consideration of the kinds of websites and applications the new threshold would include. That 50-million-user threshold carried over to the versions introduced in the second special legislative session. In all events, though the cut-offs are largely arbitrary in the platforms they exclude, they have always been designed to include platforms like Facebook and YouTube. This definition of "social media platform" expressly includes content- and speaker-based exceptions that apply categorically to Internet service providers and electronic mail. H.B. 20

---

[31] *See* S.B. 12, 87th Leg., Reg. Sess. (Tex. 2021), https://bit.ly/3kkO7W0.

[32] Shawn Mulcahy, *Texas Senate approves bill to stop social media companies from banning Texans for political views*, Texas Tribune (updated April 1, 2021), https://bit.ly/3nU2ceV.

[33] *Id.*; Tex. H.R. Journal, 87th Leg. at 499 (2021), https://bit.ly/3Cq663o.

[34] *See* S.B. 5, 87th Leg., 1st Spec. Sess. (Tex. 2021), https://bit.ly/37x8asX.

further excludes from the definition of "social media platform" all websites or applications that "consist[] primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider," so long as user chats and comments are "incidental to" the "preselected" content. Tex. Bus. & Com. Code § 120.001(1)(A)-(C).

80.     In legislative remarks ordered printed into the legislative record, Senator Hughes said that H.B. 20 was not intended to include "websites or apps whose primary purpose is the sale of good[s] or services."[35] He asserted that the "primary purpose" clause applied to the entire website or application—not the communication features the website enables, as the plain text would indicate. *Cf.* Tex. Bus. & Com. Code § 120.001(1) ("enables users to communicate with other users for the primary purpose of posting information, comments, messages, or images"). He also asserted the carve-out for websites that "consist[] primarily" of "information or content that is not user generated but is preselected by the provider" would exclude commercial websites. *Id.*

81.     H.B. 20's expansive definition of "social media platform" includes many digital services popular with consumers, some of which are members of one or both Plaintiffs: Facebook, Instagram, LinkedIn, Pinterest, Quora, Reddit, Snapchat, TikTok, Tumblr, Twitter, Vimeo, WeChat, WhatsApp, and YouTube. The statute's vague definition, however, may sweep in other sites such as eBay, which is not popularly understood as a social media platform, but which provides users the opportunity to create accounts to communicate *and* is full of user-submitted products and product listings. Or Etsy, which does not yet reach the 50-million-user threshold in H.B. 20, but which has been growing rapidly and may be inadvertently swept into H.B. 20's regulatory scheme as it grows more successful. H.B. 20's definition also excludes other sites like Parler, Gettr, Gab, and Rumble based on their currently smaller user bases, notwithstanding that

---

[35] Tex. H.R. Journal, 87th Leg., 2d Spec. Sess. at 220 (2021), https://bit.ly/3yEIZzH.

these social media companies claim to be alternatives to the covered platforms. Similarly, social media platforms like "Cowboys Zone"—a forum dedicated to Dallas Cowboys football—would (ostensibly) also be excluded based on size.[36]

82.     A "user" is a person who "posts, uploads, transmits, shares, or otherwise publishes or receives content through a social media platform." Tex. Bus. & Com. Code § 120.001(2). This includes "a person who has a social media platform account that the social media platform has disabled or locked." *Id.* Users who live in the state of Texas, do business in Texas, or "share[] or receive[] content on a social media platform" in Texas are covered by H.B. 20—but because users "receive" content posted by users located all over the globe, H.B. 20 effectively applies world-wide. *Id.* § 120.002(a)(3); Tex. Civ. Prac. & Rem. Code § 143A.003(a)-(b).

**Section 7's Restrictions on Exercising Editorial Judgment**

83.     Section 7 of H.B. 20 makes it unlawful for a "social media platform" to "censor a user, a user's expression, or a user's ability to receive the expression of another person based on: (1) the viewpoint of the user or another person; (2) the viewpoint represented in the user's expression; or (3) a user's geographic location in this state or any part of this state." Tex. Civ. Prac. & Rem. Code § 143A.002(a)(1)-(3).

84.     H.B. 20 does not define "viewpoint," and left undefined, it is vague enough to encompass all expression—because all expression will convey at least some viewpoint. For instance, the Taliban's statement that they had to "enter Kabul to stop . . . criminals and abusers" expresses a viewpoint about how Afghanistan's government should operate.[37]

---

[36] *See* Cowboys Zone, https://bit.ly/3hIretM (last visited Sept. 22, 2021).
[37] *Transcript of Taliban's first news conference in Kabul*, Al Jazeera (Aug. 17, 2021), https://bit.ly/390E7KZ.

85.     H.B. 20 defines "censor" to encompass potentially every editorial tool available to the covered platforms: "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." Tex. Civ. Prac. & Rem. Code § 143A.001(1).

