# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, | ) ) ) | |
| and | ) ) | |
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, | ) ) ) | Civil Action No. 1:21-cv-00840-RP |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | |
| KEN PAXTON, in his official capacity as Attorney General of Texas | ) ) ) | |
| *Defendant*. | ) ) | |
| ———————————————————— | ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

    A.    Plaintiffs' members include "social media platforms" covered by H.B. 20 that exercise editorial discretion over their own websites and applications. ................. 2

    B.    H.B. 20 was enacted for the express purpose of stifling platforms' editorial discretion. ................................................................................................................ 6

ARGUMENT .................................................................................................................. 13

I.    H.B. 20 violates the First Amendment. ........................................................................ 14

    A.    The First Amendment guarantees privately owned Internet platforms the right to exercise editorial discretion over the content they display. .............................. 14

    B.    H.B. 20 violates the covered platforms' First Amendment rights. ...................... 18

        1.    H.B. 20 compels privately owned websites and applications to disseminate third-party content, denying them editorial discretion over their platforms. ................................................................................................. 18

        2.    H.B. 20's onerous disclosure and operational requirements further burden platforms' editorial discretion. ......................................................... 23

        3.    H.B. 20 discriminates based on content and speaker. .................................. 26

        4.    H.B. 20 is unconstitutionally vague. ............................................................ 28

    C.    H.B. 20 fails any level of heightened First Amendment scrutiny. ....................... 30

        1.    H.B. 20 serves no sufficient state interest. ................................................... 31

        2.    H.B. 20 is neither the least restrictive means nor narrowly tailored. ........... 34

II.    H.B. 20 is preempted by the Communications Decency Act, 47 U.S.C. § 230. .............. 37

III.    H.B. 20 violates the Commerce Clause. ...................................................................... 39

IV.    The remaining factors favor a preliminary injunction. .................................................. 43

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Human Services*,
No. 21A23, 2021 WL 3783142 (U.S. Aug. 26, 2021) ............................................................44

*Allen v. Sackrider*,
37 N.Y. 341 (1867) ...............................................................................................................32

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2016) .......................................................................................38, 39

*American Booksellers Found. v. Dean*,
342 F.3d 96 (2d Cir. 2003) ...................................................................................................41

*American Libraries Ass'n v. Pataki*,
969 F. Supp. 160 (S.D.N.Y. 1997) .......................................................................................41

*Americans for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) .........................................................................................30, 34, 36, 37

*Arizona Free Enter. Club v. Bennett*,
564 U.S. 721 (2011) ..............................................................................................................31

*Arkansas Educ. TV Comm'n v. Forbes*,
523 U.S. 666 (1998) ..............................................................................................................15

*Arkansas Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ..............................................................................................................27

*Bank of Orange v. Brown*,
1829 WL 2396 (N.Y. Sup. Ct. 1829) .....................................................................................32

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ..............................................................................................................14

*Ben Ezra, Weinstein, & Co. v. America Online Inc.*,
206 F.3d 980 (10th Cir. 2000) ...............................................................................................37

*Board of Airport Comm'rs v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) ..............................................................................................................36

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011) .........................................................................................................14, 35

*Buckley v. Valeo,*
    424 U.S. 1 (1976) (per curiam)................................................................29, 31

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
    520 U.S. 564 (1997)................................................................................43

*Citizens United v. FEC,*
    558 U.S. 310 (2010)................................................................................27

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ..............................................................37

*Daniels v. Alphabet,*
    2021 WL 1222166 (N.D. Cal. Mar. 31, 2021).......................................39

*Davison v. Facebook, Inc.,*
    370 F. Supp. 3d 621 (E.D. Va. 2019) ...................................................17

*Denbra IP Holdings, LLC v. Thornton,*
    2021 WL 674238 (E.D. Tex. Feb. 22, 2021) ........................................44

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC,*
    518 U.S. 727 (1996)...................................................................15, 18, 32

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ................................................................38

*Edenfield v. Fane,*
    507 U.S. 761 (1993)................................................................................34

*FCC v. Fox TV Stations, Inc.,*
    567 U.S. 239 (2012)................................................................................28

*FEC v. Wisconsin Right To Life, Inc.,*
    551 U.S. 449 (2007)................................................................................29

*Florida Businessmen, Etc. v. City of Hollywood,*
    648 F.2d 956 (5th Cir. 1981) ................................................................44

*Florida Star v. B.J.F.,*
    491 U.S. 524 (1989)................................................................................34

*Gisbourn v. Hurst,*
    I Salk. 249, 91 Eng. Rep. 220 (1710)...................................................32

*Gonzales v. Mathis Indep. Sch. Dist.,*
    978 F.3d 291 (5th Cir. 2020) ................................................................14

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ...............................................................38

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936)...............................................................................27

*Healy v. Beer Inst., Inc.*,
    491 U.S. 324 (1989).........................................................1, 40, 41, 42

*Herbert v. Lando*,
    441 U.S. 153 (1979).......................................................................23, 25

*Hias, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...............................................................37

*Horton v. City of Houston*,
    179 F.3d 188 (5th Cir. 1999) ...............................................................33

*Howard v. America Online, Inc.*,
    208 F.3d 741 (9th Cir. 2000) ...............................................................32

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995).................................................................. *passim*

*Isaac v. Twitter*,
    2021 WL 3860654 (S.D. Fla. Aug. 30, 2021).......................................17

*Janus v. AFSCME*,
    138 S. Ct. 2448 (2018)...........................................................................23

*Kansas v. Garcia*,
    140 S. Ct. 791 (2020).............................................................................37

*Kinderstart.com LLC v. Google, Inc.*,
    2006 WL 3246596 (N.D. Cal. July 13, 2006).......................................32

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) .............................................17, 38

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007)......................................................17

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019).....................................................................15, 22

*Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*,
    138 S. Ct. 1719 (2018)...........................................................................16

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974) ................................................................................. *passim*

*Millan v. Facebook, Inc.*,
    No. A161113, 2021 WL 1149937 (Cal. Ct. App. Mar. 25, 2021) ...........................................32

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983) ................................................................................26

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ................................................................................44

*National Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018) ............................................................................ *passim*

*NetChoice, LLC v. Moody*,
    2021 WL 2690876 (N.D. Fla. June 30, 2021) ................................................................ *passim*

*North Dakota v. Heydinger*,
    825 F.3d 912 (8th Cir. 2016) ......................................................................42

*Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of California*,
    475 U.S. 1 (1986) ................................................................................... *passim*

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ............................................................................30

*Publius v. Boyer-Vine*,
    237 F. Supp. 3d 997 (E.D. Cal. 2017) ................................................................17

*R.A.V. v. City of St. Paul, Minn.*,
    505 U.S. 377 (1992) ................................................................................27

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..............................................................................26, 28

*Reno v. ACLU*,
    521 U.S. 844 (1997) ................................................................................ *passim*

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988) ................................................................................24

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) (per curiam) ..................................................................43

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ..............................................................................21, 22

*Sam Francis Foundation v. Christies, Inc.*,
  784 F.3d 1320 (9th Cir. 2015) (en banc) ............................................42

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ............................................14, 23

*TelTech Sys., Inc. v. Barbour*,
  866 F. Supp. 2d 571 (S.D. Miss. 2011) ............................................42

*Texans for Free Enter. v. Texas Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) ............................................43, 45

*Time Warner Cable, Inc. v. Hudson*,
  667 F.3d 630 (5th Cir. 2012) ............................................27, 33

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ............................................27, 33, 34

*United States Telecom Association v. FCC*,
  855 F.3d 381 (D.C. Cir. 2017) ............................................18

*United States v. Playboy Entm't Grp., Inc.*,
  529 U.S. 803 (2000) ............................................24

*United States v. Salerno*,
  481 U.S. 739 (1987) ............................................37

*Voting for Am., Inc. v. Steen*,
  732 F.3d 382 (5th Cir. 2013) ............................................22

*Washington Post v. McManus*,
  944 F.3d 506 (4th Cir. 2019) ............................................23, 26

*Worldwide, LLC v. Google, Inc.*,
  2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ............................................17

*Zhang v. Baidu.com, Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ............................................17

**Statutes and Rules**

47 U.S.C. § 230 ............................................1, 37, 38, 39

Fed. R. Civ. P. 65 ............................................2

Tex. Bus. & Com. Code § 120.001 ............................................2, 8, 29

Tex. Bus. & Com. Code § 120.002 ............................................2, 8

Tex. Bus. & Com. Code § 120.051 ................................................................ *passim*

Tex. Bus. & Com. Code § 120.052 ................................................................ 11, 24

Tex. Bus. & Com. Code § 120.053 ................................................................ 11, 12, 24

Tex. Bus. & Com. Code § 120.101 ................................................................ 12, 24

Tex. Bus. & Com. Code § 120.102 ................................................................ 12

Tex. Bus. & Com. Code § 120.103 ................................................................ 12, 13

Tex. Bus. & Com. Code § 120.104 ................................................................ 12, 13

Tex. Bus. & Com. Code § 120.151 ................................................................ 13

Tex. Civ. Prac. & Rem. Code § 143A.001 ..................................................... *passim*

Tex. Civ. Prac. & Rem. Code § 143A.002 ..................................................... *passim*

Tex. Civ. Prac. & Rem. Code § 143A.003 ..................................................... 2, 10, 41

Tex. Civ. Prac. & Rem. Code § 143A.006 ..................................................... 9, 10, 26, 36

Tex. Civ. Prac. & Rem. Code § 143A.007 ..................................................... 9, 10

Tex. Civ. Prac. & Rem. Code § 143A.008 ..................................................... 10, 30

Tex. Occ. Code § 1101.752 ............................................................................ 30

**Legislative Materials**

House Bill 20 ................................................................................................... 8, 10, 32

Tex. H.R. Journal (87th Leg., 2d Spec. Sess.) (2021) .................................. 19, 36

**Other Authorities**

Greg Abbott (@GregAbbott_TX),
    Twitter (Mar. 5, 2021, 9:35 PM) ................................................................ 6

Office of the Governor Greg Abbott (@TexasGovernor),
    Facebook, WATCH: Signing House Bill 20 into Law—Relating to censorship
    on social media platforms (Sept. 9, 2021) ................................................ 7

Office of the Texas Governor | Greg Abbott,
    Governor Abbott Signs Law Protecting Texans From Wrongful Social Media
    Censorship (Sept. 9, 2021) ......................................................................... 7

Proclamation by the Governor of the State of Texas (Aug. 5, 2021) .............................................7

Senator Bryan Hughes (@SenBryanHughes),
    Twitter (July 14, 2021, 3:35 PM)...........................................................................................6

Senator Bryan Hughes (@SenBryanHughes),
    Twitter (Mar. 5, 2021, 11:48 PM)..........................................................................................6

Senator Bryan Hughes (@SenBryanHughes),
    Twitter (Aug. 9, 2021, 5:34 PM) ...........................................................................................7

Shawn Mulcahy, *Texas Senate approves bill to stop social media companies from
    banning Texans for political views*, Texas Tribune (updated Apr. 1, 2021) ..........................34

Texas Attorney General, Site Policies (last visited Sept. 30, 2021) .............................................39

## INTRODUCTION

Under the First Amendment, no government may compel a privately owned website or application to disseminate speech and interfere with its editorial discretion over its own platform. *E.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 581 (1995); *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of California*, 475 U.S. 1, 12 (1986) (plurality op.) ("*PG&E*"); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Likewise, under the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), no state government may impose liability on privately owned websites or applications for moderating content on their platforms. And under the Commerce Clause, no state government may extraterritorially regulate Internet communications. *E.g.*, *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989).

