**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, | ) ) ) | |
| and | ) ) | |
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, | ) ) ) ) | Civil Action No. 1:21-cv-00840-RP |
| *Plaintiffs*, | ) ) | |
| v. | ) ) ) | |
| KEN PAXTON, in his official capacity as Attorney General of Texas | ) ) ) | |
| *Defendant*. | ) ) | |

# Exhibit B – NetChoice, LLC's Declaration

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, <br><br> and <br><br> COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas <br><br> *Defendant*. | Civil Action No. 1:21-cv-00840-RP |

## DECLARATION OF NETCHOICE, LLC IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Carl Szabo, declare as follows:

1. I am the Vice President and General Counsel of NetChoice, LLC ("NetChoice"). I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2. In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet.

3. Plaintiff NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and "engages at the local, state, national, and international levels to ensure a bright digital future."[1] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas. When online businesses are free to make their own moderation decisions, they create choices for users and advertisers alike—for example, Texans looking for a less moderated experience can use social media platforms like Parler, Gab, or Rumble; those looking for more family-friendly services can find options from several NetChoice members. All in all, we strongly believe in giving users and advertisers choices in how they use the Internet.

4. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services and platforms, including: Airbnb, Alibaba.com, Amazon.com, AOL, DII, DRN, eBay, Etsy, Expedia, Facebook, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Nextdoor, Lyft, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, TikTok, Travelocity, TravelTech, Trivago, Turo, Twitter, Verisign, VRBO, Vigilant Solutions, VSBLTY, Waymo, Wing, and Yahoo!.[2]

5. Several of NetChoice's members are subject to Texas's new law, House Bill 20 (the "Bill"), as they meet the statutory definition of a covered "social media platform" under the

---

[1] Home, NetChoice, https://perma.cc/3NPH-KH2T.
[2] About Us, NetChoice, https://perma.cc/4NPV-PLU7.

Bill because they: (i) are open to the public (subject to their respective terms and conditions and community guidelines); (ii) allow users to create accounts; (iii) enable users to communicate with other users for the "primary purpose" (though this requirement is vague) of posting information, comments, messages, or images; and (iv) have more than 50 million monthly users in the United States of America. Several of these NetChoice members have submitted declarations attesting to the irreparable harms they will suffer if the Bill is allowed to go into effect.[3]

6. NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that this Bill, should it take effect, would irreparably harm our members and their business models by repelling users and advertisers and creating long-term, adverse impacts when it comes to our members' reputations.

7. These negative effects of the Bill are associative and enduring, and thus irreparable. Once the public associates an online business with harmful or offensive content, it is nearly impossible to undo that association. Indeed, what common sense suggests and evidence confirms is that users and advertisers prefer not to see harmful or objectionable content online and will strongly associate that content with the platform on which they saw it.[4]

8. That is because online services, like most businesses, rely on their reputations—which they have often spent many years diligently cultivating and protecting—to gain and main-

---

[3] *See, e.g.*, Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021); Esparza Decl. (Sept. 29, 2021).
[4] *See, e.g.*, Tiffany Hsu & Eleanor Lutz, *More Than 1,000 Companies Boycotted Facebook. Did it Work?*, N.Y. Times (last updated Nov. 17, 2020), https://perma.cc/EL62-NCDP.

3

tain users and advertisers.[5] By hosting harmful or objectionable content, as the Bill would force them to do, online services would suffer enduring reputational harm. Many long-time users and advertisers will likely quit or reduce use of these online services should their websites become polluted with offensive content. This content is also likely to repel potential users[6] and turn off potential advertisers by greatly deteriorating the value and usability of these services.[7] And, as experience has shown, these deleterious effects would likely lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.[8]

9. In fact, the World Federation of Advertisers—a leading global trade association for advertisers—is adamant that online services must moderate user-generated content to prevent exposure to objectionable or offensive content.[9] "The issue of harmful content online," WFA's CEO Stephan Loerke explains, "has become one of the challenges of our generation. As the primary monetization mechanism of the online ecosystem, advertisers have a critical role to play in driving positive change . . . . A safer social media environment will provide huge benefits not just for advertisers and society but also to the platforms themselves." Not only does the Bill impose immediate financial harm to online businesses, it risks permanent, irreparable harm should any of those users or advertisers decide never to return to our members' sites based on their past experience or the detrimental feedback they have heard from others.

---

[5] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021).
[6] Gutierrez Decl. (Sept. 27, 2021); Esparza Decl. (Sept. 29, 2021).
[7] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021).
[8] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021).
[9] *See, e.g.*, WFA and Platforms Make Major Progress to Address Harmful Content, World Federation of Advertisers (Sept. 23, 2020), https://perma.cc/YC3N-738F.

