**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, </br></br> and </br></br> COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, </br></br> *Plaintiffs*, </br></br> v. </br></br> KEN PAXTON, in his official capacity as Attorney General of Texas </br></br> *Defendant*. | Civil Action No. 1:21-cv-00840-RP |

# Exhibit D – Facebook's Declaration

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC, d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation, *Plaintiffs*, v. KEN PAXTON, in his official capacity as Attorney General of Texas, *Defendant*. | Civ. Action No. 1:21-cv-00840-RP |

## DECLARATION OF FACEBOOK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Neil Potts, declare as follows:

1.  I am currently a Vice President, Trust & Safety Policy, at Facebook, Inc. ("Facebook"), and have been employed there since April 2016. The statements contained in this declaration are made upon my personal knowledge. I am over the age of 18 and am competent to make the statements herein. I make this Declaration in Support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. If called as a witness, I could and would testify under oath as follows.

## Background

2.  Facebook was founded in 2004. Its products enable more than 3 billion people around the world to share ideas, offer support, and discuss important issues, including politics, public health, and social issues. Users of Facebook's products share over a billion stories and over 100 billion messages, every day.

3. On Facebook, people can share status updates, photos, videos, and links (among other types of content) with family and friends. People can also follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content, as well as join Groups or attend Events that relate to topics of interest to them. These are some of the many ways in which people can share and interact with others on Facebook.

4. The average person could be flooded with millions of posts each day from people all over the world, but most people do not have time (or interest) to look at all of their available content. As a result, Facebook has invested significant resources to develop systems to "rank" content that users are most likely to find relevant and meaningful. The rankings are unique to each user and are informed by their individual choices and actions (both historical and real-time).

5. Facebook displays ranked content in a curated News Feed, a feature Facebook launched in 2006. News Feed uses algorithms to show a constantly updated and personalized list of stories—for example, vacation pictures from friends, videos from family gatherings, articles from local or national news outlets, and much more.

6. Millions of Facebook users reside in Texas and have access to and engage with content posted by users across the United States and throughout the world.

**Content Moderation**

7. Facebook's mission is to give people the power to build community and bring the world closer together.

8. Facebook has invested substantial resources to foster and maintain a safe experience for its community. People will not use Facebook if they do not feel safe. Similarly, advertisers will not advertise on Facebook if they believe it is not effective at removing harmful

content or content that violates our community standards. Indeed, people and advertisers have stopped using Facebook due to these concerns.

9. Facebook has long recognized the importance of giving its users a voice and allowing debate on topics about which people may disagree. But content that harasses, threatens, seeks to defraud, or violates the rights of other users makes the community less safe and/or puts people at risk of harm.

10. Facebook has over many years developed robust policies and practices relating to content permitted on its service. Facebook continues to refine these policies and practices based on its experience, evolving societal norms, extraordinary current events, and input from external stakeholders and experts (among others). Moderating speech often involves difficult judgment calls—a task further complicated by the sheer volume of content appearing online, the global reach of Facebook's products, and the absence of vital context typically accompanying speech in the offline world.

11. Facebook's publicly available Terms of Service (to which people must agree to use the service) and Community Standards (which people agree not to violate) describe what content is acceptable. Facebook has had terms and policies like these in place for many years, though the specific requirements have evolved.

12. The Terms of Service prohibit users from, among other things, doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights, including their intellectual property rights."[1]

---

[1] *Terms of Service*, Facebook, https://www.facebook.com/terms.php (last visited Sept. 29, 2021).

13. The Community Standards provide details about what content is not allowed on Facebook.[2] The Community Standards are organized into five categories: (i) violence and criminal behavior, (ii) safety, (iii) objectionable content, (iv) integrity and authenticity, and (v) respecting intellectual property. Within each of those five categories, the Community Standards identify additional subcategories, such as "adult nudity and sexual activity" or "hate speech." Users can see Facebook's policy rationale for prohibiting each category of content and examples. For example, the Community Standards explain that "hate speech" is not allowed on Facebook. Facebook, however, recognizes that people sometimes share content that includes someone else's hate speech to condemn it or raise awareness.[3] In other cases, user expression, including speech, that might otherwise violate our standards can be used self-referentially or in an empowering way. Facebook's policies are designed to allow room for these types of expression. The Community Standards also include information about when content may be accompanied by a sensitivity warning.

