**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, <br><br> and <br><br> COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> KEN PAXTON, in his official capacity as Attorney General of Texas <br><br> *Defendant*. | Civil Action No. 1:21-cv-00840-RP |

# Exhibit F –
# Stop Child Predators'
# Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

NETCHOICE, LLC, d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation,

*Plaintiffs*,

v.

KEN PAXTON, in his official capacity as Attorney General of Texas,

*Defendant*.

Civ. Action No. 21-cv-00840

**DECLARATION OF STOP CHILD PREDATORS
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Stacie D. Rumenap, declare as follows:

1. I am President at Stop Child Predators (SCP), an organization founded in 2005 to combat the sexual exploitation of children and protect the rights of crime victims nationwide. I have led SCP since 2006, having worked in all 50 states—including spearheading the passage in 46 states of Jessica's Law—on laws and educational efforts to bring together a team of policy experts, law enforcement officers, community leaders, and parents to launch state and federal campaigns to inform lawmakers and the public about policy changes that will protect America's children from sexual predators both online and in the real world.

2. The statements contained in this declaration are made upon my personal knowledge. I am over the age of 18 and am competent to make the statements herein. I make this Declaration in Support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. If called as a witness, I could and would testify under oath as follows.

3.   We work with parents, lawmakers, and technology companies to better educate families, schools, and lawmakers about the potential risks children face online, including grooming, luring, bullying, child pornography, and other harms to children.

4.   We also launched the Stop Internet Predators (SIP) initiative in 2008 because sex offender management and child safety must be addressed both in the real world and online. SIP recognizes that child predators often use online social-networking platforms to recruit child sex-trafficking victims, to groom children for sexual exploitation, and to sexually victimize children in general. Because previously convicted and registered sex offenders are the most identifiable and likely class of predators to target children online, we focus our policy efforts on keeping social media and the Internet more broadly safe for children.

5.   To do this, we work with leading online platforms, including Plaintiffs' members, to develop and enforce safety policies that prioritize children's safety while still promoting free speech. Our goal is to help these businesses develop tools and mechanisms to identify illegal content—Child Sexual Abuse Material (CSAM)—as soon as possible so that children are not exposed to abuse.

6.   Unfortunately, CSAM is prolific on the Internet. In 2018 alone, leading social media platforms reported over 45 million photos and videos of children being social media platforms reported over 45 million photos and videos of children being sexually abused.[1] In fact, there are so many reports of child exploitation that FBI and Department of Justice officials said it would require assigning cases to every FBI agent. The government does not presently have the resources to do that.[2]

---

[1] Katie Benner & Mike Isaac, *Child-Welfare Activists Attack Facebook Over Encryption Plans*, N.Y. Times (Feb. 5, 2020), https://nyti.ms/38rN3IX.
[2] *Id.*

7.      The government's limited resources underscore the critical importance of private moderation and filtering technologies. In order to detect CSAM, as well as to report it to authorities, online companies must develop and use advanced algorithms and other screening tools.

8.      If House Bill 20 (HB 20) is allowed to go into effect, we are concerned it will be harder to remove objectionable content online and to keep children safe online.

9.      The online platforms we work with remove millions of pieces of content that would otherwise enable child predation and harm children. We have grave concerns that HB 20 will impede their ability to remove such content and undermine my group's efforts to stop child predation and to make the internet safer for children. HB 20 is also vague and broad enough to prohibit the covered "social media platforms" from using algorithms in ways that could flag, remove, restrict, or demote harmful content, including CSAM.

10.     Similarly, HB 20's disclosure requirements give child predators a roadmap to escape detection. If they know how algorithms and other forms of editorial discretion work in detail, they will have an easier time evading detection and preying on vulnerable children.

11.     Likewise, HB 20's onerous obligations for account and content removal will likely cause online platforms to moderate less aggressively. That is particularly concerning at a time when we need even more moderation and even more filtering.

12.     I understand that HB 20 permits the covered "social media platforms" to continue their editorial discretion over expression that "is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment."

13.     While this carve-out is welcome, we still have three main concerns.

14. First, it is unclear whether this carve-out applies only to individual pieces of harmful content, or whether it prevents the programmatic efforts we have helped develop with the covered "social media platforms."

15. Second, in all events, we are concerned that the threat of countless lawsuits will lead to under-enforcement of such policies.

16. And third, it relies entirely on third-party organizations to detect and flag such content. As someone who has experience reporting such content for removal, I can say that it is impossible for third-party organizations to flag *all* or even most of this content. Sadly, many types of harmful content—including child grooming and predatory messages—remain hidden from public view. That is why it is essential that the platforms retain their right to remove harmful content and to use algorithms to help with that.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing to be true and correct to the best of my knowledge. Executed on this [28th day of September, 2021] in [Washington, DC].

[Stacie D. Rumenap]