# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a Netchoice, a 501(c)(6) District of Columbia organization,<br><br>and<br><br>COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation,<br><br>   *Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as Attorney General of Texas,<br><br>   *Defendant*. | § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 1:21-cv-00840-RP |

---

**BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF TEXAS, CENTER FOR DEMOCRACY & TECHNOLOGY, AND MEDIA LAW RESOURCE CENTER AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

**DISCLOSURE STATEMENT**

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

The American Civil Liberties Union ("ACLU") and the American Civil Liberties Union of Texas are non-profit entities that do not have parent corporations. No publicly held corporation owns 10 percent or more of any stake or stock in amici curiae ACLU or ACLU of Texas.

The Center for Democracy & Technology has no parent corporation and, because it is a non-stock corporation, no publicly held corporation owns 10% or more of its stock.

The Media Law Resource Center has no parent corporation and issues no stock

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iv

INTEREST OF AMICI CURIAE ............................................................................ 1

SUMMARY OF ARGUMENT ................................................................................ 4

ARGUMENT ........................................................................................................... 7

   I.   The challenged provisions of H.B. 20, if allowed to stand, would violate *Tornillo*'s rule against state regulation of editorial decisions.......................... 7

   II.  H.B. 20's application to a small subset of platforms raises additional First Amendment concerns................................................................................... 12

CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) .........................15

*Associated Press v. United States*, 326 U.S. 1 (1945). .............................................8

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)............................14

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94 (1973)..........6

*e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) ......................................................................................11

*Grosjean v. American Press Co.*, 297 U.S. 233 (1936)...........................................15

*Grp. W Cable, Inc. v. City of Santa Cruz*, 669 F. Supp. 954 (N.D. Cal. 1987).......14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ................................................................................................... 10, 11

*Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433 (S.D.N.Y. 2014) ........... 6, 10, 11

*La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981 (S.D. Tex. 2017).....................11

*Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007)................................11

*Meyer v. Grant*, 486 U.S. 414 (1988). .....................................................................8

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974). .......................... passim

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983).................................................................................................................15

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ............................................9

*Netchoice v. Moody*, 4:21-cv-220-RH-MAF, 2021 WL 2690876 (N.D. Fl. June 30, 2021). ............................................................................................... 10, 14

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)..............................................9

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017). ........................................10

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973)..............................................................................................................8

*Preferred Commc'ns, Inc. v. City of Los Angeles, Cal.*, 754 F.2d 1396 (9th Cir. 1985). ..............................................................................................................14

*Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434 (D.C. Cir. 1985) ........................14

*Reno v. ACLU*, 521 U.S. 844 (1997). ....................................................................10

*Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568 (W.D. Okla. May 27, 2003)................................................................................11

*Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994)..............................15

**Statutes**

Tex. Bus. & Com. Code, § 120.002(b) ...................................................................12

Tex. Bus. & Com. Code, § 120.001(1) ...................................................................12

Tex. Bus. & Com. Code, § 120.001(1)(C)(i)-(ii)....................................................12

Tex. Civ. Prac. & Rem. Code, § 143A.001(4)........................................................12

Tex. Civ. Prac. & Rem. Code, §§ 143A.001(1)–(2)................................................4

**Other Authorities**

Br. of Amici Curiae the Reporters Committee for Freedom of the Press and Media Law Resource Center, Inc. in Support of Plaintiff-Appellant, *Twitter v. Paxton*, No. 21-15869 (9th Cir. filed July 23, 2021)..........................................................5

Lucas A. Powe, Jr., The Fourth Estate and the Constitution (1992) ..................8, 13

Zechariah Chafee, Government and Mass Communications (1947)..........................9

## INTEREST OF AMICI CURIAE

The Reporters Committee for Freedom of the Press (the "Reporters Committee") is an unincorporated non-profit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan, non-profit organization. The ACLU of Texas is a state affiliate of the ACLU. Both organizations are dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws and, for more than a century, have been at the forefront of efforts nationwide to protect the full array of civil rights and liberties, including freedom of speech and freedom of the press online. The ACLU and the ACLU of Texas have frequently appeared before courts throughout the country in First Amendment cases, both as direct counsel and as amici curiae.

Center for Democracy & Technology ("CDT") is a non-profit public interest organization. For more than 25 years, CDT has represented the public's interest in an open, decentralized internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age.

CDT regularly advocates in support of the First Amendment and protections for online speech before legislatures, regulatory agencies, and courts.

