**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, | § § § § | |
| and | § § | |
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation | § § § | Civil Action No. 1:21-cv-00840-RP |
| *Plaintiffs*, | § § § | |
| v. | § § | |
| KEN PAXTON, in his official capacity as Attorney General of Texas | § § § | |
| *Defendants*. | § § | |

**BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION IN SUPPORT
OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Thomas S. Leatherbury
VINSON & ELKINS L.L.P.
2001 Ross Avenue
Suite 3900
Dallas, Texas 75201-2975
214.220.7700 (telephone)
214.999.7792 (facsimile)
tleatherbury@velaw.com

David Greene (*Pro Hac Vice* pending)
Mukund Rathi (*Pro Hac Vice* pending)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, California 94109
415.436.9333 (telephone)
415.436.9993 (facsimile)
davidg@eff.org

*Attorneys for Amicus Curiae
Electronic Frontier Foundation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................... ii

INTERESTS OF AMICUS CURIAE ....................................................................................... 1

INTRODUCTION .................................................................................................................... 2

ARGUMENT ........................................................................................................................... 2

I.      INTERNET USERS ARE BEST SERVED BY THE AVAILABILITY OF
BOTH UNMODERATED AND MODERATED PLATFORMS ..................................... 2

        A.      Moderated Platforms Serve the Interests of Users and the Public
Generally .......................................................................................................... 2

        B.      HB 20 WILL DESTROY THE MANY ONLINE COMMUNITIES
THAT RELY ON CURATION ........................................................................ 7

        C.      In Praise of the Unmoderated Platform .................................................... 8

II.     CURRENT CONSTITUTIONAL AND STATUTORY LAW SUPPORT
THE CO-EXISTENCE OF UNMODERATED AND MODERATED
PLATFORMS ................................................................................................................ 10

        A.      The First Amendment Protects a Service's Right to Curate Users'
Speech That It Publishes on Its Site ...................................................... 11

        B.      Social Media Sites Are Similar to Newspapers' Opinion Pages That
Were Subject to the Right-of-Reply Law in *Tornillo* ........................... 14

        C.      HB 20'S RELIANCE ON THE SIZE OF A PLATFORM'S USER
BASE DOES NOT CURE ITS CONSTITUTIONAL DEFECTS ...................... 16

III.    HB 20'S PUBLICATION MANDATE UNDERMINES SECTION 230 ........................ 16

IV.    INTERNET USERS ARE BEST SERVED BY VOLUNTARY MEASURES
FOR CONTENT MODERATION RATHER THAN HB 20'S MANDATES ................ 18

CONCLUSION ...................................................................................................................... 20

CERTIFICATE OF SERVICE .............................................................................................. 21

# TABLE OF AUTHORITIES

*Cases*

*Assocs. & Aldrich Co. v. Times Mirror Co.*,
  440 F.2d 133 (9th Cir. 1971) .................................................................... 11, 13

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ...................................................................................... 15

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ................................................................. 17, 18

*Davison v. Facebook, Inc.*,
  370 F. Supp. 3d 621(E.D. Va. 2019),
  *aff'd*, 774 F. App'x 162 (4th Cir. 2019) ....................................................... 14

*DJ Lincoln Enters., Inc. v. Google,
  LLC*, No. 2:20-CV-14159,
  2021 WL 184527 (S.D. Fla. Jan. 19, 2021) ................................................ 14

*Dreamstime.com, LLC v. Google, LLC*,
  No. C 18-01910 WHA,
  2019 WL 2372280 (N.D. Cal. June 5, 2019) .............................................. 14

*Elonis v. United States*,
  575 U.S. 723 (2015) ...................................................................................... 8

*e-ventures Worldwide, LLC v. Google, Inc.*,
  No. 214CV646FTMPAMCM,
  2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) .............................................. 14

*Florida Star v. B.J.F.*,
  491 U.S. 524 (1989) ..................................................................................... 16

*Green v. America Online*,
  318 F.3d 465 (3d Cir. 2003) ......................................................................... 17

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ..................................................................................... 13

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
  138 S. Ct. 2448 (2018) ................................................................................. 13

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ................................................................... 17

*La'Tiejira v. Facebook, Inc.*,
   272 F. Supp. 3d 981 (S.D. Tex. 2017) ............................................................. 14, 17

*Los Angeles v. Preferred Communications, Inc.*,
   476 U.S. 488 (1986) ........................................................................................ 11, 13

*Manhattan Community Access Corp. v. Halleck*,
   139 S. Ct. 1921 (2019) .......................................................................................... 11

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018) .......................................................................................... 13

*Miami Herald Publishing Co. v. Tornillo*,
   418 U.S. 241 (1974) ......................................................................................... *passim*

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
   460 U.S. 575 (1983) .............................................................................................. 16

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) .......................................................................................... 13

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .............................................................................................. 15

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017) .......................................................................................... 15

*Reno v. Am. Civil Liberties Union*,
   521 U.S. 844 (1997) ................................................................................................ 8

*Smith v. California*,
   361 U.S. 147 (1959) .............................................................................................. 15

*Stratton Oakmont, Inc. v. Prodigy Services Co.*,
   No. 31063/94,
   1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .................................................. 17

*United States v. Alvarez*,
   567 U.S. 709 (2012) ................................................................................................ 8

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ................................................................................ 18

*Zhang v. Baidu.com Inc.*,
   10 F. Supp. 3d 433 (S.D.N.Y. 2014) .................................................................... 14

