IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation,<br>    *Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as Attorney General of Texas,<br>    *Defendant*. | Civil Action No. 1:21-cv-00840-RP |

**DEFENDANT'S MOTION FOR EXPEDITED DISCOVERY**

Two internet lobbying groups have brought suit against the Office of the Attorney General claiming to advocate for the free speech rights of their many, varying members. These lobbying groups make an as applied claim against House Bill 20 (H.B. 20), a bill aimed at recognizing the fundamental interest each Texas citizen has in the free exchange of ideas and information by ensuring the large monopolies that control this exchange on the internet provide transparency and viewpoint-neutral content moderation. Plaintiffs seek a preliminary injunction on behalf of their members. But other than claiming all moderation of user-generated content is protected speech, and that disclosures are unfair because members' have publicly claimed their policies and practices are sound, Plaintiffs' motion is devoid of any factual basis for this Court to consider. In turn, Defendant is limited in its ability to respond without discovery to determine, and present argument on, threshold issues in this case. For the reasons discussed below, Defendant asks that this Court permit it to engage in expedited discovery sought in Exhibits A-C of this motion, which are proposed requests for production, interrogatories, and depositions to be served on Plaintiffs'

members.[1]

## Argument

Federal Rules 34(b) and 26(d) allow a party to seek expedited discovery, and the Fifth Circuit has permitted such discovery in certain circumstances. *See, e.g., FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 501 (5th Cir. 1982) (affirming district court's order authorizing expedited discovery before a hearing on a preliminary injunction); *Quilling v. Funding Resource Group*, 227 F.3d 221, 233 (5th Cir. 2000) (affirming a district court's order of expedited discovery). A district court has the discretion to grant expedited discovery so long as good cause is shown. *Hunter Killer Productions, Inc. v. Boylan*, EP-20-CV-00306-FM, 2021 WL 2878558, at *2 (W.D. Tex. Jan. 28, 2021).

"Good cause exists where, considering the totality of the circumstances, the need for expedited discovery outweighs the prejudice to the responding party." *Id*. In making this consideration, Courts usually examine "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Id*.

Plaintiffs have filed a motion for preliminary injunction, which Defendant is currently required to respond to by October 15, 2021.[2] Dkt. No. 8-2. Plaintiffs' motion mirrors their complaint in that it raises as applied challenges to H.B. 20 on behalf of each of its members. Dkt.

---

[1] Members of one or both Plaintiff organizations include Airbnb, Alibaba.com, Amazon.com, AOL, DJl, DRN, eBay, Etsy, Expedia, Facebook, Fluidtruck, Google, HomeAway, Hotels.com, Instagram, Lime, Nextdoor, Lyft, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, TikTok, Travelocity, TravelTecb, T1ivago, Turo, Twitter, Verisign, Vimeo, VRBO, Vigilant Solutions, VSBLTY, Waymo, Wing, and Yahoo!. Because Plaintiffs seek as applied relief for each one of its members, *see, infra*, Section III, third party discovery as seen in Exs. A-C will be required from all.
[2] Because discovery is necessary, Defendant has filed a motion to extend its deadline to respond to Plaintiffs' motion for preliminary injunction concurrently with this motion.

Nos. 1, 8-2. Specifically, Plaintiffs claim H.B. 20 violates their members' rights under the First Amendment, Commerce Clause, Preemption Clause and Equal Protection Clause. *Id*.

Expedited discovery is appropriate in cases involving preliminary injunctions. *See, e.g., El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 991 (S.D. Tex. 2004). Here, that discovery is even more appropriate by virtue of the claims made, and evidence provided in support, by Plaintiffs. As seen below, Defendant provides good cause to justify expedited discovery that will allow the parties to be in an equal position of ability to present argument to this Court at a preliminary injunction hearing.

### I. Good Cause Exists to Grant Expedited Discovery as to How Members' First Amendment Rights Would Be Violated Under H.B. 20.

