| | |
|---|---|
| NETCHOICE, LLC, et al.,<br>    *Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as<br>Attorney General of Texas,<br>    *Defendant*. | Civil Action No. 1:21-cv-00840-RP |

## DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1)

Consistent with how they avoid accountability to the public at large, Plaintiffs' members have attempted to shield themselves from the burdens of challenging a law they do not like by getting their lobbying groups to do it for them. These lobbying groups make an as applied claim against House Bill 20 (H.B. 20), a bill aimed at protecting the fundamental interest each Texas citizen has in the free exchange of ideas and information by ensuring the large monopolies that control this exchange on the internet provide transparency and viewpoint-neutral content moderation. But Plaintiffs cannot meet standing requirements based on bare assertions that their members protect the public from harm, let alone their claims that these behemoths of the tech world should be exempt from all transparency requirements in their intentional practices currently affecting Texas' citizens' free access to information.

No matter the price their members pay to remain "non-parties" safeguarded from the requirements of litgation, particularly dicovery, Plaintiffs do not have associational or organizational standing as a matter of law and this Court should dismiss Plaintiffs' suit in its entirety.

Rooted in Article III's extension of the judicial power only to cases and controversies, the standing "doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). Because "[s]tanding is not dispensed in gross," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quotation omitted), Plaintiffs "must demonstrate standing for each claim [they] seek[ ] to press" and "each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [standing] elements."). The standing inquiry is "especially rigorous when," as true here, "reaching the merits of the dispute would force [this Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Moreover, because Plaintiffs are not "the object[s]" of the challenged H.B. 20, their standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562.

Plaintiffs simply cannot meet this fundamental burden to show either associational standing or organizational standing to bring this suit against Texas Attorney General Ken Paxton.[1] Because Plaintiffs' Complaint fails to establish their standing to sue, this Court lacks jurisdiction over Plaintiffs' claims and must dismiss this suit.

## I.   Plaintiffs Lack Associational Standing.

Plaintiffs' first theory of standing rests upon alleged harms to its members. *See* Dkt. No. 1 ¶13. To have associational standing, Plaintiffs must establish that "(a) its members would

---

[1] Plaintiffs have sued the Attorney General in his official capacity only.

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs cannot satisfy the "Article III necessity" of showing that any of their members individually would have standing, nor can they realistically posit that their members need not participate in the claims asserted or the consideration of relief sought.

### A. Plaintiffs have not identified any injured members to qualify for associational standing.

The associational standing doctrine requires that Plaintiffs "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (emphasis added). Moreover, the allegations related to that "named member"—not those of unnamed members—must be sufficient to establish standing for each claim and form of requested relief.[2] *Spokeo, Inc.*, 578 U.S. at 330. No unnamed members are entitled to relief if the named member lacks standing to press a claim or seek relief. *See id.*

Here, while Plaintiffs name some of their members specifically—Facebook, Google, YouTube, Twitter[3]—they fail to allege how any of these companies are, or will be, actually injured as a result of H.B. 20's neutrality and disclosure provisions. Plaintiffs state generally that, under H.B. 20, their "members' editorial judgment" will be impaired, that their "members [will have to] substantially modify the design and operation of their platforms," and their members will be

---

[2] "The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (internal citations and quotation marks omitted).

[3] Plaintiffs appear to identify these 4 companies as the only members of Plaintiffs to which H.B. 20 would actually apply. It is understandable why their other 34 members are not mentioned—most are not social media companies under H.B. 20's definition.

"force[d]…to disclose highly sensitive, confidential business information and trade secrets." Dkt. No. 1 ¶¶18, 20, 21. But the Complaint is devoid of any facts showing how such an "injury" is suffered or faced by any of Plaintiffs' "named members." *See generally* Dkt. No. 1. Plaintiffs' reliance on nothing more than broad, generalized, and conclusory allegations offends both the associational standing doctrine and basic pleading standards.

