UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

NETCHOICE, LLC d/b/a NETCHOICE, a
501(c)(6) District of Columbia organization, and
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a CCIA, a
501(c)(6) non-stock Virginia corporation,

    Plaintiffs,

v.

KEN PAXTON, in his official capacity as Attorney
General of the State of Texas,

    Defendant.

Civil Action No.
1:21-cv-00840-RP

**BRIEF OF AMICI CURIAE CHAMBER OF PROGRESS,
CONNECTED COMMERCE COUNCIL, CTA®, ENGINE ADVOCACY,
INFORMATION TECHNOLOGY & INNOVATION FOUNDATION, NATIONAL
BLACK JUSTICE COALITION, PROGRESSIVE POLICY INSTITUTE, TECHNET,
AND WASHINGTON CENTER FOR TECHNOLOGY POLICY INCLUSION AND
HISPANIC TECHNOLOGY AND TELECOMMUNICATIONS PARTNERSHIP IN
<u>SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## INTRODUCTION

    Amici urge the Court to enter a preliminary injunction to prevent Texas House Bill 20 ("H.B. 20," enacted September 9, 2021) (the "Act") from taking effect on December 2, 2021. Doing so will prevent immediate, irreparable harm to providers and consumers of online services from the Act's unconstitutional interference with providers' First Amendment rights to set and enforce content policies for their individual platforms. Plaintiffs Netchoice LLC and Computer & Communications Industry Association ("Plaintiffs") have satisfied all of the factors for entering a preliminary injunction.

1

Texas officials assert that the Act is to the benefit of its residents.[1] Amici strongly disagree. H.B. 20 will dramatically and adversely impact consumers both inside and outside of Texas. This is directly relevant to the legal issues before the Court on the motion for preliminary injunction, including plaintiffs' likelihood of success on the merits of their claims, the relative harm the parties may suffer if H.B. 20 is or is not enjoined, and the public interests impacted by the Act.

The Act will place online providers and their users in a no-win situation where both legal and illegal harmful content will proliferate. H.B. 20 does this by: (1) prohibiting screening and blocking of harmful content and activities; (2) compelling detailed disclosures of the methods providers use to enforce their policies making it easier for wrongdoers to evade detection; and (3) imposing undue burdens on content moderation. The harm to consumers is direct and unavoidable—consumers' ability to seek out truthful, trustworthy, and safe online content and avoid harmful content will be obstructed. The Act violates the First Amendment and should be enjoined.

## INTEREST OF AMICI CURIAE

Chamber of Progress is a tech industry coalition devoted to a progressive society, economy, workforce, and consumer climate. It is an industry organization that backs public policies that will build a fairer, more inclusive country in which all people benefit from technological leaps. Its work is supported by corporate partners, many of whom will be subject to the law at issue.[2]

The Connected Commerce Council (3C) is a nonprofit membership organization with a single goal: to promote small businesses' access to essential digital technologies and tools.

---

[1] Plaintiffs' Motion at pp. 6-7.
[2] Chamber of Progress' Partners are available at: https://progresschamber.org/. Chamber of Progress' partners do not sit on its board of directors and do not have a vote on or veto over its positions.

As North America's largest technology trade association, CTA® is the tech sector. Its members are the world's leading innovators – from startups to global brands – helping support more than 18 million American jobs. CTA owns and produces CES® – the most influential tech event in the world.[3]

Engine Advocacy ("Engine") is a nonprofit technology policy, research, and advocacy organization that bridges the gap between policymakers and startups. Engine works with government representatives and a community of high-technology, growth-oriented startups across the nation to support the development of technology entrepreneurship.

Founded in 2006, Information Technology & Innovation Foundation (ITIF) is an independent 501(c)(3) nonprofit, nonpartisan research, and educational institute—a think tank. Its mission is to formulate, evaluate, and promote policy solutions that accelerate innovation and boost productivity to spur growth, opportunity, and progress.

