REID COLLINS & TSAI LLP
Jason A. Cairns (State Bar No. 24097447)
  jcairns@reidcollins.com
1301 S. Capital of Texas Hwy, Suite C300
Austin, TX 78746
Telephone: (512) 647-6100
Facsimile: (512) 647-6129

TECHFREEDOM
Corbin K. Barthold (*pro hac vice* admission pending)
  cbarthold@techfreedom.org
110 Maryland Ave NE, Suite 205
Washington, DC 20002
Telephone: (925) 788-6847

Attorneys for *Amicus Curiae* TechFreedom

### IN THE UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 502(c)(6) District of Columbia organization; COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, | Case No. 1:21-cv-840-RP |
| Plaintiffs, | |
| vs. | ***AMICUS CURIAE* BRIEF OF TECHFREEDOM IN SUPPORT OF PLAINTIFFS NETCHOICE AND CCIA'S MOTION FOR PRELIMINARY INJUNCTION** |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | |
| Defendant. | |

TABLE OF AUTHORITIES ........................................................................................ ii

I.      INTRODUCTION ...................................................................................... 1

   II.      ARGUMENT ....................................................................................... 3

   A.      Social Media and Common Carriage Are Irreconcilable Concepts ......................... 3

         1.      Social Media Are Not "Carriage": They Are Diverse and
                 Evolving Products ....................................................................... 3

         2.      Social Media Are Not "Carriage": They Are Fundamentally
                 Expressive .................................................................................. 5

         3.      Social Media Are Not "Common": They Are Not Offered
                 Indiscriminately ......................................................................... 6

   B.      Social Media Bears None of the Indicia of Common Carriage Listed
           in HB 20 ........................................................................................ 8

         1.      "Affected With a Public Interest" ................................................ 8

         2.      "Have Enjoyed Governmental Support" ........................................ 8

         3.      "Market Dominance" ................................................................ 10

   C.      Supreme Court Case Law Does Not Save HB 20's Common Carrier
           Theory ......................................................................................... 11

         1.      *PruneYard Shopping Center v. Robins* ........................................... 11

         2.      *Rumsfeld v. FAIR* .................................................................... 12

         3.      *Turner Broadcasting System v. FCC* ............................................. 12

   D.      The Burdens Imposed by HB 20 Go Far Beyond Common Carriage ......... 14

   III.     CONCLUSION ................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Knight First Am. Inst.*
    141 S. Ct. 1220 (2021) ................................................................ 11

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*
    827 F.2d 1291 (9th Cir. 1987)................................................ 8, 18

*Columbia Broadcasting v. Democratic Comm.*
    412 U.S. 94 (1973) ......................................................................... 8

*FTC v. Facebook*
    20-cv-3590 (D.D.C., June 28, 2021) ....................................... 13

*German Alliance Ins. Co. v. Kansas*
    233 U.S. 389 (1914) ................................................................ 6, 16

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*
    515 U.S. 557 (1995) .............................................................. passim

*Lombard v. Louisiana*
    373 U.S. 267 (1963) ..................................................................... 17

*Lorain Journal Co. v. United States*
    342 U.S. 143 (1951) ..................................................................... 13

*McCoy v. Pac. Spruce Corp.*
    1 F.2d 853 (9th Cir. 1924) ............................................................ 6

*Miami Herald v. Tornillo*
    418 U.S. 241 (1974) .............................................................. passim

*Nebbia v. New York*
    291 U.S. 502 (1934) ..................................................................... 11

*NetChoice LLC v. Moody*
    4:21-cv-220, Dkt. 113 (N.D. Fla., June 30, 2021) ..................... 4

*PG&E v. Pub. Util. Comm'n of Cal.*
    475 U.S. 1 (1986) ......................................................................... 18

*Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*
    251 U.S. 27 (1919) ....................................................................... 12

*PruneYard Shopping Center v. Robins*
    447 U.S. 74 (1980) ................................................................. 5, 14

*Reed v. Town of Gilbert*
    135 S. Ct. 2218 (2015) ................................................................ 17

*Reno v. ACLU*
    521 U.S. 844 (1997) ............................................................................................ 14

*Rumsfeld v. FAIR*
    547 U.S. 47 (2006) .......................................................................................... 5, 15

*Stratton Oakmont, Inc. v. Prodigy Servs.*
    1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) .............................................. 10

*Turner Broadcasting System, Inc. v. FCC*
    512 U.S. 622 (1994) ........................................................................... 5, 15, 16, 17

*U.S. Telecom Ass'n v. FCC*
    855 F.3d 381 (D.C. Cir. 2017) ............................................................................ 9

*Wash. Post v. McManus*
    944 F.3d 506 (4th Cir. 2019) ............................................................................ 16

*Zeran v. Am. Online*
    129 F.3d 327 (4th Cir. 1997) ............................................................................ 12

**<u>Statutes</u>**

47 U.S.C. § 153(h) ...................................................................................................... 8

47 U.S.C. § 230 ......................................................................................................... 11

47 U.S.C. §§ 201(b) .................................................................................................. 18

47 U.S.C. §§ 230(c)(1), (c)(2) ................................................................................... 9

47 U.S.C. 202(a) ....................................................................................................... 18

