IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

NETCHOICE, LLC, et al.,
        *Plaintiffs*,

v.

KEN PAXTON, in his official capacity as
Attorney General of Texas,
        *Defendant*.

Civil Action No. 1:21-cv-00840-RP

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

For the 7 days that followed this Court's order on expedited discovery, Plaintiffs never conceded to answer a *single one* of the expedited discovery requests or deposition topics proposed by Defendant and granted in part by this Court.

Defendant has agreed to withdraw 30(b)(6) depositions – at Plaintiffs' request; to withdraw all interrogatories as to any of Plaintiffs' members – at Plaintiffs' request; and to narrow their RFPs from 9 requests to 8, only to be served on 8 members. But Plaintiffs believe their members entitled to complete safeguarding from the proposed discovery this Court permitted. Plaintiffs' motion on behalf of members they do not have authority to represent should be denied.

### ARGUMENT

"The decision to enter a protective order is within the Court's discretion." *Kolstad v. Durham Transp. Express, LLC*, A-20-CV-752-RP, 2020 WL 6749010, at *2 (W.D. Tex. Nov. 17, 2020) (citing *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985)). Federal Rule of Civil Procedure 26(c) states: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . ." Fed. R. Civ. P. 26(c). "Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective

order indicates that '[t]he burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'" *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326, n. 3 (5th Cir. 1978)).

Plaintiffs have not carried their burden. Plaintiffs make general and conclusory objections that this Court considered prior to granting expedited discovery. Their general desire to continue to safeguard their members from any responsibility to prove harm to this Court or be held accountable by anyone does not suffice. Plaintiffs do not identify a single specific interest of their own that is impacted by third party discovery. And, even if they did, Defendant has acted reasonably in narrowing *all* of its proposed discovery to fit Plaintiffs' inflexible demands in the short period of time Plaintiffs have insisted on. Plaintiffs should not be granted a protective order that they have sought to, in effect, shield them entirely from any of Defendant's proposed discovery that this Court already granted.

## I.     Plaintiffs Lack Standing to Seek a Protective Order to Protect Only Non-Parties' Interests.

The Fifth Circuit, in *Brown v. Braddick*, stated that a party to a lawsuit is without standing to attack a third party's "amenability to the compulsory process of the district court[,]" unless the party to the suit possesses the material requested . . . or asserts a "personal right or privilege with respect to the material." 595 F.2d 961, 967 (5th Cir. 1979). In other words, a "party may seek a Rule 26(c) protective order if it believes **its own interest is jeopardized** by discovery sought from a third person." *Kilmon v. Saulsbury Indus., Inc.*, MO:17-CV-99, 2018 WL 5800759, at *4 (W.D. Tex. Feb. 13, 2018) (internal citations omitted) (emphasis added). In keeping with that requirement, "[d]istrict courts require parties to color their claims of a **personal** right or privilege

in materials sought with **specificity**." *Granados v. State Farm Lloyds*, DR-10-CV-13-AML-VRG, 2010 WL 11597707, at *1 (W.D. Tex. June 2, 2010) (emphasis added).

Plaintiffs' motion is entirely silent as to how the third-party discovery Defendant served specifically jeopardizes their own interests in this case. *See* Dkt. No. 29. Instead, the entirety of the motion focuses on perceived violations to their members' First Amendment rights if they are required to answer discovery and insisting that there are "pure legal questions" before the Court. *See id.* These arguments have already been considered by this Court and found to be insufficient to overcome Defendant's entitlement to expedited discovery. Dkt. No. 25. Plaintiffs have put the facts of their members' content moderation practices squarely at issue in their motion for preliminary injunction. Granting this protective order, where none of Plaintiffs' own interests are implicated and the effect would be to bar Defendants from *every single one* of its originally proposed requests, cannot possibly comport with this Court's order granting expedited discovery (Dkt. No 25).

## II. This Court Has Granted Expedited Discovery and Should be Presented with the Facts Necessary to Decide Critical Issues in this Case.

