IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC, et al.,<br>    *Plaintiffs*,<br><br>v.<br><br>KEN PAXTON, in his official capacity as Attorney General of Texas,<br>    *Defendant*. | Civil Action No. 1:21-cv-00840-RP |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS (DKT. NO. 23)**

Plaintiffs' Response serves to highlight the reasons why they cannot meet the requirements of either associational or organizational standing.[1]

## I. PLAINTIFFS CANNOT CONFER ASSOCIATIONAL STANDING UPON THEMSELVES BY DECLARING THEIR MEMBERS ARE NOT COMMON CARRIERS.

### A. Plaintiffs' Members are Common Carriers.

Plaintiffs' members *are* common carriers, regardless of what they declare themselves to be.[2] *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 648 (5th Cir. 1967) (quoting *United States v. California*, 297 U.S. 175, 181 (1936) (stating that whether a company "is a common carrier depends

---

[1] Plaintiffs' response to Defendant's argument that they lack organizational standing is exactly two sentences long that does nothing to indicate they are engaging in activities that "differ from . . . routine lobbying activities." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). Because Plaintiffs have inadequately briefed, and therefore waived, any argument on organizational standing, Defendant will not address it herein. *See, e.g.*, *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that the plaintiff's failure to defend a claim in response to a motion to dismiss "constituted abandonment" of the claim).

[2] That Plaintiffs' members engage in some form of speech in *other* contexts on their platforms is irrelevant. "Since it is clearly possible for a given entity to carry on many types of activities, it is at least logical to conclude that one can be a common carrier with regard to some activities but not others." *Nat'l Ass'n of Regulatory Util. Com'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976); *see also Lone Star Steel Co. v. McGee*, 380 F.2d 640, 646 (5th Cir. 1967) ("Common carrier status . . . can even be declared as to some functions of the companies but not others."). Thus, it is no argument against Plaintiffs' members being recognized as common carriers in this context merely because they also engage in speech in other contexts (such as when they label user-generated content). Here, the only context in which the Court need recognize Plaintiffs' members as common carriers is in their function as moderators of user-generated content.

not upon its corporate character or declared purposes, but upon what it does"). For centuries, common carriage has ensured that basic economic, transportation, and communication channels are open and accessible to all members of society. It reflects a practical approach to the issue of market dominance in industries that provide public goods. Under common carriage, the government gives dominant firms certain privileges, such as immunity from antitrust laws or tort liability, and in exchange, these firms have an obligation to provide their goods and serve all comers in a non-discriminatory way. In this way, common carrier regulation operates as a classic carrots-and-sticks "regulatory bargain." *See* Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 Yale J.L. & Tech. 391 (2020).

A common carrier is that which uses its goods "in a manner to make it of public consequence and affect the community at large." *Munn v. Illinois*, 94 U.S. 113, 126 (1876). Companies need not be "available to the entire public" to be deemed common carriers. *Nat'l Ass'n of Regulatory Util. Com'rs*, 533 F.2d at 608. Instead, if the company "holds himself out to serve indifferently all potential users," it is a common carrier. *Id.*

Plaintiffs' members provide universal communications platforms where individuals and the government can communicate with everyone else; it cannot seriously be disputed that these platforms are a matter of public consequence that affects our community at large. Any potential user creates an account and gains access to the members' platforms indiscriminately. And while Plaintiffs' members allegedly treat the *content* being received from users in different ways, this does not change the fact that those policies and practices get applied to all *users* in the same way.[3]

---

[3] *Pruneyard* exemplifies this distinction. There, the shopping mall attempted to argue that it was not "open to the public" because a prior Supreme Court opinion allowed them to prohibit the distribution of handbills on its property when the handbilling was unrelated to the shopping center's operations. *PruneYard Shopping Ctr. v. Robins*, 447 U.S.

These members already receive the first half of the common carriage regulatory bargain: Section 230 immunity protections from liability for third-party content because they are not editorializing the content they display. With the emergence of dominant social media platforms, the absence of a stick to ensure the free and democratic provision of this public good is increasingly problematic. Section 230 gives Plaintiffs' members the legal immunity that telephones and telegraphs enjoy, but without the corresponding duty to serve all customers in a non-discriminatory manner. Imposing non-discrimination requirements on Plaintiffs' members will correct this imbalance and ensure that Texas's citizens enjoy the ability to communicate with each other on equal footing.

