### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

NETCHOICE, LLC, et al.,
     *Plaintiffs*,

v.

                         Civil Action No. 1:21-cv-00840-RP

KEN PAXTON, in his official capacity as
Attorney General of Texas,
     *Defendant*.

### DEFENDANT'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION (DKT. 12)

### TABLE OF CONTENTS

Defendant's Response to Motion for Preliminary Injunction (Dkt. 12) .......................................... i

Table of Contents ...................................................................................................................... ii

Index of Authorities ................................................................................................................ iv

Argument ..................................................................................................................................1

I. Plaintiffs Have Failed to Demonstrate Likelihood of Success on the Merits. ............................1

   A. Plaintiffs Have Failed to Show a Likelihood of Success on their
      First Amendment Claim. .................................................................................................... 2

      1.   The Platforms Are Common Carriers. ........................................................................ 2

      2.   H.B. 20 Prohibits Viewpoint Discrimination and Nothing More. ...............................10

      3.   Automatically Applied Engagement Algorithms Are Not Speech. ...............................14

      4. To the Extent the Platforms' Engagement Algorithms Discriminating Against
         Viewpoint Are Speech, They Are Commercial Speech that H.B. 20 Constitutionally
         Regulates. ..............................................................................................................18

      5.   H.B. 20 is a Content Neutral Statute that Survives Any Level of Scrutiny..................21

      6.   H.B. 20's Disclosure Requirements are Constitutional for Additional Reasons ..........25

II.      Vagueness and Overbreadth ....................................................................................... 26

   A. H.B. 20 is Facially Valid.................................................................................................. 26

   B. H.B. 20 is Constitutional As Applied to the Platforms...................................................... 29

   C. H.B. 20 is not Overbroad. .............................................................................................. 29

III.     H.B. 20 is Not Preempted by Section 230. ....................................................................... 30

IV.    Plaintiffs are Unlikely to Succeed on their Commerce Clause Claim..................................34

   A. The Dormant Commerce Clause Doctrine Applies Only When that Power is
      Actually Dormant, Not When, As Here, Congress Has Acted. ...........................................34

   B. The Dormant Commerce Clause Does Not Apply to H.B. 20 Because, At Most,
      H.B. 20 Only Indirectly Regulates Speech. ......................................................................36

   C. The Expansion of the Commerce Power to Enable Congress to Regulate Speech
      Does Not Mean that Courts Enjoy an Equally Expanded Power to Suppress a State
      Statute Protecting Speech.................................................................................................37

   D. The Plaintiffs' Dormant Commerce Clause Claims Prove Too Much, as Those
      Arguments Would Leave Social Media Platforms Outside the Reach of Any State............38

   E. In the Alternative, Even if the Dormant Commerce Clause Doctrine Were to Apply,
      H.B. 20 Would Not Violate It. .........................................................................................38

V.      Plaintiffs Lack Standing and Are Unlikely to Succeed on that Basis. ................................ 44

VI.     Any Proper Preliminary Injunction that Issues Requires Severability................................45

VII.    Plaintiffs Fail to Show Irreparable Injury. .......................................................................... 48

VIII.   The Balance of Equities Favors The Enforcement of H.B. 20, And An Injunction
        Would Undermine The Public Interest. ............................................................................... 49

Conclusion ............................................................................................................................................ 50

**Certificate of Service** ...................................................................................................................... 51

## Index of Authorities

**Texas Cases**

*Gulf, C. & S.F. Ry. Co. v. Trawick,*
    4 S.W. 567 (1887) .......................................................................................................... 8
*Humble Pipe Line Co. v. State,*
    2 S.W.2d 1018 (Tex. Civ. App.—Austin 1928, writ ref'd) ......................................... 8

**Texas Statutes**

H.B. 20 § 8(a) ...................................................................................................................... 46
H.B. 20 § 8(b) ...................................................................................................................... 46
H.B. 20 § 8(c) ...................................................................................................................... 46
H.B. 20 § 8(d) ...................................................................................................................... 46
H.B. 20 § 8(e) ...................................................................................................................... 46
H.B. 20 § 8(f) ....................................................................................................................... 46
H.B. 20 ............................................................................................................................ passim
Tex. Bus. & Com. Code § 120.052 ............................................................................ 11, 23
Tex. Civ. Prac. & Rem. Code § 143A.006 ........................................................................12
Tex. Civ. Prac. & Rem. Code § 143A.006 (b).............................................................. 49
Tex. Civ. Prac. & Rem. Code § 143A.002 ......................................................................32
Tex. Labor Code § 21.001...................................................................................................25
Tex. Nat. Res. Code § 111.011 ........................................................................................... 8

**Federal Cases**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ...............................................................................................19, 20
*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) .................................................................................................... 46
*Alexander v. Sandoval,*
    532 U.S. 275 (2001)......................................................................................................31
*Allstate Ins. Co. v. Abbott,*
    495 F.3d 151 (5th Cir. 2007)................................................................................ 40, 43
*American Libraries Ass'n v. Pataki,*
    969 F. Supp. 160 (S.D.N.Y. 1997)...................................................................... 42, 44
*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015)......................................................................................................31
*Ayotte v. Planned Parenthood of N. New Eng.,*
    546 U.S. 320 (2006)......................................................................................................47
*Baldwin v. G.A.F. Seelig, Inc.,*
    294 U.S. 511 (1935)..................................................................................................... 42

iv

*Biden v. Knight First Amendment Inst. At Columbia Univ.*,
    141 S. Ct. 1220 (2021) ....................................................................... 3, 4, 8, 10

*Boos v. Barry*,
    485 U.S. 312 (1988) ....................................................................................... 22

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) ................................................................................... 18, 30

*Byrum v. Landreth*,
    566 F.3d 442 (5th Cir. 2009) ......................................................................... 49

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997) ........................................................................ 39, 40, 42, 45

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ...................................................................................... 25

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ...................................................................................... 19

*Cir. City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) ................................................................................. 31, 32

*City of Chicago v. Morales*,
    527 U.S. 41 (1999) ........................................................................................ 30

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ...................................................................................... 26

*Crampton v. Weizenbaum*,
    No. A-16-CA-00959-SS, 2017 WL 5474020 (W.D. Tex. Nov. 14, 2017), *aff'd*, 757 F. App'x
    357 (5th Cir. 2018) ....................................................................................... 15

*CTIA-The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) .................................................................... 22, 26

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*,
    518 U.S. 727 (1996) ................................................................................. 10, 48

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) .................................................................................... 23

*Exxon Corp. v. Governor of Maryland*,
    437 U.S. 117 (1978) ................................................................................. 43, 44

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ...................................................................................... 30

*Foley v. Univ. of Houston Sys.*,
    355 F.3d 333 (5th Cir. 2003) ......................................................................... 15

*Ford Motor Co. v. Texas Dep't of Transp.*,
    106 F. Supp. 2d 905 (W.D. Tex. 2000), aff'd, 264 F.3d 493 (5th Cir. 2001) ........................ 44

*Ford Motor Co. v. Texas Dep't of Transp.*,
    264 F.3d 493 (5th Cir. 2001) ......................................................................... 44

*Gooding v. Wilson*,
    405 U.S. 518 (1972) ...................................................................................... 30

*Green Party of Tenn. v. Hargett*,
791 F.3d 684 (6th Cir. 2015)................................................................................ 29

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989).............................................................................. 39, 41, 42

*Heart of Atlanta Motel, Inc. v. United States*,
379 U.S. 241 (1964)..............................................................................................34

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981)............................................................................................ 24

*Hill v. Colorado*,
530 U.S. 703 (2000)............................................................................................ 28

*Hughes v. Oklahoma*,
441 U.S. 322 (1979)............................................................................................ 40

*Illusions—Dallas Private Club, Inc. v. Steen*,
482 F.3d 299 (5th Cir. 2007)............................................................................ 24

*In re Cao*,
619 F.3d 410 (5th Cir. 2010) ............................................................................ 29

*Lauder, Inc. v. City of Houston, Tex.*,
751 F. Supp. 2d 920 (S.D. Tex. 2010), aff'd sub nom. *Lauder, Inc. v. City of Houston, Tex.*,
670 F.3d 664 (5th Cir. 2012) ............................................................................ 24

*Leavitt v. Jane L.*,
518 U.S. 137 (1996)............................................................................................ 46

*Lebron v. Nat'l R.R. Passenger Corp.*,
513 U.S. 374 (1995)..............................................................................................34

*Leibowitz v. City of Mineola, Tex.*,
660 F. Supp. 2d 775 (E.D. Tex. 2009) ............................................................ 26

*Lewis v. BT Inv. Managers, Inc.*,
447 U.S. 27 (1980) ........................................................................................ 44, 48

*Lion Health Servs., Inc. v. Sebelius*,
635 F.3d 693 (5th Cir. 2011).............................................................................. 48

*Lloyd Corp. v. Tanner*,
407 U.S. 551 (1972) ..............................................................................................7

*Manhattan Cmty. Access Corp. v. Halleck*,
139 S. Ct. 1921 (2019)..........................................................................................3

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014) ...................................................................................... 22

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
559 U.S. 229 (2010)......................................................................................19, 20

*Missouri v. Jenkins*,
515 U.S. 70 (1995) .............................................................................................. 48

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ........................................................................................32

*Nat'l Ass'n of Mfrs. v. SEC,*
  800 F.3d 518 (D.C. Cir. 2015) .......................................................... 26
*Nat'l Endowment for the Arts v. Finley,*
  524 U.S. 569 (1998) ...........................................................................27
*New York State Club Ass'n, Inc. v. City of New York,*
  487 U.S. 1 (1988) ............................................................................. 30
*New York State Rest. Ass'n v. New York City Bd. Of Health,*
  556 F.3d 114 (2d Cir. 2009) ............................................................ 26
*New York State Restaurant Ass'n v. New York City Bd. Of Health,*
  556 F.3d 114 (2d Cir. 2009) ............................................................ 22
*Olcott v. Fond du Lac County,*
  83 U.S. 678 (1872) ............................................................................25
*Packingham v. North Carolina,*
  -- U.S.--, 137 S.Ct. 1730 (2017) ...................................................5, 24
*Penry v. Lynaugh,*
  492 U.S. 302 (1989) .....................................................................19, 29
*Pharm. Rsch. & Mfrs. of Am. v. Walsh,*
  538 U.S. 644 (2003) ......................................................................... 42
*Pittsburgh Press Co. v. Human Rel. Comm'n,*
  413 U.S. 376 (1973) ..........................................................................18
*Primrose v. Western Union Telegraph Co.,*
  154 U.S. 1 (1894) ..............................................................................25
*PruneYard Shopping Ctr. v. Robins,*
  447 U.S. 74 (1980) ........................................................................8, 19
*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015) ......................................................................11, 22
*Roark & Hardee LP v. City of Austin,*
  522 F.3d 533 (5th Cir. 2008) .........................................................23, 30
*Romero–Barcelo,*
  456 U.S. 305 (1982) ......................................................................... 50
*Sabri v. United States,*
  541 U.S. 600 (2004) ..........................................................................27
*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
  140 S. Ct. 2183 (2020) ..................................................................... 46
*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
  139 S. Ct. 2449 (2019) ......................................................................34
Tex. Civ. Prac. & Rem. Code §§ 143A.007-008 ..................................34
*Turner Broadcasting System, Inc. v. FCC,*
  512 U.S. 622 (1994) ................................................................. passim
*U.S. v. O'Brien,*
  391 U.S. 367 (1968) ..........................................................................24

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
  550 U.S. 330 (2007) ...........................................................................40, 41
*United States Telecom Ass'n v. Fed. Communications Comm'n*,
  825 F.3d 674 (D.C. Cir. 2016)..................................................................3
*United States v. Lopez*,
  514 U.S. 549 (1995) .................................................................................36
*United States v. Morrison*,
  529 U.S. 598 (2000) .................................................................................36
*United States v. Paradise*,
  480 U.S. 149 (1987) .................................................................................25
*United States v. Raines*,
  362 U.S. 17 (1960) ...................................................................................28
*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) .................................................................................27
*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) .................................................................................18
*W. Union Tel. Co. v. James*,
  162 U.S. 650 (1896) ...................................................................................8
*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) .................................................................................29
*Whitaker v. Livingston*,
  732 F.3d 465 (5th Cir. 2013).....................................................................1
*Williamson v. Lee Optical, Inc.*,
  348 U.S. 483 (1955) .................................................................................10
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .........................................................................1, 49, 50
*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ..........................................................................22, 26

## Federal Statutes

15 U.S.C.A. § 7a-3 ........................................................................................ 28
29 U.S.C. § 621-634 .....................................................................................25
42 U.S.C. § 12101 .........................................................................................25
42 U.S.C. § 2000e .........................................................................................25
47 U.S.C. § 230 ..................................................................................... passim
47 U.S.C. § 230 (c)(1) ...................................................................................9
47 U.S.C.A. § 230(c)(2)(a) ...........................................................................35
47 U.S.C.A. § 230(c)(2)(A) ..........................................................................32
47 U.S.C.A. § 230(e)(3) ..........................................................................34, 35
47 U.S.C.A. § 555a .........................................................................................9
47 USC § 521(4) .............................................................................................9

Honest Ads Act, S. 1989, 115th Cong. § 7 (2017) ........................................................ 20
Pub. L. No. 104-104 (1996) § 551(b) (1) Amendment to 47 USCA § 303.................................33
TELECOMMUNICATIONS ACT OF 1996, PL 104–104, February 8, 1996, 110 Stat 56..........33

## Federal Rules

Federal Rule of Civil Procedure 29(a)(4)(E) ................................................................. 4

