IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

NETCHOICE, LLC, et al.,
     *Plaintiffs*,

v.

Civil Action No. 1:21-cv-00840-RP

KEN PAXTON, in his official capacity as
Attorney General of Texas,
     *Defendant*.

FEDERAL RULE OF CIVIL PROCEDURE 26(a)(2)(b)
EXPERT WITNESS REPORT OF ADAM CANDEUB

1

# I. Introduction

## A. Purpose

I am an expert in the historical development and application of the common carrier doctrine and the regulatory powers of government over communications networks, public utilities, and the internet. The Texas Office of the Attorney General has retained me as an expert in connection with *NetChoice, LLC v. Paxton*, Civil Action No. 1:21-cv-00840-RP (filed in the Western District of Texas, Austin Division), to offer opinions regarding the historical basis for Texas' regulation of social media platforms and email service providers as common carriers, as expressed in Texas' recently enacted H.B. 20.

I am being paid for my work in connection with this litigation at the rate of $350 per hour, plus reimbursement for any reasonable expenses. My compensation is not dependent upon my opinions or the outcome of this case.

The opinions I express are based on my own personal knowledge, qualifications, experience, research, and professional judgment. If called as a witness in this case, I am prepared to testify as a fully competent witness about my opinions.

I understand that discovery in this case is ongoing, and I reserve the right to amend or add to my opinions if new evidence is provided or if new opinions or arguments are presented by other parties, amici, or experts.

## B. Qualifications

My qualifications are summarized in my Curriculum Vitae (or "CV"), which is included as Appendix A to this Report. My CV contains all my scholarly publications authored in the previous ten years. Appendix B contains an additional list of my articles written for popular audiences.

I have served as a law professor at Michigan State University for over 17 years, was tenured in 2010, and have written over 25 scholarly publications. Most of those publications involve common carriage and/or communications/internet law. My historical analyses of common carrier networks have been cited by federal courts. In addition, I have extensive experience in communications and internet law, serving as an attorney advisor for the Federal Communications Commission's Common Carriage Bureau and later Acting Assistant Secretary of Commerce for the National Telecommunications and Information Authority.

I have not testified as an expert at trial or by deposition in any case during the past four years.

## C. Materials Considered

In addition to my knowledge based on many years of studying and working in relevant fields, as well as the extensive materials cited in this report, I have reviewed various documents specifically related to this case. The case-specific documents that I reviewed are listed in Appendix C to this Report.

## II. Opinions

The State of Texas has the power to regulate large social media platforms as common carriers or firms "affected with the public interest." State and federal governments rely on these legal categories for the authority to regulate large communications networks. Just as courts recognized states' power in the 19th century to categorize the then cutting-edge telegraphs and telephones as common carriers, so may Texas now regulate social media platforms and email service providers, which are but communication technology's more recent iterations. Limiting this authority would constitute a judicial diminishment of government's regulatory power not seen since the days of *Lochner v. New York*.[1]

Throughout the centuries, courts have defined common carriers in numerous ways. A recent statement by one of the current Supreme Court Justices well summarizes this law into five tests: (1) whether a firm exercises market power, (2) whether an industry is affected with "the public interest," (3) whether the entity regulated is part of the transportation or communications industry, (4) whether the industry receives countervailing benefits from the government, or (5) whether the firm holds itself out as providing service to all.[2]

These tests are necessarily broad because they give government the ability to ensure all citizens have access to essential services, ranging from gas, electricity, and water to airline and railway travel as well as telephone and internet access. In today's world, this regulation is particularly necessary to ensure equal and non-discriminatory access to the internet, which the United States Supreme Court has termed our "modern public square."[3]

But even under the Plaintiffs' and their Amici's, at times, incomprehensible description of social media, the major social media platforms satisfy each of the five tests courts have set forth for common carrier status and industries "affected with the public interest." Purporting to avoid this conclusion, Plaintiffs and their Amici put forth novel legal tests for common carrier status that lack any basis in precedent as a matter of historical fact.

## A. Common Carriers:  The Historical Development of the Legal Concept

The five tests for common carriers listed above accurately reflect centuries of legal decisions distinguishing between common carriers and other firms. Until the Supreme Court's decision in *Nebbia*,[4] which reversed much of the *Lochner* era constitutional restrictions on government regulation of business, the Court had ruled that government could impose extensive regulation only upon common carriers and other industries "affected with the public interest."[5] These tests, therefore, received much attention during the 19th and early 20th century because they demarcated

---

[1] *Lochner v. New York*, 198 U.S. 45 (1905).
[2] *Biden v. Knight First Amendment Inst.*, ___U.S.___, 141 S. Ct. 1220,  1222–23 (Thomas, J., concurring statement concerning denial of certiorari).
[3] *Packingham v. North Carolina*, ___U.S.___, 137 S.Ct. 1730, 1737 (2017).
[4] *Nebbia v. New York*, 291 U.S. 502 (1934).
[5] *Munn v. Illinois*, 94 U.S. 113, 126 (1876).

the limits of government regulatory power. Important for the case at hand, under any of these tests, a social media platform is properly classified as a common carrier.

A "common calling," of which common carrier is but one type, is a legal concept with roots in the earliest chapters in English law. Mentioned in the Year Books, the earliest law reports, a common calling refers to any trade or industry that had an obligation to serve all without discrimination on generally accepted terms and conditions.[6] Common callings typically worked under special, higher standards of care and liability.[7] Given that the early legal system of England was largely status-based, as opposed to contract-based, there were many such callings. For example, millers, who were obligated to process all surrounding farmers' grain, were considered a common calling, as were bakers, who were obligated to provide daily bread for all in a village. According to Arterburn, the first litigated legal case on record concerning a common calling dates from 1348 and involved a ferryman.[8] Adler asserts that the first mention of common carriers, referred to as *aliis communibus cariatoribus*, can be found in the Beverley Town Documents (Selden Society) dating from between 1300 and 1600.[9]

In the centuries since the concept's introduction into English law, courts have entertained numerous tests to distinguish common carriers from ordinary businesses. Writing in the early 1900s, Bruce Wyman suggested that in the infancy of England's trade economy in the 14th and 15th centuries, the special common calling duties applied to all trades and businesses, because in any area, few persons were engaged in each trade and the problem of monopoly or market power abuse was thus endemic.[10] He viewed common callings as a type of early common law antitrust or trade regulation. This view has been criticized because many early public callings clearly had no obvious monopoly power.[11] Gustavus Robinson expands Wyman's notion arguing that public utilities serve a central economic *and social* role in society without necessarily being a monopoly.[12] This interpretation of common carriage law is reflected in the first of Justice Thomas's tests, "whether a firm has market power," and many courts and agencies have adopted this test.[13]

---

[6] *See, e.g.*, Y.B. 2 Hen IV.7, pl. 31 (mentioning innkeepers).  According to Arterburn, the first "duty to serve" case dates from the 15th century. Norman F. Arterburn, *Origin and First Test of Public Callings*, 75 U. Pa. L. Rev. 411, 424 (1926-1927), citing Keilw. 50, pl. 4 (1450).

