IN THE UNITED STATES DISTRICT COURT

For the Western District of Texas

Austin Division


NETCHOICE, LLC d/b/a NetChoice, a    :

501(c)(6) District of Columbia       :

   Organization, COMPUTER &            :Civil Action

   COMMUNICATIONS INDUSTRY ASSOCIATION :No.

   1:21-cv-00840-RP

d/b/a CCIA, a 501(c)(6) non-stock    :

Virginia Corporation,                :

         Plaintiffs,              :

         v.                       :

KEN PAXTON, in his official capacity:

as Attorney General of Texas,        :

         Defendant.               :

Tuesday, November 16, 2021

Washington, D.C.

MATTHEWS SCHRUERS, pursuant to notice, the witness
being sworn by BARBARA MOORE, a Notary Public in
and for the District of Columbia, taken at the
offices of CCIA, 25 Massachusetts Avenue, NW,
Washington, D.C., on Tuesday, November, 2021, and
the proceedings being taken down by Stenotype by
BARBARA MOORE, CRR, RMR and transcribed under her
direction.

2

```
1   APPEARANCES:
2
3       On Behalf of Plaintiff CCIA:
4       TODD DISHER, ESQ.
5       LEHOTSKY KELLER
6       909 Congress Avenue, Suite 1100
7       Austin, Texas 78701
8       todd@lehotskykeller.com
9
10      On Behalf of the Defendant:
11      COURTNEY CORBELLO, Assistant Attorney
12      General
13      BENJAMIN LYLES, Assistant Attorney
14      General
15      P.O. Box 12548
16      Austin, Texas  768711-2548
17      Courtney.corbello@oag.texas.gov
18      benjamin.lyles@oag.texas.gov
19  Videographer: Gene Aronov
20
21
22
23
24
25
```

3

```
1           TABLE OF CONTENTS
2              WITNESSES
3   WITNESS                      PAGE
4   MATTHEW SCHRUERS
5   By Mr. Lyle             5
6   By Mr. Disher           167
7
8
9
          _____EXHIBITS_____
10
    EXHIBIT      DESCRIPTION        PAGE
11
    Exhibit 1   Declaration         12
12
    Exhibit 2   DTSP document       17
13
    Exhibit 3   HB 20               30
14
15  *****Exhibit 2 was not tendered to reporter*****
16
17
18
19
20
21
22
23
24
25
```

4

```
1          P R O C E E D I N G S
2       THE VIDEOGRAPHER:  Good morning.
3   This begins the video deposition of
4   Matthew Schruers taken by defendant [sic]
5   in the matter of NetChoice, LLC, et al.,
6   versus Computer & Communications Industry
7   Association, et al., filed in the United
8   States District Court for the Western
9   District of Texas, Austin Division, Civil
10  Action Number 1:21-cv-00840-RP.
11      This deposition is being held at
12  25 Massachusetts Avenue NW, Suite 300C,
13  Washington, D.C. on November 16, 2021, at
14  approximately 2:24 p.m.
15      My name is Gene Aronov from the
16  firm Integrity Legal Support Solutions,
17  and I am the legal video specialist.  The
18  court reporter is Barbara Moore from the
19  firm Integrity Legal Support Solutions.
20      Will counsel please introduce
21  themselves.
22          (Attorneys stated their
23
24
25
```

5

```
1       appearances for the record.)
2       THE VIDEOGRAPHER:  Will the court
3   reporter please swear in the witness.
4           ************************
5           MATTHEW SCHRUERS,
6   having been called as a witness on behalf of the
7   Defense and having been first duly sworn, was
8   examined and testified as follows:
9   EXAMINATION BY
10  MR. LYLE:
11      Q.   Good afternoon, Mr. Schruers.  Would
12  you please state and spell your name for the
13  record.
14      A.   Matthew Schruers, S-c-h-r-u-e-r-s.
15      Q.   And have you been deposed before?
16      A.   I have not.
17      Q.   So a few guidelines.  If you could
18  please give a verbal answer to every question so
19  the court reporter can get it down.  Don't say
20  "uh-huh" or nod or anything like that.  And if you
21  want to take a break, feel free to, you know, ask
22  your counsel to ask for one, but please finish
23
24
25
```

Matthew Schruers - 11/16/2021

6

1  answering whatever question you've been asked
2  beforehand.
3      What does -- what does CCIA stand for?
4      A.   It's the Computer & Communications
5  Industry Association.
6      Q.   And what is your position at CCIA?
7      A.   I'm the president.
8      Q.   And what -- what are your job duties
9  there?
10     A.   I oversee the organization and
11 manage its general affairs and direct its policy
12 and its legal practice.
13     Q.   And what does the organization do?
14     A.   It is a trade association that seeks
15 to foster its mission and the interests of its
16 members.
17     Q.   And what is its mission?
18     A.   Open markets, open systems, open
19 networks.
20     Q.   And who -- who are some of its more
21 prominent members?
22     A.   The association has 20-some members.
23
24
25

7

1  They include Apple, Amazon, Facebook, Google,
2  Twitter, Pinterest, Samsung, Intel, Intuit and
3  various others.  They're all on the association's
4  website.
5      Q.   And how do you become a member of
6  CCIA?
7      A.   There's an application process.
8      Q.   And how thoroughly are applicants
9  vetted, or what are some of the requirements?
10     A.   Applicants are vetted by board.
11 They need to meet criteria that the board applies.
12 And general criteria established on the application
13 form includes belonging to the industry, sharing
14 the association's mission, various other factors
15 that are for the board's consideration.
16     Q.   And how would you describe that
17 industry?
18     A.   The computer and communications
19 industry.
20     Q.   Okay.  How does CCIA receive
21 funding?
22     A.   Through dues.
23
24
25

8

1      Q.   Through what?
2      A.   Through contributions from members,
3  companies.
4      Q.   Okay.  To be a member, is it a
5  condition that you make a monetary contribution?
6      A.   There is a dues requirement for
7  membership, yes.
8      Q.   And are those dues equal across the
9  membership, or do they vary from member to member?
10     A.   They are indexed by revenue.
11     Q.   Indexed by revenue.  What sort of
12 percentage of each company's revenue would that
13 index consist of?
14          MR. DISHER:  Objection.  Form.
15          THE WITNESS:  Yeah, can you --
16 BY MR. LYLE:
17     Q.   So you said the dues are indexed by
18 revenue.  Does that mean that each company pays a
19 percentage of its revenue?
20     A.   No.
21     Q.   What does "indexed by revenue" mean?
22     A.   "Indexed by revenue" means that as
23
24
25

9

1  revenues increase, the dues increase.
2      Q.   On a company-by-company basis?
3      A.   What's on a company-by-company
4  basis?
5      Q.   So, for example, would a company
6  like Google pay more in dues than a company that
7  was, say, 1/100 of its size by revenue?
8      A.   Yes.
9      Q.   So it's fair to say that the greater
10 the revenue of the company, the more dues they pay?
11          MR. DISHER:  Objection.  Form.
12          THE WITNESS:  Is it fair?
13 BY MR. LYLE:
14     Q.   Is it accurate?
15     A.   It is -- it is accurate that higher
16 annual revenues companies pay higher dues.
17     Q.   Okay.  Who are your three highest
18 annual revenue companies?
19     A.   I don't have that information at my
20 fingertips.
21     Q.   Would -- would Facebook be in the
22 top five?
23
24
25

10

```
1      A.   I don't have that at my fingertips.
2      Q.   Would Google be in the top five?
3      A.   I don't have that at my fingertips
4  either.
5      Q.   What about Amazon?
6      A.   I don't have that at my fingertips.
7      Q.   So you don't -- you don't know who
8  your top five dues payers in revenue are?
9           MR. DISHER:  Objection.  Form.
10          THE WITNESS:  I'd have to
11     speculate.
12 BY MR. LYLE:
13     Q.   Could you speculate, please?
14          MR. DISHER:  Objection.  Form.
15          MR. LYLE:  Okay.  So just let the
16     record reflect that the deponent is
17     refusing to speculate as to the top five
18     dues payers.
19 BY MR. LYLE:
20     Q.   Do you work with NetChoice in any
21 other context besides this lawsuit?
22     A.   Context?
23
24
25
```

11

```
1      Q.   Yes.  Apart from suing the State of
2  Texas for NetChoice, do you work with them in any
3  other way?
4      A.   The association is also a
5  co-plaintiff with NetChoice in a suit against
6  Florida.
7      Q.   Okay.  You said -- you described
8  your organization's mission earlier.  As a
9  practical matter, how does that play out in the
10 organization's activities?
11     A.   Influences the association
12 personnel's decision-making about what issues to
13 prioritize and how to pursue policies that are
14 representative of the industry's interests,
15 generally speaking.
16     Q.   Does the organization lobby members
17 of Congress?
18     A.   It does.
19     Q.   Does it lobby members of the Senate?
20     A.   Yes.
21     Q.   Does it make any campaign
22 contributions?
23
24
25
```

12

```
1      A.   No.
2      Q.   All right.  I'm going to hand you
3  your declaration, Mr. Schruers.  And I'm going to
4  mark this as Exhibit 1.
5           (Exhibit 1, Declaration, was
6      marked for identification.)
7  BY MR. LYLE:
8      Q.   Are you familiar with that document,
9  Mr. Schruers?
10     A.   Assuming this document is a true
11 copy of my declaration, yes.
12          MR. DISHER:  Is that document in
13     the exhibit binder?
14          MR. LYLE:  Yes.
15 BY MR. LYLE:
16     Q.   Who drafted that document,
17 Mr. Schruers?
18     A.   I did, in collaboration with the
19 association's counsel.
20     Q.   About how many drafts did that go
21 through?
22          MR. DISHER:  I'll instruct the
23
24
25
```

13

```
1      witness not to answer to the extent it
2      will implicate anything you've discussed
3      or worked on with counsel for CCIA.
4  BY MR. LYLE:
5      Q.   Who edited it and revised it?
6           MR. DISHER:  Same instruction.
7  BY MR. LYLE:
8      Q.   Who saw drafts before you signed it?
9           MR. DISHER:  Same instruction.
10 BY MR. LYLE:
11     Q.   When did you start drafting it?
12     A.   Prior to filing the Complaint.
13     Q.   Who did you consult with while
14 drafting it?
15          MR. DISHER:  Again, same
16     instruction to the extent it implicates
17     discussions you've had with attorneys.
18     Otherwise, you can answer.
19          MR. LYLE:  So I wasn't asking
20     about the content of the discussions.
21     I'm was asking about who he consulted
22     with, which I don't believe is
23
24
25
```

Matthew Schruers - 11/16/2021

14

1      privileged.
2          MR. DISHER:  You can identify who
3   you talked to.  To the extent that those
4   conversations took place with lawyers for
5   CCIA, do not answer.
6          THE WITNESS:  Can I identify
7   counsel?
8          MR. LYLE:  Yes.
9          THE WITNESS:  I discussed the
10  draft with one of our in-house counsel.
11  BY MR. LYLE:
12      Q.    And did that in-house counsel have a
13  role in editing and revising it?
14         MR. DISHER:  I will instruct the
15     witness not to answer that question based
16     on attorney-client privilege and attorney
17     work product privilege.
18  BY MR. LYLE:
19      Q.    Did you communicate with your
20  members as to any of the information contained in
21  the declaration?
22      A.    Not to my recollection.
23
24
25

15

1      Q.    So they didn't go over any drafts or
2   anything?
3      A.    Not to my recollection.
4      Q.    Any phone conversations or anything
5   with them?
6      A.    Again, not to my recollection.
7      Q.    When was the Digital Trust & Safety
8   Partnership created?
9      A.    It was incorporated in approximately
10  the first quarter of 2020.
11      Q.    And I see from the organization's --
12  or the partnership's framework that CCIA incubated
13  it or is incubating it.  Is that correct?
14      A.    That's generally the accurate term,
15  yes.
16      Q.    And what -- what does that mean?
17      A.    The association supports the efforts
18  of the partnership in its activities.
19      Q.    Did the association draft the
20  framework?
21      A.    No.
22      Q.    Did it have input on the framework?
23
24
25

16

1      A.    I, in my joint capacity as one of
2   the cofounders, provided input and contributed to
3   the drafting of the framework.
4      Q.    As a cofounder of the framework or a
5   cofounder of CCIA?
6      A.    A cofound-- what is a --
7      Q.    I'm sorry?
8      A.    Can you give me a full question?
9      Q.    You contributed to the framework as
10  a cofounder of the digital partnership or of CCIA?
11      A.    I contributed to the framework as a
12  cofounder of the Digital Trust & Safety
13  Partnership.
14      Q.    Okay.
15          (Discussion held off the
16     record.)
17  BY MR. LYLE:
18      Q.    I'm handing you the first seven
19  pages of your document production of the Digital
20  Trust & Safety Partnership.
21         MR. DISHER:  Is this in the binder
22     too?
23
24
25

17

1          MR. LYLE:  Yes.
2          MR. DISHER:  Do you know what tab
3      it is?
4          MR. LYLE:  15.
5   BY MR. LYLE:
6      Q.    Mr. Schruers, is there a significant
7   overlap between CCIA's membership and not of the
8   Digital Trust & Safety Partnership?
9          MR. DISHER:  Hold on one second.
10     Just to be clear, two -- it looks like
11     that starts on page 1 of that document,
12     not page 2.  I just want to be --
13         MR. LYLE:  Yeah, you're right.
14         (Exhibit 2, DTSP document ,
15     was marked for identification.)
16         MR. DISHER:  Okay.  So is this --
17     this is Exhibit 2.  And Exhibit 2 is
18     Bates No. CCIA -- it looks like the Bates
19     got cut off here.  But it's the -- it's
20     the DTSP document --
21         MR. LYLE:  Yes, it's 1 to 7.
22         MR. DISHER:  -- titled
23
24
25

18

```
1        "Digital" --
2            MR. LYLE:  "Digital Trust" --
3            MR. DISHER:  Excuse me.  "Trust
4    and Safety Best Practices Framework."
5            MR. LYLE:  Yes.
6            MR. DISHER:  Okay.
7    BY MR. LYLE:
8        Q.   So is there -- is there a
9    significant overlap between the partnership's
10   membership and that of CCIA?
11       A.   There is overlap.
12       Q.   Is Facebook part of the Trust &
13   Safety Partnership?
14       A.   Yes.
15       Q.   What about Google?
16       A.   Yes.
17       Q.   What about Amazon?
18       A.   No.
19       Q.   What about Twitter?
20       A.   Yes.
21       Q.   Okay.  This -- the pages I just
22   handed you, they include guidelines for the
23
24
25
```

20

```
1    BY MR. LYLE:
2        Q.   But as of now, there's no
3    third-party auditing going on?
4        A.   At present, there is no third-party
5    assessment of any kind.
6        Q.   How about any self-reporting at
7    present?
8            MR. DISHER:  Objection.  Form.
9            THE WITNESS:  Are you asking me
10       are companies presently doing
11       self-reporting?
12   BY MR. LYLE:
13       Q.   To -- to the partnership.
14       A.   That process is currently underway.
15       Q.   Is there any -- is there anyplace
16   one could go to look at the results of that
17   self-reporting; the public, for example?
18       A.   At present?
19       Q.   Yes.
20       A.   No.
21       Q.   But they are reporting to the
22   partnership?
23
24
25
```

19

```
1    members; correct?
2        A.   I wouldn't characterize it that way.
3        Q.   What would you characterize them as?
4        A.   I would characterize this as the
5    practice -- framework of best practices.
6        Q.   Is there any auditing as to members
7    complying with these practices?
8            MR. DISHER:  Objection.  Form.
9            THE WITNESS:  Presently?
10   BY MR. LYLE:
11       Q.   Yes.
12       A.   No.
13       Q.   Was there?
14       A.   No.
15       Q.   Will there be?
16           MR. DISHER:  Objection.  Form.
17           THE WITNESS:  The organization's
18       road map contemplates internal
19       assessments and ultimately third-party
20       assessments of implementation of the best
21       practices framework.
22
23
24
25
```

21

```
1        A.   No.
2        Q.   No?
3        A.   That process is currently underway.
4        Q.   Okay.  On page 7, you talk about
5    content and content-related risks.
6        A.   Sorry, who is "you"?
7        Q.   The partnership document, the best
8    practices.
9        A.   Okay.
10       Q.   And I'm seeing that to be considered
11   a risk, it has to be prohibited by the relevant
12   policies and Terms of Service of the organization;
13   correct?
14           MR. DISHER:  Objection.  Form.
15           THE WITNESS:  No, I don't agree
16       with that interpretation.
17   BY MR. LYLE:
18       Q.   So your interpretation is there's a
19   sort of separate metric for determining if it's a
20   risk apart from the -- or it's irrelevant whether
21   it's consistent with the relevant policies and
22   Terms of Service?
23
24
25
```

## 22

1	MR. DISHER:  Objection.  Form.
2	THE WITNESS:  No, no.  You said
3	relevant policies and Terms of Service of
4	the organization?  You didn't define
5	"organization."  I assume that --
6	BY MR. LYLE:
7	Q.	The digital -- the digital
8	partnership on page 7, page 7 of what I handed you,
9	says "content and conduct-related risks."
10	A.	Uh-huh.
11	Q.	This is the Digital Trust & Safety
12	Partnership framework?
13	A.	That's correct.
14	Q.	"'Content and conduct-related risks'
15	refers to the possibility of certain illegal,
16	dangerous, or otherwise harmful content or
17	behavior, including risks to human rights, which
18	are prohibited by relevant policies and Terms of
19	Service.  References to risks shall be understood
20	to refer to content and conduct-related risks."
21	That is what the last -- the document says
22	at the last paragraph; correct?
23
24
25

## 23

1	A.	The document says that, yes.
2	Q.	So is the interpretation correct
3	that under these -- under this best practices
4	framework, in order to be considered a content and
5	conduct-related risk, it must be prohibited by the
6	relevant policies and Terms of Service of the
7	organization in question?
8	MR. DISHER:  Objection.  Form.
9	THE WITNESS:  Define "organization
10	in question."
11	BY MR. LYLE:
12	Q.	"Prohibited by relevant policies and
13	Terms of Service."  So, for example, if -- if
14	Facebook did not prohibit content X in its policies
15	and Terms of Service, that would not be considered
16	a content or conduct-related risk under the
17	framework; correct?
18	MR. DISHER:  Objection.  Form.
19	THE WITNESS:  I believe -- I
20	believe that content that does not --
21	that is not prohibited by relevant
22	policies and Terms of Service would not
23
24
25

## 24

1	meet the definition of content and
2	conduct-related risks.
3	BY MR. LYLE:
4	Q.	Okay.  Which -- which kind of risk
5	is considered most serious by the framework, the
6	content-related or the conduct-related?
7	MR. DISHER:  Objection.  Form.
8	THE WITNESS:  Neither.
9	BY MR. LYLE:
10	Q.	Neither.  So they are considered
11	equally serious?
12	A.	The practices are agnostic as to the
13	nature of the content at issue.
14	Q.	What about the conduct-related
15	risks?
16	A.	Similarly.
17	Q.	They are distinct forms of risks;
18	correct?
19	A.	No, no.  Because there can be
20	conduct which generates content.  It's best to
21	consider the two as overlapping circles in the Venn
22	diagram.  There is some content that is strictly
23
24
25

## 25

1	content.  There is conduct that will produce
2	content.  But there is also conduct which does not
3	necessarily have any associated content with it
4	that can constitute a risk.
5	Q.	And is there content that doesn't
6	have any associated conduct with it that can
7	constitute a risk?
8	A.	At least in theory.  If you assume
9	away that -- the conduct of posting the content.
10	Q.	Okay.  Where they -- where these
11	risks are distinct in the Venn diagram, is one more
12	resource-intensive for dealing with than the other?
13	MR. DISHER:  Objection.  Form.
14	THE WITNESS:  That's going to vary
15	by company and by the nature of the
16	product.
17	BY MR. LYLE:
18	Q.	So Facebook, for example.
19	MR. DISHER:  Same objection.
20	THE WITNESS:  Facebook isn't a
21	product.  Facebook has multiple products.
22
23
24
25

26

1  BY MR. LYLE:
2      Q.   So the -- Facebook's what we think
3  of as a social networking site?
4          MR. DISHER:  Same objection.
5          THE WITNESS:  Even within
6      Facebook's -- the blue website, I imagine
7      that Facebook would construe different
8      parts of the site to be separate
9      products.
10         Having said that, based on my
11     knowledge of trust and safety practices
12     across the industry, which are not
13     specific to any one company, I don't
14     believe that trust and safety policies
15     are constructed distinctly around content
16     in one bucket and conduct in another.
17 BY MR. LYLE:
18     Q.   Okay.
19         (Discussion held off the
20         record.)
21 BY MR. LYLE:
22     Q.   Who is Alex Feerst, F-e-e-r-s-t?
23
24
25

27

1      A.   Alex Feerst is a lawyer with
2  expertise in this area who consulted for the
3  Digital Trust & Safety Partnership at and beyond
4  its incubation.
5      Q.   Was he consulting when you were
6  working on the Digital Trust & Safety Partnership?
7      A.   Yes.
8      Q.   Did you work with him personally?
9      A.   Yes.
10     Q.   What did he mean -- and I'm trying
11 to pull the exhibit for you, but I'm having
12 difficulty because the Bates number seems to have
13 been cut off.
14         When he says that the partnership was not
15 aiming to create an industry-wide definition of
16 hate speech or misinformation, but to define the
17 internal processes companies should use to develop
18 their own policies, is that a fair characterization
19 of the partnership?
20     MR. DISHER:  Objection to form.
21     THE WITNESS:  I would say that's a
22     fair characterization of what the
23
24
25

28

1      partnership attempts to do.
2  BY MR. LYLE:
3      Q.   So why does the partnership shy away
4  from having an industry-wide definition of hate
5  speech or misinformation?
6          MR. DISHER:  Objection.  Form.
7          THE WITNESS:  I don't agree with
8      the notion that it shies away from
9      anything.  But if you're asking does it
10     have such a definition, the answer is no.
11 BY MR. LYLE:
12     Q.   Is it planning to create such a
13 definition?
14     A.   As a member of the board of the
15 organization, I cannot speak for the entire entity,
16 but it is my understanding that such a definition
17 is not planned and would not be consistent with the
18 mission of the organization.
19     Q.   Would the organization want such a
20 definition?
21     MR. DISHER:  Objection.  Form.
22     THE WITNESS:  I'm not sure I can
23
24
25

29

1      speak to what the organization would
2      want, but DTSP has been clear that its
3      practices are content-agnostic and seek
4      to identify practices and processes, not
5      content-specific rules.
6  BY MR. LYLE:
7      Q.   So these processes would be for
8  individual companies to define on their own what
9  constituted hate speech or misinformation?
10     A.   No.
11     Q.   Would it be consistent with the
12 partnership in this regard that what YouTube
13 considered hate speech or misinformation was
14 different from what Facebook considered hate speech
15 or misinformation?
16     MR. DISHER:  Objection.  Form.
17     THE WITNESS:  I don't know that it
18     would be consistent or inconsistent, but
19     the practices admit for the -- the
20     possibility that companies can and will
21     adopt different rules around what content
22     and conduct their products -- is
23
24
25

Matthew Schruers - 11/16/2021

30

1      permitted on their products.
2  BY MR. LYLE:
3      Q.   So that the quote continues, "The
4  goal is that there be sufficient flexibility
5  such that the different companies can have
6  different substantive definitions of these things
7  and still agree on whether you have a set of
8  institutional practices that are addressing them."
9      And I'm going to hand you that marked as
10 Exhibit 3.
11             (Exhibit 3, HB 20, was
12             marked for identification.)
13         MR. DISHER:  Do you know what --
14     what pages these are of tab 15?
15         MR. LYLE:  It should be 122 to
16     123, if -- do you have them there at the
17     bottom, the Bates number?
18         MR. DISHER:  No, they're cut off.
19     I think I found it.
20         Okay.  I got it.
21         MR. LYLE:  Okay.
22
23
24
25

31

1  BY MR. LYLE:
2      Q.   So does that -- is it an accurate
3  characterization of that quote I just read you that
4  individual companies that are members of the
5  partnership can, under the guidelines, have
6  different substantive definitions of hate speech
7  and misinformation?
8      A.   Consistent with the practices,
9  companies could and do have different approaches
10 for those types of content.
11     Q.   Meaning misinformation and hate
12 speech?
13     A.   Among other types of content.
14     Q.   And part of what the quote I just
15 read you means that the different approaches
16 include different substantive definitions?
17         MR. DISHER:  Objection.  Form.
18         THE WITNESS:  The approach to the
19     content will necessarily involve the
20     service's definition of that content.
21     Does that answer your question?
22
23
24
25

32

1  BY MR. LYLE:
2      Q.   I just want to be clear.  So one
3  company in the partnership and another company in
4  the partnership could have different substantive
5  definitions of hate speech and misinformation, and
6  this would be consistent with the best practices
7  under the partnership?
8      A.   Yes.
9      Q.   Okay.  Do you personally believe
10 that hate speech can be objectively defined?
11         MR. DISHER:  Objection.  Form.
12         THE WITNESS:  I don't believe
13     that's within the scope of my
14     definition -- my declaration.
15 BY MR. LYLE:
16     Q.   Are you refusing to answer the
17 question?
18     A.   I just did.
19         MR. DISHER:  Objection.  Form.
20     And I'll instruct the witness not to
21     answer to the extent it exceeds the scope
22     of his declaration.  You can answer, if
23
24
25

33

1      you can.  But to the extent it's not
2      within the scope, that's outside the
3      bounds of this deposition.
4          THE WITNESS:  For purposes of my
5      declaration, many -- perhaps most of the
6      companies that are CCIA members who have
7      trust and safety practices, and including
8      companies who are DTSP members, have
9      working definitions of hate speech that
10     they apply.
11 BY MR. LYLE:
12     Q.   All right.  Why is it important to
13 the partnership that these companies be allowed
14 flexibility in creating their own definitions of
15 hate speech?
16     A.   Definitions of hate speech are
17 not -- it's not specific to definitions of one
18 particular type of content.
19     Q.   But it includes hate speech?
20     A.   It includes it, yes.  And that is
21 because their size varies, the nature of their
22 products vary, and the nature of their communities
23
24
25

34

1  vary.  The resources they have to deliver their
2  services and devote attention to trust and safety
3  varies.
4        Q.    So the size of a company can
5  determine whether or not something is hate speech?
6            MR. DISHER:  Objection.  Form.
7            THE WITNESS:  No.  No.  The answer
8        was no.
9  BY MR. LYLE:
10       Q.    But didn't you just say that's why
11  the companies should be able to have different
12  definitions of things like hate speech?
13           MR. DISHER:  Objection.  Form.
14           THE WITNESS:  Practices do not
15        control what companies are able to do.
16        Companies have committed to the practices
17        as a way of demonstrating and documenting
18        how their trust and safety operations
19        work.  They are voluntary.  They do not
20        constrain a company's actions other than
21        to the extent the company wants to ensure
22        it's compliant with the practices.
23
24
25

35

1  BY MR. LYLE:
2        Q.    These -- these are best practices;
3  right?
4        A.    These are what the DTSP participants
5  assessed to be best practices at the time of the
6  drafting.
7        Q.    And does that mean they are, in some
8  sense, aspirational?
9        A.    The practices may be aspirational
10  for some companies.  They are implemented by
11  others.
12       Q.    Which ones actually implement them?
13           MR. DISHER:  Objection.  Form.
14           THE WITNESS:  That will -- that is
15        what the ongoing assessment process is
16        designed to assess, to determine.
17  BY MR. LYLE:
18       Q.    And has it yielded up any results as
19  of now?
20       A.    The process is still ongoing.
21       Q.    Is there a prediction of when it
22  will be completed?
23
24
25

36

1        A.    The internal scoping assessments are
2  projected to be completed next year, early next
3  year.  The third-party assessment is hoped to be
4  completed in 2022 or 2023.
5        Q.    And who -- who will be the third
6  party conducting the assessment?
7        A.    It has yet to be determined, other
8  than that this partnership has specified that it
9  would be an independent third-party expert
10  organization or entity in the assurance sector.
11       Q.    And is it envisaged to release the
12  results of that third-party assessment to the
13  public?
14       A.    The practices contemplate various
15  measures of transparency.  What the work product of
16  the third-party assessor is going to be is yet to
17  be determined, so I can't speak to whether it's
18  going to be released.  I don't know what the work
19  product will be.
20       Q.    What about the self-reporting?
21       A.    The companies are working towards
22  determining what of their internal assessments can
23
24
25

37

1  be made public, separate from their existing
2  transparency reports which are, of course, already
3  public.
4        Q.    And what -- is there any schedule
5  contemplated for releasing this stuff in the
6  future?  I mean, is it -- like, is there going to
7  be a cycle for releasing it or --
8            MR. DISHER:  Objection.  Form.
9            THE WITNESS:  I don't have any
10        further information beyond what I've
11        already told you.
12  BY MR. LYLE:
13       Q.    Which of your members do you contend
14  are covered by HB20?
15           MR. DISHER:  Objection.  Form.
16           THE WITNESS:  All the companies
17        that fall within the definition in
18        Section 120.
19  BY MR. LYLE:
20       Q.    Can you name some examples?
21           MR. DISHER:  Objection.  Form.
22           THE WITNESS:  I believe my
23
24
25

---

**38**

```
1        declaration is clear that at least some
2        CCIA members would fall within the
3        definition.
4  BY MR. LYLE:
5        Q.    Can we turn to page -- paragraph 5
6  of your declaration, please.
7        A.    (Witness complies with request.)
8        Page 5 or paragraph 5?
9        Q.    Paragraph 5.
10       So you list there some of them.  You list
11 what CCIA's membership includes?
12       A.    That's correct.
13       Q.    Is that an exhaustive list?
14       A.    It was at the time this was drafted.
15       Q.    Who has been added since then?
16       A.    I don't believe there are any
17 companies that have been added since this list was
18 drafted.
19       Q.    And which -- which of the -- which
20 of the entities in paragraph 5 do you contend are
21 covered by HB20?
22             MR. DISHER:  Objection.  Form.
23
24
25
```

---

**39**

```
1              THE WITNESS:  At least -- well,
2        let me take a step back.  The definition
3        in HB20 contemplates monthly active
4        users, which we don't know until the end
5        of the month.  So in any given month, any
6        of these companies may arise to a user
7        base that could trigger this statute, but
8        we won't know until that data has been
9        collected.
10             But I believe my declaration is
11       clear that at least some of these
12       companies' products are covered,
13       including, for example, Facebook and
14       Google.
15 BY MR. LYLE:
16       Q.    When you -- the month before you
17 filed the lawsuit, which of these members do you
18 contend were covered by HB20?
19             MR. DISHER:  Objection.  Form.
20             THE WITNESS:  I don't have that
21       information before me, but at least some
22       of them met the statutory definition.
23
24
25
```