86.     It does not provide any further guidance as to what any of these component parts of the "censor" definition mean. Thus, it is unclear what it means to (for example) "deboost," or "deny equal access or visibility to, or otherwise discriminate against expression." *Id.*

87.     Like the other terms in the definition, both "deboost" and "deny equal access or visibility to" encompass content-prioritization decisions that platforms make as a matter of editorial judgment.

88.     And the definition of "censor" reaches broadly enough to include the platforms' direct speech. A court could hold that a platform "discriminates against" expression when the platform appends disclaimers or notices to user-submitted content, especially if the platform does not append its own speech to another user's expression. For example, platforms may label certain user-submitted expression as medical misinformation.

89.     H.B. 20 authorizes lawsuits not only by any user who "resides in this state," but also anyone who "does business in this state" or "shares or receives expression in this state." *Id.* §§ 143A.002(a), 143A.004(a), 143A.007. H.B. 20 does not define "doing business in Texas," but according to the Texas Secretary of State, while "Texas statutes do not specifically define 'transacting business' . . . a foreign [out-of-state] entity *is* transacting business in Texas" if it is "pursuing one of its purposes in Texas."[38] Given the global reach of the Internet, any person

_____

[38] Texas Secretary of State, Foreign or Out-of-State Entities FAQs, https://bit.ly/39bvKvW (last visited Sept. 22, 2021) (emphasis in original).

operating a commercial website outside of Texas could be deemed to be "doing business in Texas," thus greatly expanding the universe of persons authorized to sue and enforce H.B. 20's chilling effect on the exercise of editorial judgment by "social media platforms." Likewise, granting a right to sue to any person who (wherever she or he actually resides) "receives expression" from a "social media platform" while "in this state," Tex. Civ. Prac. & Rem. Code §§ 143A.001(6), 143A.004(b); extends the right to sue even to transients using their smartphones while passing through Texas.

90.     Combined, the extraordinary breadth of H.B. 20's provisions will directly forbid platforms from exercising almost any editorial discretion over their private websites and applications. Furthermore, that extraordinary breadth will further chill the editorial discretion that H.B. 20 does not directly forbid.

91.     The Texas Legislature has, however, chosen to include two content-based exceptions to the statute's general prohibition on editorial discretion that, as explained *infra* ¶¶ 117, 120, subject the law to strict scrutiny. *First*, H.B. 20 does not apply to platforms exercising editorial discretion over content "that is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment." Tex. Civ. Prac. & Rem. Code § 143A.006(a)(2). *Second*, the prohibition does not apply to platforms exercising editorial discretion over "expression that directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge." *Id.* § 143A.006(a)(3).

92.     H.B. 20's anti-editorial-discretion requirements—which purport to cover only users that reside in Texas, do business in Texas, or otherwise "share[] or receive[] . . . expression" in Texas, *id.* § 143A.004(b)—explicitly regulate conduct wholly outside Texas in at least four ways.

93.     *First*, they restrict platforms from exercising editorial discretion over content posted by persons from locations outside of Texas, including (1) almost any person operating a commercial website; (2) transient persons who reside outside of Texas but have visited the state using their smartphones; and (3) Texas residents using the Internet from outside the state. *See id.* So, if a Texas resident travels to and posts social media from New York, H.B. 20 purports to travel with her. Likewise, if a company outside of Texas "does business" in Texas by virtue of a commercial website and posts to social media from its location outside of Texas—even about matters having nothing to do with Texas or its residents—these anti-editorial-discretion provisions will restrict platforms from exercising editorial discretion over such out-of-state posts.

94.     *Second*, they compel platforms to publish content posted by covered users to *all* social media users worldwide. *See id.* §§ 143A.001, 143A.002. The restrictions on editorial discretion do not merely regulate how Texans send and receive social media posts in Texas. On the contrary, they regulate how social media platforms display content on their platforms everywhere.

95.     *Third*, they explicitly restrict platforms from exercising editorial discretion over content posted by non-Texans outside of Texas. This is because H.B. 20 covers both any user that "shares *or receives* content on a social media platform in [Texas]" and all "expression that is shared *or received* in [Texas]." *Id.* § 143A.004(a)(3)-(b) (emphases added). For such users and expression, H.B. 20 prohibits editorial discretion based on the views of the expression or "viewpoint" of "another person," a term that—unlike covered "users"—has no geographic limit and thus includes anyone worldwide. *Id.* § 143A.002(a)(1). By the Internet's very nature, nearly all information available online is capable of being "received" in Texas, so H.B. 20's purported geographic limits are really no limits at all.

26

96.     *Fourth*, they prohibit platforms from discriminating based on "a user's geographic location in [Texas] or any part of [Texas]." *Id.* § 143A.002(a)(3). In other words, H.B. 20 reaches beyond Texas's borders and effectively mandates that out-of-state social media companies enter Texas to engage in commerce in the State.