Yet Texas House Bill 20 ("H.B. 20") does all three. H.B. 20 prohibits "censorship" based on "viewpoint"—and since almost all expression online has a viewpoint, H.B. 20 would sweepingly ban covered online platforms from moderating user-provided content. Thus, it would compel those platforms to disseminate anything and everything with a "viewpoint," including pro-Nazi speech, medical misinformation, terrorist propaganda, and foreign government disinformation. It exposes those platforms to the exact liability that Congress protected against in enacting Section 230. And it both regulates how the targeted websites disseminate speech to and from users around the globe—regardless of their connection to Texas—and specifically *requires* the websites to continue doing business in Texas.

The Northern District of Florida recently enjoined a similar Florida law based upon these First Amendment and Section 230 violations. *NetChoice, LLC v. Moody*, 2021 WL 2690876, *12 (N.D. Fla. June 30, 2021), *appeal pending*, 11th Cir. No. 21-12355. The court found that the Florida law would have made the covered platforms "unacceptable—and indeed useless—to most users." *Id.* at *7. H.B. 20 is even broader than the Florida law, applying to all speech and viewpoints

on platforms, globally. For these reasons, Plaintiffs respectfully request that the Court preliminar-

ily enjoin the Texas Attorney General from enforcing this unconstitutional and preempted law

against Plaintiffs' members before it takes effect on December 2, 2021. *See* Fed. R. Civ. P. 65.

## BACKGROUND

### A.    Plaintiffs' members include "social media platforms" covered by H.B. 20 that exercise editorial discretion over their own websites and applications.

H.B. 20 covers "social media platforms"—which H.B. 20 defines as any "Internet website

or application" that (1) "functionally has more than 50 million active users in the United States in

a calendar month"; is (2) "open to the public"; (3) "allows a user to create an account"; and (4) "en-

ables users to communicate with other users for the primary purpose of posting information, com-

ments, messages, or images." Tex. Bus. & Com. Code §§ 120.001(1), .002(b); Tex. Civ. Prac. &

Rem. Code § 143A.003(c).[1] H.B. 20 thus covers websites and applications operated by Plaintiffs'

trade-association members—including Facebook, Instagram, Pinterest, TikTok, Twitter, Vimeo,

WhatsApp, and YouTube. *See* Ex. A ¶¶ 5-6 (Decl. of CCIA); Ex. B ¶¶ 4-5 (Decl. of NetChoice,

LLC).

To operate their services, Plaintiffs' members exercise editorial discretion over the presen-

tation of content on their platforms. Ex. A ¶¶ 9-21; Ex. B. ¶ 11; Ex. C ¶¶ 5-17 (Decl. of YouTube);

Ex. D ¶¶ 5, 8, 10, 17-23 (Decl. of Facebook). The platforms' content-moderation policies and

enforcement efforts embody the types of communities and social discourse they want to foster,

maintain, and provide. Ex. A ¶¶ 19, 22-27; Ex. C ¶ 7; Ex. D. ¶ 8. In other words, the platforms'

content moderation "is an important way that online services express themselves and effectuate

---

[1] "Users" includes any "person who posts, uploads, transmits, shares, or otherwise pub-
lishes or receives content through a social media platform" and "a person who has a social media
platform account that the social media platform has disabled or locked." Tex. Bus. & Com. Code
§ 120.001(2).

their community standards." Ex. A ¶ 19. These content-moderation and trust-and-safety efforts are necessary to ensure that the platforms are hospitable forums for their users. *E.g.*, Ex. B ¶¶ 8, 14; Ex. C ¶ 9; Ex. D ¶ 8; Ex. E ¶ 5 (Decl. of LGBT Technology Institute).

Each covered platform provides its users a distinctive experience—according to its own policies formalized in terms of service and community standards. And each has expended vast time, resources, and human effort to develop and enforce these policies for moderating and disseminating staggering amounts of content submitted by billions of users. Ex. A ¶ 13; Ex. C ¶ 57; Ex. D ¶¶ 4, 8. This user-submitted expression is displayed on each platform's distinctive user interface next to its branding, and sometimes next to the platform's own direct expression.

Platforms use a combination of content-moderation tools to determine whether and how user content is displayed on their platforms. These tools reflect a range of editorial judgements, from what kind of content the platforms permit (or forbid) to how that content is disseminated to individual users. The platforms apply their terms and policies using both human and algorithmic processes, reflecting the platforms' judgments about which speech to display. Ex. A ¶ 14; Ex. C ¶¶ 5-8, 27, 40-45; Ex. D ¶¶ 10, 14. Algorithmic processes simply allow the platforms to apply their judgments on a vast scale to billions of pieces of user-submitted expression. Ex. A ¶¶ 9, 31-32; Ex. C ¶¶ 24-27; Ex. D ¶ 14.

Applying their policies, Plaintiffs' members seek to ensure that disseminated user-submitted content adheres to their platforms' terms and guidelines. Ex. A ¶ 13; Ex. C ¶¶ 6-7, 12-13, 20-23; Ex. D ¶¶ 11, 13-14. In some cases, platforms may also bar particular *users* for failing to comply with their policies. Ex. C ¶ 13; *accord NetChoice*, 2021 WL 2690876, at *2. Just as other Internet forums dedicated to specific communities establish and enforce the standards for discourse, the covered platforms here also have their own distinctive policies concerning what expression they

want, and do not want, to disseminate. Enforcing those policies is critical to the experience that the platforms provide their users. *E.g.*, Ex. C ¶¶ 5-8; Ex. D ¶¶ 8-10. The platforms have always enforced such policies, which have evolved over time to reflect the platforms' evolving judgments regarding new threats to the safety of the platforms and their users. Ex. C ¶¶ 21-23; Ex. D ¶ 11.

Covered platforms (like other websites and applications) therefore routinely refuse to disseminate spam, criminal speech, pornography, hate speech, disinformation, and other content that these platforms deem objectionable. Ex. A ¶¶ 11, 20; Ex. B ¶ 15; Ex. C ¶ 18; Ex. D ¶¶ 14-16; Ex. F (Decl. of Stop Child Predators) ¶¶ 5-9 (outlining how platforms work to identify and remove Child Sexual Abuse Material ("CSAM")); Ex. G ¶¶ 4-6 (Decl. of Technology Network). Without such actions, users would be flooded with abusive and objectionable material, which would drown out the unobjectionable content and make the platforms inhospitable to and unsafe for their users. Ex. A ¶ 12; Ex. B ¶ 14; Ex. D ¶ 4; Ex. E ¶¶ 6-12 (harmful effects on the LGBTQ community); Ex. F ¶¶ 8-16 (harmful effects on efforts to curtail CSAM); *see NetChoice*, 2021 WL 2690876, at *7 ("In the absence [of] curation, a social-media site would soon become unacceptable—and indeed useless—to most users."). For instance, during 6 months in 2018 alone, Facebook, Google, and Twitter took action on over 5 billion accounts or user submissions—including 3 billion cases of spam, 57 million cases of pornography, 17 million cases of content regarding child safety, and 12 million cases of extremism, hate speech, and terrorist speech. Ex. B ¶ 15. Within these categories of objectionable speech, the platforms must exercise judgment about what constitutes "hate speech," for instance. Ex. A ¶¶ 23, 25; Ex. C ¶ 35; Ex. D ¶ 13; Ex. E ¶¶ 8-10. And beyond these categories, platforms must make similar evaluations about what other kinds of content to exclude (such as medical misinformation) and how to define that content. Ex. C ¶¶ 28-30; Ex. D ¶¶ 10, 16.

Platforms also prioritize, arrange, recommend, and otherwise make content accessible in

ways that accord with the platforms' design. Ex. B ¶ 11; Ex. D ¶¶ 4-5.[2] Generally, the platforms provide their users with unique products, compiling user-submitted content curated according to the platforms' judgments about what content the user would like to see and how that user would like the content displayed. Ex. C ¶¶ 16-17; Ex. D ¶¶ 4-5. In other words, platforms often "mak[e] more readily available to a user content the provider believes the user will most wish to see." *NetChoice*, 2021 WL 2690876, at \*3. This necessarily means that other content will be less readily available. In addition to reflecting the platforms' respective policies, these functions are necessary for the platforms to operate. Without content curation, there would be no effective way to deliver the content that users want. *E.g.*, Ex. A ¶ 47; Ex. D ¶ 4.

Platforms also engage in their own affirmative speech. Ex. A ¶ 17; Ex. C ¶ 9; Ex. D ¶¶ 13, 27. They append warning labels, disclaimers, links to related sources, and other kinds of commentary to user-submitted expression that the platforms believe are necessary based on their judgments. *Id.*; Ex. C ¶ 16. For example, platforms may warn their users that certain images may be upsetting or graphic. Ex. A ¶ 17.a. Or platforms may warn their users that certain information has not been verified by official sources or may contain misinformation. *Id.* ¶ 17.c; Ex. C ¶ 16; Ex. D ¶ 17. Beyond the expression inherent in the speech itself, the decision of whether, when, and how to engage in such speech reflects those platforms' terms and community standards.

Finally, the platforms also provide different experiences to different audiences. For instance, the platforms may restrict certain content to people of certain ages, reflecting the platforms' judgments that different products are appropriate for users of different ages. Ex. A ¶ 15; Ex. C ¶¶ 40, 53-54. And the platforms provide tools so users can further curate their own experiences (for example, seeing more content about sports or from family members). Ex. A ¶ 16; Ex. D ¶ 18.

---

[2] Even the choice to present content chronologically is an editorial choice.

These tools often require the platform to categorize certain kinds of user-submitted content. *E.g.*, Ex. A ¶¶ 15-16.

Without these policies, the platforms would offer a very different—and, to most users, a vastly inferior—set of experiences. The platforms would be full of hate speech and misinformation (not to mention spam, pornography, and the like), which would be presented no differently than other unobjectionable speech (assuming that unobjectionable speech would not be entirely drowned out by the objectionable speech). Users would not have the benefit of the platforms' judgments (sometimes relying on independent fact checkers) that certain content may be false or misleading, or that certain content might be graphic or otherwise upsetting.

### B. H.B. 20 was enacted for the express purpose of stifling platforms' editorial discretion.

H.B. 20 was enacted to address covered platforms' purported political bias in how they foster, maintain, and provide their respective communities on their platforms for their users. On March 4, 2021, during the Texas Legislature's regular biennial session, State Senator Bryan Hughes and Governor Greg Abbott introduced a precursor bill to H.B. 20, announcing on Twitter that this bill would "allow Texans to participate on the virtual public square free from Silicon Valley censorship." Senator Bryan Hughes (@SenBryanHughes), Twitter (Mar. 5, 2021, 11:48 PM), https://bit.ly/3zb2eSK. The next day, Governor Abbott supported this bill on Twitter by tweeting "Silencing conservative views is un-American, it's un-Texan and it's about to be illegal in Texas." Greg Abbott (@GregAbbott_TX), Twitter (Mar. 5, 2021, 9:35 PM), https://bit.ly/3mndV5e. After the Senate passed its bill during the first special session, Senator Hughes tweeted, "A handful of West Coast elites cannot be allowed to control our right to free speech." Senator Bryan Hughes (@SenBryanHughes), Twitter (July 14, 2021, 3:35 PM),

https://bit.ly/2VKMyXp. The Legislature failed to pass this or similar bills during the regular session and the first special legislative session.