10. Because many online businesses (not just social media platforms, but also online exchanges and websites that allow users to post reviews) rely on advertising as a necessary mechanism to remain in business, the decisions of advertisers to take their business elsewhere have very serious consequences for these businesses, including lost revenue and long-term reputational damage.[10] Not only will advertisers pull their ads and funding immediately after the Bill takes effect and forces our members to host objectionable content, advertisers will be hesitant to return to these businesses in the future. Consider that WFA's call for advertisers to "driv[e] positive change" reveals an implicit truth about online services and digital platforms: their advertising space is valuable *only if* it is not displayed next to harmful and offensive content that users do not want to see and advertisers do not want to be associated with. This Bill, as discussed, makes our members more vulnerable to advertiser boycotts, which directly hurts their revenue and reputation. In the long run, this loss of a quintessential monetization mechanism could jeopardize the very business model on which so many of these digital services rely.

11. Being able to moderate, organize, curate, and otherwise prioritize content is critical to our members—especially search engines, social media platforms, and other digital services that retrieve and present information responsive to user requests—so that they can deliver users and advertisers the high-quality services they demand.[11] As noted above, it is essential for our members to be able to develop a brand and customer experience that allows them to avoid exposing their users to objectionable, offensive, harmful, or unlawful content.[12] It is also essential that our members be able to organize and curate content in a way that is useful to users. For example,

---

[10] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021).
[11] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021); Gutierrez Decl. (Sept. 27, 2021); Rumenap Decl. (Sept. 29, 2021).
[12] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021); Gutierrez Decl. (Sept. 27, 2021); Rumenap Decl. (Sept. 29, 2021).

an online marketplace that displayed items in purely chronological order (rather than categorizing them by product type) would be far less helpful in connecting users with the products they are looking for. Similarly, a social media platform that is forced to deliver content in purely chronological order may cause its users to miss out on more relevant content. This Bill would deny our members the ability to organize and display content in ways that best serve the needs of their users.[13]

12. If the Bill takes effect on December 2, 2021, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt.

13. NetChoice members would also be harmed by the Bill's severe restrictions on their ability to exercise editorial discretion over their websites and applications (action that is protected under the First Amendment) and its provisions exposing our members to myriad potential private and Attorney General lawsuits if they do not comply with these onerous restrictions.

14. The Bill will not only harm the private parties whose editorial discretion it restricts, it will also limit user choice and would pollute family-friendly websites with highly offensive and objectionable content and products, greatly reducing the value of the services for both users and advertisers.[14] Most users do not want to see harmful content like advocacy of white supremacy, homophobia or bigoted speech, advocacy of extremism and terrorism, medical disinformation like so-called miracle cures for Covid-19, bullying and harassment, and other highly objectionable content.[15] Advertisers likewise do not want their names and products dis-

---

[13] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021); Gutierrez Decl. (Sept. 27, 2021); Rumenap Decl. (Sept. 29, 2021).
[14] Gutierrez Decl. (Sept. 27, 2021); Rumenap Decl. (Sept. 29, 2021).
[15] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021); Gutierrez Decl. (Sept. 27, 2021); Rumenap Decl. (Sept. 29, 2021).

played alongside such content. Users and advertisers would likely abandon online businesses that are no longer permitted to moderate offensive and harmful content.

15. NetChoice's members exercise editorial discretion over massive amounts of content, and 6 months in 2018 alone, Facebook, Google, and Twitter took some action on over 5 billion accounts or user-submissions—including 3 billion cases of spam, 57 million cases of pornography, 17 million cases of content regarding child safety, and 12 million cases of extremism, hate speech, and terrorist speech.[16]

16. Such an outcome would greatly harm our members by directly and durably undermining their business models. Perhaps more concerning, advertisers and users would associate this content with our members themselves, creating irreparable damage to our members' reputations and harming them well into the future. We have already seen this loss of revenue happen when advertisers removed millions of dollars' worth of ads due to the presence of "extremist content."[17] NetChoice members moved quickly to rectify the situation, but even in this short instance, NetChoice members lost millions.[18]

17. For example, in 2017 Google's wholly owned subsidiary YouTube lost millions of dollars in advertising revenue after a number of major corporations including Walmart, Verizon, Johnson & Johnson, and Pepsi took down their ads after seeing them distributed next to vid-

---

[16] See NetChoice Social Media Content Moderation Transparency Report 1-3, https://bit.ly/2UzXPct.

[17] *See, e.g.*, Olivia Solon, *Google's Bad Week: YouTube Loses Millions as Advertising Row Reaches US*, The Guardian (Mar. 25, 2017), https://perma.cc/Y WO5-BXGB; Kim Lyons, *Coca- Cola, Microsoft, Starbucks, Target, Unilever, Verizon. All the Companies Pulling Ads from Facebook*, The Verge (Jul. 2, 2020), https://perma.cc/LTC2-HKFW.