14. Facebook relies on both automated and human review to enforce its terms and policies at scale across its global service. For many categories, Facebook's artificial intelligence systems find more than 90% of the content they remove before anyone reports it. Facebook also has over 35,000 people working on safety and security. Teams across the company work together to, for example, prevent millions of attempts to create fake Facebook accounts and remove million of pieces of content containing adult nudity, sexual activity, bullying and harassment, child nudity and sexual exploitation of children, and hate speech, content shared by terrorist and organized hate

---

[2] *Community Standards*, Facebook, https://www.facebook.com/communitystandards/ (last visited Sept. 29, 2021) (*Facebook Community Standards*).
[3] *Facebook Community Standards*.

4

groups, and content that violates intellectual property rights. Facebook publicly shares information about its enforcement efforts in its Transparency Center.[4]

15. Facebook regularly publishes updates about its efforts to remove harmful content and protect its community. For example, in September 2018, Facebook published an article on how it uses artificial intelligence on Facebook to help suicide prevention efforts. In October 2019, Facebook published an article about the substantial efforts it had undertaken to protect against efforts to interfere with the 2020 U.S. election. In June 2020, Facebook published an article related to labels it would add to content and ads from entities believed to be state-controlled media; in February 2021, Facebook announced it would add informational labels to some posts related to climate change. In May 2021, Facebook published a threat report on efforts it is taking to protect against influence operations aimed at manipulating or corrupting public debate on Facebook by governments, commercial entities, politicians, and conspiracy and fringe political groups.

16. Facebook has had to implement changes to its policies and practices in response to extraordinary situations. For example, following Myanmar's military coup in February 2021, Facebook reduced the distribution of misinformation shared by the Myanmar military but also protected content, including political speech, that allowed "the people of Myanmar to express themselves." Facebook also revised its policies as information emerged during the COVID-19 pandemic.

17. Facebook has an appeals process for users to request review of most of its enforcement decisions. If Facebook determines it should not have removed the content under its policies, it will restore the content. In May 2020, Facebook established an external Oversight

---

[4] *Transparency Center*, Facebook, https://transparency.fb.com/ (last visited Sept. 29, 2021) (*Facebook Transparency Center*).

Board to review some of the most difficult enforcement decisions; the Oversight Board's decisions are binding on Facebook. Facebook also relies on independent, third-party fact-checkers to help identify and review certain types of content. If a fact-checker determines a particular post contains false information, Facebook will label the content and reduce its distribution.

18. Facebook also has tools that enable users to further curate their own News Feeds—for example, choosing a list of "Favorite" friends and pages to feature, blocking content from certain users or Pages, and reporting content they believe is inappropriate. Facebook has rolled out other features in response to feedback, such as the ability to turn off a counter displaying how many people have "liked" a post or photo.

19. Facebook has implemented a number of changes over the years to the way it ranks and displays content in News Feed. For example, in January 2018, Facebook announced changes to prioritize content from friends, family, and Groups in News Feed. Facebook recognized this change would likely decrease the amount of time users spent on Facebook, which it did, but believed it would be good for the community and its business over the long term. Facebook also announced recently that users were requesting to see less political content in their News Feeds and so it was studying ways to reduce the prominence of such posts.

### House Bill 20's Impact on Facebook

20. I understand that on or around September 9, 2021, the State of Texas enacted House Bill 20 (the "Bill"), which is set to go into effect on December 2, 2021. I also understand that Facebook will be subject to the law.

21. The Bill will significantly undermine, if not outright prevent, Facebook from enforcing its content policies and will require substantial and burdensome changes to the design and operation of its products. I will describe some examples below.

22. I understand that the Bill will force Facebook to display and prioritize content it would otherwise remove, restrict, or arrange differently. For example, the Bill prohibits "censorship" of any content based on the "viewpoint" of the expression or the speaker. "Censorship" includes decisions "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression."

23. This definition is broad enough to prevent Facebook from enforcing its terms and policies and even "ranking" the content that users are eligible to see in their News Feeds.

24. The definition of "viewpoint" is broad enough to include virtually any type of user expression, including hate speech and other objectionable content like white supremacist content, anti-Semitic conspiracy theories, and other racist content.