The Media Law Resource Center, Inc. ("MLRC") is a non-profit professional association for content providers in all media, and for their defense lawyers, providing a wide range of resources on media and content law, as well as policy issues. These include news and analysis of legal, legislative and regulatory developments; litigation resources and practice guides; and national and international media law conferences and meetings. The MLRC also works with its membership to respond to legislative and policy proposals, and speaks to the press and public on media law and First Amendment issues. It counts as members over 125 media companies, including newspaper, magazine and book publishers, TV and radio broadcasters, and digital platforms, and over 200 law firms working in the media law field. The MLRC was founded in 1980 by leading American publishers and broadcasters to assist in defending and protecting free press rights under the First Amendment.

Amici collectively represent the First Amendment interests of media outlets and communication platforms across all technologies and the public's interest in receiving and disseminating information free from government censorship or control. Amici submit this brief because they are concerned that H.B. 20 violates

fundamental First Amendment rights that animate and preserve robust public debate across all media.

## SUMMARY OF ARGUMENT

H.B. 20 poses an acute threat to essential First Amendment protections for the press and public. If allowed to take effect, H.B. 20 would compel private communications platforms to host speech by others that they would otherwise not carry, and it would allow the state to regulate how private communications platforms curate that speech. Any law that authorizes the government to police the content of lawful speech on a private communications platform could permit government officials to force platforms to host speech perceived as favorable to the government or to pressure platforms to remove speech perceived as unfavorable. H.B. 20 vests the pure power of the censor in the State of Texas and its officials.

Amici the Reporters Committee and MLRC take no position on technology platforms' content moderation policies or practices; in other forums, other amici, including the ACLU and CDT, have expressed an array of views on the public policy implications of how and when platforms moderate content by public officials or others. All amici are, however, united in their position that the curation of lawful content online constitutes an exercise of "editorial control and judgment," which cannot be regulated by the state "consistent with First Amendment guarantees." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

Accordingly, amici write to address the following two points in support of Plaintiffs' motion for a preliminary injunction.

**First**, government efforts to police perceived bias by enforcing "viewpoint" neutrality, as defined by the state, in the exercise of editorial judgment by a private speaker contravene the rule articulated by the Supreme Court in *Tornillo*. Under *Tornillo*, it is impermissible for the government, regardless of motive, to mandate that a private editor "publish that which reason tells [it] should not be published," *id*. at 256 (internal quotation marks omitted), as such a mandate would "operate[] as a command in the same sense as a statu[t]e or regulation forbidding [a speaker] to publish specific matter," *id*. The *Tornillo* rule reflects the manifest danger in an enforceable right of access to publication on a private platform—that it would permit the *state* to impose *its* view of neutrality on a platform for speech, creating a profound temptation for those in power to skew public discourse in their favor. *Cf. id*. at 260 (White, J., concurring) ("[A]ny . . . system that would supplant private control of the press with the heavy hand of government intrusion . . . would make the government the censor of what the people may read and know.").

Under H.B. 20, the Texas Attorney General (as well as any patron of the platform) would be entitled to seek judicial relief against social media platforms who, in their view, have "censor[ed]" users' "expression" based on "viewpoint," with "viewpoint" undefined. Tex. Civ. Prac. & Rem. Code, §§ 143A.001(1)–(2), 143A.002, 143A.007(b)(1), 143A.008(b). "Censor" is defined as to "block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility

5

to, or otherwise discriminate against expression." *Id.* § 143A.001(1). In other words, "censorship" in H.B. 20 is effectively coterminous with routine content moderation, which, at base, reflects an exercise of editorial judgment by the platform. Further, supporters of H.B. 20, including the Governor and the Attorney General, have explicitly promised to use it to combat what they perceive as ideological bias in 'Big Tech.' *See* Plaintiffs' Mot. at 6–7 (reviewing legislative history); Br. of Amici Curiae the Reporters Committee for Freedom of the Press and Media Law Resource Center, Inc. in Support of Plaintiff-Appellant, *Twitter v. Paxton*, No. 21-15869 (9th Cir. filed July 23, 2021) (detailing Attorney General's stated intent to use Texas deceptive practices law to police bias).

Were such a regime allowed to stand, it could erode *Tornillo* protections for other forms of media, including traditional news organizations. *Cf. Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 144–45 (1973) (Stewart, J., concurring) (noting concern that requiring broadcast licensees to carry paid editorial advertising could erode editorial autonomy of print media). In part for that reason, courts have extended the *Tornillo* rule—a "virtually insurmountable barrier [against] . . . government tampering . . . with news and editorial content," *Tornillo*, 418 U.S. at 259 (White, J., concurring)—to online communications platforms such as search engines and social media, *see, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 443 (S.D.N.Y. 2014) ("In short, Plaintiffs' efforts to hold [search

6

engine] Baidu accountable in a court of law for its editorial judgments about what political ideas to promote cannot be squared with the First Amendment."). And that rule squarely prohibits what H.B. 20 would do: state regulation of a private speaker's decisions to speak or not to speak, and if the former, to determine when and how to speak. That large social media platforms are primarily engaged in facilitating speech between third parties is immaterial. The platforms may not be traditional media outlets, but the platform actions that H.B. 20 seeks to control are exercises of editorial discretion.