**Statutes**

47 U.S.C. § 230 ............................................................................................... *passim*

Texas House Bill 20 (HB 20)................................................................................ *passim*

**Other Authorities**

*A Brief History of NSF and the Internet*,
    National Science Foundation, Aug. 13, 2003 ........................................... 17

*Accountability Report 1.0*, Internet Comm'n (2021) .................................. 20

*Community Guidelines*, Pinterest........................................................................ 4

Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, Oct. 2020................................ 10

David Post, *Opinion: A Bit of Internet History, or How Two Members of Congress
    Helped Create a Trillion or so Dollars of Value*,
    Washington Post, Aug. 27, 2015 .............................................................. 16

*Facebook Treats Punk Rockers Like Crazy Conspiracy Theorists, Kicks Them Offline*,
    EFF............................................................................................................ 10

*How Communities Are Safeguarded?*, HealthUnlocked.................................. 5

Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*,
    Brooking's TechStream, May 21, 2020.................................................... 3

Jillian C. York, *Silicon Values: The Future of
    Free Speech Under Surveillance Capitalism* (Verso 2021)...................... 9

Kevin Anderson, *YouTube Suspends Egyptian Blog Activist's Account*,
    speThe Guardian, Nov. 28, 2007 ............................................................ 10

*Letting the Sun Shine In: Transparency and Accountability in the Digital Age*
    UNESCO (2021), ...................................................................................... 20

Malachy Browne, *YouTube Removes Videos Showing Atrocities in Syria*,
    N.Y. Times, Aug. 22, 2017........................................................................ 10

Martin Belam, *Twitter Under Fire After Suspending Egyptian
    Journalist Wael Abbas*, The Guardian, Dec. 18, 2017............................ 9

Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT Videos—and
    Adding Anti-LGBT Ads to Some*, The Verge, June 4, 2018 ..................... 10

*Membership Rules*, Vegan Forum........................................................................ 6

Mike Masnick, *Masnick's Impossibility Theorem: Content Moderation At Scale
    Is Impossible To Do Well*, Techdirt, Nov. 20, 2019 ................................ 9

*Moderator Guidelines*, Reddit .......................................................................... 7

iv

*Number of Monthly Active Pinterest Users*, Statista ....................................................... 3

Press Release, EFF, *EFF and Coalition Partners Push Tech Companies To Be
   More Transparent and Accountable About Censoring User Content* (May 7, 2018) ............. 19

ProAmericaOnly, https://proamericaonly.org ................................................................ 5

RallyPoint, https://www.rallypoint.com ....................................................................... 4

Ravelry, https://www.ravelry.com .............................................................................. 5

*Reddiquette*, Reddit .................................................................................................. 7

Ryan Mac, *Instagram Censored Posts About One of Islam's Holiest Mosques, Drawing
   Employee Ire*,
   BuzzFeed News, May 12, 2021 .............................................................................. 10

*Strava Community Standards*, Strava .......................................................................... 4

*Strava Terms of Service*, Strava, .............................................................................. 4

Taylor Wofford, Twitter Was Flagging Tweets Including the
   Word "Queer" as Potentially "Offensive Content," Mic, June 22, 2017 ................................... 9

*Terms of Use*, Conservative Truth Network ................................................................. 6

*Terms of Use*, HealthUnlocked ................................................................................. 5

The Democratic Hub, https://www.democratichub.com ................................................... 5

*The Rules*, SmokingMeatForums.com ........................................................................ 6

The Santa Clara Principles, https://santaclaraprinciples.org/ ...................................... 19

### INTERESTS OF AMICUS CURIAE[1]

*Amicus curiae* Electronic Frontier Foundation (EFF) files this brief on behalf of internet users in the United States and around the world who rely on online intermediaries, including social media, to communicate with each other and to access information online. Many internet users are concerned about the power these intermediaries exercise over online discourse. Some users think social media platforms allow too much speech they consider harmful, while others think social media companies "moderate" too much of their users' speech. But all benefit from the diverse options available to them.

Recognizing the internet's power as a tool of democratization, for more than 30 years, EFF has worked to protect the rights of users to transmit and receive information online. EFF is a non-profit civil liberties organization with more than 38,000 dues-paying members, bound together by a mutual and strong interest in helping the courts ensure that such rights remain protected as technologies change, new digital platforms for speech emerge and reach wide adoption, and the internet continues to re-shape governments' interactions with their citizens. EFF has a keen interest in ensuring that the interests of internet users are presented to courts considering crucial online free speech issues such as the ones before this Court. EFF represents the interests of technology users in court cases and broader policy debates surrounding the application of law in the digital age and has filed amicus briefs in similar cases in both U.S. and international courts on these issues.

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than the *amicus curiae* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.

## INTRODUCTION

Although some internet users are understandably frustrated and perplexed by how social media companies curate their users' speech on their platforms, internet users nevertheless derive the most benefit when the First Amendment protects the platforms' rights to make those decisions, and 47 U.S.C. § 230 (Section 230) bolsters and supports those rights. These protections ensure that social media companies can create their own curation policies free from governmental mandates, resulting in a diverse array of forums for users, with unique editorial views and community norms.

Texas House Bill 20 (HB 20) takes those protections away and forces platforms to host speech inconsistent with their editorial vision. HB 20 prohibits popular online platforms from declining to publish others' speech, even when that speech violates the platform's rules, and even though such "content moderation" can be valuable to many internet users when it is carefully implemented.