The gravamen of Plaintiffs' First Amendent claim rests on the premise that Plaintiffs' members engage in protected speech when they exercise editorial discretion by moderating content on their platforms. This claim requires two assumptions, which discovery is needed to actually prove. First, this claim assumes that Plaintiffs' members are not common carriers. Second, this claim assumes that all "moderation of content" constitutes speech under the First Amendment. Neither claim is based in law and neither claim can be proven, or disprove,n without discovery.

#### A. Good Cause Exists to Grant Expedited Discovery as to How Plaintiffs' Members are Common Carriers.

Whether Plaintiffs' members are common carriers is of critical importance to this case. An entity deemed a "common carrier" is subjected to "special regulations" on account of their public concern. *United States Telecom Ass'n v. Fed. Communications Comm'n*, 825 F.3d 674, 741 (D.C. Cir. 2016). Specifically, for common carriers, there is an "absence of any First Amendment concern" in the government mandating they provide equal access to speakers utilizing their platform. *Id*. In

other words, Plaintiffs' members being classified as common carriers would effectively nullify the need for a preliminary injunction to protect Plaintiffs' members' First Amendment rights; as common carriers Plaintiffs would be required to provide equal access to their platforms regardless of viewpoint. *Id.*

Therefore, in order to apply the correct framework to Plaintiffs' claims, Defendant must conduct limited discovery on the question of whether Plaintiffs' members should be deemed common carriers. Plaintiffs insist they should not. *See* Dkt. No. 8-2 at 40-43.[3] But this question is far from settled. Indeed, Justice Thomas recently posited the very opposite:

> In many ways, digital platforms that hold themselves out to the public resemble traditional common carriers. Though digital instead of physical, they are at bottom communications networks, and they "carry" information from one user to another. A traditional telephone company laid physical wires to create a network connecting people. Digital platforms lay information infrastructure that can be controlled in much the same way. And unlike newspapers, digital platforms hold themselves out as organizations that focus on distributing the speech of the broader public. Federal law dictates that companies cannot "be treated as the publisher or speaker" of information that they merely distribute.

*Biden v. Knight First Amendment Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021). A determination of whether a company is a common carrier requires several considerations such as, but not limited to, (1) market power; (2) whether an industry is "affected with the public interest;" (3) whether the entity regulated is part of the transportation or communications industry; (4) whether it receives countervailing benefits from the government; and (5) whether the actor holds itself out as providing service to all. *Knight First Amendment Inst.*, 141 S. Ct. at 1222–2. Whether the platforms in this suit are common carriers has yet to be decided to any level of jurisprudential effect. Therefore, this question should not be presented to this Court without adequate discovery to ensure a full and complete determination at both the district court and appellate court levels.

---

[3] Page numbers cited to within Plaintiffs' preliminary injunction motion refer to ECF pagination.

*See Biden*, 141 S. Ct. at 1221 ("applying old doctrines to new digital platforms is rarely straightforward.").

Therefore, the discovery requests and deposition topics submitted for consideration in this expedited discovery motion serve only to provide evidence necessary to this Court's consideration of a preliminary injunction. *See* Exs. A-C. Plaintiffs, in fact, appear to agree on the necessity of evidence to support this claim given that they have submitted their members' self-serving, unchallenged affidavits in support of their assertion that "the covered platforms do not hold, and have never held, themselves out as organizations that carry all persons or all content 'indifferently.'" Dkt. No. 8-2 at 41. Given that Plaintiffs rely on evidence to support the claim that their members are not common carriers, Defendant should be permitted to obtain discovery that provides the ability to make the opposite argument, rather than be bound to argue a record that is only half-complete.

### B. Good Cause Exists to Grant Expedited Discovery as to How Members Moderate Content.

Expedited discovery should also be granted on the topic of Plaintiffs' members varying content moderation practices. Plaintiffs readily admit that "[e]ach covered platform provides its users a *distinctive* experience—according to its *own* policies formalized in terms of service and community standards." Dkt. No. 8-2 at 12 (emphasis added). "[T]he platforms also provide *different* experiences to *different* audiences." *Id.* at 14. Plaintiffs claim that their members moderate content on their platforms to serve these experiences, which is a form of editorial discretion protected by the First Amendment. *Id.* at 10. But there is nothing currently in the record as to what that each of Plaintiffs' members content moderation looks like in practice and effect. At most, Plaintiffs provide an overbroad description about members' use of algorithms to determine what