Under the Supreme Court's associational standing doctrine, Plaintiffs must "make *specific* allegations establishing that at least one *identified* member had suffered or would suffer harm." *Summers*, 555 U.S. at 498 (emphasis added); *see FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990) (ruling that an affidavit which "fails to identify the individuals" who allegedly were injured "falls short of establishing" standing). Expansive allegations about "editorial discretion," "burdensome" reporting, and unidentified "trade secrets" does not satisfy the Supreme Court's requirement for specific identification of a member who has standing to sue.

**B. Even if Plaintiffs' broad claims of injury applied to named members, Plaintiffs cannot establish an injury sufficient to show standing.**

Even if considered, the allegations about the "named" members' injuries are insufficient to confer standing on Plaintiffs. To satisfy associational standing, an organization must do more than identify a likelihood that the defendant's conduct will harm a member in light of the organization's extensive size or membership base. *See Summers*, 555 U.S. at 498–99. The organization must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct. *See id*. Plaintiffs assert four ways in which their members could be injured by H.B. 20's neutrality and disclosure provisions. None of those theories, however, are particularized or detailed as to any of Plaintiffs' members.

1. <u>Right to Editorial Discretion</u>

Editorial discretion exists where an entity engages in the "selection and presentation" of material. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). Plaintiffs claim that its members, in general, engage in editorial discretion in three ways: (1) content moderation; (2) censoring images from minors based on their age; and (3) affixing warning labels, disclaimers, or commentary to user-submitted material. Dkt. No. 1 ¶¶48-53. But none of those actions involve the members selecting and then presenting chosen content. Thus, Plaintiffs' members' conduct is not comparable to the case they rely on, *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 575-76 (1995). Dkt. No. 1 ¶113. Unlike in *Hurley*, where a newspaper received, reviewed, and chose content to issue publicly, Plaintiffs' members resemble "a passive receptacle" where users are free to share their speech without review or rebuke unless unlawful. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974). There is no legal basis for Plaintiffs' claim that their members are speaking simply because they technically play some role in the administration of their websites.

And even if there were, Plaintiffs present no factual basis explaining how, and to what extent, the members engage in content moderation in a way that constitutes editorial discretion. At most, Plaintiffs make the general claim that their members use automatically applied algorithms to moderate content. Not only does this claim contradict what their members know to be true,[4] but it also fails to show that Plaintiffs' members are engaging in "speech" that can trigger First Amendment concerns at all. There is no authority for the assertion that algorithms applied in an automated fashion to user content hosted by open platforms constitutes speech. *See, e.g.*, James

---

[4] *See Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead*, The Washington Post, Sept. 15, 2021 (last visited Oct. 7, 2021) (stating that, rather than moderating "harmful" content, Facebook applies its algorithms to content in order to make the content that gets the most engagement—and, therefore, profit—out of its users).

Grimmelmann, *Speech Engines*, 98 Minn. L. Rev. 868, 889 (2014) (discussing varying theories on algorithms as speech). Plaintiffs ask this Court to simply presume that such automated conduct constitutes speech, and Plaintiffs then use that bare presumption to argue they have standing to bring this suit. This Court should reject Plaintiffs' baseless presumption, as conclusory assumptions cannot support standing. *See, e.g.*, *Andrews v. Eckhardt*, 1:20-CV-0608-LY-SH, 2021 WL 950668, at *3 (W.D. Tex. Mar. 12, 2021).

*Content Moderation.* Even were this Court to believe that any of Plaintiffs' members engage in "speech" by applying automated processes to user-generated content, the fact remains that there is no support for the conclusion that this discretion will be impinged by H.B. 20. H.B. 20 does not modify the members' abilities to moderate content. H.B. 20 explicitly provides for "content *management*" and only requires the massive technology companies with immeasurable influence on the public to be transparent about that management. Tex. Bus. & Com. Code § 120.051. And although the members are prohibited from censoring its users based on viewpoint, that prohibition does not affect their ability to continue to moderate content pursuant to state and federal law. Tex. Civ. Prac. & Rem. Code § 143A.006(a). Nor does it prevent a member from moderating content as to an individual user whenever that user requests it. *Id.* § 143A.006(b).