Since 2003, the National Black Justice Coalition (NBJC) has been America's leading national civil rights organization dedicated to the empowerment of Black lesbian, gay, bisexual, transgender, queer+, and same gender loving (LGBTQ+/SGL) people, including people living with HIV/AIDS through coalition building, federal policy change, research, and education.

The Progressive Policy Institute (PPI) is a catalyst for policy innovation and political reform based in Washington, D.C. Its mission is to create radically pragmatic ideas for moving America beyond ideological and partisan deadlock.

TechNet is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses

---

[3] A complete list of the Consumer Technology Association's members is available at: http://cta.tech/Membership/Membership-Directory.aspx.

ranging from startups to the most iconic companies on the planet and represents over four million employees and countless customers.

The Washington Center for Technology Policy Inclusion (WashingTECH), a nonpartisan, nonprofit 501(c)(3) corporation, is an advocacy platform committed to civil rights, empowerment, justice, and inclusion in technology public policy making. As America's "inclusive voice of tech policy," WashingTECH's mission is to convene diverse technology public policy professionals to defend America's rich diversity with programs that promote an inclusive narrative about technology's impact on society.

The Hispanic Technology and Telecommunications Partnership ("HTTP") is the leading national Latino/a/x voice on telecommunications and technology policy. HTTP members serve as a nonpartisan coalition of national Latino civil rights organizations working to ensure that the full array of technological and telecommunications advancements are available to the Latino/a/x community across the United States.

Amici[4] have a substantial interest in ensuring that consumers can enjoy a healthy online environment where they can effectively and efficiently work, play, learn, shop, connect, and express themselves without harassment, disinformation, and incendiary content. To ensure that online services are inclusive, useful, and safe, online providers take a variety of actions, often referred to collectively as "content moderation."[5] Online providers understand that these actions are necessary to support the innovation economy and promote equitable access to the benefits of technological innovations.

---

[4] The term "Amici" includes Chamber of Progress, 3C, CTA®, Engine, ITIF, NBJC, PPI, TechNet, WashingTECH, and the Hispanic Technology and Telecommunications Partnership.
[5] "Content moderation" generally refers to the process by which online providers "decide to publish or remove third-party content." Eric Goldman, *Content Moderation Remedies* (2021), at p. 6. Michigan Technology Law Review, Forthcoming, Santa Clara Univ. Legal Studies Research Paper, https://ssrn.com/abstract=3810580.

The Act poses a direct threat to healthy and safe online communities by restricting, undermining, and burdening the ability of online providers to exercise their First Amendment rights to moderate content on their private platforms. Laws that seek to regulate content moderation like H.B. 20 are extremely important to Amici, because the parties Amici represent routinely engage in or benefit from content moderation. Amici have a substantial interest in this action as the outcome will impact the ability of providers to offer and consumers to access safe online platforms.

## ARGUMENT

Content moderation by private parties is expressive activity protected by the First Amendment. The Act's unjustifiable restriction and regulation of this protected expression weighs heavily in favor of granting plaintiffs' motion for a preliminary injunction. If H.B. 20 takes effect, it will result in irreparable injuries to online providers and their consumers.

Providers' and consumers' interests in online content moderation are inextricably intertwined. Consumers want reliable information and safe online communities.[6] Similarly, online providers have an imperative to develop services that deliver consumers beneficial online experiences.[7] Providers must make judgments about the types of content and activities that will disrupt the online experience they want to cultivate. Providers' content moderation policies are carefully weighed judgements about what measures are necessary to attract and retain consumers

---

[6] *See* Decl. Netchoice ¶14.
[7] The Declaration of LGBT Tech brings this into sharp focus, stating: "Put simply, few users—gay, straight,trans; white, black, brown; young or old—want to scroll through hateful content and messages. But because HB 20 compels platforms to host such content, and because bad actors tend to spam message boards, private group pages, and other forums with hateful messages, many users will flee these platforms. At the very least, many will engage less." Decl. LGBT Technology Institute ¶13.

and/or advertisers[8] and limit corporate risk and reputational damage.[9] Each provider must make these judgments[10] based on their service's unique situation considering factors such as the nature of the service; the intended audience; the well-being of employees and contractors; and a range of cultural, political, and legal factors based on the company's global footprint.[11] The imperative to create healthy and trustworthy online communities operates to the benefit of consumers by reducing the amount of illegal, "lawful but awful," irrelevant, low quality, and nuisance content they must wade through to conduct their daily activities, whether research for work or school or planning travel, a big purchase, or where to eat that night.