18 U.S.C. § 2511 ........................................................................................................ 8

<u>Other Authorities</u>

Analis Bailey, *Premier League, English Soccer Announce Social Media Boycott in Response to Racist Abuse*, USA Today, https://bit.ly/3xIpfdT (Apr. 24, 2021) .......................... 10

Bruce Wyman, *Public Service Corporations* (1911), available at https://bit.ly/3wb5c84) ...... 17, 18

Dr. Seuss, *Yertle the Turtle and Other Stories* (1958) ................................................. 13

Communications Act of 1934 ..................................................................................... 8

*Computer III Phase I Order*, 104 FCC. 2d 958, 968, ¶ 10 (1986);
*Stevens Report*, 11511-15, ¶¶ 22-32 ......................................................................... 7

Daniel Brenner, *Cable Television and the Freedom of Expression*,
1988 Duke L.J. 329, 339 (1988) ................................................................. 16

*Federal-State Joint Board on Universal Service*, Report to Congress,
13 FCC Rcd 11501, 11513, ¶ 25 (1998) (*Stevens Report*) ............................ 7

*Free Speech and the Myth of the Internet as an Unintermediated Experience*,
78 Geo. Wash. L. Rev. 697, 701 (2010) ................................................. 8, 10

HB 20 §§ 1(3), (4) ............................................................................... 4

*In re Petitions for Decl'y Ruling on Reg'y Status of Wireless Messaging Serv.*,
33 FCC Rcd. 12075 (2018) ...................................................................... 7

Interstate Commerce Act, 24 Stat. 379, 379-80 (1887) ............................... 6

Mann-Elkins Act, 36 Stat. 539, 544-45 (1910) ....................................... 7

Radio Act of 1927 ................................................................................ 8

*The First Amendment, Common Carriers, and Public Accommodations: Net Neutrality, Digital
  Platforms, and Privacy*, 1 J. of Free Speech Law 463, 473-75 (2021) ................ 9

Tiffany Hsu & Elanor Lutz, *More Than 1,000 Companies Boycotted Facebook.
Did It Work?*, NY Times, https://nyti.ms/3gjyryR (Aug. 1, 2020) ................ 11

Tom Maxwell, *Twitch Streamers Demand the Platform 'Do Better' at Moderating
Hate Speech*, Input, https://bit.ly/37wIbSo (Aug. 10, 2021) ........................ 10

Twitter, *The Twitter Rules*, https://bit.ly/3cpc75S (last accessed Sept. 24, 2021) ........ 9

u/DubTeeDub, "Open Letter to Steve Huffman and the Board of Directors of Reddit, Inc.—
If You Believe in Standing up to Hate and Supporting Black Lives, You Need to Act,"
posted on *r/AgainstHateSubreddits*, reddit, https://bit.ly/3xef0hW (June 8, 2020) .............. 11

Wayback Machine, *Facebook Terms of Use*, https://bit.ly/3w1gYC5 (Nov. 26, 2005) ............ 10

I.    **INTRODUCTION**

Announcing his support for the social media speech code that would become HB 20, Texas Governor Greg Abbott tweeted: "Too many social media sites silence conservative speech and ideas and trample free speech. It's un-American, Un-Texan, & soon to be illegal." Greg Abbott (@GreggAbbott_TX), Twitter (Mar. 4, 2021), 11:52 PM, https://bit.ly/3jqSwWP. A few months later, in an order blocking enforcement of a similar law passed by Florida, District Judge Hinkle offered the perfect response: "[L]eveling the playing field—promoting speech on one side of an issue or restricting speech on the other—is not a legitimate state interest." *NetChoice LLC v. Moody*, 4:21-cv-220, Dkt. 113 at 27 (N.D. Fla., June 30, 2021).

Under the First Amendment, "a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995). This is, at bottom, a right to "editorial control and judgment" over the speech one hosts and disseminates. *Miami Herald v. Tornillo*, 418 U.S. 241, 258 (1974). See also Pls' Mot. for Prelim. Inj., Dkt. 12 at 15-16 (discussing *Hurley* and *Miami Herald* in greater detail). With its onerous reporting and process requirements, and its unprecedented (and impossible) demand for viewpoint neutrality, HB 20 roundly violates this right.

Texas appears to understand that under a conventional First Amendment analysis, HB 20 is doomed. Hence its attempt to insulate its new law from such analysis under the guise of "common carriage." See HB 20 §§ 1(3), (4). But slapping the label "common carrier" on something doesn't make it so. And even if it did, common carriers retain their First Amendment rights, and they have much broader discretion to refuse service than HB 20 allows for.

This brief addresses Texas's "common carrier" theory as follows:

**A.** Social media websites—even large ones—are nothing like common carriers. Common carriage is about (1) *carriage*, i.e., transportation, (2) of uniform *things*, i.e., people, commodities, or parcels of private information, (3) in a manner that is *common*, i.e., indiscriminate. Social media are different from common carriage in all pertinent respects. They are (1) a diverse array of differentiated media products (microblogs, videochats, photo streams, and so on), (2) typically shared as a *public*-facing *expressive* activity, (3) that are subject to extensive terms of service.