Plaintiffs' motion is primarily an attempt to relitigate the expedited discovery motion. Plaintiffs may believe this Court should require nothing of their members, declare they are not common carriers and hold all algorithms are always speech that cannot be regulated as a pure matter of law. That argument has already been considered and rejected by the Court, and Defendant has explained why its proposed discovery is necessary. *See* Dkt. Nos. 20, 24. But in light of Plaintiffs' professed confusion over the relevance of Defendant's proposed requests, *see* Dkt. No. 29 at 5, Defendant offers the following explanations regarding each proposed document request:

1.      All documents and communications, including recordings, minutes, and documents
        reflecting team meetings, related to [COMPANY's] content moderation policies and
        practices.

        Plaintiffs claim the way their members moderate content constitutes speech, they all do
        it in a unique way and they do not hold their platforms open to everyone. This discovery
        request directly seeks proof of those claims, and these facts are at the core of Plaintiffs'
        First Amendment claims. Even if this discovery entails the potential disclosure of trade
        secrets, trade secrets are not privileged. Thus, they cannot be withheld under the
        Federal Rules. And, in fact, this Court's own standard protective order expressly
        contemplates disclosure of trade secrets. L.R. Appendix H-1. Moreover, Defendant has
        repeatedly communicated willingness to further limit this request in order to minimize
        the burdens imposed (for example, by narrowing the time period covered or agreeing
        to search terms), but Plaintiffs have not proposed any such limitations.

2.      All documents and communications related to [COMPANY's] current reporting and
        disclosure obligations under federal and/or state law.

        Plaintiffs have heavily emphasized the "burdens" that H.B. 20's disclosure
        requirements will have on their members and attempt to assert their speech will be
        chilled if they have to comply. It's therefore relevant to the question of how significant
        that burden or "chilling" is to discover what disclosure and reporting the members
        already do.

3.      Offline copies of all git repositories, including version and commit history, related to
        content moderation.

        Repositories in git contain a collection of files of different versions and stages of
        completion of a project. Essentially, these repositories are the algorithms or source
        codes that Plaintiffs claim to be speech. Much like any other case where a plaintiff
        claims to be engaging in speech, Defendant, and this Court, need to know what that
        alleged speech actually is rather than what Plaintiff merely claims it is.

4.      Training data sets for all machine learning models employed for purposes of content
        moderation to the extent they are not contained in documents produced in response to
        No. 3

        Machine learning algorithms, like those used by Plaintiffs' members, learn from data.
        They find relationships, develop understanding, make decisions, and evaluate their
        confidence from the training data they're given. Training data also indicates whether
        there are any gaps in the algorithm's abilities to apply to user-generated content.[1] Thus,

---

[1] By way of example, if you are creating an algorithm to determine if an animal is a horse or not, and you train that
algorithm with images of a rabbit, but no horses, the algorithm will think that all rabbits are horses. The lack of any
horse images is a "gap" in the training data. An algorithm is only as smart as an engineer teaches it

this request seeks the training data that is used to train the algorithms Plaintiffs claim to be speech because it will indicate whether those algorithms are actually moderating content in an editorial fashion or doing something else entirely. Note that this request only needs to be answered if not contained in response to No. 3.

5.   All wiki, README, or similar documentation related to software utilized for content moderation from 2019-present.

Software documentation is written text or illustration that accompanies computer software or is embedded in the algorithm/source code. The documentation explains various information such as how the software operates, how to use it, who maintains it, and why it is necessary. This information is generally necessary for people who are not engineers to be able to interpret the source code correctly. Therefore, it is necessary to Defendant, and its experts, because it provides necessary context to the way in which the algorithm functions.

6.   Any issues, user stories, epics, tasks, themes or initiatives* created in relation to content moderation of your platform.
*To the extent the respondent requires keywords to comply with this request, respondent should confer with Defendant on those keywords

Discovery of these items will show a to do list of bugs to be fixed within a source code as well as new features a company intends to implement. This will allow Defendant to determine the feedback the company has received on its source code – namely as to how it functions – and how the company intends to alter that source code going forward. This data will also show past changes to a source code, further demonstrating the company's intent as to how the source code is meant to apply to incoming user-generated content.