Moreover, the Texas Legislature specifically found that Plaintiffs' members are common carriers. H.B. 20, Sec. 1. A legislature's ability to declare certain companies or industries to be "common carriers" is clearly sanctioned by the Supreme Court. Congress has done so with success. *See, e.g., Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1226 (2021) (Thomas, J., concurring) ("[I]t stands to reason that if Congress may demand that telephone companies operate as common carriers, it can ask the same of digital platforms.") (internal quotation marks omitted) (citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 684 (1994) (O'Connor, concurring in part)). And so has the Texas Legislature. *See, e.g.*, Tex. Nat. Res. Code § 111.011 ("The operation of common carriers covered by this chapter is a business in which the public is interested and is subject to regulation by law."); *see also Gulf, C. & S.F. Ry. Co. v. Trawick*, 4 S.W. 567, 569 (1887) ("That railroads are common carriers is determined by the constitution and laws of this state . . . ."); *Humble Pipe Line Co. v. State*, 2 S.W.2d 1018, 1019 (Tex.

---

74, 80 (1980). But the fact that the mall exercised certain authority over those that came onto their property was not dispositive to whether the mall was available to the entire public. *Id*.

Civ. App.—Austin 1928, writ ref'd) ("In 1917, the Legislature declared pipe line companies to be common carriers."). The Texas Legislature's deeming of Plaintiffs' members to be "common carriers" is not a mere "statutory label" that this Court can ignore (Dkt. No. 12 at 40); it has legal significance that must be recognized. Accordingly, Plaintiffs' members are common carriers. As such, they have no First Amendment injury due to H.B. 20's requirement that they treat their users indiscriminately.[4]

### B. Plaintiffs' Members Must Participate in any Necessary Common Carrier Inquiry.

Should Texas's legislative authority to declare Plaintiffs' members common carriers be insufficient, this Court cannot reach a conclusion on this issue where *none* of the companies seeking to avoid the common carrier stamp are parties. The jurisprudence of common carriage demonstrates that the question of whether an industry should, or should not be, deemed a common carrier must involve inquiry into that industry itself, rather than a third party "advocating for their interests." *Primrose v. Western Union Telegraph Co.*, 154 U.S. 1, 14 (1894) (telegraph companies); *Olcott v. Fond du Lac County*, 83 U.S. 678 (1872) (railroads); *PruneYard Shopping Ctr.*, 447 U.S. at 88 (shopping centers). The reason for this principle is both simple and apparent: "Common carrier status depends on the **specific actions** of the industry and can even be declared as to some functions of the companies but not others." *Lone Star Steel Co.*, 380 F.2d at 646 (emphasis added).

---

[4] Plaintiffs have repeatedly made the curious argument that this question does not matter because "a common carrier scheme has no real First Amendment consequences." Dkt. No. 28 at 24 (citing *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 824-26 (1996) (Thomas, J., concurring in judgment in part and dissenting in part)). This singular line plucked from a single Justice's separate opinion does not abrogate the decades of precedent that makes abundantly clear "our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Biden*, 141 S. Ct. at 1222 (Thomas, J., concurring) (noting "the right to cut off speech lies most powerfully in the hands of private digital platforms," and common carrier status is one way in "which that power could lawfully be modified").

Thus, the third prong for associational standing—that the case does not require the participation of the individual affected members—cannot be met here. It has been noted by this Court that "not all of Plaintiffs' members operate covered platforms." Dkt. No. 25. So, in this case in which an as-applied challenge has been made on behalf of all members (Dkt. No. 1 at 47), Defendant must discover which of the members actually meet the common carrier definition under H.B. 20. As to those that do, the "unique" nature of those members' operations will necessarily require inquiry into their "specific actions" to determine what functions are those of a common carrier. Dkt. No. 12 (Plaintiffs' PI motion) at 14 (stating "the platforms . . . provide *different* experiences to *different* audiences"); *Lone Star Steel Co.*, 380 F.2d at 646.