## Other Authorities

*About public and protected Tweets*, Twitter .......................................................... 6
Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(C)(2)*, Journal of Free Speech
    Law, 179 (2021)........................................................................................32
Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section
    230*, 22 Yale J.L. & Tech. 391, 395–96 (2020) ...........................................5
Best, Joseph, *Signposts Turn to Twitter Posts: Modernizing the Public Forum Doctrine and Preserving
    Free Speech in the Era of New Media*, 53 Tex. Tech L. Rev. 273, 291 (2021)................................ 6
Brian Stelter, *Twitter's Jack Dorsey: 'We are not' discriminating against any political viewpoint*,
    CNN, Aug. 20, 2018 ...............................................................................13
Derek E. Empie, *The Dormant Internet: Are State Regulations of Motor Vehicle Sales by
    Manufacturers on the Information Superhighway Obstructing Interstate and Internet Commerce?*, 18
    Ga. St. U. L. Rev. 827, 834 (2002)........................................................... 42
Eugene Volokh, *Trump has a point: Facebook's policing of speech is ominous*, Washington Post, Jul.
    15, 2021 ...............................................................................................25
*Facebook, Google and Twitter: Examining the Content Filtering Practices of Social Media Giants:
    Hearing Before H. Comm. on the Judiciary*, 115th Cong. 2 (2018) (statement of Nick Pickles,
    Senior Strategist, Public Policy, Twitter, Inc.) ........................................14
Garofalo, Pat, *Facebook's tax breaks are thoroughly undeserved*, NBC News, May 13, 2019...............5
Henry Farrell, *Mark Zuckerberg Runs a Nation-State, and he's the King*, Vox, Apr. 10, 2018 ......... 6
Jack Nicas, Why can't the social networks stop fake accounts?, Dec. 8, 2020
    (https://nyti.ms/3C8Yi5l) (last visited 11/12/2021)..................................7
James Wilson, State House Yard Speech (Oct. 6, 1787), T*he Documentary History of the
    Ratification of the Constitution Digital Edition, ed*., John P. Kaminski, et al, at
    http://rotunda.upress.virginia.edu/founders/RNCN-02-02-02-0002-0002-0018. ................37
Jesselyn Cook, *YouTube Is A Pedophile's Paradise, Huffington Post UK*, Mar. 21, 2020................19
Josh Constine, *Facebook Changes Mission Statement to 'Bring the World Closer Together,'*
    TechCrunch, Jun. 22, 2017 ......................................................................21
Kalev Leetaru, *What Does It Mean For Social Media Platforms To "Sell" Our Data?* Forbes, Dec.
    15, 2018 ...............................................................................................19
Kate Losse, *I was Zuckerberg's speechwriter. "Companies over countries" was his early motto*, Vox
    (Nov. 21, 2021, 11:44 PM) ......................................................................38

Katie Benner, Glenn Thrush and Mike Isaac, *Facebook Engages in Housing Discrimination With Its Ad Practices, U.S. Says*, New York Times, Mar. 28, 2019 ...................................................... 20

Kerri A. Thompson, *Commercial Clicks: Advertising Algorithms As Commercial Speech*, 21 Vand. J. Ent. & Tech. L. 1019, 1031 (2019)........................................................................................16

Michela Del Vicario et al., *The Spreading of Misinformation Online,* 113 Proc. Nat'l Acad. Scis. U.S. Am. 554, 558 (2016)............................................................................................................ 20

Paul Bischoff, Inside a Facebook bot farm, May 10, 2021 (https://bit.ly/3Fes0Yz) (last visited 11/12/2021) ....................................................................................................................................7

Philip M. Napoli, Sanford Sch. of Pub. Policy, & Robyn Caplan, Data & Soc'y Research Inst., *When Media Companies Insist They're Not Media Companies and Why It Matters for Communications Policy*, Sept. 30, 2016 .................................................................................... 17

Ravi Somaiya, *How Facebook Is Changing the Way Its Users Consume Journalism*, The New York Times, Oct. 27, 2014....................................................................................................................17

Rupert Neate, *Extremists Made Ł250,000 from Ads for UK Brands on Google, Say Experts*, Guardian, Mar. 17, 2017.................................................................................................................19

Ryan Mac, *Internal Alarm, Public Shrugs: Facebook's Employees Dissect Its Election Role*, NY Times, Oct. 22, 2021 ................................................................................................................................. 20

Sang Ah Kim, *Social Media Algorithms: Why You See What You See*, 2 Geo. L. Tech. Rev. 147 (2017) ...........................................................................................................................................16

Sebenius, Alyza, *Should Facebook Ads Be Regulated Like TV Commercials?*, The Atlantic, Sept. 14, 2017 ................................................................................................................................................ 20

*Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 116th Cong. 1 (2019) ...............................................14

University of Texas at Austin Nondiscrimination Policy, Operating Procedure 3-3020...............25

*What is public information on Facebook?*, Facebook.com ................................................................. 6

Plaintiffs' members ("Platforms") have long enjoyed a doubly privileged status. Federal law recognizes that they are public conduits for information and therefore allows them to avoid liability for hosting the speech of others. At the same time, they have claimed a First Amendment right to discriminate against such material on the basis of viewpoint. But Texas has designated the Platforms common carriers; they no longer have a right to discriminate against different views in their role as public conduits. Nonetheless, after shielding themselves from the responsibilities of proving their claims, the Platforms' lobbying firms bring suit against the State for daring to impose regulations on them that cease their dangerous, discriminatory practices.

## Argument

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an ddinjunction is in the public interest.[1] This is a "difficult" and "stringent" standard for the movant to meet, and the movant bears "the burden of establishing each element."[2] Plaintiffs' Motion for Preliminary Injunction ("PI Motion") does not establish any element.

## I.   Plaintiffs Have Failed to Demonstrate Likelihood of Success on the Merits.

A preliminary injunction is considered "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[3] "Merely finding that there is more likelihood than 'no chance' is not sufficient to sustain the granting of a preliminary

---

[1] *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).
[2] *Whitaker v. Livingston*, 732 F.3d 465, 469 (5th Cir. 2013).
[3] *Winter*, 555 U.S. at 22.

injunction."[4] "To assess the likelihood of success on the merits, [the Court] look[s] to standards provided by the substantive law."[5] If a plaintiff fails to identify an enforceable right that a preliminary injunction might safeguard, it cannot prevail on the merits and therefore cannot show a substantial likelihood of ultimately succeeding on the merits.[6] Plaintiffs have brought seven causes of action[7] and have failed to present evidence or argument showing likelihood of success on any of them.[8]

### A. Plaintiffs Have Failed to Show a Likelihood of Success on their First Amendment Claim.

Plaintiffs claim the Platforms are engaging in protected speech by exercising editorial discretion in the way they moderate and express positions on user-generated content. But this argument requires several assumptions to line up that simply do not. First, it assumes the Platforms are not common carriers – they are. Second, it assumes that H.B. 20 prohibits any content moderation – it does not. Third, it assumes that, even if they are not common carriers *and* H.B. 20 prohibits content moderation, that their rotely applied engagement algorithms constitute speech – they do not. Fourth, it assumes that, even if they are not common carriers *and* algorithms are speech, that speech is not commercial speech for which a substantial government interest justifies restricting it – it is, and it does.

### 1. *The Platforms Are Common Carriers.*

Not every private entity is entitled to the same level of protection of its speech; "when a private entity provides a forum for speech, the private entity is not ordinarily constrained by the

---

[4] *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.3 (5th Cir. 1979).
[5] *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (internal quotation marks omitted).
[6][6] *See Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013).
[7] Dkt. 1.
[8] Dkt. 12.

First Amendment."[9] But an entity deemed a "common carrier" is subjected to "special regulations" on account of their public concern.[10] Specifically, for common carriers, there is an "absence of any First Amendment concern" in the government mandating they provide equal access to speakers utilizing their platform.[11] In other words, the Platforms being classified as common carriers would effectively nullify the need for a preliminary injunction to protect the Platforms' First Amendment rights; as common carriers the Platforms would be required to provide equal access to their public forums without viewpoint discrimination.[12]

A determination of whether a company is a common carrier requires several considerations such as, but not limited to, (1) market power; (2) whether the entity regulated is part of the transportation or communications industry[13]; (3) whether it receives countervailing benefits from the government; (4) whether the actor holds itself out as providing service to all; and (5) whether the Legislatures regulates them as common carriers.[14] "[L]arge social media platforms and email service providers are prima facie common carriers within the various historical understandings of that term."[15]

---

[9] *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019) (emphasis added).
[10] *United States Telecom Ass'n v. Fed. Communications Comm'n*, 825 F.3d 674, 741 (D.C. Cir. 2016).
[11] *Id.*
[12] *Id.*
[13] This factor will not be discussed in detail given that Plaintiffs' members are clearly part of the communications industry. *Biden v. Knight First Amendment Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring) ("Though digital instead of physical, they are at bottom communications networks, and they "carry" information from one user to another.").
[14] Candeub Expert Report (Ex. A).
[15] Candeub Expert Report (Ex. A) at p.8.

Market power. There is no disputing that Facebook, Twitter, and YouTube have significant market power. These companies dominate the social networking market and use their size and profits to ensure no other competitors can survive.[16] As Justice Thomas stated:

> The Facebook suite of apps is valuable largely because 3 billion people use it. Google search—at 90% of the market share—is valuable relative to other search engines because more people use it, creating data that Google's algorithm uses to refine and improve search results. **These network effects entrench these companies**. Ordinarily, the **astronomical profit margins** of these platforms—last year, Google brought in $182.5 billion total, $40.3 billion in net income—**would induce new entrants into the market**. That these companies **have no comparable competitors highlights that the industries may have substantial barriers to entry**.[17]

Plaintiffs, the Platforms and their funded supporters[18] do not dispute, but in fact acknowledge, that they provide the communication infrastructure that people, worldwide, rely on to engage in speech and the exchange of ideas.[19] They do so without any significant competition and with "the right to cut off speech" whenever they arbitrarily choose to.[20] Thus, all agree that the Platforms have the market power that is typical of common carriers.

Countervailing Benefits from the Government. The Platforms receive numerous benefits based on their status as untouchable behemoths of the online communications world. First, Plaintiffs, themselves, are used most often by the Platforms to lobby for favors regarding laws, regulations and kickbacks.[21] One example is the Internet Tax Freedom Act (ITFA), which

---

[16] Szabo Depo. (Ex. D) 52:5-60:13 (stating Netchoice's members have successfully denied their millions of users access to other platforms applications - such as Rumble and Gab - by removing those apps from the Platforms' app stores); Candeub Expert Report (Ex. A) at p.8 ("The economic consensus holds that the large platforms exercise market power against advertisers and have deterred entrance in an anticompetitive manner.").

[17] *Biden*, 141 S. Ct. at 1224 (Thomas, J., concurring) (emphasis added).

[18] Although required under Federal Rule of Civil Procedure 29(a)(4)(E), the following Amici have not disclosed that they are, in fact, funded by one or more of the Platforms challenging H.B. 20 through their lobbying firms: Chamber of Progress, Consumer Tech. Assoc., Engine Advocacy, Information Technology & Innovation Foundation, Progressive Policy Institute, Technet, Center for Democracy & Technology, and TechFreedom. Dkts. 30-32.

[19] Potts Depo. (Ex. B) 33:5-12; Vietch Depo. (Ex. C) 60:9-12; Szabo Decl. (Dkt. 12-2) at ¶5 (Stating the Platforms are "are open to the public"); Gutierrez Decl. (Dkt. 12-5) at ¶5.

[20] *Biden*, 141 S. Ct. at 1227 (Thomas, J., concurring).

[21] Szabo Depo. (Ex. D) 14:3-7, 17:18-18:2, 26:11-14; Schruers Depo. (Ex. E) 11:16-20.

"prohibits state and local entities from taxing internet access services that the platforms provide."[22] These "extraordinary tax privileges and exemptions are historically typical for common carriers."[23] The Platforms also benefit from large tax subsidies. "Amazon has reaped billions in tax subsidies across America in recent years, while Facebook has pulled in some $300 million and Alphabet, Google's parent company, has collected more than $800 million."[24]

Another favor comes in the form of complete absolution from liability for any user-generated content they host.[25] Section 230 allows Platforms to insulate themselves from any liability for damages stemming from the content they permit on their sites.[26] This stands in stark contrast from "the newspapers, parade[s], or bookstore[s]" that are held liable for the content they display.[27] Section 230 essentially operates as a giveaway to the Platforms who receive all the benefits of common carriage status without having to accept the actual title and reduce their First Amendment rights.[28]

The Platforms are open to the public.[29] The Supreme Court recognized several years ago that "[w]hile in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace … and social media in particular."[30] Because of how society is evolving, traditional public forums are becoming

---

[22] Candeub Expert Report (Ex. A) at p.9 (citing Title IX, Pub. L. No. 105-277, 112 Stat. 2681-719 (1998)).
[23] *Id.*
[24] Garofalo, Pat, *Facebook's tax breaks are thoroughly undeserved*, NBC News, May 13, 2019 (https://cutt.ly/RTPskpA).
[25] 47 U.S.C. § 230.
[26] Vietch Depo. (Ex. C) 48:2-8.
[27] Dkt. 12 at 27; *see* Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 Yale J.L. & Tech. 391, 395–96 (2020) ("[I]f a newspaper publishes a libelous letter to the editor, the newspaper faces legal liability."); *see also* Schruers Depo. (Ex. E) 110:4-111:17 (agreeing newspapers, so long as they are not operating as an "interactive computer service," are not protected by Section 230).
[28] *Id.*
[29] Candeub Expert Report (Ex. A) at p.8-9.
[30] *Packingham v. North Carolina*, -- U.S.--, 137 S.Ct. 1730, 1735 (2017).

increasingly obsolete as mediums for expression.[31] Instead, the public turns towards online platforms for its expression and discussion.[32] "[W]e cannot appreciate yet [the internet's] full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be."[33]

The Platforms clearly hold themselves out to the public.[34] Facebook, Twitter and YouTube all market their sites as being open to everyone;[35] even the very children they claim to prohibit.[36] In fact, their sites are able to be accessed by the public, either completely or to some extent, without any username or screening whatsoever.[37] And even when becoming an "official" user of a Platform, the barriers to entry are very low – simply a name, valid email address and consent to their Terms of Service gives anyone access.[38] Plaintiffs, YouTube and Facebook have specifically conceded that they take no other measures, if any at all,[39] to delay a user's ability to access their platforms once that information is submitted.[40] In fact, it is so simple to gain access to the Platforms

---

[31] Best, Joseph, *Signposts Turn to Twitter Posts: Modernizing the Public Forum Doctrine and Preserving Free Speech in the Era of New Media*, 53 Tex. Tech L. Rev. 273, 291 (2021).

[32] *Id.*

[33] *Packingham*, 137 S. Ct. at 1736.