[7] Joseph H. Beale, Jr., *The Carrier's Liability: Its History*, 11 Harv. L. Rev. 158, 163 (1897) ("From the earliest times certain tradesmen and artificers were treated in an exceptional way, on the ground that they were engaged in a "common" or public occupation; and for a similar reason public officials were subjected to the same exceptional treatment. Such persons were innkeepers, victuallers, taverners, smiths, farriers, tailors, carriers, ferrymen, sheriffs, and gaolers.").

[8] Arterburn, *Origin and First Test of Public Callings*, 75 U. Pa. L. Rev at 421 (citing Y.B. 22 Ass. 95, pl. 41 (1348)).

[9] Edward A. Adler, *Business Jurisprudence*, 28 Harv. L. Rev. 135, 147 n.31 (1914-1915).

[10] Bruce Wyman, *The Law of the Public Callings as a Solution of the Trust Problem*, 17 Harv. L. Rev. 156 (1904).

[11] Adler, 28 Harv. L. Rev. at 149 ("When we consider the principle of monopoly as producing in the early days the supposed distinction between classes of callings, its failure is clearly apparent, for no evidence of any kind is offered that carriers were less numerous than butchers, or that innkeepers were fewer than carpenters, or barbers than weavers. Tailors were no less numerous than fullers.").

[12] *The Public Utility Concept in American Law*, 41 Harv. L. Rev. 277 (1928); *see also* Arterburn, 75 U. Pa. L. Rev. at 427-28 (asserting that social and economic conditions led to particular industries being labelled common and arguing the Black Death's labor shortage led to the development of the duty to serve all).

[13] *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 57 (D.C. Cir. 2019) (the "premise of Title II and other public utility regulation is that [broadband providers] can exercise market power sufficient to substantially distort economic efficiency and harm end users"); *In the Matter of Pol'y & Rules Concerning Rates for Competitive Common Carrier*

In contrast, other scholars have argued that the difference between common callings and other trades was in the legal nature of their offering. Singer as well as Haar & Fessler contend that common callings offered their goods and services on general terms and conditions to all.[14] In the 17th and 18th century, courts continued to treat certain industries, such as common carriers and innkeepers, as common callings on public policy and fairness grounds. Burdick has argued that a firm was categorized as a common calling "because a person held himself out to serve the public generally, making that his business, and in doing so assumed to serve all members of the public who should apply, and to serve them."[15] This interpretation of common carriage is found in Justice Thomas's fifth test: whether the actor holds itself out as providing service to all. Many courts have adopted this test.[16]

In addition, Burdick also argued that "the peculiar duties resting upon them [common carriers and public utilities] grow out of the exercise of public franchises or the receipt of financial aid from the state."[17] Here, he presaged Justice Thomas's fourth test: whether an industry receives countervailing benefits from the government, such as tax benefits or powers of eminent domain, which some courts have followed.[18]

---

*Servs. & Facilities Authorizations Therefor*, 84 F.C.C.2d 445, 448 (1981) ("we have tentatively determined that those communications suppliers without market power need not be treated as common carriers").

[14] Charles M. Haar & Daniel W. Fessler, *The Wrong Side Of The Tracks: A Revolutionary Rediscovery Of The Common Law Tradition Of Fairness In The Struggle Against Inequality* 15 (1986) ("Over the centuries, the common law doctrine of equal services and the duty to serve surfaced and resurfaced as a potent and dynamic means to address changing—and often the grimmest imaginable—social and economic traditions."); Joseph William Singer, *No Right to Exclude: Public Accommodations and Private Property*, 90 Nw. U. L. Rev. 1283, 1298 (1996) ("the most plausible statement of the law is that all businesses open to the public had a duty to serve the public").

Justice Story adopts this view too. He states, "To bring a person within the description of a common carrier he must exercise it as a public employment; he must undertake to carry goods for persons generally; and he must hold himself out as ready to engage in the transportation of goods for hire as a business, not as a casual occupation, pro hac vice." Story, Commentaries of the Law of Bailments § 495 (9th ed. 1878) at 323 (citations omitted).

[15] Charles K. Burdick, The Origin of the Peculiar Duties of Public Service Companies. Part II, 11 Colum. L. Rev. 616, 635 (1911).

[16] *See, e.g.*, *Refrigerated Transp. Co. v. I.C.C.*, 616 F.2d 748, 754 (5th Cir. 1980) ( a "common carrier has a duty to serve"); *N. Am. Acc. Ins. Co. v. Pitts*, 213 Ala. 102, 105 (1925) ("A common carrier of passengers is one who is engaged in a public calling, which imposes upon him the duty to serve all without discrimination."); *Sun Oil Co. v. Dalzell Towing Co.*, 287 U.S. 291, 294 (1932) ("the doctrine that common carriers and others under like duty to serve the public"); *W. Union Tel. Co. v. Byrd*, 155 Tenn. 455, 458 (1927) ("Telegraph and telephone companies have frequently been termed 'common carriers,' or common carriers of news or information, and in some jurisdictions have been declared to be common carriers by constitutional or statutory provisions; but while they are in the nature of common carriers in regard to their quasi-public character, and their duty to serve the public generally and without discrimination.").

[17] Burdick, 11 Columb. L. Rev. at 621.

[18] *Tex. Rice Land Partners, Ltd. v. Denbury Green Pipeline-Texas, LLC*, 363 S.W.3d 192, 205 (Tex. 2012) ("To qualify as a common carrier with the power of eminent domain, the pipeline must serve the public; it cannot be built only for the builder's exclusive use."); *Tenn. Gas Pipeline Co. v. Rylander*, 80 S.W.3d 200, 205 (Tex. App.—Austin 2002, pet. denied) ("The Comptroller's interpretation of Rule 3.297 does not deny effect to Tennessee Gas's status as a licensed and certificated carrier because it can still qualify for exemptions in the tax code intended to be available to common carrier pipelines or to licensed and certificated carriers generally. As the Comptroller points out, by virtue of its status as a common carrier pipeline, Tennessee Gas may qualify for an exemption under section 151.330(h) of the tax code . . . .").