---

**40**

```
1  BY MR. LYLE:
2        Q.    Okay.  So are you -- are you unable
3  to give us the precise selection of the companies
4  in Paragraph 5 that you contend are covered by
5  HB20?
6              MR. DISHER:  Objection.  Form.
7              THE WITNESS:  Sitting here today,
8        I cannot tell you what the monthly active
9        users were of all 29 companies the month
10       that we filed the Complaint.
11 BY MR. LYLE:
12       Q.    So is HB20 based solely on the
13 number of users?
14       A.    No.
15             MR. DISHER:  Objection.  Form.  Go
16 ahead.
17             THE WITNESS:  No, but it is one of
18       the elements in the definition.
19 BY MR. LYLE:
20       Q.    So I just want to be clear.  Are you
21 refusing to answer the question as to which of the
22 entities listed in Paragraph 5 are covered in your
23
24
25
```

---

**41**

```
1  contention by HB20?
2              MR. DISHER:  Hold on.  He did not
3        refuse to answer the question.  He did
4        answer the question, so I will object to
5        form.  And I will also object to your
6        mischaracterization of his answer.
7              Go ahead and answer, if you can.
8              THE WITNESS:  I have already
9        answered this question to say that at
10       least Facebook and Google are covered by
11       this statute, and other companies may
12       have met and may continue to meet the
13       definitions of the statute.
14 BY MR. LYLE:
15       Q.    So you're saying that all members
16 could potentially be covered by HB20?
17       A.    If they meet the definition in
18 Section 120.
19       Q.    When was the last time you had
20 knowledge of the monthly usership sufficient for
21 you to know who fell under HB20 and who didn't?
22             MR. DISHER:  Objection.  Form.
23
24
25
```

42

```
1            THE WITNESS:  I don't recall.
2  BY MR. LYLE:
3       Q.    At any point in time, have you known
4  which of your members fall under HB20?
5            MR. DISHER:  Objection.  Form.
6            THE WITNESS:  I know now that some
7     of my members fall under HB20.
8  BY MR. LYLE:
9       Q.    Have you ever known, like, precisely
10 which ones fall under HB20?
11           MR. DISHER:  Objection.  Form.  Go
12    ahead.
13           THE WITNESS:  I just identified
14    precisely that some members fall under
15    HB20.  Are you asking me do I know at any
16    moment in time each individual company
17    and whether or not they are covered?
18 BY MR. LYLE:
19      Q.    Has there ever been a point in time
20 in which you knew which of your members would fall
21 under HB20?
22           MR. DISHER:  Objection.  Form.
23
24
25
```

43

```
1            THE WITNESS:  I know now that some
2     of my members fall under the bill.
3  BY MR. LYLE:
4       Q.    I'm asking for an exhaustive list,
5  if you've ever had an exhaustive list.
6            MR. DISHER:  Hold on.  Is that the
7     question?
8     MR. LYLE:  Yes.
9            MR. DISHER:  Objection to form.
10           THE WITNESS:  I do not believe
11    that an exhaustive list of all the
12    companies potentially within the
13    definition of the statute has ever been
14    compiled.
15 BY MR. LYLE:
16      Q.    And have you ever just known that?
17           MR. DISHER:  Objection.  Form.
18           THE WITNESS:  I have never at any
19    moment in time known the monthly active
20    users of all my members at that moment,
21    no.
22
23
24
25
```

44

```
1  BY MR. LYLE:
2       Q.    Is CCIA seeking relief in this suit
3  on behalf of all its members?
4            MR. DISHER:  Objection.  Form.
5            THE WITNESS:  The association is
6     seeking relief on behalf of all the
7     members who are subject to the statute.
8  BY MR. LYLE:
9       Q.    And who is that?
10           MR. DISHER:  Objection.  Form.
11           THE WITNESS:  All of the companies
12    that fall within the definition in
13    Section 120.
14 BY MR. LYLE:
15      Q.    But you've declined to give us a
16 list of that.
17           MR. DISHER:  Objection.  Form.
18           THE WITNESS:  I disagree.
19           MR. DISHER:  Hold on.  He has not
20    declined to do -- answer any of your
21    questions.  I just want to be clear that
22    he has not declined to answer any of your
23
24
25
```

45

```
1     questions other than those related to
2     privilege that we talked about earlier.
3            THE WITNESS:  I have identified --
4     I have listed for you companies that fall
5     within the scope of the statute.
6  BY MR. LYLE:
7       Q.    I'm asking for a specific list, not
8  a partial list.  Can you give a specific list?
9            MR. DISHER:  Objection.  Form.
10           THE WITNESS:  I believe
11    identifying Facebook and Google, among
12    others, depending on their monthly active
13    users, constitutes a specific list.  It
14    may not be an exhaustive list.  I do not
15    have an exhaustive list.
16 BY MR. LYLE:
17      Q.    So you're unable to give an
18 exhaustive list?
19           MR. DISHER:  Objection.  Form.
20           THE WITNESS:  With the right -- I
21    am unable at this very moment to provide
22    an exhaustive list.
23
24
25
```

Matthew Schruers - 11/16/2021

46
1  BY MR. LYLE:
2      Q.   Okay.  Have you talked to any of
3  your members about this lawsuit?
4      A.   Yes.
5      Q.   Who have you talked to?
6      A.   I've communicated with all our
7  members about the lawsuit.
8      Q.   Each one?
9      A.   Yes.
10     Q.   How many of them are supportive of
11 this lawsuit?
12     A.   I am not aware of any company that
13 does not support the lawsuit.  If you're asking if
14 I took a straw poll, the answer is no.
15     Q.   So it's your testimony that none of
16 your members are opposed to the lawsuit?
17     A.   No, that's not my testimony.
18     Q.   So you're unaware of any that do not
19 support it, you said?
20     A.   That's correct.
21     Q.   Doesn't that mean that you're
22 unaware of any who oppose it?
23
24
25

47
1          MR. DISHER:  Objection.  Form.
2          THE WITNESS:  No, because they
3      could neither oppose nor support but have
4      no position on it, and they wouldn't fall
5      into either group.
6  BY MR. LYLE:
7      Q.   Are you aware of any members who are
8  opposed to the lawsuit?
9      A.   None of my members have expressed
10 opposition to the lawsuit to me.
11     Q.   Has it come to your awareness in any
12 other way?
13     A.   No.
14     Q.   Have any of the members expressed
15 opposition to not you personally but your
16 organization?
17         MR. DISHER:  Objection.  Form.
18         THE WITNESS:  Not to my knowledge.
19 BY MR. LYLE:
20     Q.   Have any of them expressed that
21 they're not covered by HB20?
22         MR. DISHER:  Objection.  Form.
23
24
25

48
1          THE WITNESS:  To my knowledge, no
2      company has -- I do not specifically
3      recall whether or not any companies may
4      have expressed the view that they are not
5      covered.
6  BY MR. LYLE:
7      Q.   Do you know why none of your
8  plaintiffs filed -- or none of your members filed
9  suit individually in this lawsuit?
10         MR. DISHER:  Objection.  Form.
11         THE WITNESS:  I'm not privy to the
12     legal decision-making of all our member
13     companies.
14 BY MR. LYLE:
15     Q.   Were there any discussions about
16 that?
17         MR. DISHER:  Objection.  Form.  I
18     will also object and instruct the witness
19     not to answer to the extent -- and I
20     don't know if those conversations might
21     be covered by some type of joint defense
22     or common interest agreement, which would
23
24
25

49
1      be privileged if it was related to legal
2      decision-making.
3          But subject to that instruction,
4      you can answer if none of those
5      conversations would fall under a joint
6      defense or common interest agreement.
7  BY MR. LYLE:
8      Q.   None of them are defendants;
9  correct?
10         MR. DISHER:  I gave him the
11     instruction.  He can answer if he can.
12         THE WITNESS:  Based on that
13     instruction, I don't have much to tell
14     you.
15 BY MR. LYLE:
16     Q.   Are you -- are any of your members
17 defendants in this lawsuit?
18     A.   No.
19     Q.   Do they have any common interest
20 agreements from CCIA?
21     A.   There are common interest agreements
22 in place between the association and the other
23
24
25

**50**

1  parties involved in the litigation, including
2  member.
3      Q.    Which member?
4          MR. DISHER:  You can answer which
5      members.
6          THE WITNESS:  We have common
7      interest agreements with Google,
8      Facebook, Amazon, Pinterest.  NetChoice,
9      who is not a member.  And possibly some
10     others.  I'd have to check.
11 BY MR. LYLE:
12     Q.    What about Twitter?
13     A.    Off the top of my head, I'm not
14 certain whether such an agreement exists.
15     Q.    How does one create a user profile
16 on Facebook?
17     A.    Which product?
18     Q.    I think you were referring to it as
19 the blue site earlier.  The one that one thinks of
20 when one's making a Facebook profile.
21     A.    Facebook.com.  I have not done this
22 in many years, and so the process may have changed,
23
24
25

**51**

1  but, generally speaking, one navigates to the
2  website or through the mobile app, creates an
3  account, reviews the relevant policies and
4  practices that you are required to review prior to
5  creating the account.
6      You check that you have reviewed and agree
7  with those practices.  Hit "I accept," provide
8  whatever information they may ask, such as a mobile
9  number, if you're using it.  And proceed with what
10 they're asking for.
11     Now, as I said, it's been many years since
12 I've done this, so I'm not steeped in the internal
13 workflow.
14     Q.    And in your understanding, can
15 anybody do that?
16          MR. DISHER:  Objection.  Form.
17          THE WITNESS:  No.
18 BY MR. LYLE:
19     Q.    Who can't?
20          MR. DISHER:  Same objection.
21          THE WITNESS:  There are many
22     groups of people who are not eligible for
23
24
25

**52**

1      Facebook accounts, Facebook.com accounts.
2  BY MR. LYLE:
3      Q.    Who are those?
4      A.    I believe that includes children, by
5  which I mean those under the age of 13.
6      I believe that includes convicted sex
7  offenders.  It may include people in jurisdictions
8  where the product is not offered, as well as other
9  categories that I'm not privy to off the top of my
10 head.
11     Q.    So how does -- how does Facebook
12 keep children from opening accounts?
13          MR. DISHER:  Objection.  Form.
14          THE WITNESS:  I am not a member of
15     the Facebook trust and safety team.  And
16     so my knowledge on this is arguably
17     limited to industry practice.  But there
18     are a variety of software-driven and
19     human-driven tools that are used to
20     identify accounts that may violate the
21     Terms of Service.
22
23
24
25

**53**

1  BY MR. LYLE:
2      Q.    And, in general, from the industry
3  practice standpoint you spoke of, are these tools
4  implemented on the front end, like an account
5  creation, or do they come after the creation of the
6  account?
7      A.    At creation, most require
8  individuals to certify that they are of age, if the
9  age-gating is occurring.  Some services also
10 utilize age verification technology.  I could not
11 tell you whether Facebook uses age verification
12 technology in any of its products in any of the
13 jurisdictions where it operates.
14     Q.    As opposed to self-certification?
15     A.    For the -- well, wait a minute.
16 Those -- those aren't exclusive.  One could do
17 both.  But -- have I answered your question?
18     Q.    Let me rephrase it.  To your --
19 which of your members use exclusively
20 self-certification for creating accounts?
21     A.    I am not steeped in the individual
22 workflows of our company's trust and safety
23
24
25

Matthew Schruers - 11/16/2021

---

**54**

1  practices.  So I cannot tell you off the top of my
2  head.
3       Q.   Do you know which of your members
4  use a certification that is independent of
5  self-certification at the creation of accounts?
6       A.   Like an age verification technology?
7       Q.   Yes.
8       A.   I could not point you to a
9  particular company presently using age verification
10 technology.
11      Q.   What about the technologies to
12 prevent sex offenders from creating accounts, which
13 of your members use verification technologies
14 beyond self-certification for that?
15           MR. DISHER:  Objection.  Form.
16           THE WITNESS:  I have to give you
17           the same answer that I did with respect
18           to child protection, which is I'm not
19           privy to the specific internal practices
20           of all the companies' trust and safety
21           operations.
22
23
24
25

---

**55**

1  BY MR. LYLE:
2       Q.   Are you aware that some use
3  something other than self-certification?
4       A.   It is my understanding that
5  companies -- many companies' trust and safety
6  practices involve screening users for that group
7  and terminating accounts accordingly.
8       Q.   And are you aware of ones that do
9  that at the moment of account creation?
10      A.   I could not point you to a specific
11 company that does -- that I know to do that at
12 account creation.
13      Q.   Let's turn to paragraph 9 of your
14 declaration, please.
15      A.   (Witness complies with request.)
16      Q.   How many users do -- does Facebook
17 have?
18           MR. DISHER:  Objection.  Form.
19           THE WITNESS:  I mean, even if that
20           question were specific as to a product --
21 BY MR. LYLE:
22      Q.   The blue site.
23
24
25

---

**56**

1       A.   Yes.  I have no idea.
2       Q.   What about YouTube?
3       A.   I do not know the current users.
4       Q.   What about Twitter?
5       A.   I do not know.
6       Q.   Do you know anything about the
7  demographics of the users of those companies?
8           MR. DISHER:  Objection.  Form.
9           THE WITNESS:  I have general
10          knowledge about the demographics of all
11          of the companies' user base, yes.
12 BY MR. LYLE:
13      Q.   Do they include children?
14           MR. DISHER:  Objection.  Form.
15           THE WITNESS:  Some products are
16          available to children, yes.
17 BY MR. LYLE:
18      Q.   Which ones?
19      A.   YouTube has a kids-focused product.
20      Q.   Now, are the YouTube products that
21 are not explicitly kid-focused, are those
22 accessible to children?
23
24
25

---

**57**

1           MR. DISHER:  Objection.  Form.
2           THE WITNESS:  Define "accessible."
3  BY MR. LYLE:
4       Q.   Could a child create an account
5  online?
6           MR. DISHER:  Objection.  Form.
7           THE WITNESS:  Could a child create
8           an account on YouTube?
9  BY MR. LYLE:
10      Q.   Yeah, the nonkids' site.
11      A.   Are they capable of creating the
12 account or is -- do the Terms of Service permit the
13 account?
14      Q.   Capable.
15           MR. DISHER:  Objection.  Form.
16           THE WITNESS:  Certainly anybody,
17           even someone who -- to who -- to whom the
18           rules prohibit access is capable of
19           filling out the form.  Now, is the
20           account terminated after -- you know,
21           immediately after creation or soon
22           thereafter?  You know, perhaps so.
23
24
25

---

58

1  BY MR. LYLE:
2      Q.    What about -- is that the same for
3  Twitter?
4          MR. DISHER:  Objection.  Form.
5          THE WITNESS:  I do not know
6      Twitter's Terms of Service off the top of
7      my head.
8  BY MR. LYLE:
9      Q.    But in terms of it being accessible
10 to somebody who is prohibited by the Terms of
11 Service creating an account?
12     A.    Are we still --
13         MR. DISHER:  Objection --
14     objection to form.
15         THE WITNESS:  Sorry.
16         Are we still using the same
17     definition of "accessible"?
18 BY MR. LYLE:
19     Q.    Yes, possible to create an account.
20         MR. DISHER:  Objection.  Form.
21         THE WITNESS:  It is possible.
22
23
24
25

59

1  BY MR. LYLE:
2      Q.    What about Facebook?
3          MR. DISHER:  Objection.  Form.
4          THE WITNESS:  Again, it is
5      possible.
6  BY MR. LYLE:
7      Q.    Are you aware of any benefits that
8  your members have gotten from the federal
9  government?
10         MR. DISHER:  Objection.  Form.
11         THE WITNESS:  No.
12 BY MR. LYLE:
13     Q.    Are you aware of any subsidies your
14 members have gotten from the federal government?
15     A.    I'm not aware.
16     Q.    Do you consider Section 230 of the
17 Communications Decency Act to be a benefit that
18 your members have gotten from the government?
19         MR. DISHER:  Objection.  Form.
20         THE WITNESS:  No.
21         (Discussion held off the
22         record.)
23
24
25

60

1  BY MR. LYLE:
2      Q.    Let's go to Paragraph 9, please, of
3  your declaration.
4      A.    (Witness complies with request.)
5      Q.    You write here that the scale of
6  users and activity on your members' services is
7  significant.  And you provide some numbers.  You
8  say Facebook and YouTube each has over 2 billion
9  users.  Every day, users watch over a billion hours
10 of video.  That and the other things in this
11 paragraph, do you have personal knowledge of this?
12         MR. DISHER:  Objection.  Form.
13         THE WITNESS:  I'm generally aware
14     of these facts and that -- no.  No, I
15     don't have personal knowledge.
16 BY MR. LYLE:
17     Q.    So what is the source of your
18 knowledge of these?
19     A.    There are reports made by the
20 companies or -- yeah, or media accounts of those
21 reports.
22         MR. DISHER:  Can we take a
23
24
25

61

1      10-minute break?
2          MR. LYLE:  Yes.
3          THE VIDEOGRAPHER:  We're going off
4      the record.  This is the end of media
5      Unit No. 1.  The time is 3:27 p.m.
6          (Recess)
7          THE VIDEOGRAPHER:  We're back on
8      the record.  This is the beginning of
9      media Unit No. 2.  The time is 3:41 p.m.
10 BY MR. LYLE:
11     Q.    All right.  Let's -- let's go to 10A
12 of your declaration.  Let's go to 10A,
13 Mr. Schruers, of your declaration.
14     A.    It's "Shears," like the utensil.
15     Q.    Schruers.  Sorry.  Mr. Schruers.
16 10A.
17         You talk about how "when the COVID-19
18 pandemic struck, many small businesses turned to
19 social media services and online schools to
20 continue operations, engage current and prospective
21 customers, and cultivate loyalty in a
22 socially-distant context.  Many small businesses
23
24
25

62

1 who succeeded in the shuttered economy did so by
2 embracing social media services and digital tools."
3        Now, were any of your members providing the
4 services and tools you describe in that paragraph?
5     A.   Some, yes.
6     Q.   Which ones?
7     A.   The -- if you were to look at this
8 post here that's linked to, I believe it discusses
9 services, including -- in footnote 12, services
10 including Twitter, Facebook, Google, Maps in
11 particular, as well as a variety of other services
12 which are not offered by association members but
13 are also digital.
14     Q.   And is that a result of your own
15 personal knowledge or having read the post that you
16 cite to?
17        MR. DISHER:  Objection.  Form.
18        THE WITNESS:  The answer to that
19        question is based on my direct
20        observation of companies offering
21        services that were being used by
22        individuals to do this.
23
24
25

63

1 BY MR. LYLE:
2     Q.   Within your work at CCI or reading
3 articles?
4     A.   No, in the scope of my work, I
5 directly observed companies offering services that
6 individuals are taking advantage of.
7     Q.   How did you directly observe that?
8     A.   By seeing them live online is one
9 such example.  By patronizing them not in the scope
10 of my work as another example.  By discussing that
11 with companies as a third example.
12     Q.   Companies that include your members?
13     A.   Association members, yes.
14     Q.   Let's go to the next paragraph, B.
15 You talk about "amid a quarantine of indeterminate
16 length, schools and public health [sic] services
17 turned to social media tools," and you include here
18 Facebook Live as an example and remote learning via
19 Google Meet and Zoom.
20        Are these things that you have personal
21 knowledge of?
22     A.   I believe so, yes.
23
24
25

64

1     Q.   How exactly?
2     A.   I have observed these products being
3 used in my work, as well as being aware of public
4 accounts of them.  I have observed family and
5 friends utilizing products as described in this
6 context.  So I have what I consider to be personal
7 knowledge that this is correct.
8     Q.   Have you talked to these companies
9 directly about this?
10     A.   I have talked to employees at these
11 companies about the use of these services in this
12 context, yes.  I should say some of these.
13     Q.   Which -- which ones?
14     A.   I characterize that because I don't
15 believe I've spoken with Twitter or Venmo about
16 their products.
17     Q.   Let's go to 11A.  You talk about the
18 extensive efforts across the industry to remove the
19 videos of the mass shootings at Christchurch.
20     A.   Yes.
21     Q.   Is that -- are those efforts
22 something you have personal knowledge of?
23
24
25

65

1     A.   Yes.
2        MR. DISHER:  Objection.  Form.  Go
3        ahead.
4        THE WITNESS:  Yes.
5 BY MR. LYLE:
6     Q.   How do you have personal knowledge
7 of that?
8     A.   Having discussed these with -- these
9 efforts with the companies implementing them and
10 policymakers who were interested in them and seeing
11 the results of those efforts online.
12     Q.   Are there any other bases of your
13 personal knowledge of that that you haven't
14 described?
15     A.   My general knowledge derived from
16 having spent more than 15 years in this space,
17 yeah.
18     Q.   Right, but I'm talking about actual
19 personal knowledge of these specific efforts with
20 respect to these particular shooting videos.
21        MR. DISHER:  Objection.  Form.
22        THE WITNESS:  Can you restate that
23
24
25

66

1      question?
2   BY MR. LYLE:
3      Q.    So I asked you how you had personal
4   knowledge of the efforts across the industry to
5   remove the videos of the Christchurch shooting.
6      A.    Yes.
7      Q.    And you responded partially with an
8   account of your 15 years in the industry.  And I'm
9   asking you, specific to this, how you have personal
10  knowledge of the industry effort.
11         MR. DISHER:  Objection.  Form.
12         THE WITNESS:  I believe the bases
13         that I have described substantially
14         provide my knowledge of these efforts.
15  BY MR. LYLE:
16     Q.    I'm talking not about like reading
17  things on the internet, but you personally in your
18  work coming about knowledge of these efforts.
19         MR. DISHER:  Objection.  Form.
20         THE WITNESS:  I am not a content
21         moderator myself.  So if your definition
22         of "personal knowledge" means I have to
23
24
25

67

1         be a content moderator, well, then I
2         don't think we have a shared
3         understanding as to what a definition --
4         what personal knowledge is.
5         It is my view that based on what I
6         have publicly and personally observed,
7         what I have discussed with companies and
8         policy makers and what I have witnessed
9         online as an internet user, I have
10        personal knowledge of these things.
11        If we need to hammer out a shared
12        definition of "personal knowledge," maybe
13        you can tell me what you think "personal
14        knowledge" is.
15  BY MR. LYLE:
16     Q.    Have you had conversations with the
17  individual companies about their efforts?
18         MR. DISHER:  Objection.  Form.
19         THE WITNESS:  I have had
20         conversations with employees at these
21         companies about their efforts.
22
23
24
25

68

1   BY MR. LYLE:
2      Q.    Let's go to 10C.  This is the
3   #ClearTheList movement to help teachers clear their
4   online wish lists from platforms like Amazon.
5   "Social media has also enabled Texas country
6   musicians to raise money for teachers."
7      A.    I'm sorry, which paragraph are we
8   in?
9      Q.    10C.  What you describe there, is
10  your knowledge from that -- of that derived from
11  conversations with your own members?
12     A.    I do not precisely recall where my
13  knowledge of this particular instance first arose.
14  This is cited here because it substantiated my
15  awareness of this particular issue.
16     Q.    Let's go to 11B.  This is the dark
17  examples of content shared on the darker side of
18  the internet.  Videos and propaganda posts by ISIS
19  to the recruit American teenagers.
20     A.    Yes.
21     Q.    Is that something you have knowledge
22  of from conversations with your members?
23
24
25

69

1      A.    Yes, with personnel at the member
2   companies.
3      Q.    What about C, fraud schemes that
4   specifically target older adults online?  Do you
5   have knowledge of that from conversations with your
6   members?
7      A.    I do not precisely recall where my
8   knowledge of that online fraud arises from.
9      Q.    How about 11D, have you had
10  conversations with your members about the content
11  of that paragraph:  Sexual, graphic or otherwise
12  disturbing content?
13     A.    Yes.
14     Q.    What about 11E, content that
15  promotes or glorifies self-harm?
16     A.    Yes.
17     Q.    That's -- do you have knowledge of
18  that from conversations with your members?
19     A.    Yes.
20     Q.    Now, in your declaration, the
21  paragraphs we just talked about, you cite a lot of
22  online articles for that, for the propositions
23
24
25

70

1 there. Did you search for these articles yourself?
2      A.   Yes.
3      Q.   And does your knowledge expressed in
4 your declaration primarily come from those searches
5 and reading the articles or from conversations with
6 your members?
7           MR. DISHER:  Objection.  Form.
8           THE WITNESS:  Neither.  Well,
9      speaking broadly, neither.  In many
10     cases, it arises from my general
11     knowledge, being in this industry and
12     communicating with these companies over
13     the past 15 years, since this is my area
14     of expertise.
15          These articles substantiate and
16     are consistent with my understanding,
17     provide additional information to
18     contextualize the claims that I am
19     putting down here that embody my general
20     knowledge of trust and safety operations
21     in the industry.
22
23
24
25

71

1 BY MR. LYLE:
2      Q.   Now, a lot of these observations
3 refer to things that happened in the past year or
4 two, not the last 15 years.  Do you agree with
5 that?
6           MR. DISHER:  Objection.  Form.
7           THE WITNESS:  No.  I mean, there
8      are some instances here that have
9      occurred recently.  There are also
10     phenomena that are described which occur
11     persistently.
12 BY MR. LYLE:
13     Q.   Did anyone help you search for these
14 articles?
15     A.   This was drafted with assistance by
16 in-house counsel.
17          MR. DISHER:  I'll instruct the
18     witness not to answer to the extent it
19     implicates any assistance you got from
20     in-house counsel.  But subject to that
21     instruction, go ahead and answer if you
22     can.
23
24
25

72

1           THE WITNESS:  And so outside of my
2      conversations with counsel, the answer is
3      no.
4 BY MR. LYLE:
5      Q.   No one helped you search for the
6 articles?
7      A.   Outside of my conversations with
8 counsel.
9      Q.   Let's go to paragraph 14, please.
10 You talk about human review and the use of digital
11 tools that rely in part on algorithms.
12     A.   Uh-huh.
13     Q.   Could you explain that process,
14 please.
15     A.   I can explain the process generally
16 as it's implemented across industry.  Necessarily,
17 no one description is going to characterize a firm
18 exactly, and not all firms will align with this.
19 But as a general proposition, companies account for
20 the risks that we were discussing earlier at the
21 product design stage.  They then develop governance
22 that reflects those risks.  And they, based on that
23
24
25

73

1 governance, develop a trust and safety program
2 which, from the user perspective, involves
3 enforcement of the product governance, which may be
4 called Terms of Service or the end user licensing
5 agreement or the community guidelines or any other
6 number of names.
7           And those policies and practices and
8 guidelines and Terms of Service are enforced
9 through a combination of computer-aided and
10 human-driven decisions.  Computer-aided, of course,
11 was itself developed by people.
12           There is then a refinement or internal
13 evaluation mechanism that updates the three
14 previous stages that I was describing.  And then
15 some -- many companies then report out to the
16 public based on that.  This is a constantly
17 iterative process.
18     Q.   So perhaps an example would be --
19 would be -- would clarify this.  So you write in
20 Paragraph 14 that Instagram has made it harder to
21 search for graphic images involving suicide
22 attempts and self-harm.
23
24
25

74

1    How, as a practical matter, have they done
2 that or would they do that?
3    A.   So that may involve downranking or
4 deprioritizing; for example, Tide POD challenge,
5 when Internet trolls encouraged children to eat
6 detergent pods.  I should say young people, because
7 not all who did this were necessarily children.
8 And the results that may be displayed to users will
9 reflect both software-based deprioritization of
10 potentially dangerous results, and some of that
11 content may be moderated by humans, which is to say
12 that it's tagged or downranked or otherwise
13 classified so as not to be visible.
14    Some services, including potentially
15 Instagram, although I can't specifically recall,
16 may go so far as to update their Terms of Service
17 to say you cannot use our service to encourage
18 others to do dangerous things, including eat
19 detergent pods.
20    Q.   And so from the standpoint of this
21 both human review and use of digital tools that you
22 referred to in Paragraph 14, how is the dangerous
23
24
25

75

1 thing, you know, perceived by the platform and then
2 deranked?  As a practical matter, how does that
3 work?
4    MR. DISHER:  Objection.  Form.
5    THE WITNESS:  That sounds like the
6    question I just answered.
7 BY MR. LYLE:
8    Q.   How do algorithms play into that?
9    MR. DISHER:  Objection.  Form.
10    THE WITNESS:  Can we establish a
11    working definition of algorithms before I
12    proceed?  Can we just say software code?
13 BY MR. LYLE:
14    Q.   Sure.
15    A.   Okay.  There will be programming in
16 the service's back end that may have various labels
17 or tags assigned to it which results in what people
18 generally refer to as deprioritization, which is to
19 say that content with those tags is less likely to
20 be surfaced, maybe only to a particular class of
21 users.
22    But those tags and that -- those
23
24
25

76

1 adjustments to the programming will be done by
2 members of the trust and safety team or content
3 moderators, depending on the service, to -- to --
4 to effectuate that outcome.
5    Q.   Also in paragraph 14, you talk about
6 how it -- more frequently, content moderation
7 involves context-specific decisions about how to
8 arrange and display content, how best to recommend
9 content to users based on their interests, and how
10 easy it should be to access certain kinds of
11 content.
12    Where in HB20 is that practice required to
13 change?
14    MR. DISHER:  Objection.  Form.
15    THE WITNESS:  I believe you're
16    asking me for a legal interpretation.
17    But insofar as "detergent pods taste
18    great" is a viewpoint, and HB20 prohibits
19    companies from discriminating on the
20    basis of a viewpoint, that is one aspect
21    of the bill.
22    What's more, the bill has
23
24
25

77

1    extensive penalties, and the risk of
2    running afoul of those penalties due to
3    the vague language in the statute may
4    deter activity that might, under an
5    interpretation, be permitted because the
6    risk is too great.
7    And as this paragraph points out,
8    content -- the propriety of the content
9    can be highly context-dependent.
10 BY MR. LYLE:
11    Q.   In paragraph 15, you talk about
12 age-gating.  How would HB20 prohibit age-gating?
13    MR. DISHER:  Objection.  Form.
14    THE WITNESS:  The statute
15    generates risks for companies
16    implementing their content moderation
17    practices.  And what a company regards as
18    inappropriate for young people and is,
19    therefore, gated away from them may well
20    be considered a viewpoint.
21    And saying this viewpoint is
22    inappropriate for young people, whether
23
24
25

---

**78**

1    it's content promoting self-harm,
2    promoting the use of cannabis,
3    celebrating adult content, depictions of
4    extreme violence, all of that may
5    constitute a viewpoint against which a
6    company would be penalized for
7    discriminating under HB20.
8    BY MR. LYLE:
9         Q.   How would depictions of cannabis
10   constitute a viewpoint?
11        MR. DISHER:  Objection.  Form.
12        THE WITNESS:  Depends on the
13   context.  But there are certainly some
14   depictions of cannabis that would
15   constitute a viewpoint.  It may be -- it
16   may co-occur with the expression of the
17   viewpoint.
18   BY MR. LYLE:
19        Q.   Can you provide an example where a
20   depiction of cannabis would constitute a viewpoint?
21        MR. DISHER:  Objection.  Form.
22        THE WITNESS:  I'd have to
23
24
25