97.     The Legislature appeared to acknowledge the constitutional and federal preemption obstacles to H.B. 20, and provided that H.B. 20 "does not subject a social media platform to damages or other legal remedies to the extent the social media platform is protected from those remedies under federal law." *Id.* § 143A.005. Similarly, H.B. 20 provides that it should not be construed to prohibit a social media platform from "censoring expression" that it "is specifically authorized to censor by federal law." *Id.* § 143A.006(a)(1). But rather than save H.B. 20 from challenge, these provisions serve merely to highlight its irremediable defects.

98.     The anti-editorial-discretion provisions of H.B. 20 are enforceable by both private lawsuits brought by users for declaratory and injunctive relief, *id.* § 143A.007; and by the Attorney General for injunctive relief, *id.* § 143A.008. Notably, the Attorney General may "bring an action to *enjoin* a violation *or potential violation*." *Id.* § 143A.008(b) (emphases added). Both private plaintiffs and the Attorney General may recover reasonable costs and attorneys' fees. *Id.* §§ 143A.007(b)(1), 143A.008(b). Though H.B. 20 does not expressly provide for monetary penalties, H.B. 20 permits courts to hold covered platforms in civil contempt—including unspecified daily penalties—in the event a platform does not "promptly" comply with a court order. *Id.* § 143A.007(c).

**Section 2's Disclosure And Operational Obligations**

99.     To complement its direct infringements on editorial discretion, H.B. 20 adds various burdensome and vague disclosure and operational requirements designed to chill the exercise of editorial discretion.

100.    *First*, H.B. 20 requires platforms to explain their editorial criteria. Specifically, a covered platform must "publicly disclose accurate information regarding its content management, data management, and business practices, including specific information regarding how the social media platform: (i) curates and targets content to users; (ii) places and promotes content, services, and products, including its own content, services, and products; (iii) moderates content; (iv) uses search, ranking, or other algorithms or procedures that determine results on the platform; and (v) provides users' performance data on the use of the platform and its products and services." Tex. Bus. & Com. Code. § 120.051(a).

101.    These disclosures must be "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform." *Id.* § 120.051(b). And they must be published on a website that is "easily accessible by the public." *Id.* § 120.051(c). H.B. 20 does not define what "sufficient" means or what is "easily accessible" to the public.

102.    *Second*, and similarly, H.B. 20 requires each "social media platform" to publish "acceptable use policies" "in a location that is easily accessible to a user." *Id.* § 120.052(a). These policies must: "[r]easonably inform users about the types of content allowed on the social media platform"; "[e]xplain the steps the social media platform will take to ensure content complies with the policy"; and "[e]xplain the means by which users can notify the social media platform of content that potentially violates the acceptable use policy, illegal content, or illegal activity." *Id.* § 120.052(b).

103.    In addition, a "social media platform" must inform users of ways to notify the platform of purported content violations, including an "e-mail address or relevant complaint intake mechanism," and a complaint and appeal system (described below). *Id.* § 120.052(b)(3).

104.    *Third*, as part of H.B. 20's mandate for an acceptable use policy, each "social media platform" must also publish a "biannual transparency report" "outlining actions taken to enforce the policy." *Id.* § 120.052(b)(4). This voluminous report must include in detail the number of instances in which the platform "was alerted to illegal content, illegal activity, or potentially policy-violating content," as well as the number of instances in which the platform "took action with respect to illegal content, illegal activity, or potentially policy-violating content." *Id.* § 120.053. These actions include things like "content removal," "content demonetization," "content deprioritization," "account suspension," and "account removal," among others. *Id.* The biannual transparency report must also include information on numerous other matters, including the "number of coordinated campaigns" (a term that is not defined), the number of appeals by users, the percentage of successful appeals, and more. *Id.* § 120.053(3)-(7).

105.    In short, this report must include detailed information about potentially billions of editorial decisions platforms make to operate their websites and applications worldwide, given H.B. 20's extraterritorial reach. And the level of detail demanded threatens to require platforms to reveal trade secrets and other nonpublic, competitively sensitive information about how their algorithms and platforms operate. Above all, these detailed requirements interfere with, and chill the exercise of, platforms' editorial discretion.

106.    *Fourth*, if a platform receives "notice of illegal content or illegal activity" on the platform, it must "make a good faith effort to evaluate the legality of the content or activity within 48 hours of receiving the notice." *Id.* § 120.102. And if a platform removes content based on a

violation of its acceptable use policy, it shall "(1) notify the user who provided the content of the removal and explain the reason the content was removed"; (2) "allow the user to appeal the decision to remove the content to the platform"; and (3) "provide written notice to the user who provided the content" of the determination of the appeal requested or of the reason for the reversal of the platform's decision, if there is a reversal. *Id.* § 120.103(a).

107.    *Fifth*, each "social media platform" must set up an "easily accessible" complaint system. *Id.* § 120.101. If a "social media platform" receives a user complaint that the platform removed content "provided by the user . . . that the user believes was not potentially policy-violating content," then the platform has 14 days (excluding weekends) from when it receives the complaint to: (1) "review the content"; (2) "determine whether the content adheres to the platform's acceptable use policy"; (3) "take appropriate steps based on the determination"; and (4) "notify the user regarding the determination made . . . and the steps taken." *Id.* § 120.104.