On August 5, 2021, the Governor called a second special legislative session, directing the Legislature to "consider and act upon . . . [l]egislation safeguarding the freedom of speech by protecting social-media and email users from being censored based on the user's expressed viewpoints, including by providing a legal remedy for those wrongfully excluded from a platform." Proclamation by the Governor of the State of Texas (Aug. 5, 2021), https://bit.ly/37uTuuw. Senator Hughes again introduced his version of the bill ("Senate Bill 5") and announced the bill on Twitter: "Texans must be able to speak without being censored by West Coast oligarchs. I filed #SB5 to give Texans a path to hold Big Tech accountable and get their voice back online." Senator Bryan Hughes (@SenBryanHughes), Twitter (Aug. 9, 2021, 5:34 PM), https://bit.ly/3lQTpJY. Representative Cain introduced the substantially similar House Bill 20, which the House passed after declining to adopt amendments that would alleviate some of the burdens imposed by the Bill. The Senate then passed House Bill 20 after amending the Bill's definition of "censor" to match Senator Hughes' original bill text.

After signing House Bill 20 into law on September 9, 2021, Governor Abbott stated, "[T]here is a dangerous movement by social media companies to silence conservative viewpoints and ideas. That is wrong, and we will not allow it in Texas." Office of the Texas Governor | Greg Abbott, Governor Abbott Signs Law Protecting Texans From Wrongful Social Media Censorship (Sept. 9, 2021), https://bit.ly/38ZEkxQ. During the signing ceremony, Governor Abbott said, "It is now law that conservative viewpoints in Texas cannot be banned on social media." Office of the Governor Greg Abbott (@TexasGovernor), Facebook, WATCH: Signing House Bill 20 into Law—Relating to censorship on social media platforms (Sept. 9, 2021), https://bit.ly/3z0Ysub.

H.B. 20 is set to take effect "the 91st day after the last day of the legislative session"—that is, December 2, 2021. H.B. 20 § 10.

Just like Florida's similar unconstitutional law, H.B. 20 "imposes sweeping requirements on some but not all social-media providers." *NetChoice*, 2021 WL 2690876, at *1. By targeting platforms with at least 50 million monthly active U.S. users, the Bill singles out a minority of the Internet's most-used websites and applications for disfavored treatment. *See* Tex. Bus. & Com. Code §§ 120.001(1), .002(b); Tex. Civ. Prac. & Rem. Code § 143A.001(4). H.B. 20's definition of "social media platform" covers not just Facebook and YouTube, but other "West Coast," "Silicon Valley" sites like Reddit and Pinterest. *See* Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4). Yet the definition excludes all sorts of smaller social media platforms—like Parler, Gettr, Gab, and Rumble, which purport to appeal to more conservative users. Even so, all these noncovered platforms moderate the content they display in some form. Ex. A ¶ 12 n.26.

H.B. 20 also expressly excludes certain favored businesses: (1) Internet service providers; (2) electronic mail providers; and (3) websites or applications that "consist[] primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider" where user chats and comments are "incidental to" the content posted by the website or application. Tex. Bus. & Com. Code § 120.001(1)(A)-(C).

Section 7 of H.B. 20 directly restricts covered platforms' editorial discretion over *all expression* on their respective platforms—not just expression submitted by Texas users in Texas. By prohibiting covered platforms from moderating content based on "viewpoint" (which is not defined) in "expression," H.B. 20 interferes with the platforms' messages about the communities that

they hope to foster, maintain, and provide. Specifically, covered platforms:

> may not censor [*i.e.*, "block, ban, remove, deplatform, demonetize, de-boost, re-strict, deny equal access or visibility to, or otherwise discriminate against expres-sion"] a user, a user's expression, or a user's ability to receive the expression of another person based on: (1) the viewpoint of the user or another person; [or] (2) the viewpoint represented in the user's expression or another person's expression[.]

Tex. Civ. Prac. & Rem. Code §§ 143A.001(1); .002. These prohibitions purportedly do not apply if the platform "is specifically authorized to censor by federal law"—but H.B. 20 makes no mention of what this provision covers, and H.B. 20 does not define "specifically authorized." *Id.* § 143A.006(a)(1). H.B. 20 also does not define vague terms such as "de-boost" and "deny equal access or visibility."

After establishing this broad prohibition, H.B. 20 then carves out content-based exceptions that allow platforms to engage in a limited amount of "viewpoint" discrimination that H.B. 20 favors. *First*, covered platforms may moderate content that "is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment." *Id.* § 143A.006(a)(2). *Second*, covered platforms also may moderate content that "directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge." *Id.* § 143A.006(a)(3).

Whenever a user believes a platform has improperly "censored" content based on "viewpoint," the platform may be held civilly liable, required to disseminate such content, and made responsible for the user's attorney's fees. *Id.* § 143A.007(b)(1). Additionally, H.B. 20 grants courts the authority to pursue "all lawful measures to secure immediate compliance with the order, including *daily penalties* sufficient to secure immediate compliance" with any court order. *Id.*

§ 143A.007(c) (emphasis added). Furthermore, H.B. 20 grants the Texas Attorney General authority to bring a civil action for injunctive relief for any violation and any "potential violation," along with fee-shifting and compensation for the Attorney General's "reasonable investigative costs." *Id.* § 143A.008(b). This anti-editorial-discretion provision "applies only to a cause of action that accrues on or after the effective date of this Act." H.B. 20 § 9.[3]

H.B. 20's prohibition on editorial judgment contains three more extraordinary provisions. *First*, because H.B. 20 covers both contributing *and viewing* content, H.B. 20 attempts to regulate all content on covered platforms—regardless of where in the world and by whom such content is posted. Tex. Civ. Prac. & Rem. Code § 143A.002(a) (covering a "user's ability to receive the expression"). *Second*, a platform cannot seek to avoid these requirements by limiting its interaction with users in the state. *Id.* § 143A.002(a)(3) (preventing "censorship" based on "a user's geographic location in this state or any part of this state"). In other words, H.B. 20 *requires* covered platforms to do business in the state—and according to the state's terms. *Third*, H.B. 20 does not allow users to waive H.B. 20's "protections" if those users prefer a moderated and curated experience. *Id.* § 143A.003. Such waivers are "void as unlawful and against public policy." *Id.*

Finally, the Bill provides that a covered social media platform may "authoriz[e]" or "facilitat[e] a user's ability to censor specific expression on the user's platform or page at the request of that user." *Id.* § 143A.006(b). It is not clear how far this provision extends. For instance, if a user wants to block hate speech that H.B. 20 otherwise compels platforms to disseminate as a protected "viewpoint," H.B. 20 is not clear whether the covered social media platform may label certain posts as hate speech to "facilitate[e]" its users' desires to avoid hate speech.

---

[3] It is not clear whether this provision allows people who "ha[ve] a social media platform account that the social media platform has disabled or locked" before the effective date to sue to reinstate their account. Tex. Civ. Prac. & Rem. Code § 143A.001(6).

Even beyond H.B. 20's outright prohibition on editorial functions in Section 7, Section 2 of H.B. 20 also imposes a slew of onerous disclosure and operational requirements burdening the platforms' *enforcement* of its policies. These reporting and operational requirements will require substantial investment. And even where the requirements are not onerous, they are vague—inviting arbitrary and discriminatory enforcement from the Texas Attorney General.

*First*, a covered platform must provide "public disclosures" about how the platform operates in a manner "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform." Tex. Bus. & Com. Code § 120.051(b). H.B. 20 does not provide an exhaustive list of disclosures that covered platforms must make, ostensibly permitting lawsuits when platforms fail to disclose un-specified information. Instead, H.B. 20 identifies a non-exhaustive list of information: Among other information, each platform must disclose how it "(1) curates and targets content to users; (2) places and promotes content, services, and products, including its own content, services, and products; (3) moderates content; [and] (4) uses search, ranking, or other algorithms or procedures that determine results on the platform[.]" *Id.* § 120.051(a)(1)-(4). Even within these identified categories, H.B. 20 does not explain, for instance, how a platform could satisfy explaining how it "moderates content."

*Second*, a covered platform must "publish an acceptable use policy"—that explains what content the platform will allow, how the platform will ensure compliance with the policy, and how users can inform the platform about noncompliant content. *Id.* § 120.052. H.B. 20 does not explain what will make such policies sufficient to "reasonably inform" or "explain" to their users the required disclosures.

*Third*, a covered platform must publish a "biannual transparency report" that requires information about the platform's enforcement of their policies. *Id.* § 120.053(a). Specifically, the

11

covered platforms must explain in painstaking detail:

- "the total number of instances in which the social media platform was alerted to illegal content, illegal activity, or potentially policy-violating content" and by what means (*i.e.*, by users, employees, or automated processes);
- how often the platform "took action" with regard to such content including "content removal," "content demonetization," "content deprioritization," "the addition of an assessment to content," "account suspension," "account removal," and "any other action" that accords with the acceptable use policy, "categorized by" "the rule violated" and "the source for the alert";[4]
- "the country of the user who provided the content for each instance described" above;
- "the number of coordinated campaigns" (an undefined and unexplained term);
- "the number of instances in which a user appealed the decision to remove the user's potentially policy-violating content";
- "the percentage of appeals . . . that resulted in the restoration of content";
- "a description of each tool, practice, action, or technique used in enforcing the acceptable use policy."

*Id.* § 120.053(a)(1)-(7), (b). These reporting requirements apply to potentially billions of pieces of expressive content submitted to covered platforms.

 *Fourth*, covered platforms must provide for a comprehensive "complaint system to enable a user to submit a complaint in good faith and track the status of the complaint"—regarding either a report of violative content or "a decision made by the social media platform to remove content posted by the user." *Id.* § 120.101. For reports of illegal content, the covered platform must "make a good faith effort to evaluate the legality of the content or activity within 48 hours of receiving the notice," excluding weekends. *Id.* § 120.102. Because of the incredible volume of content submitted to the covered platforms, this complaint system could flood covered platforms with requests to which the platforms must respond within a very short period of time. The complaint process does not account for the possibility that platforms will be deluged by complaints made in bad faith.

---

[4] Specifically, H.B. 20 identifies governments, users, "internal automated detection tool[s]," "coordination with other social media platforms," and "persons employed by or contracting with the platform" as potential sources. Tex. Bus. & Com. Code § 120.053(b)(2).