[18] *Id.*

eos containing extremist content and hate speech.[19] Similarly, in 2020 Facebook saw a nearly identical response as some of the largest businesses in the world including Coca-Cola, Microsoft, Starbucks, Target, Hershey, Honda, and Unilever all pulled their ads and boycotted Facebook citing concerns of third parties' use of the website to spread hate speech and misinformation.[20]

18. While the short-term loss of revenue resulting from these examples was already substantial, it pales in comparison to the long-term reputational loss this Bill will inflict on YouTube and Facebook's overall brand—not to mention the fact that such third-party content runs counter to these companies' policies and standards. Once harmful or offensive content is associated with a business, it is nearly impossible to undo the harm. The content will forever be intertwined with a user's or advertiser's perception of the underlying business.

19. The Bill prohibits the private exercise of editorial discretion over private websites and applications. The plain sweep of the law reaches almost all expression and every editorial tool NetChoice's members have at their disposal.[21] The vagueness in the operative provisions will ensure that NetChoice's members are chilled from exercising their editorial discretion over whatever remaining expression the statute purports not to reach.[22]

20. Under the Bill, NetChoice members will have to host content that they would otherwise remove or restrict because it violates their editorial policies (like their terms of service and community guidelines), including the harmful and objectionable forms of content referenced above. Under the Bill, these online services would be significantly constrained in their ability to

---

[19] Olivia Solon, *Google's Bad Week: YouTube Loses Millions as Advertising Row Reaches US*, The Guardian (Mar. 25, 2017), https://perma.cc/Y W5-BXGB.

[20] Kim Lyons, *Coca- Cola, Microsoft, Starbucks, Target, Unilever, Verizon. All the Companies Pulling Ads from Facebook*, The Verge (Jul. 2, 2020), https://perma.cc/LTC2-HKFW.

[21] Veitch Decl. (Sept. 30, 2021); Potts Decl. (Sept. 30, 2021).

[22] Complaint, *NetChoice v. Paxton*, No. 1:21-cv-00840-RP (W.D. Tex. Austin Div.).

remove harmful content that offends their users and advertisers. As a result, NetChoice members would be forced to host harmful and offensive content including but not limited to: racial epithets;[23] Nazi antisemitism;[24] aggressive homophobia and transphobia;[25] medical misinformation and harmful at-home "remedies;[26] dangerous conspiracy theories;[27] and cyberbullying.[28]

21. They will also be forced to host certain speakers as long as a single user in Texas wants to view that speaker's content. For instance, Neo-Nazi websites like Stormfront would be privileged from NetChoice's members' private editorial discretion, regardless of how patently offensive or even dangerous Stormfront's content may be.

22. Likewise, the Taliban would be protected from commonsense editorial discretion as long as one of millions of Texas users sues for private "censorship" against the Taliban.[29]

23. The potential for reputational harm is staggering. And the potential to repel users and advertisers is even worse: Trust between NetChoice members and their users and advertisers would evaporate and be difficult to regain—and understandably so. Society, online and off, has

---

[23] *See* Cheyenne MacDonald, *These Abhorrent Images From Parler Show Why Apple Upheld its Ban*, Input (Mar. 10, 2021), https://perma.cc/H7GV-ZFZQ.
[24] Nathan Grayson, *Valve Removes Nazi Steam Profiles After German Complaints*, Kotaku (Dec. 11, 2019), https://perma.cc/6L8E-E7NB; Brianna Sacks, *Reddit Is Removing Nazi And Alt-Right Groups As Part Of A New Policy And Some Users Are Confused*, BuzzFeed News (Oct. 25, 2017), https://perma.cc/W7NL-CKGN.
[25] See Removing Harassing Subreddits, Reddit (Jun. 10, 2015), https://perma.cc/65FE-TPyC.
[26] See Beth Mole, *Facebook Bans Health and Conspiracy Site Natural News [Updated]*, ARS Technica (Jun. 10, 2019), https://perma.cc/2875-RCYS.
[27] *See* Marianna Spring, *The Casualties of This Year's Viral Conspiracy Theories*, BBC News (Dec. 26, 2020), https://perma.cc/XAD2-3528.
[28] Alexandria Ingham, *7 Real Life Cyberbullying Horror Stories*, Family Orbit Blog (Nov. 11, 2018), https://perma.cc/52DW-B3JN.
[29] *Taliban slam Facebook for curbing Afghanistan's freedom of speech after social media ban*, India Today (August 18, 2021), https://bit.ly/3zgWNl4.

an obligation to protect the most vulnerable among us and to create inclusive services that attract and retain users of all backgrounds.[30]

24. NetChoice's members would incur substantial, unrecoverable costs in complying with the Bill's overly burdensome requirements. These costs could not be recouped if Plaintiffs' challenge to the Bill is ultimately successful on the merits.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on this September 30, 2021 in Washington, DC.

Carl Szabo

---

[30] Gutierrez Decl. (Sept. 27, 2021); Rumenap Decl. (Sept. 29, 2021).