25. Similarly, the vague prohibition against "deny[ing] equal access or visibility to" content would appear to strike directly at Facebook's ability to rank and prioritize content to show people what they individually would deem most meaningful and valuable.

26. Further, because the Bill prohibits Facebook from "censoring" a Texas "user's ability to receive the expression of another person," the Bill effectively will require Facebook to alter its policies globally as Texans can access and engage with billions of pieces of content shared by billions of people across the world and every statement arguably expresses some viewpoint. The required changes will be extraordinarily burdensome to implement and will adversely impact Facebook's community.

27. Finally, the Bill appears to prohibit Facebook from engaging in its *own speech* because it vaguely prohibits Facebook from "otherwise discriminat[ing]" against user-submitted expression—which encompasses situations where Facebook appends a warning label (or other statement) to certain user-submitted content. So, for example, Facebook effectively will be

7

precluded from warning users, including teens, before viewing graphically-violent content or about content independent fact-checkers have determined is false.

28. I also understand that the Bill will impose a number of "disclosure", administrative, and operational requirements on Facebook. These requirements are also extraordinarily burdensome.

29. I understand that the Bill requires Facebook to "publicly disclose accurate information" regarding its content moderation practices, "including specific information regarding how the social media platform: (i) curates and targets content to users; (ii) places and promotes content, services, and products, including its own content, services, and products; (iii) moderates content; (iv) uses search, ranking, or other algorithms or procedures that determine results on the platform; and (v) provides users' performance data on the use of the platform and its products and services."

30. Though Facebook publishes its terms of service and community standards, the Bill does not explain what it means that Facebook's editorial policies must be "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform."

31. Moreover, although Facebook's detailed policies are publicly available, the Bill purports to demand even more without any guidance, making it impossible to publish policies that will account for each and every decision Facebook makes regarding the billions of pieces of content users can access on its services every day. All such decisions are unique and context-specific, and involve some measure of judgment.

32. The Bill also requires Facebook to disclose highly confidential, competitively sensitive business information, such as the "algorithms or procedures that determine results on the

platform." The underlying technology and processes that personalize users' News Feeds are highly proprietary and critical to Facebook's success. The public disclosure of this kind of information will result in competitive harm to Facebook and also expose Facebook and its community to harm by bad actors who will exploit such information.

33. I also understand that the Bill imposes a wide range of administrative and operational requirements that will be extraordinarily burdensome and require a substantial investment of time and resources to comply—for example:

- If Facebook removes content based on a violation of its "acceptable use policy," it must notify the user who provided the content of the removal and explain why the content was removed.

- Facebook must publish a "biannual transparency report" "outlining actions taken to enforce the policy," such as, for example, the number of instances the platform "was alerted to" and "took action with respect to illegal content, illegal activity, or potentially policy-violating content," including things like "content removal," "content demonetization," "content deprioritization" (which happens every time a user loads her or his News Feed since our product experiences are personalized), "account suspension," and "account removal," among others. The report must also include information on other matters, such as the "number of coordinated campaigns," the number of appeals by users, the percentage of successful appeals, and more.

- Facebook must implement a user complaint system that requires Facebook, within 14 days (excluding weekends), to review the content that is the subject of the complaint, determine whether the content adheres to Facebook's "acceptable use

9

policy," "take appropriate steps based on the determination," and then notify the user "regarding the determination made" and "steps taken." Facebook also must implement a specific appeals process that allows the user to appeal the decision to remove content from the platform, and provides written notice to the user of the determination of the appeal.

34. Given the extraordinary scale of Facebook's systems and enforcement efforts, as described above and in Facebook's transparency reports, these disclosure, administrative, and operational requirements would impose an enormous burden on Facebook, to the extent compliance is even feasible.

35. In short, if the Bill's restrictions go into effect, it will, among other things, force Facebook to display, arrange, and prioritize content it would otherwise remove, restrict, or arrange differently; it will chill Facebook's own speech; it will lead some users and advertisers to use Facebook less or stop use entirely; it will force Facebook to substantially modify the design and operation of its products; it will force Facebook to disclose highly sensitive, confidential business information; and it will impose highly onerous administrative and operational burdens on Facebook.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on September 30, 2021 in Washington, D.C..

DocuSigned by:

381E463703AB46C...

Neil Potts