*Second*, by targeting only social media platforms with more than 50 million active monthly users, H.B. 20 not only violates another core holding in *Tornillo*— that market concentration or size *alone* does not permit legislative interference with editorial discretion—it also serves to discriminate against a small subset of a particular medium, which has long been prohibited by the First Amendment.

For these reasons, amici respectfully urge the Court to grant Plaintiffs' motion for a preliminary injunction.

## ARGUMENT

I.     **The challenged provisions of H.B. 20, if allowed to stand, would violate *Tornillo*'s rule against state regulation of editorial decisions.**

Private curation of content online is an inextricable component of modern public discourse. Such private curation necessarily entails making decisions about what material is allowed or disallowed on a platform, and those decisions are often

based on the viewpoint expressed in the content being moderated.[1]  In 1974, the

Supreme Court unanimously affirmed that the First Amendment forbids

governmental interference in editorial decisions by the print media when it held

unconstitutional Florida's "right of reply" statute, which "grant[ed] a political

candidate a right to equal space to reply to criticism and attacks on his record by a

newspaper." *Tornillo*, 418 U.S. at 243, 258.

The Court in *Tornillo* made clear that government regulation of the "choice

of material" to include in a newspaper cannot be "exercised consistent with First

Amendment guarantees." *Id.* at 258.  This conclusion applies with particular force

when such decisions deal with the "treatment of public issues and public officials—

whether fair or unfair." *Id.*  Indeed, press autonomy in decisions "about what and

what not to publish" has been described as "absolute." *See* Lucas A. Powe, Jr., The

Fourth Estate and the Constitution 277 (1992) ("Because editorial autonomy is

indivisible, it must be absolute."); *see also Tornillo*, 418 U.S. at 259 (White, J.,

---

[1]     Amici emphasize that, by purporting to impose viewpoint neutrality on platforms, H.B. 20 necessarily sweeps in core political speech, "an area in which the importance of First Amendment protections is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (invalidating Colorado prohibition on paid petition circulators as violative of First Amendment) (internal quotation marks omitted).  This is not a regulation concerning "a classic example of commercial speech," *see Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973), nor does it involve the application of generally applicable laws like antitrust regulations against a private speaker, *see Tornillo*, 418 U.S. at 254 (distinguishing *Associated Press v. United States*, 326 U.S. 1 (1945), and stressing that the district court decree at issue in *Associated Press* did not "compel AP or its members to permit publication of anything which their 'reason' tells them should not be published" (quoting 326 U.S. at 20 n.18)).  Rather, H.B. 20 directly interferes with the ability of communications platforms to present core political speech as their "reason" dictates. *Id.* at 256.

concurring) ("According to our accepted jurisprudence, the First Amendment erects a virtually insurmountable barrier between government and the print media so far as government tampering, in advance of publication, with news and editorial content is concerned." (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971))).

Chief Justice Burger's opinion for the Court in *Tornillo* emphasized two inevitable consequences of permitting the government to mandate access to publication in print media. *Id.* at 254. First, a "[g]overnment-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate,'" *id.* at 257 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964)). Second, must-carry provisions "intru[de] into the function of editors," including choices they would otherwise make about "the material to [publish]" and "the treatment of public issues and public officials." *Id.* at 258. In other words, an enforceable right of access poses the threat of direct press censorship: "[L]iberty of the press is in peril as soon as the government tries to compel what is to go into a newspaper." *Id.* at 258 n.24 (quoting Zechariah Chafee, Government and Mass Communications 633 (1947)). This holds for H.B. 20, which would grant the government a powerful mechanism to shape online speech to its will.

While the *Tornillo* Court confronted these issues in the context of print media, the Supreme Court has since recognized that the internet as a communications medium is entitled to full First Amendment protection. *Reno v. ACLU*, 521 U.S.

844, 870 (1997); *see also Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (holding unconstitutional a governmental ban on access to social media, and finding that "social media users employ these websites to engage in a wide array of protected First Amendment activity"). The Court has also recognized the application of *Tornillo* "well beyond the newspaper context," including to new communications media. *Jian Zhang*, 10 F. Supp. 3d at 437 (discussing Supreme Court caselaw). Further, as the Court has since explained, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569–70 (1995).