Inconsistent and opaque private content moderation is a problem for users. But it is one best addressed through self-regulation.

This Court should grant the plaintiffs' motion for a preliminary injunction.

## ARGUMENT

**I.  INTERNET USERS ARE BEST SERVED BY THE AVAILABILITY OF BOTH UNMODERATED AND MODERATED PLATFORMS**

Internet users are best served under current law, where the First Amendment and Section 230, taken together, create legal space for the emergence of both highly moderated and unmoderated platforms.

### A.    Moderated Platforms Serve the Interests of Users and the Public Generally

Social media platforms like Facebook, YouTube, Twitter, and others targeted by HB 20,

are not the first online services to moderate—or edit, or curate—the user speech that appears on their sites. Online services, at least from their point of mass adoption, rarely allowed all legal speech to be published on their sites. Most notably, most platforms for user speech banned legal, non-obscene sexual content, speech that enjoys First Amendment protection. Large-scale, outsourced content moderation emerged in the early 2000s.[2]

Many internet users greatly benefit from moderated platforms. Users may want to find or create affinity and niche communities dedicated to certain subject matters or viewpoints, and exclude others. Users may prefer environments that shield them from certain kinds of legal speech, including hateful rhetoric and harassment. Users may want a service that attempts to filter out misinformation by relying on sources the user trusts.

As a result of this exercise of editorial freedom, users can choose from a variety of social media offerings, many of which reflect distinct editorial viewpoints that Texas bans as soon as the platform achieves a certain number of active users.

Pinterest, a site designed to visually inspire creative projects, for example, has "community guidelines" that "outline what we do and don't allow on Pinterest."[3] Under these guidelines, Pinterest reserves the right to remove several categories of constitutionally protected speech: "Adult content," "Exploitation," "Hateful activities," "Misinformation," "Harassment and criticism," "Private information," "Self-injury and harmful behavior," "Graphic Violence and Threats," "Violent actors," "Dangerous goods and activities," "Harmful or Deceptive

---

[2] Jillian C. York & David Greene, *How to Put COVID-19 Content Moderation Into Context*, Brooking's TechStream, May 21, 2020, https://www.brookings.edu/techstream/how-to-put-covid-19-content-moderation-into-context/.

[3] *Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines (last visited Oct. 7, 2021). Pinterest currently has 91 million monthly active users in the United States and is thus bound by HB 20. *Number of Monthly Active Pinterest Users*, Statista, https://www.statista.com/statistics/995071/pinterest-app-mau-region/ (last visited Oct. 7, 2021).

Products & Practices," and "Impersonation." Pinterest has special rules for comments users post

on other users "Pins," including a ban on "Irrelevant or non-purposeful material."[4]

Roblox, a rapidly growing social network through which its over 46 million active daily

users worldwide play and build their own games, warns that its Community Standards "prohibit

things that certain other online platforms allow."  For example, Roblox prohibits "Singling out a

user or group for ridicule or abuse," "all sexual content or activity of any kind," "The depiction,

support, or glorification of war crimes or human rights violations, including torture," and much

political content, including any discussion of political parties or candidates for office.[5]

Strava, a social media platform for athletes with millions of active users, only offers

account verification to professional athletes.[6] Strava's Community Standards also warn that non-

original content, offensive statements, and hate speech will be removed. One of Strava's main

features is for cyclists and runners to share their routes, called "segments," on Strava; but

Strava's Community Standards allow only "good segments" created with "common sense."[7]

But every service starts small and the internet is full of specialized services with unique

editorial viewpoints that may rapidly gain users as the sites above have—from RallyPoint, a

social media platform for members of the armed services,[8] to Ravelry, a social media site

---

[4] *Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines (last visited Oct. 7, 2021).

[5] *Roblox Community Standards*, Roblox, https://en.help.roblox.com/hc/en-us/articles/203313410-Roblox-Community-Standards (last visited October 8, 2021); *Roblox Reports Second Quarter 2021 Financial Reports*, https://ir.roblox.com/news/news-details/2021/Roblox-Reports-Second-Quarter-2021-Financial-Results/.

[6] *Strava Terms of Service*, Strava, https://www.strava.com/legal/terms#conduct (last updated Dec. 15, 2020).

[7] *Strava Community Standards*, Strava, https://www.strava.com/community-standards (last visited Oct. 7, 2021).

[8] RallyPoint, https://www.rallypoint.com (last visited Oct. 7, 2021).

focused on knitting.[9]

HealthUnlocked, a social media site for the discussion of health information, notifies its users that "Negative and damaging references to identifiable individuals" may be edited or deleted either by HealthUnlocked or by a community administrator and requires users to agree "to share information that is true and correct to the best of your knowledge and . . . that is primarily drawn from your personal experience."[10]

Because they are protected by the First Amendment, and not restricted by it, social media platforms may choose to provide forums only for certain political ideologies, engaging in the type of viewpoint discrimination the First Amendment generally forbids the government from doing. Thus, we can have both ProAmericaOnly, https://proamericaonly.org, which promotes itself as "Social Media for Conservatives" and promises "No Censorship | No Shadow Bans | No BS | NO LIBERALS" and The Democratic Hub, https://www.democratichub.com, an "online community … for liberals, progressives, moderates, independent[s] and anyone who has a favorable opinion of Democrats and/or liberal political views or is critical of Republican ideology," and everything else on the political spectrum.