content they permit, or do not permit, on their platforms. *Id*. at 12. Publicly-available information supports this notion that it is rotely-applied computer programs, not persons, that moderate content for Plaintiffs' members in unique and individual ways. *See* Sang Ah Kim, *Social Media Algorithms: Why You See What You See*, 2 Geo. L. Tech. Rev. 147 (2017). And this Court has specifically noted before that the "precise technical nature of the computer files at issue" is relevant for the purposes of a preliminary injunction determination. *Def. Distributed v. U.S. Dep't of State*, 121 F. Supp. 3d 680, 692 (W.D. Tex. 2015), aff'd sub nom. *Def. Distributed v. United States Dep't of State*, 838 F.3d 451 (5th Cir. 2016)

Of course, the ways in which algorithms and programming are used is quite different depending on who you ask and what the stakes are. In their pleadings, Plaintiffs claim their members' content moderation algorithms are created with the aim of ensuring "users would [not] be flooded with abusive and objectionable material" because that "would drown out the unobjectionable content and make the platforms inhospitable to and unsafe for their users.[4]" Dkt. No. 8-2 at 13. However, internal documents from Facebook, as one example[5], indicate that "'[m]isinformation, toxicity, and violent content are **inordinately prevalent** among reshares'" on their site. *Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead*, The Washington Post, Sept. 15, 2021 (https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215?mod=article_inline) (last visited Oct. 7, 2021). In fact, in 2018, Facebook changed their "proprietary algorithm [that] controls what appears in each user's News Feed" so

---

[4] Plaintiffs' members, who have chosen not to be parties to this suit, are publicly traded companies subject to investigation by the SEC for making fraudulent statements to investors. *See* 15 US Code § 77a, *et. seq.* (Securities Act of 1933).

[5] YouTube is another example. One study from Swiss and Brazilian researchers published in 2020 found that YouTube users who start out commenting on relatively mild anti-establishment content often end up leaving comments on extreme far-right videos later on, suggesting that the platform recommended more extreme videos over time. *M.H. Ribeiro*, Auditing radicalization pathways on YouTube (Aug. 2019) (available at https://www.researchgate.net/publication/335337464_Auditing_Radicalization_Pathways_on_YouTube).

that the algorithm now optimizes for content that gets engagement. *Id.* Although Facebook's own research showed that the content receiving the most engagement was content that inspired people to anger, Facebook prioritized the growth this led to in terms of user participation, over knowingly "amplifying the worst of human nature.[6]" *Interview of Frances Haugen*, 60 Minutes, CBS, October 3, 2021 (transcript available at https://www.rev.com/blog/transcripts/facebook-whistleblower-frances-haugen-60-minutes-interview-transcript).

The lack of consistent representations of content moderation practices aside, there is no authority for the assertion that algorithms applied in an automated fashion to user content hosted by open platforms constitutes speech. *See, e.g.*, James Grimmelmann, *Speech Engines*, 98 Minn. L. Rev. 868, 889 (2014) (discussing varying theories on algorithms as speech). And there is nothing in the record, currently, that indicates how each of Plaintiffs' members moderate content using either unique algorithms, personnel or a combination of the two. *See* Dkt. No. 1 at 14 ("Content moderation can take many different forms, involving both human review and algorithmic or other automated editorial tools."). It could be plausibly argued that, if each of Plaintiffs' members' unique algorithms do no more than act as an efficient conduit between speakers and audiences, rather than function to editorialize what members present to their users, these members are not engaging in speech. *See Speech Engines*, 98 Minn. L. Rev. at 889. But, without expedited discovery, no such analysis can take place. *See* Exs. A-C. Thus, prior to preliminary injunction, discovery on Plaintiffs' members content moderation practices are necessary to determine whether Plaintiffs'

---

[6] These algorithms as they relate to minors are also represented to this Court in contradiction to what is known by, at least, Facebook. *Compare* Dkt. No. 1 at 17 (claiming Plaintiffs' members actively work to screen "adult" material from children) *with Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show*, Wall Street Journal (https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667?mod=article_inline) (last visited Oct. 6, 2021) ( stating that "teams of employees have for years been laying plans to attract preteens that go beyond what is publicly known" despite the fact that "Facebook's own research has shown that Instagram can have a negative effect on teen mental health, especially among girls.").

members are, indeed, engaging in "speech."