These provisions that promote free expression with continued limitations required by law are in keeping with H.B. 20's respect for "each person in this state [having] a fundamental interest in the free exchange of ideas and information, including the freedom of others to share and receive ideas and information." H.B. 20 § 1(1). For Plaintiffs' named members, at least publicly, they appear to share H.B. 20's goal. For example, Twitter expressly states its mission is to "give *everyone* the power to create and *share* ideas and information instantly *without barriers*." Twitter

FAQ (last visited Oct. 7, 2021) (emphasis added). Facebook claims one of its main principles is that "[p]eople deserve to be heard and to have a voice." Facebook Company Info (last visited Oct. 7, 2021). YouTube claims to "believe everyone should have easy, *open* access to information." Our Mission, YouTube (last visited Oct. 7, 2021) (emphasis added). Thus, H.B. 20 and Plaintiffs' named members have the exact same goal: to allow the public to have the freest, most uncensored exchange of ideas as possible on their platforms.

*Censoring images from minors based on their age*. Plaintiffs' complaints that their members will be forced to expose minors to content that is inappropriate based on age is a similar red herring.[5] Plaintiffs' named members do not allow children under 13 on their platforms without the consent of the parent. This would not change under H.B. 20's neutrality and disclosure provisions because nothing in H.B. 20 compels Plaintiffs' members to make children under 13 "users" on their platforms. Tex. Bus. & Com. Code § 120.001(2).

Moreover, H.B. 20 does not require Plaintiffs' members to alter their practices required by federal law. Tex. Civ. Prac. & Rem. Code § 143A.006(1). Children under 13 are not allowed on members' platforms, not out of a concern that they may see "pro-Nazi speech" or "terrorist propaganda," but because of the Children's Online Privacy Protection Act (COPPA). 15 U.S.C. § 6501-6506; Tex. Civ. Prac. & Rem. Code § 143A.006 ("the social media platform is specifically authorized to censor by federal law"). COPPA prevents Plaintiffs' members from collecting, using, or disclosing personal information from children under 13. As these members' entire profit scheme

---

[5] Social media companies have ignored the years of studies done on their platforms' negative effects on minors. *Testimony of Frances Haugen*, Senate Hearing Oct. 5, 2021 at 37:11 ("Many of Facebook's internal research reports indicate that Facebook has a serious negative harm on a significant portion of teenagers and younger, and children."); *see also* *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show*, Wall Street Journal (last visited Oct. 6, 2021) (stating that "teams of employees have for years been laying plans to attract preteens that go beyond what is publicly known" despite the fact that "Facebook's own research has shown that Instagram can have a negative effect on teen mental health, especially among girls").

relies on the ability to collect data from private citizens, clearly their ban of children under 13 had occurred solely because of COPPA and will remain in effect because of COPPA.

Moreover, Plaintiffs' named members do not currently offer or promote a sitewide policy of censoring what children are viewing on their platforms, whether they are over or under 13.[6] At most, companies have privacy settings that users, or their parents, may modify to self-censor on the platforms. H.B. 20 does not "prohibit or restrict a social media platform from authorizing or facilitating a user's ability to censor specific expression on the user's platform or page at the request of that user." Tex. Civ. Prac. & Rem. Code § 143A.006(b). Therefore, H.B. 20 is not injuring Plaintiffs' members' ability to maintain any age-based policies regarding content.

*Members' Use of Labels to Provide Opinion on User Content.* Plaintiffs lament that their members will not be able to label content they believe to be "misinformation" or "potentially sensitive." But Plaintiffs do not explain what aspect of H.B. 20 would prevent this practice from continuing. Indeed, the definition of censor does not include "labelling." Tex. Civ. Prac. & Rem. Code § 143A.001(1). So long as content has been given "equal access or visibility" to its users, it has not been censored, regardless of a label being present. *Id.* As the labeling of content necessarily indicates the content remains accessible and visible on the members' platform, this practice is not implicated by H.B. 20.