To create a healthy, safe, and trustworthy environment, just some of the policies providers adopt and enforce include:

- screening for spam, viruses, malware, phishing, scams, child sexual abuse material, terrorist propaganda, coordinated inauthentic activity by hostile nation states, and other policy violations;

---

[8] *See* Decl. Netchoice ¶¶8-10; Decl. CCIA ¶22, ¶28.
[9] *See* Decl. Netchoice ¶16, ¶23.
[10] *See* Decl. CCIA ¶19(describing content moderation as "normative judgments" and "important statements about the kind of community [the provider] wishes to foster").
[11] As argued in plaintiff's motion H.B. 20 applies to conduct outside Texas' borders in violation of the Commerce Clause. Plaintiffs' Motion at pp. 39-43. Because H.B. 20 regulates online content that Texas residents may want to receive, it purports to require covered providers to allow access to content that violates the laws of other jurisdictions. Tex. Civ. Prac. & Rem. Code § 143A.004(a). This could expose providers to liability in other U.S. states and foreign countries. The German Network Enforcement Act (Netzwerkdurchsetzungsgesetz) imposes liability on online services if they do not remove illegal content, such as Holocaust denial, after receiving a notice. *See*, Library of Congress, *Germany: Network Enforcement Act Amended to Better Fight Online Hate Speech* (2021), available at: www.loc.gov/item/global-legal-monitor/2021-07-06/germany-network-enforcement-act-amended-to-better-fight-online-hate-speech/. H.B. 20 would prohibit a provider from enforcing a policy against Holocaust denial because it does not fit within an exception. This is highly disruptive to efforts to facilitate cross-border communications and to adopt global content policies.

- responding to reports from the public, consumers, and trusted partners about the content described above, as well as, harassment; impersonation; invasions of privacy such as posting non-consensual intimate images, doxxing, and deadnaming; grooming minors; and promotion of suicide and self-harm;

- labeling, restricting, rating, or otherwise identifying content that may not be appropriate for certain audiences, is regulated, or is suspicious or potentially harmful; and

- removing, demoting, or limiting the spread of content that is disruptive to the type of environment they want to provide to their consumers, including hate speech, disinformation, and content that may be simply irrelevant to the function of the service.[12]

## I. PROHIBITION ON SCREENING & BLOCKING

The Act prohibits online providers from engaging in many of these content moderation activities by prohibiting "censorship" of "viewpoints"[13] subject to only narrow exceptions.[14] Violations will result in Attorney General and private lawsuits.[15] While some provider rules may

---

[12] For example, TripAdvisor's Traveler Review Guidelines require that reviews avoid including information unrelated to the experience with the business being reviewed. https://www.tripadvisorsupport.com/hc/en-us/articles/200614797-Traveler-review-guidelines. Amazon has a similar "relevance" policy for product reviews. https://www.amazon.com/gp/help/customer/display.html?nodeId=GLHXEX85MENUE4XF

[13] Plaintiffs' Motion at pp. 8-10(detailing the Act's restrictions on content moderation).

[14] Tex. Civ. Prac. & Rem. Code § 143A.006 provides exceptions for: 1) censorship explicitly authorized by federal law; 2) content removed based on a referral from an organization dedicated to preventing child sexual exploitation; 3) content removed because it directly incites violence or threatens violence against an individual based on certain protected characteristics; and 4) unlawful expression. Section 143A.001(5) defines "unlawful expression" by reference to federal and Texas law, including tort law.