**B.**  Contrary to HB 20's naked assertions, large social media websites display none of the indicia of traditional common carriage. First, even if social media websites were "affected with a public interest" (whatever that means), see § 1(3), the Supreme Court—and some of the common carrier theory's most notable proponents—don't think a "public interest" test is useful for determining who can be treated as a common carrier. Second, social media websites have not "enjoyed governmental support," see § 1(3), in any special or unique sense. They certainly have not received anything akin to the public easements that gave railroads and telegraph companies *de facto* geographic monopolies. And finally, the concept of "market dominance," see § 1(4), is not useful. Even an entity with substantial market power retains its First Amendment rights, and, in any event, the social media market remains highly fluid and competitive.

**C.**  Three Supreme Court cases—*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980); *Rumsfeld v. FAIR*, 547 U.S. 47 (2006); and *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994)—are often cited as support for the common carrier theory. These cases show, at most, that one speaker can sometimes be required to host another speaker if doing so does not "interfer[e]" with the host speaker's "desired message." *Rumsfeld*, 547 U.S. at 64. The whole point of HB 20, by contrast, is to "interfere" with social media websites' "desired message." What's more, unlike the entities regulated in *PruneYard*, *Rumsfeld*, and *Turner*, social media websites function as editors, constantly making decisions about whether and how to allow, block, promote, demote, remove, label, or otherwise respond to content. Curation and editing of expression are antithetical to the concept of common carriage.

**D.**  Even if social media websites *were* similar to common carriers, most, if not all, of HB 20 would remain unconstitutional. In addition to the fact that common carriers are not stripped of their First Amendment rights (see Dkt. 12 at 31-32), no common carrier has ever had to serve customers utterly blind to their behavior. Common carriers have always been entitled to refuse service, or bar entry, to anyone who misbehaves, disrupts the service, harasses other patrons, and so on. Because HB 20 tries to force websites to serve *even* such people, it is not itself a proper common carriage regulation.

Because HB 20 blatantly violates the First Amendment, there is no need to reach the topic of common carriage. If that topic *is* reached, however, this brief explains why Texas's attempt to treat social media websites like common carriers is a constitutional dead end.

**II.    ARGUMENT**

**A.    Social Media and Common Carriage Are Irreconcilable Concepts**

"A common carrier is generally defined as one who, by virtue of his calling and as a regular business, undertakes to transport persons or commodities from place to place, offering his services to such as may choose to employ him and pay his charges." *McCoy v. Pac. Spruce Corp.*, 1 F.2d 853, 855 (9th Cir. 1924). As its name suggests, in other words, "common carriage" is about offering, to the *public at large* and on *indiscriminate* terms, to carry generic *stuff* from point A to point B. Social media websites fulfill none of these elements.

**1.    Social Media Are Not "Carriage": They Are Diverse and Evolving Products**

Lumber is lumber. Once it has arrived at a construction site, one two-by-four is generally as good as another. How the wood *got* to the site is, for purposes of the construction itself, irrelevant. Putting common carriage in its proper historical context begins with this fundamental point. The "business of common carriers" is, at its core, "the transportation of property." *German Alliance Ins. Co. v. Kansas*, 233 U.S. 389, 406 (1914); see Interstate Commerce Act, 24 Stat. 379, 379-80 (1887) (prohibiting a "common carrier" in "the transportation of *passengers or property*" from discriminating, by price, among its similarly situated customers) (emphasis added).

True, the "transmission of intelligence" has sometimes been treated as "of cognate character" to traditional common carriage. *German Alliance*, 233 U.S. at 406-07. But that "cognate character" arose in fields, such as telegraphy and telephony, where information was treated as a commodity product to be purveyed through some sort of (typically scarce) public thoroughfare. See *id.* at 426-27 (Lamar, J., dissenting). The key is that, like traditional common carriage, "they all ha[d] direct relation to the business or facilities of *transportation*" itself. *Id.* at 426 (emphasis added). Although it doubtless contains a message, a telegram is best thought of as a widget of information conveyed along "public ways," *id.*, by a commodity carrier, see Mann-

Elkins Act, 36 Stat. 539, 544-45 (1910) (applying the Interstate Commerce Act to telegraph and telephone companies).

Social media websites are nothing like this. They are not interchangeable carriers of information widgets. The core aspect of their product, in fact, is not *transportation* at all. What the platforms offer is a wide array of differentiated—and rapidly evolving—forms of public-facing communication. Twitter's main product is a microblog. Instagram is primarily a photo-sharing service. TikTok is centered around short videos. Snapchat's main feature is the evanescence of posts. Clubhouse focuses on providing oral chatrooms. Facebook, which has embraced several of these other forms, has recently recommitted to fostering group pages. Far from simply transporting information from point A to point B, moreover, each of these services deploys its own proprietary algorithms to customize the order in which content appears on any given user's feed. When it comes to social media, Marshall McLuhan's aphorism rings true: the medium is the message.