7.   Current workflow diagrams to the extent they are not contained in documents produced in response to No. 3.

A workflow diagram provides a graphical overview of the data flow. In other words, it shows data coming from their website, into the company's servers, the algorithm grabs that data from the servers and processes it however it has been told to so. From there, the data flows back after being processed – into the company's servers and back to their website. In this case in particular, this information will show what data sources the algorithms at issue are ingesting. Plaintiffs state without specificity that there is a combined effort between humans and automatically applied algorithms that moderate content where humans are so involved in "screening material" it has to constitute speech. If that is true, these diagrams are what will reflect that. It will also allow Defendant to discover whether Plaintiffs' members algorithms are performing editorial functions or something else.

8.    All documents and communications containing studies, inquiries and/or statements as to advertiser retention being affected by user content allowed on [COMPANY's] platform.

Plaintiffs' only argument as to why their members do not have to provide this is because *Plaintiffs* have issued declarations to that effect. Dkt. No. 29 at 7. Aside from the obvious point that these declarations are proof of a factual dispute, surely a claim that advertisers will choose to leave the most powerful companies in the world as a result of H.B. 20 would allow Defendant to discover evidence as to the veracity of that assertion. *See* Dkt. No. 28 (Response to MTD) at 28 (citing Compl. ¶23) ("This will deter advertisers and users, reducing members' advertising revenue.").

This Court's order expressly acknowledged Defendants' need for discovery to "develop a factual record that will aid Defendant in responding to the PI motion." Dkt. No. 25 at 3. Those facts, as the Court noted, are in regards to key questions before it: "(1) whether Plaintiffs' members are common carriers, (2) how Plaintiffs' members moderate content, (3) the probable effects of H.B. 20 on Plaintiffs' members, (4) the burden on Plaintiffs' members ability to comply with H.B. 20 and federal law, and (5) Plaintiffs' members 'knowledge, practices, source codes[,] and capabilities to determine how H.B. 20 is unlawful as applied' to each member." *Id*. at 2 (citing Dkt. No. 20 at 3-11).

As explained immediately above, each of these RFPs go to those questions and have been served only on "Plaintiffs' members [who] operate covered platforms." *Id*. at 4. And Defendant have always been willing to consider reasonable modifications of these RFPs that would minimize the burden imposed on Plaintiffs and their members. However, Plaintiffs have flatly refused to consider any of Defendants' requests for production. This is contrary to the Court's ruling on Defendant's motion for expedited discovery. Accordingly, Plaintiffs' motion should be denied.

III.   **Defendant Has Conferred in Good Faith, but Plaintiffs Have Not Accepted or Proposed Reasonable Compromises.**

Any basis for a protective order must be laid in good faith. Fed. R. Civ. P. 26(c)(1). Here, Plaintiffs are seeking a protective order after slow and unproductive negotiations and after refusing to submit to a single discovery request or deposition topic proposed by Defendant. The full timeline of events are as follows:

- **October 22, 11:54 a.m. (Dkt. No. 25)**: This Court grants Defendant's Motion for Expedited Discovery in part explaining the proposed discovery "was not sufficiently tailored" because it reached too broadly as to the members from whom discovery was sought, some of whom "do not operate covered platforms." Additionally, the requests were likely too numerous given the "shorter timeframe for expedited discovery." In sum, this Court permitted "Defendant [to] significantly tailor *its discovery requests* and serve *those* significantly tailored *requests* only on Plaintiffs' members with covered platforms." (emphasis added)

  **October 22, 12:51 p.m. (Ex. A)**: Defense counsel immediately contacted Plaintiffs, given the short timeline, and committed to proposing tailored discovery requests.

- **October 23, 6:23 a.m. (Exs. B, C)**: Defendant proposed significantly tailored discovery requests. The proposal reduced the RFPs from 9 requests to 8; ROGs from 3 down to 2 and 30(b)(6) topics from 10 down to 7. (Ex. C). Counsel agreed to speak the following Monday to discuss these proposals and finalize.

- **October 24, 3:52 p.m. (Ex. D)**: Plaintiffs emailed Defendant regarding the proposal but do not offer a counterproposal on Defendant's requests.