A finding as to one of Plaintiffs' members being applied to all members nonsensical. For example, Facebook and Pinterest are both admittedly covered platforms (*see* Dkt. No. 12 at 11). But Facebook is fundamentally a networking site, and Pinterest is a catalogue of different aesthetics. Facebook's audience is broad and covers the general public while Pinterest's user base is majority women. Pinterest allows for optimal personalization by the user; Facebook controls what users see based on algorithms aimed at increasing user engagement. If, for example, this Court were to deem Facebook a common carrier, this decision would not necessarily dictate Pinterest's common carrier status where none of *its* specific actions militating for or against common carrier designation are known. While the two are social media companies, that does not make them the same in all actions and functions. *See, e.g.*, Dkt. No. 12 at 24 ("[Plaintiffs' members] provide unique experiences on their respective platforms that are realized through their terms of service and their content-moderation policies."). Therefore, member-specific discovery is necessary to determine what those actions and functions are for each of Plaintiffs' members.

## II. Plaintiffs' Conclusory Allegations Do Not Confer Associational Standing.

Even if Plaintiffs' members are deemed not to be common carriers, despite directly contrary authority and a dearth of specific evidence on the issue, Plaintiffs still fail to satisfy the requirements for associational standing. Plaintiffs urge this Court to find an injury to their members by relying on conclusory allegations about speech and harm. Dkt. No. 28. But "[b]are allegations are insufficient . . . to establish a [plaintiff's] standing," and where that standing is not self-evident, a plaintiff "must support each element of its claim to standing by affidavit or other evidence." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 851 F.3d 1324, 1327 (D.C. Cir. 2017).

Bare, unsupported allegations are all that Plaintiffs have provided here. These allegations are legally insufficient to establish Plaintiffs' standing to proceed.

### A. Plaintiffs' Vague Allegations That Their Members Engage in Speech Protected by the First Amendment Do Not Confer Standing.

Plaintiffs continue to insist that their members engage in "speech" because they "curate" user-generated content in a way that "sends a constitutionally protected message about what content the platforms consider worthy of presentation and appropriate for their audience of users." Dkt. No. 28 at 15.

This conclusory assertion tells this Court nothing. Specifically, it does not explain *how* this curation is occurring—a crucial factual matter that dictates the extent of constitutional protections—so the Court must guess as to what Plaintiffs' protected speech actually is. Plaintiffs cannot simply promise this Court that their members' AI-created algorithms are speech that H.B. 20 harms; a "[p]recise identification of protected speech is necessary for the Court" in proving a First Amendment claim. *Crampton v. Weizenbaum*, No. A-16-CA-00959-SS, 2017 WL 5474020, at

\*6 (W.D. Tex. Nov. 14, 2017), *aff'd*, 757 F. App'x 357 (5th Cir. 2018). In other words, where a plaintiff claims harm "for making statements protected by the First Amendment, [the plaintiff is] required to be specific as to when [its] statement or statements were made, to whom they were made, whether they were oral or written, and **the content** of those statements." *Foley v. Univ. of Houston Sys.,* 355 F.3d 333, 342 (5th Cir. 2003) (emphasis added).

Here, Plaintiffs' members have refused to be specific. *See* Dkt. No. 29 (Plaintiff's motion for protective order). This failure leaves the Court without a legally sufficient evidentiary basis to hold that Plaintiffs' algorithms are moderating user-generated content in a way that expresses a viewpoint. Plaintiffs' *ipse dixit* simply does not suffice.[5] This claim becomes even more unreliable when measured against the plethora of members' former employees that contradict it. Plaintiffs may tell this Court that their members' algorithms express their disavowing of "hate speech," "misinformation" or "foreign-government disinformation" but other publicly available information indicates they, in fact, incentivize it.[6] This contrast suggests Plaintiffs' members' algorithms are *not* treating incoming user-generated content in a way that expresses speech, but

---

[5] Notably, Plaintiffs compare their members to bookstores, theaters, parade organizers, and editors of encyclopedias, essay collections, journals, and other periodicals. But those categories are fundamentally different from Plaintiffs' members—those other entities are liable for the speech *they* express through curation of their content. As discussed above, *see* Section I.A *supra*, Plaintiffs' members have been insulated from such liability—a considerable "carrot"—with no corresponding "stick" such as those other categories have.