[34] Dkt. 12-2 (Szabo Decl.) at ¶5 (conceding Netchoice's members "are open to the public,…allow users to create accounts; [and] . . . enable users to communicate with other users.").

[35] Mark Zuckerberg even believes that "[i]n a lot of ways Facebook is more like government than a traditional company…[Facebook has] this large community of people, and more than other technology companies we're really setting policies." Henry Farrell, *Mark Zuckerberg Runs a Nation-State, and he's the King*, Vox, Apr. 10, 2018 (https://cutt.ly/4TPsnl0).

[36] Schruers Depo. (Ex. E) 56:19-57:14 (acknowledging that a child is entirely capable of creating an account on YouTube).

[37] Potts Depo. (Ex. B) 35:5-16; Vietch Depo (Ex. C) 25:11-15.

[38] Vietch Depo. (Ex. C) 17:4-11, 25:3-13.

[39] YouTube, in fact, allows members of the public to access its platform without even creating an account. Vietch Depo. (Ex. C) 25:11-21. And portions of Facebook's website are viewable to the public without an account. *See What is public information on Facebook?*, Facebook.com, https://www.facebook.com/help/203805466323736 (describing public information that can be seen on your Facebook page by others, even those "people off of Facebook."). Unless posted as "private," any user's "tweet" is visible on Twitter without an account. *See About public and protected Tweets*, Twitter, https://help.twitter.com/en/safety-and-security/public-and-protected-tweets ("Public Tweets (the default setting): Are visible to anyone, whether or not they have a Twitter account.").

[40] Potts Depo. (Ex. B) 35:5-16, 38:8-11; Vietch Depo. (Ex. C) 20:22-21:6.

that they are estimated to have *billions* of accounts on their site at any given time that are entirely

fake bots "indistinguishable from legitimate users."[41]

In holding themselves open to the public, the Platforms have become the modern public

forums. One of the most basic principles of property law is that private property comes with an

assumption that there is not open access to the public. And when private property is made open to

the public, such as malls and restaurants, it is a "public forum" regardless of minor limitations

such as on time or on disorderly conduct by members of the public.[42]

Plaintiffs claim that the Platforms are not open to the public because, once users are *on* the

Platforms, the Platforms do not treat the content "indifferently" but, instead, subject users to their

policies and procedures.[43] This is no basis to find common carriage does not apply to the Platforms:

> [T]here is no historic common carrier legal test that requires "indifference." Common
> carriers were never obligated—and to this day have no obligation—to accept all traffic.
> They are *not indifferent* to the passengers, goods, and messages they transport.  Airlines can
> deny service to unruly passengers or those who otherwise violate their rules, as can
> railroads. Telephones are not obligated to carry harassing phone calls.[44]

That the Platforms treat *content* differently does not change the fact that their content policies and

practices get applied to all *users* in the same way after those users have gained immediate access to

---

[41] Potts Depo. (Ex. B) 39:4-22; Paul Bischoff, Inside a Facebook bot farm, May 10, 2021 (https://bit.ly/3Fes0Yz) (last visited 11/12/2021); Jack Nicas, Why can't the social networks stop fake accounts?, Dec. 8, 2020 (https://nyti.ms/3C8Yi5l) (last visited 11/12/2021).
[42] *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972).
[43] Dkt. 12 at 41.
[44] Candeub Expert Report (Ex. A) at p.10.

the forums.[45] "Historically, common carriers must serve all under the same and 'non-different' general terms and conditions."[46] That is all that Plaintiffs, and the Platforms, claim is happening.[47]

To hold that Platforms cannot be common carriers because they have policies in place for the public that use their services is entirely contradictory to the common carriage doctrine.[48] Surely there is no logical argument to be made that, for example, shopping malls, taxi services, or airlines cannot have *any* policies in place to moderate the use of their forums. Such is the same for the Platforms.

<u>The Legislature May Deem Platforms to be Common Carriers</u>. The Texas Legislature has specifically designated the Platforms as common carriers.[49] A legislature's ability to declare certain companies or industries to be "common carriers" is sanctioned by the Supreme Court given that Congress has done so time and again with success.[50] And so has the Texas Legislature.[51] This case is no different from *Western Union v. James*, in which the Supreme Court upheld a Georgia law that imposed common carrier status on "every electric telegraph company."[52] "In subsequent decades, the Supreme Court and state supreme courts made clear that states could require

---

[45] Potts Depo. (Ex. B) 41:25-42:23; Vietch Depo. (Ex. C) 45:15-20, 46:9-14; Szabo Depo. (Ex. D) 82:3-13; 84:9-19.

[46] Candeub Expert Report (Ex. A) at p.10. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 80 (1980) exemplifies this distinction. There, a shopping mall attempted to argue that it was not "open to the public" because a prior Supreme Court opinion allowed them to prohibit the distribution of handbills on its property when the handbilling was unrelated to the shopping center's operations.[46] But the fact that the mall exercised certain authority over those that came onto their property was not dispositive to whether the mall was available to the entire public.[46]

[47] Potts Depo. (Ex. B) 41:41-42:7; Vietch Depo. (Ex. C) 45:15-20; Szabo Depo. (Ex. D) 82:3-15, 84:9-19.

[48] Candeub Expert Report (Ex. A) at p.10.

[49] H.B. 20, Sec. 1.

[50] *See, e.g., Biden*, 141 S. Ct. at 1226 (Thomas, J., concurring) ("[I]t stands to reason that if Congress may demand that telephone companies operate as common carriers, it can ask the same of digital platforms.") (internal quotation marks omitted) (citing *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 684 (1994) (O'Connor, concurring in part)).

[51] *See, e.g.*, Tex. Nat. Res. Code § 111.011 ("The operation of common carriers covered by this chapter is a business in which the public is interested and is subject to regulation by law."); *see also Gulf, C. & S.F. Ry. Co. v. Trawick*, 4 S.W. 567, 569 (1887) ("That railroads are common carriers is determined by the constitution and laws of this state . . . ."); *Humble Pipe Line Co. v. State*, 2 S.W.2d 1018, 1019 (Tex. Civ. App.—Austin 1928, writ ref'd) ("In 1917, the Legislature declared pipe line companies to be common carriers.").

[52] *W. Union Tel. Co. v. James*, 162 U.S. 650, 651 (1896).

communications firms within with their borders to transmit and deliver messages in an impartial and good faith manner."[53] Thus, that H.B. 20 deems the Platforms to be "common carriers" is not a mere "statutory label"[54] that this Court can ignore; it has legal significance that must be recognized.

Moreover, it is consistent with Congress' treatment of the Platforms as common carriers by virtue of Section 230. Section 230(c)(1) protects the Platforms from being treated as "the publisher or speaker of any information provided by another information content provider."[55] In other words, that section recognizes that the Platforms and services are conduits for information and protects them from liability on that basis. This is a typical protection shared by other common carriers.[56] And that Section 230 does not explicitly use the term "common carrier" is not dispositive; Congress has historically designated common carrier benefits without explicitly using the term[57] and, regardless, the Platforms are enjoying the benefits of that status by Section 230's protections.

Far from having "no real First Amendment consequences," H.B. 20's designation defines the very First Amendment inquiry essential to this suit.[58] It is, after all, a legislative recognition of the Platforms' common carrier status in providing speech conduits for the public; this statutory designation that must be upheld unless it is so arbitrary and capricious as to be without a rational

---

[53] Candeub Expert Report (Ex. A) at p.14.
[54] Dkt. 12 at 40.
[55] 47 U.S.C. § 230 (c)(1).
[56] *See* Candeub Expert Report (Ex. A) at p.9.
[57] *See, e.g.,* 47 USC § 521(4) (requiring that cable systems "to provide the widest possible diversity of information sources and services to the public"); 47 U.S.C.A. § 555a (in exchange for the obligation in 47 USC § 521(4) cable systems receive immunity from suit).
[58] Dkt. 12 at 40; *See* Candeub Expert Report (Ex. A).

basis.[59] Indeed, a rational basis surely exists as their common carrier status is eminently justified.[60] And being common carriers, who serve as conduits for the speech of others, the Platforms can be barred by H.B. 20 from engaging in viewpoint discrimination against such speech without any First Amendment injury or violation.[61]

Accordingly, the Platforms are common carriers. They have no First Amendment injury due to H.B. 20's requirement that they treat their users' viewpoints indiscriminately.[62]

### 2. *H.B. 20 Prohibits Viewpoint Discrimination and Nothing More.*[63]

Plaintiffs' entire premise for a constitutional violation in this suit is that H.B. 20 requires the Platforms to moderate content in a way that infringes on their editorial discretion.[64]

It does not.

The Supreme Court has, time and again, explained that "viewpoint" and "content" are two separate, "distinct" terms.[65] Content is "general subject matter" while a viewpoint is "the

---

[59] *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 491 (1955).

[60] See, *supra.*

[61] Plaintiffs have repeatedly made the curious argument that this question does not matter because "a common carrier scheme has no real First Amendment consequences." Dkt. 28 at 24 (citing *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 824-26 (1996) (Thomas, J., concurring in judgment in part and dissenting in part)). This singular line does not abrogate the decades of precedent that makes abundantly clear "our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers." *Biden*, 141 S. Ct. at 1222 (Thomas, J., concurring) (noting "the right to cut off speech lies most powerfully in the hands of private digital platforms," and common carrier status is one way in "which that power could lawfully be modified").

[62] Plaintiffs have repeatedly made the curious argument that this question does not matter because "a common carrier scheme has no real First Amendment consequences." Dkt. 28 at 24 (citing *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 824-26 (1996) (Thomas, J., concurring in judgment in part and dissenting in part)). This singular line plucked from a single Justice's separate opinion does not abrogate the decades of precedent that makes abundantly clear "our legal system and its British predecessor have long subjected certain businesses, known as common carriers, to special regulations, including a general requirement to serve all comers. *Biden*, 141 S. Ct. at 1222 (Thomas, J., concurring) (noting "the right to cut off speech lies most powerfully in the hands of private digital platforms," and common carrier status is one way in "which that power could lawfully be modified").

[63] As further discussed *infra*, Section II, "viewpoint" and "content" are two distinct terms, which gives rise to the arguments made herein.

[64] Dkt. 12 at 12; Szabo Depo. (Ex. D) 66:6-10.

[65] *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015).

specific motivating ideology or the opinion or perspective of the speaker."[66] "For example, a law banning the use of sound trucks for political speech—and only political speech—would be a **content**-based regulation, even if it imposed no limits on the political **viewpoints** that could be expressed."[67] Plaintiffs, and the Platforms, not only seem to be unaware of the Supreme Court's definition of these terms but also could not answer why they would be irrelevant to construing H.B. 20's provisions, which use both terms.[68]

Looking at the plain language of H.B. 20, the law clearly contemplates the continued ability of the Platforms to choose which content it does not want on their platforms. H.B. 20 requires each Platform to have what they already possess - an "acceptable use policy" – in which they determine what "the types of content allowed on the[ir] social media platform" are.[69] It further dictates that users should be able to notify the Platforms of "content that potentially violates the acceptable use policy, illegal content, or illegal activity."[70] The statute in fact is replete with reference to "potentially policy-violating content," suggesting that content moderation policies are not prohibited by H.B. 20 nor are the actions taken under those policies.

Given that H.B. 20 does not dictate what content – or subject matter – the Platforms must or must not permit on their sites, it logically follows that the plethora of examples of content they would be "forced" to display are irrelevant. Content categories such as "terrorist speech," "pornography," "spam," or "racism" are not suddenly going to flood these Platforms as they claim if those Platforms prohibit them in their acceptable-use policies. These examples become

---

[66] *Id.*
[67] *Id.* at 169 (emphasis added).
[68] Vietch Depo. (Ex. C) 115:10-117:19; Schruers Depo. (Ex. E) 81:20-82:15.
[69] Tex. Bus. & Com. Code § 120.052.
[70] *Id.* at 120.052(b)(3).

even more illogical where they clearly encompass the obvious carve out that allows continued censorship authorized by federal or state law as well as otherwise unlawful speech as H.B 20 defines it.[71] Given this, Plaintiffs, their Platforms and their declarants' claims that H.B. 20 requires content such as incitement of criminal activity, threats of harm, or depictions of sexual abuse to be present on their Platforms appears no more than deliberately misleading.[72]

Thus, "[n]othing in [H.B. 20] imposes a restriction, penalty, or burden by reason of the views" the Platforms have.[73] H.B. 20 clearly contemplates that it is still the Platforms that determine what content they want to host on their sites. And Plaintiffs do not suggest that they challenge H.B. 20 on the ground that the Platforms can choose what content to permit or deny. Facebook, at least, has stated this is the exact type of law it would "favor," that is, a law that allows them to maintain the ability to dictate what content they are moderating."[74]

It is only once a type of content is or is not allowed that all viewpoints within that content category require the same treatment – lack of discrimination by the Platforms.  For example, a Platform is clearly permitted, under H.B. 20, to ban all content that amounts to "pornography."[75] But once that category is a part of their acceptable use policy, the Platform is required to treat all content that meets *its* definition of pornography in the same way – removing it from their site – regardless of viewpoints expressed therein. And, alternatively, if a Platform determines that it

---

[71] Tex. Civ. Prac. & Rem. Code § 143A.006.

[72] Potts Decl. (Dkt. 12-4) at ¶¶13-14, 21 (claiming H.B. 20 will "significantly undermine, if not outright prevent, Facebook from enforcing its content policies" such as – "violence and criminal behavior" and "content shared by terrorists"); *but see* Potts Depo. (Ex. B) 127:14-128:19 (acknowledging the carve out in Tex. Civ. Prac. & Rem. Code § 143A.006); *see also* Rumenap Decl. (Dk. 12-6) at ¶9 (claiming H.B. 20 would impede the ability to remove content that would "enable child predation and harm children") *but see* Rumenap Depo. (Ex. F) 30:23-31:1, 57:23-58:7 (acknowledging the content stated in her declaration is illegal).

[73] *Turner Broad. Sys., Inc.*, 512 U.S. at 644.

[74] Potts Decl. (Ex. B) ¶¶49:15-21.