By the 17th century, the law was clear that an "implied contract" required common callings to serve all on the same nondiscriminatory terms. At the same time, as this law developed in the 17th and 18th century, contract law began to govern most commercial activities, such as "taylor" or "workman," limiting the number of common callings.[19]

The following excerpt from Blackstone, writing in the 17th century, demonstrates this shift. Blackstone recognized as common callings trades so recognized in the subsequent centuries by American courts, namely innkeeper, common carrier or bargemaster, and common "farrier," a blacksmith that specialized in shoeing horses.[20] At the same time, reflecting older law, Blackstone recognized trades which would not be considered common just a century later, such as "taylor," or workman.

> There is also in law always an implied contract with a common inn-keeper, to secure his guest's goods in his inn; with a common carrier, or bargemaster, to be answerable for the goods he carries; with a common farrier, that he shoes a horse well, without laming him; with a common taylor, or other workman, that he performs his business in a workmanlike manner; in which if they fail, an action on the case lies to recover damages for such breach of their general undertaking . . . . Also, if an inn-keeper, or other victualler, hangs out a sign and opens his house for travelers, it is an implied engagement to entertain all persons who travel that way; and upon this universal assumpsit an action on the case will lie against him for damages, if he without good reason refuses to admit a traveler.[21]

The trades and occupations that courts continued to classify as common carriers were typically related to transportation and communications. Innkeepers and farriers were, of course, vital to travel by horse and coach and transporting goods through the 17th to the 19th centuries. By the same token, these industries were central to communication. Until the emergence of the telegraph in the 19th century, communications were exclusively by letter. And a significant portion of letters were borne by private carrier as the United States Post Office for most of the 19th century failed to provide home delivery in most places.

Armed with these legal concepts, courts in the 19th century expanded the notion of common carrier to new technologies, such as steamboats and railroads. Eventually, courts realized that most types

---

[19] William C. Scott, Judicial Logic as Applied in Delimiting the Concept of Business Affected with a Public Interest, 16 Ky. L.J. 19, 21-23 (1930).

[20] According to Scott, "With the dawn of what we might call our modern judicial era, or at least semi-modern, we find that only two members of the erstwhile 'common' group retain their status, namely, carriers and innkeepers." 16 Ky. L.J at 23. In addition, farriers as well were considered common carriers. *See Lord v. Jones*, 24 Me. 439, 443 (1844) ("[T]he law has given this privilege to persons concerned in certain trades and occupations, which are necessary for the accommodation of the people. Upon this ground common carriers, innkeepers, and farriers had a particular lien." (quotation omitted)); *N. Chicago Street Railroad Co. v. Williams*, 140 Ill. 275, (1870) ("[A]mong the instances of implied contracts are mentioned those of the common innkeeper to secure his guest's goods in his inn, of the common carrier to be answerable for the goods he carries, and of the common farrier that he shoes a horse well without laming him. 'The law presumes or implies from the fact of receiving, as common carriers, the passenger to carry for hire, a contract.'"); *Conwell v. Voorhees*, 13 Ohio 523, 540 (1844) ("These authorities establish the rule that if a party undertakes to perform work without consideration, and does not proceed on the work, no action will lie; but these authorities expressly except from the rule common carriers, innkeepers, porters, ferrymen, farriers.").

[21] III William Blackstone, *Commentaries On The Law Of England*, 163.

of "[t]ransportation, as its derivation denotes, is a carrying across, and, whether the carrying be by rail, by water or by air, the purpose in view and the thing done are identical in result" and classified most types of transportation services as common carriers.[22]

In addition, courts and legislatures expanded the common carrier category to keep up with technology innovation in communications as telegram and telegraph replaced the physical letter. For instance, the Supreme Court held that telegraphs, because they "resemble[d] railroad companies and other common carriers," were "bound to serve all customers alike, without discrimination."[23]  The Court later stated, "As a common carrier of messages for hire, the telegraph company, of course, is bound to carry for [all] alike."[24] Similarly, numerous states classified telegraphs as common carriers by statute, with courts seeing "no good reason why the Legislature may not, in the exercise of its discretion, when it deems such action appropriate, fix upon a telegraph company the status of a common carrier."[25]

Perhaps most important, federal law recognized telegraphs and telephones—indeed all "wire communications" as common carriage. The Mann-Elkins Act of 1910 resolved whether telegraphs and telephones were classified as common carriers and gave regulatory control of telegraph and telephone services to the Interstate Commerce Commission (ICC).[26]  Similarly, Section 201 of the Communications Act of 1934 regulates all common carriage service that is "communication by wire" to this day.[27] Thus, we get Justice Thomas's third test: whether the entity regulated is part of the transportation or communications industry. No one can doubt that social media platforms and email services providers are modern communications industries.

Finally, common carriers fall under the rubric of industries affected with the public interest. In *Munn v. Illinois*, the Court ruled that grain elevators could be constitutionally subject to state non-discrimination and rate regulation because they were "affected with the public interest."[28]  States could regulate these industries despite the *Lochner*-era restrictions on government action.

Chief Justice Waite stated that an industry is "clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large."[29] While the New Deal

---

[22] *Curtiss-Wright Flying Service v. Glose*, 66 F.2d 710, 712 (3d Cir. 1933).

[23] *Primrose v. W. Union Tel. Co.*, 154 U.S. 1, 14 (1894).

[24] *Moore v. N.Y. Cotton Exch.*, 270 U.S. 593, 605 (1926); *see also Pac. Tel. Co. v. Underwood*, 55 N.W. 1057, 1057 (Neb. 1893) ("A telegraph company is a common carrier of intelligence for hire, bound to promptly and correctly transmit and deliver all messages intrusted to it."); *Parks v. Telegraph Co.*, 13 Cal. 423, 424 (1859) ("The rules of law which govern the liability of telegraph companies are not new. They are old rules applied to new circumstances. Such companies hold themselves out to the public as engaged in a particular branch of business, in which the interests of the public are deeply concerned. They propose to do a certain service for a given price. There is no difference in the general nature of the legal obligation of the contract between carrying a message along a wire and carrying goods or packages along a route. The physical agency may be different, but the essential nature of the contract is the same.").

[25] *Blackwell Mill. & Elevator Co. v. W. Union Tel. Co.*, 89 P. 235 (Okla. 1906); *Reaves v. W. Union Tel. Co.*, 110 S.C. 233 (1918) ("Is defendant a common carrier in the transmission of money by telegraph? With regard to the transmission of intelligence for hire, defendant was made a common carrier by section 3 of article 9 of the Constitution, which provides that all telegraph corporations engaged in the business of transmitting intelligence for hire are common carriers. That provision, however, is merely declaratory of the common law.").