---

**79**

1    speculate about scenarios, but I can
2    think of some, yes.
3    BY MR. LYLE:
4         Q.   Could you describe it, please.
5         A.   A video displaying cannabis in which
6    the content creator extols the use of cannabis
7    would constitute a viewpoint.
8         Q.   Can you provide an example of where
9    a depiction of self-harm would constitute a
10   viewpoint?
11        MR. DISHER:  Objection.  Form.
12        THE WITNESS:  A video in which one
13   user shows another user -- shows the
14   viewer how to perform or hide self-harm
15   could be construed as a viewpoint under
16   the vague terms of the statute.
17   BY MR. LYLE:
18        Q.   Could it also be construed as
19   content, self-harm content?
20        MR. DISHER:  Objection.  Form.
21        THE WITNESS:  Potentially.  Whose
22   definition of "self-harm content" are we
23
24
25

---

**80**

1    using?
2    BY MR. LYLE:
3         Q.   What about adult content?
4         A.   What about it?
5         Q.   Is that a viewpoint or is that a
6    content?
7         MR. DISHER:  Objection.  Form.
8         THE WITNESS:  Under the vague
9    definitions of the statute, there is
10   undoubtedly some adult content that could
11   be construed as a viewpoint.  And it may
12   co-occur with promotion of that content,
13   extolling it, saying it is a positive
14   thing.  That would undoubtedly be a
15   viewpoint which could be regulated under
16   the statute.
17   BY MR. LYLE:
18        Q.   Can you provide an example of that?
19        A.   Adult content?  I'm going to need a
20   working definition of "adult content."
21        Q.   Say pornography.
22        A.   Do I just --
23
24
25

---

**81**

1         MR. DISHER:  Objection.  Form.  Go
2    ahead.
3         THE WITNESS:  Do I know it when I
4    see it?
5    BY MR. LYLE:
6         Q.   I mean, case law is relatively
7    clear.
8         MR. DISHER:  Is there a question?
9         MR. LYLE:  Yes.
10        MR. DISHER:  What's the question?
11        MR. LYLE:  The question is whether
12   pornography is content or viewpoint.
13        MR. DISHER:  I will object to the
14   form of that question.
15        THE WITNESS:  That question
16   presupposes that one -- a thing cannot be
17   both content and viewpoint, which is a --
18   a premise that I reject.
19   BY MR. LYLE:
20        Q.   Are you aware that the Supreme Court
21   of the United States has defined "content" and
22   "viewpoint"?
23
24
25

---

82

```
 1           MR. DISHER:  Objection.  Form.
 2           THE WITNESS:  I am generally aware
 3     of Supreme Court definitions in the First
 4     Amendment context.
 5  BY MR. LYLE:
 6      Q.    Do you -- is there any reason that
 7  CCIA sees the Supreme Court's distinction there as
 8  not applying?
 9           MR. DISHER:  Objection.  Form.
10           THE WITNESS:  It depends on the
11     context in which we are analyzing the --
12     the statute and the -- the unity between
13     the definitions of content in HB20 and
14     Supreme Court jurisprudence, which is
15     something we have not established.
16  BY MR. LYLE:
17      Q.    Let's move on to paragraph 16.  You
18  talk about how in other circumstances, moderation
19  includes giving users tools to decide for
20  themselves what content they wish to avoid, such as
21  warning labels, disclaimers or general commentary
22  informing the user.  How would HB20 prohibit this?
23
24
25
```

83

```
 1           MR. DISHER:  Objection.  Form.
 2           THE WITNESS:  Well, by one
 3     example, allowing users to -- well, all
 4     right.  I think to give you the most
 5     precise answer, I'd like to look at the
 6     definition in the statute, if I may.
 7  BY MR. LYLE:
 8      Q.    Yes.
 9      A.    Yeah.  So if -- if the -- just
10  hypothetically, if the service were to provide a
11  means by which a user can not be served up
12  particular categories of content, that, in my view,
13  would create a risk of violation of the statute.
14           Given its ambiguities, I can't say for
15  certain, but in light of its penalties, that
16  necessarily chills the company's implementation of
17  its trust and safety practices.
18      Q.    So specific to this example, you're
19  saying that HB20 would prevent a company from
20  providing a user tools to curate their own content?
21           MR. DISHER:  Objection.  Form.
22           THE WITNESS:  It may prevent it.
23
24
25
```

84

```
 1     It may also deter it by imposing a severe
 2     penalty based on a misinterpretation --
 3     well, an inconsistent interpretation
 4     between the company and the court
 5     enforcing the statute.
 6  BY MR. LYLE:
 7      Q.    All right.  Let's go on to
 8  paragraph 18.  You talk about how "content
 9  moderation is necessary so that even the most basic
10  online functions, like shopping or searching for
11  local businesses or having material arranged by
12  topic or geography, work as intended.  Without
13  prioritizing, classifying, and ordering the
14  never-ending volume of online content, online
15  services would have no way to deliver the content
16  users want."
17           What does that have to do with a viewpoint?
18           MR. DISHER:  Objection.  Form.
19           THE WITNESS:  The order in which a
20     service ranks the content that it
21     displays to a user is itself the
22     service's viewpoint about relevance.  And
23
24
25
```

85

```
 1     the notion that some potentially
 2     responsive content to the user is less
 3     valuable and less relevant to the user's
 4     query is potentially discrimination under
 5     the vague definitions of the statute.
 6     Saying this result is not as responsive
 7     as this result could be construed as
 8     discrimination.
 9  BY MR. LYLE:
10      Q.    And would that be true in terms of
11  relevance based on, for example, geography?
12           MR. DISHER:  Objection.  Form.
13           THE WITNESS:  Potentially.  I'd
14     have to think about all those myriad
15     scenarios that would arise.
16  BY MR. LYLE:
17      Q.    Well, solely geography, relevance
18  based on geography, is that viewpoint?
19           MR. DISHER:  Objection.  Form.
20           THE WITNESS:  I'm unwilling to
21     rule out the idea that -- the notion that
22     content might be served up to different
23
24
25
```

Matthew Schruers - 11/16/2021

---

**86**

1    geographies and would never constitute a
2    viewpoint.  I suppose I could construct a
3    hypothetical wherein serving different
4    results based solely on geography would
5    be a viewpoint.
6  BY MR. LYLE:
7      Q.   Can you provide one?
8      A.   If you give me a few minutes to
9  think about it.
10     One hypothetical I'll offer is if a service
11  elected to not serve up a particular type of
12  controversial content in a jurisdiction, which was,
13  let's say, presume it to be lawful but politically
14  contentious for that jurisdiction, that geography,
15  not serving that would appear to be, under the
16  terms of the statute, viewpoint discrimination.
17     Q.   What about searching for, say, a
18  piece of furniture to buy?  Would the fact that you
19  got a result in your area as opposed to on the
20  other side of the country be viewpoint
21  discrimination?
22          MR. DISHER:  Objection.  Form.
23
24
25

---

**87**

1          THE WITNESS:  That particular
2    scenario, I'm not certain that I can -- I
3    don't want to rule it out, but as a
4    general proposition, I think that's less
5    likely to constitute -- to represent any
6    kind of viewpoint discrimination.
7  BY MR. LYLE:
8      Q.   In paragraph 19, you talk about how
9  content moderation is an important way that online
10  services express themselves.
11     How is that content moderation expressive?
12          MR. DISHER:  Objection.  Form.
13          THE WITNESS:  Content moderation
14    is expressive because digital services
15    make decisions about the order and
16    arrangement in which they present content
17    to the user.  That reflects the service's
18    view as to what is the most relevant and
19    potentially interesting to the user.
20          It reflects the service's views
21    about what is appropriate and conducive
22    to a healthy community, all the while
23
24
25

---

**88**

1    implementing the policies and guidelines
2    and practices that it has.  All of those
3    choices, collectively the editorial
4    discretion of the service, is -- are
5    protected under the First Amendment.
6  BY MR. LYLE:
7      Q.   Does it express the service's view
8  about what will get more user engagement?
9          MR. DISHER:  Objection.  Form.
10          THE WITNESS:  In some cases.  Not
11    necessarily.
12  BY MR. LYLE:
13     Q.   In some cases?
14          MR. DISHER:  Objection.  Form.
15          THE WITNESS:  In some cases what?
16  BY MR. LYLE:
17     Q.   The content moderation expresses the
18  service's view of what will get more user
19  engagement.
20     A.   In some cases, content moderation
21  may or may not get more user engagement.  That is
22  independent from the service's editorial judgment
23
24
25

---

**89**

1  about what it seeks to present to its users.  Those
2  two things may overlap.  They are independent
3  variables.
4      Q.   How do these services make money?
5          MR. DISHER:  Objection.  Form.
6          THE WITNESS:  Which services?
7  BY MR. LYLE:
8      Q.   Let's just say Facebook, for
9  example.
10          MR. DISHER:  Objection.  Form.
11          THE WITNESS:  Facebook has a
12    number of business models, but the
13    majority of its revenues for Facebook,
14    the blue site, are derived from
15    advertising revenue.
16  BY MR. LYLE:
17     Q.   And how does that work?
18          MR. DISHER:  Objection.  Form.
19          THE WITNESS:  How does internet
20    advertising work?
21  BY MR. LYLE:
22     Q.   Yeah, for Facebook.
23
24
25

---

90

1      MR. DISHER:  Objection.  Form.
2      THE WITNESS:  Facebook's
3  advertising products are complicated, but
4  at a -- it is a general level.  Facebook
5  and many other services allow advertisers
6  to serve up ads on its sites based on
7  metrics and variables to some extent
8  chosen by the advertiser within certain
9  boundaries about what you can and cannot
10  focus your advertising on, and then uses
11  its programming -- these ads are
12  algorithmically served up to the users to
13  whom those advertisements are expected to
14  be most relevant.
15      When those ads are served, the
16  advertisers effectively pay for it.  They
17  will generally pay by impressions, the
18  number of times the advertising is -- you
19  know, will either pay for a period of
20  time or pay for an amount of impressions.
21  It will probably vary product to product
22  and service to service.  But those
23
24
25

91

1      advertisements are then served up through
2      the platform to the user, and the
3      advertisers pay for that.
4  BY MR. LYLE:
5      Q.   And is the user engagement on the
6  platform important to those advertisers?
7      MR. DISHER:  Objection.  Form.
8      THE WITNESS:  It depends.
9  BY MR. LYLE:
10      Q.   What does it depend on?
11      MR. DISHER:  Objection.  Form.
12      THE WITNESS:  Whether user
13  engagement matters depends on the
14  advertising goals of the particular
15  advertiser.
16      Some advertisers simply want to
17  raise awareness, in which case the extent
18  to which users are engaging with the
19  content may be less relevant.
20      Others are looking for activation
21  or -- I'm sorry, user action, which may
22  involve clicking on the ad to continue
23
24
25

92

1  through to a product or service or
2  message or other matter.
3      And so that -- those two
4  variables, those two conditions will
5  change what the advertisers' objectives
6  are.  Advertisers, though, are
7  heterogenous.  It's difficult to paint
8  them all with one brush.
9  BY MR. LYLE:
10      Q.   How does HB20 prohibit services from
11  giving their users what they want to see?
12      MR. DISHER:  Objection.  Form.
13      THE WITNESS:  In many ways.  HB20
14  prohibits services from discriminating on
15  the basis of viewpoint.  Some users may
16  not want to see contents of a particular
17  viewpoint.  Some advertisers may not want
18  their brands advertised adjacent to
19  particular viewpoints.
20      And independently of that, the
21  service may view particular viewpoints as
22  inappropriate or dangerous or harmful to
23
24
25

93

1      its community, irrespective of whether or
2      not the content or behavior is legal, and
3      not wish to display that to its users.
4      All of those decisions are
5      threatened by the vague and ambiguous
6      definitions and the extreme penalties in
7      HB20.
8  BY MR. LYLE:
9      Q.   The viewpoints now that your members
10  allow on their websites, what is the relationship
11  of those viewpoints to the members?  Are they
12  fostering those viewpoints?
13      MR. DISHER:  Objection.  Form.
14      THE WITNESS:  I don't believe it's
15  accurate to say companies are fostering
16  viewpoints, no.  Companies seek to foster
17  a particular type of community consistent
18  with the Terms of Service and guidelines
19  and commitments it's made to its users.
20  That may have indirect effects on
21  viewpoints.
22      Companies don't set out -- well,
23
24
25

Matthew Schruers - 11/16/2021

94

1     in my general understanding, companies
2     aren't setting out to foster viewpoints.
3     They are setting out to provide a service
4     consistent with the representations
5     they've made to their users and their
6     advertisers about what will appear on
7     their service. That, without a doubt,
8     embodies the values of the service, but
9     also the values of the users who are on
10    the service and those of the advertisers
11    who advertise on the service.
12  BY MR. LYLE:
13       Q.   And that determines what content
14  they let on and what content they don't let on --
15             MR. DISHER: Objection. Form.
16  BY MR. LYLE:
17       Q.   -- is that correct?
18       A.   When you say "that," are you
19  referring to all those value judgments that I --
20       Q.   So in order to, as you put it in
21  paragraph 19, foster the kind of community that
22  companies have promised to their users, part of
23
24
25

95

1   this is moderating what content they allow on their
2   service. Is that correct?
3        A.   Yes.
4        Q.   And so there's a value judgment
5   going into the curating of the content; correct?
6             MR. DISHER: Objection. Form.
7             THE WITNESS: Companies' curations
8        of -- curation of content, at times,
9        unquestionably reflects a value
10       judgment -- multiple value judgments.
11  BY MR. LYLE:
12       Q.   And the environments that are
13  created by these services reflect the services'
14  value judgments as well; correct?
15       A.   Among other things, yes.
16       Q.   Can you describe how that content
17  moderation in paragraph 19 occurs with reference to
18  software and to humans?
19             MR. DISHER: Objection. Form.
20             THE WITNESS: I believe we touched
21       on this previously, but yeah. As a
22       general matter, when a digital service
23
24
25

96

1        sets out with a new product, they will
2        make design choices, choices about
3        potential risks that the product could
4        present.
5   BY MR. LYLE:
6        Q.   Let's just start from like when
7   something pops up and it needs to be moderated.
8   What happens? Let's say an image that is
9   inconsistent with -- or may be inconsistent with
10  the service's Terms of Service posted, what happens
11  then?
12       A.   That's not --
13             MR. DISHER: Objection. Form.
14             THE WITNESS: That's not really
15       how this works. But I think if you're
16       asking what happens when content or
17       behavior runs against the governance, I
18       think I can answer that question.
19             Generally speaking, there will be
20       either automated systems or human
21       systems, depending on the nature of the
22       product, the resources that the company
23
24
25

97

1   is able to devote to it, the type of risk
2   and whether or not that risk is something
3   that can easily be automated.
4        And, additionally, the context
5   dependence of the content, which can be
6   very volatile. So there may be either an
7   automated process that will lead to
8   actioning of content or behavior or it
9   is -- it winds up before a content
10  moderator person, a member of a trust and
11  safety team, either because it's been
12  flagged by a user or because the content
13  moderators themselves observed the
14  content which itself may be a function of
15  an automated system that pops up in the
16  queue.
17       And then if it's an automated
18  system, the automated system will action
19  the content according to the heuristics
20  that have been established; but almost
21  invariably, that will wind up before a
22  human because even though those
23
24
25

98

1   programming decisions were made by
2   humans, the automation process has false
3   positives and negatives which need to be
4   reviewed.
5          And if it's strictly a human
6   process, we wind up in the same place
7   where moderation action may be taken.  It
8   will vary.  It could be any number of
9   outcomes based on the -- again, the
10  product and the tools used by the
11  service.
12         And then based on that action,
13  sometimes users will have an appeal
14  mechanism or a review mechanism, which
15  are not the same thing.  And then the
16  service may, you know, respond to that
17  accordingly.  Depending on the gravity of
18  the offense, there may be actions taken
19  with respect to the user's account.
20  BY MR. LYLE:
21  Q.    Is that process expressive?
22         MR. DISHER:  Objection.  Form.
23
24
25

99

1          THE WITNESS:  Yes.
2   BY MR. LYLE:
3   Q.    How so?
4          MR. DISHER:  Same objection.
5          THE WITNESS:  How are choices
6   about what content to present to your
7   users expressive?  They are expressive in
8   the same way that any editorial choice
9   about what to put before a user is
10  expressive.
11  BY MR. LYLE:
12  Q.    Let's go to paragraph 20.  You list
13  here things that social media companies regularly
14  enforce their Terms of Service to remove.  You've
15  got illegal nonconsensual intimate imagery,
16  depictions of child sex abuse, calls for genocide,
17  a number of other things.
18         Does federal or state law prohibit showing
19  any of these categories of content?
20         MR. DISHER:  Objection.  Form.
21         THE WITNESS:  Some of the subjects
22         listed in this paragraph may be covered
23
24
25

100

1   by federal or state law.
2   BY MR. LYLE:
3   Q.    Do you know which ones?
4          MR. DISHER:  Same objection.
5          THE WITNESS:  I cannot, sitting
6   here now, speak with complete specificity
7   about every state and federal
8   jurisdiction.  However, there are -- a
9   number of these categories, including
10  child sexual abuse, are governed by --
11  well, are -- the federal law will read
12  upon those categories.
13  BY MR. LYLE:
14  Q.    Which others?
15  A.    Well --
16         MR. DISHER:  Sorry, what did you
17  say?
18         MR. LYLE:  Which others.
19         MR. DISHER:  Oh.  Objection.
20  Form.
21         THE WITNESS:  Wait.  Which others
22  what?
23
24
25

101

1   BY MR. LYLE:
2   Q.    You said federal -- maybe I
3   misunderstood.  You said federal law will what upon
4   the category of child sex --
5   A.    Read on these categories.
6   Q.    What does that mean?
7   A.    By which I mean, depictions of child
8   sex abuse may be broader than the federal
9   definition for CSAM -- for child sexual abuse
10  materials.  In other words, the policy may extend
11  to things that are adjacent to but not expressly
12  prohibited by federal law.
13  Q.    Are there any other examples in that
14  paragraph that that is true of?
15         MR. DISHER:  Objection.  Form.
16         THE WITNESS:  Yes.
17  BY MR. LYLE:
18  Q.    Which ones?
19  A.    So --
20         MR. DISHER:  Objection.  Form.  Go
21  ahead.
22         THE WITNESS:  That's the case for
23
24
25

Matthew Schruers - 11/16/2021

102

1      attempts to sell weapons and drugs.
2      There may be regulated controlled
3      substances or weapons whose sale are
4      restricted by federal or state law in
5      particular contexts, but in many cases,
6      one may find that a service's TOS, Terms
7      of Service, are broader than the federal
8      regulations or state regulations, either
9      because the sense is that better protects
10     user safety or simply for
11     administrability reasons.
12 BY MR. LYLE:
13     Q.   Let's go on to Paragraph 21.  You
14 talk about how "content moderation facilitates the
15 organization of content rendering an online service
16 more useful.  Imagine if a search engine presented
17 results in a random or purely chronological order."
18     Is it your position that HB20 would prevent
19 a search engine from presenting results in
20 something other than a random or purely
21 chronological order?
22          MR. DISHER:  Objection.  Form.
23
24
25

103

1          THE WITNESS:  No.  Do you want to
2   restate that question?
3 BY MR. LYLE:
4     Q.   So --
5          (Discussion held off the
6          record.)
7 BY MR. LYLE:
8     Q.   Is it your contention that HB20
9  would prevent services from prioritizing what was
10 most relevant in the context of search engines?
11          MR. DISHER:  Objection.  Form.
12          THE WITNESS:  It may, in at least
13     some cases.
14     Q.   Can you provide some examples of
15 those cases?
16     A.   Where the choice about relevance
17 runs up against a user's viewpoint regulated by --
18 regulated by HB20.
19
20     Q.   Such as?
21          MR. DISHER:  Objection.  Form.
22          THE WITNESS:  A choice by a
23
24
25

104

1      service to expressly downrank hate
2      speech, anti-Semitism, or otherwise
3      violent or vitriolic content directed at
4      a group of individuals, irrespective of
5      its relevance otherwise, could be
6      construed as a violation of the
7      prohibition on viewpoint discrimination
8      and thereby run afoul of the statute.
9 BY MR. LYLE:
10     Q.   Now, what about examples not
11 involving vitriolic content?
12     A.   Like --
13          MR. DISHER:  Is that the end of
14     your question?
15          MR. LYLE:  Yeah.
16          MR. DISHER:  Objection.  Form.
17          THE WITNESS:  Like hate speech or
18     anti-Semitism?
19 BY MR. LYLE:
20     Q.   Outside of these subject areas.
21          MR. DISHER:  Objection.  Form.
22          THE WITNESS:  There are many other
23
24
25

105

1      categories of content that a service may
2      choose to downrank whose presentation --
3      whose -- that may be construed by a user
4      as a viewpoint and whose deprioritization
5      would constitute viewpoint
6      discrimination.
7 BY MR. LYLE:
8     Q.   Is anti-Semitic speech, in your
9  view, viewpoint or content?
10          MR. DISHER:  Objection.  Form.
11          THE WITNESS:  I believe
12     anti-Semitic speech can be both a
13     viewpoint -- it would -- well, as I
14     understand those terms, unless the
15     content -- unless the material that we
16     are speaking about is totally ephemeral,
17     meaning it was never fixed at any point
18     in time for more than a transitory
19     measure, then it would be both content
20     and viewpoint.
21 BY MR. LYLE:
22     Q.   Let's go on to Paragraph 22.
23
24
25

106

1      MR. DISHER:  Could we take another
2  break?
3      MR. LYLE:  Yeah.
4      MR. DISHER:  10 minutes.
5      THE VIDEOGRAPHER:  We are going
6  off the record.  This is the end of media
7  Unit No. 2.  The time is 4:38 p.m.
8      (Recess)
9      THE VIDEOGRAPHER:  We are back on
10  the record.  This is the beginning of
11  media Unit No. 3.  The time is 4:53 p.m.
12  BY MR. LYLE:
13      Q.   Let's go to paragraph 22 of your
14  declaration, Mr. Schruers.
15      A.   22?
16      Q.   Yes.  Here you say the members of
17  the public associate digital services with
18  third-party content that appears in their service.
19      A.   Uh-huh.
20      Q.   What's the basis for your knowledge
21  of that?
22      A.   Having discussed it with companies,
23
24
25

107

1  advertisers.  Having observed boycotts.  Having
2  observed individual members of the public and
3  policy makers stating as much, among other things.
4      Q.   Is a basis of your knowledge
5  conversations with your members?
6      MR. DISHER:  Objection.  Form.
7      THE WITNESS:  Conversations with
8      members inform my view that -- my
9      knowledge that members of the public
10     associate companies with content that
11     appears -- and behavior that appears on
12     their service.
13  BY MR. LYLE:
14      Q.   Have your members told you that?
15      A.   Some.
16      Q.   What's the basis for your knowledge
17  that advertisers associate digital services with
18  the content that appears on their sites?
19      A.   The same.
20      Q.   Advertisers have told you that?
21      A.   Some.
22      Q.   Your members have told you that?
23
24
25

108

1      A.   They have, some.
2      Q.   Have you relied on any documents
3  other than what you've produced to form the
4  opinions in paragraph 22?
5      A.   Not expressly that I can recall.
6  But having formed a view over more than 15 years in
7  this industry and observing that advertisers
8  regularly associate -- are concerned about being
9  associated with content that appears adjacent to
10  their brands.  There may be some documents that I
11  don't recall that informed of this viewpoint.
12      Q.   But everything that you recall was
13  in the discovery production?
14      A.   Yes.
15      Q.   In paragraph 23 you -- you talk
16  about how a service's policy on sensitive media is
17  as equally expressive as a newspaper's calls about
18  which stories make the front page.  And then I'm
19  not going to read the rest of it.  And you say that
20  the difference is that online service providers are
21  called upon to make moderation decisions on a vast
22  scale for immense volumes of content.
23
24
25

109

1      Is it your contention that that difference
2  is the only difference between the calls social
3  media services make as to what sensitive media to
4  display and what a newspaper's editorials show?
5      MR. DISHER:  Objection.  Form.
6      THE WITNESS:  My contention is
7      that it is a difference.  I do not think
8      saying the difference is equivalent as
9      saying the only difference.
10  BY MR. LYLE:
11      Q.   What are the -- what are the other
12  differences?
13      MR. DISHER:  Objection.  Form.
14      THE WITNESS:  There are
15      technological differences.  There are
16      timing differences.  Digital services are
17      generally making decisions in a very
18      short time span.  They are expected to
19      get it right, where "right" is a highly
20      subjective notion.  They manifest those
21      decisions in digital form online.
22      Newspapers may only manifest those
23
24
25

Matthew Schruers - 11/16/2021

110

1      decisions in print, although recognizing
2      that many newspapers also have websites.
3 BY MR. LYLE:
4    Q.   Are newspapers protected under 230
5 of the Communications Decency Act?
6        MR. DISHER:  Objection. Form.
7        THE WITNESS:  Insofar as they are
8     performing functions that are consistent
9     with being an interactive computer
10    service, yes, they are.
11 BY MR. LYLE:
12    Q.   Functions that are not consistent
13 with being an interactive computer service, are
14 they protected for those?
15        MR. DISHER:  Objection. Form.
16        THE WITNESS:  Section 230 only --
17     Section 230's protections only apply to
18     interactive computer services.
19 BY MR. LYLE:
20    Q.   So newspapers' activities that are
21 not part of interactive computer services are not
22 protected by 230; correct?
23
24
25

111

1        MR. DISHER:  Objection. Form.
2        THE WITNESS:  Insofar as a
3     newspaper is not behaving as an
4     interactive computer service, it is not
5     protected by Section 230.
6 BY MR. LYLE:
7    Q.   And what are those 230 protections
8 from?  Are they --
9        MR. DISHER:  Objection.
10 BY MR. LYLE:
11    Q.   -- from liability for third-party
12 content?
13        MR. DISHER:  Objection. Form.
14        THE WITNESS:  Section 230
15     generally protects interactive computer
16     services from liability for third-party
17     content, yeah.
18 BY MR. LYLE:
19    Q.   The same scale that you refer to in
20 Paragraph 23 that online services must make
21 moderation decisions for, is that huge scale also a
22 source of huge revenue and resources for these
23
24
25

112

1 companies?
2        MR. DISHER:  Objection. Form.
3        THE WITNESS:  It depends.
4 BY MR. LYLE:
5    Q.   What does it depend on?
6        MR. DISHER:  Objection. Form.
7        THE WITNESS:  Among other things,
8     how they choose to -- if -- including if
9     they choose to monetize that service.
10 BY MR. LYLE:
11    Q.   Do some choose to monetize that
12 service?
13    A.   Yes.
14    Q.   What's an example of your member --
15 of a member of yours who has huge scale and
16 attempts to monetize that service?
17    A.   Define "huge."
18    Q.   Well, what you're referring to here
19 as "vast scale."
20    A.   Okay.  Is the scale within the scope
21 of Paragraph 23?
22    Q.   Yes.
23
24
25

113

1    A.   I think many of my member companies
2 have the scale contemplated in Paragraph 23,
3 including some who have already been described in
4 the declaration, like Google and Facebook.
5    Q.   And do Google and Facebook choose to
6 monetize content?
7        MR. DISHER:  Objection. Form.
8        THE WITNESS:  Google and
9     Facebook -- some -- some products.
10     They -- do they -- I don't think it's
11     accurate to say they monetize content.
12     They monetize the product.  There may be
13     content presented within the product.
14 BY MR. LYLE:
15    Q.   Let's go to paragraph 24.  You have
16 some numbers in here about the billions of people
17 in the Facebook community, the number of stories,
18 the active stories on Instagram.  Are the various
19 hard numbers you provide in paragraph 24
20 subsections pulled from the articles you cite?
21    A.   I believe these numbers were pulled
22 directly from Facebook transparency reports and
23
24
25

114

1  other public accounts.  Other -- I'm sorry, other
2  accounts to the public by Facebook.
3       Q.    And are those cited here in your
4  declaration or not?
5       A.    I'm referring to the numbers cited
6  in the declaration.
7       Q.    But the citations for those numbers,
8  are those --
9       A.    Yes, yes.
10      Q.    Okay.  Those are in the declaration?
11      A.    Indeed.  Generally speaking, the
12 footnotes here, 38 to 41.
13      Q.    That information in the subsections
14 of paragraph 24, how did each of those companies
15 get that information?
16      A.    I am not a content moderator for
17 these companies.  While I have a broad knowledge of
18 how content moderation practices as a subset of
19 trust and safety are implemented across the entire
20 industry, I don't have granular visibility into
21 their transparency and public accounting processes
22 other than what I see as a member of the industry
23
24
25

115

1  association and in my role at DTSP and in my
2  conversations with the companies.
3       But I cannot answer the question how did
4  each company go about gathering this data other
5  than to say that it is gathered as a part of its
6  trust and safety or equivalent practice.
7       Q.    Do you know how long it took them to
8  gather it?
9            MR. DISHER:  Objection. Form.
10           THE WITNESS:  Other than that this
11           kind of reporting is resource intensive,
12           no.
13 BY MR. LYLE:
14      Q.    Do you know who was responsible for
15 compiling it?
16           MR. DISHER:  Objection. Form.
17           THE WITNESS:  Compiling the
18           numbers described here in the
19           declaration?
20 BY MR. LYLE:
21      Q.    Yes.
22      A.    I know the teams.  I am aware of the
23
24
25

116

1  teams and divisions which are generally either the
2  trust or trust and safety or content moderation
3  teams of these companies traditionally are those
4  charged with implementing and executing their
5  transparency efforts.
6       Q.    And did the companies do it
7  internally?
8            MR. DISHER:  Objection. Form.
9            THE WITNESS:  As opposed to what?
10 BY MR. LYLE:
11      Q.    Having an outside party.
12           MR. DISHER:  Same objection.
13           THE WITNESS:  I cannot rule out
14           that some companies may have outside
15           parties.
16 BY MR. LYLE:
17      Q.    Are you aware of any companies
18 having outside parties compile this information?
19      A.    I am aware that some companies
20 utilize contractors in their trust and safety
21 practices.  And those contractors, as one of their
22 many responsibilities pursuant to the contract, may
23
24
25

117

1  have a data collection responsibility and a
2  reporting function.
3       Q.    Which companies are those?
4       A.    At this moment, I could not say.
5  Over time, I know as a fact that Facebook has
6  utilized about third-party contractors in its trust
7  and safety plan -- trust and safety practices.
8       Q.    Do you know the names of any of
9  those third-party contractors?
10      A.    Not sitting here now, no.
11      Q.    Do you know how much it cost the
12 companies to compile that information?
13           MR. DISHER:  Objection. Form.
14           THE WITNESS:  Enough that smaller
15           companies find transparency reporting to
16           be a challenging endeavor.  Beyond that,
17           no.
18 BY MR. LYLE:
19      Q.    What about larger companies?  Do
20 they find it to be a challenging endeavor?
21      A.    It is certainly a costly and
22 time-intensive undertaking.  It is a challenging
23
24
25