108.    In combination, these disclosure and operational provisions require platforms to engage in operational investment to (1) publish their editorial standards; (2) report in punitive detail how they exercise their editorial judgment; (3) provide notice and an explanation to all users whose content is removed; and (4) provide personalized handling of every individual user complaint concerning how platforms exercise their editorial discretion and give every user recourse to challenge the platforms' editorial decisions, which will flood the covered platforms with such requests. This will only chill the platforms' exercise of editorial discretion.

109.    The disclosure and operational provisions are enforceable through an action brought by the Attorney General against a "social media platform" to enjoin violations of any of the foregoing provisions. If the platform is successfully enjoined, then the Attorney General may

recover costs incurred, including reasonable attorneys' fees and investigative costs. *Id.* § 120.151(a)-(b).

## CLAIMS

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT

110.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

111.   The First Amendment of the Constitution of the United States provides that "Congress shall make no Law . . . abridging the Freedom of Speech, or of the Press; or of the Right of the People peaceably to assemble." U.S. Const. amend. I. The protections of the First Amendment have been incorporated against the States through the Due Process Clause of the Fourteenth Amendment to the Constitution.

112.   In exercising editorial discretion over their platforms, Plaintiffs' members offer a "presentation of an edited compilation of speech generated by other persons," which "fall[s] squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570.

113.   Plaintiffs' members have a First and Fourteenth Amendment right to exercise "editorial control" over the user-submitted content that they present on their social media platforms. *Tornillo*, 418 U.S. at 258; *see also, e.g.*, *Hurley*, 515 U.S. at 575-76; *PG&E*, 475 U.S. at 10-12 (plurality op.). Plaintiffs' members have a concurrent constitutional right not to be compelled to include unwanted content on their platforms. Likewise, they have a right to engage in their own direct expression. And the government may not circumvent the First Amendment's protections by imposing other requirements—such as burdensome disclosure and operational requirements—designed to chill expression.

114.    H.B. 20, however, singles out Plaintiffs' members for disfavored treatment and eviscerates the editorial discretion that they exercise—violating their rights by requiring the covered platforms to "alter the expressive content of their" message. *Hurley*, 515 U.S. at 572-73. Section 7 of H.B. 20 makes it unlawful for covered platforms "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression" based on *anyone's* "viewpoint." Tex. Civ. Prac. & Rem. Code §§ 143A.001(1); 143A.002(a). In other words, H.B. 20 completely denies platforms their right of editorial discretion over what appears on their websites.

115.    H.B. 20 both compels speech and prohibits the covered platforms from engaging in their own speech.

116.    Moreover, H.B. 20 imposes expression-chilling disclosure burdens and operational requirements that exceed the "purely factual" and "noncontroversial" informational disclosures— which cannot be "unjustified or unduly burdensome"—that the Supreme Court has held permissible. *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)). H.B. 20 compels disclosure of non-public, competitively sensitive information that the platforms would otherwise not reveal. And H.B. 20's mandated operational requirements are so costly and unworkable that they further burden the platforms' exercise of editorial judgment.

117.    H.B. 20 is content-based and thus triggers strict scrutiny in the following ways. *Riley*, 487 U.S. at 795.

118.    *First*, H.B. 20 compels speech—both through its restrictions on editorial discretion and its disclosure requirements. *See* Tex. Bus. & Com. Code. § 120.051(a); Tex. Civ. Prac. & Rem. Code § 143A.002(a). "[P]rohibiting a platform from making a decision based on content is itself a

content-based restriction." *NetChoice*, 2021 WL 2690876, at \*10; *see also Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc) (holding that compelled speech doctrine requires the compelled disclosure to be "(1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome"); *Washington Post v. McManus*, 944 F.3d 506, 514-15 (4th Cir. 2019) (government cannot "force elements of civil society to speak when they otherwise would have refrained" and "[i]t is the presence of compulsion from the state itself that compromises the First Amendment"); *Herbert v. Lando*, 441 U.S. 153 (1979) (the First Amendment prohibits "law[s] that subject[] the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest").

119.    *Second*, H.B. 20 singles out Plaintiffs' members for disfavored treatment, based on their platforms' content and message, while allowing other preferred platforms to continue to exercise *their* constitutional rights to exercise editorial discretion over their sites. By statutory definition, covered platforms do not include websites "that consist[] primarily of news, sports, entertainment, or other information or content that is not user generated." Tex. Bus. & Com. Code § 120.001(1)(C)(i). H.B. 20 also discriminates based on speaker size and circulation, excluding platforms with less than 50 million monthly active users in the United States. *Id.* § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.003(c); *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983). As addressed *supra* ¶ 79, there are no legislative findings supporting the user threshold, and the Legislature arbitrarily switched between various user thresholds throughout the legislative sessions. These unconstitutional content-based preferences infect the entire Bill, including its disclosure provisions.