*Fifth*, covered platforms must offer a notice and appeal system for any content that platforms decide to remove (assuming H.B. 20 allows the platform to remove the content notwithstanding its outright prohibition on doing so). Subject to limited exceptions, every time a covered platform "removes" content, it must give the user (1) a notice of the removal; (2) an opportunity to appeal; and (3) a written explanation of the decision on appeal, including an explanation for any reversal. *Id.* § 120.103. H.B. 20's mandated appeal process allows a user-initiated appeal—in which the platform must "review the [removed] content," "determine whether the content adheres to the platform's acceptable use policy," and "take appropriate steps" (including providing any notice described above) within 14 days (excluding weekends). *Id.* § 120.104. This process subjects the covered platforms to an onerous requirement to respond to appeals of exercises of the platforms' everyday judgments.

The Texas Attorney General has authority to enforce these disclosure and operational requirements, and may collect attorney's fees and "reasonable investigative costs" if successful in obtaining injunctive relief. *Id.* § 120.151. The Attorney General thus has substantial discretion to sue covered platforms for purported violations. The Attorney General may sue on the purported basis that a covered platform did not provide certain unenumerated information in its required disclosures, rendering the platform's public disclosure "[in]sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform." *Id.* § 120.051(b). Similarly, the Attorney General ostensibly has authority to sue a covered platform because he believes the platform has miscategorized data in its biannual transparency report.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction blocking the Texas Attorney General's enforcement of H.B. 20 because they meet the preliminary-injunction standard: "(1) a substantial

13

likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Gonzales v. Mathis Indep. Sch. Dist.*, 978 F.3d 291, 294 (5th Cir. 2020) (quotation marks and citation omitted).

## I.   H.B. 20 violates the First Amendment.

H.B. 20 violates the First Amendment rights of Plaintiffs' members for multiple reasons. H.B. 20 compels privately owned platforms to disseminate third-party content and interferes with their editorial discretion over their platforms. It discriminates based on content and speaker. And it is unconstitutionally vague. H.B. 20 is unconstitutional no matter which level of heightened scrutiny applies. *NetChoice*, 2021 WL 2690876, at *11.

### A.   The First Amendment guarantees privately owned Internet platforms the right to exercise editorial discretion over the content they display.

The Supreme Court recognized a generation ago that "the content on the Internet is as diverse as human thought," and there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (internal citation omitted). The "dissemination of information" through an Internet website or application, no less than through other media, is "speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792 n.1 (2011) ("distributing" speech is protected); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("if the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category") (citation, alteration, and quotation marks omitted). In fact, the Internet has provided virtually limitless new opportunities "for individuals to publish their views . . . than existed before" the Internet. *NetChoice*, 2021 WL 2690876, at *7. That is precisely why "the Internet can hardly be considered a 'scarce' expressive commodity. It provides

relatively unlimited, low-cost capacity for communication of all kinds." *Reno*, 521 U.S at 870.

Privately owned Internet platforms have a First Amendment right to moderate user-submitted content disseminated on their platforms. *E.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019) (recognizing "private entities' rights to exercise editorial control over speech and speakers on their properties or platforms"); *Hurley*, 515 U.S. at 581; *PG&E*, 475 U.S. at 12 (plurality op.); *Tornillo*, 418 U.S. at 258. As addressed above, Plaintiffs' members are not mere passive conduits that simply transmit expression of their users. Rather, they provide unique experiences on their respective platforms that are realized through their terms of service and their content-moderation policies. That "editorial function itself is an aspect of 'speech'" protected by the First Amendment. *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 737-38 (1996) (plurality op.). Furthermore, the Constitution protects not only the editorial process but also the dissemination and "presentation of an edited compilation of speech generated by other persons." *Hurley*, 515 U.S. at 570 (citation omitted); *see also Arkansas Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) (when a party "exercises editorial discretion in the selection and presentation" of content, "it engages in speech activity" protected by the First Amendment).

In *Tornillo*, the Supreme Court confirmed that the First Amendment protects the editorial discretion of private entities disseminating speech, including the fundamental "choice of material" disseminated. 418 U.S. at 258. The state law in *Tornillo* required newspapers to publish political candidates' responses to criticism. *Id.* at 250, 258. The Court invalidated this law because "the choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—*whether fair or unfair*—constitute the exercise of editorial control and judgment" protected by First Amendment. *Id.* at 258 (emphasis added). The mandatory "right of reply" was constitutionally indistinguishable from a

law "forbidding [a newspaper] to publish specified matter." *Id.* at 256. At bottom, the law at issue in *Tornillo* violated "the First Amendment because of its intrusion into the function of editors." *Id.* at 258.

Similarly, in *Hurley*, the Supreme Court held that the government may not use equal-access laws to "alter the expressive content" of private parties' platforms. 515 U.S. at 572; *id.* at 573 (no law may "ha[ve] the effect of declaring the sponsors' speech itself to be the public accommodation" subject to government restriction). Specifically, the Court held that the government could not compel a privately operated parade—over which the organizers decided which floats to include— to include a float featuring a message with which the parade operators disagreed. *Id.* at 572-73. The Court reiterated "that a speaker has the autonomy to choose the content of his own message." *Id.* at 573. "Indeed this general rule"—shared "by business corporations generally and by ordinary people engaged in unsophisticated expression"—"that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Id.*

Even if the platforms may not always present a singular "particularized message" to their users, the First Amendment does not privilege singular expression over compilations of diverse expression. *Hurley*, 515 U.S. at 569, *quoted in*, *e.g.*, *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n*, 138 S. Ct. 1719, 1741-42 (2018) (Thomas, J., concurring). Likewise, Plaintiffs' members retain their First Amendment rights over their platforms even if they do not adopt user-submitted content as their own or agree with every user post on their sites: "[A] private speaker does not forfeit constitutional protection simply by combining multifarious voices" even if it is "rather lenient in admitting participants." *Hurley*, 515 U.S. at 569. "Nor, under [the Supreme Court's] precedent, does First Amendment protection require a speaker to generate, as an original matter, each

item featured in the communication." *Id.* at 570.

The Northern District of Florida thus recently recognized that laws that interfere with plat-forms' editorial discretion violate their First Amendment rights, as have other courts. *E.g.*, *NetChoice*, 2021 WL 2690876, at *9; *Isaac v. Twitter*, 2021 WL 3860654, at *7 (S.D. Fla. Aug. 30, 2021) (Twitter has "First Amendment right to decide what to publish and what not to publish on its platform") (citation omitted); *Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 629 (E.D. Va. 2019) ("Facebook has, as a private entity, the right to regulate the content of its platforms as it sees fit."), *aff'd*, 774 F. App'x 162 (4th Cir. 2019); *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("Google's [editorial decisions] are the same as decisions by a newspaper editor[.] . . . The First Amendment protects these decisions, whether they are fair or unfair, or motivated by profit or altruism."); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (Facebook has "First Amendment right to decide what to publish and what not to publish on its platform"); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 437, 440 (S.D.N.Y. 2014) ("Government may not interfere with the editorial judgments of private speakers on issues of public concern"; "'[t]here can be no disagreement' that [a search engine] is 'engage[d] in and transmit[s] speech"; the search engine "'exercise[s] editorial discretion' over its search re-sults") (citations omitted; alterations in original); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007) (Google has First Amendment right not to publish unwanted ads); *see also Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1008 (E.D. Cal. 2017) ("Hoskins has a First Amend-ment right to distribute and facilitate protected speech on [his] site.").[5]

---

[5] In fact, H.B. 20 itself recognizes that a covered social media platform engages in editorial discretion in how it "(1) curates and targets content to users; (2) places and promotes content, services, and products, including its own content, services, and products; (3) moderates content; [and] (4) uses search, ranking, or other algorithms or procedures that determine results on the platform[.]" Tex. Bus. & Com. Code § 120.051(a)(1)-(4) (listing topics for disclosure).

The Constitution accordingly protects covered Internet platforms from having to dissemi-
nate third-party content they do not wish to distribute. "For corporations as for individuals, the
choice to speak includes within it the choice of what not to say," so "compelling a private corpo-
ration to provide a forum for views other than its own may infringe the corporation's freedom of
speech." *PG&E*, 475 U.S. at 9, 16 (plurality op.); *see Tornillo*, 418 U.S. at 256 ("[A]ny such com-
pulsion to publish that which 'reason tells them should not be published' is unconstitutional.").
Simply put, just as the government may not tell a newspaper, parade, or bookstore what speech it
must disseminate, it also "may not . . . tell Twitter or YouTube what videos to post; or tell Face-
book or Google what content to favor." *United States Telecom Association v. FCC*, 855 F.3d 381,
392 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc); *see also Den-
ver*, 518 U.S. at 816 (Thomas, J., concurring in judgment in part and dissenting in part) (govern-
ment cannot "force the editor of a collection of essays to print other essays on the same subject").

**B.      H.B. 20 violates the covered platforms' First Amendment rights.**

**1.      H.B. 20 compels privately owned websites and applications to dissemi-
nate third-party content, denying them editorial discretion over their
platforms.**

Like Florida's similar law, the "legislation compels providers to host speech that violates
their standards—speech they otherwise would not host—and forbids providers from speaking as
they otherwise would." *NetChoice*, 2021 WL 2690876, at \*1. Covered platforms "use editorial
judgment in making [ ] decisions" about which content to remove that violates their policies and
how to disseminate content to their users—"much as more traditional media providers use editorial
judgment when choosing what to put in or leave out of a publication or broadcast." *Id.* at \*7. The
exercise of editorial discretion over the dissemination of content is inherently expressive. Dissem-
inating speech sends the message that it is "worthy of presentation." *Hurley*, 515 U.S. at 575. A
decision to remove certain content, permanently remove a particular user's access to their account,

18

or prioritize certain content over other content thus conveys a message about the type of community a platform wants to foster.

H.B. 20 prohibits Plaintiffs' members from moderating content based on user "viewpoint" (undefined), banning virtually all forms of the platforms' moderation efforts. Tex. Civ. Prac. & Rem. Code §§ 143A.001(1); .002. If H.B. 20 takes effect, it will therefore require covered platforms to disseminate, for example, pro-Nazi expression, terrorist propaganda, and foreign-government disinformation. In fact, legislators rejected amendments allowing platforms to exclude vaccine misinformation, terrorist content, and Holocaust denial. Tex. H.R. Journal (87th Leg., 2d Spec. Sess.) at 229-31 (2021), https://bit.ly/2Y2YGEp. The covered platforms have policies against all kinds of content that express some kind of "viewpoint." By requiring platforms to apply, or decline to apply, their standards in ways they would not otherwise apply them, H.B. 20 requires platforms to "alter the expressive content of their" message. *Hurley*, 515 U.S. at 572-73.