Applying those principles, courts have held that online platforms' decisions about what lawful content to host on their sites receive full First Amendment protection. Indeed, in a recent challenge to Florida's similar must-carry social media law, the district court held that the stated purpose of that law—to "balanc[e] the discussion" by "reining in the ideology of the large social-media providers"—is "*precisely* the kind of state action held unconstitutional" in *Tornillo* and *Hurley*. *Netchoice v. Moody*, 4:21-cv-220-RH-MAF, 2021 WL 2690876, *9 (N.D. Fl. June 30, 2021 (emphasis added); *see also Jian Zhang*, 10 F. Supp. 3d at 438 (recognizing that "a search engine's editorial judgment is much like many other familiar editorial

judgments, such as the newspaper editor's judgment of which wire-services stories to run and where to place them in the newspaper") (citation and quotation marks omitted); *e-ventures Worldwide, LLC v. Google, Inc.*, No. 2:14-cv-646, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017) ("A search engine is akin to a publisher, whose judgments about what to publish and what not to publish are absolutely protected by the First Amendment."); *Search King, Inc. v. Google Tech., Inc.*, No. CIV-02-1457, 2003 WL 21464568, at *2–4 (W.D. Okla. May 27, 2003) (concluding that search rankings are protected opinion).

Further, these protections apply equally to decisions to remove or exclude content. *See, e.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (holding Facebook could decide whether to take down or leave up a post because of "Facebook's First Amendment right to decide what to publish and what not to publish on its platform"); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629–30 (D. Del. 2007) (holding First Amendment right extends to decisions to exclude content from search platform). Crucially, these protections apply irrespective of the government's intention in seeking to intervene in these decisions. *See Jian Zhang*, 10 F. Supp. 3d at 438 ("Put simply, '[d]isapproval of a private speaker's statement'—no matter how justified disapproval may be—'does not legitimize use of the [Government's] power to compel the speaker to alter the message by including one more acceptable to others.'" (quoting *Hurley*, 515 U.S. at 581)).

State mandated viewpoint neutrality cannot be neutral; it will necessarily reflect the exercise of "editorial control and judgment" *by the state*. *Tornillo*, 418 U.S. at 258. Indeed, as noted, there is ample evidence in the record that this is exactly how the law's proponents intend to deploy it—to combat online bias, as they perceive it. Whether the concern over "bias" in online speech is fair or unfair, the danger of such a law to robust and open public discourse—"a powerful antidote to any abuses of power," *Tornillo*, 418 U.S. at 260 (White, J., concurring) (citation omitted)—cannot be overstated nor can it be tolerated in a free society.[2]

## II. H.B. 20's application to a small subset of platforms raises additional First Amendment concerns.

H.B. 20 applies only to social media platforms that functionally have more than 50 million active users in the United States in a calendar year. Tex. Bus. & Com. Code, §§ 120.001(1), .002(b); Tex. Civ. Prac. & Rem. Code, § 143A.001(4). Further, it exempts from the definition of "social media platform" any online service, application, or website that "consists primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider," where "any chat, comments, or interactive functionality is incidental to,

---

[2]     Such a concern was not abstract for the unanimous Court in *Tornillo*. Indeed, the Court's ruling came at the height of fallout from Watergate and shortly after a request by President Richard Nixon that the Justice Department explore the need for a federal right-of-reply statute because of press coverage perceived as critical of his administration. Anthony Lewis, *Nixon and a Right of Reply*, N.Y. Times, Mar. 24, 1974, at E2, https://perma.cc/2W2J-AJ65 ("Overhanging the debate is the reality of Watergate, where a vigorous press broke through repeated official White House denials of wrongdoing.").

directly related to, or dependent" on that content. Tex. Bus. & Com. Code, § 120.001(1)(C)(i)–(ii). In its findings, H.B. 20 also states that "social media platforms with the largest number of users are common carriers by virtue of their market dominance." H.B. 20, § 1(4).

The statute's focus on only large social media platforms both runs afoul of *Tornillo*, which expressly rejected the argument that market concentration alone can justify an enforceable access right and implicates other First Amendment prohibitions on speaker-based regulations and discrimination within a medium.

With respect to *Tornillo* and market concentration, Chief Justice Burger, in the longest section of the Court's opinion, carefully articulated the "contentions of access proponents," laying out in detail the abiding concern even then with diminished competition in mass media. 418 U.S. at 251 ("The First Amendment interest of the public in being informed is said to be in peril because the 'marketplace of ideas' is today a monopoly controlled by the owners of the market."). "[W]ere it not for the Court's use of phrases like 'access advocates,' a person reading it and stopping there would assume that" those advocates had won. Powe, *supra*, at 271.