Such ideologically focused sites may constitutionally exclude those who express a conflicting political ideology. For example, the Conservative Truth Network explains that

> **This is a CONSERVATIVE PLATFORM.** CTN was created as a public space in which patriots, conservatives and right wing politicians can speak their truth, share their knowledge and voice their opinions without being silenced, suspended or banned by big tech social media platforms such as Twitter and Facebook.
>
> However, if you are a liberal or leftist and create an account on CTN to

---

[9] Ravelry, https://www.ravelry.com (last visited Oct. 7, 2021).

[10] *How Communities Are Safeguarded?*, HealthUnlocked, https://support.healthunlocked.com/article/11-community-guidelines#enforcing (last visited Oct. 7, 2021); *Terms of Use*, HealthUnlocked, https://support.healthunlocked.com/article/147-terms (last updated Sept. 2, 2021).

respectfully and politely ask questions for the purpose of becoming educated and enlightened about the Conservative position without using any insulting or defamatory language towards any conservative, patriot or right wing politician on our platform *(or not on our platform)* or towards the President of the United States, you will be permitted to remain as a CTN member.

If you are a liberal or leftist and create an account on CTN to harass or to "mess with" conservatives, patriots or right wing politicians on our platform *(or not on our platform)*, or if you use any defamatory language towards any CTN member or use any derogatory language in reference to our President, Donald J. Trump, you will receive **only ONE WARNING** to correct your behavior and your demeanor on this platform. If, after receiving this warning, you still refrain from correcting your demeanor and behavior on this platform, **YOU WILL BE PERMANENTLY BANNED; NO EXCEPTIONS.**

If you wish to post negative and derogatory content regarding conservatives, the President of the United States or any right wing politicians, you have other social media platforms on which to share your negative leftist or liberal viewpoints; that type of behavior will NEVER be permitted here on Conservative Truth Network.[11]

This right to exclude opposing viewpoints extends to all types of belief systems. So, Vegan Forum does not require its users to be "vegan, vegetarian or even have immediate plans to give up animal products"; but since it is a site designed to promote a vegan lifestyle, "we will not tolerate members who promote contrary agendas."[12] And SmokingMeatsForums.com, a "community of food lovers dedicated to smoking meat," more generally bans "fighting or excessive arguing" in its user discussion forums.[13]

Among the variety of content moderation practices is community moderation, with Reddit among its most popular adopters. Reddit users manage and create thousands of communities, called subreddits. Although Reddit has an overriding content policy, a moderator

---

[11] *Terms of Use*, Conservative Truth Network, https://conservativetruthnetwork.com/termsofuse (last visited Oct. 7, 2021) (emphasis in original).

[12] *Membership Rules*, Vegan Forum, https://www.veganforum.org/help/terms/ (last visited Oct. 7, 2021).

[13] *The Rules*, SmokingMeatForums.com, https://www.smokingmeatforums.com/help/rules/ (last visited Oct. 7, 2021).

makes the decisions within each community as guided by Reddit's "Moderator Guidelines for Healthy Communities."[14] Reddit thereby empowers some users to remove other users' speech if that speech is against that community's rules. As a result, while a user's viewpoint may be acceptable in one subreddit, it may be deleted from another.

### B.    HB 20 WILL DESTROY THE MANY ONLINE COMMUNITIES THAT RELY ON CURATION

That the variety of editorial policies sampled above would all be required to adopt neutral viewpoint policies as they became popular is nonsensical and contrary to the interests of internet users. HB 20 forces platforms to defend their specialized moderation practices in court, and prospect of the costs of repeated litigation will chill their exercise of editorial discretion. That will ultimately harm users by limiting the availability of online services that cater to their particular interests, communities, or political viewpoints, and which seek to protect their users from abuse and harassment.[15] HB 20 appears to bar community moderation where users are empowered to down-rank other users' speech based on viewpoint.[16]

That HB 20 only prohibits viewpoint discrimination does not relieve its censorial effect on social media platforms. Even the non-niche platforms that publish diverse content and views will be hesitant to remove any unwanted legal speech from their sites, for fear that their decisions might be judged to be based on a viewpoint the user or *any other person* expressed *on or off the*

---

[14] *Moderator Guidelines*, Reddit, https://www.redditinc.com/policies/moderator-guidelines (eff. Apr. 17, 2017).

[15] *Amicus* also has serious concerns with HB 20's creation of Bus. & Com. Code § 321.054, which may impose untenable restrictions on email providers' ability to protect users from annoying, abusive, and harassing spam. The new Sec. 321.054 would prohibit email providers from blocking emails unless they contain illegal content or malware, thus disabling email providers from merely blocking emails its users find objectionable and obnoxious.

[16] *See Reddiquette*, Reddit, https://reddit.zendesk.com/hc/en-us/articles/205926439-Reddiquette (last visited Oct. 7, 2021).

*site*. *See* HB 20 § 143A.002. This unwanted speech might include non-obscene nudity; non-threatening violent content; false but non-harmful or non-defamatory content; or any content that is irrelevant to the platform's purpose or contrary to the platform host's or its community's values, but is nevertheless protected by the First Amendment.[17]

### C.     In Praise of the Unmoderated Platform

Unmoderated platforms, where the operator plays no role in selecting protected content or ordering its presentation, also benefit internet users and the public generally by eliminating private censors, inhibiting the creation of silos, and allowing users to engage in free-form discussions and debates of their choosing, and find unexpected sources of ideas and information. Users need not fear that their communications are actively monitored, nor that they may accidentally run afoul of content rules. Unmoderated platforms can be of special value to political dissidents and others who may be targeted for censorship by governments and private actors. They provide an accessible forum for speech that is unpopular, disfavored, or inadvertently suppressed. Given the centrality of the Internet to modern communication, a world where unmoderated online platforms were prohibited would be an impoverished one.