The same is true for discovery on Plaintiffs' claim that their members will be burdened if required to comply with H.B. 20's transparency requirements. Plaintiffs state that H.B. 20 "imposes a slew of onerous disclosure and operational requirements" by virtue of requiring their members to, among other things, report their content moderation practices and results. Plaintiffs claim these requirements will "require substantial investment" by its members. Dkt. No. 8-2 at 20. However, this appears in conflict with the fact that Plaintiffs' members are already apparently capable of reporting the results of their content moderation. *See* Dkt. No. 8-4 (Ex. B) at ¶15 (explaining results of content moderation as reported in "NetChoice Social Media Content Moderation Transparency Report"). And, as explained, *supra*, Plaintiffs' members largely use automated algorithms in moderating their content; so it is unclear why the use of automated algorithms on "billions of pieces of expressive content" could not assist in disclosing the results of moderating that content as required by H.B. 20. Dkt. No. 8-2 at 33. To effectively argue the "irreparable injury" prong of the preliminary injunction analysis, Defendant requires discovery to discern the extent of the burdens each of Plaintiffs' members claim they will suffer as a result of H.B. 20's disclosure requirements.

Notably, despite claiming a burden in having to accumulate and report the results of content moderation, Plaintiffs contrastingly assert that their members have previously done so: "during 6 months in 2018 alone, Facebook, Google, and Twitter took action on over 5 billion accounts or user submissions—including 3 billion cases of spam, 57 million cases of pornography, 17 million cases of content regarding child safety, and 12 million cases of extremism, hate speech, and terrorist speech." Dkt. No. 8-2 at 13. This appears to be stated in support of Plaintiffs' claim that their members are *heavily* engaged in content moderation and therefore editorial discretion is

pervasive throughout their platforms. *Id*.

But this cannot be relied on as evidence either of a minimal burden created by the reporting requirements or as proof of comprehensive content moderation. Facebook's own internal research belies it. Facebook's study of content moderation this year revealed "we estimate that we may action as little as 3-5% of hate and about 6-tenths of 1% of V & I [violence and incitement] on Facebook despite being the best in the world at it." Whistleblower: Facebook is Misleading the Public on Progress Against Hate Speech, Violence, Misinformation, CBS News, Oct. 4, 2021 (https://www.cbsnews.com/news/facebook-whistleblower-frances-haugen-misinformation-public-60-minutes-2021-10-03/). Moreover, this claim that Plaintiffs' members are heavily enaged in content moderation that rises to the level of speech is the exact opposite of what they choose to claim when using 47 U.S.C. § 230 as a shield. *See, e.g., Diez v. Google, Inc.*, 831 Fed. Appx. 723, 725 (5th Cir. 2020), cert. denied sub nom. *Diez v. Google, Inc.*, 20-8010, 2021 WL 4507991 (U.S. Oct. 4, 2021) (agreeing with Google that it "is merely an interactive computer service provider as opposed to an information content provider" because it is not "responsible, in whole or in part, for the creation or development of information provided" on its site.).

This Court, Defendant and the public are getting a story that is different than the one that appears to be known, internally, by Plaintiffs' members.

Because of this, Defendant is currently in a position where the only evidence before the Court is that which serves Plaintiffs' members' interests, even where it does not reflect the true nature of the members' practices. Plaintiffs have alleged their members engage in editorial discretion and would be unduly burdened by reporting requirements set forth in H.B. 20. Expedited discovery can resolve this dichotomy between what Plaintiffs claim about their members to this Court and what those members know to be true. Defendant asks for narrowly tailored

discovery that simply allows it the equal ability to present factual support for its opposition to preliminary injunction. This ask is reasonable, therefore, this motion should be granted. *See, e.g., Talon Transaction Techs., Inc. v. Stoneeagle Services, Inc.*, 3:13-CV-902-P, 2013 WL 12172925, at *2 (N.D. Tex. May 14, 2013) (stating that granting expedited discovery prior to a preliminary injunction hearing would "better enable the court to judge the parties' interests and respective chances for success on the merits.").