### 2. Compelled Government Speech

Social media platforms like Facebook and Twitter are not speaking when they provide a platform for hosting the speech of their users. In fact, Plaintiffs' members have repeatedly—and very publicly—abjured the notion that they are expressing any message, articulating a viewpoint,

---

[6] CITES

or conveying a political ideology while engaged in content moderation. Consider the example of Twitter CEO, Jack Dorsey, has explained: "We do not look at content with regards to political viewpoint or ideology. We look at behavior." Brian Stelter, *Twitter's Jack Dorsey: 'We are not' discriminating against any political viewpoint*, CNN (Aug. 20, 2018). The company has assured a committee of the U.S. House of Representatives that its rules "are not based on ideology or a particular set of beliefs" but instead "based on behavioral contexts." *Facebook, Google and Twitter: Examining the Content Filtering Practices of Social Media Giants: Hearing Before H. Comm. on the Judiciary*, 115th Cong. 2 (2018) (statement of Nick Pickles, Senior Strategist, Public Policy, Twitter, Inc.). And it has likewise informed a subcommittee of the U.S. Senate that "Twitter does not use political viewpoints, perspectives, or party affiliation to make any decisions, whether related to automatically ranking content on our service or how we develop or enforce our rules." *Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 116th Cong. 1 (2019) (responses to questions for the record for Carlos Monje, Jr., Director of Public Policy & Philanthropy, U.S. & Canada, Twitter, Inc.).

Because Plaintiffs' members have disclaimed the intent to express a message in conjunction with their hosting of user-generated content, H.B. 20's neutrality and disclosure provisions cannot plausibly be read as compelling government speech. The circumstances of this case are analogous to the Supreme Court's more recent decision in *Rumsfeld v. Forum of Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61, 66 (2006) ("*FAIR*"). There, the Court rejected a First Amendment challenge to a congressional statute requiring institutions of higher education to allow military recruiters on their campuses. *Id.* at 51. An association of law schools argued the statute violated the First

Amendment because it was tantamount to compelling their speech; the Court held that the statute "regulates conduct, not speech" because it "[did] not dictate the content of the speech at all" and any burden on the plaintiffs' speech was "plainly incidental to the . . . regulation of conduct." *Id*. at 60, 62. After all, "the schools are not speaking when they host interviews and recruiting receptions." *Id*. at 64. And "send[ing] e-mails and post[ing] notices on behalf of the military" is the type of "incidental" burden on speech that is a "far cry" from what the Court has held abridges a party's right to free speech. *Id*. at 61-62.

The same is true here. H.B. 20's neutrality and disclosure provisions do not regulate, much less dictate the content of the "speech" of Plaintiffs or their members; they only regulate "conduct"—arbitrary application of content moderation policies. *See* H.B. 20 § 1(1) ("each person in this state has a fundamental interest in the free exchange of ideas and information"). Moreover, social media platforms like Facebook and Twitter are not themselves speaking when they provide a platform for hosting the speech of their users. *See FAIR*, 547 U.S. at 64. And the requirements that Plaintiffs' members apply any censorship policies in an even-handed manner and provide disclosures to affected users are akin to the "incidental" burden on speech visited upon the law schools in *FAIR*. Thus, Plaintiffs' members are not being compelled to make government speech. H.B. 20 regulates only conduct, and Plaintiffs' members are not speaking.

### 3. Costs to Modify Platforms to Comply with the Law

Plaintiffs claim that the costs their members will bear because of H.B. 20 is an injury. But none of the specific factual assertions they make demonstrate a significant imminent harm that could establish standing. Plaintiffs' first theory is that H.B. 20 will cause their members to lose users and advertisers because of the inability to moderate the content to which their users are

exposed. Dkt. No. 1 ¶¶20, 23. But this conclusory claim is based on nothing more than subjective speculation. Further, it completely ignores the internet-centered nature of our current society, in which social media is a primary, heavily-relied-upon form of communication.