[15] Tex. Civ. Prac. & Rem. Code § 143A.007(b)-(c) & § 143A.008(b).

be indifferent to the content of a post,[16] many rules deal exclusively with the content of posts.[17] Given the litigation risk, providers will be chilled from taking action against harmful content unless it very clearly falls within one of the exceptions.[18]

      This result creates immediate irreparable harm in several different ways. There are many reasons why a provider or consumer may want to limit content that is potentially harmful but not illegal. Regardless of the reason, H.B. 20 presents a significant roadblock. For example, parents and adult caregivers frequently seek out safe spaces online that children can visit without exposure to content that may not be appropriate for the child's age or the family's values.[19] The Act undermines this by preventing sites that are geared toward children from screening out pornographic content. Likewise, these sites would not be able to prohibit content containing violence, animal cruelty, profanity, or other age-inappropriate content. Because of the broad

---

[16] For example, Twitter maintains limits on the amount of activity on its site, such as allowing an account no more than 1,000 direct messages a day. A violation may result in removal of content even if the content otherwise complies with the Twitter Rules. *See* Twitter Limits, https://help.twitter.com/en/rules-and-policies/twitter-limits.

[17] *See, e.g.*, Tumblr Community Guidelines (prohibiting content containing hate speech, glorification of self-harm, excessive violence, impersonation, non-consensual pornography, and voter intimidation). Available at: https://www.tumblr.com/policy/en/community.

[18] *See*, Decl. YouTube ¶14; Decl. Stop Child Predators ¶11. The risk of lawsuits for removing content is not hypothetical; these types of suits are happening now. *See Daniels v. Alphabet, Inc.*, No. 20-cv-04687 (N.D. Cal. March 31, 2021), 2021 WL 1222166 (conspiracy theories), *Children's Health Defense v. Facebook Inc.*, ___ F. Supp.3d ___, 2021 WL 2662064 (N.D. Cal. June 29, 2021) (vaccine and health misinformation), *Domen v. Vimeo, Inc.*, 991 F.3d 66 (sexual orientation conversion therapy).

[19] Millions of parents and caregivers regularly allow the children in their care to visit or use sites and apps such as Youtube and Roblox. *See* A. Smith, S. Toor, P. Van Kessel, *Many Turn to Youtube for Children's Content, News, How-To Lessons*, (Nov. 7, 2018), https://www.pewresearch.org/internet/2018/11/07/many-turn-to-youtube-for-childrens-content-news-how-to-lessons/; *Factbox: The Nuts and Bolts of Roblox*, REUTERS (Nov. 19, 2020), https://www.reuters.com/article/us-gaming-roblox-factbox/factbox-the-nuts-and-bolts-of-roblox-idUSKBN27Z1FZ.

definition of what constitutes censorship, the Act also prohibits age-gating or providing warnings to users for these types of content.[20]

Recently, federal lawmakers on both sides of the aisle pressured Facebook to take greater action to support teen users' mental health.[21] Sen. Blumenthal highlighted concerns over the "easily findable accounts associated with extreme dieting and eating disorders."[22] Proponents of the federal bill, the KIDS Act,[23] complain of teen access to "unhealthy content," such as content containing violence or promoting self-harm, and content containing influencers' marketing messages.[24] Today, Facebook and other providers prohibit a range of content that is not illegal—but could be dangerous for impressionable users—including content promoting eating disorders, cutting, and suicide. H.B. 20 would curtail this by prohibiting removal of this type of content.[25] If providers cannot make judgments about what policies best serve their users, consumers will lose the ability to choose which service best suits their needs. For vulnerable consumers, this could have serious consequences.