The FCC has long confirmed that "data *transport*" is the essence of telecommunications common carrier service, whereas "any offering over the telecommunications network which is more than a basic transmission service" is not. *Federal-State Joint Board on Universal Service*, Report to Congress, 13 FCC Rcd 11501, 11513, ¶ 25 (1998) (*Stevens Report*) (emphasis added); see generally *Computer III Phase I Order*, 104 FCC. 2d 958, 968, ¶ 10 (1986); *Stevens Report*, 11511-15, ¶¶ 22-32 (summarizing the FCC's treatment of "data processing" since 1966). Indeed, because the bar for qualifying as "more than a basic transmission service" is low, even some services that, unlike social media, really do closely resemble pure information "transport" are, nonetheless, *not* common carriers. Although telephony, which connects users without any intervention by the carrier, is common carriage, even simple text messaging, which requires the carrier to undertake some information processing during transmission, is not. See *In re Petitions for Decl'y Ruling on Reg'y Status of Wireless Messaging Serv.*, 33 FCC Rcd. 12075 (2018).

The social media market is diverse and fast-moving. Social media websites constantly create new forms of content. They compete in a market for differentiated *media* products. What they do *not* do is passively act as "carriers" of information.

-4-

2.      <u>Social Media Are Not "Carriage": They Are Fundamentally Expressive</u>

Again, common carriage involves the transportation of people and commodities. Telegraphy and telephony press the boundaries of that core, transportational conception of common carriage. One message, after all, is not interchangeable with another. There is, however, a key sense in which a telegram or a telephone call is indeed just a widget of information: such communications are usually private. And being private, they are usually treated as strictly between the individual sender and recipient. Cf. 18 U.S.C. § 2511 (criminal penalties for intercepting a wire or secretly recording a call). This means that a carrier may transmit a telegram or a call while remaining indifferent to its content.

Once a "telephone company becomes a medium for public rather than private communication," however, "the fit of traditional common carrier law becomes much less snug." *Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1294 (9th Cir. 1987). While transmitting a private call or message can be thought of as carrying an information widget, transmitting a public-facing call or message is clearly about *broadcasting* ideas and viewpoints. *Id.* It is a mode of expression, *not only* by the direct speaker, *but also* by the purveyor of the speech. "Mass-media speech," in short, "implicates a broader range of free speech values" than does "person-to-person" speech. Christopher S. Yoo, *Free Speech and the Myth of the Internet as an Unintermediated Experience*, 78 Geo. Wash. L. Rev. 697, 701 (2010).[1]

As the plaintiffs explain (Dkt. 12 at 15-16), two of the key precedents governing this case are *Miami Herald*, 418 U.S. 241, and *Hurley*, 515 U.S. 557. *Miami Herald* strikes down a Florida law that required a newspaper to print a political candidate's reply to the newspaper's unfavorable coverage. *Hurley* holds that a private parade may exclude some groups from participating. Like a

---

[1] This is not to say that all private communications are common carriage. As we saw above, text messaging is not. Nor would an Internet-based messaging service such as WhatsApp be. What is true, though, is that *public* communication is, virtually by definition, *not* common carriage. Indeed, Congress considered, and rejected, proposals to make broadcasting common carriage in the Radio Act of 1927, and it explicitly declared that broadcasting is *not* common carriage in the Communications Act of 1934. *Columbia Broadcasting v. Democratic Comm.*, 412 U.S. 94, 105 (1973); see 47 U.S.C. § 153(h).

newspaper (*Miami Herald*) or a parade (*Hurley*), a social media website presents a collection of messages to a wide audience. This public-facing expression is incompatible with—indeed, contradictory to—the concept of common carriage. Calling the websites "common carriers" anyway doesn't make it so. The Texas legislature could not overturn *Miami Herald* or *Hurley* simply by declaring that newspapers or parades are "common carriers." The same holds true here.

"[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's [First Amendment] right to autonomy over the message is compromised." *Hurley*, 515 U.S. at 576. That is the overriding principle HB 20 flouts. "Common carriage" is not a magic label that can make this First Amendment violation go away.

### 3. Social Media Are Not "Common": They Are Not Offered Indiscriminately

An edited product is, inherently, not common carriage. Although the FCC has waffled over whether most Internet service providers are common carriers, for instance, what's clear is that if an Internet service provider explicitly "hold[s] itself out as providing something other than a neutral, indiscriminate pathway," it is not a common carrier. *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 389 (D.C. Cir. 2017) (Srinivasan, J., concurring in the denial of rehearing en banc). So long as it's up front about what it's doing, a provider that wants to engage in "editorial intervention"— and, thus, not common carriage—is free to do so. *Id.* See also Christopher Yoo, *The First Amendment, Common Carriers, and Public Accommodations: Net Neutrality, Digital Platforms, and Privacy*, 1 J. of Free Speech Law 463, 473-75 (2021) (discussing the weaknesses of a "holding out" theory of common carriage).

All prominent social media platforms engage in such intervention. Twitter, for example, has rules that seek to "ensure all people can participate in the public conversation freely and safely." Twitter, *The Twitter Rules*, https://bit.ly/3cpc75S (last accessed Sept. 24, 2021). "Violence, harassment and other similar types of behavior discourage" such conversation, and are therefore barred by Twitter's rules. *Id*. Not surprisingly, bans on things like harassment and hate

1  speech are common among online platforms. See Dkt. 12 Ex. A ¶¶ 12-13 & n.27, Ex. C ¶ 11, Ex.