- **October 25, 3:39 p.m. (Ex. E)**: Defendant requested a response regarding the proposed document discovery and agreed to pull the 30(b)(6) depositions, entirely in favor of Plaintiffs' request that only their declarants to the PI motion be deposed. Defendant asked for a confidentiality and protective order and asked that a Rule 26(f) conference be scheduled, and initial disclosures be sent.

- **October 26, 11:53 a.m. (Ex. F)**: Plaintiffs agreed to produce only those documents used in support of the declarations to their PI motion. Despite having claimed privileges and confidentiality concerns with Defendant's requests, Plaintiffs stated they do not believe a protective order is necessary right now.

- **October 27, 7:43 p.m. (Ex. G)**: After significant back and forth, Defendant proposed: (1) Deposing all Declarants who put forth declarations in support of the PI Motion, as was

proposed by Plaintiffs in lieu of Defendant's requested 30(b)(6) depositions; (2) <u>Serving interrogatories on Plaintiffs</u>, as was proposed by Plaintiffs in lieu of Defendant serving Plaintiffs' members with ROGs; (3) <u>Production of all documents cited to or relied on by Declarants in making their declarations</u>, as was offered by Plaintiffs as relevant to the issues raised in their PI Motion; and (4) <u>Limiting RFPs to only five of Defendant's nine original requests, and limiting them only to Facebook and YouTube</u>.

- **October 28, 12:00 p.m. (Ex. H)**: Plaintiffs agree to Defendant's first three points as stated. Plaintiffs refuse, again, to answer the RFPs even as Defendant has further limited them.

Only after this extensive back and forth over the week following the Court's order did Defendant serve its discovery requests. After spending 7 days refusing to concede even *one* of the RFPs Defendant had asked this Court permission to serve as to even *one* of their members, Plaintiffs cannot genuinely claim Defendant acted unreasonably in serving their self-tailored, never-countered RFPs in a timeframe that still allowed for discovery responses within Plaintiffs' demanded schedule.

This Court has already found that "portions of the proposed discovery are tailored to the issues raised in this case" and "Plaintiffs and their members will not be overly burdened by responding to limited discovery of a short duration." Dkt. No. 25 at 3. Defendant, in a good faith attempt to confer per this Court's order, pulled all three 30(b)(6) depositions, pulled interrogatories from any of Plaintiffs' members and asked for 8 members to answer, at most, 8 RFPs.[2] Exs. B, C and G. Defendant ultimately offered to limit their document requests to only five of the original nine requests, and to serve them only on two of Plaintiffs' members. Plaintiffs agreed to, at most, produce individuals for deposition, and for Facebook and YouTube to produce only the curated universe of documents that only self-selected in crafting their declarations.

---

[2] Even going so far on the 7th day to offer that 2 of their members answer 5 RFPs. Ex. G. But even this was refused.

## Conclusion

Plaintiffs want the Court to grant relief to them and their members, but they do not want to have to prove their claims to the Court to get that relief. The Court has rejected that argument, and it should do so again. Plaintiffs' motion for protective order should be denied with clear instructions that Plaintiffs' 8 members must respond to 8 RFPs.

Respectfully Submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Grant Dorfman
Deputy First Assistant Attorney General

Shawn Cowles
Deputy Attorney General for Civil Litigation

Thomas A. Albright
Division Chief
General Litigation Division

*/s/ Courtney Corbello*
Courtney Corbello
Attorney-in-Charge
Assistant Attorney General
Texas State Bar No. 24097533
*courtney.corbello@oag.texas.gov*

Christopher D. Hilton
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24087727
christopher.hilton@oag.texas.gov

Benjamin Storey Lyles
Counsel of Record
Assistant Attorney General

Texas State Bar No. 24094808
*benjamin.lyles@oag.texas.gov*

**BENJAMIN S. WALTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24075241
*benjamin.walton@oag.texas.gov*

General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 936-2109
**ATTORNEYS FOR DEFENDANT**

### CERTIFICATE OF SERVICE

I certify that on November 1, 2021 the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General

### NOTICE OF ELECTRONIC FILING

I, certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing in accordance with the Electronic Case Files system of the United States District Court for the Western District of Texas, on November 1, 2021.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General