[6] *See, e.g.*, Elizabeth Dwoskin et al., "The case against Mark Zuckerberg: Insiders say Facebook's CEO chose growth over safety," The Washington Post (Oct. 25, 2021), available at https://www.washingtonpost.com/technology/2021/10/25/mark-zuckerberg-facebook-whistleblower/ (last visited Nov. 4, 2021) ("Ahead of Vietnam's party congress in January, Facebook significantly increased censorship of "anti-state" posts, giving the government near-total control over the platform, according to local activists and free-speech advocates."); Keach Hagey & Jeff Horwitz, "Facebook Tried to Make Its Platform a Healthier Place. It Got Angrier Instead," The Washington Post (Sept. 15, 2021), available at https://www.wsj.com/articles/facebook-algorithm-change-zuckerberg-11631654215 (last visited Nov. 4, 2021) (stating that, rather than moderating "harmful" content, Facebook applies its algorithms to content in order to make the content that gets the most engagement—and, therefore, profit—out of its users); Sofia Grafanaki, *Platforms, the First Amendment and Online Speech: Regulating the Filters*, 39 Pace L. Rev. 111, 125 (2018) ("[T]he platforms' goal is not necessarily welfare enhancing. They just need to keep users on the platform. In fact, sometimes lower quality or easier-to-consume-content can serve this goal better.").

instead, the content, regardless of the viewpoint, is simply being placed as necessary to increase user engagement and, therefore, profits. This difference is dispositive.[7] Reading Plaintiffs' Complaint on its face, and certainly reading it against the backdrop of whistleblowers who know the members' internal processes, this Court does not have the specific factual allegations necessary to reach Plaintiffs' self-proclaimed conclusions.

### B. Plaintiffs Cannot Demonstrate Injury Based on Conclusory Allegations.

Plaintiffs' Response still fails to allege with sufficient particularity the economic harm they believe will befall their members due to H.B. 20. Their conclusory assertions come in three varieties: threatened compliance costs, reduced advertising and reputational harm, and competitive harm from "disclos[ing] the precise technical mechanisms they use to enforce their [content moderation] policies," which, Plaintiffs aver, will also cause their members reputational harm. *See* Dkt. No. 28 at 13-14. None suffices to state an injury sufficient to confer standing.

#### 1. Plaintiffs fail to describe or quantify their members' alleged compliance costs.

Plaintiffs' quantifying of the compliance costs they allege H.B. 20 will impose on them gets no more specific than "serious expense" and "operational investment," *see* Dkt. No. 28 at 13-14—conclusory pleading at its most emblematic, and insufficient to establish economic injury sufficient for standing. By contrast, the cases Plaintiffs rely on for the proposition that increased compliance costs equate to economic injury sufficient to confer standing involve inapposite circumstances. *See Texas v. EPA*, 829 F.3d 405, 416 (5th Cir. 2016) (reflecting an allegation as to a specific figure for the cost of compliance); *see Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (observing that

---

[7] "Algorithmic navigation represents a new kind of knowledge logic, to be contrasted with the editorial logic." Grafanaki, *supra* note 4, at 126.

unsubstantiated allegations of economic loss are insufficient to confer standing); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (reflecting allegations as to the compliance measures required to avoid *criminal prosecution*).[8]

None of that authority supports Plaintiffs' claim that allegations as to compliance costs amounting to "serious expense" and "operational investment" for their members—among whom are some of the most valuable companies in the world—are enough to show economic injury sufficient for standing.

### 2. Plaintiffs fail to explain how H.B. 20 will reduce their members' advertising revenue or damage their reputations.

Plaintiffs assert that H.B. 20 will force them to stop "curati[ng]" their social media sites, and that this will "deter advertisers and users, reducing members' advertising revenue." Dkt. No. 28 at 14. This bare assertion is, without more, insufficient to establish threatened economic injury. For one thing, while terming this a "commonsense proposition," *see id.*, Plaintiffs fail to address its obvious flaw: where else can users and advertisers go other than to Plaintiffs' members, particularly where other major social media platforms will also be covered by H.B. 20?

And Plaintiffs' Response still fails to remedy the fatal pleading error pointed out in Defendant's Motion to Dismiss: Plaintiffs omit to explain how H.B. 20 will make "curation" impossible given that it explicitly provides for "content management" and allows users to curate their own experience on a platform however they would like. Tex. Bus. & Com. Code § 120.051;

---

[8] All of the other cases Plaintiffs cite in their Response in connection with their economic injury claim—in addition to those distinguished above—involve something conspicuously lacking in the case at hand: evidence of the economic harm the party expected to suffer. *See Tex. Ass'n of Manufacturers v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 378 (5th Cir. 2021) (petitioners provided actual "evidence of lost sales[,] [which the Court found] sufficiently demonstrate[d] an injury in fact traceable to the Final Rule."); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("finding of financial injury . . . is supported by testimony in the record.").

Tex. Civ. Prac. & Rem. Code § 143A.006(b).