[75] *Id.*; Dkt. 12-2 (Facebook Decl.) at ¶14.

wants to host, for example, political speech, it is only thereafter that they cannot utilize viewpoint discrimination when conveying material within that content category.[76] Notably, while first claiming that they simply could not determine the difference between "content" and "viewpoint," Plaintiffs and the Platforms have since attested to knowing the difference in practice.[77]

H.B. 20's provisions are aimed entirely at the Platforms in their operation as publicly accessible conduits for the speech of others, not as authors or editors engaged in their own publication. This sort of distinction has long been ingrained in federal law—including 47 U.S.C. § 230(c)(1), which distinguishes between information provided by an interactive computer service and "information provided by another information content provider." Thus, even Congress has recognized that there is a distinction between the Platforms' own speech and the speech of others for which they provide a conduit. When they are acting in the latter capacity, it is well recognized that the government may "impose burdens and confer benefits without reference to the content of speech."[78] Here, where all H.B. 20 regulates is an action – viewpoint discrimination – against all speech, without distinction, the Platforms are in no way prohibited from content moderation. If anything, H.B. 20 *permits* the Platforms to continue doing the very content moderation they are doing already.[79]

---

[76] As discussed further below (Section II), the distinction between "content" and "viewpoint" has clearly been made by the Supreme Court.

[77] Schuers Depo. (Ex. E) 78:9-79:7; Vietch Depo. (Ex. C) 44:9-13.

[78] *Turner Broad. Sys., Inc.*, 512 U.S. at 643.

[79] Brian Stelter, *Twitter's Jack Dorsey: 'We are not' discriminating against any political viewpoint*, CNN, Aug. 20, 2018 (https://cutt.ly/3TSoYrd) (Twitter CEO, Jack Dorsey, explaining: "We do not look at content with regards to political viewpoint or ideology. We look at behavior."); *Facebook, Google and Twitter: Examining the Content Filtering Practices of Social Media Giants: Hearing Before H. Comm. on the Judiciary*, 115th Cong. 2 (2018) (statement of Nick Pickles, Senior Strategist, Public Policy, Twitter, Inc.) (Assuring a committee of the U.S. House of Representatives that Twitter's rules "are not based on ideology or a particular set of beliefs" but instead "based on behavioral contexts."); *Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before Subcomm. on the Const.*

### 3. *Automatically Applied Engagement Algorithms Are Not Speech.*

Even to the extent this Court finds it "likely" Section 7 of H.B. 20 burdens the Platforms' moderation of content, rather than prohibiting their viewpoint discrimination practices, Plaintiffs' First Amendment claim nonetheless fails as the way in which the Platforms determine content is not speech.[80] Although initially making only an "as-applied" challenge to Section 7 of H.B. 20, Plaintiffs have since attempted to bring a facial challenge as well.[81] Neither challenge suffices to support a preliminary injunction because *what* these algorithms are doing is a critical, and so far, unexplained, aspect of this case.

To hold otherwise would be to accept Plaintiffs' position that *all* algorithms, no matter the level or consistency of human involvement, are *always* speech. But algorithms can often be automated mechanical devices for shunting different information to different users. So a simplistic holding that algorithms are speech is far too broad to be anything other than problematic.[82] Jurisprudence and a comprehensive understanding of the functionality of algorithms dictates that the proper approach is to consider their function in particular instances before leaping to the one-dimensional overgeneralization that they are speech

Such an approach requires analysis of evidence, which was not entirely possible after Plaintiffs sought preliminary injunction. It is all the more difficult because, even while claiming

---

*of the S. Comm. on the Judiciary*, 116th Cong. 1 (2019) (informing a subcommittee of the U.S. Senate that "Twitter does not use political viewpoints, perspectives, or party affiliation to make any decisions, whether related to automatically ranking content on our service or how we develop or enforce our rules.").

[80] This section is only included as an alternative to the extent this Court finds Plaintiffs likely to succeed on a claim that their algorithms do not operate to discriminate based on a viewpoint – an obviously prohibited activity for common carriers.

[81] *Compare* Dkt. 1 *with* Dkt. 12.

[82] For example, algorithms are used to operate a car alarm. While such algorithms contain information communicated to a car and the car makes an outward noise, Plaintiffs would be hard pressed to find a court that considers that algorithm speech.

their algorithms are speech, Plaintiffs do not know, and have never seen, what those algorithms are, or look like, in practice.[83] For Plaintiffs to be "likely to succeed," this Court cannot simply take their word for it that the Platforms' algorithms operate to express viewpoints. After all, a "**[p]recise** identification of protected speech is necessary for the Court" in proving a First Amendment claim.[84] In other words, where a plaintiff claims harm "for making statements protected by the First Amendment, [the plaintiff is] required to be specific as to when [its] statement or statements were made, to whom they were made, whether they were oral or written, and **the content** of those statements."[85]

The only detail Plaintiffs provide as to the Platforms' "content moderation" algorithms are that they are automatically applied.[86] Thus, these algorithms operate without a need for any human initiating the process *or* reviewing the results thereafter.[87] It is therefore the Platforms' automatic AI, not the Platforms themselves, that make almost all of the decisions related to user generated content.[88]

And the decisions being made by this AI are for the purpose of increasing user engagement with content, not for expressing any particular "viewpoint" held by the Platforms.[89] In contrast to the Platforms' self-serving documentation, many sources dispute the Platforms' claim that the

---

[83] Szabo Depo. (Ex. D) 69:9-73:11; Schruers Depo. (Ex. E) 127:5-128:10, 153:13-154:1. While there are an unspecified number of members that Plaintiffs may know this information for, they have refused to provide any evidence on those algorithms. Szabo Depo. (Ex. D) 70:6-11, 71:22-72:9.

[84] *Crampton v. Weizenbaum*, No. A-16-CA-00959-SS, 2017 WL 5474020, at *6 (W.D. Tex. Nov. 14, 2017), *aff'd*, 757 F. App'x 357 (5th Cir. 2018) (emphasis added).

[85] *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 342 (5th Cir. 2003) (emphasis added).

[86] Szabo Depo. (Ex. D) 69:9-73:11; Schruers Depo. (Ex. E) 153:13-154:1

[87] Potts Depo. (Ex. B) 189:24-25 ("all content is subject to review on Facebook via automation."); Vietch Depo. (Ex. C) 69:18-70:2; Potts Decl. (Dkt. 12-4) at ¶14 ("Facebook's artificial intelligence systems find more than 90% of the content they remove before anyone reports it."); Szabo Depo. (Ex. D) 86:16-17 ("Algorithms are used alongside, *potentially*, human review").

[88] Potts Depo. (Ex. B) 62:3-7; Vietch Depo. (Ex. C) 69:18-22 ("a piece of content that appears on our platform that violates our policies but is, nonetheless, on our platform may never have been reviewed by either human or machine.").

[89] Potts Depo. (Ex. B) 15:5-14; Vietch Depo. (Ex. C) 30:3-33:13.

Platforms use algorithms to moderate content in a way that expresses their opinions or viewpoints. And the Platforms concede they do not receive financial gain by expressing their own viewpoints through the choices made with their algorithm.[90] Instead, the Platforms "derive profit from having users stay 'engaged' on their platform…The longer a user stays engaged, the more exposure advertisements receive."[91] As Plaintiffs concede, "advertising [is] a **necessary** mechanism [for Platforms] to remain in business."[92] Thus, there is evidence that the automatically applied algorithms that Plaintiffs seek to "deem speech" do no more than facilitate communication that increases user engagement, which, in turn, increases advertisement profit.[93] These kinds of algorithms "are simply computer code, programmed to weigh several criteria and produce a result."[94] They do not express a viewpoint; they only prominently feature content, and advertisements, that users will be more likely to click on.[95]

      Nothing in the record suggests the algorithms at issue function in any way other than solely to facilitate the flow of information to an audience. Plaintiffs present no evidence in support of their claim that the Platforms' algorithms edit user-generated content to express the Platforms' viewpoints. As Greg Marra, the Facebook engineer whose team designs the code that drives Facebook's News Feed, has plainly stated: "We try to **explicitly view ourselves as not editors** …

---

[90] *See* Potts Depo. (Ex. B) 128:24-25, 129:2-12 (stating Facebook revenue comes "primarily through advertising" and account for somewhere between 80%-100% of revenue); Vietch Depo. (Ex. C) 92:14-15 (stating "[YouTube's] advertisers . . . are the source of --or what sustain our business.").

[91] Sang Ah Kim, *Social Media Algorithms: Why You See What You See*, 2 Geo. L. Tech. Rev. 147 (2017); Vietch Depo. (Ex. C) 92:14-15.

[92] Dkt. 12-2 (Szabo Decl.) at ¶10 (emphasis added); Potts Depo. (Ex. B) 129:2-12.

[93] Kerri A. Thompson, *Commercial Clicks: Advertising Algorithms As Commercial Speech*, 21 Vand. J. Ent. & Tech. L. 1019, 1031 (2019).

[94] *Id.*

[95] Schruers Depo. (Ex. E) 148:7-16 ("user engagement increases the likelihood that the site can serve to the user advertisements that are relevant to the user's interests with which the user may interact. And that is a -- when that happens, the matchmaker function of the platform has been achieved, and that is value to the user. That is what a ad-supported digital service looks to do.").

**We don't want to have editorial judgment** over the content that's in your feed. You've made your friends, you've connected to the pages that you want to connect to and you're the best decider for the things that you care about."[96] Thus, these Platforms take deliberate steps to ensure their algorithms are rotely applied to content only to ensure what users, and in turn advertisers, want to engage in.[97] That engagement is sought through algorithms purely to make money.

In sum, there is no basis, currently, for the Court to find that Section 7 of H.B. 20 targets algorithms used by the Platforms for the purposes of expression because there is no way to discern when algorithms are being used to express a viewpoint, to increase engagement for ad revenue, or both. At a minimum, the evidence shows that not *all* algorithms used by the Platforms are for the purposes of expressing viewpoints of those Platforms. Thus, an injunction on the basis of Plaintiffs' delayed facial challenge could not succeed where not all applications of H.B. 20 are unconstitutional.[98] Even as to their as-applied challenge, Plaintiffs, and their declarants, provide no evidence as to each covered Platform's use of viewpoint algorithms versus engagement algorithms.[99] Nor do they explain how *any* of their algorithms operate in conjunction with human input rather than just being rotely applied outside of human interference.[100] With a current record where what is being used and whether it is speech remains unknown, an injunction providing as applied relief would be improper.[101]

---

[96] Ravi Somaiya, *How Facebook Is Changing the Way Its Users Consume Journalism*, The New York Times, Oct. 27, 2014 (https://nyti.ms/3ommZXb) (emphasis added).

[97] *See* Philip M. Napoli, Sanford Sch. of Pub. Policy, & Robyn Caplan, Data & Soc'y Research Inst., *When Media Companies Insist They're Not Media Companies and Why It Matters for Communications Policy*, Sept. 30, 2016 (https://ssrn.com/abstract=2750148); *see also* Dkt. 12-4 at ¶5 ("News Feed uses algorithms to show a constantly updated and personalized list of stories.").

[98] *See, infra,* Section II.

[99] Dkts. 12 – 12-4; Potts Depo. (Ex. B) 41:13-19; Szabo Depo. (Ex. D) 70:6-11, 71:22-72:9.

[100] *Id.*

[101] *See, infra,* Section II.

4.  ***To the Extent the Platforms' Engagement Algorithms Discriminating Against Viewpoint Are Speech, They Are Commercial Speech that H.B. 20 Constitutionally Regulates.***

Even if this Court finds the Platforms' engagement algorithms constitute speech that H.B. 20 regulates, an injunction is still improper because this speech falls under the category of commercial speech. In explaining the distinction between commercial speech and other forms of speech, the Supreme Court has emphasized that commercial speech is both "more easily verifiable by its disseminator" and less likely to be "chilled by proper regulation."[102]

Engagement algorithms are commercial speech. Engagement algorithms match users' interests to commercial advertisers. The message, or speech, of the algorithm is to match user information to the advertiser, targeting users who are more likely to accept the advertiser's message and engage in a commercial transaction by clicking on the advertisement.[103] Given that, as Plaintiffs claim, advertisers are "the main source of revenue" for the Platforms it logically follows that the engagement algorithms are what make that revenue possible.[104]

Recognizing that engagement algorithms are commercial speech also supports a public shift in how the Platforms are viewed. When a user speaks through a Facebook, Twitter or YouTube post, these Platforms have ultimate control in whether that speech is heard. The Platforms are much more than a free tool for building social connections and communicating freely with friends and family. Rather, they are private companies that sell the data they collect to advertisers.[105] The

---

[102] *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976).
[103] *See Pittsburgh Press Co. v. Human Rel. Comm'n*, 413 U.S. 376, 385 (1973).
[104] *See* Dkt. 12-2 (Szabo Decl.) at ¶8; *see also id.* at ¶10 (Stating the Platforms "rely on advertising as a necessary mechanism to remain in business."); *see also* Potts Depo. (Ex. B) 128:24-25, 129:2-12 (stating Facebook revenue comes "primarily through advertising" and account for somewhere between 80%-100% of revenue); *see also* Vietch Depo. (Ex. C) 92:14-15 (stating "[YouTube's] advertisers . . . are the source of --or what sustain our business.").
[105] Kalev Leetaru, *What Does It Mean For Social Media Platforms To "Sell" Our Data?* Forbes, Dec. 15, 2018 (https://cutt.ly/oTPk0Qr) ("Social media platforms often generate the majority of their revenue through selling

Platforms' speech, like the speech of advertisers, can and should be regulated in order to protect consumers.

Because engagement algorithms are commercial speech, the *Central Hudson* test controls, which determines whether commercial speech receives absolute First Amendment protection or whether they may be regulated by the government.[106] The *Central Hudson* criteria for determining whether government regulation of commercial speech is constitutional is whether (1) the expression is protected by the First Amendment[107] (information that is unlawful or misleading is not protected), (2) the government has a substantial interest in regulating the speech, (3) the regulation reasonably relates to the asserted government interest, and (4) the regulation is reasonably fit to serve that interest.[108]

The government has a substantial interest in regulating the speech at issue here. The automated engagement algorithms of Facebook, Twitter or YouTube alone have resulted in, for example, the amplification of terrorist propaganda,[109] and pedophilia;[110] they have even had traceable effects upon presidential elections.[111] This is because, currently, there are few limits on

---

hyper targeted advertising based on algorithmically mining every second of their unwilling and unwitting users' lives.").