[26] Mann-Elkins Act, Pub. L. No. 61-218, § 7, 36 Stat. 539, 544 (1910).

[27] 47 U.S.C. § 201.

[28] *Munn v. Illinois*, 94 U.S. 113, 126 (1876).

[29] *Id.*; *see also* Walton H. Hamilton, *Affectation with Public Interest*, 39 Yale L.J. 1089, 1097 (1930).

Supreme Court's disavowal of *Lochner* lessened the term's importance to regulatory authority, *see Nebbia v. New York*, 291 U.S. 502 (1934), the term retains its validity. The Supreme Court cases such as *Nebbia* simply expanded the power of government to regulate and never overturned or disavowed the common carriage.  Here we get Justice Thomas's second test: whether the entity is affected with "the public interest."

## B.  Based on Established Legal History, Social Media Platforms and Email Service Providers May Be Regulated As Common Carriers.

As an initial matter, Plaintiffs have produced nothing to show that their members are not in fact common carriers under the various historical tests. This is particularly true in light of the minimal factual development at this stage of litigation. "Courts routinely hold that "[w]hether a particular individual is a common carrier is a question of fact to be determined from the evidence."[30] Plaintiffs' members, despite their claim otherwise, do not constitute "common carriers as a matter of law" (Dkt. No. 12 at 32) under any historical test. As the above analysis shows, common carriage tests often present complicated, fact-intensive questions.

Yet, even given the currently inadequate factual record, large social media platforms and email service providers are prima facie common carriers within the various historical understandings of that term. First, it is unquestionable that the large social media platforms and email service providers have market power. They currently face numerous antitrust suits in Europe and the United States.[31]  While these cases have yet to find the platforms violate the U.S. antitrust laws, market power is but one part of a successful antitrust suit. The economic consensus holds that the large platforms exercise market power against advertisers and have deterred entrance in an anticompetitive manner.[32]

---

[30] *Williams v. Limpert*, 50 V.I. 467, 470 (D.V.I. Aug. 4, 2008) (citing *Commonwealth v. Babb*, 70 A.2d 660, 662 (Pa. Super. Ct. 1950); *Esprit De Corp. v. Victory Express*, No. 95–16887, 1997 U.S. App. LEXIS 7724, at *4, 1997 WL 191466 (9th Cir. Apr. 17, 1997) ("Whether a carrier meets the statutory and regulatory requirements to act as a contract carrier or a common carrier is a question of fact.") (citation omitted); *Powerhouse Diesel Servs. v. Tinian Stevedore*, Civ. No. 93–0003, 1994 U.S. Dist. LEXIS 10661, at *34–35, 1994 WL 383231 (D.N. Mar. I. July 15, 1994) ("What constitutes a common carrier, and what constitutes a contract carrier, are questions of law, but whether the carrier is acting as a common carrier or as a contract carrier is a question of fact.") (quotation omitted); *Wright v. Midwest Old Settlers & Threshers Ass'n*, 556 N.W.2d 808, 810 (Iowa 1996) ("It is a question of law for the court to determine what constitutes a common carrier, but it is a question of fact whether, under the evidence in a particular case, one charged as a common carrier comes within the definition of that term and is carrying on its business in that capacity."); *Beavers v. Federal Ins. Co.*, 437 S.E.2d 881, 882–83 (N.C. Ct. App. 1994) ("[W]hat constitutes a common carrier is a question of law, but whether one is acting as a common carrier is ordinarily a question of fact.") (citation omitted); *Adkins v. Slater*, 298 S.E.2d 236, 240 (W. Va. 1982) ("What constitutes a common carrier is a question of law, but whether a party in a particular instance comes within the class is a question of fact, to be determined as the case may arise.") (quotation omitted)).

[31] *See, e.g.*, Adam Satariano, *Facebook Faces Two Antitrust Inquiries in Europe*, N.Y. Times, June 4, 2021, *available at* https://tinyurl.com/2stnassb; Katyanna Quach, *US States' Antitrust Lawsuit Against Google's Advertising Business Keeps Growing*, The Register, Nov. 16, 2021, *available at* https://tinyurl.com/hv8n5b9j; Cecelia Kant, *States Say They Will Appeal the Dismissal of Their Facebook Antitrust Suit*, N.Y. Times, July 28, 2021, *available at* https://tinyurl.com/2y5dffpa; Aoife White. *EU, U.K. Open First Antitrust Probe into Facebook*, Bloomberg, June 4, 2021, *available at* https://tinyurl.com/v7fnv3bw.

[32] J. Alleman, E. Baranes & P.N. Rappoport, "Multisided Markets and Platform Dominance," in J. Alleman, P.N. Rappoport & M. Hamoudia (eds.), *Applied Economics in the Digital Era* (Palgrave Macmillan 2020); Kenneth A. Bamberger & Orly Lobel, *Platform Market Power*, 32 Berkeley Tech. L.J. 1051 (2017).

Second, both social media and email service providers are industries "affected with the public interest." The category is broad and no doubt includes entities traditionally recognized as common carriers as well as public utilities. In his highly influential listing of industries affected with the public interest, Chief Justice Taft includes both common carriers and public utilities.[33]

Transportation and communications industries form the core of those affected with the public interest as industries providing basic services. In a series of cases, the Supreme Court expanded the concept to include industries closely related to transportation and communication. For instance, the Court ruled meat slaughtering yards were affected with the public interest because they were so interconnected to trains and thus part of the transportation network and essential to food production.[34]

Surely, if industries such as meat packing or express messaging, which are peripheral to a transportation or communication network, are affected with the public interest, then social media would qualify *a fortiori*. There is nothing peripheral about social media. Rather, it is, as the Supreme Court says, the "modern public square."[35]

Third, there is no doubt that social media is part of the communications industry.

Fourth, social media platforms receive countervailing benefits from the government of the sort typically enjoyed only by common carriers. Most importantly, they have conduit immunity under section 230 of the Communications Decency Act, meaning they do not have liability for the third-party content they carry (e.g., unlawful content).[36] This protection is shared with common carriers, which do not have legal liability for the content of the messages they bear.[37]

Like other historic common carriers, social media platforms enjoy a federal exemption from local taxation on the services they provide. The Internet Tax Freedom Act (ITFA) prohibits state and local entities from taxing internet access services that the platforms provide.[38] Again, extraordinary tax privileges and exemptions are historically typical for common carriers, which have often enjoyed exemptions from state and local taxes.[39]

---

[33] *Charles Wolff Packing Co. v. Ct. of Indus. Rels. of Kan.*, 262 U.S. 522, 535–36 (1923).