Matthew Schruers - 11/16/2021



118

1  endeavor.
2      Q.    Is it more challenging for small
3  companies or for larger companies?
4          MR. DISHER:  Objection. Form.
5          THE WITNESS:  That's difficult to
6      answer.  It will be a function of the
7      size of the content on the service, the
8      nature of the product, the number of the
9      user base and the resources that the
10      company has.
11          In a situation where you have a
12      service which has grown at a rate faster
13      than its infrastructure anticipated, the
14      burden can be extraordinary.
15  BY MR. LYLE:
16      Q.    Some of the citations you have for
17  these numbers in paragraphs 24A to 24E involve
18  transparency reports issued by these companies.
19      A.    Uh-huh.
20      Q.    Sorry?  Is that a "yes"?
21      A.    Yes, I hear you and I agree, they
22  do.
23
24
25

119

1      Q.    Why -- why do these companies issue
2  transparency reports?
3          MR. DISHER:  Objection. Form.
4          THE WITNESS:  Why?  Well, I can't
5      speak to the specific motives of any
6      individual company.  I believe it is
7      generally viewed across industry that as
8      best resources permit, being transparent
9      about how trust and safety operations are
10      implemented fosters trust and confidence
11      in users and advertisers and is
12      subjectively desirable.
13  BY MR. LYLE:
14      Q.    Have any of these companies that
15  issued these reports, have they told you that
16  issuing those reports was burdensome on them?
17      A.    Yes.
18      Q.    Which ones?
19      A.    Sitting here today, I cannot
20  specifically recall conversations, but I would say
21  that in the context of my conversations with CCIA
22  and DTSP member companies, the majority of
23
24
25

120

1  companies who offer user-facing services have
2  commented on the burden and cost associated with
3  this.
4      Q.    Can you think of any names of
5  companies that have commented on it?
6      A.    I believe I have had conversations
7  about products offered by YouTube, Twitter, Meta,
8  at least, and there are likely other conversations
9  that I'm not precisely recalling now regarding the
10  burden.  And, actually, Pinterest.  There may be
11  others that I just don't recall.
12      Q.    How are HB20's disclosure
13  requirements different from the transparency
14  reports you've cited?
15          MR. DISHER:  Objection. Form.
16          THE WITNESS:  That's difficult to
17      answer that question with any precision
18      because companies' transparency reports
19      vary.  If it's useful, you can talk about
20      where industry practice generally differs
21      from the transparency requirements.
22          Sorry.  I don't know where the
23
24
25

121

1  transparency provisions are.
2          Okay.  Yes, this is now coming
3      back to me.  So as a general matter,
4      reporting every 12 months is a challenge
5      even for large companies.  Reporting with
6      respect to a six-month period would be
7      doubly so.  The statute requires tracking
8      particular instances of things which some
9      companies may simply not track, and the
10      burden of rebuilding their trust and
11      safety operations to catalog removal,
12      demonetization, deprioritization are
13      vastly burdensome, to say the least and,
14      in some cases, not potentially
15      operationalizable [sic].  By which I mean
16      to the extent that some events of
17      moderation may occur in an automatic
18      fashion or when a service -- when a user
19      queries the service, does that count;
20      and, if so, how do you track that?
21          Generally speaking, the
22      granularity of this, of the statute, is
23
24
25

122

1      far greater than the transparency
2      reporting that even the most
3      sophisticated companies do right now.  To
4      say that it's burdensome is a gross
5      understatement.
6  BY MR. LYLE:
7      Q.     Would it be possible for the members
8  to comply with HB20?
9             MR. DISHER:  Objection. Form.
10            THE WITNESS:  Possible relative to
11     what?
12 BY MR. LYLE:
13     Q.     How about economically feasible.
14 Would they go out of business?
15            MR. DISHER:  Objection. Form.
16            THE WITNESS:  Certainly, some of
17     them would be faced with the option of
18     operating in the market of -- of exiting
19     the marketplace rather than attempting to
20     comply with the statute.
21 BY MR. LYLE:
22     Q.     Which -- which members would that
23
24
25

123

1  be?
2             MR. DISHER:  Objection. Form.
3             THE WITNESS:  That would require
4      me to speculate.
5  BY MR. LYLE:
6      Q.     Can you?
7      A.     No.
8             MR. DISHER:  Objection. Form.
9  BY MR. LYLE:
10     Q.     You're refusing to speculate on
11 which members would have to exit the market rather
12 than comply with HB20?
13     A.     Yes.
14            MR. DISHER:  Objection. Form.
15            THE WITNESS:  Yes, I am.
16 BY MR. LYLE:
17     Q.     What about members that would not
18 have to exit the market?
19            MR. DISHER:  Objection to form.
20            THE WITNESS:  Again, this is not
21     something that is easy to predict.  The
22     means by which companies comply with
23
24
25

124

1      burdensome regulation can vary
2      considerably, including limiting the
3      nature of a product, restricting the
4      features of a product, among other
5      practices.  And it's hard to say with any
6      degree of reliability what -- what I can
7      confidently tell you would happen in the
8      future for a company trying to comply
9      other than that it is extremely
10     burdensome.
11 BY MR. LYLE:
12     Q.     Which companies do you believe would
13 be able to stay in the market by making alterations
14 to their business model?
15            MR. DISHER:  Objection. Form.
16            THE WITNESS:  I don't know that I
17     believe any company would -- could
18     cost-effectively stay in the Texas market
19     and comply with the statute.
20 BY MR. LYLE:
21     Q.     What specific disclosure
22 requirements in HB20 go beyond transparency
23
24
25

125

1  reporting?
2             MR. DISHER:  Objection. Form.
3             THE WITNESS:  To my knowledge,
4      very few services report granularly about
5      demonetization, deprioritization,
6      contextualization, which is how I
7      interpret the addition of an assessment
8      to content or any other action, whatever
9      that means.
10 BY MR. LYLE:
11     Q.     Why -- why don't they report on
12 that?
13            MR. DISHER:  Objection. Form.
14            THE WITNESS:  Because it's
15     extraordinarily burdensome.
16 BY MR. LYLE:
17     Q.     But surely they -- they keep records
18 of that sort of thing?
19            MR. DISHER:  Objection. Form.
20            THE WITNESS:  Do they?
21 BY MR. LYLE:
22     Q.     I mean, isn't that part of their
23
24
25

126

1  whole process of user engagement and, I mean,
2  figuring out like where their algorithms have
3  gotten it right to increase user engagement and
4  where they haven't?
5          MR. DISHER:  Objection. Form.
6          THE WITNESS:  Not necessarily.
7  BY MR. LYLE:
8      Q.   So a company sort of tracking how
9  it's deprioritized things doesn't play into its
10  ongoing attempt to curate its content?
11         MR. DISHER:  Objection. Form.
12         THE WITNESS:  I'm not sure I know
13      what you mean by "playing into."
14  BY MR. LYLE:
15     Q.    So if, for example, a company
16  instructs an algorithm that deprioritizes a certain
17  kind of content.  They wouldn't keep a record of
18  that for terms of -- for purposes of tweaking the
19  algorithm in the future to see if that kind of
20  deprioritization worked, for lack of a better word?
21     A.    They may.  There is no guarantee
22  that they do or that, if they do, that this
23
24
25

127

1  information could be reported in any meaningful
2  manner to the State of Texas --
3      Q.   But do you --
4      A.   -- twice a year.
5      Q.   Do they keep the records?
6          MR. DISHER:  Objection. Form.
7          THE WITNESS:  Do who keep what
8      records?
9  BY MR. LYLE:
10     Q.    The services of deprioritizing
11  certain kinds of content.
12     A.    I can't speak to that across all
13  companies or without knowing what types of content
14  we're talking about.
15     Q.    How about Facebook?  Does it keep
16  records of what it deprioritizes?
17         MR. DISHER:  Objection. Form.
18         THE WITNESS:  I can't speak
19      specifically to Facebook's internal
20      implementation of its trust and safety
21      practices.
22
23
24
25

128

1  BY MR. LYLE:
2      Q.   Is that because you don't know the
3  answer?
4      A.   Yes.  I do not have that level of
5  granular visibility into their policy
6  implementations.
7      Q.   Is that true of YouTube as well?
8      A.   It is the same for YouTube.
9      Q.   What about Twitter?
10     A.    Likewise.
11     Q.   Let's go to paragraph 31 where you
12  talk about much of moderation must be done
13  algorithmically because of the scale.
14         MR. DISHER:  Sorry, what
15      paragraph?
16         MR. LYLE:  31.
17  BY MR. LYLE:
18     Q.   What's -- what's the basis of
19  your -- for your knowledge of that to make that
20  claim?
21     A.   Discussions with industry experts,
22  familiarity with the operational literature on
23
24
25

129

1  content moderation and trust and safety practice.
2  My general knowledge of being in this space for
3  many years and helping to found the Digital Trust &
4  Safety Partnership.  And my basic observation, like
5  anyone else, that there is a very large amount of
6  content and behavior on nearly all the services
7  that we're talking about.
8      Q.   And is that true of the basis of
9  your knowledge that algorithmic processes are
10  needed to screen content?
11     A.    Can you point to me where in the
12  declaration I say they are needed?
13     Q.   Well, "the capacity to make
14  moderation decisions algorithmically in the first
15  instance is vitally important to many services
16  offered by CCIA members" and its moderation of
17  incalculable content online.  There.
18         MR. DISHER:  I'm sorry, where are
19      you reading?
20         MR. LYLE:  So 32, the first two
21      sentences.
22         THE WITNESS:  I do not agree that
23
24
25

130

1        algorithmic is needed in all instances.
2        And, in fact, some services do rely
3        principally on human moderation or
4        community moderation.
5   BY MR. LYLE:
6        Q.    Which services are those?
7        A.    It can vary from product to product
8   over time, but although they are not a CCIA member,
9   Reddit is frequently pointed to as the service who
10  most directly utilizes community moderation.
11       Q.    Of your members, which ones
12  principally rely on nonalgorithmic moderation?
13            MR. DISHER:  Objection. Form.
14            THE WITNESS:  Well, they all rely
15       on human moderation in conjunction with
16       algorithmic software code-driven
17       processing.  Are you asking me about
18       exclusively?
19  BY MR. LYLE:
20       Q.    Well, which are the ones that must
21  do much of their moderation algorithmically in
22  order to function that you referred to in
23
24
25

131

1   Paragraph 31?
2        A.    In that case, I think that statement
3   accurately describes products, although not all
4   products, offered by Google -- at least some
5   products offered by Google, Facebook, Apple,
6   Amazon, Twitter, Pinterest and others.
7        Q.    Go to Paragraph 35, please.  The one
8   that begins with "H.B. 20 bans 'censorship' of
9   'viewpoint.'"
10       A.    Yes.
11       Q.    When your members ban Taliban
12  extremist content, is that banning based on
13  viewpoint?
14            MR. DISHER:  Objection. Form.
15            THE WITNESS:  Yes.
16  BY MR. LYLE:
17       Q.    What about when they ban medical
18  disinformation aimed at the public by foreign
19  government propagandists?
20            MR. DISHER:  Objection. Form.
21            THE WITNESS:  What about it?
22
23
24
25

132

1   BY MR. LYLE:
2        Q.    Is that discrimination based on --
3   is that banning based on viewpoint?
4            MR. DISHER:  Same objection.
5            THE WITNESS:  Can you restate that
6       question.
7   BY MR. LYLE:
8        Q.    So when your members ban medical
9   disinformation aimed at the public by foreign
10  government propagandists, is that a ban based on
11  viewpoint?
12            MR. DISHER:  Objection. Form.
13            THE WITNESS:  It is a ban that --
14       it -- it is banning content based on the
15       viewpoint the content expresses.
16  BY MR. LYLE:
17       Q.    And when your members allow
18  viewpoint -- or they allow content, is that
19  allowing content based on the viewpoint the content
20  expresses?
21            MR. DISHER:  Objection. Form.
22            THE WITNESS:  Not necessarily.
23
24
25

133

1   BY MR. LYLE:
2        Q.    Is it sometimes?
3        A.    In some cases.
4        Q.    Let's go to paragraph 36.  This
5   talks a bit about platforms appending warning
6   labels.  If the term "discrimination" was
7   eliminated from HB20, is there anything else in the
8   language of HB20 that you contend eliminates the
9   ability to attach warning labels or other tags to
10  user-generated content?
11            MR. DISHER:  Objection. Form.
12            THE WITNESS:  Can you point me to
13       where the statute uses the word
14       "discrimination."
15  BY MR. LYLE:
16       Q.    Yeah, just a second.  It's
17  143A.001(1).  Subsection 1.
18       A.    You'll forgive me if I haven't
19  memorized the statute.  Is this the only instance
20  of "discriminate" in the statute?
21       Q.    Yeah.
22       A.    Okay.  And your question -- I'm
23
24
25

Matthew Schruers - 11/16/2021

134

1  sorry.  Now that we've identified what we're
2  talking about, can I ask you to restate the
3  question?
4      Q.    Yeah.  If the term "discrimination"
5  were eliminated, is there anything else in the
6  language of HB20 what you contend eliminates
7  platforms' ability to attach warning labels or
8  other tags to user-generated content?
9          MR. DISHER:  Objection. Form.
10         THE WITNESS: Yes.
11  BY MR. LYLE:
12     Q.    What?
13         MR. DISHER:  Objection. Form.
14         THE WITNESS: Is your question
15      what else in the statute?
16  BY MR. LYLE:
17     Q.    Yes.
18     A.    What else in the statute what?
19     Q.    What else in the statute prevents
20  services' abilities to attach warning labels or
21  other tags to user-generated content other than
22  discrimination?
23
24
25

135

1          MR. DISHER:  Objection. Form.
2          THE WITNESS:  I got it.  Thank
3      you.  I believe denying -- at the least,
4      denying equal access or visibility to
5      would -- could be interpreted to read on
6      attaching warning labels.  And, of
7      course, warning labels may sometimes
8      involve interstitials where the content
9      is blurred.  Some users may find this
10     content emotionally troublesome and
11     whatnot.  And so at the least, denying
12     equal access or visibility to would also
13     implicate warning labels and
14     interstitials.
15     Q.    Is there a way to attach warning
16  labels to user-generated content that doesn't deny
17  visibility?
18         MR. DISHER:  Objection. Form.
19         THE WITNESS:  I think that would
20     require me to guess what a Texas court
21     would interpret, you know, "deny
22     visibility" or "reduce visibility to."
23
24
25

136

1  BY MR. LYLE:
2      Q.    Well, in your view, would a -- would
3  a warning label appearing in a scrolling sidebar,
4  for example, deny visibility in a way inconsistent
5  with the statute?
6          MR. DISHER:  Objection. Form.
7          THE WITNESS:  We're now, you know,
8      constructing a hypothetical product which
9      may or may not be in the marketplace.
10     And that doesn't really seem to be
11     consistent with my understanding of how
12     companies label or provide interstitials
13     to content.
14         But as I understand your question,
15     it is:  Does putting a label in the
16     sidebar adjacent to the content
17     constitute denying visibility?
18         I think I'd have to decide what a
19     Texas court is likely to think that that
20     means.  I don't know that I'm comfortable
21     predicting what a Texas state court would
22     interpret "deny visibility to" means.
23
24
25

137

1  BY MR. LYLE:
2      Q.    Well, in your view, is there a
3  difference between the extent to which just -- a
4  user's -- is there a difference in a user's
5  experience of content with which they're
6  interacting when the warning label is in a
7  scrolling sidebar or if it's actually, like,
8  interfering with their viewing of the content?
9          MR. DISHER:  Objection. Form.
10         THE WITNESS:  Yes.  You have
11     described two different product
12     experiences.
13  BY MR. LYLE:
14     Q.    Okay.  Go to paragraph 38, please.
15  You talk about decisions to remove a particular
16  item of content uploaded by a user.
17     A.    Uh-huh.  Yes.
18     Q.    Are those -- when you say
19  "decisions," are those decisions made by a computer
20  or by a person?
21         MR. DISHER:  Objection. Form.
22         THE WITNESS:  It depends.  It
23
24
25

138

1      could be both or either.  Ultimately
2      almost all computer-implemented decisions
3      reflect human input at the front end to
4      produce the results.
5  BY MR. LYLE:
6      Q.    Can you explain that?
7      A.    Generally speaking, when a
8  software -- machine-based content moderation is
9  deployed, there are choices made at the front end
10 by the trust and safety or equivalent team about
11 how to populate the variables in that machine-based
12 system, how it will work.
13      Those choices reflect the human team's
14 efforts to implement the governance.  And then the
15 system effectuates those -- those viewpoints of the
16 personnel, and it tends to be an iterative process.
17      Q.    Meaning?
18      A.    "Iterative" meaning you do it once,
19 you look at the results you're getting, you go
20 back, you do it again, and the cycle repeats
21 potentially ad infinitum.
22      Q.    "You" meaning the human?
23
24
25

139

1      A.    The trust and safety team that is
2  programming the machine-based system that supports
3  their work.
4      Q.    So when I asked you who is making
5  the decision, a computer or machine, you said it
6  could be both or it could be either.  Was that an
7  example you just gave me of where it's both?
8      A.    Ultimately all decisions are made by
9  the humans.  The machines simply are effectuating
10 through their programming those decisions.  So in
11 the moment, the decision might be a
12 machine-implemented decision, but that is just one
13 instantiation of the choice the programmers made.
14      Now, you could also have programmers going
15 into the back end of the system and saying, our
16 automated filtering technology is generating false
17 positives or negatives for a copyright protection
18 technology that we have licensed, and we need to
19 fix that to prevent these false positives.
20      And they might individually restore or
21 remove content based on whether it's a false
22 positive or negative.  That's happening
23
24
25

140

1      concurrently with the development of the
2      programming.
3      Q.    Let's go to paragraph 43, please.
4  This paragraph talks about the requirement for a
5  report dealing [sic] every piece of content over
6  which a covered member upheld its policies.  Do you
7  see the one I'm talking about?
8      A.    I do, yes.
9      Q.    How is that different from what you
10 described the companies as doing in 24A to 24E
11 where some of the members' efforts to, you know,
12 suspend accounts and other -- and remove channels
13 are detailed?
14      MR. DISHER:  Objection.  Form.
15      THE WITNESS:  They're totally
16      different.  24A refers to the
17      enforcement.  Paragraph 43 refers to
18      reporting on the enforcement.  Those are
19      apples and oranges.
20      MR. LYLE:  Right.  But aren't 24A
21  to 24E, these are reports of enforcement;
22      right?
23
24
25

141

1      MR. DISHER:  Objection.  Form.
2      THE WITNESS:  These are numbers.
3      "No" is the answer.  No, these are not.
4      These are not reports of enforcement.
5  BY MR. LYLE:
6      Q.    Okay.  So could you describe the
7  difference, please.
8      A.    Paragraph 43 of the declaration
9  refers to a report detailing every piece of content
10 over which policies were implemented, which would
11 include such things as are defined in Section HB
12 20.
13      What is described in paragraph 24 are
14 top-level aggregate numbers for content, particular
15 classes of policy enforcement with respect to
16 particular types of content on some products.
17      Q.    The requirement you describe in 43,
18 could -- could an algorithm be created to perform
19 that function?
20      MR. DISHER:  Objection.  Form.
21      THE WITNESS:  I don't know, but
22      assuming that it were possible, it would
23
24
25

142

1    be -- it would impose the same costs that
2    we're talking about here.  But I don't
3    know that such a thing would be possible.
4  BY MR. LYLE:
5       Q.    The same costs as what?
6       A.    The -- the burden that we've been
7  discussing through the course of our conversation
8  today.
9       Q.    Let's go to paragraph 44 where you
10 discuss the notice requirement.
11      A.    Yes.
12      Q.    So as it stands now, can your
13 members send notices to users?
14      A.    Define "can."  Are they -- do you
15 mean are they capable of --
16      Q.    Is it something they ever do?
17      A.    Some companies will provide some
18 form of notice to users based on moderation
19 decisions.
20      Q.    And how -- how is it typically done?
21      A.    It varies based on the product and
22 the service.  In some cases, an email could be sent
23
24
25

143

1  to the address on file.  In other cases, the user
2  might receive a message in an in-product inbox.
3  The product may simply be tombstoned, which is a
4  term meaning that there is a notification placed on
5  the content.  One example of this would be YouTube
6  videos that are removed for copyright violations,
7  and you'll see the little red box with the frown
8  face saying this content was removed due to a
9  copyright complaint by XYZ.  Those are in-product
10 notifications.
11      But, you know, given the diversity and size
12 and scale of industry and the heterogeneity of the
13 products, it's difficult to speak uniformly about
14 how they notify users as to content removal.
15      Q.    How would complying with HB20's
16 notice requirement require your members to do
17 something different from what you just described?
18      A.    What I described was for some
19 classes of content removal in some products.  HB 20
20 doesn't just refer to content removal.  It also
21 refers to demonetization, deprioritization,
22 addition of an assessment, suspension, removal or
23
24
25

144

1  any other action.
2      I think informing users of any other action
3  you took after viewing content would be far more
4  burdensome than putting up a YouTube tombstone
5  notice when you took something down because it
6  algorithmically was determined to violate a
7  copyright hash.
8       Q.    Could an algorithm be created to
9  fulfill this notice requirement?
10      MR. DISHER:  Objection. Form.
11      THE WITNESS:  I don't know, but I
12 doubt that it could be done in any
13 reliable way that would satisfy
14 compliance with the statute.  And if in
15 some moonshot universe that were
16 possible, it would be extraordinarily
17 expensive to operationalize.
18 BY MR. LYLE:
19      Q.    Do algorithms currently fulfill the
20 function of, say, tombstoning YouTube videos?
21      A.    When -- if -- in that particular
22 context, the narrow context of copyright hash
23
24
25

145

1  resolution, it is highly automated and still not
2  without substantial error costs.  But it can be
3  highly automated because there are licensable
4  databases of copyright hashes that can be matched
5  against an ingest filter and the content can be
6  compared against that hash database with relatively
7  high clarity against certain ranges of tolerances,
8  and if there's a hit, automatically either prevent
9  the content from being uploaded, in which case the
10 user gets a notice before it's even posted, or
11 perhaps it wasn't filtered at ingest for any number
12 of reasons, but then subsequently is discovered.
13 When that happens, it is my understanding that that
14 particular process is highly automated.
15      Q.    What about the other examples you've
16 described of sending notices to users?
17      MR. DISHER:  Objection. Form.
18      THE WITNESS:  No.  Copyright is
19 perhaps the most -- well, it is certainly
20 one of the most automatable systems
21 because there are identifiable databases
22 that can be supplemented and do not
23
24
25

146

1      change.  There are general, albeit
2      disputed, notions around the ranges of
3      tolerance that can be used for
4      implementing those databases.  And even
5      there, there are tons of error costs that
6      affects users, individual users and Heads
7      of State.  And that still requires human
8      intervention on the back end to address
9      the error cost.
10  BY MR. LYLE:
11      Q.    Let's go to paragraph 46.  This is
12  where you talk about how a substantial proportion
13  of the value provided to users is the service's
14  arrangement of information in the way it provides
15  the sort of content and experience that the user is
16  seeking.
17      How -- how do your members know when
18  they've given the user what the user is seeking?
19          MR. DISHER:  Objection. Form.
20          THE WITNESS:  One never knows that
21      you've met a user's preferences unless
22      they explicitly tell you, but it can be
23
24
25

147

1      inferred based on users' behavior.
2  BY MR. LYLE:
3      Q.    How -- how is that?  Can you explain
4  that process?
5          MR. DISHER:  Objection. Form.
6          THE WITNESS:  The extent to which
7      they continue to use the product.
8      Perhaps they leave positive reviews in
9      other contexts.  Other indirect indicia:
10      Site traffic, time on site.  Various
11      analytical variables that are used in the
12      internet community to assess user
13      engagement.
14  BY MR. LYLE:
15      Q.    Which of what you just -- okay.  So
16  user -- does user engagement bear any relationship
17  to advertising revenue?
18      A.    It can.  Yes.
19      Q.    Where -- where?
20          MR. DISHER:  Objection. Form.
21          THE WITNESS:  All else equal, a
22      more -- the more a user engages with the
23
24
25

148

1      site, the more likely they will be to --
2      well, I should say this applies
3      for advertisement-based services.  If
4      it's monetized through a different model,
5      then we would have to talk about that.
6      But assuming we're talking about
7      an advertisement-based service, user
8      engagement increases the likelihood that
9      the site can serve to the user
10      advertisements that are relevant to the
11      user's interests with which the user may
12      interact.  And that is a -- when that
13      happens, the matchmaker function of the
14      platform has been achieved, and that is
15      value to the user.  That is what a
16      ad-supported digital service looks to do.
17  BY MR. LYLE:
18      Q.    And is it true that higher rates of
19  user engagement appeal to the advertisers that are
20  paying to place their ads there?
21          MR. DISHER:  Objection. Form.
22          THE WITNESS:  In many contexts,
23
24
25

149

1      not necessarily all.
2  BY MR. LYLE:
3      Q.    What kind of efforts did CCIA make
4  when HB 20 was in the legislative process against
5  it?
6      A.    Because that advocacy was not within
7  the scope of my declaration, I cannot, off the top
8  of my head, tell you precisely what the association
9  did.  However, in the -- the association, at the
10  least, may have issued public statements about the
11  statute.
12      Q.    Did the association issue public
13  statements?
14      A.    I'd have to go back and verify.  I
15  believe we did, but I do not precisely recall.
16      Q.    Did the association do anything
17  more?
18      A.    I believe we did, but I do not
19  precisely recall the scope of our advocacy ex-ante.
20      Q.    So you're not going to describe any
21  more advocacy actions CCIA took with respect to HB
22  20 apart from they issued public statements?
23
24
25

---

150

```
1              MR. DISHER:  Objection.  Form.
2              THE WITNESS:  I can only describe
3      to you what I remember.
4   BY MR. LYLE:
5      Q.    Did CCIA provide funding to
6   opposition groups?
7      A.    Define "opposition groups."
8      Q.    Groups opposing the bill.
9              MR. DISHER:  Objection.  Form.
10             THE WITNESS:  The association did
11     not provide funding to any organization
12     with the instruction that it should
13     oppose the bill.
14  BY MR. LYLE:
15     Q.    Did CCIA provide funding to any
16  organizations that did oppose the bill?
17     A.    The association supports a variety
18  of entities in its role, and I'm not in a position
19  to tell you what each and every one of those people
20  may have said about the statute.
21     Q.    Do you know if CCIA provided money
22  to any organization that opposed the bill?
23
24
25
```

---

151

```
1      A.    To my knowledge, I am not aware of
2   any organization that the association has supported
3   that opposed the enactment of the bill.
4      Q.    What about opposing various
5   provisions of the bill?
6      A.    The same.  To my knowledge, no.
7      Q.    Did CCIA provide funding to any
8   legislators?
9      A.    Funding?
10     Q.    Yes, like campaign contributions.
11     A.    Ah.  That's a little bit different.
12  In Texas, no.
13     Q.    Anywhere else?
14     A.    The association itself does not
15  provide campaign contributions to anyone.  The
16  association has an associated PAC which may provide
17  contributions.  That PAC has made no contributions
18  to state legislators in Texas.
19     Q.    What is the name of that PAC?
20     A.    CCIA PAC.
21     Q.    Who has it made contributions to in
22  connection with HB 20?
23
24
25
```

---

152

```
1      A.    In connection with --
2              MR. DISHER:  Go ahead.
3              THE WITNESS:  In connection with
4      HB 20?  No one.
5   BY MR. LYLE:
6      Q.    Are there any attempts to kill HB 20
7   in any way that we haven't discussed that CCIA or
8   the CCIA PAC engaged in?
9              MR. DISHER:  Objection.  Form.
10             THE WITNESS:  Excluding this
11     lawsuit?
12  BY MR. LYLE:
13     Q.    Yeah.
14     A.    Define "kill."
15     Q.    To prevent the bill from being
16  passed.
17     A.    Outside of what we have discussed
18  here, I'm not aware of the association having taken
19  any other steps but for this litigation.
20     Q.    What about the CCIA PAC?
21     A.    The PAC only contributes to federal
22  candidates at present, and sparingly so.
23
24
25
```

---

153

```
1      Q.    What attempts has CCIA engaged in to
2   alter the text of HB 20?
3      A.    Other than this lawsuit?
4      Q.    Yes.
5      A.    Other than this lawsuit and any
6   public statements the association may have made
7   prior to enactment and potentially some public
8   correspondence that I may or may not recall,
9   nothing.
10     Q.    Okay.  So no other lobbying
11  activities?
12     A.    Not to my recollection.
13     Q.    Do you know the specifics of how
14  each one of your members' algorithms works to
15  moderate content?
16             MR. DISHER:  Objection.  Form.
17             THE WITNESS:  I cannot speak to
18     the specifics of each member's
19     machine-implemented policies, assuming
20     that's what you mean by "algorithms," in
21     content moderation.  I understand them at
22     a general level as an industry executive
23
24
25
```

154

1    and expert.
2  BY MR. LYLE:
3      Q.   Are there significant differences
4  between them, company to company?
5      A.   There can be.  They vary based on --
6  their sophistication varies based on the size and
7  resources of the company.  What they operate
8  against based -- varies based on the underlying
9  governance which, as we've discussed, can vary
10 considerably based on the kind of products, the
11 user base, the type of community that the service
12 is attempting to cultivate with that product or
13 products.  It's difficult to paint them all with
14 one brush.
15     Q.   When did NetChoice and CCIA enter
16 into a common interest agreement?
17     A.   I cannot tell you the date of that
18 agreement off the top of my head.  But prior to
19 planning for this lawsuit.
20     Q.   Do you have any estimate as to how
21 many -- was it like a year, a year or more?
22     A.   I don't recall.
23
24
25

155

1      Q.   Two years or more?
2      A.   Probably not more than two years.
3      Q.   How certain are you about that?
4      A.   On a scale of 1 to 10?
5      Q.   Yes.
6      A.   Like two years, I'd say like nine.
7      Q.   Okay.  Was it as recently as six
8  months ago?
9      A.   I don't recall.
10     Q.   Three months ago?
11     A.   I am terribly busy, and I do not
12 have the ability to pluck dates like this out of my
13 memory.  I applaud those of you who do.
14     Q.   So you're declining to give even an
15 estimate of when you entered into a common interest
16 agreement with NetChoice?
17         MR. DISHER:  Objection.  Form.
18         THE WITNESS:  I cannot provide you
19     an accurate assessment, and I'm declining
20     to give you an inaccurate one.
21 BY MR. LYLE:
22     Q.   Was it prior to CCIA's litigation in
23
24
25