120.     *Third*, H.B. 20 has two content-based exemptions from its prohibition on editorial discretion (Section 7). *See* Tex. Civ. Prac. & Rem. Code § 143A.006(a)(2)-(3).

121.     *Fourth*, H.B. 20 also discriminates against the particular viewpoints of Plaintiffs' members. As revealed by Legislators' public statements and the platforms H.B. 20 targets, H.B. 20 restricts the editorial discretion of Plaintiffs' members over their platforms because of the members' perceived political views. *See Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content."). H.B. 20 is motivated by a desire to target, punish, and retaliate against Plaintiffs' members for their perceived political or ideological viewpoints. Viewpoint discrimination is a particularly egregious form of content discrimination and is virtually *per se* unconstitutional. *NetChoice*, 2021 WL 2690876, at *10 ("[The] viewpoint-based motivation [behind the Florida statute], without more, subjects the legislation to strict scrutiny, root and branch.").

122.     H.B. 20 fails First Amendment scrutiny no matter what level of scrutiny applies. But these content-based distinctions plainly fail strict scrutiny as they lack a compelling government interest and are not narrowly tailored. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

123.     As the Supreme Court held in *Tornillo*, government cannot—consistent with the First Amendment—compel publication of speech to promote a balance of viewpoints. *See* 418 U.S. at 254. Whatever interest the state may have in "ensur[ing] that a wide variety of views reach the public," that interest is not sufficient to justify compelling private parties to host speech they do not want to host. *Id.* at 248.

124.     Likewise, H.B. 20 is not narrowly tailored because (1) it burdens private actors with compelled speech, over less restrictive alternatives, including a proposal to instead create a true

public forum for speech, *see supra* ¶ 69; and (2) after impermissibly choosing to burden private actors, H.B. 20 only compels speech from an over- and under-inclusive subset of disfavored websites and applications. In all events, H.B. 20 burdens more speech than is necessary to further whatever interest H.B. 20 promotes.

125.   H.B. 20 also fails intermediate and "exacting" scrutiny.

126.   At bottom, H.B. 20 imposes a "far greater burden on the platforms' own speech than" the Supreme Court has ever recognized as permissible. *NetChoice*, 2021 WL 2690876, at *9. And H.B. 20 is not supported with any evidence, let alone "evidence to justify painting with such a broad brush." *Washington Post*, 944 F.3d at 522.

## COUNT II
## 42 U.S.C. § 1983
## VOID FOR VAGUENESS

127.   Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

128.   Vague laws, particularly those that regulate communication protected by the First Amendment to the Constitution, are null and void under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States. A vague law that regulates constitutionally protected speech also violates the First Amendment.

129.   H.B. 20 contains numerous provisions that do not provide a person of ordinary intelligence fair notice of their meaning, and that invite arbitrary and discriminatory enforcement against disfavored content, viewpoints, and speakers. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

130.   Key parts of H.B. 20's anti-editorial-discretion provisions in Section 7 are unconstitutionally vague, including but not limited to the following.

131.    The scope of speech over which covered platforms lack editorial discretion is unclear. The statute does not define what constitutes a protected "viewpoint," which—without limitation—could encompass essentially all expression.

132.    Similarly, the scope of impermissible forms of editorial discretion is unclear. H.B. 20's definition of "censor" contains terms that lack further definition and threaten to encompass even the basic functions that Plaintiffs' members use to present content. In particular, it is not clear what forms of editorial discretion would "deboost," "deny equal access or visibility to, or otherwise discriminate against expression" under the statute. Tex. Civ. Prac. & Rem. Code § 143A.001(1). *See also NetChoice*, 2021 WL 2690876, at *11 (requiring "a social media platform to apply its standards in a consistent manner" is "especially vague").

133.    These prohibitions purportedly do not apply if the platform "is specifically authorized to censor by federal law"—but H.B. 20 makes no mention of what this provision covers, and H.B. 20 does not define "specifically authorized." Tex. Civ. Prac. & Rem. Code § 143A.006(a)(1).

134.    Furthermore, the statute says that the Attorney General may "bring an action to *enjoin* a violation *or a potential violation*." *Id.* § 143A.008(b) (emphases added). This language, by its plain terms, may allow courts to enjoin "potential violations" of the statute's anti-editorial-discretion provisions. Even assuming that "viewpoint" and "censor" were not vague, the fact that the statute may apply to situations beyond those terms' requirements means that Plaintiffs' members have no guidance about what editorial discretion they may lawfully exercise. And it would grant the Attorney General incredibly broad enforcement authority—raising serious concerns about arbitrary or discriminatory enforcement.

135.    Additionally, H.B. 20 permits platforms to "authoriz[e]" or "facilitat[e] a user's ability to censor specific expression on the user's platform or page at the request of that user." *Id.* § 143A.006(b). But it is not clear what this provision entails. For instance, if a user wants to block hate speech, H.B. 20 does not clearly explain whether the covered social media platform may label certain posts as hate speech to "facilitat[e]" its users' desires to avoid hate speech—or if that labeling would "censor" the hate speech.