H.B. 20 also constrains how Plaintiffs' members disseminate content according to the platforms' policies. For instance, H.B. 20's prohibition on actions that "de-boost" and "deny equal access or visibility to or otherwise discriminate against expression"—to the extent that these prohibitions can even be understood—impede covered platforms' ability to place "post[s] in the proper feeds." *NetChoice*, 2021 WL 2690876, at *3; Ex. C ¶¶ 46-48. It is hard to imagine a post that does not express some "viewpoint." The platform must determine how and where users see those different viewpoints, and some posts will necessarily have places of prominence—even if just at the top of the website. *Id.*

H.B. 20's prohibition on "censorship" thus completely alters the covered online platforms' products. *Hurley*, 515 U.S. at 572-73. Not only are covered platforms required to disseminate content they find objectionable, but they are also required to disseminate that objectionable content

19

no differently than other, non-objectionable content on their websites and applications. H.B. 20 therefore puts the covered platforms to an unconstitutional choice: (1) disseminate content that is contrary to the platforms' community standards, thereby altering the very nature of the expressive communities they seek to foster; or (2) remove broad categories of unobjectionable content (on entire topics, for example) to avoid improperly discriminating based on "viewpoint"—an outcome that would "burn[] the house to roast a pig." *NetChoice*, 2021 WL 2690876, at *11 (citing *Reno*, 521 U.S. at 882). In either case, H.B. 20 imposes a "far greater burden on the platforms' own speech than" the Supreme Court has ever recognized as permissible. *Id.* at *9; *id.* ("[T]he statutes compel the platforms to change their own speech in other respects, including, for example, by dictating how the platforms may arrange speech on their sites."). The First Amendment prohibits the government from forcing these platforms to disseminate this content. *E.g.*, *Hurley*, 515 U.S. at 572-73.

That is especially true here where content on covered platforms is attributed to, or associated with, the platforms. Current and prospective platform users, business partners, advertisers, and the public at large, often conclude that the platforms find content permitted on the sites to be "worthy of presentation." *Hurley*, 515 U.S. at 575; *see* Ex. A ¶ 28; Ex. B ¶¶ 16-18. As a result of the platforms' long histories of moderating various forms of objectionable content, users may assume that content disseminated by platforms also reflects the platform's tacit "support." *Id.* And as reflected by their public statements, public officials in Texas believe that the platforms moderate content in line with the platforms' perceived political beliefs. *See supra* pp.6-8. The same was true in Florida, and the court there recognized that "the targets of the statutes at issue are the editorial judgments themselves," and that the "announced purpose of balancing the discussion—reining in

the ideology of the large social-media providers—is precisely the kind of state action held unconstitutional in *Tornillo*, *Hurley*, and *PG&E*." *NetChoice*, 2021 WL 2690876, at *9.

Furthermore, these platforms disseminate expression to people on their own branded websites and applications, with unique user interfaces and right next to their businesses' logos. So it is understandable that the platforms want to moderate what content they distribute because users and others associate that content with the platforms themselves. Indeed, many believe that "content moderation policies often reflect a company's values[.]" Ex. E ¶ 14. That is precisely why covered platforms would suffer reputational harm and lost advertising revenue if harmful and objectionable content had to appear on their websites and applications. Ex. A ¶ 28; Ex. B ¶¶ 16-18.

In addition, H.B. 20 limits the platforms' ability to engage in *their own speech*. Specifically, H.B. 20's prohibition against covered platforms "otherwise discriminat[ing] against" user-submitted content restricts speech generated by the platforms. Tex. Civ. Prac. & Rem. Code § 143A.001(1). For instance, if a platform appends its own speech to certain user-submitted content—such as posts from state-sponsored media or containing medical misinformation—users might argue that the platform has "discriminated" against that content if it does not append a disclaimer to other content. *Id.* This provision thus restricts the covered platforms' right to engage in expression when they disagree with or object to user-submitted expression or believe that user-submitted expression requires more context—striking at the core of the covered platforms' First Amendment rights. *See NetChoice*, 2021 WL 2690876, at *9 ("unlike the state actions in *FAIR* and *PruneYard*," discussed below, the Florida law "explicitly forbid social media platforms from appending their own statements to posts").

All these features distinguish H.B. 20 from the law upheld in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"), which did not involve government

restrictions on editorial functions. The "equal access" law there—unlike the content- and speaker-based law here—simply required schools that allowed employment recruiters on campus to also allow military employment recruiters on campus. *Id.* at 65. That campus-recruiter law thus "regulates conduct, not speech," and any resulting compelled speech was "plainly incidental to the . . . regulation of conduct." *Id.* at 62; *accord Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (*FAIR* held that the law-school recruitment was conduct, not expression). As the Supreme Court explained, "accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions." *FAIR*, 547 U.S. at 64. In stark contrast, the core business of many Internet websites and applications is to present speech, making them inherently "expressive," and covered platforms engage in core First Amendment protected expression when they enforce their terms and community standards regarding what content to display and how. *Reno*, 521 U.S at 870. Because the platforms have an "expressive character," H.B. 20 cannot declare that "speech itself to be [a] public accommodation" that must present all viewpoints. *Hurley*, 515 U.S. at 573; *see also NetChoice*, 2021 WL 2690876, at *9 (distinguishing *FAIR* because the law upheld there did not compel or restrict speech).

The covered platforms have First Amendment rights as privately owned speakers. *See NetChoice*, 2021 WL 2690876, at *7 (citing *Manhattan Cmty.*, 139 S. Ct. at 1930). *PruneYard Shopping Center v. Robins*, does not change that analysis. 447 U.S. 74 (1980). *PruneYard* upheld a California law that required a shopping mall that never engaged in expression to host people collecting signatures for petitions, because the Court concluded there was no "intrusion into the function of editors" where the shopping mall's operation of its business lacked an editorial function. *Id.* at 88. Crucially, "the owner *did not even allege that he objected to the content* of the

pamphlets; nor was the access right content based." *PG&E*, 475 U.S. at 12 (plurality op.) (discussing *PruneYard*) (emphasis added); *see Hurley*, 515 U.S. at 580 ("*PruneYard* did not involve 'any concern that access to this area might affect the shopping center owner's exercise of his own right to speak.'") (citation omitted). Here, as explained above, the covered platforms are engaged in expression and enforce their terms and policies to facilitate the type of community and discourse they want to foster, as described in their policies. And H.B. 20 is a content-based restriction on that editorial judgement. So "*PruneYard* [] does not undercut the proposition that forced associations that burden protected speech are impermissible." *PG&E*, 475 U.S. at 12 (plurality op.). H.B. 20 will trample on the covered platforms' right to "eschew association for expressive purposes." *Janus v. AFSCME*, 138 S. Ct. 2448, 2463 (2018).

### 2. H.B. 20's onerous disclosure and operational requirements further burden platforms' editorial discretion.

H.B. 20 supplements its outright prohibition on platforms' exercise of editorial discretion with further onerous content-based procedural and reporting requirements (*see supra* pp.11-13), which also unconstitutionally infringe on the platforms' rights. The First Amendment prohibits a "law that subjects the editorial process to private or official examination merely to satisfy curiosity or to serve some general end such as the public interest." *Herbert v. Lando*, 441 U.S. 153, 174 (1979). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 556; *accord, e.g.*, *National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2378 (2018) ("*NIFLA*") (invalidating "unduly burdensome disclosure requirement that will chill [] protected speech"); *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (law requiring disclosures about published political advertisements "intrud[ed] into the function of editors and forc[ed] news publishers to speak in a way they would

not otherwise") (internal quotation marks omitted). That is why "content-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000); *accord Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988).

Even if H.B. 20's procedural and reporting requirements were not *per se* invalid as intrusions targeting editorial functions, the Supreme Court has sharply circumscribed the situations under which governments may burden First Amendment expression through disclosure and operational requirements. To survive constitutional scrutiny, such a law (1) must require only "purely factual"; (2) "noncontroversial" information; and (3) cannot be "unjustified or unduly burdensome." *NIFLA*, 138 S. Ct. at 2372 (citation omitted).

None of H.B. 20's disclosure and operational provisions meet all three elements. For starters, they are extremely—and intentionally—burdensome. H.B. 20 compels platforms to disclose in excruciating detail how they moderate potentially *billions* of pieces of user-submitted content worldwide—every piece and every type of content. *See* Tex. Bus. & Com. Code § 120.051. Platforms must publish an "acceptable use" policy that would describe each platform's policies and the way it will enforce those policies—a statement of judgments, rather than mere facts. *See id.* § 120.052. They must publish a "biannual transparency report" including voluminous detail about the moderation of potentially billions of pieces of content worldwide, and any and all action they take under their acceptable use policies. *Id.* § 120.053. And they must provide and operate inherently burdensome "complaint" and appeal procedures with incredibly tight deadlines for all content subject to the covered platforms' policies—again, covering potentially billions of posts from across the globe. *Id.* §§ 120.101-04.

In other words, H.B. 20 imposes operational mandates and disclosure requirements de-signed to prescriptively manage—and therefore interfere with and chill—covered social media platforms' constitutionally protected editorial discretion. H.B. 20's invasive disclosure require-ments go far beyond the "factual, noncontroversial information" disclosures the First Amendment permits in certain circumstances because they compel the covered platforms to speak about their judgments—including on topics that are highly controversial. *NIFLA*, 138 S. Ct. at 2372. Moreo-ver, the required disclosures, particularly with respect to "algorithms or procedures that determine results on the platform," may reveal trade secrets and other nonpublic, competitively sensitive information about how the platforms operate. Tex. Bus. & Com. Code § 120.051(a)(4). This in-formation will also give bad actors, such as foreign adversaries, scammers, spammers, predators, and criminals a roadmap for evading even the minimal moderation permitted under H.B. 20, mak-ing it more difficult and costly to keep harmful content off members' platforms. Ex. F ¶ 10. Besides its disclosure obligations, H.B. 20's requirements regarding individual notices to users whose con-tent is subject to moderation and the complaint and appeal process are designed to overload the platforms and force them to refrain from exercising their editorial judgment. They invite bad-faith abuse from users who lack legitimate complaints and who wish only to impose burdens on the platforms. Individually and especially together all these requirements "unduly burden[]" covered platforms' protected moderation—not to mention their basic business operations. *NIFLA*, 138 S. Ct. at 2377-78.

These requirements are akin to requiring large bookstores to publicly declare their process to select which books to display and feature, disclose which books they chose not to display or feature, and provide a grievance procedure for writers whose books they declined to carry. The Constitution does not permit this. *E.g.*, *Herbert*, 441 U.S. at 174; *Tornillo*, 418 U.S. at 258; *id.* at

256 (restraints "need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers"). For example, the Fourth Circuit recently invalidated purported disclosure requirements for "online platforms that host political ads." *McManus*, 944 F.3d at 514. The court found the disclosure law unconstitutional because the law's requirements "force elements of civil society to speak when they otherwise would have refrained. . . . It is the presence of compulsion from the state itself that compromises the First Amendment." *Id.* (citations omitted). So too here with the covered online platforms regulated by H.B. 20: "It targets speakers, not speech, and imposes an unduly burdensome disclosure requirement that will chill their protected speech." *NIFLA*, 138 S. Ct. at 2378.

### 3.     H.B. 20 discriminates based on content and speaker.

H.B. 20 has additional constitutional defects because it discriminates based on content and speaker. This discrimination pervades the entire statutory scheme, subjecting all of H.B. 20 to strict scrutiny regardless of its severability provision. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (content discrimination); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (speaker discrimination).