But, immediately after that discussion, the Court wrote that "[h]owever much validity may be found in these arguments," a coercive right of access would "at once bring[] about a confrontation with the express provisions of the First Amendment and the judicial gloss on that Amendment developed over the years." *Tornillo*, 418

U.S. at 254.  The Court continued, "A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated," and thus the Florida right-of-reply statute failed First Amendment scrutiny, *even if* a newspaper would face no costs for having to comply, "because of its intrusion into the function of editors." *Id.* at 256–58.  In short, *Tornillo* is unequivocal that market concentration alone cannot justify state interference in the exercise of editorial control.[3]

Additionally, H.B. 20's focus on a small subset of private speakers within a medium, as well as its carve-out for entities that "pre-select" content that is not user-generated, also present serious First Amendment concerns.  Speaker-based restrictions such as these are often a "tell for content discrimination," *NetChoice, LLC*, 2021 WL 2690876, *10 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)), and, where they are, should be subject to heightened scrutiny, *id.*, independent of their contravention of *Tornillo*.  The Supreme Court has long held that differential taxation of members of a medium can violate the First

---

[3]    *See also Quincy Cable TV, Inc. v. F.C.C.*, 768 F.2d 1434, 1450 (D.C. Cir. 1985) ("[T]he Supreme Court has categorically rejected the suggestion that purely economic constraints on the number of voices available in a given community justify otherwise unwarranted intrusions into First Amendment rights.") (citing *Tornillo*, 418 U.S. at 247–56); *Preferred Commc'ns, Inc. v. City of Los Angeles, Cal.*, 754 F.2d 1396, 1404–05 (9th Cir. 1985), *aff'd and remanded sub nom. City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488 (1986) ("The Court [in Tornillo] refused to accept the plaintiff's argument that because economic conditions made entry into newspaper markets difficult, the government could impose a limited right of access to the press."); *Grp. W Cable, Inc. v. City of Santa Cruz*, 669 F. Supp. 954, 965 (N.D. Cal. 1987) ("In [*Tornillo*], the Supreme Court rejected the natural monopoly rationale in the context of newspapers.").

Amendment. *See Grosjean v. American Press Co.*, 297 U.S. 233, 244–55 (1936) (tax only on newspapers with over 20,000 weekly circulation unconstitutional); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (use tax on paper and ink applicable in practice only to large publications unconstitutional); *see also Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 234 (1987) (sales tax applicable to all newspapers and only some magazines unconstitutional). In *Minneapolis Star*, the Court also held that taxes targeting a specific medium—in that case print media—may also violate the First Amendment, even if they do not differentiate among members of the medium. 481 U.S. at 231; *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 659-61 (1994). While *Turner* also acknowledged that not all regulations that differentiate among media warrant strict scrutiny, what is clear is that speech regulations that are geared to the "suppression of certain ideas" absolutely are. *Id.* H.B. 20, by its plain terms, is such a law. Indeed, the state officials charged with its enforcement have said as much. Accordingly, both the law's targeting of a small subset of speakers within a medium, and its application just to social media platforms, would compel the application of strict scrutiny here and, along with its clear violation of *Tornillo*, its invalidation.

## CONCLUSION

For all of these reasons, amici respectfully urge the Court to grant Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

**HAYNES AND BOONE, LLP**

By: */s/Laura Lee Prather*
Laura Lee Prather
State Bar No. 16234200
Laura.Prather@haynesboone.com
Catherine Lewis Robb
State Bar No. 24007924
Catherine.Robb@haynesboone.com

600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone: (512) 867-8400
Telecopier: (512) 867-8470

***Counsel of Record for Amici Curiae***

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served in compliance with the Federal Rules of Civil Procedure via ECF filing on this 7th day of October 2021 to the following:

Gabriela Gonzalez-Araiza
Jeremy Evan Maltz
Jonathan D. Urick
Steven P. Lehotsky
Lebotsky Keller LLP
200 Massachusetts Avenue NW
Washington, DC 20001
slehotsky@uschamber.com

Scott A. Keller
Matthew Hamilton Frederick
Todd Lawrence Disher
Lehotsky Keller LLP
919 Congress Ave., Ste. 1100
Austin, TX 78701
scott@lehotskykeller.com
matt@lehotskykeller.com
todd@lehotskykeller.com

*Attorneys for Plaintiff*

*/s/Laura Lee Prather*
Laura Lee Prather