One of the chief advantages of unmoderated platforms is that they avoid the millions of impossible moderation decisions a platform must make once it decides to begin even the smallest amount of moderation. As it is often said, content moderation at scale is impossible to do

---

[17] *See, e.g., Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997) (non-obscene but indecent sexual content is protected by First Amendment); *Elonis v. United States*, 575 U.S. 723, 740 (2015) (certain threatening speech is protected by First Amendment); *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (certain non-harmful false speech is protected by First Amendment).

perfectly, and nearly impossible to do well.[18] Even when using a set of precise rules or carefully articulated "community standards," moderated platforms often struggle to draw workable lines between speech that is and is not permitted. Every online forum for user speech, not just the dominant social media platforms, struggles with this problem.

This is neither a new problem nor one limited to U.S. conservative politics. In 2007, YouTube, only two years old at the time, shut down the account of Egyptian human rights activist Wael Abbas, after receiving multiple reports that the account featured graphic videos of police brutality and torture. YouTube's community standards at the time stated that "Graphic, gratuitous violence is not allowed." Just one year before, Abbas became the first blogger to receive the Knight International Journalism Award. Abbas's account was restored only after the U.S. State Department intervened with YouTube's new owner, Google.[19]

Thousands of questionable, confounding, and often downright incorrect decisions continue to occur to this day, and again, are in no way limited to conservative American speakers. In 2017, Twitter disabled the verified account of Wael Abbas.[20] That same year, users discovered that Twitter had marked tweets containing the word "queer" as offensive.[21] In

---

[18] *See, e.g.*, Mike Masnick, *Masnick's Impossibility Theorem: Content Moderation At Scale Is Impossible To Do Well*, Techdirt, Nov. 20, 2019, https://www.techdirt.com/articles/20191111/23032743367/masnicks-impossibility-theorem-content-moderation-scale-is-impossible-to-do-well.shtml.

[19] Jillian C. York, *Silicon Values: The Future of Free Speech Under Surveillance Capitalism* 25-27 (Verso 2021).

[20] Martin Belam, *Twitter Under Fire After Suspending Egyptian Journalist Wael Abbas*, The Guardian, Dec. 18, 2017 , https://www.theguardian.com/media/2017/dec/18/twitter-faces-backlash-after-suspending-egyptian-journalist-wael-abbas.

[21] Taylor Wofford, Twitter Was Flagging Tweets Including the Word "Queer" as Potentially "Offensive Content," Mic, June 22, 2017, https://www.mic.com/articles/180601/twitter-was-flagging-tweets-including-the-word-queer-as-potentially-offensive-content.

January 2021, Facebook's updated policy to remove "harmful conspiracy theories" resulted in it disabling a punk rock band's page because its name, Adrenochrome, is a chemical that has become a central part of the QAnon conspiracy theory.[22] Also earlier this year, Facebook-owned Instagram removed posts about one of Islam's holiest mosques, Al Aqsa, because its name is contained with the name of a designated terrorist organization.[23] YouTube has also removed videos documenting atrocities in Syria and elsewhere under its graphic violence policy,[24] and has been accused of restricting and demonetizing LGBTQ+ content.[25] Sex worker advocates have documented how they are routinely shadow banned across a variety of social media platforms.[26]

Unmoderated sites are uncommon. But existing law supports their existence.

## II. CURRENT CONSTITUTIONAL AND STATUTORY LAW SUPPORT THE CO-EXISTENCE OF UNMODERATED AND MODERATED PLATFORMS

The law in its current state, without jettisoning decades of binding precedent that HB 20 disregards, supports the co-existence of both moderated and unmoderated online platforms.

As the plaintiffs correctly argue, the First Amendment shields platforms from being

---

[22] *Facebook Treats Punk Rockers Like Crazy Conspiracy Theorists, Kicks Them Offline*, EFF, https://www.eff.org/takedowns/facebook-treats-punk-rockers-crazy-conspiracy-theorists-kicks-them-offline (last visited Oct. 7, 2021).

[23] Ryan Mac, *Instagram Censored Posts About One of Islam's Holiest Mosques, Drawing Employee Ire*, BuzzFeed News, May 12, 2021, https://www.buzzfeednews.com/article/ryanmac/instagram-facebook-censored-al-aqsa-mosque.

[24] Malachy Browne, *YouTube Removes Videos Showing Atrocities in Syria*, N.Y. Times, Aug. 22, 2017, https://www.nytimes.com/2017/08/22/world/middleeast/syria-youtube-videos-isis.html; Kevin Anderson, *YouTube Suspends Egyptian Blog Activist's Account*, The Guardian, Nov. 28, 2007, https://www.theguardian.com/news/blog/2007/nov/28/youtubesuspendsegyptianblog.

[25] Megan Farokhmanesh, *YouTube Is Still Restricting and Demonetizing LGBT Videos—and Adding Anti-LGBT Ads to Some*, The Verge, June 4, 2018, https://www.theverge.com/2018/6/4/17424472/youtube-lgbt-domentization-ads-alogrithm.