## II. Good Cause Exists to Grant Expedited Discovery on Plaintiffs' Three Other Causes of Action.

Plaintiffs' other causes of action - void-for-vagueness doctrine, Commerce Clause and Preemption Clause – also require expedited discovery. These claims require each of Plaintiffs' members to provide individualized facts in order for this Court to consider likelihood of success on the merits. For the Commerce Clause claims, Defendant must discover the probable effects of H.B. 20 on Plaintiffs' members, as reflected in Exhibits A-C. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980) ("The principal focus of [a commerce clause inquiry] must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects."). And the merits of Plaintiffs' of void-for-vagueness will need to be determined by this Court, and Defendant, by discerning whether Plaintiffs' members "know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see* Exs. A-C. As to preemption, this Court has already recognized that "[t]his inquiry is fact-specific," therefore, Defendant requires individualized discovery from each of Plaintiffs' members because "[g]eneral evidence that [the proponent of preemption] *may* be affected is insufficient." *Gallo v. Union Pac. R.R. Co.*, 372 F. Supp. 3d 470, 480 (W.D. Tex. 2019) (emphasis added) (requiring detailed evidence and expert testimony as to the burden on Plaintiff's ability to comply with federal

law); *see* Exs. A-C.

The proposed discovery requests seek information necessary to assess the merits of Plaintiffs' claims at the preliminary injunction stage in the most narrow way possible. *See* Exs. A-C. Therefore, Defendant asks this Court to find good cause exists to grant expedited discovery on these claims and grant Defendant's motion.

### III. Good Cause Exists to Grant Expedited Discovery as to the Proper "As-Applied" Relief.

Plaintiffs seek only equitable relief in this case and only relief that declares H.B. 20 "unlawful as applied to their members." Dkt. No. 1 at 47. In order to establish a substantial likelihood of success on the merits at the preliminary injunction stage, "Plaintiffs must demonstrate [H.B. 20], as applied to Plaintiffs['] [members] in this case **on these facts**, likely violate[s] the Constitution. *Whole Woman's Health v. Hellerstedt*, 231 F. Supp. 3d 218, 226 (W.D. Tex. 2017) (citing *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 453 (5th Cir. 2014). Thus, each of Plaintiffs' claims requires an inquiry into, and assessment of, every one of their members' knowledge, practices, source codes and capabilities to determine how H.B. 20 is unlawful as applied to their specific company.

This inquiry must be made using expedited discovery because it is necessary to this Court's fashioning of a preliminary injunction. After all, where only as-applied challenges have been brought, a district court may not grant preliminary injunction by "enjoining 'any and all forms of enforcement.'" *Currier*, 760 F.3d at 458 (narrowing a district court's apparent facial relief, which the court held "was an overly broad remedy in an as-applied challenge"). Instead, any preliminary injunction can only extend far enough to cover the specific sections of H.B. 20's effects on each individual member. *See id*. The proposed discovery requests do just that, and nothing more. As

such, good cause exists to grant this motion.

## Conclusion

Defendant respectfully requests that this Court allow it to conduct expedited discovery on all of Plaintiffs' members as sought in Exhibits A-C of this motion.

Respectfully Submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Division Chief
General Litigation Division

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Attorney-in-Charge
Assistant Attorney General
Texas State Bar No. 24097533
*courtney.corbello@oag.texas.gov*

General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 936-2109
**ATTORNEYS FOR DEFENDANT**

## Certificate Of Service

I certify that on October 11, 2021 the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General

### NOTICE OF ELECTRONIC FILING

I, **COURTNEY CORBELLO**, Assistant Attorney General of Texas, certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing in accordance with the Electronic Case Files system of the United States District Court for the Western District of Texas, on October 11, 2021.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General

### CERTIFICATE OF CONFERENCE

I hereby certify that I have conferred with counsel of record regaring the relief requested in this motion. Counsel has informed me that Plaintiffs are opposed.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General