Even more notably, this theory that "harmful" content will lead to fewer users and, therefore, fewer advertisers is contrary to what Plaintiffs' members have discovered though research. M.H. Ribeiro, *Auditing radicalization pathways on YouTube* (Aug. 2019) (describing study from Swiss and Brazilian researchers finding that YouTube users who start out commenting on relatively mild anti-establishment content often end up leaving comments on extreme far-right videos later on, suggesting that the platform recommended more extreme videos over time); *Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead*, The Washington Post, Sept. 15, 2021 (last visited Oct. 7, 2021) (Facebook changed their "proprietary algorithm [that] controls what appears in each user's News Feed" so to optimize for content that inspired people to anger). Currently, Plaintiffs' members are finding the most profit in providing the very type of platforms they claim H.B. 20 forces them to provide.

Moreover, this alleged injury is obviously not imminent, based on the actual language of H.B. 20 itself. H.B. 20 does nothing to prevent users from censoring their own, or their minor children's, sending or receipt of content. Tex. Civ. Prac. & Rem. Code § 143A.006(b) (H.B. 20 does not "prohibit or restrict a social media platform from authorizing or facilitating a user's ability to censor specific expression on the user's platform or page at the request of that user"). And nothing in H.B. 20 prevents advertisers from continuing to purchase data gathered by Plaintiffs' members. Even if some of the language in H.B. 20 were to alter the content displayed on members' platforms, Plaintiffs provide no factual basis to prove advertisers would suddenly refuse to utilize

the most prevalent form of communication in our contemporary society for targeted advertising, particularly where content is still being censored based on federal or state law or the preferences of users.

Further, to the extent Plaintiffs do not want their members to have to spend money to provide transparent reporting to the public, this also cannot suffice as an injury. Nothing in H.B. 20 dictates how members must gather and report the required information other than to be "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform." Tex. Bus. & Com. Code § 120.051(b). Plaintiffs' general complaint that it will cost their members to have to report - without specifying why, based on the broad latitude they are given, the information cannot be easily produced – is a conclusory allegation that cannot suffice as an injury for standing.

The claim itself that substantial funds would have to be expended is contrary to what Plaintiffs have told this Court. Plaintiffs' members largely use automated algorithms in moderating their content.[7] Thus, it is unclear why the use of automated algorithms on "billions of pieces of expressive content" could not assist in disclosing the results of moderating that content as required by H.B. 20. Dkt. No. 8-2 at 33. Plaintiffs' members appear readily able to provide information on the results of policing the user-generated content on their sites when pursuing litigation. *See* Dkt. No. 12 (Plaintiffs' PI motion providing specific numbers for types of content censored in 2018 by Facebook, Google, and Twitter).

### 4. Forced Disclosure of Trade Secret and Confidential Information

---

[7] Facebook, as an example, uses artificial intelligence in its gathering of content moderation data. *Facebook Reports it Took Action*, The Washington Post, Nov. 13, 2019. This has enabled Facebook to make quarterly reports of numerous categories of content it censored as well as similar efforts made in policing Instagram. *Id.*

Although their Complaint is replete with reference to trade secrets and confidential information that H.B. 20 "requires" their members to disclose, Plaintiffs fail to provide a single specific example of their members' protected information or the statutory basis for withholding that information. That aside, as discussed *supra*, nothing in H.B. 20 requires Plaintiffs' members to produce information in a particular manner, nor does it go beyond the requirements of federal law and the members' past adherence to those requirements.

In contrast with the Complaint, Plaintiffs' members have publicly supported the disclosure of content moderation practices. Facebook agreed that "[p]latforms should *have* to issue transparency reports…" and also "not[ed] that Facebook already publishes such quarterly reports." Kaye, Kate, *Cheat sheet: Facebook, Google, Twitter CEOs signal support for content moderation rules in Section 230 reform*, Mar. 26, 2021 (last visited Oct. 8, 2021). Google CEO Sundar Pichai acknowledged "[t]here are definitely good proposals around transparency and accountability which I've seen in various legislative proposals," and "that Google would 'certainly welcome' some legislative approaches." *Id.* (emphasis added). Dorsey admitted Twitter is "*lacking in transparency* and giving people more choice and control," and then openly pledged to make its content moderation practices more transparent. *Twitter intends to make its content moderation practices more transparent*, The Hindu, Feb. 26, 2021.