---

[20] Both of these activities would "restrict" or "deny equal access to" content under the definition of "censor." Tex. Civ. Prac. & Rem. Code § 143A.001(1). *See also*, Decl. YouTube ¶36.
[21] A. Silberling, TechCrunch, *Facebook Grilled in Senate Hearing over Teen Mental Health* (Sept. 30., 2021), https://techcrunch.com/2021/09/30/facebook-grilled-in-senate-hearing-over-teen-mental-health/.
[22] Congressional Record Vol. 167, No. 170, S6759 (September 29, 2021).
[23] S. 3411 (116th Cong.), https://www.congress.gov/bill/116th-congress/senate-bill/3411?q=%7B%22search%22%3A%5B%22KIDS+Act%22%2C%22KIDS%22%2C%22Act%22%5D%7D&s=2&r=7.
[24] https://www.markey.senate.gov/news/press-releases/senators-markey-and-blumenthal-rep-castor-reintroduce-legislation-to-protect-children-and-teens-from-online-manipulation-and-harm.
[25] *See, e.g.*, Facebook Community Standards: Suicide and Self-Injury, https://transparency.fb.com/policies/community-standards/suicide-self-injury/; Twitter Rules and Policies: Suicide and Self-harm Policy, https://help.twitter.com/en/rules-and-policies/glorifying-self-harm. It is worth noting that other services choose to allow these types of content to ensure individuals who struggle with these issues are able to participate in supportive communities. *See, e.g.,* Reddit Content Policy, https://www.redditinc.com/policies/content-policy (which does not contain a prohibition on this content). *See also*, Sarah Mitroff, *Reddit Now Lets You Report Users Who May Be at Risk of Self-harm* (March 4, 2020), https://www.cnet.com/health/reddit-now-lets-you-report-users-that-you-worry-might-self-harm/.

The impact of prohibiting providers from taking action against legal, but harmful content, will be felt by consumers of all ages. There is a wide gulf between the types of speech the government may prohibit[26] and what speech consumers want to see.[27] Providers seek to fill this gap with policies against:

- all manner of threats,[28] not merely "true threats;"[29]

- content that dehumanizes or discriminates against individuals based on perceived membership in a protected class,[30] not merely threats or acts of violence based on such membership;[31]

- content that sexualizes children,[32] even if it doesn't involve actual children (*e.g.*, virtual child pornography or cartoons).[33]

The results of H.B. 20's prohibition on enforcement of such policies is amply described in the declarations supporting Plaintiffs' motion.[34] However, it cannot be overstated that allowing

---

[26] *See* Congressional Research Service, Rep. No. IF11072, *First Amendment Categories of Speech* (Killion 2019), https://crsreports.congress.gov/product/pdf/IF/IF11072.

[27] *See,* Decl. Facebook ¶ 2, Decl. NetChoice ¶14. *See also, e.g.*, Anti-Defamation League, *Online Hate and Harassment: The American Experience 2021*, What Solutions do Americans Want? (2021), https://www.adl.org/online-hate-2021#what-solutions-do-americans-want; Sophie Bertazzo, Trust Magazine, *Online Harassment Isn't Growing—But It's Getting More Severe* (June 28, 2021), https://www.pewtrusts.org/en/trust/archive/spring-2021/online-harassment-isnt-growing-but-its-getting-more-severe (discussing measures consumers would like to see online services take).

[28] *See, e.g.*, Twitter Rules: Abusive Behavior, https://help.twitter.com/en/rules-and-policies/abusive-behavior.

[29] *See, e.g., Virginia v. Black,* 538 U.S. 343 (2003).

[30] *See, e.g.,* Facebook Community Standards: Hate Speech, https://support.google.com/youtube/answer/2801999?hl=en&ref_topic=9282679.

[31] *See, e.g.*, Texas Civ. Prac. & Rem. Code § Sec. 143A.006(a)(3) (exception to prohibition on censorship for "specific threats of violence" based on a protected characteristic).

[32] *See, e.g.*, YouTube Community Guidelines: Child Safety Policy, https://support.google.com/youtube/answer/2801999?hl=en&ref_topic=9282679.

[33] *See*, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (holding ban on virtual child pornography unconstitutional).