2  D ¶¶ 8-12.[2]

3         That social media websites engage in curation and editing should come as no surprise,

4  given that curation and editing are a fundamental aspect of the service those platforms exist to

5  provide. Without intermediaries, the Internet would be a bewildering flood of disordered

6  information. By organizing that information, intermediaries enable users to "sift through the ever-

7  growing avalanche of desired content that appears on the Internet every day." Yoo, *supra*, 78 Geo.

8  Wash. L. Rev. at 701. Indeed, "social media" could not exist if intermediaries did not play this

9  role. It is only after a platform engages in curation and editing that a mass of "social" media

10 becomes navigable by the average user. More than that, such curation and editing is necessary to

11 make social media a pleasant experience worth navigating. "[T]he editorial discretion that

12 intermediaries exercise" enables users to avoid "unwanted speech" and "identify and access

13 desired content." *Id*.

14        Not only do platforms refuse to host content indiscriminately; they are widely expected not

15 to do so. See Dkt. 12, Ex. A ¶ 28; Ex. B ¶¶ 16-18. Everyone from advertisers to civil rights groups

16 to the media holds the platforms responsible for the content they amplify, or even just host. See,

17 e.g., Tom Maxwell, *Twitch Streamers Demand the Platform 'Do Better' at Moderating Hate

18 Speech*, Input, https://bit.ly/37wIbSo (Aug. 10, 2021); Analis Bailey, *Premier League, English

19 Soccer Announce Social Media Boycott in Response to Racist Abuse*, USA Today,

20 https://bit.ly/3xIpfdT (Apr. 24, 2021); u/DubTeeDub, "Open Letter to Steve Huffman and the

21

22 [2] What's more, such bans have always been common. "You agree not to use the Web site,"
   Facebook's terms of service said in 2005, to post "any content that we deem to be harmful,

23 threatening, abusive, harassing, vulgar, obscene, hateful, or racially, ethnically or otherwise
   objectionable." Wayback Machine, *Facebook Terms of Use*, https://bit.ly/3w1gYC5 (Nov. 26,

24 2005). Indeed, one can go back much farther than that. As early as 1990, Prodigy, one of the first
   social networks, made its curation function a central part of its marketing strategy. "'We make no

25 apology for pursuing a value system that reflects the culture of the millions of American families
   we aspire to serve,'" it declared. *Stratton Oakmont, Inc. v. Prodigy Servs.*, 1995 WL 323710 at *3

26 (N.Y. Sup. Ct. May 24, 1995). "'Certainly no responsible newspaper does less when it chooses the

27 type of advertising it publishes, the letters it prints, the degree of nudity and unsupported gossip its
   editors tolerate.'" *Id*.

28

Board of Directors of Reddit, Inc.—If You Believe in Standing up to Hate and Supporting Black Lives, You Need to Act," posted on *r/AgainstHateSubreddits*, reddit, https://bit.ly/3xef0hW (June 8, 2020). In a short span during the middle of last year, for example, Facebook had to deal with a congressional hearing, an advertiser boycott, and a civil rights audit, all of it arising from a widespread perception that Facebook must do more to limit the spread of hate speech. Tiffany Hsu & Elanor Lutz, *More Than 1,000 Companies Boycotted Facebook. Did It Work?*, NY Times, https://nyti.ms/3gjyryR (Aug. 1, 2020). The underlying assumption is that Facebook can, and should, intervene, extensively, in its own product to ensure that it is free, so far as possible, of toxic content.

### B.   <u>Social Media Bears None of the Indicia of Common Carriage Listed in HB 20</u>

HB 20 declares (without evidence) that large social media websites meet some criteria widely exhibited by common carriers of the past, such as railroad and telegraph companies. Even if these criteria had more than limited relevance to the rights of expressive entities (they don't), social media websites meet none of the criteria at hand.

### 1.   <u>"Affected With a Public Interest"</u>

HB 20 claims that social media websites are "affected with a public interest." § 1(3). The Supreme Court has said, however, that whether a business serves a "public interest" is "an unsatisfactory test of the constitutionality of legislation directed at [the business's] practices or prices." *Nebbia v. New York*, 291 U.S. 502, 536 (1934). Even Justice Thomas—perhaps the common carrier theory's most prominent champion—concedes that a "public interest" test for common carriage "is hardly helpful," given that "most things can be described as 'of public interest.'" *Biden v. Knight First Am. Inst.*, 141 S. Ct. 1220, 1223 (2021) (Thomas, J., concurring).

### 2.   <u>"Have Enjoyed Governmental Support"</u>

HB 20 says that social media websites have "enjoyed governmental support in the United States." § 1(3). This is presumably a nod to Section 230 of the Communications Decency Act. 47 U.S.C. § 230; see Dkt. 12 at 37-39 (discussing Section 230).

True enough, businesses that employ property acquired through eminent domain have sometimes had to operate as common carriers. It does not follow that Section 230, which broadly protects *all* websites for hosting speech that originates with others, creates a similar *quid pro quo* obligation. There are several problems with the comparison:

- Section 230 was not a gift to a few "Big Tech" firms (or any other select group). It applies to every Internet website and service. See 47 U.S.C. §§ 230(c)(1), (c)(2). If Section 230 doesn't turn a blog, or Yelp, or a newspaper's comments sections, or an individual social media account, into a common carrier, it's unclear why it should turn Facebook, YouTube, or TikTok into one.