### 3. Plaintiffs fail to explain how disclosing the details of their content moderation will cause them competitive and reputational harm.

Plaintiffs' argument that having to "disclose the precise technical mechanisms" of their content moderation will cause them competitive harm and reputational damage (Dkt. No. 28 at 14) remains entirely conclusory. First, Plaintiffs never explain exactly how H.B. 20's disclosure requirements will result in their members' competitors—to the extent there are any—being able to exploit members' "confidential business information and trade secrets" and thus cost the members competitive advantage. Nothing in H.B. 20 requires such disclosure. H.B. 20 dictates only that, however the information is provided, it needs to be "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform." Tex. Bus. & Com. Code § 120.051(b).

Second, Plaintiffs' Response alleges, without explaining how, that H.B. 20's disclosure requirements will force members to provide a roadmap for various sinister groups to "evade the platforms' moderation." *See* Dkt. No. 28 at 14. This claim also does not specify what in H.B. 20 would require disclosures that amount to "roadmaps." *Id*. Moreover, it re-poses the problem pointed out in Defendant's Motion to Dismiss: the members, who have publicly promised transparency to their consumers, now aver that the cost of such transparency is too high, *and* that increased transparency will drive away those very consumers. *See* Dkt. No. 23 at 13; Dkt. No. 28 at 14. Plaintiffs' members should not be permitted to speculate that transparency will harm them when they have already deemed transparency *necessary* for the future of their companies and publicly lauded their own transparency efforts. *See* Dkt. No. 23 at 13 (providing examples).

### III. Plaintiffs' Members Will Need to Participate Significantly in Discovery to Prove the Claims at Issue.

Plaintiffs premise their entire argument as to the third associational standing prong on the claim that they have made *solely* a facial challenge to H.B. 20. Dkt. No. 28 at 20. But Plaintiffs do not cite to a single line in either their complaint or their PI motion for this claim. Indeed, they cannot. Dkt. No. 1 (Complaint) at 47 (Prayer for Relief limiting the requested relief to declaring that "Section 2" and "Section 7" are "unlawful as applied to Plaintiffs' members"); Dkt. No. 12 (PI Motion) ("Key provisions of H.B. 20 also are unconstitutionally vague—both facially and as applied to Plaintiffs' members."). And Plaintiffs' claim that their suit does not necessitate their members' participation is further belied by the fact that they submitted declarations from their own members in order to attempt to meet their burden in seeking a preliminary injunction. Dkt. No. 12. This Court has already recognized that there is a "factual record" that needs to be developed on the claims raised by Plaintiffs and granted discovery, including discovery on those members. Dkt. No. 25. Full merits discovery will require even more of Plaintiffs' members than is already being conducted for the PI response.

Respectfully Submitted.

**Ken Paxton**
Attorney General of Texas

**Brent Webster**
First Assistant Attorney General

**Grant Dorfman**
Deputy First Assistant Attorney General

**Shawn Cowles**
Deputy Attorney General for Civil Litigation

      **THOMAS A. ALBRIGHT**
      Division Chief
      General Litigation Division

      */s/ Courtney Corbello*
      **COURTNEY CORBELLO**
      Attorney-in-Charge
      Assistant Attorney General
      Texas State Bar No. 24097533
      *courtney.corbello@oag.texas.gov*

      **CHRISTOPHER D. HILTON**
      Counsel of Record
      Assistant Attorney General
      Texas State Bar No. 24087727
      *christopher.hilton@oag.texas.gov*

      **BENJAMIN STOREY LYLES**
      Counsel of Record
      Assistant Attorney General
      Texas State Bar No. 24094808
      benjamin.lyles@oag.texas.gov

      **BENJAMIN S. WALTON**
      Counsel of Record
      Assistant Attorney General
      Texas State Bar No. 24075241
      benjamin.walton@oag.texas.gov

      General Litigation Division
      Office of the Attorney General
      P.O. Box 12548
      Austin, Texas 78711-2548
      (512) 463-2120 / Fax (512) 936-2109

      **ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

  I certify that on November 4, 2021 the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

      */s/ Courtney Corbello*
      **COURTNEY CORBELLO**
      Assistant Attorney General

**NOTICE OF ELECTRONIC FILING**

  I, certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing in accordance with the Electronic Case Files system of the United States District Court for the Western District of Texas, on November 4, 2021.

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Assistant Attorney General