[106] *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980) (Holding the "Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."); *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) ("When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, or requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review.").

[107] This factor will be assumed for the purposes of this section. *But see*, *supra*, Section I.A.

[108] *Central Hudson Gas & Electric*, 447 U.S. at 566; *see also Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010); *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989).

[109] *See* Rupert Neate, *Extremists Made £250,000 from Ads for UK Brands on Google, Say Experts*, Guardian, Mar. 17, 2017 (https://cutt.ly/dTAfC8V).

[110] Jesselyn Cook, *YouTube Is A Pedophile's Paradise, Huffington Post UK*, Mar. 21, 2020 (https://cutt.ly/UTAfJBl).

[111] *See* Honest Ads Act, S. 1989, 115th Cong. § 7 (2017); *see also, e.g.*, Sebenius, Alyza, *Should Facebook Ads Be Regulated Like TV Commercials?*, The Atlantic, Sept. 14, 2017 (https://cutt.ly/STAf0PA) (reporting that "Facebook disclosed to congressional investigators that it sold $100,000 worth of advertisements to a troll farm connected to the Kremlin surrounding the U.S. presidential election."); *see also* Ryan Mac, *Internal Alarm, Public Shrugs: Facebook's Employees Dissect Its Election Role*, NY Times, Oct. 22, 2021 (https://nyti.ms/3DbNVit).

how the Platforms can select data to sell or which categories it can offer. This lack of regulation has given advertisers the ability to bid on categories based on any information the Platforms collect, even if the advertisers want to target users based on their interests that will amplify their anger or hate.[112]

Thus, unlike the publication of, for example, a price list, as was at issue in *44 Liquor Mart v. Rhode Island*, the algorithms here are not publishing information that the public needs to make an informed decision about purchasing goods or services.[113] The algorithms do not publish any information to users or to advertisers, but rather invisibly match interests and users without informing either party to the transaction of exactly how they were matched. And this matching occurs with no regard to the echo chamber it creates for its users to reinforce their existing viewpoints no matter how harmful.[114] Thus, Texas has obvious interests in "preventing deception to consumers"[115] about the scope and practice of censorship on the Platforms, and in ensuring public forums that allow for the "free exchange of ideas and information."[116]

H.B. 20 reasonably relates to these interests. The provisions Plaintiffs challenge require transparency and neutrality in the content that the Platforms choose to display. The Platforms' current censorship practices are very different than ones that promote a democratic culture. There is a skewed exchange of ideas in the Platforms that prevents a search for the truth. On the contrary,

---

[112] Julia Angwin, Madeleine Varner & Ariana Tobin, *Facebook Enabled Advertisers to Reach 'Jew Haters'*, ProPublica, Sept. 14, 2017 (https://cutt.ly/XTAgk1a).

[113] 517 U.S. 484, 496 (1996).

[114] *See* Michela Del Vicario et al., *The Spreading of Misinformation Online,* 113 Proc. Nat'l Acad. Scis. U.S. Am. 554, 558 (2016) (http://www.pnas.org/content/pnas/113/3/554.full.pdf) (stating "[u]sers tend to aggregate in communities of interest, which causes reinforcement and fosters confirmation bias, segregation, and polarization. This comes at the expense of the quality of the information and leads to proliferation of biased narratives fomented by unsubstantiated rumors, mistrust, and paranoia").

[115] *Milavetz, Gallop & Milavetz*, 559 U.S. at 249-50.

[116] *See* Katie Benner, Glenn Thrush and Mike Isaac, *Facebook Engages in Housing Discrimination With Its Ad Practices, U.S. Says*, New York Times, Mar. 28, 2019 (https://cutt.ly/LTAgxV4).

when the Platforms engage in viewpoint censorship, mutual understanding between groups becomes harder, leading to group polarization. Although these Platforms publicly claim that they "give people the power to build community … strengthen our social fabric and bring the world closer together,"[117] their viewpoint discrimination practices currently undermine that goal. The information environment these Platforms' preside over undermines the notion of individual autonomy in the selection and consumption of content and threatens the viability of a functioning marketplace of ideas.

Prohibiting of the free exchange of ideas is exactly what H.B. 20's provisions are aimed at regulating. H.B. 20's transparency provisions require the common carrier Platforms to disclose their content moderation practices in a manner "sufficient to enable users to make an informed choice regarding the purchase of or use of access to or services from the platform" thereby allowing users to know what the Platforms' consumer practices and results actually look like. And H.B 20's neutrality provisions ensure users are not confined to the viewpoint they give as input to an algorithm, destroying the marketplace of ideas and undermining the effectiveness of counterspeech. Texas is clearly permitted to regulate the commercial speech at issue here, which is deceiving users,[118] and effects the public interest.[119]

### 5. *H.B. 20 is a Content Neutral Statute that Survives Any Level of Scrutiny.*

The key dividing line in First Amendment law is whether or not a regulation "target[s] speech based on its communicative content."[120] Content-based laws "are presumptively

---

[117] Josh Constine, *Facebook Changes Mission Statement to 'Bring the World Closer Together,'* TechCrunch, Jun. 22, 2017 (https://cutt.ly/STAgYJq) (internal quotations omitted).
[118] *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985)
[119] *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 843 (9th Cir. 2019); *New York State Restaurant Ass'n v. New York City Bd. Of Health*, 556 F.3d 114 (2d Cir. 2009).
[120] *Reed*, 576 U.S. at 163.

unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[121] By contrast, the Court has "afforded the government somewhat wider leeway to regulate features of speech unrelated to its content."[122]

As the Supreme Court has explained, a "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."[123] By contrast, a law is content neutral if its restrictions are "justified without reference to the content of the regulated speech."[124] "The principal inquiry," therefore, "in determining content-neutrality … is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."[125]

H.B. 20's operation does not turn on "the topic discussed or the idea or message expressed."[126] Instead, it regulates all social media platforms, regardless of political preferences, without reference to specific types of content or viewpoint in any way. H.B. 20 permits social media platforms to make their own determinations of what content to permit on their sites. It then prohibits any viewpoint discrimination, rather than discrimination only as to one type of viewpoint. H.B. 20 is similar to the ordinance upheld as content neutral in *Roark & Hardee LP v. City of Austin*.[127] There, the Fifth Circuit was faced with a law that required bar owners to take "necessary steps" to enforce the "smoking ban" that the law imposed. Despite acknowledging the provision for "necessary steps" would obviously require some "speech" in order to enforce the ban, the Fifth Circuit nonetheless determined it was content-neutral. In sum, "the ordinance regulate[d]

---

[121] *Id.*
[122] *McCullen v. Coakley*, 134 S. Ct. 2518, 2529 (2014).
[123] *Reed*, 576 U.S. at 171.
[124] *Boos v. Barry*, 485 U.S. 312, 320 (1988) (plurality).
[125] *Ward*, 491 U.S. at 791.
[126] *Reed,* 576 U.S. at 155.
[127] 522 F.3d 533, 550 (5th Cir. 2008).

Plaintiffs' conduct, not speech[,]" and, importantly, the "bar owners and their employees remained free to express whatever views they have on the ordinance."[128]

So too here. H.B. 20 may dictate the need for an "accessible use policy," but it does not say what content that policy must or must not permit.[129] In other words, the very policies that the Platforms have and want to continue to have are precisely what H.B. 20 allows.[130] As in *Roark*, the Platforms covered by H.B. 20 are "free to express whatever views" they have and are only limited by their own decisions as to the categories of content they decide to permit on their sites, or not.

Because H.B. 20 is content- and speaker-neutral, Plaintiffs must show a likelihood of success that it cannot survive intermediate scrutiny. Regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, "because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."[131] A content-neutral regulation must be sustained "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."[132] The "evidentiary burden" on this matter "is very light;" "only 'some evidence' is required."[133]

Texas has several significant interests that are served by H.B. 20. First, the Supreme Court has long recognized a significant government interest in the free and unobstructed use of public forums and of the information conduits provided by common carriers.[134] While the public forum

---

[128] *Id.*

[129] Tex. Bus. & Com. Code § 120.052.

[130] And, thus, why Plaintiffs cannot show their members will be injured as a result of H.B. 20. *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (emphasis added) ("Equitable remedies, like remedies in general, are meant to redress the injuries sustained *by a particular* plaintiff in a *particular* lawsuit.").

[131] *Turner Broad. Sys., Inc.*, 512 U.S. at 642.

[132] *U.S. v. O'Brien*, 391 U.S. 367, 377 (1968) (emphasis added).

[133] *Lauder, Inc. v. City of Houston, Tex.*, 751 F. Supp. 2d 920, 930 (S.D. Tex. 2010), aff'd sub nom. *Lauder, Inc. v. City of Houston, Tex.*, 670 F.3d 664 (5th Cir. 2012) (quoting *Illusions—Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 312 (5th Cir. 2007))

[134] *See, e.g., Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 650 (1981).

jurisprudence developed out of cases involving traditional public forums, the interest is even more significant when the public forum is digital. After all, the Supreme Court has recognized the public forums the Platforms provide as our "modern public square."[135] And, it has also required that "the significance of the governmental interest . . . be assessed in light of the characteristic nature and function of the particular forum involved."[136] That this "public square" is one that reaches much further– globally, in fact – than any other public squares in history is a "special attribute[ ]" of the Platforms that is particularly "relevant to the constitutionality of [H.B. 20]"[137] as well as the necessity of protections against viewpoint discrimination in common carrier conduits. As with public safety, H.B. 20 has narrowly tailored regulations that permit the Platforms to retain control over content, while ensuring that, once that content is permitted, the public is not obstructed from viewpoints the Platforms would otherwise discriminate against.

Second, Texas has a well-recognized governmental interest in "provid[ing] individual citizens effective protection against [discriminatory] practices," including discriminatory practices by common carriers.[138] Here, those discriminatory practices are clear.[139] Antidiscrimination laws are familiar limits on speech. The U.S. has a range of local, state and federal antidiscrimination laws with significant speech consequences.[140] For example, one has a First Amendment right to bigoted speech, but not, according to the courts, in circumstances that, for example, amount to discrimination in employment or public accommodations. As Courts have

---

[135] *Packingham*, 137 S.Ct. at 1737.
[136] *Heffron*, 452 U.S. at 650–51.
[137] *Id.*
[138] *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979); *see also United States v. Paradise*, 480 U.S. 149, 170 (1987).
[139] Eugene Volokh, *Trump has a point: Facebook's policing of speech is ominous*, Washington Post, Jul. 15, 2021 (https://cutt.ly/VTAkxtN).
[140] 42 U.S.C. § 2000e, et seq.; 29 U.S.C. § 621-634; 42 U.S.C. § 12101, et seq.; Tex. Labor Code § 21.001, et. seq.; University of Texas at Austin Nondiscrimination Policy, Operating Procedure 3-3020 (https://cutt.ly/STSpZCT).

not held these discrimination laws fail to serve the significant governmental interest of protecting the public from discriminatory practices in other contexts, there is no reason to hold as such for the Platforms.

Thus H.B. 20 clearly passes intermediate scrutiny. However, even if this Court determines strict scrutiny applies, the result is the same. Regardless of whether the Platforms are in some sense engaged in their own speech when they physically exclude the speech of others, there is a compelling government interest in barring viewpoint discrimination in these common carrier conduits—and also in public forums. Such laws protecting the public in the information conduits provided by common carriers have consistently been upheld as constitutional.[141] H.B. 20 thus rests on a compelling government interest and is narrowly tailored to this end.

### 6. *H.B. 20's Disclosure Requirements are Constitutional for Additional Reasons*

In addition, Plaintiffs cannot plausibly succeed in their challenge to Section 2 of H.B. 20 because that Section simply requires the Platforms to make certain factual, uncontroversial disclosures about how their products operate in practice. It is well-established that the First Amendment is not offended when government requires commercial enterprises to disclose certain undisputed facts about their products.[142] That is why businesses may be required to disclose information such as calorie counts, a product's country-of-origin, or whether a product contains certain hazardous material.[143] Plaintiffs claim that H.B. 20's disclosure requirements are too burdensome to be constitutional, ostensibly because they require Plaintiffs to disclose too much

---

[141] *Primrose v. Western Union Telegraph Co.*, 154 U.S. 1, 14 (1894) (telegraph companies); *Olcott v. Fond du Lac County*, 83 U.S. 678 (1872) (railroads); *Turner Broad. Sys., Inc.*, 512 U.S. at 622 (broadcast television).

[142] *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

[143] *See, e.g.*, *New York State Rest. Ass'n v. New York City Bd. Of Health*, 556 F.3d 114, 131-32 (2d Cir. 2009); *CTIA-The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 843 (9th Cir. 2019); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015).

information, and too frequently.[144] That is wrong; and if adopted it would render unconstitutional countless well-established disclosure laws, such as SEC reporting requirements (*i.e.*, 10-Qs) and campaign finance disclosures.

## II.    VAGUENESS AND OVERBREADTH

"Succeeding on a vagueness claim requires more than showing that an enactment requires a person to conform his conduct to an imprecise standard."[145] Instead, a plaintiff must show a complete absence of a standard of conduct.[146] Here, although seeking only "as applied" relief in their complaint, Plaintiffs insist in their PI motion that H.B. 20 is unconstitutionally vague "both facially and as applied."[147] Additionally, inconsistent with their Complaint, Plaintiffs also now claim H.B. 20 is "unconstitutionally overbroad."[148]

It is neither too vague nor overbroad.

Plaintiffs cannot meet their burden of likelihood of success on the merits as to either their facial challenge or their as applied challenge. Plaintiffs do not identify how the provisions are vague in all applications nor do they explain the basis for the Platforms' inability to know what is required of them under the law. For similar reasons, their new overbreadth challenge must also fail.