[34] *Id.*; *see also German Alliance Ins. Co. v. Kansas*, 233 U.S. 389, 414–15 (1914) (fire insurance relied upon as an essential service for all industries); *Brass v. North Dakota ex rel. Stoeser*, 153 U.S. 391, 405 (1894) (grain elevators that were an integral part of grain transportation and the commodity trade); *Fort St. Union Depot Co. v. Hillen*, 119 F.2d 307, 312 (6th Cir. 1941) (railroad terminals that simply receive traffic are common carriers because they are essential to transportation); *Railway Express Agency v. Kessler*, 189 Va. 301, 305 (1949) (express messenger services that rely upon regular train operation).

[35] *Packingham v. North Carolina*, ___U.S.___, 137 S. Ct. 1730 (2017).

[36] 47 U.S.C. § 230(c)(1); *see Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997).

[37] Telegraph companies generally had no liability for the statements they transmitted, but they could be liable if they acted with malice or with knowledge that the sender was not privileged to make the statement. *See* Restatement (Second) Of Torts § 612(2); *Mason v. W. Union Tel. Co.*, 125 Cal. Rptr. 53, 56 (1975); *W. Union Tel. Co. v. Lesesne*, 182 F.2d 135, 137 (4th Cir. 1950); *Von Meysenbug v. W. Union Tel. Co.*, 54 F. Supp. 100, 101 (S.D. Fla. 1946).

[38] Title IX, Pub. L. No. 105-277, 112 Stat. 2681-719 (1998).

[39] *See supra* note 18.

Fifth, social media holds itself out as providing service to all. Anyone can join a social media platform on equal terms as set forth in the platform's terms and conditions.

## C.  Plaintiffs' and Amici's Proposed Common Carriage Tests Have No Historical Legal Bases.

Rather than apply the accepted historical tests for common carriage to large social media firms, Plaintiffs and their Amici invent tests out of whole cloth and then claim that social media platforms fail to meet their ersatz tests. Contrary to historical precedent, they erroneously claim that (1) common carriers must serve users "indifferently" and may not have terms and conditions concerning the goods, passengers, or messages they carry; and (2) common carriers produce or provide standardized or uniform goods or services, which at least one Amicus terms a "widget of information," whereas social media is rapidly advancing public-facing communications.  Neither argument has a basis in legal history.

Plaintiffs assert that large social platforms "are not common carriers as a matter of law or fact . . . [because] common carriers were those who undertook to transport or carry goods 'indifferently.'" (Dkt. No. 12 at 32) Plaintiffs define "indifferent" as not distinguishing among customers, materials, or content carried. They contend that because social media platforms are *not* indifferent and, for instance, do not permit adult content or pornography or only accept users who agree to the platforms' terms and policies and comply with each platform's respective community standards, the platforms cannot be common carriers.

First, there is no historic common carrier legal test that requires "indifference." Common carriers were never obligated—and to this day have no obligation—to accept all traffic. They are *not indifferent* to the passengers, goods, and messages they transport.  Airlines can deny service to unruly passengers or those who otherwise violate their rules, as can railroads.[40] Telephones are not obligated to carry harassing phone calls.[41]

Rather, cases that use "indifferent" refer to Blackstone's implied contract, which must be offered to all but can distinguish among customers, materials, or content.  Historically, common carriers must serve all under the same and "non-different" general terms and conditions, i.e., Justice Thomas's fifth test for common carriers.  But, in this context, "indifferently" means that the terms and conditions in the implied contract must be offered to all.  "Indifferent" here means "not different."  Common carriers must have "nondiscriminatory . . . terms."[42]  A common carrier need not "make individualized decisions, in particular cases, whether and on what terms to deal."[43]  For

---

[40] *Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975) (recognizing the "common law rule that 'where a carrier has reasonable cause to believe, and does believe, that the safety or convenience of its passengers will be endangered by a person who presents himself for transportation, it may refuse to accept such person for transportation and is not bound to wait until events have justified its belief'"); *Dir. Gen. of Railroads v. Viscose Co.*, 254 U.S. 498 (1921) (a common carrier railroad may refuse to transport artificial silk providing such limitation was duly promulgated in tariffs).

[41] *See* 47 U.S.C. 223 − Obscene or harassing telephone calls in the District of Columbia or in interstate or foreign communications.

[42] *Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1000 (2005).

[43] *Am. Orient Exp. Ry. Co., LLC v. Surface Transp. Bd.*, 484 F.3d 554, 557 (D.C. Cir. 2007) (citing *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976)).

example, a common carrier railroad may refuse to carry artificial silk, provided that such prohibition is duly published in its tariffs and thereby included in its terms or service.[44] A common carrier is not obligated to carry all substances.

Even though common carriers have traditionally been required to offer the same contract to all, that historical requirement has not meant that common carriers cannot refuse certain passengers, freight, or messages or have demanding terms of service, provided these terms and conditions are non-discriminatorily applied. Further, the "rule of the common law [is] that common carriers have the right to decline shipment of packages proffered in circumstances indicating contents of a suspicious, indeed of a possibly dangerous, nature."[45]

The cases Plaintiffs cite do not negate this historical understanding. In *Allen v. Sackrider*,[46] the court answered the question of whether a sloop hired in what appeared to be a one-off contract to carry grain was a common carrier. Finding that the sloop did not make a general offering of services to all, the court held that it was not a common carrier. It stated, quoting Story on Contracts, § 752: "Every person who undertakes to carry, for a compensation, the goods of all persons indifferently, is, as to the liability imposed, to be considered a common carrier. The distinction between a common carrier and a private or special carrier is, that the former holds himself out in common, that is, to all persons who choose to employ him, as ready to carry for hire; while the latter agrees, in some special case, with some private individual, to carry for hire."[47]

The full quotation makes it apparent that the case is an example of Justice Thomas's fifth test for common carrier: whether a firm "holds himself out in common" to all offering the same, non-differentiated contracts.  The case does not mean that a common carrier must carry all and has no power to refuse—rather it must make a common offering of terms and conditions, which can be restrictive or selective, to all.