156

1  Florida?
2      A.   The common interest agreement
3  predated the litigation in Florida.
4      Q.   Should CCIA be seen by the public as
5  agreeing with the viewpoints expressed by its
6  members?
7         MR. DISHER:  Objection.  Form.
8         THE WITNESS:  In some cases, but
9     not all cases.
10 BY MR. LYLE:
11     Q.   Which cases?
12         MR. DISHER:  Objection.  Form.
13         THE WITNESS:  Our members express
14     many viewpoints.  They are a very
15     heterogenous group.  The association does
16     not endorse any and all messages that its
17     members make.  Much of what they say is
18     irrelevant to the association's advocacy
19     on behalf of the technology sector.
20         Insofar as the member companies'
21     viewpoints are consistent with the
22     association's advocacy for open markets,
23
24
25

157

1      open systems and open networks, then
2      perhaps; but I think it is a mistake to
3      assume that the association is invariably
4      aligned with its members.  But it seeks
5      to advocate to advance that mission and
6      industry's general interests and the
7      interests of their users.
8  BY MR. LYLE:
9      Q.   Are there any of your members whose
10 views you would view CCIA would like to be seen as
11 endorsing?
12         MR. DISHER:  Objection.  Form.
13         THE WITNESS:  I don't believe the
14     association's role is to endorse members'
15     opinions, and I do not set out or get up
16     in the morning looking to endorse what
17     companies say.  The association seeks to
18     foster its mission, the users -- the
19     interests of -- of industry and its
20     users.
21 BY MR. LYLE:
22     Q.   Are there entities that have sought
23
24
25

Matthew Schruers - 11/16/2021

---

158

1  membership in CCIA who you have not allowed in
2  because you want to be disassociated from --
3        MR. DISHER:  Objection.  Form.
4    Q.   -- that they expressed?
5        MR. DISHER:  Objection.  Form.
6        THE WITNESS:  Albeit not in recent
7     memory, there have been instances that I
8     do not precisely recall wherein the
9     companies pursuing membership have been
10    rejected.
11 BY MR. LYLE:
12   Q.   Do you remember who those were?
13   A.   Not -- not all of them specifically.
14 I do know that perhaps within the last decade, the
15 association refused an application for membership
16 by Huawei.
17   Q.   By who?
18   A.   Huawei.
19   Q.   If Porn Hub applied for membership
20 in CCIA, would CCIA accept their application?
21        MR. DISHER:  Objection.  Form.
22        THE WITNESS:  The application
23
24
25

---

159

1        process involves the leadership
2     recommending membership to the board and
3     approval by the board.  I only control
4     one of those two phases.  I cannot speak
5     to what the board would do.
6  BY MR. LYLE:
7    Q.   Would you, in your phase of
8  assessing membership, accept Porn Hub as a member?
9    A.   That is a very --
10        MR. DISHER:  Objection.  Form.
11        THE WITNESS:  That's an
12     interesting question.  I think it
13     would -- it would depend on the
14     circumstances, but my instinct is that
15     notwithstanding the legality of its
16     content, that an adult service could
17     generate brand damage for an association
18     like mine.
19        MR. LYLE:  So would you recommend
20     they be accepted or not?
21        MR. DISHER:  Objection.  Form.
22        THE WITNESS:  Predicting the
23
24
25

---

160

1        future, sitting here today, if I were to
2     receive an application from Porn Hub, I
3     believe I would recommend the board not
4     entertain it.
5  BY MR. LYLE:
6    Q.   What about Alt Right chat rooms like
7  4Chan, what would your recommendation there be as
8  far as accepting them as a member?
9        MR. DISHER:  Objection.  Form.
10        THE WITNESS:  It would depend on
11     whether or not the service indicated that
12     they were willing to subscribe to the
13     mission and support the association's
14     advocacy.
15 BY MR. LYLE:
16   Q.   How could they credibly indicate
17 that to you?
18        MR. DISHER:  Objection.  Form.
19        THE WITNESS:  Are you suggesting
20     that they don't have the credibility to
21     make that representation?
22
23
24
25

---

161

1  BY MR. LYLE:
2    Q.   No, I'm just asking you.
3        MR. DISHER:  Same objection.
4        THE WITNESS:  It would require a
5     series of conversations and some
6     discussions about how a particular
7     company pursues public policy and what
8     policies it pursues and expects to
9     pursue.
10 BY MR. LYLE:
11   Q.   All right.  Let's go back to your
12 declaration generally.  Can you give me the names,
13 please, of everybody that was involved in the
14 preparation of your declaration?
15   A.   Including counsel?
16   Q.   Yes.
17        MR. DISHER:  Just to be clear,
18     I'll instruct you not to answer the
19     substance of those conversations, but
20     simply to identify who you talked to or
21     may have talked to about the declaration,
22     I'll allow.
23
24
25

---

162

```
1            THE WITNESS:  The declaration
2       was -- was prepared -- I spoke with
3       our senior policy counsel in the
4       preparation of the declaration.
5   BY MR. LYLE:
6       Q.   What's his or her name?
7       A.   Ali Sternburg.  And I think as well
8   as members of our outside counsel at Lehotsky
9   Keller.
10      Q.   Which people?
11      A.   I have to think.  Counsel here, Todd
12  Disher.  I don't precisely recall which other
13  members of the Lehotsky team I spoke with in
14  preparation of this -- the declaration.
15      Q.   Do you remember how many you spoke
16  with?
17      A.   Not precisely.
18      Q.   So apart from Mr. Disher, these few
19  members of Lehotsky that you don't remember, and
20  Ms. Sternburg, did you speak to anyone else about
21  your declaration?
22      A.   Not that I recall, no.
23
24
25
```

163

```
1       Q.   Did anybody else see drafts of your
2   declaration?
3       A.   Not that I'm aware of.
4       Q.   Did you correspond with anybody else
5   about your declaration?
6       A.   Outside of counsel?
7       Q.   Outside of the people you've just
8   described.
9       A.   Not that I recall.
10      Q.   Do you remember when you spoke to
11  each of these people?
12      A.   Within two to three weeks prior of
13  the filing of the Complaint.
14      Q.   How many revisions did your
15  declaration go through?
16           MR. DISHER:  No, I will instruct
17      you not to answer that question.
18           MR. LYLE:  That doesn't have to do
19      with communications, though.
20           MR. DISHER:  It does, in fact,
21      have to do with communications.  You're
22      getting into what we might or might not
23
24
25
```

164

```
1   have told him, what we might or might not
2   have provided him in terms of attorney
3   work product.
4       So to the extent you want to ask
5   him who he talked to, that is totally
6   fine.  To the extent you want to ask him
7   what input he was provided by his counsel
8   on his declaration, that is absolutely
9   protected, and I will instruct the
10  witness not to answer those questions.
11           MR. LYLE:  Mr. Disher, I'm asking
12  for the number of revisions, which has
13  nothing to do with the content of your
14  communications.
15           MR. DISHER:  It does indeed,
16  because purely the simple fact that
17  you're implying there was any revisions
18  reveals communications that he might or
19  might not had with counsel in addition to
20  work product that counsel might or might
21  not have provided to him.
22       So I absolutely will shut down
23
24
25
```

165

```
1   this line of questioning right here.
2   You're entitled to know who he talked to
3   and when he talked to us, but you're not
4   entitled to know anything related to the
5   substance of those communications,
6   including if there were -- the mere fact
7   of whether there were or were not
8   revisions to his declaration.
9       That is privileged.  And, quite
10  frankly, we've allowed you quite a bit of
11  leeway, but this is where we draw the
12  line, and this is where I instruct the
13  witness not to answer.
14           MR. LYLE:  Our position is that
15  the question about the number of drafts
16  the declaration went through doesn't
17  speak to content and is not privileged
18  and that your objection is improper.
19           MR. DISHER:  I disagree.
20           MR. LYLE:  We're going to preserve
21  it.
22
23
24
25
```

Matthew Schruers - 11/16/2021



166

1  BY MR. LYLE:
2      Q.   To form the opinions you express in
3  your declaration, what -- what did you consult
4  apart from the people that we've discussed?
5      A.   Let's see.  I consulted the bill.
6  I, as we've discussed, consulted with counsel.  I
7  consulted the documents in the Florida litigation.
8  And generally my memory of industry practice and
9  how these processes work.  I consulted the
10 documents that are cited in the footnotes to the
11 declaration insofar as they substantiate the
12 assertions that I'm making in the declaration.
13     Q.   Did you consult any documents that
14 you didn't produce?
15     A.   Not other than what I've listed.
16     Q.   Did you consult anything not
17 produced to refresh your memory of 15 years of
18 industry practice?
19     A.   Not that we haven't produced.
20     MR. DISHER:  Let's take a quick
21   break.
22     THE VIDEOGRAPHER:  We are going
23
24
25

167

1      off the record.  This is the end of media
2      Unit No. 3.  The time is 6:07 p.m.
3          (Recess)
4      THE VIDEOGRAPHER:  We're back on
5      the record.  This is the beginning of
6      media Unit No. 4.  The time is 6:12 p.m.
7      MR. LYLE:  Pass the witness.
8  EXAMINATION BY
9  MR. DISHER:
10 BY MR. DISHER:
11     Q.   Mr. Schruers, I just have a few
12 questions for you.  Thank you for your time today
13 so far.
14     Earlier today you mentioned fostering
15 specific viewpoints and content moderation
16 generally.  I just want to be clear about one
17 thing.
18     In your opinion, are content moderations --
19 excuse me, are content moderation decisions
20 expressive?
21     A.   Yes, unquestionably.
22     Q.   What are your members trying to
23
24
25

168

1  express when they make those content moderation
2  decisions?
3      A.   They are attempting to express the
4  values embedded in their policies and to deliver on
5  the commitments that they've made to their users
6  about the kind of community, the kind of content
7  that those users can expect in the -- in the
8  product.
9      MR. DISHER:  Thank you.  I have
10     nothing further.
11     THE VIDEOGRAPHER:  We're off the
12     record at 6:13 p.m.  And this concludes
13     today's testimony given by Matthew
14     Schruers.
15         (Proceedings adjourned at
16         6:13 PM)
17
18
19
20
21
22
23
24
25

169

1  DISTRICT OF COLUMBIA:          SS
2      I, Barbara Moore, a Registered Court Reporter
3  of the District of Columbia, do hereby certify that
4  these proceedings took place before me at the time
5  and place herein set out, and the proceedings were
6  recorded stenographically by me and this transcript
7  is a true record of the proceedings.
8
9      I further certify that I am not of counsel to
10 any of the parties, nor an employee of counsel nor
11 related to any of the parties, nor in any way
12 interested in the outcome of this action.
13
14
15
16     _____
17     BARBARA MOORE, CRR, RMR
18
19 _____
20 My Commission Expires:
21 July 31, 2023
22
23
24
25

| Numbers | | |
|---|---|---|
| | 124:13 | 120:10 137:7 |
| **Numbers** | **absolutely** 164:8,22 | **added** 38:15,17 |
| | **abuse** 99:16 100:10 | **addition** 125:7 |
| **1/100** 9:7 | 101:8,9 | 143:22 164:19 |
| **10A** 61:11,12,16 | **accept** 51:7 158:20 | **additional** 70:17 |
| **10C** 68:2,9 | 159:8 | **additionally** 97:4 |
| **10-minute** 61:1 | **accepted** 159:20 | **address** 143:1 146:8 |
| **11A** 64:17 | **accepting** 160:8 | **addressing** 30:8 |
| **11B** 68:16 | **access** 57:18 76:10 | **adjacent** 92:18 |
| **11D** 69:9 | 135:4,12 | 101:11 108:9 |
| **11E** 69:14 | **accessible** 56:22 | 136:16 |
| **120** 37:18 41:18 | 57:2 58:9,17 | **adjourned** 168:15 |
| 44:13 | **according** 97:19 | **adjustments** 76:1 |
| **122** 30:15 | **accordingly** 55:7 | **administrability** |
| **123** 30:16 | 98:17 | 102:11 |
| **143A.0011** 133:17 | **account** 51:3,5 53:4, | **admit** 29:19 |
| **1:21-cv-00840-RP** | 6 55:9,12 57:4,8, | **adopt** 29:21 |
| 4:10 | 12,13,20 58:11,19 | **ads** 90:6,11,15 |
| **2020** 15:10 | 66:8 72:19 98:19 | 148:20 |
| **2021** 4:13 | **accounting** 114:21 | **ad-supported** 148:16 |
| **2022** 36:4 | **accounts** 52:1 52:1, | **adult** 78:3 80:3,10, |
| **2023** 36:4 169:21 | 12,20 53:20 54:5, | 19,20 159:16 |
| **20-some** 6:22 | 12 55:7 60:20 64:4 | **adults** 69:4 |
| **230** 59:16 110:4,16, | 114:1,2 140:12 | **advance** 157:5 |
| 22 111:5,7,14 | **accurate** 9:14,15 | **advantage** 63:6 |
| **230's** 110:17 | 15:14 31:2 93:15 | **advertise** 94:11 |
| **24A** 118:17 140:10,16, | 113:11 155:19 | **advertised** 92:18 |
| 20 | **accurately** 131:3 | **advertisement-based** |
| **24E** 118:17 140:10,21 | **achieved** 148:14 | 148:3,7 |
| **2:24** 4:14 | **across** 8:8 26:12 | **advertisements** |
| **300C** 4:12 | 64:18 66:4 72:16 | 90:13 91:1 148:10 |
| **3:27** 61:5 | 114:19 119:7 | **advertiser** 90:8 |
| **3:41** 61:9 | 127:12 | 91:15 |
| **4:38** 106:7 | **Act** 59:17 110:5 | **advertisers** 90:5,16 |
| **4:53** 106:11 | **Action** 4:10 91:21 | 91:3,6,16 92:5,6, |
| **4Chan** 160:7 | 97:18 98:7,12 | 17 94:6,10 107:1, |
| **6:07** 167:2 | 125:8 144:1,2 | 17,20 108:7 119:11 |
| **6:12** 167:6 | 169:12 | 148:19 |
| **6:13** 168:12,16 | **actioning** 97:8 | **advertising** 89:15,20 |
| | **actions** 34:20 98:18 | 90:3,10,18 91:14 |
| **#** | 149:21 | 147:17 |
| | **activation** 91:20 | **advocacy** 149:6,19,21 |
| **#ClearTheList** 68:3 | **active** 39:3 40:8 | 156:18,22 160:14 |
| | 43:19 45:12 113:18 | **advocate** 157:5 |
| **A** | **activities** 11:10 | **affairs** 6:11 |
| | 15:18 110:20 | **affects** 146:6 |
| **abilities** 134:20 | 153:11 | **afoul** 77:2 104:8 |
| **ability** 133:9 134:7 | **activity** 60:6 77:4 | **after** 53:5 57:20,21 |
| 155:12 | **actual** 65:18 | 144:3 |
| **able** 34:11,15 97:1 | **actually** 35:12 | **afternoon** 5:11 |

Again 13:15 15:6
    59:4 98:9 123:20
    138:20
against 11:5 78:5
    96:17 103:18 145:5,
    6,7 149:4 154:8
age 52:5 53:8,10,11
    54:6,9
age-gating 53:9
    77:12 77:12
aggregate 141:14
agnostic 24:12
ago 155:8,10
agree 21:15 28:7
    30:7 51:6 71:4
    118:21 129:22
agreeing 156:5
agreement 48:22 49:6
    50:14 73:5 154:16,
    18 155:16 156:2
agreements 49:20,21
    50:7
ahead 40:16 41:7
    42:12 65:3 71:21
    81:2 101:21 152:2
aimed 131:18 132:9
aiming 27:15
albeit 146:1 158:6
Alex 26:22 27:1
algorithm 126:16,19
    141:18 144:8
algorithmic 129:9
    130:1,16
algorithmically
    90:12 128:13
    129:14 130:21
    144:6
algorithms 72:11
    75:8,11 126:2
    144:19 153:14,20
Ali 162:7
align 72:18
aligned 157:4
allow 90:5 93:10
    95:1 132:17,18
    161:22
allowed 33:13 158:1
    165:10
allowing 83:3 132:19
almost 97:20 138:2

already 37:2,11 41:8
    113:3
also 11:4 25:2 41:5
    48:18 53:9 62:13
    68:5 71:9 76:5
    79:18 84:1 94:9
    110:2 111:21
    135:12 139:14
    143:20
Alt 160:6
alter 153:2
alterations 124:13
although 74:15 110:1
    130:8 131:3
Amazon 7:1 10:5
    18:17 50:8 68:4
    131:6
ambiguities 83:14
ambiguous 93:5
Amendment 82:4 88:5
American 68:19
amid 63:15
Among 31:13 45:11
    95:15 107:3 112:7
    124:4
amount 90:20 129:5
analytical 147:11
analyzing 82:11
annual 9:16,18
another 26:16 32:3
    63:10 79:13 106:1
answer 5:18 13:1,18
    14:5,15 28:10
    31:21 32:16,21,22
    34:7 40:21 41:3,4,
    6,7 44:20,22 46:14
    48:19 49:4,11 50:4
    54:17 62:18 71:18,
    21 72:2 83:5 96:18
    115:3 118:6 120:17
    128:3 141:3 161:18
    163:17 164:10
    165:13
answered 41:9 53:17
    75:6
answering 6:1
anticipated 118:13
anti-Semitic 105:8,
    12
anti-Semitism 104:2,

18
anybody 51:15 57:16
    163:1,4
anyone 71:13 129:5
    151:15 162:20
anyplace 20:15
anything 5:20 13:2
    15:2,4 28:9 56:6
    133:7 134:5 149:16
    165:4 166:16
Anywhere 151:13
Apart 11:1 21:20
    149:22 162:18
    166:4
app 51:2
appeal 98:13 148:19
appear 86:15 94:6
appearances 5:1
appearing 136:3
appears 106:18
    107:11 107:11,18
    108:9
appending 133:5
applaud 155:13
Apple 7:1 131:5
apples 140:19
applicants 7:8,10
application 7:7,12
    158:15,20,22 160:2
applied 158:19
applies 7:11 148:2
apply 33:10 110:17
applying 82:8
approach 31:18
approaches 31:9,15
appropriate 87:21
approval 159:3
approximately 4:14
    15:9
area 27:2 70:13
    86:19
areas 104:20
aren't 53:16 94:2
    140:20
arise 39:6 85:15
arises 69:8 70:10
Aronov 4:15
arose 68:13
around 26:15 29:21
    146:2

arrange 76:8
arranged 84:11
arrangement 87:16
    146:14
articles 63:3 69:22
    70:1,5,15 71:14
    72:6 113:20
ask 5:21,22 51:8
    134:2 164:4,6
asked 6:1 66:3 139:4
asking 13:19,21 20:9
    28:9 42:15 43:4
    45:7 46:13 51:10
    66:9 76:16 96:16
    130:17 161:2
    164:11
aspect 76:20
aspirational 35:8,9
assertions 166:12
assess 35:16 147:12
assessed 35:5
assessing 159:8
assessment 20:5
    35:15 36:3,6,12
    125:7 143:22
    155:19
assessments 19:19,20
    36:1,22
assessor 36:16
assigned 75:17
assistance 71:15,19
associate 106:17
    107:10,17 108:8
associated 25:3,6
    108:9 120:2 151:16
Association 4:7 6:5,
    14,22 11:4,11
    15:17,19 44:5
    49:22 62:12 63:13
    115:1 149:8,9,12,
    16 150:10,17 151:2,
    14,16 152:18 153:6
    156:15 157:3,17
    158:15 159:17
association's 7:3,14
    12:19 156:18,22
    157:14 160:13
assume 22:5 25:8
    157:3
Assuming 12:10

141:22 148:6
    153:19
assurance 36:10
attach 133:9 134:7,
    20 135:15
attaching 135:6
attempt 126:10
attempting 122:19
    154:12 168:3
attempts 28:1 73:22
    102:1 112:16 152:6
    153:1
attention 34:2
attorney 14:16 164:2
attorney-client
    14:16
Attorneys 4:22 13:17
auditing 19:6 20:3
Austin 4:9
automatable 145:20
automated 96:20 97:3,
    7,15,17,18 139:16
    145:1,3,14
automatic 121:17
automatically 145:8
automation 98:2
available 56:16
Avenue 4:12
avoid 82:20
aware 46:12 47:7
    55:2,8 59:7,13,15
    60:13 64:3 81:20
    82:2 115:22 116:17,
    19 151:1 152:18
    163:3
awareness 47:11
    68:15 91:17
away 25:9 28:3,8
    77:19

---

**B**

back 39:2 61:7 75:16
    106:9 121:3 138:20
    139:15 146:8
    149:14 161:11
    167:4
ban 131:11,17 132:8,
    10,13
banning 131:12 132:3,

14
bans 131:8
Barbara 4:18 169:2
base 39:7 56:11
    118:9 154:11
based 14:15 26:10
    40:12 49:12 62:19
    67:5 72:22 73:16
    76:9 84:2 85:11,18
    86:4 90:6 98:9,12
    131:12 132:2,3,10,
    14,19 139:21
    142:18,21 147:1
    154:5,6,8,8,10
bases 65:12 66:12
basic 84:9 129:4
basis 9:2,4 76:20
    92:15 106:20 107:4,
    16 128:18 129:8
Bates 17:18 17:18
    27:12 30:17
bear 147:16
become 7:5
before 5:15 13:8
    39:16,21 75:11
    97:9,21 99:9
    145:10 169:4
beforehand 6:2
beginning 61:8
    106:10 167:5
begins 4:3 131:8
behalf 5:6 44:3,6
    156:19
behaving 111:3
behavior 22:17 93:2
    96:17 97:8 107:11
    129:6 147:1
being 4:11 58:9
    62:21 64:2,3 70:11
    108:8 110:9,13
    119:8 129:2 145:9
    152:15
believe 13:22 23:19,
    20 26:14 32:9,12
    37:22 38:16 39:10
    43:10 45:10 52:4,6
    62:8 63:22 64:15
    66:12 76:15 93:14
    95:20 105:11
    113:21 119:6 120:6

124:12,17 135:3
149:15,18 157:13
160:3
**belonging** 7:13
**benefit** 59:17
**benefits** 59:7
**besides** 10:21
**Best** 18:4 19:5,20
21:7 23:3 24:20
32:6 35:2,5 76:8
119:8
**better** 102:9 126:20
**between** 17:7 18:9
49:22 82:12 84:4
109:2 137:3 154:4
**beyond** 27:3 37:10
54:14 117:16
124:22
**bill** 43:2 76:21,22
150:8,13,16,22
151:3,5 152:15
166:5
**billion** 60:8,9
**billions** 113:16
**binder** 12:13 16:21
**bit** 133:5 151:11
165:10
**blue** 26:6 50:19
55:22 89:14
**blurred** 135:9
**board** 7:10,11 28:14
159:2,3,5 160:3
**board's** 7:15
**both** 53:17 74:9,21
81:17 105:12,19
138:1 139:6,7
**bottom** 30:17
**boundaries** 90:9
**bounds** 33:3
**box** 143:7
**boycotts** 107:1
**brand** 159:17
**brands** 92:18 108:10
**break** 5:21 61:1
106:2 166:21
**broad** 114:17
**broader** 101:8 102:7
**broadly** 70:9
**brush** 92:8 154:14
**bucket** 26:16

**burden** 118:14 120:2,
10 121:10 142:6
**burdensome** 119:16
121:13 122:4 124:1,
10 125:15 144:4
**business** 89:12
122:14 124:14
**businesses** 61:18,22
84:11
**busy** 155:11
**buy** 86:18

---

## C

**called** 5:6 73:4
108:21
**calls** 99:16 108:17
109:2
**campaign** 11:21
151:10,15
**can** 5:19 8:15 13:18
14:2,6 16:8 24:19
25:4,6 28:22 29:20
30:5 31:5 32:10,22
33:1 34:4 36:22
37:20 38:5 41:7
45:8 49:4,11,11
50:4 51:14 60:22
65:22 67:13 71:22
72:15 75:10,12
77:9 78:19 79:1,8
80:18 83:11 86:7
87:2 90:9 95:16
96:18 97:3,5
103:15 105:12
108:5 118:14 120:4,
19 123:6 124:1,6
129:11 130:7 132:5
133:12 134:2 138:6
142:12,14 145:2,4,
5,22 146:3,22
147:3,18 148:9
150:2 154:5,9
161:12 168:7
**candidates** 152:22
**cannabis** 78:2,9,14,
20 79:5,6
**cannot** 28:15 40:8
54:1 74:17 81:16
90:9 100:5 115:3

116:13 119:19
149:7 153:17
154:17 155:18
159:4
**can't** 36:17 51:19
74:15 83:14 119:4
127:12,18
**capable** 57:11,14,18
142:15
**capacity** 16:1 129:13
**case** 81:6 91:17
101:22 131:2 145:9
**cases** 70:10 88:10,13,
15,20 102:5 103:13,
16 121:14 133:3
142:22 143:1 156:8,
9,11
**catalog** 121:11
**categories** 52:9
83:12 99:19 100:9,
12 101:5 105:1
**category** 101:4
**CCIA's** 17:7 38:11
155:22
**celebrating** 78:3
**censorship** 131:8
**certain** 22:15 50:14
76:10 83:15 87:2
90:8 126:16 127:11
145:7 155:3
**Certainly** 57:16
78:13 117:21
122:16 145:19
**certification** 54:4
**certify** 53:8 169:3,9
**challenge** 74:4 121:4
**challenging** 117:16,
20,22 118:2
**change** 76:13 92:5
146:1
**changed** 50:22
**channels** 140:12
**characterization**
27:18,22 31:3
**characterize** 19:2,3,
4 64:14 72:17
**charged** 116:4
**chat** 160:6
**check** 50:10 51:6
**child** 54:18 57:4,7

99:16 100:10 101:4,
7,9
**children** 52:4,12
56:13,16,22 74:5,7
**chills** 83:16
**choice** 99:8 103:17,
22 139:13
**choices** 88:3 96:2
96:2 99:5 138:9,13
**choose** 105:2 112:8,9,
11 113:5
**chosen** 90:8
**Christchurch** 64:19
66:5
**chronological**
102:17,21
**circles** 24:21
**circumstances** 82:18
159:14
**citations** 114:7
118:16
**cite** 62:16 69:21
113:20
**cited** 68:14 114:3,5
120:14 166:10
**Civil** 4:9
**claim** 128:20
**claims** 70:18
**clarify** 73:19
**clarity** 145:7
**class** 75:20
**classes** 141:15
143:19
**classified** 74:13
**classifying** 84:13
**clear** 17:10 29:2
32:2 38:1 39:11
40:20 44:21 68:3
81:7 161:17 167:16
**clicking** 91:22
**code** 75:12
**code-driven** 130:16
**cofound** 16:6
**cofounder** 16:4,5,10,
12
**cofounders** 16:2
**collaboration** 12:18
**collected** 39:9
**collection** 117:1
**collectively** 88:3

**Columbia** 169:3
**combination** 73:9
**come** 47:11 53:5 70:4
**comfortable** 136:20
**coming** 66:18 121:2
**commentary** 82:21
**commented** 120:2,5
**Commission** 169:20
**commitments** 93:19
168:5
**committed** 34:16
**common** 48:22 49:6,19,
21 50:6 154:16
155:15 156:2
**communicate** 14:19
**communicated** 46:6
**communicating** 70:12
**Communications** 4:6
6:4 7:18 59:17
110:5 163:19,21
164:14,18 165:5
**communities** 33:22
**community** 73:5 87:22
93:1,17 94:21
113:17 130:4,10
147:12 154:11
168:6
**companies** 8:3 9:16,
18 20:10 27:17
29:8,20 30:5 31:4,
9 33:6,8,13 34:11,
15,16 35:10 36:21
37:16 38:17 39:6,
12 40:3,9 41:11
43:12 44:11 45:4
48:3,13 54:20 55:5
55:5 56:7,11 60:20
62:20 63:5,11,12
64:8,11 65:9 67:7,
17,21 69:2 70:12
72:19 73:15 76:19
77:15 93:15,16,22
94:1,22 95:7 99:13
106:22 107:10
112:1 113:1 114:14,
17 115:2 116:3,6,
14,17,19 117:3,12,
15,19 118:3 118:3,
18 119:1,14,22
120:1,5,18 121:5,9

122:3 123:22
124:12 127:13
136:12 140:10
142:17 156:20
157:17 158:9
**company** 8:18 9:5,6,
10 25:15 26:13
32:3 32:3 34:4,21
42:16 46:12 48:2
54:9 55:11 77:17
78:6 83:19 84:4
96:22 115:4 118:10
119:6 124:8,17
126:8,15 154:4
154:4,7 161:7
**company-by-company**
9:2,3
**company's** 8:12 34:20
53:22 83:16
**compared** 145:6
**compile** 116:18
117:12
**compiled** 43:14
**compiling** 115:15,17
**Complaint** 13:12
40:10 143:9 163:13
**complete** 100:6
**completed** 35:22 36:2,
4
**compliance** 144:14
**compliant** 34:22
**complicated** 90:3
**complies** 38:7 55:15
60:4
**comply** 122:8,20
123:12,22 124:8,19
**complying** 19:7
143:15
**Computer** 4:6 6:4
7:18 110:9,13,18,
21 111:4,15 137:19
139:5
**computer-aided** 73:9,
10
**computer-implemented**
138:2
**concerned** 108:8
**concludes** 168:12
**concurrently** 140:1
**condition** 8:5

conditions 92:4
conducive 87:21
conduct 24:20 25:1,2,
  6,9 26:16 29:22
conducting 36:6
conduct-related
  22:9,14,20 23:5,16
  24:2,6,14
confidence 119:10
confidently 124:7
Congress 11:17
conjunction 130:15
connection 151:22
  152:1,3
consider 24:21 59:16
  64:6
considerably 124:2
  154:10
consideration 7:15
considered 21:10
  23:4,15 24:5,10
  29:13,14 77:20
consist 8:13
consistent 21:21
  28:17 29:11,18
  31:8 32:6 70:16
  93:17 94:4 110:8,
  12 136:11 156:21
constantly 73:16
constitute 25:4,7
  78:5,10,15,20 79:7,
  9 86:1 87:5 105:5
  136:17
constituted 29:9
constitutes 45:13
constrain 34:20
construct 86:2
constructed 26:15
constructing 136:8
construe 26:7
construed 79:15,18
  80:11 85:7 104:6
  105:3
consult 13:13 166:3,
  13,16
consulted 13:21 27:2
  166:5,6,7,9
consulting 27:5
contained 14:20
contemplate 36:14

contemplated 37:5
  113:2
contemplates 19:18
  39:3
contend 37:13 38:20
  39:18 40:4 133:8
  134:6
content 13:20 21:5
  22:9,14,16,20 23:4,
  14,16,20 24:1,13,
  20,22 25:1,2,3,5,9
  26:15 29:21 31:10,
  13,19,20 33:18
  66:20 67:1 68:17
  69:10,12,14 74:11
  75:19 76:2,6,8,9,
  11 77:8 77:8,16
  78:1,3 79:6,19,19,
  22 80:3,6,10,12,19,
  20 81:12,17,21
  82:13,20 83:12,20
  84:8,14,15,20 85:2,
  22 86:12 87:9,11,
  13,16 88:17,20
  91:19 93:2 94:13,
  14 95:1,5,8,16
  96:16 97:5,8,9,12,
  14,19 99:6,19
  102:14,15 104:3,11
  105:1,9,15,19
  106:18 107:10,18
  108:9,22 111:12,17
  113:6,11,13 114:16,
  18 116:2 118:7
  125:8 126:10,17
  127:11,13 129:1,6,
  10,17 131:12
  132:14,15,18,19,19
  133:10 134:8,21
  135:8,10,16 136:13,
  16 137:5,8,16
  138:8 139:21 140:5
  141:9,14,16 143:5,
  8,14,19,20 144:3
  145:5,9 146:15
  153:15,21 159:16
  164:13 165:17
  167:15,18,19 168:1,
  6
content-agnostic