136.    H.B. 20's definition of "social media platform" is also vague, because it does not apply to platforms that "primarily" provide "news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider." Tex. Bus. & Com. Code § 120.001(1)(c)(i). Does this include gaming platforms, such as Roblox, that allow users to create games and play games created by other users? Even if "primarily" means "greater than 50%," the question remains: 50% of what? A person of ordinary intelligence would have no idea what "primarily" refers to as either the relevant numerator or denominator. How is the amount of content to be measured—by the number of individual pieces of content, by file size, by frequency of appearance, by editorial emphasis, by usage, or by some other metric? How are different kinds of digital content, such as video and text, to be equated and measured? A person of ordinary intelligence would have no idea how to answer any of these questions, and thus would have no idea whether H.B. 20 covers her platform.

137.    Similarly, it is not clear what it means for a website or application to "enable[] users to communicate with other users for the *primary purpose* of posting information, comments, messages, or images." *Id.* § 120.001(1) (emphasis added). Does the fact that websites like eBay allow their users to post reviews (*i.e.*, information, comments, messages, and images) about the items they purchase suffice? Likewise, people of ordinary intelligence would have no idea what

makes a chat or comment section "incidental to, directly related to, or dependent on" a platform's preselected content. *Id.* Roblox provides another good example, as may Twitch (a game streaming platform), Xbox, PlayStation, or Nintendo Switch: Is user-submitted content on those online-gaming platforms incidental, directly related, or dependent? H.B. 20 provides no guidance about the necessary degree of connection or how much of the discussion in the chat or comment section must relate (and how closely) to the platform's preselected content. *Id.* § 120.001(1)(C)(ii).

138.    Finally, H.B. 20's onerous disclosure and operational provisions are also unconstitutionally vague for myriad reasons. For instance, H.B. 20 requires covered social media platforms to (1) publish required disclosures and policies in an "easily accessible" location, *id.* § 120.051(c), 52; and (2) "provide an easily accessible complaint system," *id.* § 120.101. But "easily accessible" has no established legal meaning, and an ordinary person would have no idea how "easy" user access must be, or in what respects.

139.    These vague aspects of H.B. 20 not only provide constitutionally insufficient notice, they also invite arbitrary and discriminatory enforcement against disfavored content, viewpoints, and speakers.

## COUNT III
### 42 U.S.C. § 1983
### VIOLATION OF THE COMMERCE CLAUSE, THE FULL FAITH AND CREDIT CLAUSE, AND THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE

140.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

141.    Article I, Section 1 of the U.S. Constitution vests Congress with the power "to regulate Commerce . . . among the several States" and "among foreign Nations," U.S. Const., art. I, § 8, cl. 3.

142.    "Although the Clause is framed as a positive grant of power to Congress," it "also prohibits state laws that unduly restrict interstate commerce." *Tennessee Wine & Spirits Retailers*

*Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). It is thus well-established that the Commerce Clause prohibits states from regulating or burdening out-of-state commerce, penalizing extraterritorial conduct, or imposing charges that have the purpose or effect of discriminating against interstate commerce and firms that engage in such commerce.

143.    The Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

144.    The Commerce Clause does not permit a single state to dictate the rules of content for the global Internet. H.B. 20 would regulate wholly-out-of-state conduct—balkanizing the Internet by imposing onerous extraterritorial regulation on the operation of covered social media platforms. This vastly exceeds Texas's regulatory purview and will impede commerce across the Internet.

145.    H.B. 20 unconstitutionally regulates beyond Texas's borders and, if upheld, threatens Plaintiffs' members with potentially inconsistent regulations from other States. The statute regulates editorial discretion that takes place outside of Texas and it regulates editorial discretion over content that is neither created nor posted in Texas. Tex. Civ. Prac. & Rem Code § 143A.004. Indeed, H.B. 20 explicitly regulates conduct wholly outside Texas in at least four ways, as addressed *supra* ¶¶ 92-96.

146.    Besides exceeding Texas's territorial power, H.B. 20 also unconstitutionally discriminates against companies engaged in interstate and foreign commerce. H.B. 20 exclusively targets online platforms with over 50 million monthly active users in the United States (an arbitrary number nevertheless designed to include disfavored platforms), which is only possible through interstate commerce. H.B. 20 also compels social media platforms to serve Texas users by

prohibiting platforms from discriminating based on "a user's geographic location in [Texas] or any part of [Texas]," penalizing companies that would prefer to engage in interstate commerce outside Texas. Tex. Civ. Prac. & Rem Code § 143A.002(a)(3).

147.    Thus, H.B. 20 is *per se* unconstitutional under the Commerce Clause because it regulates beyond Texas's borders, it discriminates against out-of-state firms, it discriminates against firms for engaging in inherently interstate commerce, and it discriminates against firms for refusing to engage in interstate commerce in Texas.