H.B. 20's two content-based exceptions from its prohibitions on content moderation reveal that the statute "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163 (collecting cases); *see* Tex. Civ. Prac. & Rem. Code § 143A.006(a)(2)-(3). For instance, H.B. 20 permits moderation over "expression that directly incites criminal activity or consists of specific threats of violence covered against a person or group because of their race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge." Tex. Civ. Prac. & Rem. Code § 143A.006(a)(3). This exemption recognizes and "permits" an important component of covered platforms' *current policies*. *See* Ex. A ¶ 24. But there is no legitimate reason to allow the platforms to enforce their policies over threats

based only on these favored criteria but not, for example, sexual orientation, military service, or union membership. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 391 (1992); Ex. C ¶ 39.

Targeting so-called "Big Tech," H.B. 20 also sweeps in disfavored large businesses with over 50 million monthly active U.S. users and excludes favored social media businesses such as Parler, Gab, and Gettr, as well as sports (such as ESPN and Barstool Sports) and news (such as CNN and MSNBC) websites, and more. As the Supreme Court has recognized, such "discrimination between speakers is often a tell for content discrimination." *NetChoice*, 2021 WL 2690876, at *10 (citation omitted); *see Grosjean v. American Press Co.*, 297 U.S. 233, 250-51 (1936) (striking down tax targeting newspapers with large circulation). As the Fifth Circuit has explained, "Laws singling out a small number of speakers for onerous treatment are inherently suspect." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012); *accord Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content."). That principle has special force when it comes to speakers— such as social media platforms—that disseminate user content, news, and information. *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987). Laws "that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns" because such laws present very real "dangers of suppression and manipulation" of the medium. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 659, 661 (1994) ("*Turner*").

H.B. 20's legislative history confirms that its arbitrary size threshold is a proxy for targeting platforms whose moderation efforts some perceive as disfavoring "conservative" views. As discussed above, Governor Abbott and H.B. 20's earliest legislative proponents expressly argued that H.B. 20 was needed to stop the covered platforms from "silencing conservative views" due to perceived political viewpoints of these platforms, as expressed through their enforcement of their

policies. *See supra* pp.6-8. H.B. 20's size limit thus discriminates based on content (and viewpoint) because it "cannot be 'justified without reference to the content of the regulated speech,'" and it "w[as] adopted by the government 'because of disagreement with the message' the speech conveys." *Reed*, 576 U.S. at 164 (citation omitted). These defects pervade these sections of H.B. 20 and cannot be cured merely by severing off isolated provisions.

### 4.     H.B. 20 is unconstitutionally vague.

Key provisions of H.B. 20 also are unconstitutionally vague—both facially and as applied to Plaintiffs' members. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague—and must be invalidated—when it fails "to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* These principles apply with special force to expression, and "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54.

H.B. 20's definition of prohibited "censorship" raises more questions than answers. In particular, the provision requiring covered platforms to provide "equal access to or visibility" to content is hopelessly indeterminate. Tex. Civ. Prac. & Rem. Code § 143A.001(1). This provision is akin to an unconstitutional provision in Florida's enjoined law that required platforms to enforce their policies in a "consistent" manner—which the Northern District of Florida held "especially vague." *NetChoice*, 2021 WL 2690876, at *11. The covered platforms process billions of pieces of content, and there is no administrable way to determine whether any single piece of content has "equal access or visibility" as another single piece of content. This provision could "prohibit[] a social media platform from" displaying content "in the proper feeds—to put the post in the feed

of a user who wishes to receive it or to exclude the candidate's post from the feed of a user who does not wish to receive it. Including a post in the feed of a user who wishes to receive it places the post ahead of and in a more prominent position than the many posts the user will not receive at all. Excluding a post from the feed of a user who does not wish to receive it will eliminate the user's exposure to the post." *NetChoice*, 2021 WL 2690876, at *3.

H.B. 20's definition of "social media platform" is also unclear, and its multiple primary-purpose tests threaten to cover websites and applications not generally understood as "social media." The definition excludes websites and applications that "primarily" provide "news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider." Tex. Bus. & Com. Code § 120.001(1)(C)(i). Even if "primarily" means "greater than 50%," a person of ordinary intelligence would have no idea what "primarily" refers to as the relevant denominator, and would thus have no idea whether H.B. 20's onerous provisions apply. Similarly, it is unclear which websites and applications "enable[] users to communicate with other users for the primary purpose of posting information, comments, messages, or images." *Id.* § 120.001(1). Such "[a]n intent-based standard" is invalid for speech regulations because it "'blankets with uncertainty whatever may be said.'" *FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 468 (2007) (plurality op.) (quoting *Buckley v. Valeo*, 424 U.S. 1, 43 (1976) (per curiam)). Ordinary people would further have no idea what makes a chat or comment section "incidental to, directly related to, or dependent on" a platform's preselected content. Tex. Bus. & Com. Code § 120.001(1)(C)(ii). H.B. 20 provides no guidance about the necessary degree of connection or how much of the discussion in the chat or comment section must "relate" (however closely) to the platform's preselected content. *See id.* § 120.001.

H.B. 20's enforcement authority even empowers the Attorney General to seek an injunction against "*potential* violation[s]" of the statute. Tex. Civ. Prac. & Rem. Code § 143A.008 (emphasis added). Other statutes using similar language specify that the potential violation must be imminent. *E.g.*, Tex. Occ. Code § 1101.752(a). H.B. 20 lacks this important qualification, creating enormous uncertainty for covered platforms. If H.B. 20 permits the courts to enjoin any "potential violations" then the statute reaches all moderation decisions a covered platform might make—chilling platforms' First Amendment rights even further.

The statute's disclosure and operational requirements contain similar infirmities. Section 2's requirements, where they are not open-ended, are too vague to apprise covered platforms of their obligations. For instance, H.B. 20's non-exhaustive list of disclosure requirements grants the Attorney General substantial discretion to sue based on a covered platform's failure to include unenumerated information. *See supra* pp.11. All these vague provisions chill platforms' exercise of their constitutionally protected editorial judgment.

### C.     H.B. 20 fails any level of heightened First Amendment scrutiny.

H.B. 20 contains content-based, viewpoint-based, and speaker-based restrictions that trigger strict scrutiny, which is satisfied only if the state has adopted "the least restrictive means of achieving a compelling state interest." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2377 (2021) ("*AFP*") (quoting *McCullen v. Coakley*, 573 U.S. 464, 478 (2014)). In all events, H.B. 20 fails any form of heightened First Amendment review. Even under "intermediate scrutiny," the state must prove that H.B. 20 is "narrowly tailored to serve a significant government interest." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017); *see also AFP*, 141 S. Ct. at 2377 (requiring narrow tailoring under "exacting scrutiny" standard). H.B. 20 "come[s] nowhere close." *NetChoice*, 2021 WL 2690876, at *11.

### 1.      H.B. 20 serves no sufficient state interest.

H.B. 20 furthers no legitimate—let alone a compelling or important—government interest. The government cannot compel some private entities to disseminate speech "in order to enhance the relative voice of others." *Buckley*, 424 U.S. at 48-49; *accord Tornillo*, 418 U.S. at 254; *Arizona Free Enter. Club v. Bennett*, 564 U.S. 721, 749-50 (2011) ("leveling" not a legitimate interest). Put another way, as the Northern District of Florida observed in *NetChoice*, "promoting speech on one side of an issue or restricting speech on the other . . . is not a legitimate state interest." 2021 WL 2690876, at *11 (citation omitted); *accord Hurley*, 515 U.S. at 581; *PG&E*, 475 U.S. at 9, 16 (plurality op.).

The "enviable" "size and success" of covered platforms' communities does not "support[] a claim that [the covered platforms] enjoy an abiding monopoly of access to spectators." *Hurley*, 515 U.S. at 577-78. As the Supreme Court recognized in *Hurley*, even if there may be only one true St. Patrick's Day parade in Southie, that does not diminish the parade organizers' First Amendment rights. *Id.*; *accord Tornillo*, 418 U.S. at 250 (rejecting asserted interest in preventing the "abuses of bias and manipulative reportage" that government claimed were "the result of the vast accumulations of unreviewable power in the modern media empires"). The alleged "concentration of market power among large social-media providers does not change the governing First Amendment principles." *NetChoice*, 2021 WL 2690876, at *7.

H.B. 20 declares that "social media platforms with the largest number of users are common carriers by virtue of their market dominance." H.B. 20 § 1(4); *see also* § 1(3) ("social media platforms function as common carriers"). But the statutory label as "a common carrier scheme has no real First Amendment consequences," so "impos[ing] a form of common carrier obligation" cannot justify a law that "burdens the constitutionally protected speech rights" of platforms "to expand

the speaking opportunities" of others. *Denver*, 518 U.S. at 824-26 (Thomas, J., concurring in judgment in part and dissenting in part); *see PG&E*, 475 U.S. at 17-18 & n.14 (plurality op.) (common carriers retain their "right to be free from state regulation that burdens [their] speech"). In other words, while H.B. 20 attempts to designate privately owned platforms as "common carriers," § 1(3)-(4), that label does not allow Texas to circumvent the First Amendment's protections.

Regardless, the covered platforms are not common carriers as a matter of law or fact. Under the common law before the American Founding, at the time of the Founding, and around the ratification of the Fourteenth Amendment, common carriers were those who undertook to transport or carry goods "indifferently." *Allen v. Sackrider*, 37 N.Y. 341, 342 (1867) (collecting authorities); *Bank of Orange v. Brown*, 1829 WL 2396 (N.Y. Sup. Ct. 1829) ("Every person who undertakes to carry, for a compensation, the goods of all persons indifferently, is, as to the liability imposed, to be considered a common carrier."); *Gisbourn v. Hurst*, I Salk. 249, 250, 91 Eng. Rep. 220, 220 (1710) ("[A]ny man undertaking for hire to carry the goods of all persons indifferently . . . is . . . a common carrier."). As addressed above, the covered platforms do not hold, and have never held, themselves out as organizations that carry all persons or all content "indifferently." Ex. A ¶ 12-13; Ex. C ¶ 11; Ex. D ¶8.[6] For example, many platforms have never permitted adult content or pornography. H.B. 20 would force them to carry such content. More generally, the platforms may be used only by users who agree to the platforms' terms and policies and comply with each platform's respective community standards.

---

[6] This is why state and federal courts have consistently held that companies like (and including) the covered platforms are not common carriers. *E.g.*, *Howard v. America Online, Inc.*, 208 F.3d 741, 753 (9th Cir. 2000) (AOL not "common carrier"); *Kinderstart.com LLC v. Google, Inc.*, 2006 WL 3246596, at *10-11 (N.D. Cal. July 13, 2006) (Google not "common carrier"); *Millan v. Facebook, Inc.*, 2021 WL 1149937, at *3 (Cal. Ct. App. Mar. 25, 2021) ("Facebook does not satisfy the definition of a 'common carrier.'").

The Supreme Court's decision in *Turner* supports this conclusion. *Turner* turned on "the unique physical characteristics of cable [television] transmission" which provided cable companies a physical "bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's homes." *Turner*, 512 U.S. at 639, 656; *see Reno*, 521 U.S. at 868-69 ("some of our cases have recognized special justifications for regulation of the broadcast media that are not applicable to other speakers," such as "forums of the Internet"). As the Fifth Circuit held, "the Supreme Court [in *Turner*] applied intermediate scrutiny to a law imposing must-carry obligations on cable operators *only because the cable medium uniquely allowed for the bottleneck control* that explained Congress requiring just cable operators, and not other video service providers, from carrying certain stations." *Time Warner*, 667 F.3d at 640 (emphasis added); *accord Horton v. City of Houston*, 179 F.3d 188, 192, 194 (5th Cir. 1999) (explaining that the law in *Turner* was only deemed content neutral because it was designed "to further the non-speech-related goals of protecting local broadcasters and *assuring free TV access to citizens who lack cable connections*") (emphasis added).