[26] *See* Danielle Blunt et al., *Posting Into The Void*, Hacking//Hustling, Oct. 2020, https://hackinghustling.org/wp-content/uploads/2020/09/Posting-Into-the-Void.pdf.

forced to publish any content that they would otherwise choose not to publish. And this remains true regardless of a platform's size or market-dominance.

Section 230 bolsters these constitutional rights with important procedural benefits that allow for quick dismissal and discourage frivolous lawsuits, thus decreasing incentives to censor user speech. Section 230 provides online platforms with immunity from liability both for publishing and deciding not to publish user speech. HB 20, which requires social media companies with many users to publish all user content, upsets this careful balance.

> **A.    The First Amendment Protects a Service's Right to Curate Users' Speech That It Publishes on Its Site**

Every court that has considered the issue has rightfully found that private entities that operate online platforms for user speech enjoy a First Amendment right to curate that speech.

The Supreme Court has long held that private publishers have a First Amendment right to control the content of their publications. *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 254-55 (1974). *Cf. Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) (reaffirming that "when a private entity provides a forum for speech," "[t]he private entity may . . . exercise editorial discretion over the speech and speakers in the forum"). *See also Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494 (1986) (recognizing cable television providers' First Amendment right to "exercis[e] editorial discretion over which stations or programs to include in its repertoire"); *Assocs. & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 134 (9th Cir. 1971) (rejecting argument that Los Angeles Times' "semimonopoly and quasi-public position" justified order compelling it to publish certain advertisements). This intrusion into the functions of editors is *per se* unconstitutional even if the compelled publication of undesired content would not cause the publisher to bear additional costs or forgo publication of desired content. *Tornillo*, 418 U.S. at 258.

The parallels between *Tornillo* and the present case are strong.

Both concern state laws that require private companies to publish the viewpoints of others. In *Tornillo*, the law required newspapers that endorsed a candidate for elected office to publish a response from the endorsed candidate's opponents. *Id*. at 243-45. HB 20 is even broader, flatly prohibiting large social media companies from making editorial decisions based on *anybody's* viewpoint, no matter where it was expressed, and regardless of whether it was a viewpoint expressed by one of its users.

And the policy concerns behind the laws are similar.

HB 20 is largely motivated by the perceived market dominance of large platforms, and the state's belief that user-rich social media companies were not traditional publishers, but instead "are common carriers by virtue of their market dominance." HB 20 § 1(4).

In *Tornillo*, the Supreme Court rejected "vigorous" arguments that "the government has an obligation to ensure that a wide variety of views reach the public." 418 U.S at 247-48. The state of Florida had argued in *Tornillo*, that the print news media both dominated public discourse—the state cited a "concentration of control of outlets to inform the public," that had "become big business," "noncompetitive and enormously powerful and influential in its capacity to manipulate popular opinion and change the course of events," *Id.* at 248-49,—and were biased and manipulated public discourse:

> The result of these vast changes has been to place in a few hands the power to inform the American people and shape public opinion. . . . The abuses of bias and manipulative reportage are, likewise, said to be the result of the vast accumulations of unreviewable power in the modern media empires.

*Id.* at 250-51.

The *Tornillo* Court did not dispute the validity of these concerns, but nevertheless found that governmental interference with editorial discretion was so anathema to the First Amendment

and the broader principles of freedom of speech and the press that the remedy for these concerns must be found through "consensual mechanisms" and not by governmental compulsion. *Id.* at 254. *See also Times Mirror Co*., 440 F.2d at 134 (rejecting argument that the *Los Angeles Times*' "semimonopoly and quasi-public position" justified order compelling the newspaper to publish certain advertisements).

     *Tornillo* is not limited to newspapers or platforms that actively pre-screen content before publishing it. It applies to any entity that speaks by curating the speech of others, and, though phrased in terms of traditional print newspaper publishers, has been applied in a variety of speech contexts, including thrice in the 2018 Supreme Court term. *See Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018); *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1745 (2018) (Thomas, J., concurring). In one noteworthy, non-press setting, the Supreme Court applied *Tornillo*, among other authorities, in holding that the organizers of a parade had a First Amendment right to curate its participants, and thus could not be required to include a certain message, even if the parade was perceived as generally open for public participation. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569–70 (1995). As the *Hurley* Court explained, "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech. Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication." *Id.*

     Numerous courts have applied *Tornillo* to social media platforms that primarily, if not

exclusively, publish user-generated content.[27] A separate, but related line of cases has rejected the argument that social media platforms are state actors that are limited by the First Amendment in their ability to select the speech of others.[28]

### B. Social Media Sites Are Similar to Newspapers' Opinion Pages That Were Subject to the Right-of-Reply Law in *Tornillo*

Although *Tornillo* is not limited to newspapers and applies to any exercise of editorial or curatorial discretion, it is helpful to understand the similarities between social media platforms and the opinion pages of a newspaper, the specific forum targeted by the Florida right of reply law struck down in *Tornillo*.

Like social media sites, newspapers publish a mix of original content and items created by others: syndicated and wire service articles, advertisements, and comics. The opinion pages

---

[27] *See, e.g., Davison v. Facebook, Inc.*, 370 F. Supp. 3d 621, 628-29 (E.D. Va. 2019), *aff'd*, 774 F. App'x 162 (4th Cir. 2019); *DJ Lincoln Enters., Inc. v. Google, LLC*, No. 2:20-CV-14159, 2021 WL 184527, at *8 (S.D. Fla. Jan. 19, 2021); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d at 991; *Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 436-37 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007); *Dreamstime.com, LLC v. Google, LLC*, No. C 18-01910 WHA, 2019 WL 2372280, at *2 (N.D. Cal. June 5, 2019); *e-ventures Worldwide, LLC v. Google, Inc.*, No. 214CV646FTMPAMCM, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017).