Thus, Plaintiffs' claim, now, that the very transparency their members have promised to consumers is unfair because it will cost them money, completely fails to show a genuine, imminent injury. Plaintiffs' members should not be permitted to mislead users into an expectation that transparent practices can and will be made readily available and then complain that the burden in being accountable to those promises is suddenly too high.

**C. The Claims and Requested Relief in this Case Require Participation of Plaintiffs' Individual Members.**

Associational standing carves out only a narrow exception from the ordinary rule that a litigant "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). The third associational standing prong serves to promote this adherence to the ordinary rule. "To satisfy the third prong, a party must show that 'the nature of the case does not require the participation of the individual affected members as plaintiffs to resolve the claims or prayers for relief at issue.'" *Prison Just. League v. Bailey*, 697 F. App'x 362, 363 (5th Cir. 2017) (quoting *Friends for Am. Free Enter. Ass'n v. Wal–Mart Stores*, 284 F.3d 575, 577–78 (5th Cir. 2002)). "In particular, a party satisfies the third prong if its 'claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry.'" *Id.* (quoting *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010)).

Plaintiffs cannot meet this standard. Both the claims in this case as well as the relief demanded will require significant, long-term participation from each of Plaintiffs' members claiming an injury. Defendant has explained this important point in more detail in Defendant's Motion for Expedited Discovery. Dkt. No. 20. Based on that Motion, incorporated here for the sake of brevity, and as explained further below, this Court should not find associational standing where Plaintiffs' members are the sole holders and providers of all necessary information.

1.  Plaintiffs' claims can be resolved only with participation of Plaintiffs' members.

The Fifth Circuit and the Supreme Court have recognized that when a cause of action requires a fact-intensive, individualized inquiry, individual member participation is required and

associational standing has not been shown. *See Society of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir.) (en banc), cert. denied, 506 U.S. 866 (1992). Here, Plaintiffs have brought claims of violations under the First Amendment, void-for-vagueness doctrine, Commerce Clause,[8] and Preemption Clause under 42 U.S.C. § 1983. These claims require Plaintiffs' members' participation because "[c]onstitutional questions must be presented in the context of specific live grievances." *Soc'y of Separationists, Inc.*, 959 F.2d at 1288. Narrowing this general proposition further, the claims Plaintiffs raise in this case surely require resolution in the context of specific factual inquiries given the allegations made. *See also* Dkt. No. 20.

As to Plaintiffs' First Amendment claim, the Court first needs to consider whether Plaintiffs' members are common carriers under the law. As explained in Defendant's Motion for Expedited Discovery, Plaintiffs' members will be required to participate in this inquiry to a significant extent. Dkt. No. 20 at 3-5. And, even if Plaintiffs' members are not deemed common carriers, this Court will nonetheless have to examine whether H.B. 20 is valid based on an intermediate level of scrutiny. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (Regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, "because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."). Under *U.S. v. O'Brien*, a content-neutral regulation will be sustained "*if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.*" 391 U.S. 367, 377 (1968) (emphasis added).

---

[8] Plaintiffs' Commerce Clause cause of action refers to the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV. Because Plaintiffs present no credible factual basis or legal reasoning to bring those claims, they will not be addressed herein.

The intermediate scrutiny analysis will necessarily require discovery into the effect of H.B. 20's restrictions on each of Plaintiffs' members' "distinctive" platforms and whether they are "no greater than is essential." Dkt. No. 12 (Plaintiffs' PI motion) at 12. Plaintiffs provide no evidence or factual basis to suggest that each of their members moderate and police user-generated content in the exact same way. *See id.* at 14 (stating "the platforms…provide *different* experiences to *different* audiences."). Each member will be required to provide evidence and testimony as to how, based on its unique corporate identity policies, capabilities, and framework, it is specifically restricted by H.B. 20.