[34] *See, e.g.*, Decl. NetChoice ¶16, ¶23; Decl. YouTube ¶¶61-62; Decl. of Facebook ¶2.

platforms to be overrun with harmful content will essentially render them unusable for all consumers, and particularly for communities that may be vulnerable[35] or that may be specifically targeted with hate and harassment.[36]

## II. THE ACT UNDERMINES EFFORTS TO PROTECT CONSUMERS

H.B. 20 compels providers to engage in speech that is contrary to their interests and the interests of their consumers in clear violation of the First Amendment.[37] In particular, the requirements to provide detailed information about the methods used to enforce content policies[38] will undermine the efficacy of providers' enforcement activities. Sophisticated bad actors continually change their playbooks for phishing, malware, scams, spam, coordinated inauthentic activity, and other illegal activities such as trading child sexual abuse material, sex trafficking, terrorist recruiting and fundraising, and selling drugs.[39] Whether organized crime, government intelligence services, state-sponsored hacking groups, foreign terrorist organizations, gangs, or drug cartels, providers must continually update and refine their approaches to detecting and countering such content. Even seemingly small amounts of information tip the balance on whether large amounts of harmful content make it onto a platform or are successfully deterred.

Online providers remove millions (and in some cases billions) of pieces of content for violating policies every year. For example, Facebook removed over 794 million of pieces of

---

[35] In addition to posing safety concerns for kids and teens, H.B. 20 will also interfere with efforts to protect seniors from scams specifically targeting them. *See* Decl. CCIA ¶12.
[36] *See* Decl. LGBT Tech ¶13.
[37] *See* Motion at p. 24 (discussing the standard to determine whether compelled disclosures are consistent with the First Amendment).
[38] *See* Tex. Bus. & Com. Code § 120.053(a) (7) (requiring disclosure of "description of each tool, practice, action, or technique used in enforcing the acceptable use policy.").
[39] *See, e.g.,* Jean Whitmore, *The Arms Race of Models: Complexify or Die* (June 24, 2021), https://ssrn.com/abstract=3867464 ("Both the spammers and spam filter-builders are under pressure to evolve or die."); Steven Gosschalk, *AI vs. AI: The Digital Arms Race to Fight Fraud* (Oct. 24, 2019), https://aithority.com/guest-authors/ai-vs-ai-the-digital-arms-race-to-fight-fraud/.

spam[40] in a quarter;[41] in a six-month period Twitter challenged 143 million suspected spam accounts;[42] and in one quarter YouTube removed over 630 million comments for violations related to spam.[43] It is hard to see how consumers would benefit from even a fraction of such content being available on the platforms they use for work, school, keeping up with friends and family, and getting news or entertainment. Certainly, providers have the right to keep this content off their platforms.

### III. THE ACT BURDENS ACTIONS THAT PROTECT CONSUMERS

The Act contains several provisions that serve as constructive prohibitions on content moderation by imposing undue burdens, making it impossible for providers to engage in the full range of policy setting and enforcement necessary for the proper operation of their services and protection of consumers.[44] These burdens include new requirements for actions that must accompany content moderation activities including individual user notices, appeals, complaint systems, and transparency reporting.[45]

These requirements apply to a broad range of actions taken to benefit consumers that go far beyond removal of content or banning of accounts. For example, the requirements will impact:

---

[40] It should be noted that each provider defines "spam" uniquely for their platform. These definitions are usually not restricted to unsolicited commercial emails typically regulated by anti-spam laws, and therefore encompass a significant amount of harmful, but not illegal content and activity.
[41] Facebook Transparency Report, https://transparency.fb.com/data/community-standards-enforcement/spam/facebook/.
[42] Twitter Transparency Report, https://transparency.twitter.com/en/reports/platform-manipulation.html#2020-jul-dec.
[43] Google Transparency Report, https://transparencyreport.google.com/youtube-policy/removals?hl=en.
[44] *See* Decl. YouTube ¶33, Decl. CCIA ¶¶42-44.
[45] *See* Plaintiffs' Motion at pp. 11-13.