- Section 230 simply ensures that the *initial speaker* is the one liable for speech that causes legally actionable harm. See *id*. § 230(c)(1). It is not a "privilege" akin to when the government hands real property to one firm, to the exclusion of all potential competitors, for use as a railroad or a telegraph line.

- Far from being a sign that the government wants social media websites to act as common carriers, Section 230 is a sign that it wants them to act as discerning editors. Section 230 ensures that a website can "exercise" a "publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content"—without (in most cases) worrying that doing so will trigger liability. *Zeran v. Am. Online*, 129 F.3d 327, 330 (4th Cir. 1997).

If the *federally* enacted Section 230 is the *quid*, by the way, why should a *state* government get to impose the *quo*? The history of common carriage in the United States, going back to the Interstate Commerce Act of 1887, is one of aiding *interstate* commerce by setting and enforcing *national* standards. Precisely because they were regulated as common carriers, telegraph companies were not subject to regulation by the states. *Postal Tel.-Cable Co. v. Warren-Godwin Lumber Co.*, 251 U.S. 27, 30 (1919). Even if Section 230 could serve as the basis for common carriage rules, it couldn't serve as the basis for common carriage rules imposed *by Texas*.

### 3. "Market Dominance"

Finally, HB 20 claims that large social media websites "are common carriers by virtue of their market dominance." § 1(4). The first problem on this front is the brute legal fact that an entity does not forfeit its constitutional rights by succeeding in the market. The Supreme Court accepted that *The Miami Herald* enjoyed near-monopoly control over local news; yet the newspaper retained its First Amendment right to exercise editorial control and judgment as it saw fit. 418 U.S. at 250-52, 256-58; see also Dkt. 12 at 31-32.

This is not to say that media firms, social or otherwise, are above the antitrust laws. A newspaper that uses its market power to inflict *economic* pain on a rival—one that, say, convinces advertisers to boycott, and thereby bankrupt, a local radio station—is inviting antitrust liability for its business practices. See *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951). It *is* to say, however, that the right to reject speech for *expressive* reasons travels with a company, like a shell on a turtle, wherever the company goes—even if the company, like Yertle, is king of the pond. Cf. Dr. Seuss, *Yertle the Turtle and Other Stories* (1958).

If that were all there is to say about social media, monopoly, and free speech, HB 20's supporters could be forgiven for some griping about the demise of their unconstitutional law (though fall it still would). But the reality is that the social media market is as lively as ever. It continues to offer many avenues of expression and communication. If you're convinced (as Gov. Abbott and HB 20's other supporters explicitly are) that "Big Tech" is "out to get" Republicans, you can do your blogging on Substack, your posting on Parler or Gettr, your messaging on Telegram or Discord, and your video watching and sharing on Rumble. And anyone who claims that network effects will ultimately thwart this competition must grapple with the astonishing rise of TikTok.[3]

---

[3] Dismissing an FTC antitrust complaint against Facebook, Judge Boasberg refused "to simply nod to the conventional wisdom that Facebook is a monopolist." *FTC v. Facebook*, 20-cv-3590, Dkt. 73 at 31 (D.D.C., June 28, 2021). The agency, he observed, had presented "almost nothing concrete on the key question of how much market power Facebook actually had, and still has, in a properly defined antitrust product market." *Id*. In an amended pleading, moreover, the FTC now stands its case on an utterly implausible claim that Facebook's only real competitor is Snapchat. (footnote continued)

1    Even the largest social media websites are just a piece of the "relatively unlimited" world

2    of online communication. *Reno v. ACLU*, 521 U.S. 844, 870 (1997). No website (or discrete group

3    of websites) holds anything like the "bottleneck" control once wielded by telegraphs or railroads.

4    **C.**    **Supreme Court Case Law Does Not Save HB 20's Common Carrier Theory**

5    Three Supreme Court cases are frequently cited as support for the notion that social media

6    websites are "analogous" to common carriers. None of the three is pertinent.

7    **1.**    ***PruneYard Shopping Center v. Robins***

8    At issue in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), was whether a

9    shopping mall could be forced, under the California Constitution, to let students protest on its

10   private property. Yes, *PruneYard* says, it could. In so saying, however, *PruneYard* distinguishes

11   *Miami Herald*. That case involved "an intrusion into the function of editors," *PruneYard* notes—a

12   "concern" that "obviously" was "not present" for the mall. *Id*. at 88. Here, by contrast, that

13   concern obviously *is* present, as explained above. "Intru[ding]" into social media websites'

14   "function" as "editors" is what HB 20 is all about.

15   What's more, *PruneYard* announces that "the views expressed by members of the public"

16   on the mall's property would "not likely be identified with that of the owner." *Id*. at 87. Even if

17   that evidence-free declaration was true, at the time, of the mall (we have our doubts), it is certainly

18   not true today of social media websites. As we've discussed, those sites *are* "identified" with the

19   speech they host. A platform that hosts a certain speaker is widely considered to have deemed that

20   speaker "worthy of presentation," and "quite possibly of support as well." *Hurley*, 515 U.S. at

21   575.[4]

22

23   *Id*. Dkt. 82. The litigation is ongoing, and its outcome cannot be predicted. But if the FTC
     struggles to define a proper social-networking market (never mind show Facebook's power within

24   that market), all the greater is the task before anyone who, like Texas, makes the even bolder claim
     that large social media websites wield bottleneck control over online speech.