### A.  H.B. 20 is Facially Valid.

At a threshold level, Plaintiffs confront a heavy burden in advancing a facial constitutional challenge to an ordinance. "Facial adjudication carries too much promise of 'premature interpretatio[n] of statutes' on the basis of factually barebones records."[149] Thus, "[f]acial

---

[144] Dkt. 12 at 32-35.
[145] *Leibowitz v. City of Mineola, Tex.*, 660 F. Supp. 2d 775, 786 (E.D. Tex. 2009).
[146] *Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971).
[147] *Id.* at 37.
[148] *Id.* at 46.
[149] *Sabri v. United States*, 541 U.S. 600, 609 (2004).

invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort."[150]

Plaintiffs have fallen short of showing they are likely to succeed in meeting this heavy burden. When considering a facial challenge to the vagueness of a law, "a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct."[151] A facial challenge to an enactment that does not implicate constitutionally protected conduct fails unless the enactment is "impermissibly vague in all of its applications."[152]

Plaintiffs' first error is failing to identify any constitutionally protected conduct that H.B. 20 impacts.[153] Plaintiffs also fail to demonstrate how H.B. 20 is vague in *all* of its applications.[154] Plaintiffs specify four ways in which H.B. 20 is vague: (1) the phrase "equal access to or visibility" to content as contained in the definition of "censorship;" (2) the definition of "social media platform;" (3) the phrase "*potential* violation;" and (4) that the Attorney General is permitted to sue over a Platforms' failure to follow the disclosure requirements in Section 2.[155]

But other than making broad statements that some of their unidentified members may by unable to interpret each one of these phrases or requirements, Plaintiffs make no attempt to support their facial challenge.[156] "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications[.]'"[157] Plaintiffs do not suggest any of these challenged

---

[150] *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (internal quotation omitted).
[151] *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982).
[152] *Id.*
[153] *See, supra,* Sections I, III-IV.
[154] *See, supra*, Section I.A.3.
[155] Dkt. No 12 at 37-39.
[156] Dkt. No 12 at 37 (Stating first provision "*could* prohibit social media platform from displaying content in the proper feeds of its users.").
[157] *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quoting *United States v. Raines,* 362 U.S. 17, 23 (1960)).

provisions would be invalid in the "vast majority" of intended applications, indeed, they fail to mention a *single* one of their own members that would find each of the provisions so vague as to make them unequivocally impossible to comply with.[158]

There is no evidence to indicate all social media platforms have "feeds" designed in a way that would make "equal access to or visibility" an issue. And Plaintiffs admitted that a number of their own members clearly fall within the definition of "social media platform;"[159] they also readily understand themselves to be "interactive computer services" in order to benefit from the protections of 47 U.S.C. § 230. [160] "Potential violation" cannot possibly be vague in all aspects given that it is a phrase contained in the federal statutes Platforms are regulated by.[161] And there is nothing vague about the identification of a specific enforcement authority for failure to perform tasks enumerated in a specific section of H.B. 20.[162]

If even one set of circumstances exists in which the State can constitutionally apply a challenged statute to non-primary parties, Plaintiffs' claim fails.[163] This result follows the principles of judicial restraint that must be employed before a federal court may declare a state law unconstitutional. "[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."[164] As Plaintiffs' motion is devoid of even the argument that their

---

[158] Dkt. 12; Szabo Decl. (Dkt. 12-2); Schruers Decl. (Dkt. 12-1).
[159] Szabo Depo. (Ex. D) 63:5-64:3; Schruers Depo (Ex. E) 38:19-39:14.
[160] Vietch Depo. (Ex. C) 48:2-8.
[161] *See, e.g.,* 15 U.S.C.A. § 7a-3 (discussing "a *potential violation* of the antitrust laws" in the context of whistleblower protection).
[162] Of note, none of the declarations submitted in support of Plaintiffs' PI motion claim that the granting of the Attorney General's authority to enforce Section 2 is vague in any way. Dkt. Nos. 12-1 – 12-10.
[163] *Id.*; *see also Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015).
[164] *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 451 (2008).

challenged provisions would be vague in *all* applications, they have failed to show their facial challenge is likely to succeed.

### B.  H.B. 20 is Constitutional As Applied to the Platforms.

Plaintiffs' as applied challenge is based on the same challenged provisions as their facial challenge.[165] "While rejection of a facial challenge to a statute does not preclude all as-applied attacks, surely it precludes one resting upon the same asserted principle of law."[166] Thus, as an initial matter, they fail on this basis.

Plaintiffs and the Platforms submitted declarations and sat for deposition testimony as to the claims in their case, including where the law is vague as applied to them. Not once did a declarant or a deponent detail how the above provisions left them unable to "know what is required of them so they may act accordingly."[167] In fact, the only basis for vagueness continuously assert by all was a claimed inability to understand what was meant by the use of "viewpoint" in H.B.  20. But, as discussed previously, "viewpoint" and "content" are two distinct and readily distinguishable terms, which are familiar from the Supreme Court's First Amendment jurisprudence.[168] Thus, Plaintiffs as applied challenge cannot survive on the disingenuous insistence that H.B. 20 requires them to get rid of their content moderation policies and practices and allow unwanted speech on their sites.

### C.  H.B. 20 is not Overbroad.

---

[165] *See, supra,* Section II.A.
[166] *In re Cao,* 619 F.3d 410, 430 (5th Cir. 2010) (quoting *Penry v. Lynaugh,* 492 U.S. 302, 354 (1989) (Scalia, J., dissenting)).
[167] *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).
[168] *See, supra,* Section I.A.2.

A statute is overbroad under the First Amendment if the terms of the challenged statute are broad enough to suppress protected speech.[169] The overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantially judged in relation to the statute's legitimate sweep.[170] To attack a statute on overbreadth grounds, a plaintiff must show either that every application of the statute creates an impermissible risk of the suppression of ideas, or that the statute is "substantially" overbroad, meaning there is a realistic danger that the statute itself will significantly compromise First Amendment protections of third parties.[171]

Plaintiffs show neither. Instead, as discussed above, H.B. 20 does not threaten the Platforms' right to be free from compelled protected speech.[172] And there is no evidence in the record to suggest H.B. 20 will compromise the First Amendment rights of third parties; in fact, there is evidence as to the exact opposite. After all, Plaintiffs, their declarants, and the Platforms all have insisted a First Amendment harm exists based entirely on the impact to the Platforms' content-moderation policies and practices.[173]   But since H.B. 20 clearly permits content moderation to continue to occur,[174] and only prohibits viewpoint discrimination from common carriers, there are no First Amendment issues that "overbreadth" within H.B. 20 would compromise.

### III.   H.B. 20 is Not Preempted by Section 230.

---

[169] *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

[170] *See City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15 (1973)).

[171] *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988).

[172] *Roark & Hardee LP*, 522 F.3d at 550 (finding smoking bans not to be overbroad because they were entirely targeted at conduct and any speech that was compelled was "plainly incidental[.]").

[173] Dkt. 12 at 12; Szabo Depo. (Ex. D) 66:6-10.

[174] *See, supra,* Section I.A.2.

Plaintiffs' argument that "H.B. 20 is preempted by the Communications Decency Act, 47 U.S.C. § 230," is irrelevant to their request for a preliminary injunction: an allegation, or even a showing, that a federal law preempts a state law does not equate to a valid cause of action.[175] Notably, Plaintiffs, while arguing at length that Section 230 preempts H.B. 20, nowhere attempt to explain how that alleged preemption provides them with a cause of action.[176] This in unsurprising, as the Supreme Court has made clear that it does not.[177]

This lack of a valid cause of action aside, Section 230 simply does not preempt H.B. 20. This is so for two reasons. Preemption is a specific concept: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."[178] The "restrictions" that H.B. 20 imposes on interactive computer services do not conflict with the "rights"—immunity from *damages* liability for third party *content* hosted— Section 230 confers on them.

H.B. 20 restricts viewpoint discrimination,[179] while Section 230(c)(2) protects interactive computer services for restricting various classes of content—but not their restriction of viewpoints.[180] Section 230(c)(2) immunizes interactive computer services for restricting "access

---

[175] Dkt. 12 at 46-48.

[176] *see*, e.g., Dkt. 12 at 47 ("Section 230 expressly preempts H.B. 20's attempt to punish content moderation.").

[177] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (emphasis added) (internal quotations and citations omitted) ("The Supremacy Clause creates a rule of decision: Courts shall regard the Constitution, and all laws made in Pursuance thereof, as the supreme Law of the Land. They must not give effect to state laws that conflict with federal laws. . . It is equally apparent that *the Supremacy Clause is not the source of any federal rights[] . . . and certainly does not create a cause of action*. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so."); *see also Alexander v. Sandoval*, 532 U.S. 275, 286-287 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress…. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.) (internal citations and quotations omitted).

[178] *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018) (internal citations and quotations omitted).

[179] *See*, *supra*, Section I.A.2.

[180] *See* 47 U.S.C. § 230; H.B. 20 § 143 A.002; *see also* supra, Section 2.

to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."[181] That "otherwise objectionable" class refers, not to objectionable viewpoints, but only to additional objectionable content—and specifically *of the same sort as the categories proceeding it*. This is so for two reasons.

First, the *ejusdem generis* canon of interpretation supports this conclusion. "*[E]jusdem generis*[] [is] the statutory canon that where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."[182] Under that canon, then, "otherwise objectionable" in § 230(c)(2) . . . should not be read 'in the abstract' as simply referring to anything that an entity views as in some way objectionable" but instead "should be read as objectionable in ways 'similar in nature' to the ways that the preceding terms are objectionable."[183] And those terms' nature is shown within Section 509 of the Communications Decency Act, the Act which formed Title V of Telecommunications Act of 1996. *See id.* at 180. That Act provides for restricting "obscene," "harassing," and "violent" content, among other things.[184]

Thus, what is "similar in nature" between the categories listed in Section 230(c)—"lewd, lascivious, filthy, excessively violent, harassing"—is that they "[a]ll refer to speech regulated in the very same Title of the Act, because they all had historically been seen by Congress as regulable

---

[181] 47 U.S.C.A. § 230(c)(2)(A).
[182] *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (internal citations and quotations omitted).
[183] Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(C)(2)*, Journal of Free Speech Law, 179 (2021) https://www.journaloffreespeechlaw.org/candeubvolokh.pdf.
[184] *See* TELECOMMUNICATIONS ACT OF 1996, PL 104–104, February 8, 1996, 110 Stat 56; Candeub & Volokh at 180-181.

when distributed via electronic communications."[185] So "otherwise objectionable" should be construed as including material analogous to "lewd…," and not materials outside of the Act.[186] [187]

Second, as explained above, the Supreme Court's freedom of speech doctrine distinguishes between content and viewpoint discrimination, and it is not plausible that Congress was unaware of that distinction when it drafted Section 230.[188] Section 230(c)(2) provides a listing of content categories, not viewpoint categories, and would have likely never passed into law had it provided an enumerated list of viewpoint categories that it protected companies for suppressing. Thus, "otherwise objectionable" must mean objectionable on grounds of content, not viewpoint. Read as encompassing viewpoint, the clause would provide a classic example of the privatization of censorship—not just relieving tech companies for censoring categories of viewpoint but rewarding companies with immunity for suppressing material in accordance with a menu of views disfavored by Congress. That would be profoundly unconstitutional under the First Amendment.[189]

Further, H.B. 20's remedy for violating the "restriction" it places on interactive computer services is non-damages remedies, whereas the "right" Section 230 confers on them is to be immune from damages actions. This independently suffices for H.B. 20 to avoid a conflict with

---

[185] *Id.* at 181.

[186] *See id.* at 183.

[187] Tellingly, the Act does not attempt to regulate political content, with Section 230(a)(3) actually lauding "interactive computer services [for] offer[ing] a forum for a true diversity of political discourse." *See id.* at 184-185; Pub. L. No. 104-104 (1996), with Section 230(a)(3).  And in one of its amendments, the Act even explicitly bans rating procedures from considering political content. *See* Pub. L. No. 104-104 (1996) § 551(b) (1) Amendment to 47 USCA § 303 ("procedures for the identification and rating of video programming that contains sexual, violent, or other indecent material about which parents should be informed before it is displayed to children: Provided, That nothing in this paragraph shall be construed to authorize any rating of video programming on the basis of its political or religious content").

[188] *See, supra*, Section I.A.2.

[189] *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995) ("It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form."); *see also Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964) (holding that Congress may proscribe discrimination by private parties).

Section 230. That Section 230(c)(2) protects only against damages actions is made clear by Section 230(e), which states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."[190] This draws a distinction between "cause[s] of action" and "liability." Consequently, while Section 230(c) provides protection from being held liable, it does not protect against causes of action generally. In other words, Section 230(c)'s protection against "liability" equates to protection only from damages—and does not bar a suit under a cause of action for a non-damages remedy, as provided for by H.B. 20.[191]

### IV.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR COMMERCE CLAUSE CLAIM.

#### A. The Dormant Commerce Clause Doctrine Applies Only When that Power is Actually Dormant, Not When, As Here, Congress Has Acted.

The dormant Commerce Clause doctrine applies only when the Commerce Clause is dormant—when that power has not been exercised by Congress.[192] In Section 230, Congress exercised its Commerce Clause power to regulate the information conduits provided by the Platforms. Section 230 is the definitive current statement of congressional legislation on the subject. And this exercise of the commerce power by Congress precludes enjoining H.B. 20 on the theory that the Commerce Clause has not been exercised or is dormant.

Far from prohibiting state legislation on social media platforms and publicly available conduits for information, Section 230(e)(3) expressly recites that it shall not be construed to

---

[190] 47 U.S.C.A. § 230(e)(3).
[191] H.B. 20 §§ 143A.007-008.
[192] "Dormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019).

prevent any state from enforcing consistent state law.[193] Although Section 230 does not authorize, and constitutionally could not authorize, state law, it clearly anticipates states laws on such conduits. And in securing social media platforms from liability for restricting material, Section 230(c)(2)(a) carefully offers a list of types of content, not viewpoints.[194] Congress thereby leaves room for state legislation barring viewpoint discrimination—precisely the sort of anti-discrimination requirement that has long been imposed on information common carriers.

So it cannot be said that the commerce power is dormant in this area. On the contrary, Congress has exercised this power and has recognized the possibility of state legislation.

Were the Court, however, to conclude that some ambiguity exists as to whether the Commerce Clause has been fully exercised here or is perhaps partially dormant, it should still decline to enjoin H.B. 20: where the foundation of the doctrine is ambiguous, so that its application might conflict with the intentions of Congress, judicially enjoining a state law on that doctrine's basis would be unwarranted. Ambiguity as to whether the Commerce Clause is dormant is no basis for applying the dormant Commerce Clause doctrine.