*Bank of Orange v. Brown*,[48] is also an example of this same test for common carrier, which the court applied to a steamboat that apparently mislaid bank bills.  Plaintiffs quote the court: "Every person who undertakes to carry, for a compensation, the goods of all persons indifferently, is, as to the liability imposed, to be considered a common carrier." Plaintiffs omit the very next sentence: "There is an implied undertaking on his part to carry the goods safely, and on the part of the owner to pay a reasonable compensation."[49] The court was speaking about an "implied undertaking" that is the same, i.e., the carrier had to offer in its implied contract the same standard of liability to all. However, that does not mean that he must carry more grain than his ship can safely carry or bear unlawful substances in his steamboat.

Finally, *Gisbourn v. Hurst*,[50] is inapposite. The case involved whether a landlord could seize cheese transported by a common carrier who owed the landlord rent. The opinion explains that

---

[44] *Dir. Gen. of Railroads*, 254 U.S. 498.

[45] *United States v. Pryba*, 502 F.2d 391, 399 (D.C. Cir. 1974); *see also Nitro-Glycerine Case* (*Parrott v. Wells*), 82 U.S. (15 Wall.) 524, 535-36 (1872); *Bruskas v. Railway Express Agency*, 172 F.2d 915, 918 (10th Cir. 1949).

[46] *Allen v. Sackrider*, 37 N.Y. 341, 342 (1867).

[47] *Id.*

[48] *Bank of Orange v. Brown*, 1829 WL 2396 (N.Y. Sup. Ct. 1829).

[49] *Id.* at *2.

[50] *Gisbourn v. Hurst*, I Salk. 249, 250, 91 Eng. Rep. 220, 220 (1710).

"indifferently" means that a common carrier must offer the same terms and conditions to all. In other words, Hurst was obligated to carry cheese or similar goods for all. It did not mean that he had to be indifferent to what he carried, i.e., he could refuse to carry unlawful substances or things unsafe or too large for his wagon.

Amicus TechFreedom forwards different claims, which also lack historical legal basis. TechFreedom states that the "business of common carriers is, at its core, the transportation of property." (Dkt. No. 32 at 3 (internal quotation marks omitted).)  As shown above, this claim has no historical basis. As an initial matter, one of the most important types of "property" that common carriers carried for most of history was letters. Given that history, courts classified new technologies that carry messages, such as telephones and telegraphs, as common carriers. As even TechFreedom concedes, telegraphs and telephones are regulated as common carriers under the Mann-Elkins Act of 1912. (Dkt. No. 32 at 3-4.) The Communications Act of 1934 discussed above defines common carriers even more broadly to include wire communications.

Retreating from its own claim that common carriers do not involve communications industries, TechFreedom argues that social media is somehow metaphysically different from telegraphs and telephones. "Although it doubtless contains a message, a telegram is best thought of as a widget of information conveyed along 'public ways' by a commodity carrier . . . ." (Dkt. No. 32 at 3 (citation omitted).)  In contrast, social media platforms "are not interchangeable carriers of information widgets. The core aspect of their product, in fact, is not *transportation* at all. What the platforms offer is a wide array of differentiated—and rapidly evolving—forms of public-facing communication." (Dkt. No. 32 at 4.)

TechFreedom's discussion leaves it unclear what it means by "differentiated—and rapidly evolving—forms of public-facing communication," let alone a "widget of information." (Dkt. No. 32 at 3-4.) Indeed, all of its examples involve transmitting messages just like telegraphs and telephones. TechFreedom says, "Twitter's main product is a microblog." (Dkt. No. 32 at 4.) Well, no.  Twitter transmits its users' messages ("tweets") to their followers. TechFreedom says Instagram "is primarily a photo-sharing service." (Dkt. No. 32 at 4.) Instagram sends pictures just as the post office or a fax machine does.  Facebook, we learn, "has embraced several of these other forms, [although] has recently recommitted to fostering group pages." (Dkt. No. 32 at 4.) Again, a group page is simply a forum where multiple individuals send each other messages. As a matter of fact, each of these modern examples falls squarely within the historical definition of a common carrier.

TechFreedom also quotes the famous gnomic statement of media scholar Marshall McLuhan that "the medium is the message." (Dkt. No. 32 at 4.)  But, even with famous quotations, TechFreedom cannot mispresent the essential nature of social media:  carrying messages between users and recipients the user chooses—just as phones, telegraphs, and messenger services have historically done.

Finally, TechFreedom claims that "[t]he FCC has long held that data *transport* is the essence of telecommunications common carrier service, whereas any offering over the telecommunications network which is more than a basic transmission service is not." (Dkt. No. 32 at 4 (internal quotation marks omitted).)  It claims that services other than telephones, "even simple text

messaging, which requires the carrier to undertake some information processing during transmission, is not" basic transmission. (Dkt. No. 32 at 4.)

This argument simply mispresents federal law and FCC regulation. All communications services, basic or enhanced, offered to the public is potentially regulable under section 201 common carrier authority.[51]  The Communications Act of 1934 states that it "shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor."[52] For decades, the FCC *chose* to exempt computer-based communications, such as internet access or text messaging, from common carriage, but continued to regulate them as "enhanced" or "information services."[53]  But, the FCC never disclaimed the power to regulate these information services as common carriers—and indeed recently has so regulated them.[54]

## D.  It is Historically Well-Established That States May Impose Nondiscrimination Requirements on Common Carriers Transmitting or Receiving Interstate and Intrastate Messages.

The United States Supreme Court has long held that states have the power, pursuant to their common carrier authority, to impose non-discrimination requirements not only on intrastate common carriers but also on interstate carriers transmitting or delivering messages within their borders.

In *Western Union v. James*,[55] the Court reviewed a claim that a Georgia law regarding telegraph delivery within the state violated the Constitution by interfering with the federal government's power under the commerce clause.  The Georgia law read in relevant part: "Be it enacted . . . [that] every electric telegraph company  . . . wholly or partly in this state . . . shall transmit and deliver the same with *impartiality and good faith*."[56]

This case presented the exact issue the Court now faces—whether Texas may impose nondiscrimination requirements on communications firms for in-state transmission and delivery. The Supreme Court in *Western Union v. James* ruled that states do have that power. Rejecting a constitutional challenge that the state exceeded Commerce Clause limits, the Court reasoned that there "are many occasions where the police power of the state can be properly exercised to insure a faithful and prompt performance of duty within the limits of the state upon the part of those who are engaged in interstate commerce."[57]

---

[51] *Verizon v. Fed. Commc'ns Comm'n*, 740 F.3d 623, 629-30 (D.C. Cir. 2014) (The FCC "drew a line between 'basic' services, which were subject to regulation under Title II of the Communications Act of 1934 as common carrier services, *see* 47 U.S.C. §§ 201 *et seq.*, and 'enhanced' services, which were not. . . . What distinguished 'enhanced' services from 'basic' services was the extent to which they involved the processing of information rather than simply its transmission.").