  29:3
contention 41:1
  103:8 109:1,6
contentious 86:14
content-related
  21:5 24:6
contents 92:16
content-specific
  29:5
context 10:21,22
  61:22 64:6,12
  78:13 82:4,11 97:4
  103:10 119:21
  144:22 144:22
context-dependent
  77:9
contexts 102:5 147:9
  148:22
context-specific
  76:7
contextualization
  125:6
contextualize 70:18
continue 41:12 61:20
  91:22 147:7
continues 30:3
contract 116:22
contractors 116:20,
  21 117:6,9
contributed 16:2,9,
  11
contributes 152:21
contribution 8:5
contributions 8:2
  11:22 151:10,15,17,
  17,21
control 34:15 159:3
controlled 102:2
controversial 86:12
conversation 142:7
conversations 14:4
  15:4 48:20 49:5
  67:16,20 68:11,22
  69:5,10,18 70:5
  72:2,7 107:5,7
  115:2 119:20,21
  120:6,8 161:5,19
convicted 52:6
co-occur 78:16 80:12
co-plaintiff 11:5

copy 12:11
copyright 139:17
    143:6,9 144:7,22
    145:4,18
correct 15:13 19:1
    21:13 22:13,22
    23:2,17 24:18
    38:12 46:20 49:9
    64:7 94:17 95:2,5,
    14 110:22
correspond 163:4
correspondence
    153:8
cost 117:11 120:2
    146:9
cost-effectively
    124:18
costly 117:21
costs 142:1,5 145:2
    146:5
could 5:17 10:13
    20:16 31:9 32:4
    39:7 41:16 47:3
    53:10,16 54:8
    55:10 57:4,7 72:13
    79:4,15,18 80:10,
    15 85:7 86:2 96:3
    98:8 104:5 106:1
    117:4 124:17 127:1
    135:5 138:1 139:6
    139:6,14 141:6,18,
    18 142:22 144:8,12
    159:16 160:16
counsel 4:20 5:22
    12:19 13:3 14:7,10,
    12 71:16,20 72:2,8
    161:15 162:3,8,11
    163:6 164:7,19,20
    166:6 169:9,10
count 121:19
country 68:5 86:20
course 37:2 73:10
    135:7 142:7
Court 4:8,18 5:2,19
    81:20 82:3,14 84:4
    135:20 136:19,21
    169:2
Court's 82:7
covered 37:14 38:21
    39:12,18 40:4,22

41:10,16 42:17
    47:21 48:5,21
    99:22 140:6
COVID-19 61:17
create 27:15 28:12
    50:15 57:4,7 58:19
    83:13
created 15:8 95:13
    141:18 144:8
creates 51:2
creating 33:14 51:5
    53:20 54:12 57:11
    58:11
creation 53:5 53:5,7
    54:5 55:9,12 57:21
creator 79:6
credibility 160:20
credibly 160:16
criteria 7:11,12
cultivate 61:21
    154:12
curate 83:20 126:10
curating 95:5
curation 95:8
curations 95:7
current 56:3 61:20
currently 20:14 21:3
    144:19
customers 61:21
cut 17:19 27:13
    30:18
cycle 37:7 138:20

---

D

damage 159:17
dangerous 22:16
    74:10,18,22 92:22
dark 68:16
darker 68:17
data 39:8 115:4
    117:1
database 145:6
databases 145:4,21
    146:4
date 154:17
dates 155:12
day 60:9
dealing 25:12 140:5
decade 158:14

Decency 59:17 110:5
decide 82:19 136:18
decision 139:5,11,12
decision-making
    11:12 48:12 49:2
decisions 73:10 76:7
    87:15 93:4 98:1
    108:21 109:17,21
    110:1 111:21
    129:14 137:15,19,
    19 138:2 139:8,10
    142:19 167:19
    168:2
declaration 12:3,5,
    11 14:21 32:14,22
    33:5 38:1,6 39:10
    55:14 60:3 61:12,
    13 69:20 70:4
    106:14 113:4 114:4,
    6,10 115:19 129:12
    141:8 149:7 161:12,
    14,21 162:1,4,14,
    21 163:2,5,15
    164:8 165:8,16
    166:3,11,12
declined 44:15,20,22
declining 155:14,19
defendant 4:4
defendants 49:8,17
Defense 5:7 48:21
    49:6
define 22:4 23:9
    27:16 29:8 57:2
    112:17 142:14
    150:7 152:14
defined 32:10 81:21
    141:11
definition 24:1
    27:15 28:4,10,13,
    16,20 31:20 32:14
    37:17 38:3 39:2,22
    40:18 41:17 43:13
    44:12 58:17 66:21
    67:3,12 75:11
    79:22 80:20 83:6
    101:9
definitions 30:6
    31:6,16 32:5 33:9,
    14,16,17 34:12
    41:13 80:9 82:3,13

85:5 93:6
**degree** 124:6
**deliver** 34:1 84:15
    168:4
**demographics** 56:7,10
**demonetization**
    121:12 125:5
    143:21
**demonstrating** 34:17
**deny** 135:16,21 136:4,
    22
**denying** 135:3,4,11
    136:17
**depend** 91:10 112:5
    159:13 160:10
**dependence** 97:5
**depending** 45:12 76:3
    96:21 98:17
**Depends** 78:12 82:10
    91:8,13 112:3
    137:22
**depiction** 78:20 79:9
**depictions** 78:3,9,14
    99:16 101:7
**deployed** 138:9
**deponent** 10:16
**deposed** 5:15
**deposition** 4:3,11
    33:3
**deprioritization**
    74:9 75:18 105:4
    121:12 125:5
    126:20 143:21
**deprioritized** 126:9
**deprioritizes**
    126:16 127:16
**deprioritizing** 74:4
    127:10
**deranked** 75:2
**derived** 65:15 68:10
    89:14
**describe** 7:16 62:4
    68:9 79:4 95:16
    141:6,17 149:20
    150:2
**described** 11:7 64:5
    65:14 66:13 71:10
    113:3 115:18
    137:11 140:10
    141:13 143:17,18

145:16 163:8
**describes** 131:3
**describing** 73:14
**description** 72:17
**design** 72:21 96:2
**designed** 35:16
**desirable** 119:12
**detailed** 140:13
**detailing** 141:9
**deter** 77:4 84:1
**detergent** 74:6,19
    76:17
**determine** 34:5 35:16
**determined** 36:7,17
    144:6
**determines** 94:13
**determining** 21:19
    36:22
**develop** 27:17 72:21
    73:1
**developed** 73:11
**development** 140:1
**devote** 34:2 97:1
**diagram** 24:22 25:11
**difference** 108:20
    109:1,2,7,8,9
    137:3,4 141:7
**differences** 109:12,
    15,16 154:3
**different** 26:7 29:14,
    21 30:5,6 31:6,9,
    15,16 32:4 34:11
    85:22 86:3 120:13
    137:11 140:9,16
    143:17 148:4
    151:11
**differs** 120:20
**difficult** 92:7 118:5
    120:16 143:13
    154:13
**difficulty** 27:12
**Digital** 15:7 16:10,
    12,19 17:8 18:1,2
    22:7 22:7,11 27:3,
    6 62:2,13 72:10
    74:21 87:14 95:22
    106:17 107:17
    109:16,21 129:3
    148:16
**direct** 6:11 62:19

**directed** 104:3
**directly** 63:5,7 64:9
    113:22 130:10
**disagree** 44:18
    165:19
**disassociated** 158:2
**disclaimers** 82:21
**disclosure** 120:12
    124:21
**discovered** 145:12
**discovery** 108:13
**discretion** 88:4
**discriminate** 133:20
**discriminating**
    76:19 78:7 92:14
**discrimination** 85:4,
    8 86:16,21 87:6
    104:7 105:6 132:2
    133:6,14 134:4,22
**discuss** 142:10
**discussed** 13:2 14:9
    65:8 67:7 106:22
    152:7,17 154:9
    166:4,6
**discusses** 62:8
**discussing** 63:10
    72:20 142:7
**Discussion** 16:15
    26:19 59:21 103:5
**discussions** 13:17,20
    48:15 128:21 161:6
**Disher** 162:12,18
    164:11
**disinformation**
    131:18 132:9
**display** 76:8 93:3
    109:4
**displayed** 74:8
**displaying** 79:5
**displays** 84:21
**disputed** 146:2
**distinct** 24:17 25:11
**distinction** 82:7
**distinctly** 26:15
**District** 4:8,9 169:3
**disturbing** 69:12
**diversity** 143:11
**Division** 4:9
**divisions** 116:1
**document** 12:8,10,12,

16 16:19 17:11,14,
20 21:7 22:21 23:1
**documenting** 34:17
**documents** 108:2,10
166:7,10,13
**does** 6:3 6:3,13 7:20
8:18,21 11:9,16,18,
19,21 15:16 23:20
25:2 28:3,9 31:2,
21 35:7 46:13
50:15 52:11 52:11
55:11,16 70:3 75:2
84:17 88:7 89:17,
19 91:10 92:10
99:18 101:6 112:5
121:19 127:15
136:15 147:16
151:14 156:15
163:20 164:15
**doesn't** 25:5 46:21
126:9 135:16
136:10 143:20
163:18 165:16
**doing** 20:10 140:10
**done** 50:21 51:12
74:1 76:1 128:12
142:20 144:12
**doubly** 121:7
**doubt** 94:7 144:12
**down** 5:19 70:19
144:5 164:22
**downrank** 104:1 105:2
**downranked** 74:12
**downranking** 74:3
**draft** 14:10 15:19
**drafted** 12:16 38:14,
18 71:15
**drafting** 13:11,14
16:3 35:6
**drafts** 12:20 13:8
15:1 163:1 165:15
**draw** 165:11
**drugs** 102:1
**due** 77:2 143:8
**dues** 7:22 8:6,8,17
9:1,6,10,16 10:8,
18
**duly** 5:7
**duties** 6:8

## E

**each** 8:12,18 42:16
46:8 60:8 114:14
115:4 150:19
153:14,18 163:11
**earlier** 11:8 45:2
50:19 72:20 167:14
**early** 36:2
**easily** 97:3
**easy** 76:10 123:21
**eat** 74:5,18
**economically** 122:13
**economy** 62:1
**edited** 13:5
**editing** 14:13
**editorial** 88:3,22
99:8
**editorials** 109:4
**effectively** 90:16
**effects** 93:20
**effectuate** 76:4
**effectuates** 138:15
**effectuating** 139:9
**effort** 66:10
**efforts** 15:17 64:18,
21 65:9,11,19 66:4,
14,18 67:17,21
116:5 138:14
140:11 149:3
**either** 10:4 47:5
90:19 96:20 97:6,
11 102:8 116:1
138:1 139:6 145:8
**elected** 86:11
**elements** 40:18
**eligible** 51:22
**eliminated** 133:7
134:5
**eliminates** 133:8
134:6
**else** 129:5 133:7
134:5,15,18,19
147:21 151:13
162:20 163:1,4
**email** 142:22
**embedded** 168:4
**embodies** 94:8
**embody** 70:19
**embracing** 62:2

**emotionally** 135:10
**employee** 169:10
**employees** 64:10
67:20
**enabled** 68:5
**enactment** 151:3
153:7
**encourage** 74:17
**encouraged** 74:5
**end** 39:4 53:4 61:4
73:4 75:16 104:13
106:6 138:3,9
139:15 146:8 167:1
**endeavor** 117:16,20
118:1
**endorse** 156:16
157:14,16
**endorsing** 157:11
**enforce** 99:14
**enforced** 73:8
**enforcement** 73:3
140:17,18,21 141:4,
15
**enforcing** 84:5
**engage** 61:20
**engaged** 152:8 153:1
**engagement** 88:8,19,
21 91:5,13 126:1,3
147:13,16 148:8,19
**engages** 147:22
**engaging** 91:18
**engine** 102:16,19
**engines** 103:10
**Enough** 117:14
**ensure** 34:21
**enter** 154:15
**entered** 155:15
**entertain** 160:4
**entire** 28:15 114:19
**entities** 38:20 40:22
150:18 157:22
**entitled** 165:2,4
**entity** 28:15 36:10
**environments** 95:12
**envisaged** 36:11
**ephemeral** 105:16
**equal** 8:8 135:4,12
147:21
**equally** 24:11 108:17
**equivalent** 109:8

115:6 138:10
**error** 145:2 146:5,9
**establish** 75:10
**established** 7:12
   82:15 97:20
**estimate** 154:20
   155:15
**evaluation** 73:13
**Even** 26:5 55:19
   57:17 84:9 97:22
   121:5 122:2 145:10
   146:4 155:14
**events** 121:16
**ever** 42:9,19 43:5,13,
   16 142:16
**every** 5:18 60:9
   100:7 121:4 140:5
   141:9 150:19
**everybody** 161:13
**everything** 108:12
**exactly** 64:1 72:18
**examined** 5:8
**example** 9:5 20:17
   23:13 25:18 39:13
   63:9,10,11,18
   73:18 74:4 78:19
   79:8 80:18 83:3,18
   85:11 89:9 112:14
   126:15 136:4 139:7
   143:5
**examples** 37:20 68:17
   101:13 103:15
   104:10 145:15
**ex-ante** 149:19
**exceeds** 32:21
**Excluding** 152:10
**exclusive** 53:16
**exclusively** 53:19
   130:18
**Excuse** 18:3 167:19
**executing** 116:4
**executive** 153:22
**exhaustive** 38:13
   43:4,5,11 45:14,15,
   18,22
**Exhibit** 12:4,5,13
   17:14,17,17 27:11
   30:10,11
**existing** 37:1
**exists** 50:14

**exit** 123:11,18
**exiting** 122:18
**expect** 168:7
**expected** 90:13
   109:18
**expects** 161:8
**expensive** 144:17
**experience** 137:5
   146:15
**experiences** 137:12
**expert** 36:9 154:1
**expertise** 27:2 70:14
**experts** 128:21
**Expires** 169:20
**explain** 72:13,15
   138:6 147:3
**explicitly** 56:21
   146:22
**express** 87:10 88:7
   156:13 166:2 168:1,
   3
**expressed** 47:9,14,20
   48:4 70:3 156:5
   158:4
**expresses** 88:17
   132:15,20
**expression** 78:16
**expressive** 87:11,14
   98:21 99:7 99:7,10
   108:17 167:20
**expressly** 101:11
   104:1 108:5
**extend** 101:10
**extensive** 64:18 77:1
**extent** 13:1,16 14:3
   32:21 33:1 34:21
   48:19 71:18 90:7
   91:17 121:16 137:3
   147:6 164:4,6
**extolling** 80:13
**extols** 79:6
**extraordinarily**
   125:15 144:16
**extraordinary**
   118:14
**extreme** 78:4 93:6
**extremely** 124:9
**extremist** 131:12

---
**F**
---

**face** 143:8
**Facebook** 7:1 9:21
   18:12 23:14 25:18,
   20,21 26:7 29:14
   39:13 41:10 45:11
   50:8,16,20 52:1,11,
   15 53:11 55:16
   59:2 60:8 62:10
   63:18 89:8,11,13,
   22 90:4 113:4,5,9,
   17,22 114:2 117:5
   127:15 131:5
**Facebook.com** 50:21
   52:1
**Facebook's** 26:2,6
   90:2 127:19
**faced** 122:17
**facilitates** 102:14
**fact** 86:18 117:5
   130:2 163:20
   164:16 165:6
**factors** 7:14
**facts** 60:14
**fair** 9:9,12 27:18,22
**fall** 37:17 38:2 42:4,
   7,10,14,20 43:2
   44:12 45:4 47:4
   49:5
**false** 98:2 139:16,19,
   21
**familiar** 12:8
**familiarity** 128:22
**family** 64:4
**far** 74:16 122:1
   144:3 160:8 167:13
**fashion** 121:18
**faster** 118:12
**feasible** 122:13
**features** 124:4
**federal** 59:8,14
   99:18 100:1,7,11
   101:2,3,8,12 102:4,
   7 152:21
**feel** 5:21
**Feerst** 26:22 27:1
**F-e-e-r-s-t** 26:22
**fell** 41:21
**few** 5:17 86:8 125:4
   162:18 167:11

figuring 126:2
file 143:1
filed 4:7 39:17
40:10 48:8 48:8
filing 13:12 163:13
filling 57:19
filter 145:5
filtered 145:11
filtering 139:16
find 102:6 117:15,20
135:9
fine 164:6
fingertips 9:20 10:1,
3,6
finish 5:22
firm 4:16,19 72:17
firms 72:18
first 5:7 15:10
16:18 68:13 82:3
88:5 129:14,20
five 9:22 10:2,8,17
fix 139:19
fixed 105:17
flagged 97:12
flexibility 30:4
33:14
Florida 11:6 156:1,3
166:7
focus 90:10
follows 5:8
footnote 62:9
footnotes 114:12
166:10
foreign 131:18 132:9
forgive 133:18
form 7:13 8:14 9:11
10:9,14 19:8,16
20:8 21:14 22:1
23:8,18 24:7 25:13
27:20 28:6,21
29:16 31:17 32:11,
19 34:6,13 35:13
37:8,15,21 38:22
39:19 40:6,15 41:5,
22 42:5,11,22 43:9,
17 44:4,10,17 45:9,
19 47:1,17,22
48:10,17 51:16
52:13 54:15 55:18
56:8,14 57:1,6,15,

19 58:4,14,20 59:3,
10,19 60:12 62:17
65:2,21 66:11,19
67:18 70:7 71:6
75:4,9 76:14 77:13
78:11,21 79:11,20
80:7 81:1,14 82:1,
9 83:1,21 84:18
85:12,19 86:22
87:12 88:9,14 89:5,
10,18 90:1 91:7,11
92:12 93:13 94:15
95:6,19 96:13
98:22 99:20 100:20
101:15,20 102:22
103:11,21 104:16,
21 105:10 107:6
108:3 109:5,13,21
110:6,15 111:1,13
112:2,6 113:7
115:9,16 116:8
117:13 118:4 119:3
120:15 122:9,15
123:2,8,14,19
124:15 125:2,13,19
126:5,11 127:6,17
130:13 131:14,20
132:12,21 133:11
134:9,13 135:1,18
136:6 137:9,21
140:14 141:1,20
142:18 144:10
145:17 146:19
147:5,20 148:21
150:1,9 152:9
153:16 155:17
156:7,12 157:12
158:3,5,21 159:10,
21 160:9,18 166:2
formed 108:6
forms 24:17
foster 6:15 93:16
94:2,21 157:18
fostering 93:12,15
167:14
fosters 119:10
found 30:19 129:3
framework 15:12,20,
22 16:3,4,9,11
18:4 19:5,21 22:12

23:4,17 24:5
frankly 165:10
fraud 69:3,8
free 5:21
frequently 76:6
130:9
friends 64:5
from 4:15,18 8:2,9
11:1 15:11 21:20
28:4,8 29:14 37:1
49:20 52:12 53:2
54:12 59:8,14,18
65:15 68:4,10,10,
22 69:5,8,18 70:4,
5,10 71:19 73:2
74:20 76:19 77:19
83:19 88:22 89:14
92:10,14 96:6
102:19 103:9 111:8,
11,16 113:20,22
120:13,21 130:7
133:7 140:9 143:17
145:9 149:22
152:15 158:2 160:2
162:18 166:4
front 53:4 108:18
138:3,9
frown 143:7
fulfill 144:9,19
full 16:8
function 97:14 117:2
118:6 130:22
141:19 144:20
148:13
functions 84:10
110:8,12
funding 7:21 150:5,
11,15 151:7,9
furniture 86:18
further 37:10 168:10
169:9
future 37:6 124:8
126:19 160:1

---

### G

gated 77:19
gather 115:8
gathered 115:5
gathering 115:4

gave 49:10 139:7
Gene 4:15
general 6:11 7:12
    53:2 56:9 65:15
    70:10,19 72:19
    82:21 87:4 90:4
    94:1 95:22 121:3
    129:2 146:1 153:22
    157:6
generally 11:15
    15:14 51:1 52:16
    60:13 72:15 75:18
    82:2 90:17 96:19
    109:17 111:15
    114:11 116:1 119:7
    120:20 121:21
    138:7 161:12 166:8
    167:16
generate 159:17
generates 24:20
    77:15
generating 139:16
genocide 99:16
geographies 86:1
geography 84:12
    85:11,17,18 86:4,
    14
get 5:19 88:8,18,21
    109:19 114:15
    157:15
gets 145:10
getting 138:19
    163:22
give 5:18 16:8 40:3
    44:15 45:8,17
    54:16 83:4 86:8
    155:14,20 161:12
given 39:5 83:14
    143:11 146:18
    168:13
giving 82:19 92:11
glorifies 69:15
goal 30:4
goals 91:14
going 12:2,3 20:3
    25:14 30:9 36:16,
    18 37:6 61:3 72:17
    80:19 95:5 106:5
    108:19 139:14
    149:20 165:20

166:22
Good 4:2 5:11
Google 7:1 9:6 10:2
    18:15 39:14 41:10
    45:11 50:7 62:10
    63:19 113:4,5,8
    131:4,5
got 17:19 30:20
    71:19 86:19 99:15
    135:2
gotten 59:8,14,18
    126:3
governance 72:21
    73:1,3 96:17
    138:14 154:9
governed 100:10
government 59:9,14,
    18 131:19 132:10
granular 114:20
    128:5
granularity 121:22
granularly 125:4
graphic 69:11 73:21
gravity 98:17
great 76:18 77:6
greater 9:9 122:1
gross 122:4
group 47:5 55:6
    104:4 156:15
groups 51:22 150:6,7,
    8
grown 118:12
guarantee 126:21
guess 135:20
guidelines 5:17
    18:22 31:5 73:5,8
    88:1 93:18

## H

hammer 67:11
hand 12:2 30:9
handed 18:22 22:8
handing 16:18
happen 124:7
happened 71:3
happening 139:22
happens 96:8,10,16
    145:13 148:13
hard 113:19 124:5

harder 73:20
harmful 22:16 92:22
has 6:22 21:11 25:21
    29:2 35:18 36:7,8
    38:15 39:8 42:19
    43:13 44:19,22
    47:11 48:2 56:19
    60:8 68:5 73:20
    76:22 81:21 88:2
    89:11 98:2 112:15
    117:5 118:10,12
    148:14 151:2,16,17,
    21 153:1 164:12
hash 144:7,22 145:6
hashes 145:4
hate 27:16 28:4 29:9,
    13,14 31:6,11 32:5,
    10 33:9,15,16,19
    34:5,12 104:1,17
haven't 65:13 126:4
    133:18 152:7
    166:19
having 5:6,7 26:10
    27:11 28:4 62:15
    65:8,16 84:11
    106:22 107:1 107:1
    108:6 116:11,18
    152:18
HB20 37:14 38:21
    39:3,18 40:5,12
    41:1,16,21 42:4,7,
    10,15,21 47:21
    76:12,18 77:12
    78:7 82:13,22
    83:19 92:10,13
    93:7 102:18 103:8,
    19 122:8 123:12
    124:22 133:7,8
    134:6
HB20's 120:12 143:15
head 50:13 52:10
    54:2 58:7 149:8
    154:18
Heads 146:6
health 63:16
healthy 87:22
hear 118:21
held 4:11 16:15
    26:19 59:21 103:5
help 68:3 71:13

helped 72:5
helping 129:3
here 17:19 40:7 60:5
  62:8 63:17 68:14
  70:19 71:8 99:13
  100:6 106:16
  112:18 113:16
  114:3,12 115:18
  117:10 119:19
  142:2 152:18 160:1
  162:11 165:1
hereby 169:3
herein 169:5
heterogeneity
  143:12
heterogenous 92:7
  156:15
heuristics 97:19
hide 79:14
high 145:7
higher 9:15,16
  148:18
highest 9:17
highly 77:9 109:19
  145:1,3,14
Hit 51:7 145:8
Hold 17:9 41:2 43:6
  44:19
hoped 36:3
hours 60:9
However 100:8 149:9
Huawei 158:16,18
Hub 158:19 159:8
  160:2
huge 111:21,22
  112:15,17
human 22:17 72:10
  74:21 96:20 97:22
  98:5 130:3,15
  138:3,13,22 146:7
human-driven 52:19
  73:10
humans 74:11 95:18
  98:2 139:9
hypothetical 86:3,10
  136:8
hypothetically
  83:10

I

I'd 10:10 50:10
  78:22 83:5 85:13
  136:18 149:14
  155:6
idea 56:1 85:21
identifiable 145:21
identification 12:6
  17:15 30:12
identified 42:13
  45:3 134:1
identify 14:2,6 29:4
  52:20 161:20
identifying 45:11
I'll 12:22 32:20
  71:17 86:10 161:18,
  22
illegal 22:15 99:15
I'm 6:7 12:2,3 13:21
  16:7,18 21:10
  27:10,11 28:22
  30:9 43:4 45:7
  48:11 50:13 51:12
  52:9 54:18 59:15
  60:13 65:18 66:8,
  16 68:7 80:19
  85:20 87:2 91:21
  108:18 114:1,5
  120:9 126:12
  129:18 133:22
  136:20 140:7
  150:18 152:18
  155:19 161:2 163:3
  164:11 166:12
image 96:8
imagery 99:15
images 73:21
imagine 26:6 102:16
immediately 57:21
immense 108:22
implement 35:12
  138:14
implementation
  19:20 83:16 127:20
implementations
  128:6
implemented 35:10
  53:4 72:16 114:19
  119:10 141:10
implementing 65:9

  77:16 88:1 116:4
  146:4
implicate 13:2
  135:13
implicates 13:16
  71:19
implying 164:17
important 33:12 87:9
  91:6 129:15
impose 142:1
imposing 84:1
impressions 90:17,20
improper 165:18
inaccurate 155:20
inappropriate 77:18,
  22 92:22
inbox 143:2
incalculable 129:17
include 7:1 18:22
  31:16 52:7 56:13
  63:12,17 141:11
includes 7:13 33:19,
  20 38:11 52:4,6
  82:19
including 22:17 33:7
  39:13 50:1 62:9,10
  74:14,18 100:9
  112:8 113:3 124:2
  161:15 165:6
inconsistent 29:18
  84:3 96:9 96:9
  136:4
incorporated 15:9
increase 9:1 9:1
  126:3
increases 148:8
incubated 15:12
incubating 15:13
incubation 27:4
Indeed 114:11 164:15
independent 36:9
  54:4 88:22 89:2
independently 92:20
indeterminate 63:15
index 8:13
indexed 8:10,11,17,
  21,22
indicate 160:16
indicated 160:11
indicia 147:9

indirect 93:20 147:9
individual 29:8 31:4
    42:16 53:21 67:17
    107:2 119:6 146:6
individually 48:9
    139:20
individuals 53:8
    62:22 63:6 104:4
Industry 4:6 6:5
    7:13,17,19 26:12
    52:17 53:2 64:18
    66:4,8,10 70:11,21
    72:16 108:7 114:20,
    22 119:7 120:20
    128:21 143:12
    153:22 157:19
    166:8,18
industry's 11:14
    157:6
industry-wide 27:15
    28:4
inferred 147:1
infinitum 138:21
Influences 11:11
inform 107:8
information 9:19
    14:20 37:10 39:21
    51:8 70:17 114:13,
    15 116:18 117:12
    127:1 146:14
informed 108:11
informing 82:22
    144:2
infrastructure
    118:13
ingest 145:5,11
in-house 14:10,12
    71:16,20
in-product 143:2,9
input 15:22 16:2
    138:3 164:7
insofar 76:17 110:7
    111:2 156:20
    166:11
Instagram 73:20
    74:15 113:18
instance 68:13
    129:15 133:19
instances 71:8 121:8
    130:1 158:7

instantiation
    139:13
instinct 159:14
institutional 30:8
instruct 12:22 14:14
    32:20 48:18 71:17
    161:18 163:16
    164:9 165:12
instruction 13:6,9,
    16 49:3,11,13
    71:21 150:12
instructs 126:16
Integrity 4:16,19
Intel 7:2
intended 84:12
intensive 115:11
interact 148:12
interacting 137:6
interactive 110:9,13,
    18,21 111:4,15
interest 48:22 49:6,
    19,21 50:7 154:16
    155:15 156:2
interested 65:10
    169:12
interesting 87:19
    159:12
interests 6:15 11:14
    76:9 148:11 157:6,
    7,19
interfering 137:8
internal 19:18 27:17
    36:1,22 51:12
    54:19 73:12 127:19
internally 116:7
internet 66:17 67:9
    68:18 74:5 89:19
    147:12
interpret 125:7
    135:21 136:22
interpretation
    21:16,18 23:2
    76:16 77:5 84:3
interpreted 135:5
interstitials 135:8,
    14 136:12
intervention 146:8
intimate 99:15
into 47:5 75:8 95:5
    114:20 126:9,13

128:5 139:15
    154:16 155:15
    163:22
introduce 4:20
Intuit 7:2
invariably 97:21
    157:3
involve 31:19 55:6
    74:3 91:22 118:17
    135:8
involved 50:1 161:13
involves 73:2 76:7
    159:1
involving 73:21
    104:11
irrelevant 21:20
    156:18
irrespective 93:1
    104:4
isn't 25:20 125:22
issue 24:13 68:15
    119:1 149:12
issued 118:18 119:15
    149:10,22
issues 11:12
issuing 119:16
item 137:16
iterative 73:17
    138:16,18
It's 6:4 9:9 17:19
    17:19,21 21:19,20,
    21 24:20 33:1,17
    34:22 36:17 46:15
    51:11 61:14 72:16
    74:12 78:1 92:7
    93:14,19 97:11,17
    98:5 113:10 120:19
    122:4 124:5 125:14
    126:9 133:16 137:7
    139:7,21 143:13
    145:10 148:4
    154:13
its 6:11 6:11,12,15,
    15,17,20 8:19 9:7
    15:18 23:14 27:4
    29:2 44:3 53:12
    83:14,15,17 89:1,
    13 90:6,11 93:1,3,
    19 104:5 115:5
    117:6 118:13 126:9,

10 127:20 129:16
140:6 150:18 156:5,
16 157:4,18,19
159:15
**itself** 73:11 84:21
97:14 151:14
**I've** 37:10 46:6
51:12 64:15 166:15