148.    At the very least, the burden that H.B. 20 imposes on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

149.    Furthermore, H.B. 20's extraterritorial reach also violates the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV. Under both clauses, a State may regulate transactions only with which it has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (citation omitted).

150.    The content and conduct regulated by the anti-editorial-discretion provisions of H.B. 20 largely take place outside Texas.

151.    By imposing liability for the extraterritorial conduct of Plaintiffs' members, H.B. 20 regulates conduct outside of Texas. Liability imposed by H.B. 20 will be borne entirely by out-of-state companies based upon their out-of-state conduct.

152.    Applying Texas law under H.B. 20 to such out-of-state conduct would be arbitrary and unfair.

**COUNT IV**
**42 U.S.C. § 1983**
**PREEMPTION UNDER THE SUPREMACY CLAUSE OF THE CONSTITUTION**
**AND 47 U.S.C. § 230**

153.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

154.    Congress enacted Section 230 "to promote the continued development of the Internet and other interactive computer services and other interactive media" and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(1)-(2). Congress recognized that "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." *Id.* § 230(a)(4).

155.    "Congress provided broad immunity under [Section 230] to Web-based service providers for all claims stemming from their publication of information created by third parties." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). Congress recognized the danger in exposing websites and online services to liability when those websites or service providers attempted to prevent third parties from posting harmful or offensive content. Section 230 thus provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Section 230 'specifically proscribes liability'" for a website's "'decisions relating to monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.'" *MySpace*, 528 F.3d at 420 (quoting *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003)).

156.    Section 230 further protects websites and applications from state laws imposing liability for good faith actions to restrict access to or availability of content that they consider objectionable. 47 U.S.C. § 230(c)(2), (e)(3). The statute specifically provides that "[n]o provider

or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2).

157.    Section 230 similarly prohibits liability for "any action taken to enable or make available to information content providers or others the technical means to restrict access to" objectionable material. *Id.* § 230(c)(2)(B). This provision applies to tools that online service providers make available to users to help them avoid or limit their exposure to potentially objectionable content.

158.    Under Section 230, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). This provision expressly preempts inconsistent state laws that seek to hold online service providers liable for engaging in editorial discretion protected by Section 230(c). Preemption applies equally to private causes of action and public enforcement actions. These provisions collectively reinforce the First and Fourteenth Amendment's preexisting protection for websites' editorial discretion over their platforms. *See Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003) (Section 230 "sought to further First Amendment . . . interests on the Internet").

159.    Among the important purposes advanced by Section 230, Congress sought "to encourage service providers to self-regulate the dissemination of offensive material over their services." *NetChoice*, 2021 WL 2690876, at *6 (citation omitted). This is its principal purpose. *See Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 n.12 (9th Cir. 2008) (en banc).

160.    Section 230 is designed to prevent any disincentive to review and remove content that an online service provider considers or believes its users would consider to be harmful or offensive. Without Section 230, online service providers would face the constant threat of litigation and thus have an incentive to take a hands-off approach to exercising editorial discretion over third-party content for fear that doing so would subject them to liability. *See id.* at 1174 (characterizing the threat of constant litigation as "death by ten thousand duck-bites"). Alternatively, they could respond to the threat of unlimited liability by severely restricting the number and types of messages posted. *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003) ("Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.") (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997)).

161.    For purposes of Section 230, an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). The "provider" of such a service includes those who own or operate websites, such as social media platforms, and therefore covers Plaintiffs' members who are subject to H.B. 20.

162.    H.B. 20's anti-editorial-discretion provisions are inconsistent with Section 230 because they impose liability on platforms covered by Section 230 for taking actions explicitly protected by Section 230—and are thus expressly preempted. *Id.* § 230(c)-(e).

163.    H.B. 20 is also preempted under implied preemption and obstacle preemption because it frustrates and undermines the basic purposes and policy goals of Section 230. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000).

## COUNT V
## 42 U.S.C. § 1983
## VIOLATION OF THE EQUAL PROTECTION CLAUSE
## OF THE FOURTEENTH AMENDMENT

164.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

165.    The Fourteenth Amendment to the United States Constitution guarantees to all citizens "equal protection of the laws," and it forbids any state government from denying that protection "to any person within its jurisdiction[.]" U.S. Const. amend. XIV, § 1. At a minimum, it forbids state governments from engaging in arbitrary discrimination against its citizens. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

166.    Distinctions "affecting fundamental rights," including the exercise of First Amendment rights, trigger strict scrutiny under the Equal Protection Clause, even if the distinctions do not themselves constitute suspect or invidious classifications. *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "The Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101 (1972).

167.    H.B. 20 purports to regulate the conduct of "social media platforms." H.B. 20's definition of that term is arbitrary and discriminatory, thereby rendering it in violation of basic equal protection principles.