Because of that unique physical bottleneck, there would have been a complete "elimination of broadcast television"—that is, "access to free television programming for the 40 percent of Americans without cable"—if cable companies nationwide had not been required to carry broadcast television channels. *Turner*, 512 U.S. at 646; *see Time Warner*, 667 F.3d at 640 ("*Turner* made clear, however, that the must-carry requirement impacted '*almost all cable systems in the country, rather than just a select few*'") (emphasis added). And the Court noted that "broadcast licensees must retain *abundant discretion over programming choices*," so government was not categorically prohibiting private editorial decisions. *Turner*, 520 U.S. at 651 (emphasis added). The regulation upheld in *Turner* only required cable companies to carry a small number of established broadcast

channels, and it did not purport to micromanage and burden every single decision cable providers make about the content they disseminate. By contrast, H.B. 20 is far more burdensome.

Unlike the cable companies in *Turner*, the covered platforms have no natural monopoly over physical infrastructure, and they do not possess any bottleneck that would "destroy[ ]" an entire speech medium used by half of the country. *Hurley*, 515 U.S. at 577 (discussing *Turner*). As the Supreme Court recognized three years after *Turner*, "the Internet can hardly be considered a 'scarce' expressive commodity." *Reno*, 521 U.S at 870. Technological progress has made the Internet replete with different forums for expression, as demonstrated by H.B. 20's own otherwise unconstitutional speaker-based exemptions and distinctions. In all events, *Turner* is distinguishable in many other ways: (1) H.B. 20 is content-based, *cf. Turner*, 512 U.S. at 655-56; (2) the expression on the covered platforms can be, and often is, attributed to the platforms, *cf. id.* at 655; and (3) H.B. 20 cannot satisfy intermediate scrutiny; *cf. id.* at 662.

### 2. H.B. 20 is neither the least restrictive means nor narrowly tailored.

Even if H.B. 20 served a sufficient state interest—which it does not—it is neither narrowly tailored nor the "least restrictive" means of furthering any such interest. *AFP*, 141 S. Ct. at 2383.

H.B. 20 is not narrowly tailored because, as discussed, it does not apply "evenhandedly" to "smalltime" and "giant" speakers. *Florida Star v. B.J.F.*, 491 U.S. 524, 540-41 (1989). H.B. 20's 50-million-U.S.-user line for covered platforms is both arbitrary and unsupported by any legislative findings. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (requiring more than "mere speculation or conjecture" to justify speech restrictions). Indeed, the user threshold was amended at various points in the legislative process without much consideration. And during the regular legislative session, one state Senator proposed lowering the threshold to 25 million monthly users, in an effort to include "websites such as Parler and Gab, which are popular among conservatives." Shawn Mulcahy, *Texas Senate approves bill to stop social media companies from banning Texans*

*for political views*, Texas Tribune (updated Apr. 1, 2021), https://bit.ly/3nU2ceV. But the amendment failed. *Id.*

By discriminating among platforms by size, H.B. 20 raises "serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S. Ct. at 2376 (quoting *Brown*, 564 U.S. at 802). As in Florida, the state cannot offer a "basis for imposing these restrictions only on the largest providers. . . . The application of these requirements to only a small subset of social-media entities would be sufficient, standing alone, to subject these statutes to strict scrutiny." *NetChoice*, 2021 WL 2690876, at *10. This size cutoff makes H.B. 20 hopelessly underinclusive to satisfy whatever possible state interest could be implicated.

Furthermore, as discussed above, H.B. 20 permits covered platforms to moderate content disfavored by Texas—notwithstanding that exempted content may express a "viewpoint"—but the inclusion of these exceptions similarly demonstrates that H.B. 20 is underinclusive and thus not narrowly tailored. *See supra* pp.9, 26-27. The legislature rejected amendments, for example, that would have allowed platforms to exclude vaccine misinformation, terrorist content, and Holocaust denial. *See supra* p.19.

H.B. 20 is also overinclusive by potentially sweeping in "systems nobody would refer to as social media." *NetChoice*, 2021 WL 2690876, at *2. It is vague enough to include any website or application that allows users to communicate, regardless whether their primary use is the dissemination of content and information.

Fundamentally, Texas cannot satisfy any tailoring requirement because there is an obvious alternative that would directly advance the state's asserted interests without limiting or burdening private First Amendment rights. Texas could create its own government-run social media platform

if it thought it so important to provide a completely open forum allowing all speech regardless of viewpoint. In fact, such a proposal was considered—but rejected—by the Texas Legislature when it adopted H.B. 20. *See* Tex. H.R. Journal (87th Leg., 2d Spec. Sess.) at 232, https://bit.ly/2Y2YGEp. Instead of that alternative, H.B. 20 commandeers privately owned businesses, compels them to disseminate content, and eviscerates their editorial discretion over their own platforms.

All these aspects indicate a "dramatic mismatch" between any interest H.B. 20 could possibly further and H.B. 20's actual effects. *AFP*, 141 S. Ct. at 2386.

*     *     *

H.B. 20's restrictions purportedly do not apply if a platform "is specifically authorized to censor by federal law," but this attempted savings clause cannot rescue H.B. 20 from invalidation. Tex. Civ. Prac. & Rem. Code § 143A.006(a)(1). H.B. 20 does not define "specifically authorized," and it is unclear what federal rights this provision contemplates. Whatever this vague provision means, it would be strange for the legislature to enact a complex statute regulating social media platforms only to render them all a nullity via this amorphous savings clause.

H.B. 20's vague savings clause is no impediment to vindicating federal free-speech rights. Under the First Amendment, "a series of adjudications, and the chilling effect of the resolution on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987). This speech-chilling complexity created by the Legislature only enhances the need for prompt adjudication and vindication of Plaintiffs' members' federal rights. *See Reno*, 521 U.S. at 884 n.49 ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be

36

set at large."); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018) ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."); *Hias, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021) ("a purely theoretical savings clause" cannot immunize an order from judicial review). Regardless, under the Supremacy Clause, the First Amendment and the Communications Decency Act provide the federal "rule of decision" because they conflict with H.B. 20's operative provisions imposing restrictions on private actors. *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020).

H.B. 20's severability clause in Section 8, likewise, does not save the challenged statutory provisions because they are facially unconstitutional in all applications. *E.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987) (law facially invalid when "no set of circumstances exists under which the [law] would be valid"). In the alternative, H.B. 20's challenged provisions are also facially invalid under the First Amendment's overbreadth doctrine because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *AFP*, 141 S. Ct. at 2387. This federal overbreadth rule trumps any state severability clause. *See Reno*, 521 U.S. at 883-84 & n.49 (striking down statute despite severability clause purporting to preserve constitutional "application[s] . . . to 'other persons or circumstances'" because "a severability clause is an aid merely; not an inexorable command") (citation omitted).

## II.      H.B. 20 is preempted by the Communications Decency Act, 47 U.S.C. § 230.

In addition to the First Amendment, Congress in the Communications Decency Act made clear that Plaintiffs' members (like all businesses offering websites) are entitled to exercise their own "editorial and self-regulatory functions." *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000); *see* 47 U.S.C. § 230(c)(2)(A). "First Amendment values . . .

drive the CDA." *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016). Indeed, Congress titled Section 230, "Protection for private blocking and screening of offensive material." 47 U.S.C. § 230.[7] Section 230 provides "broad" protection for the content-related decisions that online platforms (of all sizes and shapes) make. *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2016); 47 U.S.C. § 230(e)(3) ("No cause of action may be brought and no liability may be imposed under any state or local law that is inconsistent with this section."). Accordingly, Section 230 "preempts the parts of" H.B. 20 "that purport to impose liability for other decisions to remove or restrict access to content" and the parts of the Bill "applicable to a social media platform's restriction of access to posted material." *NetChoice*, 2021 WL 2690876, at *6.

Section 230 expressly preempts H.B. 20's attempt to punish content moderation. Under Section 230, Plaintiffs' members may not "be treated as the publisher or speaker of any information provided" by its users nor may they "be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the *provider considers* to be obscene, lewd, lascivious, filthy, excessively violent, harassing, *or otherwise objectionable*." 47 U.S.C. § 230(c)(1), (2)(A) (emphases added). Internet platforms thus may not be held liable for moderating content on their sites. Indeed, "Section 230 'specifically proscribes liability'" for a website's "'decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.'" *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (Section 230 confers "broad immunity" for "all claims" related to the "publication of information created by third parties") (citation omitted); *see also La'Tiejira*, 272 F. Supp. 3d at 993-94 ("'[A]ny activity that can be boiled down to deciding whether to exclude material

---

[7] Covered platforms and Plaintiffs' members receive Section 230 protections because they are "interactive computer services" under Section 230. 47 U.S.C. § 230(f)(2).

that third parties seek to post online is perforce immune under section 230.'") (quoting *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170 (9th Cir. 2009)); *Almeida*, 456 F.3d at 1321 n.3 ("The language of section 230(c)(2) is clearly inconsistent with state law that makes interactive service providers liable based on their efforts to screen content."). Courts have routinely held that platforms (and other websites) have the right to "restrict access to or availability of" objectionable content. *E.g.*, *Daniels v. Alphabet*, 2021 WL 1222166, at *11-13 (N.D. Cal. Mar. 31, 2021) (YouTube's removing conspiracy-theory videos).

Yet H.B. 20 imposes liability on those same websites for moderating content based on "viewpoints" that the websites consider objectionable. Tex. Civ. Prac. & Rem. Code § 143A.002(a)(1)-(3). For instance, many covered platforms (like other websites[8]) ban hate speech because hate speech is "objectionable." Yet hate speech—no matter how abhorrent—expresses a "viewpoint" that Plaintiffs' members must now carry under H.B. 20 or else face a civil lawsuit. Federal law expressly permits every website on the Internet to moderate content and provides that those websites be free from any "action" challenging how they exercise that discretion. 47 U.S.C. § 230(c), (e)(3).

## III.   H.B. 20 violates the Commerce Clause.

Independently, H.B. 20 exceeds Texas's authority under the Commerce Clause. H.B. 20 regulates not only how platforms will operate in Texas, but also regulates the worldwide operations of platforms and what and how content is displayed to non-Texans on the platforms. In so doing,

---

[8] *E.g.*, Texas Attorney General, Site Policies, https://bit.ly/3nHBwxX (last visited Sept. 30, 2021) ("Members of the public should not post or share information on an OAG social media page if that information is personal, sensitive, obscene, threatening, harassing, discriminatory, or would otherwise compromise public safety or incite violence or illegal activities.").

H.B. 20 unconstitutionally reaches far beyond Texas's borders to regulate covered platforms' economic activity and affects the product everyone in the world receives through the Internet. To top it off, H.B. 20 also unlawfully discriminates against platforms engaged in interstate commerce by compelling covered platforms to continue doing business in Texas even if they do not want to.