[28] *See, e.g.*, *Prager Univ. v. Google LLC*, 951 F.3d 991, 995 (9th Cir. 2020)*; Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019), *aff'd*, 816 F. App'x 497 (D.C. Cir. 2020); *Nyabwa v. FaceBook*, No. 2:17-CV-24, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018).

additionally publish opinion pieces, letters to the editor, and syndicated editorial cartoons.[29]

Indeed, perhaps the most powerful pronouncement of freedom of the press in Supreme Court jurisprudence, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), centered on the *Times* publishing someone else's content, a paid advertisement.

The *Times*' role as an intermediary for the speech of others was critical to the Court's decision: as the Court explained, newspapers are "an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities— who wish to exercise their freedom of speech even though they are not members of the press." *Id*. at 266.[30] More recently, the Court recognized that social media sites now play that very role by providing "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017).

In *Tornillo*, the Supreme Court did not hesitate to recognize the First Amendment right of the opinion page editors to endorse candidates and exclude replies from opponents even though the press in 1974 was much different than that of our nation's Founders. This Court should likewise apply the same rule even if social media sites are not exactly the opinion pages of 1974.

Applying *Tornillo*, it is clear that HB 20 violates the First Amendment, whatever its

---

[29] *See* Jack Shafer, The Op-Ed Page's Back Pages: A Press Scholar Explains How the New York Times Op-Ed Page Got Started, Slate, Sept. 27, 2010, https://slate.com/news-and-politics/2010/09/a-press-scholar-explains-how-the-new-york-times-op-ed-page-got-started.html (describing how the pages opposite newspapers' editorial pages became a forum for outside contributors to express views different from those expressed by the paper's editorial board); Michael J. Socolow, A Profitable Public Sphere: The Creation of the New York Times Op-Ed Page, Commc'n & Journalism Fac. Scholarship (2010), https://digitalcommons.library.umaine.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1001&context=cmj_facpub; *Op-Ed*, Wikipedia, https://en.wikipedia.org/wiki/Op-ed (last visited Oct. 7, 2021).

[30] The *Sullivan* Court also bolstered its actual malice rule by reference to earlier cases dealing with another type of intermediary, booksellers. *Id.* at 278-79 (citing *Smith v. California*, 361 U.S. 147 (1959); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)).

motivation, and however valid the concerns about the dominant role of large social media companies in our national discourse.

### C.    HB 20'S RELIANCE ON THE SIZE OF A PLATFORM'S USER BASE DOES NOT CURE ITS CONSTITUTIONAL DEFECTS

Rather than making it more constitutionally palatable, HB 20's limited application to platforms with large user bases only exacerbates its defects. As the plaintiffs correctly argue, to prevent insidious viewpoint discrimination, the Supreme Court applies strict scrutiny to laws that restrict the speech of speakers based on size. *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (striking down a law that applied only after $100,000 of ink and paper were consumed in a year). "Where important First Amendment interests are at stake, the mass scope of disclosure is not an acceptable surrogate for injury." *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (striking down a law that prohibited publication by an "instrument of mass communication").

## III.    HB 20'S PUBLICATION MANDATE UNDERMINES SECTION 230

HB 20's ban on editorial discretion violates and undermines the protections of Section 230, the legal bedrock of the internet.[31] Congress enacted Section 230 to make it crystal clear that the privately operated internet intermediaries that make up the modern internet have the right to do exactly what Texas seeks to prevent them from doing—moderate content unencumbered by

---

[31] *See* David Post, *Opinion: A Bit of Internet History, or How Two Members of Congress Helped Create a Trillion or so Dollars of Value*, Washington Post, Aug. 27, 2015, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/08/27/a-bit-of-internet-history-or-how-two-members-of-congress-helped-create-a-trillion-or-so-dollars-of-value/ ("[I]t is impossible to imagine what the Internet ecosystem would look like today without [Section 230].").

the threat of legal liability for doing so.[32]

Section 230 bolsters the First Amendment right of social media companies to have their sites reflect their preferred curatorial perspective. Subsection 230(c)(1) provides internet intermediaries with immunity from liability based on the harm plaintiffs suffered from the intermediary acting as a publisher of user-generated content. 47 U.S.C. § 230(c)(1). This includes "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). *Accord Klayman v. Zuckerberg*, 753 F.3d 1354, 1359 (D.C. Cir. 2014); *Green v. America Online*, 318 F.3d 465, 471 (3d Cir. 2003); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017). Subsection 230(c)(2) provides additional protection to internet intermediaries for claims brought by content creators themselves based on the companies having removed or blocked the plaintiffs' content or enabled others to do so. *See* 47 U.S.C. § 230(c)(2).

Prior to the enactment of subsection 230(c)(1), online platforms faced traditional publisher liability for content posted by their users: the liability could be based on notice if the platforms acted as mere passive conduits; but the liability did not require notice if the platforms engaged with user content in any way. *See Barnes*, 570 F.3d at 1101. In passing Section 230, Congress intended specifically to overturn *Stratton Oakmont, Inc. v. Prodigy Services Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), where the state court found Prodigy liable for a user's defamatory content because the company exercised editorial control over the content of messages posted on its bulletin boards. Also, prior to the enactment of subsection 230(c)(2), online platforms faced tort liability if a user was harmed by their content

---

[32] *See A Brief History of NSF and the Internet*, National Science Foundation, Aug. 13, 2003, https://www.nsf.gov/news/news_summ.jsp?cntn_id=103050 (discussing privatization of the Internet in the 1990s).

being taken down, blocked, or otherwise moderated. *See Barnes*, 570 F.3d at 1105.