The same is true for Plaintiffs' other claims. "The principal focus of [a commerce clause inquiry] must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980). And any void-for-vagueness claim will be determined by discerning whether "regulated parties…know what is required of them so they may act accordingly," and whether "precision and guidance [for those regulated parties] are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). As to preemption, this is not an independent cause of action and, thus, Plaintiffs have no standing to bring this claim on anyone's behalf.[9] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (stating preemption "is a judge-made remedy, and we have never held or even suggested

---

[9] Even if preemption was considered in the proper context, which is not found in this case, this Court has already recognized that "[t]his inquiry is fact-specific," and that therefore, "[g]eneral evidence that [the proponent of preemption] *may* be affected is insufficient." *Gallo v. Union Pac. R.R. Co.*, 372 F. Supp. 3d 470, 480 (W.D. Tex. 2019) (emphasis added) (requiring detailed evidence and expert testimony as to the burden on Plaintiff's ability to comply with federal law).

that, in its application to state officers, it rests upon an implied right of action contained in the Supremacy Clause.").

Thus, as explained here and in Defendant's Motion for Expedited Discovery (Dkt. No. 20), each of Plaintiffs' claims requires an inquiry into and assessment of every one of their members' knowledge, practices, and individual effects of H.B. 20 on their business to determine how each cause of action has been proven as to their specific company. The fact that Plaintiffs' own preliminary injunction motion contains declarations from multiple members in order to meet their burden to show their claims have merit only serves as proof of this point. *See* Dkt. No. 12. Where such extensive and significant involvement of Plaintiffs' members is necessary, Plaintiffs should not be granted associational standing.

      2. <u>Plaintiffs' requested relief cannot be awarded by this Court without participation of Plaintiffs' members.</u>

Like Plaintiffs' claims, relief in this suit also cannot be granted without participation from Plaintiffs' members. "Equitable remedies, like remedies in general, are meant to redress the injuries sustained *by a particular* plaintiff in a *particular* lawsuit." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (emphasis added). As such, "the routine issuance of universal injunctions is patently unworkable, sowing chaos for litigants, the government, courts, and all those affected by these conflicting decisions." *Id.*

This disfavoring of universal injunctions should inform this Court's consideration of how it could possibly grant the relief Plaintiffs seek without significant participation from their members. After all, the Supreme Court has recently reiterated that a valid Article III remedy must "operate with respect to specific parties," not with respect to a law or regulation "in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*,

138 S. Ct. 1461, 1486 (2018) (Thomas, J., concurring)). This party-focused rule means that a "remedy must be 'limited to the inadequacy that produced [a plaintiff's] injury in fact.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quoting *Lewis*, 518 U.S. at 357). The plaintiff must show that each requested remedy will redress some portion of the plaintiff's injury. *See DaimlerChrysler Corp.*, 547 U.S. at 352–53.

These principles are especially important where a Court must fashion a remedy to an as-applied challenge. Because Plaintiffs challenged the constitutionality of H.B. 20 "as applied" to their members, "Plaintiffs must demonstrate [H.B. 20], as applied to Plaintiffs['] [members] in this case **on these facts,**…violate[s] the Constitution." *Whole Woman's Health v. Hellerstedt*, 231 F. Supp. 3d 218, 226 (W.D. Tex. 2017). As-applied challenges cannot be proven in the absence of specific evidence particularized to the party alleging harm. *See* W*ashington State Grange v. Washington State Republican Party*, 552 U.S. 442, 457 (2008). In other words, an as-applied challenge to a law cannot be supported based on "conjecture" or a "factually barebones record." *In re Cao*, 619 F.3d 410, 434 (5th Cir. 2010) (internal citations and quotations omitted).

Plaintiffs seek declaratory and injunctive relief declaring that two, out of ten, sections of H.B. 20 are "unlawful as applied to Plaintiffs' members." Dkt. No. 1 at 47. For Plaintiffs to obtain this relief in accordance with the law, this Court will be required to fashion an injunctive order that identifies the specific injuries for each and every one of Plaintiffs' members and a remedy that is limited only to the inadequacies in H.B. 20 that produced those specific injuries. *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Such a feat cannot be accomplished without a fact-intensive inquiry into each member claiming an injury and seeking relief. No one member will be able to provide evidence as to the specific burdens, and source of those burdens, on any other members. *Ayotte v.*

*Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another.").