- Labeling, age gating, or providing an interstitial before sensitive content.[46] "Sensitive" is a broad label and can apply to graphic photos of terrorist attacks, pornography, or regulated content.

- Labeling "State-owned Media" as such to help consumers evaluate content from sources like RT America, which consumers may not recognize as a media operation backed by the Russian government.[47]

- Downranking or demoting content of a lesser quality, is likely to generate complaints, or poses a potential threat to users. For example, Facebook demotes comments that are similar to prior comments that were subject to complaints.[48]

Under the Act, these activities are subject to many of the same burdensome obligations as other content moderation decisions, including removing content and banning users.[49]

The Act imposes new burdens on content moderation activity that will make it impossible for many covered entities to afford to comply with the new requirements or—because of the high volume of content on their sites—unable to satisfy the requirements for all types of content moderation actions regulated by H.B. 20. These service providers will face stark choices, the consequences of which will flow directly or indirectly to consumers. Providers may choose to stop moderating content altogether unless required by law, or scale down their content moderation policies and enforce such policies only against the worst of the worst of policy violations. Or

---

[46] *See,* Decl. of CCIA ¶ 15. *See also, e.g.*, Twitter Rules: Media Policy, https://help.twitter.com/en/rules-and-policies/media-policy.
[47] *See,* Decl. of CCIA ¶ 17. *See also, e.g.*, Twitter Rules: State-Affiliated Content, https://help.twitter.com/en/rules-and-policies/state-affiliated.
[48] *See* Guideline Details: Comments that are likely to be reported or hidden, https://transparency.fb.com/en-gb/features/approach-to-ranking/content-distribution-guidelines/comments-likely-reported-hidden/.
[49] Tex. Com. & Bus. Code § 120.053.

platforms may choose to change aspects of how their service operates. For example, providers could collect more personal information from consumers for identity verification or charge a fee for the service to reduce the risk of inappropriate behavior or to cover the increased cost of offering the services.

Consumers will disadvantaged by these consequences in multiple ways, such as losing the:

- variety of online services that they can choose from, as high compliance costs and significant legal risks make it more difficult for small and medium-sized sites to continue to operate and create a barrier to entry for new services that will have to comply when they meet the 50 million users threshold;
- low friction to using many online services which have no registration requirement, or registration with minimal collection of personal information, which provide opportunities to speak anonymously or pseudonymously. This low friction also helps a more diverse set of communities have access to online services than would if, for example, providers were to seek to verify identities through processes that require credit cards or government-issued identification; and
- wide access to free services as companies seek to cover the costs of compliance and address the increased risk of litigation. Being able to offer certain services without cost is vital to ensure online services are available not just to those who can afford to pay.

### IV. AN INJUNCTION IS NECESSARY TO PROTECT CONSUMERS

If allowed to take effect, the Act will impinge Amici's constituents' ability to moderate their private platforms and will change the way hundreds of millions consumers experience the internet, exposing consumers to scams, fraud, and other harmful content which is now subject to moderation efforts. The nature of the internet makes it impossible to confine the Act to only Texas

users. An injunction preserves the current state of the internet, including all the actions that providers currently take and to which consumers are accustomed, at least until the Court can determine whether the Act passes Constitutional muster.

## CONCLUSION

For these reasons, Amici Curiae support Plaintiffs' Complaint and their Motion for Preliminary Injunction.

Dated: October 7, 2021

Respectfully Submitted,

/s/ W. Reid Wittliff
W. Reid Wittliff
Texas State Bar No. 00791951
reid@wittliffcutter.com

WITTLIFF | CUTTER PLLC
1209 Nueces St.,
Austin, Texas 78701
T: (512) 960-4866
F: (512) 960-4869

**COUNSEL FOR AMICI CURIAE**

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of October 2021, the foregoing *Brief of Amicus Curiae* was filed with the Clerk of the Court and served on all counsel of record in this case using the Court's CM/ECF system.

/s/ W. Reid Wittliff
W. Reid Wittliff