25   [4] The mall also challenged the speech-hosting obligation under the Takings Clause. On its way to
     rejecting that challenge, *PruneYard* makes further findings pertinent to this case. The students,

26   *PruneYard* notes, "were orderly," and the mall remained free to impose "time, place, and manner
     regulations" on others' speech that would "minimize any interference with its commercial

27   functions." 447 U.S. at 83-84. This makes *PruneYard* nothing like the case here, in which Texas

28   (footnote continued)

-11-

### 2. *Rumsfeld v. FAIR*

In protest of the military's "Don't ask, don't tell" policy, various law schools stopped allowing military recruiters on their campuses. Let the recruiters in, Congress responded, in a law known as the Solomon Amendment, or lose government funding. *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), rejected an association's contention that the Solomon Amendment violates the First Amendment.

Distinguishing *Miami Herald* and *Hurley*, *FAIR* concluded that "accommodating the military's message d[id] not affect the law schools' speech." *Id*. at 63-64. Unlike "a parade, a newsletter, or the editorial page of a newspaper," *FAIR* explained, "a law school's decision to allow recruiters on campus is not inherently expressive." *Id*. at 64. The pertinent distinction between job-recruitment meetings, on the one hand, and parades, newsletters, and newspapers, on the other, is not hard to divine. One-on-one recruitment meetings are akin to telegraphic or telephonic communication—the passage of private information widgets—and not at all like the public-facing expression of views undertaken by a parade, a publication, or a website.

HB 20 requires social media to platform various speakers, and to spread and amplify, far and wide, almost anything those speakers wish to say. It thus looks nothing like the law at issue in *FAIR*, a case about *direct* communication between a recruiter willing to talk and a law student willing to listen. For *FAIR* to resemble *this* case, Congress would have had to pass a law altogether different from the Solomon Amendment. Picture a law requiring law schools to let neo-Nazis maraud their halls toting signs and bullhorns. *That* is the equivalent of what HB 20 requires of select social media websites.

### 3. *Turner Broadcasting System v. FCC*

In the 1992 Cable Act, Congress imposed "so-called must-carry provisions" that "require[d] cable operators to carry the signals of a specified number of local broadcast television stations." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 630 (1994). While concluding that cable

---

seeks to make websites host hostile, abusive, highly disruptive speech. In effect, HB 20 requires the websites to host *disorderly* conduct, and it *bars* them from imposing reasonable time, place, and manner regulations.

operators engage in speech protected by the First Amendment, *id*. at 636, *Turner* subjects the must-carry provisions merely to intermediate, rather than to strict, scrutiny. *Turner* is positively brimming, however, with distinctions that render it inapplicable to social media websites.

*First*, like traditional common carriers, see *German Alliance*, 233 U.S. at 426-27 (Lamar, J., dissenting), cable systems use "physical infrastructure"—"cable or optical fibers"—that require "public rights-of-way and easements." *Id*. at 627-28. This setup "gives the cable operator bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home." *Id*. at 656. This means that "a cable operator, *unlike speakers in other media*," can "silence the voice of competing speakers with a mere flick of the switch." *Id*. (emphasis added). On precisely this ground, *Turner* distinguishes *Miami Herald*, notwithstanding the fact that a "daily newspaper" may "enjoy monopoly status in a given locale." *Id*. "A daily newspaper," after all, "no matter how secure its local monopoly, does not possess the power to obstruct readers' access to other competing publications." *Id*. Just the same can be said of social media websites. Whatever the level of their market control—it's not much, in our view, as we explain above—they do not, when "assert[ing] exclusive control over [their] own ... copy," thereby "prevent other[s]" from "distribut[ing]" competing products "to willing recipients." *Id*.

*Second*, "cable personnel" generally "do not review any of the material provided by cable networks," and "cable systems have no conscious control over program services provided by others." *Id*. at 629 (quoting Daniel Brenner, *Cable Television and the Freedom of Expression*, 1988 Duke L.J. 329, 339 (1988)). Cable operators are thus, "in essence," simply "conduit[s] for the speech of others." *Id*. They generally transmit speech "on a continuous and unedited basis to subscribers." *Id*. This makes sense, given that most broadcast television content is comparatively sanitized and, certainly when compared to the worst online speech, uncontroversial. *Turner* concludes, therefore—again while distinguishing *Miami Herald*—that "no aspect of the must-carry provisions would cause a cable operator or cable programmer to conclude that 'the safe course is to avoid controversy,' and by so doing diminish the free flow of information and ideas." *Id*. at 656 (quoting *Miami Herald*, 418 U.S. at 257). This is the precise opposite of the situation with social media websites. The websites are not simply "conduits"; they are provided on a

-13-

curated and edited basis, and they do sometimes take "the safe course" and "avoid controversy." Witness, for instance, Twitter's decision to stop hosting political advertisements. See *Wash. Post v. McManus*, 944 F.3d 506, 517 n.4 (4th Cir. 2019).