Application of the dormant Commerce Clause doctrine in the circumstances at hand would be especially problematic because H.B. 20 is an antidiscrimination law.[195] States have a central role in defending civil liberties, including the freedom of speech. Such a state antidiscrimination statute

---

[193] *See* 47 U.S.C.A. § 230(e)(3) ("Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").

[194] *See* 47 U.S.C.A. § 230(c)(2)(a) ("No provider or user of an interactive computer service shall be held liable on account of--any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected….").

[195] *See*, *supra*, Section I.A.2.

should not be enjoined on the basis of a judicially created and judicially empowering doctrine when doubt exists, as it does here, about the alleged underlying dormancy.

### B.  The Dormant Commerce Clause Does Not Apply to H.B. 20 Because, At Most, H.B. 20 Only Indirectly Regulates Speech.

In regulating viewpoint discrimination and thereby protecting the freedom of speech, H.B. 20 does not directly regulate or affect commerce. This statute therefore stands outside the reach of the dormant Commerce Clause.

In a pair of cases—*United States v. Lopez* and *United States v. Morrison*—the Supreme Court overturned acts of Congress on the ground that the statutes focused on matters sufficiently remote from commerce that they affected interstate commerce only indirectly. The statue in *Lopez* barred guns near schools and that in *Morrison* provided a federal civil remedy for victims of gender-motivated violence, and thus both were not unrelated to interstate commerce. But the Court held that power of Congress under the Commerce Clause does not extend to regulating matters that are not really commerce and thus only indirectly affect interstate commerce.[196]

The dormant Commerce Clause cannot reach further than the clause as exercised by Congress. So it cannot apply to a state statute on a subject that is not really commerce and that thus only indirectly affects interstate commerce. H.B. 20 is precisely such a statute. It protects the free exchange of speech—for example, by barring viewpoint discrimination. Such discrimination

---

[196] *See United States v. Lopez*, 514 U.S. 549, 567 (1995) ("The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."); *United States v. Morrison*, 529 U.S. 598, 617–18 (2000) ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce … The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.") (internal citations omitted).

is not remotely commerce and so only indirectly affects commerce. The dormant commerce clause therefore cannot be understood to apply to it.

### C. The Expansion of the Commerce Power to Enable Congress to Regulate Speech Does Not Mean that Courts Enjoy an Equally Expanded Power to Suppress a State Statute Protecting Speech.

Originally, the Constitution's broadest protection for free expression lay in Congress's limited power. James Wilson reassured Americans in 1787—four years before the First Amendment's ratification—that "a power similar to that which has been granted for the regulation of commerce" was not "granted to regulate literary publications," and thus "the proposed system possesses no influence whatever upon the press."[197] Since the New Deal, however, the Supreme Court has adopted an almost open-ended view of Congress's power to regulate interstate commerce. So much so that Congress now enjoys a power over speech and information that the framers and ratifiers expressly said would not be enjoyed by Congress.

The point is not to dispute whether communication and information are "commerce" or otherwise to deny that Congress now has a Commerce Clause power over communication and information. But just because the courts have expanded the commerce power to cover speech does not mean that the dormant commerce power expands with it.

The judicial enlargement of congressional power offers no precedent or reason for a judicial expansion of judicial power. When the courts broadened the commerce power exercised by Congress, so that it reached even speech, they gave no indication that they thereby were broadening their power to reject state statutes under the merely dormant Commerce Clause. Nor

---

[197] James Wilson, State House Yard Speech (Oct. 6, 1787), T*he Documentary History of the Ratification of the Constitution Digital Edition, ed.*, John P. Kaminski, et al, at http://rotunda.upress.virginia.edu/founders/RNCN-02-02-02-0002-0002-0018.

would they be justified in making such a move. The dormant Commerce Clause doctrine was centrally about economic discrimination, and the extension of that doctrine to all that now can be regulated by Congress would give the courts a highly controversial power to negate almost any state laws. Whereas the original Commerce Clause avoided giving Congress a power over speech, the judicial assumption of an expanded dormant Commerce Clause would give the courts a power to reject state laws protecting speech. That would raise serious separation of powers and federalism concerns.

### D. The Plaintiffs' Dormant Commerce Clause Claims Prove Too Much, as Those Arguments Would Leave Social Media Platforms Outside the Reach of Any State.

The Plaintiffs' dormant Commerce Clause claims are very broad.[198] So broad as to preclude any substantial state regulation, including any antidiscrimination law. This disdain for the jurisdiction and regulation of sovereign governments, whether a state or the United States, was captured by the old Facebook slogan "Company Over Country."[199] Now, the tech companies claim that they are beyond the reach of state regulation. This proves too much.

### E. In the Alternative, Even if the Dormant Commerce Clause Doctrine Were to Apply, H.B. 20 Would Not Violate It.

Plaintiffs' entire argument for why H.B. 20 violates the dormant Commerce Clause relies on a mere two binding authorities – the Supreme Court cases *Healy* and *Owatonna*, infra – both of which are wholly distinguishable from the case at bar.[200] At the same time, salient binding authority, unmentioned by Plaintiffs, exists to foreclose Plaintiffs' argument. If the Court finds that

---

[198] Dkt. 12 at 48-52.
[199] Kate Losse, *I was Zuckerberg's speechwriter. "Companies over countries" was his early motto*, Vox (Nov. 21, 2021, 11:44 PM) https://www.vox.com/first-person/2018/4/11/17221344/mark-zuckerberg-facebook-cambridge-analytica.
[200] Dkt. 12 at 49, 52.

the dormant Commerce Clause doctrine applies, the Court should reject Plaintiffs' argument that H.B. 20 violates it.

Plaintiffs' dormant Commerce Clause argument sidesteps the traditional dormant Commerce Clause analysis. Defendant provides that test here for the sake of clarity:

> To determine whether a law violates th[e] dormant Commerce Clause, [courts] first ask whether it discriminates on its face against interstate commerce. In this context, "discrimination" simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If the answer to that question is no, the court applies the *Pike* test, which requires that the statute be upheld unless the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.[201]

In connection with the first prong, Plaintiffs claim: "H.B. 20 discriminates against companies for having a non-Texas user base – that is, for engaging in interstate commerce."[202] Plaintiffs quote the Supreme Court case *Camps Newfound/Owatonna, Inc. v. Town of Harrison* in support of their claim that "state regulations that penalize companies for "'participat[ing] in interstate commerce'" are "facially discriminatory" and thus virtually per se unconstitutional."[203] There are two problems with this argument, both fatal to Plaintiffs' position.

First, the Supreme Court has made clear that, for a state regulation to "discriminate" under the Commerce Clause, it must discriminate between different sets of interests, namely in-state and out-of-state interests.[204] And the Fifth Circuit has held that those interests must be similarly situated, too.[205] It is Plaintiffs' burden to show this discrimination.[206]

---

[201] *Id.* at 346. (internal citations and quotations omitted) (cleaned up).
[202] Dkt. 12 at 42-43.
[203] Dkt. 12 at 43 (quoting 520 U.S. 564, 578 (1997)).
[204] *See United Haulers Ass'n*, infra, at 338.
[205] *See Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 163 (5th Cir. 2007) ("A state statute impermissibly discriminates only when it discriminates between similarly situated in-state and out-of-state interests.").
[206] *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) ("The burden to show discrimination rests on the party challenging the validity of the statute.").

But Plaintiffs' argument, which fails to provide *any interest at all* in comparison to which Plaintiffs allegedly suffer discrimination, much less an in-state Texas interest, much less a similarly situated in-state Texas interest, thus fails to properly engage with the terms of the dormant Commerce Clause test. It should be rejected accordingly.

Plaintiffs' reliance on *Owatonna* merely serves to drive home the point. *Owatonna* involved a Maine regulation that gave tax benefits to charities that served Maine residents but did not serve non-Maine residents.[207] The *Owatonna* Court undergirded its holding that the regulation violated the dormant Commerce Clause with its finding that "ninety-five percent of petitioner's campers come from out of State [and that] [i]nsofar as Maine's discriminatory tax has increased tuition, that burden is felt almost entirely by out-of-staters, deterring them from enjoying the benefits of camping in Maine."[208] Elsewhere, the Court described the statute as "functionally serv[ing] as an export tariff that targets out-of-state consumers by taxing the businesses that principally serve them . . . this [being the] sort of discrimination [] at the very core of activities forbidden by the dormant Commerce Clause."[209]

That is, the Maine statute taxed the businesses serving out-of-state campers but not those businesses serving in-state campers, passing on the costs to out-of-state consumers but not in-state consumers – discriminating against out-of-state interests in comparison with in-state ones. Plaintiffs, as noted, do not name any entity or interest in whose favor, as against Plaintiffs, H.B. 20 discriminates, much less an in-state Texas interest that is similarly situated. The Court should reject Plaintiffs' claim that H.B. 20 is discriminatory under the Commerce Clause.

---

[207] *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 572 (1997).
[208] *Id.*
[209] *Id.* at 580–81.

Plaintiffs' argument under the second prong of the dormant Commerce Clause test – whether "the burden imposed [by the statute] on interstate commerce is clearly excessive in relation to the putative local benefits," fares no better.[210]

First, as with the first prong, Plaintiffs fail to engage with prong two of the test – they do not, as that prong requires, so much as attempt to show that the "burden [H.B. 20] impose[s] on interstate commerce is clearly excessive in relation to the putative local benefits.[211] In fact, Plaintiffs do not invoke the so-called "*Pike* test" – the test the Supreme Court has laid out for determining the foregoing.[212]

Second, Plaintiffs' reliance on the Supreme Court's decision in *Healy v. Beer Inst., Inc.*, for the proposition that "under the Commerce Clause, no state government may extraterritorially regulate Internet communications," is mistaken.[213] [214] Plaintiffs' reliance on *Healy* for that proposition both mischaracterizes *Healy's* holding as to extraterritorial regulation and ignores binding Fifth Circuit precedent as to the Commerce Clause and the Internet. Either basis requires the Court to disregard Plaintiffs' argument.

As the post-*Healy* Supreme Court case *Pharm. Rsch. & Mfrs. of Am. v. Walsh* made clear, crucial to Healy's holding was *what*, exactly, was being "extraterritorially regulated" – there, it was the *price* of a good sold in neighboring states.[215] Like Plaintiffs here, the *Walsh* "Petitioner argue[d] that the reasoning in [*Healy*][216] applie[d] to what it characterize[d] as Maine's regulation

---

[210] *See*, infra, *United Haulers Ass'n.*
[211] *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007).
[212] *See*, e.g., *id.*
[213] 491 U.S. 324, 336 (1989).
[214] Dkt. 12 at 10.
[215] 538 U.S. 644 at 669.
[216] And in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521 (1935), whose conclusion that "New York has no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there" "provided the basis for the majority's conclusion in Healy…." *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003).

of the terms of transactions that occur elsewhere. But . . . unlike price control or price affirmation statutes, the Maine Act d[id] not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect."[217] Thus, the Court found, "[t]he rule that was applied in . . . *Healy*[218] accordingly [wa]s not applicable to th[e] case." *Id.*[219]

This Court should find the same: that a Supreme Court-mandated Commerce Clause bar on extraterritorial price control does not equate to one on any form of state regulation with extraterritorial effects, as Plaintiffs would have it here.

So much, then, for Plaintiffs' binding authority.[220] Plaintiffs not only do not carry their burden to show that H.B. 20 violates the Commerce Clause, they fail even to engage with the test the Supreme Court has set out for determining whether a state regulation or law does.

Given the general gestalt of Plaintiffs' dormant Commerce Clause argument, this is not surprising. Plaintiffs appear to believe that their intimate involvement with the global internet makes them, under the Commerce Clause, immune to state regulation.[221]

---

[217] *Id.*

[218] *Walsh* also rejected the application of the rule as applied in *Baldwin. Pharm. Walsh*, 538 U.S. at 669.

[219] *Id.*

[220] Apart from *Owatonna* and *Healy*, Plaintiffs cite to a raft of non-binding authority, including the Southern District for New York case *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 177 (S.D.N.Y. 1997) – a case whose logic the Fifth Circuit eviscerated as "lead[ing] to absurd results." *See Ford Motor Co. v. Texas Dep't of Transp.*, infra, at 505. Tellingly, the *Healy* case – as noted, one of *only two* binding authorities cited by Plaintiffs in support of their Commerce Clause argument – formed the basis for *Pataki. See Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160, 175-176 (S.D.N.Y. 1997); *see also* Derek E. Empie, *The Dormant Internet: Are State Regulations of Motor Vehicle Sales by Manufacturers on the Information Superhighway Obstructing Interstate and Internet Commerce?*, 18 Ga. St. U. L. Rev. 827, 834 (2002).

[221] *See*, e.g., Dkt. 12 at 49 ("H.B. 20 unconstitutionally reaches far beyond Texas's borders to regulate covered platforms' economic activity and *affects the product everyone in the world receives through the Internet*.") (emphasis added); *id.* ("H.B. 20 restricts moderation over content posted by covered "users" from anywhere"); *id.* at 50 ("H.B. 20 has the practical effect of regulating commerce outside Texas because *Plaintiffs' members operate their services and enforce their policies on a global scale*.") (emphasis added); *id.* at 50 ("Because the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without projecting its legislation into other States.") (quoting *American Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (internal quotations omitted)).