[52] 47 U.S.C. § 201.

[53] *Mozilla Corp. v. Fed. Commc'ns Comm'n*, 940 F.3d 1, 34 (D.C. Cir. 2019) ("Petitioners are in a weak posture to deny that inclusion of 'search engines and web browsers' could support an 'information service' designation . . . .").

[54] *In the Matter of Protecting & Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5614-16 (2015).

[55] *W. Union Tel. Co. v. James*, 162 U.S. 650, 651 (1896).

[56] *Id.* (emphasis added).

[57] *Id.* at 662.

*Western Union v. James* was hardly an isolated decision. In subsequent decades, the Supreme Court and state supreme courts made clear that states could require communications firms within their borders to transmit and deliver messages in an impartial and good faith manner.[58]

### III.  Conclusion

Over the centuries, courts have developed five widely accepted tests for what constitutes a common carrier. It is my expert opinion that large social media firms qualify under each of these tests. Therefore, Texas is within its historical legal authority to regulate social media firms as common carriers. In fact, state laws have regulated telegraphs, which is a common carrier as well, in the precise way as H.B. 20 seeks to regulate social media platforms.  The U.S. Supreme Court on numerous occasions has upheld those laws.

Plaintiffs evade the conclusion that social media firms can be regulated as common carriers by positing tests for common carrier status that are, to be blunt, invented for the purposes of this lawsuit. Their tests have no support in legal history or precedent.

Dated: November 22, 2021

Adam Candeub

Digitally signed by Adam Candeub
Date: 2021.11.22 17:01:42
-05'00'

Signed: _____
Adam Candeub

---

[58] *See W. Union Tel. Co. v. Crovo*, 220 U.S. 364, 367 (1911) (New York law "makes it the duty of every telegraph company doing business in the state to receive and transmit prepaid messages 'faithfully, impartially, with substantial accuracy, as promptly as practicable.' But the standard of duty under the statute is precisely that imposed at common law upon such a common carrier."); *W. Union Tel. Co. v. Com. Milling Co.*, 218 U.S. 406 (1910) (upholding Michigan law requiring "all telegraph companies . . . to receive dispatches from and for other telegraph companies' line . . . and transmit the same with impartiality and in good faith"); *W. Union Tel. Co. v. Sims*, 190 Ind. 651 (Ind. 1921) (upholding Indiana law requiring telegraph firms to deliver a telegram "with impartiality and in good faith").

APPENDIX A

# Adam Candeub

1185 Wrightwind Drive ▪ Okemos, MI 48864 ▪ 517-432-6906 ▪ candeub@law.msu.edu

**EXPERIENCE**

July 2004–Apr. 2020; February 2021-present
Michigan State University College of Law                                      East Lansing, MI
- Assistant Professor (September 2004-August 2010)
- Associate Professor (September 2010-August 2012)
- Professor, College of Law (September 2012-present)
- Director, Intellectual Property, Information, and Communications Law Program (2007 – present)
  - Led program to a top ranking in US News and World Reports
  - Oversaw hiring of major, internationally recognized scholars
  - Created forward-looking, data analytics-centered curriculum
  - Developed novel gamified coursework

Dec. 2020-Jan.2021                     Department of Justice                  Washington, D.C.
- Deputy Associate Attorney General

Apr. 2020–Dec. 2020   National Telecommunications & Information Authority (NTIA)
                  Department of Commerce   Washington, DC
- Deputy Assistant Secretary (Apr. 2020-September 2020)
- Acting Assistant Secretary (Sept. 2020-Dec. 2020)
  - Led agency efforts on section 230 reform, supply chain security, and 5G spectrum

Mar. 2000 – May 2004          Federal Communications Commission          Washington, DC
                          Attorney-Advisor
- Media Bureau   (August 2001 – June 2004)
- Common Carrier Bureau, Competitive Pricing Division  (March 2000 – August 2001)

Mar. 1998 – Mar. 2000                 Jones, Day, Reavis & Pogue           Washington, DC
                          Litigation Associate

Oct. 1996 – Jan. 1998          Cleary, Gottlieb, Steen & Hamilton          Washington, DC

Corporate Associate

Aug. 1995 – Aug. 1996          Chief Judge J. Clifford Wallace          San Diego, CA
                    Law Clerk, U.S. Court of Appeals for the Ninth Circuit

**SELECTED PUBLICATIONS**

*Reading Section 230 as Written,* 1 J. of Free Speech 139 (2021)

*Interpreting 47 U.S.C. § 230(c)(2),* 1 J. of Free Speech 175 (2021) (with Eugene Volokh)

*Preference and Administrative Law,* 72 Administrative L. Rev. 608 (2020)

*Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 Yale Journal of Law & Tech. 391 (2020)

*March to The Middle? Herd Behavior, Video Economics, and Social Media,* Competition Policy International, Antitrust Journal (Jan. 9, 2019)

*Nakedness and Publicity,* 104 Iowa L. Rev. 1747 (2019)

*Common Carriage and Internet Privacy*, 51 UC Davis Law Review 805 (2018)

*Tyranny and Administrative Law,* 59 Arizona L. Rev. 49 (2017)

*Networks, Neutrality and Discrimination*, 69 Administrative L. Rev. 125 (2017)

*Privacy and Common Law Names: Sand in the Gears of Identification,* 68 Fla. L. Rev. 467 (2016)

*Digital Medicine, the FDA, and the First Amendment*, 49 Georgia L. Rev. 933 (2015)

*Is There Anything New To Be Said About Network Neutrality?* 2015 Mich. St. L. Rev. 455

*Behavioral Economics, Internet Search, and Antitrust*, 9 I/S: A Journal of Law and Policy for the Information Society 407 (Winter 2014)

*Transparency in the Administrative State,* Symposium Issue, 51 Houston Law Review 385 (2013)

*Akratic Corporations and Dysfunctional Markets*, Symposium Issue, 1 University of Virginia Criminal Law Review 243 (2013)

*Law and the Open Internet* (with Daniel John McCartney), 64 Federal Communications Law J. 493 (2012)

*A Dead End for End-to-End? A Review Essay of Barbara van Schewick's* Internet Architecture and Innovation, 64 Federal Communications Law J. 493 (2012)

Transnational Culture in the Internet Age:  New Paradigms for Law and Communications (ed., with Sean Pager) (2012)