### J

**job** 6:8
**joint** 16:1 48:21
49:5
**judgment** 88:22 95:4,
10
**judgments** 94:19
95:10,14
**July** 169:21
**jurisdiction** 86:12,
14 100:8
**jurisdictions** 52:7
53:13
**jurisprudence** 82:14
**just** 10:15 17:10,12
18:21 31:3,14 32:2,
18 34:10 40:20
42:13 43:16 44:21
69:21 75:6,12
80:22 83:9 89:8
96:6 120:11 133:16
137:3 139:7,12
143:17,20 147:15
161:2,17 163:7
167:11,16

### K

**keep** 52:12 125:17
126:17 127:5,7,15
**Keller** 162:9
**kid-focused** 56:21
**kids-focused** 56:19
**kill** 152:6,14
**kind** 20:5 24:4 87:6
94:21 115:11
126:17,19 149:3
154:10 168:6 168:6
**kinds** 76:10 127:11
**knew** 42:20

**know** 5:21 10:7 17:2
29:17 30:13 36:18
39:4,8 41:21 42:6,
15 43:1 48:7,20
54:3 55:11 56:3,5,
6 57:20,22 58:5
75:1 81:3 90:19
98:16 100:3 115:7,
14,22 117:5,8,11
120:22 124:16
126:12 128:2
135:21 136:7,20
140:11 141:21
142:3 143:11
144:11 146:17
150:21 153:13
158:14 165:2,4
**knowing** 127:13
**knowledge** 26:11
41:20 47:18 48:1
52:16 56:10 60:11,
15,18 62:15 63:21
64:7,22 65:6,13,15,
19 66:4,10,14,18,
22 67:4,10,12,14
68:10,13,21 69:5,8,
17 70:3,11,20
106:20 107:4,9,16
114:17 125:3
128:19 129:2,9
151:1,6
**known** 42:3,9 43:16,
19
**knows** 146:20

### L

**label** 136:3,12,15
137:6
**labels** 75:16 82:21
133:6,9 134:7,20
135:6,7,13,16
**lack** 126:20
**language** 77:3 133:8
134:6
**large** 121:5 129:5
**larger** 117:19 118:3
**last** 22:21,22 41:19
71:4 158:14
**law** 81:6 99:18 100:1,

11 101:3,12 102:4
**lawful** 86:13
**lawsuit** 10:21 39:17
46:3,7,11,13,16
47:8,10 48:9 49:17
152:11 153:3,5
154:19
**lawyer** 27:1
**lawyers** 14:4
**lead** 97:7
**leadership** 159:1
**learning** 63:18
**least** 25:8 38:1 39:1,
11,21 41:10 103:12
120:8 121:13 131:4
135:3,11 149:10
**leave** 147:8
**leeway** 165:11
**Legal** 4:16,17,19
6:12 48:12 49:1
76:16 93:2
**legality** 159:15
**legislative** 149:4
**legislators** 151:8,18
**Lehotsky** 162:8,13,19
**length** 63:16
**less** 75:19 85:2,3
87:4 91:19
**let** 10:15 39:2 53:18
94:14 94:14
**Let's** 55:13 60:2
61:11 61:11,12
63:14 64:17 68:2,
16 72:9 82:17 84:7
86:13 89:8 96:6,8
99:12 102:13
105:22 106:13
113:15 128:11
133:4 140:3 142:9
146:11 161:11
166:5,20
**level** 90:4 128:4
153:22
**liability** 111:11,16
**licensable** 145:3
**licensed** 139:18
**licensing** 73:4
**light** 83:15
**like** 5:20 9:6 17:10,
18 34:12 37:6 42:9

53:4 54:6 61:14
66:16 68:4 75:5
83:5 84:10 96:6
104:12,17 113:4
126:2 129:4 137:7
151:10 154:21
155:6 155:6,12
157:10 159:18
160:6
**likelihood** 148:8
**likely** 75:19 87:5
120:8 136:19 148:1
**Likewise** 128:10
**limited** 52:17
**limiting** 124:2
**line** 165:1,12
**linked** 62:8
**list** 38:10 38:10,13,
17 43:4,5,11 44:16
45:7,8,8,13,14,15,
18,22 99:12
**listed** 40:22 45:4
99:22 166:15
**lists** 68:4
**literature** 128:22
**litigation** 50:1
152:19 155:22
156:3 166:7
**little** 143:7 151:11
**live** 63:8,18
**lobby** 11:16,19
**lobbying** 153:10
**local** 84:11
**long** 115:7
**look** 20:16 62:7 83:5
138:19
**looking** 91:20 157:16
**looks** 17:10,18
148:16
**lot** 69:21 71:2
**loyalty** 61:21

**M**

**machine** 139:5
**machine-based** 138:8,
11 139:2
**machine-implemented**
139:12 153:19
**machines** 139:9

**made** 37:1 60:19
73:20 93:19 94:5
98:1 137:19 138:9
139:8,13 151:17,21
153:6 168:5
**majority** 89:13
119:22
**make** 8:5 11:21 87:15
89:4 96:2 108:18,
21 109:3 111:20
128:19 129:13
149:3 156:17
160:21 168:1
**makers** 67:8 107:3
**making** 50:20 109:17
124:13 139:4
166:12
**manage** 6:11
**manifest** 109:20,22
**manner** 127:2
**many** 12:20 33:5
46:10 50:22 51:11,
21 55:5,16 61:18,
22 70:9 73:15 90:5
92:13 102:5 104:22
110:2 113:1 116:22
129:3,15 148:22
154:21 156:14
162:15 163:14
**map** 19:18
**Maps** 62:10
**mark** 12:4
**marked** 12:6 17:15
30:9,12
**market** 122:18 123:11,
18 124:13,18
**marketplace** 122:19
136:9
**markets** 6:18 156:22
**mass** 64:19
**Massachusetts** 4:12
**matched** 145:4
**matchmaker** 148:13
**material** 84:11
105:15
**materials** 101:10
**matter** 4:5 11:9 74:1
75:2 92:2 95:22
121:3
**matters** 91:13

**Matthew** 4:4 5:14
168:13
**may** 35:9 39:6 41:11,
12 45:14 48:3
50:22 51:8 52:7,20
73:3 74:3,8,11,16
75:16 77:3,19 78:4,
15,16 80:11 83:6,
22 84:1 88:21
88:21 89:2 91:19,
21 92:15,17,21
93:20 96:9 97:6,14
98:7,16,18 99:22
101:8,10 102:2,6
103:12 105:1,3
108:10 109:22
113:12 116:14,22
120:10 121:9,17
126:21 135:7,9
136:9 136:9 143:3
148:11 149:10
150:20 151:16
153:6,8,8 161:21
**maybe** 67:12 75:20
101:2
**mean** 8:18,21 15:16
27:10 35:7 37:6
46:21 52:5 55:19
71:7 81:6 101:6,7
121:15 125:22
126:1,13 142:15
153:20
**Meaning** 31:11 105:17
138:17,18,22 143:4
**meaningful** 127:1
**means** 8:22 31:15
66:22 83:11 123:22
125:9 136:20,22
**measure** 105:19
**measures** 36:15
**mechanism** 73:13
98:14 98:14
**media** 60:20 61:4,9,
19 62:2 63:17 68:5
99:13 106:6,11
108:16 109:3 109:3
167:1,6
**medical** 131:17 132:8
**meet** 7:11 24:1 41:12,
17 63:19

**member** 7:5 8:4,9,9
  28:14 48:12 50:2,3,
  9 52:14 69:1 97:10
  112:14,15 113:1
  114:22 119:22
  130:8 140:6 156:20
  159:8 160:8
**members** 6:16,21,22
  8:2 11:16,19 14:20
  19:1,6 31:4 33:6,8
  37:13 38:2 39:17
  41:15 42:4,7,14,20
  43:2,20 44:3,7
  46:3,7,16 47:7,9,
  14 48:8 49:16 50:5
  53:19 54:3,13 59:8,
  14,18 60:6 62:3,12
  63:12,13 68:11,22
  69:6,10,18 70:6
  76:2 93:9,11
  106:16 107:2,5,8,9,
  14,22 122:7,22
  123:11,17 129:16
  130:11 131:11
  132:8,17 140:11
  142:13 143:16
  146:17 153:14
  156:6,13,17 157:4,
  9,14 162:8,13,19
  167:22
**member's** 153:18
**membership** 8:7,9
  17:7 18:10 38:11
  158:1,9,15,19
  159:2,8
**memorized** 133:19
**memory** 155:13 158:7
  166:8,17
**mentioned** 167:14
**mere** 165:6
**message** 92:2 143:2
**messages** 156:16
**met** 39:22 41:12
  146:21
**Meta** 120:7
**metric** 21:19
**metrics** 90:7
**might** 48:20 77:4
  85:22 139:11,20
  143:2 163:22

  163:22 164:1 164:1,
  18,19,20,20
**mine** 159:18
**minute** 53:15
**minutes** 86:8 106:4
**mischaracterization**
  41:6
**misinformation**
  27:16 28:5 29:9,13,
  15 31:7,11 32:5
**misinterpretation**
  84:2
**mission** 6:15,17 7:14
  11:8 28:18 157:5,
  18 160:13
**mistake** 157:2
**misunderstood** 101:3
**mobile** 51:2,8
**model** 124:14 148:4
**models** 89:12
**moderate** 153:15
**moderated** 74:11 96:7
**moderating** 95:1
**moderation** 76:6
  77:16 82:18 84:9
  87:9,11,13 88:17,
  20 95:17 98:7
  102:14 108:21
  111:21 114:18
  116:2 121:17
  128:12 129:1,14,16
  130:3,4,10,12,15,
  21 138:8 142:18
  153:21 167:15,19
  168:1
**moderations** 167:18
**moderator** 66:21 67:1
  97:10 114:16
**moderators** 76:3
  97:13
**moment** 42:16 43:19,
  20 45:21 55:9
  117:4 139:11
**monetary** 8:5
**monetize** 112:9,11,16
  113:6,11,12
**monetized** 148:4
**money** 68:6 89:4
  150:21
**month** 39:5 39:5,16

  40:9
**monthly** 39:3 40:8
  41:20 43:19 45:12
**months** 121:4 155:8,
  10
**moonshot** 144:15
**Moore** 4:18 169:2
**more** 6:20 9:6,10
  25:11 65:16 76:6,
  22 88:8,18,21
  102:16 105:18
  108:6 118:2 144:3
  147:22 147:22
  148:1 149:17,21
  154:21 155:1,2
**morning** 4:2 157:16
**most** 24:5 33:5 53:7
  83:4 84:9 87:18
  90:14 103:10 122:2
  130:10 145:19,20
**motives** 119:5
**move** 82:17
**movement** 68:3
**much** 49:13 107:3
  117:11 128:12
  130:21 156:12
**multiple** 25:21 95:10
**musicians** 68:6
**must** 23:5 111:20
  128:12 130:20
**myriad** 85:14
**myself** 66:21

## N

**name** 4:15 5:12 37:20
  151:19 162:6
**names** 73:6 117:8
  120:4 161:12
**narrow** 144:22
**nature** 24:13 25:15
  33:21,22 96:21
  118:8 124:3
**navigates** 51:1
**nearly** 129:6
**necessarily** 25:3
  31:19 72:16 74:7
  83:16 88:11 126:6
  132:22 149:1
**necessary** 84:9

need 7:11 67:11
    80:19 98:3 139:18
needed 129:10,12
    130:1
needs 96:7
negative 139:22
negatives 98:3
    139:17
Neither 24:8,10 47:3
    70:8,9
NetChoice 4:5 10:20
    11:2,5 50:8 154:15
    155:16
networking 26:3
networks 6:19 157:1
never 43:18 86:1
    105:17 146:20
never-ending 84:14
new 96:1
newspaper 111:3
newspaper's 108:17
    109:4
Newspapers 109:22
    110:2,4,20
next 36:2 36:2 63:14
nine 155:6
nod 5:20
nonalgorithmic
    130:12
nonconsentual 99:15
none 46:15 47:9 48:7,
    8 49:4,8
nonkids 57:10
nor 47:3 169:10
    169:10,11
nothing 153:9 164:13
    168:10
notice 142:10,18
    143:16 144:5,9
    145:10
notices 142:13
    145:16
notification 143:4
notifications
    143:10
notify 143:14
notion 28:8 85:1,21
    109:20
notions 146:2
notwithstanding

159:15
November 4:13
now 20:2 35:19 42:6
    43:1 51:11 56:20
    57:19 62:3 69:20
    71:2 93:9 100:6
    104:10 117:10
    120:9 121:2 122:3
    134:1 136:7 139:14
    142:12
Number 4:10 27:12
    30:17 40:13 51:9
    73:6 89:12 90:18
    98:8 99:17 100:9
    113:17 118:8
    145:11 164:12
    165:15
numbers 60:7 113:16,
    19,21 114:5,7
    115:18 118:17
    141:2,14

O

object 41:4,5 48:18
    81:13
Objection 8:14 9:11
    10:9,14 19:8,16
    20:8 21:14 22:1
    23:8,18 24:7 25:13,
    19 26:4 27:20 28:6,
    21 29:16 31:17
    32:11,19 34:6,13
    35:13 37:8,15,21
    38:22 39:19 40:6,
    15 41:22 42:5,11,
    22 43:9,17 44:4,10,
    17 45:9,19 47:1,17,
    22 48:10,17 51:16,
    20 52:13 54:15
    55:18 56:8,14 57:1,
    6,15 58:4,13,14,20
    59:3,10,19 60:12
    62:17 65:2,21
    66:11,19 67:18
    70:7 71:6 75:4,9
    76:14 77:13 78:11,
    21 79:11,20 80:7
    81:1 82:1,9 83:1,
    21 84:18 85:12,19

86:22 87:12 88:9,
    14 89:5,10,18 90:1
    91:7,11 92:12
    93:13 94:15 95:6,
    19 96:13 98:22
    99:4,20 100:4,19
    101:15,20 102:22
    103:11,21 104:16,
    21 105:10 107:6
    109:5,13 110:6,15
    111:1,9,13 112:2,6
    113:7 115:9,16
    116:8,12 117:13
    118:4 119:3 120:15
    122:9,15 123:2,8,
    14,19 124:15 125:2,
    13,19 126:5,11
    127:6,17 130:13
    131:14,20 132:4,12,
    21 133:11 134:9,13
    135:1,18 136:6
    137:9,21 140:14
    141:1,20 144:10
    145:17 146:19
    147:5,20 148:21
    150:1,9 152:9
    153:16 155:17
    156:7,12 157:12
    158:3,5,21 159:10,
    21 160:9,18 161:3
    165:18
objectively 32:10
objectives 92:5
observation 62:20
    129:4
observations 71:2
observe 63:7
observed 63:5 64:2,4
    67:6 97:13 107:1,2
observing 108:7
occur 71:10 121:17
occurred 71:9
occurring 53:9
occurs 95:17
off 16:15 17:19
    26:19 27:13 30:18
    50:13 52:9 54:1
    58:6 59:21 61:3
    103:5 106:6 149:7
    154:18 167:1

168:11
**offenders** 52:7 54:12
**offense** 98:18
**offer** 86:10 120:1
**offered** 52:8 62:12
 120:7 129:16 131:4,
 5
**offering** 62:20 63:5
**older** 69:4
**once** 138:18
**one** 5:22 14:10 16:1
 17:9 20:16 25:11
 26:13,16 32:2
 33:17 40:17 46:8
 50:15,19,19 51:1
 53:16 63:8 72:5,17
 76:20 79:12 81:16
 83:2 86:7,10 92:8
 102:6 116:21 131:7
 139:12 140:7 143:5
 145:20 146:20
 150:19 152:4
 153:14 154:14
 155:20 159:4
 167:16
**ones** 35:12 42:10
 55:8 56:18 62:6
 64:13 100:3 101:18
 119:18 130:11,20
**one's** 50:20
**ongoing** 35:15,20
 126:10
**online** 57:5 61:19
 63:8 65:11 67:9
 68:4 69:4,8,22
 84:10,14,14 87:9
 102:15 108:20
 109:21 111:20
 129:17
**only** 75:20 109:2,9,
 22 110:16,17
 133:19 150:2
 152:21 159:3
**Open** 6:18 6:18 6:18
 156:22 157:1 157:1
**opening** 52:12
**operate** 154:7
**operates** 53:13
**operating** 122:18
**operational** 128:22

**operationalizable**
 121:15
**operationalize**
 144:17
**operations** 34:18
 54:21 61:20 70:20
 119:9 121:11
**opinion** 167:18
**opinions** 108:4
 157:15 166:2
**oppose** 46:22 47:3
 150:13,16
**opposed** 46:16 47:8
 53:14 86:19 116:9
 150:22 151:3
**opposing** 150:8 151:4
**opposition** 47:10,15
 150:6,7
**option** 122:17
**oranges** 140:19
**order** 23:4 84:19
 87:15 94:20 102:17,
 21 130:22
**ordering** 84:13
**organization** 6:10,13
 11:16 21:12 22:4,5
 23:7,9 28:15,18,19
 29:1 36:10 47:16
 102:15 150:11,22
 151:2
**organization's** 11:8,
 10 15:11 19:17
**organizations**
 150:16
**other** 7:14 10:21
 11:3 25:12 31:13
 34:20 36:7 41:11
 45:1 47:12 49:22
 52:8 55:3 60:10
 62:11 65:12 73:5
 82:18 86:20 90:5
 92:2 95:15 99:17
 101:10,13 102:20
 104:22 107:3 108:3
 109:11 112:7 114:1
 114:1 114:1,22
 115:4,10 120:8
 124:4,9 125:8
 133:9 134:8,21,21
 140:12 143:1 144:1,

2 145:15 147:9
 147:9 152:19 153:3,
 5,10 162:12 166:15
**others** 7:3 35:11
 45:12 50:10 74:18
 91:20 100:14,18,21
 120:11 131:6
**Otherwise** 13:18
 22:16 69:11 74:12
 104:2,5
**out** 11:9 57:19 67:11
 73:15 77:7 85:21
 87:3 93:22 94:2,3
 96:1 116:13 122:14
 126:2 155:12
 157:15 169:5
**outcome** 76:4 169:12
**outcomes** 98:9
**outside** 33:2 72:1,7
 104:20 116:11,14,
 18 152:17 162:8
 163:6,7
**over** 15:1 60:8,9
 70:12 108:6 117:5
 130:8 140:5 141:10
**overlap** 17:7 18:9,11
 89:2
**overlapping** 24:21
**oversee** 6:10
**own** 27:18 29:8 33:14
 62:14 68:11 83:20

---

**P**

**p.m** 4:14 61:5,9
 106:7,11 167:2,6
 168:12
**page** 17:11,12 21:4
 22:8 22:8 38:5,8
 108:18
**pages** 16:19 18:21
 30:14
**paint** 92:7 154:13
**pandemic** 61:18
**paragraph** 22:22 38:5,
 8,9,20 40:4,22
 55:13 60:2,11 62:4
 63:14 68:7 69:11
 72:9 73:20 74:22
 76:5 77:7,11 82:17

84:8 87:8 94:21
95:17 99:12,22
101:14 102:13
105:22 106:13
108:4,15 111:20
112:21 113:2,15,19
114:14 128:11,15
131:1,7 133:4
137:14 140:3,4,17
141:8,13 142:9
146:11
**paragraphs** 69:21
118:17
**part** 18:12 31:14
72:11 94:22 110:21
115:5 125:22
**partial** 45:8
**partially** 66:7
**participants** 35:4
**particular** 33:18
54:9 62:11 65:20
68:13,15 75:20
83:12 86:11 87:1
91:14 92:16,19,21
93:17 102:5 121:8
137:15 141:14,16
144:21 145:14
161:6
**parties** 50:1 116:15,
18 169:10,11
**Partnership** 15:8,18
16:10,13,20 17:8
18:13 20:13,22
21:7 22:8,12 27:3,
6,14,19 28:1,3
29:12 31:5 32:3,4,
7 33:13 36:8 129:4
**partnership's** 15:12
18:9
**parts** 26:8
**party** 36:6 116:11
**Pass** 167:7
**passed** 152:16
**past** 70:13 71:3
**patronizing** 63:9
**pay** 9:6,10,16 90:16,
17,19,20 91:3
**payers** 10:8,18
**paying** 148:20
**pays** 8:18

**penalized** 78:6
**penalties** 77:1,2
83:15 93:6
**penalty** 84:2
**people** 51:22 52:7
73:11 74:6 75:17
77:18,22 113:16
150:19 162:10
163:7,11 166:4
**perceived** 75:1
**percentage** 8:12,19
**perform** 79:14 141:18
**performing** 110:8
**perhaps** 33:5 57:22
73:18 145:11,19
147:8 157:2 158:14
**period** 90:19 121:6
**permit** 57:12 119:8
**permitted** 30:1 77:5
**persistently** 71:11
**person** 97:10 137:20
**personal** 60:11,15
62:15 63:20 64:6,
22 65:6,13,19 66:3,
9,22 67:4,10,12,13
**personally** 27:8 32:9
47:15 66:17 67:6
**personnel** 69:1
138:16
**personnel's** 11:12
**perspective** 73:2
**phase** 159:7
**phases** 159:4
**phenomena** 71:10
**phone** 15:4
**piece** 86:18 140:5
141:9
**Pinterest** 7:2 50:8
120:10 131:6
**place** 14:4 49:22
98:6 148:20 169:4,
5
**placed** 143:4
**plaintiffs** 48:8
**plan** 117:7
**planned** 28:17
**planning** 28:12
154:19
**platform** 75:1 91:2,6
148:14

**platforms** 68:4 133:5
134:7
**play** 11:9 75:8 126:9
**playing** 126:13
**please** 4:20 5:3,12,
18,22 10:13 38:6
55:14 60:2 72:9,14
79:4 131:7 137:14
140:3 141:7 161:13
**pluck** 155:12
**pods** 74:6,19 76:17
**point** 42:3,19 54:8
55:10 105:17
129:11 133:12
**pointed** 130:9
**points** 77:7
**policies** 11:13 21:12,
21 22:3,18 23:6,12,
14,22 26:14 27:18
51:3 73:7 88:1
140:6 141:10
153:19 161:8 168:4
**policy** 6:11 67:8
101:10 107:3
108:16 128:5
141:15 161:7 162:3
**policymakers** 65:10
**politically** 86:13
**poll** 46:14
**pops** 96:7 97:15
**populate** 138:11
**Porn** 158:19 159:8
160:2
**pornography** 80:21
81:12
**position** 6:6 47:4
102:18 150:18
165:14
**positive** 80:13
139:22 147:8
**positives** 98:3
139:17,19
**possibility** 22:15
29:20
**possible** 58:19,21
59:5 122:7,10
141:22 142:3
144:16
**possibly** 50:9
**post** 62:8,15

posted 96:10 145:10
posting 25:9
posts 68:18
potential 96:3
potentially 41:16
    43:12 74:10,14
    79:21 85:1,4,13
    87:19 121:14
    138:21 153:7
practical 11:9 74:1
    75:2
practice 6:12 19:5
    52:17 53:3 76:12
    115:6 120:20 129:1
    166:8,18
Practices 18:4 19:5,
    7,21 21:8 23:3
    24:12 26:11 29:3,4,
    19 30:8 31:8 32:6
    33:7 34:14,16,22
    35:2,5,9 36:14
    51:4,7 54:1,19
    55:6 73:7 77:17
    83:17 88:2 114:18
    116:21 117:7 124:5
    127:21
precise 40:3 83:5
precisely 42:9,14
    68:12 69:7 120:9
    149:8,15,19 158:8
    162:12,17
precision 120:17
predated 156:3
predict 123:21
predicting 136:21
    159:22
prediction 35:21
preferences 146:21
premise 81:18
preparation 161:14
    162:4,14
prepared 162:2
present 20:4,7,18
    87:16 89:1 96:4
    99:6 152:22
presentation 105:2
presented 102:16
    113:13
presenting 102:19
Presently 19:9 20:10

54:9
preserve 165:20
president 6:7
presume 86:13
presupposes 81:16
prevent 54:12 83:19,
    22 102:18 103:9
    139:19 145:8
    152:15
prevents 134:19
previous 73:14
previously 95:21
primarily 70:4
principally 130:3,12
print 110:1
Prior 13:12 51:4
    153:7 154:18
    155:22 163:12
prioritize 11:13
prioritizing 84:13
    103:9
privilege 14:16,17
    45:2
privileged 14:1 49:1
    165:9,17
privy 48:11 52:9
    54:19
probably 90:21 155:2
proceed 51:9 75:12
Proceedings 168:15
    169:4,5,7
process 7:7 20:14
    21:3 35:15,20
    50:22 72:13,15
    73:17 97:7 98:2,6,
    21 126:1 138:16
    145:14 147:4 149:4
    159:1
processes 27:17 29:4,
    7 114:21 129:9
    166:9
processing 130:17
produce 25:1 138:4
    166:14
produced 108:3
    166:17,19
product 14:17 25:16,
    21 36:15,19 50:17
    52:8 55:20 56:19
    72:21 73:3 90:21

90:21 92:1 96:1,3,
    22 98:10 113:12,13
    118:8 124:3,4
    130:7 130:7 136:8
    137:11 142:21
    143:3 147:7 154:12
    164:3,20 168:8
production 16:19
    108:13
products 25:21 26:9
    29:22 30:1 33:22
    39:12 53:12 56:15,
    20 64:2,5,16 90:3
    113:9 120:7 131:3,
    4,5 141:16 143:13,
    19 154:10,13
profile 50:15,20
program 73:1
programmers 139:13,
    14
programming 75:15
    76:1 90:11 98:1
    139:2,10 140:2
prohibit 23:14 57:18
    77:12 82:22 92:10
    99:18
prohibited 21:11
    22:18 23:5,12,21
    58:10 101:12
prohibition 104:7
prohibits 76:18
    92:14
projected 36:2
prominent 6:21
promised 94:22
promotes 69:15
promoting 78:1,2
promotion 80:12
propaganda 68:18
propagandists
    131:19 132:10
proportion 146:12
proposition 72:19
    87:4
propositions 69:22
propriety 77:8
prospective 61:20
protected 88:5 110:4,
    14,22 111:5 164:9
protection 54:18

139:17
**protections** 110:17
  111:7
**protects** 102:9
  111:15
**provide** 45:21 51:7
  60:7 66:14 70:17
  78:19 79:8 80:18
  83:10 86:7 94:3
  103:15 113:19
  136:12 142:17
  150:5,11,15 151:7,
  15,16 155:18
**provided** 16:2 146:13
  150:21 164:2,7,21
**providers** 108:20
**provides** 146:14
**providing** 62:3 83:20
**provisions** 121:1
  151:5
**public** 20:17 36:13
  37:1,3 63:16 64:3
  73:16 106:17 107:2,
  9 114:1,2,21
  131:18 132:9
  149:10,12,22 153:6,
  7 156:4 161:7
**publicly** 67:6
**pull** 27:11
**pulled** 113:20,21
**purely** 102:17,20
  164:16
**purposes** 33:4 126:18
**pursuant** 116:22
**pursue** 11:13 161:9
**pursues** 161:7,8
**pursuing** 158:9
**put** 94:20 99:9
**putting** 70:19 136:15
  144:4

### Q

**quarantine** 63:15
**quarter** 15:10
**queries** 121:19
**query** 85:4
**question** 5:18 6:1
  14:15 16:8 23:7,10
  31:21 32:17 40:21

41:3,4,9 43:7
53:17 55:20 62:19
66:1 75:6 81:8,10,
11,14,15 96:18
103:2 104:14 115:3
120:17 132:6
133:22 134:3,14
136:14 159:12
163:17 165:15
**questioning** 165:1
**questions** 44:21 45:1
  164:10 167:12
**queue** 97:16
**quick** 166:20
**quite** 165:9,10
**quote** 30:3 31:3,14

### R

**raise** 68:6 91:17
**random** 102:17,20
**ranges** 145:7 146:2
**ranks** 84:20
**rate** 118:12
**rates** 148:18
**rather** 122:19 123:11
**read** 31:3,15 62:15
  100:11 101:5
  108:19 135:5
**reading** 63:2 66:16
  70:5 129:19
**really** 96:14 136:10
**reason** 82:6
**reasons** 102:11
  145:12
**rebuilding** 121:10
**recall** 42:1 48:3
  68:12 69:7 74:15
  108:5,11,12 119:20
  120:11 149:15,19
  153:8 154:22 155:9
  158:8 162:12,22
  163:9
**recalling** 120:9
**receive** 7:20 143:2
  160:2
**recent** 158:6
**recently** 71:9 155:7
**Recess** 61:6 106:8
  167:3

**recognizing** 110:1
**recollection** 14:22
  15:3,6 153:12
**recommend** 76:8
  159:19 160:3
**recommendation**
  160:7
**recommending** 159:2
**record** 5:1,13 10:16
  16:16 26:20 59:22
  61:4,8 103:6 106:6,
  10 126:17 167:1,5
  168:12 169:7
**recorded** 169:6
**records** 125:17 127:5,
  8,16
**recruit** 68:19
**red** 143:7
**Reddit** 130:9
**reduce** 135:22
**refer** 22:20 71:3
  75:18 111:19
  143:20
**reference** 95:17
**References** 22:19
**referred** 74:22
  130:22
**referring** 50:18
  94:19 112:18 114:5
**refers** 22:15 140:16,
  17 141:9 143:21
**refinement** 73:12
**reflect** 10:16 74:9
  95:13 138:3,13
**reflects** 72:22 87:17,
  20 95:9
**refresh** 166:17
**refuse** 41:3
**refused** 158:15
**refusing** 10:17 32:16
  40:21 123:10
**regard** 29:12
**regarding** 120:9
**regards** 77:17
**Registered** 169:2
**regularly** 99:13
  108:8
**regulated** 80:15
  102:2 103:18,19
**regulation** 124:1

**regulations** 102:8
    102:8
**reject** 81:18
**rejected** 158:10
**related** 45:1 49:1
    165:4 169:11
**relationship** 93:10
    147:16
**relative** 122:10
**relatively** 81:6
    145:6
**release** 36:11
**released** 36:18
**releasing** 37:5,7
**relevance** 84:22
    85:11,17 103:17
    104:5
**relevant** 21:11,21
    22:3,18 23:6,12,21
    51:3 85:3 87:18
    90:14 91:19 103:10
    148:10
**reliability** 124:6
**reliable** 144:13
**relied** 108:2
**relief** 44:2,6
**rely** 72:11 130:2,12,
    14
**remember** 150:3
    158:12 162:15,19
    163:10
**remote** 63:18
**removal** 121:11
    143:14,19,20,22
**remove** 64:18 66:5
    99:14 137:15
    139:21 140:12
**removed** 143:6,8
**rendering** 102:15
**repeats** 138:20
**rephrase** 53:18
**report** 73:15 125:4,
    11 140:5 141:9
**reported** 127:1
**reporter** 4:18 5:3,19
    169:2
**reporting** 20:21
    115:11 117:2,15
    121:4,5 122:2
    125:1 140:18