168.    H.B. 20's definition of businesses that are covered by H.B. 20 discriminates against larger and more popular websites and social media companies by targeting them for restrictions

and disfavored governmental treatment. It targets only select companies that: (i) have more than 50 million active users in the United States (an arbitrary threshold that the Legislature settled on without legislative findings), (ii) are "open to the public," and (iii) "allow[] a user to create an account" to "communicate with other users for the primary purpose of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4). Meanwhile, H.B. 20 irrationally excludes other favored companies. Further, H.B. 20 excludes (i) Internet service providers, (ii) electronic mail, and (iii) websites or applications that "consist[] primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider" where user chats and comments are "incidental to" the content posted by the website or application. Tex. Bus. & Com. Code § 120.001(1)(A)-(C). Such arbitrary distinctions demonstrate that H.B. 20 unconstitutionally discriminates against the speech of certain speakers, that it is gravely under- and over-inclusive, and that it is not justified by any legitimate (much less compelling) governmental interest.

169.     Because the definition of platforms is both arbitrary and discriminatory, Section 7 will operate to unlawfully deprive Plaintiffs' members of their fundamental equal protection rights.

170.     Additionally, Section 2 establishes multiple new affirmative and onerous obligations that would affect Plaintiffs' members, but irrationally exclude other, favored entities. *See supra* ¶¶ 83-109. This separately violates equal protection.

171.     Texas cannot establish any rational basis for crafting this statutory scheme—much less satisfy strict scrutiny—and, accordingly, the statutory provisions discussed above violate the equal protection rights of Plaintiffs' members.

## COUNT VI
## EQUITABLE RELIEF

172.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

173.    For the reasons discussed above, Sections 2 and 7 of H.B. 20 violate federal law and thereby deprive Plaintiffs and their members of enforceable rights secured by federal law.

174.    Federal courts of equity have the power to enjoin unlawful actions by state officials. Such equitable relief has traditionally been available in the federal courts to enforce federal law. *Armstrong*, 135 S. Ct. at 1384.

175.    This Court can and should exercise its equitable power to enter an injunction precluding the Defendant from enforcing Sections 2 and 7 of H.B. 20 against Plaintiffs' members.

## COUNT VII
## 42 U.S.C. § 1983 and 28 U.S.C. § 2201
## DECLARATORY RELIEF

176.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

177.    For the reasons discussed above, H.B. 20 violates the First Amendment of the Constitution and thereby deprives Plaintiffs and their members of enforceable rights.

178.    Furthermore, H.B. 20 violates the Commerce Clause, the Due Process Clause, the Equal Protection Clause, and the Full Faith and Credit Clause.

179.    H.B. 20's anti-editorial-discretion provisions in Section 7 are preempted by Section 230.

180.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

181.    This Court may and should exercise its equitable power to enter a declaration that Sections 2 and 7 of H.B. 20 are unconstitutional and otherwise unlawful.

182.    In the alternative, the Court should enter a declaration stating that, within the meaning of Tex. Bus. & Com. Code §§ 143A.005 and 143A.006, federal law protects platforms from enforcement of H.B. 20's remedies for violation of Sections 2 and 7 of H.B. 20 and has the effect of specifically authorizing them to exercise editorial discretion over user content, and that platforms are therefore not subject to enforcement of Sections 2 and 7 of H.B. 20.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.  Declare that Section 2 of H.B. 20 is unlawful as applied to Plaintiffs' members;

B.  Declare that Section 7 of H.B. 20 is unlawful as applied to Plaintiffs' members;

C.  Declare that Section 7 of H.B. 20 is preempted by federal law;

D.  Declare that federal law protects Plaintiffs' members from enforcement of H.B. 20's remedies for violation of Sections 2 and 7 and specifically authorizes them to exercise editorial discretion over user content, and that Plaintiffs' members are therefore not subject to enforcement of Sections 2 and 7;

E.  Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce Sections 2 and 7 of H.B. 20 against Plaintiffs' members;

F.  Enter judgment in favor of Plaintiffs;

G.  Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

H.  Award Plaintiffs all other such relief as the Court deems proper and just.

Dated: September 22, 2021

Respectfully submitted.

*/s/ Scott A. Keller*

Steven P. Lehotsky\*
steve@lehotskykeller.com
Jonathan D. Urick\*
jon@lehotskykeller.com
Jeremy Evan Maltz (Texas Bar # 24102129)
jeremy@lehotskykeller.com
Gabriela Gonzalez-Araiza\*
gabriela@lehotskykeller.com
LEHOTSKY KELLER LLP
200 Massachusetts Avenue, NW
Washington, DC 20001

Scott A. Keller (Texas Bar # 24062822)
scott@lehotskykeller.com
Matthew H. Frederick (Texas Bar # 24040931)
matt@lehotskykeller.com
Todd Disher (Texas Bar # 24081854)
todd@lehotskykeller.com
LEHOTSKY KELLER LLP
919 Congress Ave.
Austin, TX 78701
T: (512) 693-8350
F: (833) 233-2202

\*Motion for admission *pro hac vice* forthcoming