Both directly and in "practical effect," H.B. 20 unconstitutionally regulates "commerce that takes place wholly outside of the state's borders" and is therefore *per se* invalid. *Healy*, 491 U.S. at 336 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.)). H.B. 20's provisions apply worldwide to content posted on covered platforms by Texas residents and businesses, regardless of where the resident or business is located, when it submits content, or where other users are located when they view it. H.B. 20 thus "directly controls commerce occurring wholly outside" Texas and "exceeds the inherent limits" of the state's authority. *Id.* That makes H.B. 20 unconstitutional "regardless of whether the statute's extraterritorial reach was intended by the legislature." *Id.* H.B. 20 regulates extraterritorially in at least five specific ways.

*First*, H.B. 20 restricts how covered platforms (headquartered outside Texas) may moderate user-submitted content worldwide by creating an entitlement for *Texas users* to "receive" content free of "viewpoint" "censorship." Tex. Civ. Prac. & Rem. Code § 143A.002(3). H.B. 20 prohibits editorial discretion based on the views of "another person," a term that—unlike covered "users"—has no geographic limit and thus includes anyone across the world. *Id.* § 143A.002(a)(1).

*Second*, H.B. 20 compels covered platforms to publish and disseminate worldwide content posted by "users." *Id.* § 143A.002(3). H.B. 20's restrictions do not merely regulate how Texans view social media in Texas. On the contrary, H.B. 20 restricts how Plaintiffs' members display their platforms everywhere.

*Third*, H.B. 20 restricts moderation over content posted by covered "users" from anywhere

in the world. *Id.* § 143A.003(a). If a Texas resident lives in or travels to New York or Europe and posts to or receives social media from there, H.B. 20 applies. Likewise, if a company "does business" in Texas but posts to social media from a location outside of Texas—even about matters that have nothing to do with Texas or its residents—H.B. 20 purports to restrict editorial discretion over such out-of-state posts.

*Fourth*, H.B. 20 has the practical effect of regulating commerce outside Texas because Plaintiffs' members operate their services and enforce their policies on a global scale. So even if a post is made in Texas, the decision about whether and how the post is displayed extends well beyond Texas's borders. "Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'project[ing] its legislation into other States.'" *American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (alteration in original; quoting *Healy*, 491 U.S. at 334); *accord American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 177 (S.D.N.Y. 1997).

*Fifth*, and finally, H.B. 20 reaches beyond Texas and compels Plaintiffs' covered members—headquartered and incorporated outside Texas—to engage in commerce with Texas users by prohibiting covered platforms from denying access based on "a user's geographic location in this state or any part of this state." Tex. Civ. Prac. & Rem. Code § 143A.002(a)(3). In other words, H.B. 20 makes it impossible for covered platforms to avoid its restrictions. If a covered platform decides it would rather not do business in Texas than be forced to disseminate pro-Nazi speech, it *cannot* do so under H.B. 20—or else it will face myriad lawsuits from Texas users seeking reinstatement and their statutory entitlement to receive all user-submitted content worldwide. Just as states lack authority to regulate wholly extraterritorial commerce, they cannot drag extraterritorial commerce within their borders to then subject that commercial activity to the state's intra-state

41

regulatory authority. *See Healy*, 491 U.S. at 336-37.

For all these reasons, H.B. 20's requirement of a Texas "user" obscures the fact that H.B. 20 fundamentally (and unconstitutionally) regulates how out-of-state companies interact with out-of-state users. As the Supreme Court has held, when a state regulates economic conduct wholly outside of the state's borders, it does not matter "whether or not the commerce has effects within the State." *Id.* at 336 (quoting *MITE*, 457 U.S. at 642-43). Accordingly, courts across the country have held unconstitutional laws that purport to peg their extraterritorial application to an in-state hook. *E.g.*, *North Dakota v. Heydinger*, 825 F.3d 912, 921 (8th Cir. 2016) (Minnesota law regulating company's electricity generation was unconstitutional extraterritorial legislation because out-of-state company could not prevent Minnesota consumers from accessing its electricity and therefore would have to leave the market entirely or conduct even its out-of-state business on Minnesota's terms); *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (invalidating law that "regulates sales that take place outside" state with "no necessary connection with the state other than the residency of the seller"); *TelTech Sys., Inc. v. Barbour*, 866 F. Supp. 2d 571, 576 (S.D. Miss. 2011) (holding Mississippi anti-spoofing law invalid under Commerce Clause in part because it was impossible for company to determine whether recipient of caller ID spoofing was in Mississippi, and therefore to conduct business anywhere in country without risk of liability under Mississippi's statute), *aff'd sub. nom. TelTech Sys., Inc. v. Bryant*, 702 F.3d 232 (5th Cir. 2012).

Moreover, by forcing out-of-state firms to conduct business in Texas, H.B. 20 not only regulates extraterritorially but also punishes firms for doing business in other states. H.B. 20 discriminates against companies for having a non-Texas user base—that is, for engaging in interstate

commerce. Such state regulations that penalize companies for "'participat[ing] in interstate commerce'" are "facially discriminatory" and thus virtually per se unconstitutional. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 (1996)). H.B. 20 thus violates the Commerce Clause in multiple respects.

## IV.   The remaining factors favor a preliminary injunction.

The remaining factors all weigh in favor of granting Plaintiffs a preliminary injunction. Doing so maintains the status quo, allowing covered platforms to continue exercising their First Amendment and other rights as they have since their inception.

"There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.)); *accord Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *NetChoice*, 2021 WL 2690876, at *11.

H.B. 20 will radically upset how platforms work and the core value that they provide to users. By compelling platforms to disseminate all user speech regardless of "viewpoint," H.B. 20 prohibits virtually all moderation and curation necessary to make the platforms safe and enjoyable for users. Ex. A ¶¶ 12-13; Ex. A ¶¶ 19-20; Ex. C ¶ 11; Ex. D ¶¶ 8-9, 13-14. If H.B. 20 goes into effect, users in Texas and worldwide will be inundated with abusive, unsafe, and offensive material including pornography, hate speech, foreign-state propaganda, domestic disinformation, and more that could make different platforms unusable or undesirable. Ex. A ¶ 45; Ex. B ¶ 20; Ex. C ¶ 61; Ex. D ¶ 24. And once H.B. 20 compels the platforms to disclose their methods and algorithms, it

will be too late to stop bad actors such as scammers, predators, and criminals from evading the platforms' safeguards—even if the Court later finds H.B. 20 unconstitutional. Ex. C ¶ 57; Ex. D ¶ 32.

Thus, if allowed to go into force against Plaintiffs' members, H.B. 20 would threaten monumental changes to the way online platforms work. Covered platforms that engage in less moderation will be less hospitable to their users and advertisers—who enjoy the platforms, and pay to place advertisements on the platforms, in part because the platforms prohibit harmful and objectionable conduct. Ex. B ¶¶ 9-10, 16-18, 23; Ex. C ¶¶ 17, 50, 61-62; Ex. D ¶¶ 8, 35. The loss of those users and advertisers will likewise irreparably harm covered platforms. *Florida Businessmen, Etc. v. City of Hollywood*, 648 F.2d 956, 958 (5th Cir. 1981). For similar reasons, H.B. 20 will harm covered platforms' goodwill. *Denbra IP Holdings, LLC v. Thornton*, 2021 WL 674238, at *8 (E.D. Tex. Feb. 22, 2021) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.") (quoting *Emerald City Mgmt., L.L.C. v. Kahn*, 624 F. App'x 223, 224 (5th Cir. 2015)). In addition, H.B. 20 would impose both (1) direct costs inherent in changing the covered platforms' entire business model; and (2) difficult to measure costs from the harm arising from less moderation of harmful content. Ex. A ¶¶ 40-47; Ex. B ¶¶ 23-24. These economic and operational injuries are irreparable. *E.g.*, *Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, No. 21A23, 2021 WL 3783142, at *4 (U.S. Aug. 26, 2021) (financial costs "with no guarantee of eventual recovery" are irreparable injury); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" where "clear that [states] would seek to enforce" law and plaintiffs faced "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" preempted law); *Florida Businessmen*, 648

F.2d at 958 nn.2, 3. And it will require them to disclose non-public, competitively sensitive information (particularly about their algorithms), which risks irreparable harm. Ex. C ¶ 57; Ex. D ¶ 32.

The irreparable harm to Plaintiffs' members from permitting H.B. 20's enforcement far outweighs any harm to the state from an injunction. *NetChoice*, 2021 WL 2690876, at *11 ("The threatened injury outweighs whatever damage the injunction may cause the State."). Ex. A ¶¶ 39-47; Ex. B ¶¶ 23-24; Ex. C ¶¶ 61-62; Ex. D ¶¶ 21-35. Texas lacks a sufficient interest for H.B. 20 (*see supra* pp.31-34), so the state will not be harmed if this unconstitutional and preempted law is enjoined. *See Texans for Free Enter.*, 732 F.3d at 539 (state actors not harmed when they cannot enforce laws for which they lack a sufficient interest under the First Amendment).

Finally, allowing Plaintiffs' members to exercise their First Amendment rights as they have for years is in the public interest. *NetChoice*, 2021 WL 2690876, at *11 ("[T]he injunction will serve, not be adverse to, the public interest."). As the Fifth Circuit has held, "'injunctions protecting First Amendment freedoms are always in the public interest.'" *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)). And here, the platforms' continued moderation will benefit users and the public more broadly. Ex. E ¶¶ 6-14 (harmful effects on the LGBTQ community); Ex. F ¶ 8-16 (efforts to curtail CSAM).

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin the Texas Attorney General from enforcing Sections 2 and 7 of H.B. 20 against Plaintiffs and their members.

Dated: September 30, 2021

Steven P. Lehotsky*
steve@lehotskykeller.com
Jonathan D. Urick*
jon@lehotskykeller.com
Jeremy Evan Maltz (Texas Bar # 24102129)
jeremy@lehotskykeller.com
Gabriela Gonzalez-Araiza*
gabriela@lehotskykeller.com
LEHOTSKY KELLER LLP
200 Massachusetts Avenue, NW
Washington, DC 20001

*Motion for admission *pro hac vice* forthcoming

Respectfully submitted,

*/s/ Scott A. Keller*

Scott A. Keller (Texas Bar # 24062822)
scott@lehotskykeller.com
Matthew H. Frederick (Texas Bar # 24040931)
matt@lehotskykeller.com
Todd Disher (Texas Bar # 24081854)
todd@lehotskykeller.com
LEHOTSKY KELLER LLP
919 Congress Ave.
Austin, TX 78701
T: (512) 693-8350
F: (833) 233-2202

## **CERTIFICATE OF SERVICE**

By agreement of counsel, I served this document and accompanying exhibits on counsel for Defendant on September 30, 2021, by email to the following addresses:

courtney.corbello@oag.texas.gov
christopher.hilton@oag.texas.gov
thomas.ray@oag.texas.gov

*/s/ Todd Disher*
Todd Disher

## **CERTIFICATE OF CONFERENCE**

I conferred with counsel for Defendant regarding this motion. Defendant is opposed to this motion.

*/s/ Todd Disher*
Todd Disher