Thus, prior to Section 230, online platforms had two strong disincentives to moderate or otherwise engage with user-generated content. Congress passed Section 230 to address this concern, where one "important purpose of [Section] 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services" and "to remove the disincentives to self[-]regulation." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). Section 230 encourages online platforms to moderate content in ways that benefit users, or subsets of users, and that reflect the values of the company—and not simply mirror the lines drawn by the First Amendment.

Section 230 also responded to the concern that publication decisions would be made not according to editorial preference, but out of fear of liability for harm that might result from users' speech. *See id.* ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect."). Thus, another important purpose of Section 230 was "to promote the continued development of the Internet and other interactive computer services and other interactive media." 47 U.S.C. § 230(b)(1).

HB 20 cannot be reconciled with Section 230's protections or policy goals: (1) to allow online platforms to curate content according to users' interests and company values, and (2) to have a wide variety of curatorial styles available to users.

## IV.  INTERNET USERS ARE BEST SERVED BY VOLUNTARY MEASURES FOR CONTENT MODERATION RATHER THAN HB 20'S MANDATES

Legally mandated transparency and complaint procedures may be appropriate as an alternative to government restrictions on editorial practices if they are carefully crafted to accommodate competing constitutional and practical concerns. But they are neither appropriate nor constitutional when part and parcel of such editorial restrictions. And mandated transparency

and complaint procedures that appear motivated by misconceptions about disproportionate partisan censorship raise the specter of selective punitive enforcement.[33]

HB 20's Disclosure Requirements and Complaint Procedures will also stifle innovation that would best serve internet users. Indeed, they will likely further entrench the market dominance of the very social media companies the law targets because compliance will require a significant investment of both money and time. Although the companies that currently meet HB 20's 50-million-monthly-US-users criteria may be profit-driven, users would be best served by wide adoption of non-profit and decentralized social media services that did not rely on advertising or exploiting their users' private data. Because HB 20's mandates functionally require that popular social media sites be highly capitalized, those alternatives may never develop. Separately, the law's technical mandates will inevitably become obsolete.

Instead, internet users are better served by "consensual mechanisms," in the words of the Supreme Court in *Tornillo*, 418 U.S. at 254, however imperfect they may be. Both companies and users can look to several models for self-regulation. *Amicus* is among a broad range of civil society groups that has endorsed the Santa Clara Principles.[34] UNESCO has published principles focusing on transparency around content moderation decisions that are purposefully high-level, rather than prescriptive, in recognition of the "[v]ast differences in types, sizes, business models and engineering of internet platform companies" that make government mandates

---

[33] The Attorney General's use of civil investigative demands against Twitter has already raised such concerns. *See Twitter v. Paxton*, No. 21-CV-01644-MMC, 2021 WL 1893140 (N.D. Cal. May 11, 2021), *appeal filed*, No. 21-15869 (9th Cir. May 14, 2021).

[34] *See* Press Release, EFF, *EFF and Coalition Partners Push Tech Companies To Be More Transparent and Accountable About Censoring User Content* (May 7, 2018), https://www.eff.org/press/releases/eff-and-coalition-partners-push-tech-companies-be-more-transparent-and-accountable; The Santa Clara Principles, https://santaclaraprinciples.org/ (last visited Oct. 7, 2021).

inappropriate.[35] The Internet Commission's annual Accountability Report aims to identify best practices scaled to an online service's maturity.[36]

Importantly, these are not templates for regulation. And even if they were to be transformed into sensible regulations, any such effort must consider and accommodate the effects of new rules on users and companies beyond platforms, and beyond U.S. borders.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully request that the Court grant plaintiffs' motion for a preliminary injunction.

Dated: October 8, 2021    Respectfully submitted,

        */s/ Thomas S. Leatherbury*
        Thomas S. Leatherbury
        State Bar No. 12095275
        VINSON & ELKINS L.L.P.
        Trammell Crow Center
        2001 Ross Avenue
        Suite 3900
        Dallas, Texas 75201-2975
        214.220.7700 (telephone)
        214.999.7792 (facsimile)
        tleatherbury@velaw.com

        David Greene (*Pro Hac Vice* pending)
        Mukund Rathi (*Pro Hac Vice* pending)
        Electronic Frontier Foundation
        815 Eddy Street
        San Francisco, California 94109
        415.436.9333 (telephone)
        415.436.9993 (facsimile)
        davidg@eff.org

        *Attorneys for Amicus Curiae*
        *Electronic Frontier Foundation*

---

[35] *Letting the Sun Shine In: Transparency and Accountability in the Digital Age* at 1, UNESCO (2021), https://unesdoc.unesco.org/ark:/48223/pf0000377231.

[36] *Accountability Report 1.0*, Internet Comm'n (2021), https://inetco.org/report.

## CERTIFICATE OF SERVICE

I hereby certify that, on October 8, 2021, I served a true and accurate copy of the foregoing document on all counsel of record via filing of the same with the Court's CM/ECF system.

 */s/  Thomas S. Leatherbury*
Thomas S. Leatherbury