Indeed, the most cursory glance of the list of Plaintiffs' members reveals that no two companies are the same in terms of the platforms they provide and users they host. Logically, then, evidence as to how one company, for example, moderates content, classifies trade secrets, "protects" users, or reports data will differ from similar evidence from other companies. *See also* Dkt. No. 20. And Plaintiffs readily admit that "[e]ach covered platform provides its users a *distinctive* experience—according to its *own* policies formalized in terms of service and community standards." Dkt. No. 12 (emphasis added). "[T]he platforms also provide *different* experiences to *different* audiences. *Id*. at 14. Thus, there can be no doubt that Plaintiffs' members' participation is critical and indispensable in this suit.

## II.   Plaintiffs Cannot Avail Themselves of a Diversion-of-Resources Theory to Show Organizational Standing.

Plaintiffs do not have organizational standing to bring their claims on their own behalf. A plaintiff "generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). As an initial matter, the Plaintiff organizations cannot establish injury, traceability, or redressability against Defendants for the same reasons as discussed above. But Plaintiffs also fail to establish any organizational injury based on a diversion-of-resources theory.

"[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th

Cir. 2010). "Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact." *Id.* The Fifth Circuit has "explained that '[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.'" *Id.* (quoting *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000)). Activities "which basically boil down to examining and communicating about developments" in the law and do not "differ from . . . routine lobbying activities" do not confer standing. *Id.* at 238. Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Plaintiffs cannot satisfy these requirements. There are virtually no factual allegations in the Complaint related to Plaintiffs' organization, mission, or activities. The sole claim they make is that they are burdened by having to "divert their finite resources…to address compliance with and the implications of H.B. 20 for Internet companies." Dkt. No. 1 ¶14. This singular conclusory allegation leaves the Court to only guess at what resources they expend or how they expend them. And the answer becomes even more unclear given that Plaintiffs must show this use of resources is different from their normal lobbying activities of (1) "promot[ing] online commerce and speech and [ ] increas[ing] consumer access and options through the Internet, while minimizing burdens on businesses that are making the Internet more accessible and useful;" (NetChoice) and (2) "promot[ing] open markets, open systems and open networks" (CCIA). Dkt. No. 1 ¶¶1-2. As these are the exact goals they claim to be pursuing in this case, there is nothing to suggest Plaintiffs

are not taking routine lobbyist action. This fails to get them to organizational standing and, therefore, fails to confer jurisdiction upon this Court.

## Conclusion

One of Plaintiffs' members has recently been the subject of government investigation based on evidence that "[t]he company intentionally hides vital information from the public, from the US government and from governments around the world." *Testimony of Frances Haugen*, Senate Hearing Oct. 5, 2021 at 29:25. This practice should not be continued or further condoned by allowing Plaintiffs to stand in the place of each one of their members and shield those members from being bound by representations and explanations given on their behalf to this Court. Plaintiffs' members should be required to provide all necessary information, allegations, and arguments to this Court directly. Because this suit cannot properly be maintained by Plaintiffs, Plaintiffs lack standing and this suit should be dismissed.

Respectfully Submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Division Chief
General Litigation Division

*/s/ Courtney Corbello*
COURTNEY CORBELLO

Attorney-in-Charge
Assistant Attorney General
Texas State Bar No. 24097533
*courtney.corbello@oag.texas.gov*

**CHRISTOPHER D. HILTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24087727
christopher.hilton@oag.texas.gov

**BENJAMIN STOREY LYLES**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24094808
*benjamin.lyles@oag.texas.gov*

**BENJAMIN S. WALTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24075241
*benjamin.walton@oag.texas.gov*

General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 936-2109
**ATTORNEYS FOR DEFENDANT**

### CERTIFICATE OF SERVICE

I certify that on October 14, 2021 the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General

### NOTICE OF ELECTRONIC FILING

I, certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing in accordance with the Electronic Case Files system of the United States District Court for the Western District of Texas, on October 14, 2021.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General