*Third*, and relatedly, *Turner* declares—again while distinguishing *Miami Herald* (and it could have added *Hurley* to boot)—that there was "little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator." *Id*. at 655. This, again, because of the cable operators' "long history of serving" merely "as a conduit for broadcast signals." *Id*. The cable operators did not even contest this point; they did "not suggest" that "must-carry" would "force" them "to alter their own messages to respond to the broadcast programming they [we]re required to carry." *Id*. As we've explained, the "long history" behind social media could not be more different. Naturally, given that history, the platforms vigorously contend that they would have to "respond" to certain messages they might be required "to carry."

*Fourth*, the central issue in *Turner* was whether the must-carry provisions were content neutral. "Broadcasters, which transmit over the airwaves, are favored," *Turner* acknowledges, "while cable programmers, which do not, are disfavored." *Id*. at 645. But this distinction, *Turner* concludes, did not make the must-carry provisions a content-based law subject to strict scrutiny. According to *Turner*, "Congress' overriding objective … was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free [broadcast] television programming." *Id*. at 646. In other words, the law was purely about "economic incentive[s]." *Id*. at 646. The cable operators, for their part, did little to argue otherwise, raising only "speculati[ve]" "hypothes[es]" about "a content-based purpose" for the law. *Id*. at 652. Here, by contrast, HB 20 *compels* the carrying of speech based on its viewpoint. § 6; see *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (viewpoint discrimination is simply "a more blatant and egregious form of content discrimination").

### D.    The Burdens Imposed by HB 20 Go Far Beyond Common Carriage

Texas's law effectively compels large social media services to host all users, however obnoxious their behavior. This is not what common carriage meant at common law. "An

-14-

1  innkeeper or common carrier has always been allowed to exclude drunks, criminals and diseased

2  persons[.]" *Lombard v. Louisiana*, 373 U.S. 267, 280 (1963) (Douglas, J., concurring) (citing

3  Bruce Wyman, *Public Service Corporations* (1911), available at https://bit.ly/3wb5c84). "It is not

4  the mere intoxication that disables the person from requiring service; it is the fact that he may be

5  obnoxious to the others." Wyman, *supra*, ch. 18 § 632. "Telegraph companies likewise need not

6  accept obscene, blasphemous, profane or indecent messages." *Id*. § 633; see also *id*. § 639

7  (discussing a carrier's right to set restrictions on the transport of "insane persons").

8      In short, common carriers enjoyed broad discretion to "restrain" and "prevent"

9  "profaneness, indecency, [and] other breaches of decorum in speech or behavior." *Id*. § 644. They

10  were not even "bound to wait until some act of violence, profaneness or other misconduct had

11  been committed" before expelling those whom they suspected to be "evil-disposed persons." *Id*.

12      True, there were limits. A telegraph company that refused to carry an "equivocal

13  message"—one whose offensiveness was debatable—did so "at its peril." *Id*. § 632. Although a

14  telephone service could "cut off" a "habitually profane" subscriber, it had to show some tolerance

15  to someone who "desisted from objectionable language upon complaint being made to him." *Id*.

16  And regulators could (and in some areas still can) assess whether certain of a common carrier's

17  rules and prohibitions are "just and reasonable." See, e.g., 47 U.S.C. §§ 201(b), 202(a). But in

18  general, the "principle of nondiscrimination does not preclude distinctions based on reasonable

19  business classifications." *Carlin*, 827 F.2d at 1293. Thus, a telephone company could refuse to

20  carry all price advertising in its yellow pages directory (a common carrier service) even though

21  this was an "explicit content-based restriction." *Id*.

22      As the plaintiffs explain, "common carriers retain their 'right to be free from state

23  regulation that burdens [their] speech.'" Dkt. 12 at 32 (quoting *PG&E v. Pub. Util. Comm'n of

24  Cal.*, 475 U.S. 1, 17 n.14 (1986) (plurality op.)). But although a common carrier's First

25  Amendment rights exist apart from its common-law powers over patrons' behavior, it still bears

26  noting that, under those common-law rules, HB 20 cannot qualify as a proper common-carriage

27  law. Above all, a valid common-carriage regulation would not bar social media from setting

28  reasonable rules governing "indecent messages." Wyman, *supra*, § 633.

III.   **CONCLUSION**

The plaintiffs' motion for preliminary injunction should be granted.

October 8, 2021

_/s/ Jason A. Cairns_
Jason A. Cairns

REID COLLINS & TSAI LLP
Jason A. Cairns (Bar No. 24097447)
  jcairns@reidcollins.com
1301 S. Capital of Texas Hwy, Suite C300
Austin, TX 78746
Telephone: (512) 647-6100
Facsimile: (512) 647-6129

TECHFREEDOM
Corbin K. Barthold (*pro hac vice* admission pending)
  cbarthold@techfreedom.org
110 Maryland Ave NE, Suite 205
Washington, DC 20002
Telephone: (925) 788-6847

Attorneys for *Amicus Curiae* TechFreedom

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 8th day of October 2021, the foregoing Amicus Curiae Brief of TechFreedom in Support of Plaintiffs Netchoice and CCIA's Motion for Preliminary Injunction was filed with the Clerk of the Court and served on all counsel of record in this case using the Court's CM/ECF system.

<u>*/s/ Jason A. Cairns*</u>
Jason A. Cairns