But the Supreme Court has made clear that the case is otherwise: the trans-state structure of a market does not, under the Commerce Clause, shield a participant in that market from state regulation. As the Court held in *Exxon Corp. v. Governor of Maryland*, "we cannot adopt appellants' novel suggestion that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas," while going on to observe that "this Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation…"[222] Similarly, the Fifth Circuit has observed that "[t]he dormant Commerce Clause protects the interstate market, not particular interstate firms. The Supreme Court has rejected the notion that the Commerce Clause protects the particular structure or methods of operation in a … market."[223]

So has the Fifth Circuit, with special reference to the global internet, opining that "application of th[e] principle [that the internet is a type of commerce not susceptible to state regulation] . . . would lead to absurd results. It would allow corporations or individuals to circumvent otherwise constitutional state laws and regulations simply by connecting the transaction to the internet."[224] And the Western District of Texas that opinion upheld had especially choice words of warning in this connection:

> The Court rejects the plaintiff's argument that an activity which is appropriately regulated when accomplished through any other medium becomes sacrosanct when accomplished through the internet. If the Court were to accept the plaintiff's interpretation of *American Libraries Association v. Pataki*, 969 F.Supp. 160 (S.D.N.Y.1997), then all state regulatory schemes would fall before the mighty altar of the internet. Under this theory, a state's deceptive trade practices act could not be enforced against goods advertised and sold through the internet nor could a state's criminal statutes which regulate the sale of alcohol. Although the internet is

---

[222] 437 U.S. 117, 128 (1978).
[223] *Allstate Ins. Co.*, 495 F.3d at 163–64 (internal citations and quotations omitted).
[224] *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 505 (5th Cir. 2001).

a mighty powerful tool, it is not so potent as to demolish every state's regulatory schemes as they apply to the sale of goods and services.[225]

As the Supreme Court has made clear, "[i]n the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected."[226] Plaintiffs make much of their view that "H.B. 20 is preempted by the Communications Decency Act, 47 U.S.C. § 230.[227]" But, as explained above, no conflict exists between Section 230 and H.B. 20.[228]

As a final matter, it is notable that Plaintiffs are entirely vague about how the "content" that they "host" – and which they allege H.B. 20 seeks to unconstitutionally regulate – qualifies as "commerce." That is, Plaintiffs elide entirely what, in other words, H.B. 20 regulates that brings, in their view, the regulation within the ambit of the dormant Commerce Clause.  Traditional Commerce Clause jurisprudence has focused on state regulation of such things as, for example, the interstate movement of goods,[229] and interstate movement of consumers to enjoy services hosted in-state.[230] It is unclear if Plaintiffs believe the "content" they "host" that they believe H.B. 20 impermissibly regulates qualifies as a "good" or a "service" or what – at any rate, Plaintiffs omit to explain entirely how the content they allege H.B. 20 regulates counts as commerce and hence the regulation of which falls within the ambit of dormant Commerce Cause analysis.

## V.   Plaintiffs Lack Standing and Are Unlikely to Succeed on that Basis.

---

[225] *Ford Motor Co. v. Texas Dep't of Transp.*, 106 F. Supp. 2d 905, 909 (W.D. Tex. 2000), aff'd, 264 F.3d 493 (5th Cir. 2001).

[226] *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36 (1980).

[227] *See* Dkt. 12 at 46 - 47.

[228] *See* supra, Section III.

[229] *See, e.g., Exxon*, *supra*.

[230] *See*, e.g., *Owatonna*, *supra*.

Defendant has filed a separate motion to dismiss on the grounds that Plaintiffs lack Article III standing to bring this suit.[231] Although this argument is incorporated by reference, for the sake of brevity, it should be noted that discovery permitted prior to the filing of this Response only further supports why Plaintiffs cannot assert associational standing. Both Plaintiffs were unable to explain basic, necessary information required to reach a determination on the issues discussed above.[232] Plaintiffs, in fact, both stated they had not spoken to *any* of the Platforms in crafting their declarations; instead, they relied solely on counsel and the Platforms' publicly-available, self-serving articles to make statements as to their "personal knowledge" of the impacts and consequences of H.B. 20 on their members.[233] Even their Declarants, submitted to resolve "material factual disputes,"[234] lacked the knowledge necessary to reach any of the fact issues in this suit.[235] And Plaintiffs acknowledged, as they have in their pleadings, that the Platforms are all distinct in both how their policies read as well as how those policies are applied.[236] This evidence serves only to bolster Defendant's argument that this case will not be able to proceed, and Plaintiffs cannot demonstrate any injury, without significant discovery from the Platforms.[237]

## VI.   ANY PROPER PRELIMINARY INJUNCTION THAT ISSUES REQUIRES SEVERABILITY.

---

[231] Dkt. 23.

[232] Szabo Depo. (Ex. D) 70:6-11, 71:22-72:9 (refusing to provide information pursuant to NDA); *id.* at 70:12-12-71:9, 72:22-73:11 (stating the Platforms do not share source codes, documentation related to software utilized for content moderation, or workflow diagrams), *id.* at 69:6-12 (Szabo did not know relevant information as to the Platforms' use of AI versus human content moderators), *id.* at 95:16-96:5, 98:6-10 (unable to answer questions related to the Platforms' likely financial harms claimed in his declaration); *see also* Schruers Depo. (Ex. E) 55:2-12 (unable to specify companies that screen user accounts at creation); *id.* at 55:16-56:5 (unable to say how many users Facebook, YouTube or Twitter has); *id.* at 127:5-128:10 (unable to speak to internal implementation of practices by Facebook, YouTube and Twitter); *id.* at 144:8-11 (stating he does not know whether an algorithm could be created to fulfill H.B. 20's notice requirements).

[233] Szabo Depo. (Ex. D) 112:18-113:5; Schruers Depo. (Ex. E) 71:13-16, 161:11-162:22.

[234] Dkt. 29 at 10.

[235] Potts Depo. (Ex. B) 76:17-77:2; 173:7-18; Vietch Depo. (Ex. C) 103:1-5, 130:22-131:11; Esparza Depo. (Ex. H) 48:5-16; Gutierrez Depo. (Ex. G) 27:14-21, 40:20-41:5, 44:25-45:8.

[236] Schruers Depo. (Ex. E) 29:19-30:1; Szabo Depo. (Ex. D) 66:12-21.

[237] Dkt. 23.

Finally, in the event that it does decide to issue a preliminary injunction, the Court should not issue a blanket injunction of H.B. 20 for two reasons: (1) the law has a severability clause, and (2) the injunction must be limited to the Plaintiffs' harm.

In H.B. 20 §§ 8(a)-(f), the Texas Legislature explicitly stated that (1) it intended all provisions of H.B. 20 to be severable,[238] and (2) it would have enacted any and all provisions of H.B. 20 regardless of whether any provisions are subsequently determined to be unconstitutional.[239]

Federal courts are to apply severability clauses in state laws.[240] Where the legislature "has explicitly provided for severance by including a severability clause in the statute," the Court must presume that the legislature "did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision."[241] As the Supreme Court has explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, or . . . sever its problematic portions while leaving the remainder intact." [242]

Thus, a preliminary conclusion that any part of H.B. 20 is unconstitutional should have no impact on the remainder of the law. Significantly, and as noted above, Plaintiffs have refused to present evidence as to how each one of the Platforms' algorithms constitute speech, and were unable to state which Platforms, aside from three, were even covered by H.B. 20.[243] The Fifth Circuit requires Plaintiffs to produce evidence for their position before this Court may grant a

---

[238] H.B. 20 § 8(a)
[239] H.B. 20 § 8(d)
[240] *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law.").
[241] *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (plurality op.).
[242] *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29 (2006) (citation omitted).
[243] *See*, *supra*, fn. 243.

preliminary injunction. Thus, the Court must sever H.B. 20's provisions prohibiting viewpoint discrimination from any injunction, since Plaintiffs' failure to provide evidence that their algorithms are speech qualifying for Constitutional protection renders them inapposite for constitutional protection, effectuated through a preliminary injunction, at this stage of the proceedings.

Similarly, even if Plaintiffs could establish that H.B. 20's restriction on their viewpoint discrimination should be enjoined, they should not be entitled to an injunction of H.B. 20's separate transparency requirements in Section 2 because those requirements are subject to only a minimal standard of First Amendment scrutiny, and Plaintiffs' other arguments do not call the transparency requirements into question.[244] Plaintiffs also have not provided evidence as to how H.B. 20's transparency requirements are burdensome on them or their members.[245] Consequently, the Court must sever those transparency requirements from any injunction, also.

Any injunction must also be limited to the scope of the harm. *See Lewis*, 518 U.S. at 357. The only harms claimed by Plaintiffs is that (1) the Platforms' users and advertisers will "abandon" the Platforms as a result of H.B. 20's alleged forcing them to display harmful content; and (2) the disclosure requirements will be burdensome.[246] But Plaintiffs have not presented any evidence which Platforms, if any, will likely lose users or advertisers from their globally-relied-upon sites for communication.[247] And other than broadly claiming burden, Plaintiffs, and the Platforms, have refused to present evidence how the information required in disclosure

---

[244] *See supra* at Section.I.
[245] Szabo Depo. (Ex. D) 95:16-96:5, 98:6-10; Schruers Depo. (Ex. E) 144:8-11.
[246] Dkt. 12.
[247] Dkts. 12-1 – 12-7; Exs. B-E; *see also* Vietch Depo. (Ex. C) 30:13-15 ("[A]dvertisers have **a wide range of controls** about what sort of content they want their advertisements to appear -- to appear on.").

requirements cannot be sought through use of algorithms, are any different from what their transparency reports offer or will cost the Platforms more resources than already currently being expended for those reports.[248] Even if such evidence is presented, this Court must sever H.B. 20 only insomuch as each of the Platforms are able to specifically identify what harm H.B. 20 causes them. Doing so is in keeping with the limitation that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."[249]

## VII. Plaintiffs Fail to Show Irreparable Injury.

Even if Plaintiffs could show a substantial likelihood of success on the merits of any of their claims (which they cannot), they would still not be entitled to the "extraordinary remedy" of a preliminary injunction because they cannot show "a substantial threat of irreparable injury if the injunction is not issued."[250] The Supreme Court has expressly rejected the notion that a plaintiff can satisfy this second element for a preliminary injunction by showing a mere "possibility" of irreparable injury.[251] Rather, the Court has insisted that its "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.*

Plaintiffs fail to meet this standard. Because H.B. 20 permits social media platforms and email service providers to censor whole categories of content (without, of course, discriminating based on viewpoint), H.B. 20 can have no effect on the Platforms' ongoing efforts to prevent the

---

[248] Potts Depo. (Ex. B) 76:17-77:13; 157:8-17; Vietch Depo. (Ex. C) 79:14-80:8; Szabo Depo. (Ex. D) 95:16-98: 10; 119:5-13 (admitting he does not know cost figures for any of the Platforms and did not submit evidence of costs to comply with H.B. 20 as part of his declaration (Dkt. 12-2)); Schruers Depo. (Ex. E) 117:11-17, 141:17-142:8, 144:8-11.
[249] *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (cleaned up); *see also Missouri v. Jenkins*, 515 U.S. 70, 88, 89 (1995) ("[T]he nature of the . . . remedy is to be determined by the nature and scope of the constitutional violation" (cleaned up)).
[250] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); Szabo Depo. (Ex. D) 112:18-113:5; Schruers Depo. (Ex. E) 71:13-16, 161:11-162:22.
[251] *See Winter*, 555 U.S. at 22.

publication of Child Sexual Abuse Material and other content-based categories of material Plaintiffs claim is harmful. In those limited areas where Plaintiffs claim that the Platforms need to censor only certain *viewpoints* within otherwise acceptable content categories, they simply have not, and cannot, demonstrate that compliance with H.B. 20 will cause a *likelihood* of harm to users. For example, if certain viewpoints are offensive to certain users, there is no reason why platforms cannot provide those users with the option to self-select (i.e., self-censor) the material they see.[252] Further, Plaintiffs have certainly not established that the Platforms are currently able—even without complying with H.B. 20—to successfully prevent users from seeing "offensive" viewpoints. Thus, Plaintiffs have not shown with any specificity how it will in fact increase the *likelihood* that users will encounter more offensive viewpoints if the Platforms comply with H.B. 20's limited and reasonable requirements.

## VIII.  THE BALANCE OF EQUITIES FAVORS THE ENFORCEMENT OF H.B. 20, AND AN INJUNCTION WOULD UNDERMINE THE PUBLIC INTEREST.

The final two elements Plaintiffs must prove to obtain a preliminary injunction are "that the balance of equities tips in [their] favor, and that an injunction is in the public interest."[253] Plaintiffs cannot meet either of those requirements.

As far as equity goes, Defendant has amply demonstrated above[254] and in prior filings[255] that the Platforms have been deceiving and harming the public for far too long. These platforms have told one story to the public about their content moderation while the reality has been far different. Further, it is facially inequitable to permit Plaintiffs' members to enjoy the benefit of

---

[252] Tex. Civ. Prac. & Rem. Code § 143A.006 (b).
[253] *Winter*, 555 U.S. at 20.
[254] *Supra,* Section I.A.
[255] Dkts. 20, 23, 24.

Section 230's protection against liability while avoiding the concomitant responsibilities of a common carrier. If Plaintiffs' members are going to be held free from liability as common carriers, then equity demands that a state be able to require that they live up to anti-discrimination ideals ordinarily expected of common carriers. In short, equity is simply not on Plaintiffs' side. Rather, the public's equitable interests weigh strongly in favor of treating Plaintiffs' members as common carriers and barring them from engaging in discrimination.

Similarly, an injunction is not in the public interest. "In exercising their sound discretion, courts of equity should pay *particular* regard for the public consequences in employing the extraordinary remedy of injunction."[256] Here, because of the overwhelming equitable interests the public has in seeing social media platforms and email service providers treated consistently under the law. Either those entities are common carriers, or they are private companies that should be subject to private suits for the content they decide to publish. Based on conclusive factual and legal analysis, Plaintiffs' affected members are common carriers, as discussed above.[257] Accordingly, the public has an irrefutable interest in seeing them held accountable as such.

## Conclusion

Plaintiffs have failed to meet their burden to demonstrate their entitlement to the "extraordinary remedy" of preliminary injunction. Defendant requests that this Court deny their motion.

Respectfully Submitted.

**Ken Paxton**
Attorney General of Texas

---

[256] *Romero–Barcelo,* 456 U.S. 305, 312 (1982).
[257] *Supra*, Section I.A.1.

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Division Chief
General Litigation Division

*/s/ Courtney Corbello*
**COURTNEY CORBELLO**
Attorney-in-Charge
Assistant Attorney General
Texas State Bar No. 24097533
*courtney.corbello@oag.texas.gov*

**CHRISTOPHER D. HILTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24087727
*christopher.hilton@oag.texas.gov*

**BENJAMIN STOREY LYLES**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24094808
benjamin.lyles@oag.texas.gov

**BENJAMIN S. WALTON**
Counsel of Record
Assistant Attorney General
Texas State Bar No. 24075241
benjamin.walton@oag.texas.gov

General Litigation Division
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 936-2109

**ATTORNEYS FOR DEFENDANT**

**CERTIFICATE OF SERVICE**

I certify that on November 22, 2021 the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Courtney Corbello*
**Courtney Corbello**