*Introduction*, Transnational Culture in the Internet Age:  New Paradigms for Law and Communications (with Sean Pager) (2012)

*Modernizing Marriage* (with Mae Kuykendall), 44 U. Mich. J.L. Reform 735 (2010-2011)

*Contract, Warranty, and the New Healthcare Legislation,* 46 Wake Forest L. Rev. 46 (2011)

*Network Growth: Theory and Evidence from the Mobil Telephone Industry* (with Brendan Cunningham & Peter J. Alexander), 22 Information Econ. & Policy 91 (2010)

*Partisans and Partisan Commissions* (with Keith Brown, Ph.D.), 17 George Mason L. Rev. 789 (2010)

*Shall Those Who Live By FCC Indecency Complaints Die by FCC Indecency Complaints?* Symposium Issue, 2 Regent Univ. L. Rev. 307 (2010)

*Network Transparency: Seeing the Neutral Network* (with Daniel John McCartney), 8 Northwestern J. of Tech. & IP (Spring 2010)

*An Economic Theory of Criminal Excuse,* 50 Boston College L. Rev. 87 (2009)

*Media Ownership Regulation, the First Amendment, and Democracy's Future,* 41 U.C. Davis L. Rev. 1547 (2008) (reprinted in *The First Amendment Law Handbook 2009-10* (Rod Smolla. ed.))

Spring Symposium Issue: First Amendment Lochnerism? Emerging Constitutional Limitations on Government Regulation on Non-speech Economic Activity, *The First Amendment and Measuring Media Diversity: Constitutional Principles and Regulatory Challenges,* 33 N. Kentucky L. Rev. 373 (2006)

*The Law and Economics of Wardrobe Malfunction* (with Keith Brown, Ph.D.), 2005 Brigham Young U. L. Rev. 1463

*Creating A More Child-Friendly Broadcast Media,* 3 Mich. State L. Rev. 911 (2005)

*Trinko and Re-grounding the Refusal to Deal Doctrine,* 66 U. Pitt. L. Rev. 821 (2005) "Access Remedies After Trinko" (with Jonathan Rubin & Norman Hawker) in *Network Access, Regulation and Antitrust* (American Antitrust Institute, 2005)

*Can the FCC Regulate Media Ownership?* American Bar Association, Focus on Law Studies (Jan. 2005)

*Network Interconnection and Takings,* 54 Syracuse L. Rev. 369 (2004)

*Consciousness and Culpability,* 54 Alabama L. Rev. 113 (2002)

*Motive Crimes and Other Minds,* Comment, 142 U. Penn. L. Rev. 2071 (1994)

## EDUCATION

University of Pennsylvania Law School, J.D. *magna cum laude*          1992-95
Philadelphia, PA
     University of Pennsylvania Law Review, Articles Editor 1994-1995
     Order of the Coif

Yale University, B.A. *magna cum laude*          1986-90
New Haven, CT

## COURSES TAUGHT

Administrative Law/ Regulatory State          Antitrust
Communications Law          Legal Analytics
Criminal Law          Privacy and Information Security Law
Quantitative Methods for Lawyers          Ratemaking and Utility Law
Cyber Law

**AWARDS**

Tilburg Law and Economics Center Award for Research in Search Engines (with S. Wildman)

Fulbright Lecture and Research Fellowship, University of Rijeka Faculty of Law, Croatia, Spring 2011

**Appendix B**
**Adam Candeub**
**Additional Publications**

*Keep Twitter Accountable Without Censorship*, Wall Street Journal, Nov. 7, 2017.

*Why Revoking Obama's Sex Assault Letter Won't End Campus Witch Hunts*, The Federalist, January 16, 2018.

*Platform, or Publisher? If Big Tech Firms Want To Retain Valuable Government Protections, Then They Need To Get Out of the Censorship Business*, The Wall Street Journal, May 7, 2018.

*Will Microsoft's Embrace Smother GitHub?* The Wall Street Journal, June 24, 2018.

*A Response to Online Shadow Banning: "Common carriage" Law Points to a Solution for the Problem of Censorship on Social Media*, Wall Street Journal, Aug. 5, 2018.

*Social Media Platforms or Publishers? Rethinking Section 230*, The American Conservative, June 21, 2019.

*Why Hawley's Bill Is the Right Tool To Fight Big Tech's Censorship of Conservatives*, The Federalist, July 9, 2019.

Letter, *Antitrust Must Address the Future Instead of the Past*, Wall Street Journal, July 17, 2019.

*Mike Lee, Google, and a Curious Antitrust Flip-Flop*, RealClear Politics, Aug. 29, 2019.

*Antitrust Must Address the Future Instead of the Past*, Wall Street Journal, July 17, 2019.

*How to Apply Non-Discrimination to Digital Platforms via Common Carriage*, Newsweek, May 25, 2021.

*Florida Is Moving the Ball Forward Against Big Tech Censorship*, Newsweek, June 4, 2021.

*The PRO-SPEECH Act is a Creative Solution to Censorship*, Newsweek, June 15, 2021.

**Forbes, Washingtonbytes blogs:**

- June 12, 2019: To Protect Free Speech, Reform Section 230. Don't Put It into the USMCA
- Aug. 1, 2019: Will Microsoft's New Partnership with Open AI Benefit China?
- Dec. 17, 2019: Google's IP Theft Entrenches its Monopoly Power
- Dec. 18, 2019: A GitHub Subsidiary in China Threatens National Security and Internet Freedom
- Feb. 5, 2020:  FCC Chair Ajit Pai Must Press Forward on 5G Auctions

- Feb. 26, 2020: The Obama Open Internet Vote's 5th Anniversary: Time to Talk About Network Neutrality for Big Tech
- Mar. 13, 2020: Airbnb's Woe Now Includes IBM's Patent Infringement Suit
- Apr. 24, 2020: To Fight Global IP Theft, Keep Legal Enforcement Focused
- Apr. 26, 2020: "Infotainment Systems" in Cars Portend Safety, Privacy, and Competition Issues

## **Appendix C**

**Case Materials Reviewed:**

- Plaintiffs' Motion for Preliminary Injunction (with exhibits)
- Defendant's Motion for Expedited Discovery (with exhibits)
- Plaintiffs' Combined Response in Opposition to Defendant's Motion for Expedited Discovery and Motion for Extension
- Defendant's Reply in Support of Motion for Expedited Discovery
- Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1)
- *Amicus Curiae* Brief of TechFreedom in Support of Plaintiffs NetChoice and CCIA's Motion for Preliminary Injunction