**reports** 37:2 60:19,
    21 113:22 118:18
    119:2,15,16 120:14,
    18 140:21 141:4
**represent** 87:5
**representation**
    160:21
**representations**
    94:4
**representative**
    11:14
**request** 38:7 55:15
    60:4
**require** 53:7 123:3
    135:20 143:16
    161:4
**required** 51:4 76:12
**requirement** 8:6
    140:4 141:17
    142:10 143:16
    144:9
**requirements** 7:9
    120:13,21 124:22
**requires** 121:7 146:7
**resolution** 145:1
**resource** 115:11
**resource-intensive**
    25:12
**resources** 34:1 96:22
    111:22 118:9 119:8
    154:7
**respect** 54:17 65:20
    98:19 121:6 141:15
    149:21
**respond** 98:16
**responded** 66:7
**responsibilities**
    116:22
**responsibility**
    117:1
**responsible** 115:14
**responsive** 85:2,6
**rest** 108:19
**restate** 65:22 103:2
    132:5 134:2
**restore** 139:20
**restricted** 102:4
**restricting** 124:3
**result** 62:14 85:6,7
    86:19

**results** 20:16 35:18
    36:12 65:11 74:8,
    10 75:17 86:4
    102:17,19 138:4,19
**reveals** 164:18
**revenue** 8:10,11,12,
    18,19,21,22 9:7,10,
    18 10:8 89:15
    111:22 147:17
**revenues** 9:1,16
    89:13
**review** 51:4 72:10
    74:21 98:14
**reviewed** 51:6 98:4
**reviews** 51:3 147:8
**revised** 13:5
**revising** 14:13
**revisions** 163:14
    164:12,17 165:8
**right** 12:2 17:13
    33:12 35:3 45:20
    61:11 65:18 83:4
    84:7 109:19 109:19
    122:3 126:3 140:20,
    22 160:6 161:11
    165:1
**rights** 22:17
**risk** 21:11,20 23:5,
    16 24:4 25:4,7
    77:1,6 83:13 97:1,
    2
**risks** 21:5 22:9,14,
    17,19,20 24:2,15,
    17 25:11 72:20,22
    77:15 96:3
**road** 19:18
**role** 14:13 115:1
    150:18 157:14
**rooms** 160:6
**rule** 85:21 87:3
    116:13
**rules** 29:5,21 57:18
**run** 104:8
**running** 77:2
**runs** 96:17 103:18

                    S

**Safety** 15:7 16:12,20
    17:8 18:4,13 22:11

26:11,14 27:3,6
33:7 34:2,18 52:15
53:22 54:20 55:5
70:20 73:1 76:2
83:17 97:11 102:10
114:19 115:6 116:2,
20 117:7 117:7
119:9 121:11
127:20 129:1,4
138:10 139:1
**said** 8:17 11:7 22:2
26:10 46:19 51:11
101:2,3 139:5
150:20
**sale** 102:3
**Same** 13:6,9,15 25:19
26:4 51:20 54:17
58:2,16 98:6,15
99:4,8 100:4
107:19 111:19
116:12 128:8 132:4
142:1,5 151:6
161:3
**Samsung** 7:2
**satisfy** 144:13
**saw** 13:8
**say** 5:19 9:7,9 27:21
34:10 41:9 60:8
64:12 74:6,11,17
75:12,19 80:21
83:14 86:13,17
89:8 93:15 94:18
96:8 100:17 106:16
108:19 113:11
115:5 117:4 119:20
121:13 122:4 124:5
129:12 137:18
144:20 148:2 155:6
156:17 157:17
**saying** 41:15 77:21
80:13 83:19 85:6
109:8,9 139:15
143:8
**says** 22:9,21 23:1
27:14
**scale** 60:5 108:22
111:19,21 112:15,
19,20 113:2 128:13
143:12 155:4
**scenario** 87:2

**scenarios** 79:1 85:15
**schedule** 37:4
**schemes** 69:3
**schools** 61:19 63:16
**Schruers** 4:4 5:11,14
12:3,9,17 17:6
61:13,15,15 106:14
167:11 168:14
**S-c-h-r-u-e-r-s**
5:14
**scope** 32:13,21 33:2
45:5 63:4,9 112:20
149:7,19
**scoping** 36:1
**screen** 129:10
**screening** 55:6
**scrolling** 136:3
137:7
**search** 70:1 71:13
72:5 73:21 102:16,
19 103:10
**searches** 70:4
**searching** 84:10
86:17
**second** 17:9 133:16
**Section** 37:18 41:18
44:13 59:16 110:16,
17 111:5,14 141:11
**sector** 36:10 156:19
**see** 15:11 81:4 92:11,
16 114:22 126:19
140:7 143:7 163:1
166:5
**seeing** 21:10 63:8
65:10
**seek** 29:3 93:16
**seeking** 44:2,6
146:16,18
**seeks** 6:14 89:1
157:4,17
**seem** 136:10
**seems** 27:12
**seen** 156:4 157:10
**sees** 82:7
**selection** 40:3
**self-certification**
53:14,20 54:5,14
55:3
**self-harm** 69:15
73:22 78:1 79:9,14,

19,22
**self-reporting** 20:6,
11,17 36:20
**sell** 102:1
**Senate** 11:19
**send** 142:13
**sending** 145:16
**senior** 162:3
**sense** 35:8 102:9
**sensitive** 108:16
109:3
**sent** 142:22
**sentences** 129:21
**separate** 21:19 26:8
37:1
**series** 161:5
**serious** 24:5,11
**serve** 86:11 90:6
148:9
**served** 83:11 85:22
90:12,15 91:1
**Service** 21:12,22
22:3,19 23:6,13,15,
22 52:21 57:12
58:6,11 73:4,8
74:16,17 76:3
83:10 84:20 86:10
88:4 90:22 90:22
92:1,21 93:18 94:3,
7,8,10,11 95:2,22
96:10 98:11,16
99:14 102:7,15
104:1 105:1 106:18
107:12 108:20
110:10,13 111:4
112:9,12,16 118:7,
12 121:18,19 130:9
142:22 148:7,16
154:11 159:16
160:11
**service's** 31:20
75:16 84:22 87:17,
20 88:7,18,22
96:10 102:6 108:16
146:13
**services** 34:2 53:9
60:6 61:19 62:2,4,
9,9,11,21 63:5,16
64:11 74:14 84:15
87:10,14 89:4,6

90:5 92:10,14
95:13 95:13 103:9
106:17 107:17
109:3,16 110:18,21
111:16,20 120:1
125:4 127:10 129:6,
15 130:2,6 134:20
148:3
**serving** 86:3,15
**set** 30:7 93:22
157:15 169:5
**sets** 96:1
**setting** 94:2,3
**seven** 16:18
**severe** 84:1
**sex** 52:6 54:12 99:16
101:4,8
**Sexual** 69:11 100:10
101:9
**shall** 22:19
**shared** 67:2,11 68:17
**sharing** 7:13
**Shears** 61:14
**shies** 28:8
**shooting** 65:20 66:5
**shootings** 64:19
**shopping** 84:10
**short** 109:18
**should** 27:17 30:4,15
34:11 64:12 74:6
76:10 148:2 150:12
156:4
**show** 109:4
**showing** 99:18
**shows** 79:13 79:13
**shut** 164:22
**shuttered** 62:1
**shy** 28:3
**sic** 4:4 63:16 121:15
140:5
**side** 68:17 86:20
**sidebar** 136:3,16
137:7
**signed** 13:8
**significant** 17:6
18:9 60:7 154:3
**Similarly** 24:16
**simple** 164:16
**simply** 91:16 102:10
121:9 139:9 143:3

161:20
**since** 38:15,17 51:11
70:13
**site** 26:3,8 50:19
55:22 57:10 89:14
147:10 147:10
148:1,9
**sites** 90:6 107:18
**Sitting** 40:7 100:5
117:10 119:19
160:1
**situation** 118:11
**six** 155:7
**six-month** 121:6
**size** 9:7 33:21 34:4
118:7 143:11 154:6
**small** 61:18,22 118:2
**smaller** 117:14
**social** 26:3 61:19
62:2 63:17 68:5
99:13 109:2
**socially-distant**
61:22
**software** 75:12 95:18
130:16 138:8
**software-based** 74:9
**software-driven**
52:18
**solely** 40:12 85:17
86:4
**Solutions** 4:16,19
**some** 6:20 7:9 24:22
35:7,10 37:20 38:1,
10 39:11,21 42:6,
14 43:1 48:21 50:9
53:9 55:2 56:15
60:7 62:5 64:12
71:8 73:15 74:10,
14 78:13 79:2
80:10 85:1 88:10,
13,15,20 90:7
91:16 92:15,17
99:21 103:13,15
107:15,21 108:1,10
112:11 113:3,9,9,
16 116:14,19
118:16 121:8,14,16
122:16 130:2 131:4
133:3 135:9 140:11
141:16 142:17

142:17,22 143:18,
19 144:15 153:7
156:8 161:5
**somebody** 58:10
**someone** 57:17
**something** 34:5 55:3
64:22 68:21 82:15
96:7 97:2 102:20
123:21 142:16
143:17 144:5
**sometimes** 98:13
133:2 135:7
**soon** 57:21
**sophisticated** 122:3
**sophistication**
154:6
**sorry** 16:7 21:6
58:15 61:15 68:7
91:21 100:16 114:1
118:20 120:22
128:14 129:18
134:1
**sort** 8:11 21:19
125:18 126:8
146:15
**sought** 157:22
**sounds** 75:5
**source** 60:17 111:22
**space** 65:16 129:2
**span** 109:18
**sparingly** 152:22
**speak** 28:15 29:1
36:17 100:6 119:5
127:12,18 143:13
153:17 159:4
162:20 165:17
**speaking** 11:15 51:1
70:9 96:19 105:16
114:11 121:21
138:7
**specialist** 4:17
**specific** 26:13 33:17
45:7,8,13 54:19
55:10,20 65:19
66:9 83:18 119:5
124:21 167:15
**specifically** 48:2
69:4 74:15 119:20
127:19 158:13
**specificity** 100:6

specifics 153:13,18
specified 36:8
speculate 10:11,13,
  17 79:1 123:4,10
speech 27:16 28:5
  29:9,13,14 31:6,12
  32:5,10 33:9,15,16,
  19 34:5,12 104:2,
  17 105:8,12
spell 5:12
spent 65:16
spoke 53:3 162:2,13,
  15 163:10
spoken 64:15
stage 72:21
stages 73:14
stand 6:3
standpoint 53:3
  74:20
stands 142:12
start 13:11 96:6
starts 17:11
state 5:12 11:1
  99:18 100:1,7
  102:4,8 127:2
  136:21 146:7
  151:18
stated 4:22
statement 131:2
statements 149:10,13,
  22 153:6
States 4:8 81:21
stating 107:3
statute 39:7 41:11,
  13 43:13 44:7 45:5
  77:3,14 79:16 80:9,
  16 82:12 83:6,13
  84:5 85:5 86:16
  104:8 121:7,22
  122:20 124:19
  133:13,19,20
  134:15,18,19 136:5
  144:14 149:11
  150:20
statutory 39:22
stay 124:13,18
steeped 51:12 53:21
stenographically
  169:6
step 39:2

steps 152:19
Sternburg 162:7,20
still 30:7 35:20
  58:12,16 145:1
  146:7
stories 108:18
  113:17,18
straw 46:14
strictly 24:22 98:5
struck 61:18
stuff 37:5
subject 44:7 49:3
  71:20 104:20
subjective 109:20
subjectively 119:12
subjects 99:21
subscribe 160:12
Subsection 133:17
subsections 113:20
  114:13
subsequently 145:12
subset 114:18
subsidies 59:13
substance 161:19
  165:5
substances 102:3
substantial 145:2
  146:12
substantially 66:13
substantiate 70:15
  166:11
substantiated 68:14
substantive 30:6
  31:6,16 32:4
succeeded 62:1
such 28:10,12,16,19
  30:5 50:14 51:8
  63:9 82:20 103:20
  141:11 142:3
sufficient 30:4
  41:20
suggesting 160:19
suicide 73:21
suing 11:1
suit 11:5 44:2 48:9
Suite 4:12
supplemented 145:22
Support 4:16,19
  46:13,19 47:3
  160:13

supported 151:2
supportive 46:10
supports 15:17 139:2
  150:17
suppose 86:2
Supreme 81:20 82:3,7,
  14
sure 28:22 75:14
  126:12
surely 125:17
surfaced 75:20
suspend 140:12
suspension 143:22
swear 5:3
sworn 5:7
system 97:15,18,18
  138:12,15 139:2,15
systems 6:18 96:20,
  21 145:20 157:1

                 T

tab 17:2 30:14
tagged 74:12
tags 75:17,19,22
  133:9 134:8,21
take 5:21 39:2 60:22
  106:1 166:20
taken 4:4 98:7,18
  152:18
taking 63:6
Taliban 131:11
talk 21:4 61:17
  63:15 64:17 72:10
  76:5 77:11 82:18
  84:8 87:8 102:14
  108:15 120:19
  128:12 137:15
  146:12 148:5
talked 14:3 45:2
  46:2,5 64:8,10
  69:21 161:20,21
  164:5 165:2,3
talking 65:18 66:16
  127:14 129:7 134:2
  140:7 142:2 148:6
talks 133:5 140:4
target 69:4
taste 76:17
teachers 68:3,6

team 52:15 76:2
    97:11 138:10 139:1
    162:13
teams 115:22 116:1,3
team's 138:13
technological
    109:15
technologies 54:11,
    13
technology 53:10,12
    54:6,10 139:16,18
    156:19
teenagers 68:19
tell 40:8 49:13
    53:11 54:1 67:13
    124:7 146:22 149:8
    150:19 154:17
tends 138:16
term 15:14 133:6
    134:4 143:4
terminated 57:20
terminating 55:7
Terms 21:12,22 22:3,
    18 23:6,13,15,22
    52:21 57:12 58:6,9,
    10 73:4,8 74:16
    79:16 85:10 86:16
    93:18 96:10 99:14
    102:6 105:14
    126:18 164:2
terribly 155:11
testified 5:8
testimony 46:15,17
    168:13
Texas 4:9 11:2 68:5
    124:18 127:2
    135:20 136:19,21
    151:12,18
text 153:2
than 9:6 25:12 34:20
    36:8 45:1 55:3
    65:16 101:8 102:7,
    20 105:18 108:3,6
    114:22 115:5,10
    118:13 122:1,19
    123:12 124:9
    134:21 144:4 153:3,
    5 155:2 166:15
Thank 135:2 167:12
    168:9

That's 15:14 22:13
    25:14 27:21 32:13
    33:2 34:10 38:12
    46:17,20 62:8
    69:17 87:4 96:12,
    14 101:22 118:5
    120:16 139:22
    151:11 153:20
    159:11
their 4:22 27:18
    29:8,22 30:1 33:14,
    21,21,22 34:1,18
    36:22 37:1 45:12
    64:16 67:17,21
    68:3 74:16 76:9
    77:16 83:20 92:11,
    18 93:10 94:5 94:5,
    7,22 95:1 99:14
    106:18 107:12,18
    108:10 114:21
    116:4,20,21 121:10
    124:14 125:22
    126:2 128:5 130:21
    137:8 139:3,10
    148:20 154:6 157:7
    158:20 168:4,5
themselves 4:21
    82:20 87:10 97:13
then 38:15 67:1
    72:21 73:12,14,15
    75:1 90:10 91:1
    96:11 97:17 98:12,
    15 105:19 108:18
    138:14 145:12
    148:5 157:1
theory 25:8
there 6:9 8:6 17:6
    18:8 18:8,11 19:6,
    13,15 20:4,15,15
    24:19,22 25:1,2,5
    30:4,16 35:21 37:4,
    6 38:10,16 42:19
    48:15 49:21 51:21
    52:17 60:19 65:12
    68:9 70:1 71:7,9
    73:12 75:15 78:13
    80:9 81:8 82:6,7
    96:19 97:6 98:18
    100:8 101:13 102:2
    104:22 108:10

109:14,15 113:12
    120:8,10 126:21
    129:5,17 133:7
    134:5 135:15 137:2,
    4 138:9 143:4
    145:3,21 146:1,5,5
    148:20 152:6 154:3,
    5 157:9,22 158:7
    160:7 164:17 165:6,
    7
thereafter 57:22
thereby 104:8
therefore 77:19
There's 7:7 20:2
    21:18 95:4 145:8
these 19:7 23:3
    25:10 29:7 30:6,14
    33:13 35:2 35:2,4
    39:6,11,17 53:3
    60:14,18 63:20
    64:2,8,10,11,12
    65:8 65:8,19,20
    66:14,18 67:10,20
    70:1,12,15 71:2,13
    89:4 90:11 95:13
    99:19 100:9 101:5
    104:20 111:22
    113:21 114:17
    116:3 118:17,18
    119:1,14,15 139:19
    140:21 141:2,3,4
    162:18 163:11
    166:9 169:4
They're 7:3 30:18
    47:21 51:10 137:5
    140:15
they've 94:5 146:18
    168:5
thing 75:1 80:14
    81:16 98:15 125:18
    142:3 167:17
things 30:6 34:12
    60:10 63:20 66:17
    67:10 71:3 74:18
    89:2 95:15 99:13,
    17 101:11 107:3
    112:7 121:8 126:9
    141:11
think 26:2 30:19
    50:18 67:2,13 79:2

83:4 85:14 86:9
87:4 96:15,18
109:7 113:1,10
120:4 131:2 135:19
136:18,19 144:2
157:2 159:12 162:7,
11
**thinks** 50:19
**third** 36:5 63:11
**third-party** 19:19
20:3,4 36:3,9,12,
16 106:18 111:11,
16 117:6,9
**thoroughly** 7:8
**those** 8:8 14:3 31:10
45:1 48:20 49:4
51:7 52:3,5 53:16
53:16 56:7,21
60:20 64:21 65:11
70:4 72:22 73:7
75:19,22,22 77:2
85:14 88:2 89:1
90:13,15,22 91:6
92:3,4 93:4,11,12
94:10,19 97:22
100:12 103:16
105:14 109:20,22
110:14 111:7 114:3,
7,8,10,14 116:3,21
117:3,9 119:16
130:6 137:18,19
138:13,15,15
139:10 140:18
143:9 146:4 150:19
155:13 158:12
159:4 161:19
164:10 165:5 168:1,
7
**though** 92:6 97:22
163:19
**threatened** 93:5
**three** 9:17 73:13
155:10 163:12
**Through** 7:22 8:1,2
12:21 51:2 73:9
91:1 92:1 139:10
142:7 148:4 163:15
165:16
**Tide** 74:4
**time** 35:5 38:14

41:19 42:3,16,19
43:19 61:5,9 90:20
105:18 106:7,11
109:18 117:5 130:8
147:10 167:2,6,12
169:4
**time-intensive**
117:22
**times** 90:18 95:8
**timing** 109:16
**titled** 17:22
**today** 40:7 119:19
142:8 160:1 167:12,
14
**today's** 168:13
**Todd** 162:11
**told** 37:11 107:14,20,
22 119:15 164:1
**tolerance** 146:3
**tolerances** 145:7
**tombstone** 144:4
**tombstoned** 143:3
**tombstoning** 144:20
**tons** 146:5
**too** 16:22 77:6
**took** 14:4 46:14
115:7 144:3,5
149:21 169:4
**tools** 52:19 53:3
62:2,4 63:17 72:11
74:21 82:19 83:20
98:10
**top** 9:22 10:2,8,17
50:13 52:9 54:1
58:6 149:7 154:18
**topic** 84:12
**top-level** 141:14
**totally** 105:16
140:15 164:5
**touched** 95:20
**towards** 36:21
**track** 121:9,20
**tracking** 121:7 126:8
**trade** 6:14
**traditionally** 116:3
**traffic** 147:10
**transcript** 169:6
**transitory** 105:18
**transparency** 36:15
37:2 113:22 114:21

116:5 117:15
118:18 119:2
120:13,18,21 121:1
122:1 124:22
**transparent** 119:8
**trigger** 39:7
**trolls** 74:5
**troublesome** 135:10
**true** 12:10 85:10
101:14 128:7 129:8
148:18 169:7
**Trust** 15:7 16:12,20
17:8 18:2,3,12
22:11 26:11,14
27:3,6 33:7 34:2,
18 52:15 53:22
54:20 55:5 70:20
73:1 76:2 83:17
97:10 114:19 115:6
116:2 116:2,20
117:6,7 119:9,10
121:10 127:20
129:1,3 138:10
139:1
**trying** 27:10 124:8
167:22
**turn** 38:5 55:13
**turned** 61:18 63:17
**tweaking** 126:18
**twice** 127:4
**Twitter** 7:2 18:19
50:12 56:4 58:3
62:10 64:15 120:7
128:9 131:6
**Twitter's** 58:6
**two** 17:10 24:21 71:4
89:2 92:3,4 129:20
137:11 155:1,2,6
159:4 163:12
**type** 33:18 48:21
86:11 93:17 97:1
154:11
**types** 31:10,13
127:13 141:16
**typically** 142:20

| U |
| --- |

**uh-huh** 5:20 22:10
72:12 106:19

118:19 137:17
**ultimately** 19:19
138:1 139:8
**unable** 40:2 45:17,21
**unaware** 46:18,22
**under** 23:3 23:3,16
31:5 32:7 41:21
42:4,7,10,14,21
43:2 49:5 52:5
77:4 78:7 79:15
80:8,15 85:4 86:15
88:5 110:4
**underlying** 154:8
**understand** 105:14
136:14 153:21
**understanding** 28:16
51:14 55:4 67:3
70:16 94:1 136:11
145:13
**understatement**
122:5
**understood** 22:19
**undertaking** 117:22
**underway** 20:14 21:3
**undoubtedly** 80:10,14
**uniformly** 143:13
**Unit** 61:5,9 106:7,11
167:2,6
**United** 4:7 81:21
**unity** 82:12
**universe** 144:15
**unless** 105:14,15
146:21
**unquestionably** 95:9
167:21
**until** 39:4,8
**unwilling** 85:20
**update** 74:16
**updates** 73:13
**upheld** 140:6
**uploaded** 137:16
145:9
**upon** 100:12 101:3
108:21
**use** 27:17 53:19 54:4
55:2 64:11 72:10
74:17,21 78:2 79:6
147:7
**used** 52:19 62:21
64:3 98:10 146:3

147:11
**useful** 102:16 120:19
**user** 39:6 50:15
56:11 67:9 73:2,4
79:13 79:13 82:22
83:11,20 84:21
85:2 87:17,19 88:8,
18,21 91:2,5,12,21
97:12 99:9 102:10
105:3 118:9 121:18
126:1,3 137:16
143:1 145:10
146:15,18,18
147:12,16,16,22
148:7,9,11,15,19
154:11
**user-facing** 120:1
**user-generated**
133:10 134:8,21
135:16
**users** 39:4 40:9,13
43:20 45:13 55:6,
16 56:3,7 60:6,9,9
74:8 75:21 76:9
82:19 83:3 84:16
89:1 90:12 91:18
92:11,15 93:3,19
94:5,9,22 98:13
99:7 119:11 135:9
142:13,18 143:14
144:2 145:16 146:6
146:6,13 147:1
157:7,18,20 168:5,
7
**user's** 85:3 98:19
103:18 137:4 137:4
146:21 148:11
**usership** 41:20
**uses** 53:11 90:10
133:13
**using** 51:9 54:9,13
58:16 80:1
**utensil** 61:14
**utilize** 53:10 116:20
**utilized** 117:6
**utilizes** 130:10
**utilizing** 64:5

---
**V**
---

**vague** 77:3 79:16
80:8 85:5 93:5
**valuable** 85:3
**value** 94:19 95:4,9,
10,14 146:13
148:15
**values** 94:8,9 168:4
**variables** 89:3 90:7
92:4 138:11 147:11
**varies** 33:21 34:3
142:21 154:6,8
**variety** 52:18 62:11
150:17
**various** 7:3,14 36:14
75:16 113:18
147:10 151:4
**vary** 8:9 25:14 33:22
34:1 90:21 98:8
120:19 124:1 130:7
154:5,9
**vast** 108:21 112:19
**vastly** 121:13
**Venmo** 64:15
**Venn** 24:21 25:11
**verbal** 5:18
**verification** 53:10,
11 54:6,9,13
**verify** 149:14
**versus** 4:6
**very** 45:21 97:6
109:17 125:4 129:5
156:14 159:9
**vetted** 7:9,10
**via** 63:18
**video** 4:3,17 60:10
79:5,12
**videos** 64:19 65:20
66:5 68:18 143:6
144:20
**view** 48:4 67:5 83:12
87:18 88:7,18
92:21 105:9 107:8
108:6 136:2 137:2
157:10
**viewed** 119:7
**viewer** 79:14
**viewing** 137:8 144:3
**viewpoint** 76:18,20
77:20,21 78:5,10,
15,17,20 79:7,10,

15 80:5,11,15
81:12,17,22 84:17,
22 85:18 86:2,5,16,
20 87:6 92:15,17
103:18 104:7 105:4,
5,9,13,20 108:11
131:9,13 132:3,11,
15,18,19
**viewpoints** 92:19,21
93:9,11,12,16,21
94:2 138:15 156:5,
14,21 167:15
**views** 87:20 157:10
**violate** 52:20 144:6
**violation** 83:13
104:6
**violations** 143:6
**violence** 78:4
**violent** 104:3
**visibility** 114:20
128:5 135:4,12,17,
22,22 136:4,17,22
**visible** 74:13
**vitally** 129:15
**vitriolic** 104:3,11
**volatile** 97:6
**volume** 84:14
**volumes** 108:22
**voluntary** 34:19

---

**W**

---

**wait** 53:15 100:21
**want** 5:21 17:12
28:19 29:2 32:2
40:20 44:21 84:16
87:3 91:16 92:11,
16,17 103:1 158:2
164:4,6 167:16
**wants** 34:21
**warning** 82:21 133:5,
9 134:7,20 135:6,7,
13,15 136:3 137:6
**Washington** 4:13
**wasn't** 13:19 145:11
**watch** 60:9
**way** 11:3 19:2 34:17
47:12 84:15 87:9
99:8 135:15 136:4
144:13 146:14

152:7 169:11
**ways** 92:13
**weapons** 102:1,3
**website** 7:4 26:6
51:2
**websites** 93:10 110:2
**weeks** 163:12
**well** 39:1 52:8 53:15
62:11 64:3 67:1
70:8 77:19 83:2,3
84:3 85:17 93:22
95:14 100:11,15
105:13 112:18
119:4 128:7 129:13
130:14,20 136:2
137:2 145:19 148:2
162:7
**went** 165:16
**We're** 61:3,7 127:14
129:7 134:1 136:7
142:2 148:6 165:20
167:4 168:11
**Western** 4:8
**we've** 134:1 142:6
154:9 165:10 166:4,
6
**whatever** 6:1 51:8
125:8
**whatnot** 135:11
**What's** 9:3 76:22
81:10 106:20
107:16 112:14
128:18 128:18
162:6
**wherein** 86:3 158:8
**whether** 21:20 30:7
34:5 36:17 42:17
48:3 50:14 53:11
77:22 81:11 91:12
93:1 97:2 139:21
160:11 165:7
**which** 13:22 22:17
24:4 24:4,20 25:2
26:12 35:12 37:2,
13 38:19 38:19
38:19 39:4,17
40:21 42:4,10,20,
20 48:22 50:3,4,17
52:5 53:19 54:3,12,
18 56:18 62:6,12

64:13 64:13 68:7
71:10 73:2,3 74:11
75:17,18 78:5 79:5,
12 80:15 81:17
82:11,14 83:11
84:19 86:12 87:16
89:6 91:17,18,21
97:5,14 98:3,14
100:3,14,18,21
101:7,18 108:18
116:1 117:3 118:12
119:18 121:8,15
122:22 122:22
123:11,22 124:12
125:6 130:6,11,20
136:8 137:3,5
140:6 141:10
141:10 143:3 145:9
147:6,15 148:11
151:16 154:9
156:11 162:10,12
164:12
**while** 13:13 87:22
114:17
**who** 6:20 6:20 9:17
10:7 12:16 13:5,8,
13,21 14:2 21:6
26:22 27:2 33:6,8
36:5 36:5 38:15
41:21 41:21 44:7,9
46:5,22 47:7 50:9
51:19,22 52:3
57:17 57:17 58:10
62:1 65:10 74:7
94:9,11 112:15
113:3 115:14 120:1
127:7 130:9 139:4
151:21 155:13
158:1,12,17 161:20
164:5 165:2
**whole** 126:1
**whom** 57:17 90:13
**Whose** 79:21 102:3
105:2,3,4 157:9
**why** 28:3 33:12 34:10
48:7 119:1 119:1,4
125:11 125:11
**Will** 4:20 5:2 13:2
14:14 19:15 25:1
29:20 31:19 35:14,

22 36:5,19 41:4,5
48:18 72:18 74:8
75:15 76:1 81:13
88:8,18 90:17,19,
21 92:4 94:6 96:1,
19 97:7,18,21 98:8,
13 100:11 101:3
118:6 138:12
142:17 148:1
163:16 164:9,22
**willing** 160:12
**wind** 97:21 98:6
**winds** 97:9
**wish** 68:4 82:20 93:3
**within** 26:5 32:13
33:2 37:17 38:2
43:12 44:12 45:5
63:2 90:8 112:20
113:13 149:6
158:14 163:12
**Without** 84:12 94:7
127:13 145:2
**witness** 5:3,6 13:1
14:15 32:20 38:7
48:18 55:15 60:4
71:18 164:10
165:13 167:7
**witnessed** 67:8
**won't** 39:8
**word** 126:20 133:13
**words** 101:10
**work** 10:20 11:2
14:17 27:8 34:19
36:15,18 63:2,4,10
64:3 66:18 75:3
84:12 89:17,20
138:12 139:3 164:3,
20 166:9
**worked** 13:3 126:20
**workflow** 51:13
**workflows** 53:22
**working** 27:6 33:9
36:21 75:11 80:20
**works** 96:15 153:14
**wouldn't** 19:2 47:4
126:17
**write** 60:5 73:19

---

**Y**

---

**year** 36:2,3 71:3
127:4 154:21
154:21
**years** 50:22 51:11
65:16 66:8 70:13
71:4 108:6 129:3
155:1,2,6 166:17
**yet** 36:7,16
**yielded** 35:18
**You'll** 133:18 143:7
**young** 74:6 77:18,22
**you're** 17:13 28:9
41:15 45:17 46:13,
18,21 51:9 76:15
83:18 96:15 112:18
123:10 138:19
149:20 155:14
163:21 164:17
165:2,3
**yours** 112:15
**yourself** 70:1
**YouTube** 29:12 56:2,
19,20 57:8 60:8
120:7 128:7,8
143:5 144:4,20
**you've** 6:1 13:2,17
43:5 44:15 99:14
108:3 120:14
145:15 146:21
163:7

---

**Z**

---

**Zoom** 63:19

---