```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
                   AUSTIN DIVISION

NETCHOICE, LLC d/b/a          *
NetChoice, a 501(c)(6)        *
District of Columbia          *
organization, COMPUTER &      *
COMMUNICATIONS INDUSTRY       *
ASSOCIATION d/b/a CCIA, a     *
501(c)(6) non-stock           *    CIVIL ACTION
Virginia Corporation,         *       NO. 1:21-cv-00840-RP
     Plaintiffs,              *
                              *
v.                            *
                              *
KEN PAXTON, in his            *
official capacity as          *
Attorney General of Texas,    *
     Defendant.               *
```

VIDEOTAPED ORAL DEPOSITION

OF

STACIE D. RUMENAP,

PRESIDENT AT STOP CHILD PREDATORS

Friday, November 12, 2021

(Remotely Reported)

        VIDEOTAPED ORAL DEPOSITION OF STACIE D.

RUMENAP, produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled

and numbered cause on Friday, November 12, 2021, from

12:01 p.m. to 1:35 p.m., before Debbie D. Cunningham,

CSR in and for the State of Texas, remotely reported via

Machine Shorthand, pursuant to the Federal Rules of

Civil Procedure.

**Page 2**

```
 1              APPEARANCES
 2
 3  FOR PLAINTIFFS:
 4    LEHOTSKY KELLER
        919 Congress Avenue, Suite 1100
 5      Austin, Texas  78701
 6      By:  Todd Disher, Esq.
             todd@lehotskykeller.com
 7             AND
             Jeremy Maltz, Esq.
 8           jeremy@lehtosykeller.com
 9
10  FOR DEFENDANT:
11    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
        General Litigation Division
12      P.O. Box 12548
        Austin, Texas  78711-2548
13      (T) 512.463.2120
        By:  Benjamin Walton, Esq.
14           benjamin.walton@oag.texas.gov
               AND
15           Courtney Corbello, Esq.
             courtney.corbello@oag.texas.gov
16
17
18  VIDEOGRAPHER:
19    Brian Christopher
20
21
22        --ooOoo--
23
24
25
```

**Page 3**

```
 1              INDEX
 2  APPEARANCES                    2
 3
 4  EXAMINATION OF STACIE D. RUMENAP:
 5  BY MR. WALTON                  6
 6  BY MR. DISHER                 52
 7  BY MR. WALTON                 53
 8
 9
10  REPORTER'S CERTIFICATION      59
11
12        --ooOoo--
```

**Page 4**

```
 1              EXHIBIT INDEX
 2  Exhibit Number    Description          Page
 3  Exhibit 1   Rumenap Declaration        23
 4  Exhibit 2   House Bill 20              53
 5
          --ooOoo--
```

**Page 5**

```
 1  (Friday, November 12, 2021, 12:01 p.m.)
 2          P R O C E E D I N G S
 3      THE REPORTER:  Today's date is Friday,
 4  November 12, 2021.  The time is 12:01 p.m. Central
 5  Standard Time.  This is the videotaped oral deposition
 6  of Stacie Rumenap, President of Stop Child Predators;
 7  and it is being conducted remotely.  The witness is
 8  located in Washington, DC.
 9      My name is Debbie Cunningham, CSR
10  Number 2065.  I am administering the oath and reporting
11  the deposition remotely by stenographic means from
12  Austin, Texas.
13      Would Counsel please state their
14  appearances and locations for the record, beginning with
15  Plaintiffs' Counsel?
16      MR. DISHER:  Yes.  This is Todd Disher.
17  I am in Washington, DC; and I have Jeremy Maltz with me
18  today, who is in Falls Church, Virginia.
19      MR. WALTON:  This is Ben Walton for the
20  Defendant.  I am from the Attorney General's Office.  I
21  am physically present in Austin, Texas.  With me is also
22  Courtney Corbello, who is also physically present in
23  Austin, Texas.
24                        *
25                        *
```

6

1              STACIE RUMENAP,
2     having been duly sworn, testified as follows:
3              EXAMINATION
4 BY MR. WALTON:
5     Q.   Could you please state your name for the
6 record?
7     A.   Stacie Rumenap.
8     Q.   Is it Rumenap or "Rumenap"?
9     A.   "Rumenap." My father used to always say: You
10 take a shot of rum, and then you need a nap. "Rumenap."
11    Q.   Okay. I love it. I got it. Okay. That's a
12 great way to start a Friday afternoon.
13        So, Ms. Rumenap, have you ever given a
14 deposition before?
15    A.   I have not.
16    Q.   Okay. All right. Well, welcome to the
17 wonderful world of depositions. I'm sure that your
18 attorney has probably gone over some of the basic ground
19 rules with you; but I want to go ahead and voice a few
20 of those ground rules, just so we make sure we're all
21 operating from the same set of expectations here.
22        So, first of all, you understand that
23 you've just been placed under oath; and that obligates
24 you to tell the truth just as if you were in front of a
25 live courtroom with a judge and a jury. Do you

7

1 understand that?
2     A.   I do.
3     Q.   And the court reporter, Ms. Cunningham, is
4 taking down everything that is said; but she's not
5 taking down all of our, you know, body language. So if
6 you're going to answer a question or respond to a
7 question, please do so verbally instead of simply by
8 head motions, using words like "yes" or "no" that will
9 appear clearly on a transcript so that we actually have
10 a written record of our dialogue today. Is that all
11 right?
12    A.   Yes.
13    Q.   And on that note, since the court reporter is
14 taking down everything that's being said, it makes her
15 job a lot easier if only one person is talking at a
16 time. So I will try to not interrupt. I know sometimes
17 there are pauses and glitches due to the remote format;
18 but I will do my best not to interrupt you and to let
19 you finish answering a question before I jump in with
20 another one. But if at any point I do that
21 inadvertently, then, please, you know, do something to
22 signal at me to let me know that I did interrupt you;
23 and I will stop speaking and let you finish whatever it
24 is you're saying. And then, if you would wait for me to
25 finish asking my question before you start answering,

8

1 that will help keep things clean for the court reporter.
2 Does that sound fine to you?
3     A.   Yes.
4     Q.   Okay. If at any point you don't understand my
5 questions today, please do ask me to clarify because I
6 want to make sure that we're not talking past each
7 other. I want to make sure that we're both on the same
8 page and we're understanding one another clearly so that
9 we can actually be efficient and productive today. So
10 if I ask something and you're not sure, just ask me to
11 clarify; and I'll be happy to work with you and make
12 sure we're on the same page. Okay?
13    A.   Yes.
14    Q.   And then if at any point you would like to
15 take a break, you are more than welcome to do so. If
16 I've asked a question, then after you've answered the
17 question, you can simply say, "Hey, I'd like to take a
18 break now," and we will do that. All right?
19    A.   Okay.
20    Q.   Let's see. So getting that out of the way, my
21 first question for you is: What did you do to prepare
22 for your testimony here today?
23    A.   So I have 15 years experience in child safety
24 advocacy, so I thought through a lot of what I have
25 learned through those 15 years. I read through my

9

1 declaration, which I have in front of me. I pulled the
2 New York Times article which I sourced in the
3 declaration; and, of course, I talked to my attorney,
4 Todd.
5     Q.   Okay. Other than your attorney, did you talk
6 to anybody else as part of preparing for your deposition
7 today?
8     A.   No.
9     Q.   Okay. Other than that, other than your
10 declaration and the New York Times article you
11 mentioned, did you review any other documents in
12 preparation for your deposition today?
13    A.   No -- well, sorry. The bill, HB 20, I guess.
14    Q.   Okay.
15    A.   Right, yes.
16    Q.   All right. All right. That's a good
17 clarification.
18        And then, outside of those documents,
19 along with the bill, the text of HB 20 itself, are there
20 any other documents that you looked at to get ready for
21 today?
22    A.   I did not.
23    Q.   Okay. I guess before we get into your
24 declaration, which is where I want to spend most of our
25 time, asking you about that declaration; but before we

10

1  get into that, can you give me a brief description of
2  your history with Stop Child Predators?  How did you get
3  involved with that organization?
4      A.  So almost 20 years ago, I was approached by a
5  law professor, who I knew, who had come out of the
6  Department of Justice.  He was an Assistant Attorney
7  General under General Ashcroft, so quite some time ago.
8  He was starting a law firm.  He was a professor at
9  Georgetown Law.  He was also starting his own law firm,
10  and he was approached by a client of his to start a
11  child safety organization.
12          And the premise behind the client, who
13  had no recollection about any of these laws or this
14  issue, he and his wife had six children of their own.
15  And he had watched in 2005 the horrific story play out
16  on national media around Jessica Lunsford; and Jessica
17  was a nine-year-old girl in Florida who was abducted by
18  a twice-convicted sex offender and was captured, raped
19  repeatedly, kept alive for about three days, and
20  ultimately buried alive.  And the story just received a
21  tremendous amount of attention.
22          Cary and his wife were living in
23  California at the time and had become successful in the
24  college loan industry; and they decided:  You know, if
25  something like this had happened to one of our six

11

1  children, our lives would be destroyed.  We wouldn't
2  know what to do.
3          And so they decided they were going to
4  take some of the success that they had and start their
5  own group and they looked around at places like
6  National Center for Missing and Exploited Children to
7  see if they could have an impact there, but they felt
8  like NCMEC is -- was and still is a well-oiled machine
9  and doing incredible work.  And what they wanted to do
10  was something a little more scrappy.  They wanted a
11  small organization that they felt like they could really
12  see the impact.
13          And when they talked to this law
14  professor, whom I knew, he said:  Well, listen, I'm
15  starting this law firm and I'm teaching and I, you know,
16  just came out of DOJ and I'm doing all these things.  I
17  can't take on this project, but I know this woman and
18  let me see if she would be interested in taking it on.
19  And so we sat down and they had already started the
20  entities, just from a legal perspective, the (c)(3) and
21  the (c)(4) entities; but they hadn't figured out what to
22  do with the organization.
23          And so a group of us got together and
24  said:  Well -- again, this is 2005; now we're going into
25  early 2006.  And at that time there weren't a lot of

12

1  laws really on the books that dealt with tough penalties
2  or electronic monitoring of sex offenders.  That
3  technology itself in the criminal justice system was
4  very new and controversial, as are mandatory sentences;
5  but they felt like when you looked at this story and the
6  case out of Florida in the Lunsford case, the system and
7  the laws that had been on the books had really failed
8  this family.  And so they thought if we started this
9  organization around this idea of passing Jessica's Law,
10  which would deal with mandatory sentencing and
11  electronic monitoring, we thought if we passed this law
12  around the country, that that would solve our problem.
13          And we really were naive at the time to
14  think that that would solve our problem; but that's how
15  we started the organization, with the sole mission of
16  passing this law, state by state.  And so we teamed up
17  with Mark Lunsford, Jessica's father.  I pitched him,
18  saying:  You know, listen, your story has really
19  affected a whole group of us; and we have this very
20  small nonprofit that we want to make a difference.  And
21  I don't know -- at that time, you know, I was telling
22  him I didn't know a lot about child safety; but I knew
23  how to pass bills and I knew how to organize and build
24  coalitions.  And so I made a commitment to him that if
25  he would trust me and he would join forces with us, we

13

1  would take what he was trying to do in Florida -- Texas
2  was an early adopter of Jessica's law -- what he was
3  trying to do in Florida and Texas and we would take it
4  across the country and his daughter's death would not be
5  in vain.  And so we teamed up, and we did that.
6          To this day he is still just an
7  incredible friend and mentor and advisor, an incredible
8  person that I keep in touch with.  He chairs our
9  advisory board.  We traveled the country together over,
10  gosh, probably a decade.  We learned a lot of lessons
11  along the way.
12          We learned the art of compromise.  You
13  know, in the early days we said:  Absolutely not.  If
14  it's not 25 years to life, we won't accept it.  And we
15  sort of learned along the way that, all right, maybe we
16  can start with 20 years; maybe we can start with a
17  second offense, you know.
18          And so we really built out, through Stop
19  Child Predators and through Mark, a coalition where we
20  brought other victims in to tell their stories to the
21  media and to lawmakers in an effort to make change.
22          We talked to law enforcement a lot
23  because what we were finding, especially at the state
24  level, is we were asking law enforcement to enact these
25  sentences or be part of the process on these long

14

1 sentences and the electronic monitoring aspects; but no
2 one was actually getting their input of was it possible,
3 was it enforceable, what would that look like from a
4 criminal justice perspective.
5       And so we really built a big coalition
6 at the state and local levels to rally support and
7 pass these laws.  We have passed Jessica's Law in 46
8 states -- technically all 50, but we -- 47 -- there's a
9 couple, New York being one of them, that we say doesn't
10 go quite far enough.  Even though we've learned to
11 compromise, it doesn't go quite far enough.  But for the
12 most part, we've been able to pass this law across the
13 country.
14       During that time period, because we had
15 the platform and the ability to share these stories, we
16 started working with other victims as well.  Jessica --
17 or -- I'm sorry -- Jenna Quinn down in Texas is a great
18 example.  I don't know if you've ever come across her;
19 but she has a bill, a law, called Jenna's Law that we've
20 worked closely with her on over the years which really
21 focuses on educating educators and people in the school
22 system who have interaction with kids about detecting
23 and trying to prevent signs of abuse.
24       We've teamed up with Erin Runnion out in
25 California and Marc Klaas out in California to look at

15

1 different laws and child safety initiatives there.  And
2 once we started doing this early on in the original
3 days, we realized, you know, one, we were very naive to
4 think we could pass this one law and that would change
5 things; hence, why we started getting involved in other
6 laws.
7       But, two, we really realized this problem
8 was much bigger than just what was happening in the real
9 world; and by 2008, 2009, and 2010 -- it's hard to
10 believe now -- but, you know, the internet was still
11 pretty new.  And talking about what was going on and the
12 impact it had to children and to families and to
13 communities around safety was still pretty new
14 conversation.  Parents didn't grow up at that time with
15 a smartphone, with the technology, with social media
16 platforms.
17       And so we took the same type of energy
18 and process that we put into passing Jessica's Law and
19 Jenna's Law and different laws in the real world, and we
20 started applying them to the internet space.  It was
21 then that we started reaching out to corporate partners
22 and people who -- you know, again, Facebook was new.
23 Google wasn't what it was -- what it is today.  I'm not
24 even sure if I can remember if Apple was even on the map
25 at that point in these very early conversations.  It was

16

1 AOL and CompuServe and, you know, companies that you
2 just don't really hear about these days.
3       And what we were doing is we were really
4 looking at:  Okay.  What is possible in the technology
5 space, and what could we be doing to try to get ahead of
6 these bad actors that were going to try to use this very
7 cool, new innovation and, you know, how were they going
8 to use it to harm children.
9       And so we started looking at bills like
10 cyberbullying, which was pretty new.  The first case was
11 a My- -- you know, if you remember that case of MySpace
12 out of Missouri, if I remember correctly, where an adult
13 woman actually got involved with her teen daughter and
14 her teen daughter's -- like, one of her good friends,
15 they had a falling out; and the mom was bullying this,
16 like, twelve-year-old girl, who ultimately ended up
17 committing suicide.
18       And people were saying:  Well, our laws
19 don't keep up with -- some law was broken.  What do we
20 do with this?  And in the end, it ended up being
21 litigated out of California because MySpace was housed
22 in California, although this issue was in Missouri;
23 and what they ended up prosecuting the mom on was terms
24 of -- terms and condition, right, breaking the terms and
25 conditions of use of service.

17

1       So -- but all of this, again, was just
2 brand-new; and I tell that to show that we didn't know
3 what we know now.  And we were trying to figure out how
4 to get ahead of some of these internet safety issues,
5 luring, grooming, sharing of -- then it was called child
6 pornography -- these images of children, that a lot was
7 being done through peer-to-peer communications and being
8 done in sort of the dark -- early days of the dark web.
9       And so we started talking to educators.
10 We worked with some Attorneys General over the years.
11 We went into schools.  A lot of what we saw in those
12 early days was the AG's Office was partnering with
13 school systems to actually teach internet safety in the
14 schools and working together.  And so we went down to
15 Florida, where then it was Bill McCollum, again, a very
16 long time ago; but we -- I can't remember if we came to
17 Texas.  We went out to California.  We went to North
18 Carolina.  We were up in Pennsylvania and Ohio, anywhere
19 who would take us, really, right?
20       We were just putting information out and
21 trying to say:  Hey, we want to do these trainings,
22 especially for parents because parents didn't really
23 know exactly what their kids were doing online; and they
24 didn't understand the capabilities of the internet.
25 And, you know, when they were handing their kid a phone,

18

1 they didn't necessarily understand the power that that
2 phone had. It wasn't just making phone calls, but it
3 was a way to play games. It was a way to get onto
4 social media. It was a way to connect with one another.
5         And so those early days is what launched
6 us into this internet safety space and really
7 collaborating with other nonprofits and advocacies, law
8 professors, industry, lawmakers, and law enforcement;
9 that has taken us all the way through to today.
10    Q.  So --
11        MR. DISHER:  Stacie, let me -- sorry,
12 Ben. So Debbie doesn't, you know, come through the
13 computer and strangle me, I would just ask if you could
14 just slow down just a little bit.
15        THE WITNESS:  Sorry.
16        MR. DISHER:  She's trying -- I know she's
17 getting --
18        THE WITNESS:  Sorry, Debbie.
19        MR. DISHER:  I know she's getting all of
20 what you're saying; but, you know, if we go for two
21 hours like that, her fingers might catch on fire.
22        THE WITNESS:  Noted.
23    Q   (BY MR. WALTON)  Thank you, Ms. Rumenap, that
24 was helpful, a helpful overview.
25        At this point, you know, what laws are

19

1 out there, either that you've been involved in helping
2 to lobby for and pass; but what would you describe as
3 the state of -- you know, with this online material
4 that's dangerous to children, et cetera, and sexual
5 predators, what laws are out there?  How far do they go?
6        MR. DISHER:  Objection, form.
7        Go ahead and answer.
8    A.  There are a lot of laws that are protecting
9 children and a lot more that needs to be done.  We have
10 the laws, like, the PROTECT Act, the Adam Walsh Act,
11 Jessica's Law, which I mentioned, Erin's Law, Jenna's
12 Law, where there's a theme of so many of these laws
13 being written about abducted and missing and harmed and
14 exploited and murdered children.  There's too many of
15 them, frankly.
16        There are current debates around
17 Section 230.  There's certainly laws on the books around
18 child sexual abuse images.  It depends if at the state
19 or federal level, but the list is very long and
20 exhaustive and I couldn't tell you every single law.
21    Q.  I wasn't asking for that, just a general
22 setting of the stage, which I think you did nicely.  So
23 thank you.
24        What is -- we'll go ahead and get into
25 your declaration here soon; but since you mentioned

20

1 Section 230, I'm kind of curious what is SCP -- by the
2 way, when I say "SCP," I will be referring to Stop Child
3 Predators, the organization of which you are the
4 President.  Do you understand that?
5    A.  Yes.
6    Q.  Okay.  So SCP, does it have a position
7 regarding Section 230?
8        MR. DISHER:  Objection, form.
9        Go ahead.
10    A.  Our organization has tried to bridge the
11 conversation between tech industry, lawmakers, law
12 enforcement, and child safety advocates to bring
13 awareness and education to all people involved.  That
14 has been our position.
15    Q.  (BY MR. WALTON)  Okay.  So do you take a
16 position regarding whether Section 230 is a good law or
17 a bad law?
18        MR. DISHER:  Objection, form.
19    A.  We believe that Section 230 is outdated and
20 that there could be some reforms, but we also believe
21 that Section 230 is valid and needed.  And we don't have
22 a perfect answer of how you address the concerns around
23 Section 230.
24    Q.  (BY MR. WALTON)  Okay.  What are some of SCP's
25 concerns with Section 230 as it currently stands?

21

1        MR. DISHER:  Objection, form.
2        Go ahead.
3    A.  We believe that internet safety companies and
4 platforms that allow for user-generated content should
5 not be solely held responsible for the users' generated
6 content.  We think that internet companies have a role
7 to play in keeping its users safe, but they are not
8 solely responsible for content on their platform.
9    Q.  (BY MR. WALTON)  So how would you suggest
10 updating or amending Section 230 in order to reflect
11 those concerns?
12        MR. DISHER:  Objection, form.
13    A.  I think that internet companies do a lot to
14 try to keep children safe and we applaud their efforts
15 in doing that and there's always more that can be done.
16    Q   (BY MR. WALTON)  Do you believe that -- do you
17 believe that it would be appropriate to have affirmative
18 regulations in place requiring internet service
19 providers, platforms, et cetera, to implement specific
20 content moderation policies when it comes to CSAM and
21 other related material?
22        MR. DISHER:  Objection, form.
23    A.  I'm not sure I have an opinion on that.  I
24 think we need internet companies to have a seat at the
25 table and work with child advocates and work with law

22

1 enforcement and lawmakers to keep children safe, but I
2 don't know the ins and outs of how you solve that
3 problem.
4     Q.  (BY MR. WALTON)  But do you believe that it's
5 sufficient to allow the internet providers themselves to
6 develop their own content moderation policies?
7         MR. DISHER:  Objection, form.
8     A.  I am not an expert on the individual companies
9 and what they could or couldn't do of any one company.
10 So I think I don't know that I'm qualified to answer
11 that question.
12    Q.  (BY MR. WALTON)  Okay.  Let's say there were a
13 social media platform that put together their own social
14 media app or whatever they call it these days; but there
15 was a social media company created where users could go
16 on and post stuff and it was not moderated in any way
17 for sexually explicit material, material that would
18 endanger children, et cetera.  Do you think that such a
19 social media platform should be permitted to operate
20 like that, or should they be subject to regulation that
21 requires them to prohibit that sexually explicit
22 material?
23        MR. DISHER:  Objection, form.
24    A.  I mean, that sounds so vague and so just sort
25 of a pie in the sky, I don't -- I don't know how I would

23

1 answer that properly.
2     Q.  (BY MR. WALTON)  Let's go ahead and -- I did
3 this earlier -- so let me go ahead and send through the
4 chat box here a copy of your declaration so that the
5 court reporter can have it to mark it as an exhibit and
6 we can all make sure that we're operating off of the
7 same document as we walk through the declaration.  So if
8 you will give me just a second, I will send that.
9         Okay.  I have just sent through the chat
10 box a document entitled 12-6 Rumenap Declaration, and I
11 will ask the court reporter to mark that as Exhibit 1 to
12 this deposition.
13        (Exhibit 1 marked.)
14    Q.  (BY MR. WALTON)  Ms. Rumenap, are you able to
15 download or open that document?
16    A.  I am not, but I have it in front of me.
17        MR. WALTON:  Mr. Disher, are you able to
18 access the document I just sent in the chat?
19        MR. DISHER:  Yes, I got it.
20        So, Stacie, are you able to open the chat
21 feature?
22        THE WITNESS:  I can open the chat, but
23 it's not just opening.  It's making me save a file.  Is
24 that accurate?
25        MR. DISHER:  Yes.

24

1         THE WITNESS:  Oh, okay.
2         MR. DISHER:  Yeah, download the PDF; and
3 that's going to be your declaration.
4         THE WITNESS:  Too many things open on my
5 computer here.  There we go.
6     A.  Okay.  I've got it.
7     Q.  (BY MR. WALTON)  Okay.  And very briefly, I'm
8 going to share my screen just so that we can make sure
9 that we're all operating off of the same document.
10        Let's see.  Ms. Rumenap, can you see the
11 document that I have on my screen now?
12    A.  I can.
13    Q.  Okay.  And is this the same document that you
14 just opened through the chat box from what you can tell?
15    A.  Yes, sir.
16    Q.  Okay.  And this looks like your declaration
17 that you submitted in support of Plaintiffs' Motion for
18 Preliminary Injunction in this lawsuit?
19    A.  Yes.
20    Q.  Okay.  I'm going to go ahead and just let each
21 of us keep the document open and scroll through it
22 however you'd like to, but that's the document that I'll
23 be walking us through through most of the remainder of
24 our time here this afternoon.
25        First, a couple of general questions.

25

1 How did you decide to submit this declaration?
2     A.  I was watching what was happening in the
3 debate in Texas.  This similar debate has come up in
4 other states.  We have followed that as well and have
5 weighed in, and so I had an opportunity to weigh in and
6 decided to do so.
7     Q.  In what other states have you weighed in?
8     A.  Florida.  California had a bill sort of like
9 this years ago.
10    Q.  And then you mentioned Florida.  Was that more
11 recently?
12    A.  It was.
13    Q.  Did you submit a declaration in the California
14 case?
15    A.  No, I submitted testimony.  I went and
16 testified before the Legislature.
17    Q.  I see.  Did the California Legislature end up
18 passing the bill at hand?
19    A.  They did not.
20    Q.  Did Florida pass a roughly similar bill?
21    A.  Yes.
22    Q.  And did you submit any testimony to the
23 Florida Legislature regarding that bill?
24    A.  I did a similar declaration to this.
25    Q.  And was that similar declaration submitted to

26

1 the Legislature or to a court?
2    A.  To a court.
3    Q.  And it was submitted to a court.  Was that in
4 a lawsuit over the bill the Florida Legislature had
5 passed?
6    A.  Yes.
7    Q.  Did you can provide any live testimony in the
8 Florida case?
9    A.  I did not.
10    Q.  Did anyone help you draft this declaration?
11    A.  No.
12    Q.  Did you discuss this declaration with anyone
13 else while you were preparing it?
14    A.  No.
15    Q.  All right.  Let's go ahead -- let's look at
16 Paragraph 1.  We've already talked a lot about SCP, the
17 organization that it is.  So I may not have a lot of
18 specific questions; but starting, I guess, on page 2 of
19 the PDF file, Paragraph 1 of your declaration, are you
20 able to see that?
21    A.  Yes.
22    Q.  Okay.  SCP, Stop Child Predators, is that
23 organization an e-mail service provider?
24    A.  No.
25    Q.  Is it a social media platform?

27

1    A.  No.
2    Q.  Does it control or administer a social media
3 platform?
4    A.  No.
5    Q.  And does it control or administer an e-mail
6 service provider?
7    A.  No.
8    Q.  Have there been any conversations at SCP about
9 any way in which SCP would be required to change any of
10 its current operations in order to comply with HB 20 if
11 HB 20 went into effect?
12        MR. DISHER:  Objection, form.
13    A.  No.
14    Q.  (BY MR. WALTON)  As you sit here today, are
15 you aware of any requirements that HB 20 would put upon
16 the operations of SCP if it went into effect?
17    A.  No.
18        MR. DISHER:  Objection, form.
19    Q.  (BY MR. WALTON)  How is SCP funded?
20        MR. DISHER:  Objection, form.
21        Go ahead.
22    A.  It is funded through private donations,
23 through foundations, most individual donors, and some
24 industry support.
25    Q.  (BY MR. WALTON)  Do you receive funding from

28

1 any social media platforms?
2    A.  Usually we're not required to disclose where
3 our funding comes from, but I will tell you "no."
4    Q.  Okay.  And then the same question:  Do you
5 receive any funding from any e-mail service providers?
6    A.  I do not.
7    Q.  Okay.  Let's see.  I want to jump down, for
8 the sake of time, to Paragraph 5; and that would be on
9 the next page, page 3 of the PDF file.  But Paragraph 5
10 in your declaration, are you able to see that paragraph?
11    A.  Yes.
12    Q.  It says that, "We work with leading online
13 platforms."  What does that refer to?
14    A.  So over our 15 years of operations, we have
15 worked with National Center for Missing and Exploited
16 Children.  We've worked with law enforcement.  And we
17 have worked with companies like Google and Facebook to
18 better understand the back-end operations of internet
19 safety as it applies to sexual abuse images.
20    Q.  Okay.  You talk in Paragraph 5 about
21 developing and enforcing safety policies.  So with what
22 companies -- well, let me be more specific.  Have you
23 worked -- has SCP worked with any social media platforms
24 to develop and enforce safety policies that prioritize
25 children's safety?

29

1    A.  We have had conversations about how best to do
2 this, best practices, primarily at task force meetings,
3 conferences, summits around child safety.
4    Q.  Okay.  What specifically do you encourage
5 social media platforms to do in order to enhance their
6 safety policies for children's safety?
7        MR. DISHER:  Objection, form.
8    A.  We can't tell any one company how to run their
9 business or what they should do.  Our hope is that we
10 can work in partnership with law enforcement, industry,
11 and child safety advocates to put as much -- as many
12 resources as possible behind the prevention of child
13 exploitation.
14    Q.  (BY MR. WALTON)  Okay.  So SCP encourages them
15 to put resources behind prevention.  Does -- I guess I'm
16 confused by when you say "develop and enforce safety
17 policies."  Are there specific things that SCP wants to
18 see in those policies?
19    A.  In those policies we're looking for things
20 like how do we prevent the proliferation of these
21 images.  You know, this New York Times article points to
22 a few years ago there being 45 million images and videos
23 being reported from these companies.  We know the
24 numbers are much higher than that.  It's a real problem.
25        We don't have enough law enforcement to

Stacie Rumenap – 11/12/2021

30

1  handle the issue.  We don't have enough people in
2  industry to do it.  We certainly don't have enough
3  people at an organization like mine or others to be able
4  to fully prevent this from happening.
5          Every one of these images is a child
6  being exploited and abused; and every time that image is
7  shared, a child is re-victimized.  What we try to do is
8  bring really smart people and technical people together
9  to say:  What can we do to monitor this, to prevent it,
10  and to get rid of it?
11     Q.  And just to clarify -- these may be double
12  questions; they may not be -- but when we're talking
13  about these images and material, are you referring to
14  child sexual abuse material?
15     A.  Correct.
16     Q.  And is that abbreviated with the acronym CSAM?
17     A.  It is.
18     Q.  And is that an acronym that SCP came up with?
19     A.  No.
20     Q.  Okay.  Is this an acronym that's generally
21  recognized in the law enforcement world?
22     A.  Yes.
23     Q.  Okay.  Is CSAM illegal?
24          MR. DISHER:  Objection, vague -- or
25  excuse me.  Objection, form.  Sorry.

31

1     A.  Yes.
2     Q.  (BY MR. WALTON)  Okay.  I just wanted to
3  clarify, you know.  If there's any CSAM out there that's
4  actually not illegal, you know, we should talk about
5  that.
6          And, there again, just to try to be
7  clear, does SCP advocate the removal of all CSAM from
8  internet websites?
9     A.  Yes.
10     Q.  Gotcha.  Okay.  Let's skip down to
11  Paragraph 7, which is at the top of Page 4 in my
12  document.  Are you able to see Paragraph 7 of your
13  declaration, Ms. Rumenap?
14     A.  Yes.
15     Q.  And I think you alluded to this earlier in one
16  of your answers, but you mentioned the government's
17  limited resources.  You say that these -- let me just
18  read the first sentence, and then I'll ask you about it.
19  "The government's limited resources underscore the
20  critical importance of private moderation and filtering
21  technologies."  What are private moderation and
22  filtering technologies?
23     A.  So different companies have different --
24  different capabilities, different technologies.  You can
25  have on your phone or your laptop or your, you know,

32

1  gaming devices different filters to allow for parental
2  controls, to allow for, you know, opportunities for
3  education, for -- for just the ability for parents to
4  have more control and more -- better understanding of
5  what their children are doing when they are online.
6     Q.  The private moderation and filtering
7  technologies that are currently being utilized, do you
8  believe that those technologies are sufficient?
9          MR. DISHER:  Objection, form.
10     A.  I think there's always more that can be done
11  to protect children.
12     Q.  (BY MR. WALTON)  How good of a job do you
13  think those current technologies are doing to protect
14  children today?
15          MR. DISHER:  Objection.  Objection, form.
16     A.  I think without them, we'd see an even worse
17  problem of child predation online.
18     Q.  (BY MR. WALTON)  That second sentence there
19  says that, "In order to detect CSAM, as well as to
20  report it to authorities, online companies must develop
21  and use advanced algorithms and other screening tools."
22  Is CS- -- is SCP -- I'm using way too many acronyms here
23  today.  Is SCP involved in developing advanced
24  algorithms and other screening tools?
25          MR. DISHER:  Objection, form.

33

1     A.  We are not engineers or computer scientists
2  who can develop algorithms; but we have worked hand in
3  hand, we have seen firsthand these companies work with
4  law enforcement, with child safety organizations to try
5  and better understand the problems in an effort to try
6  and prevent the problem.
7     Q.  (BY MR. WALTON)  What do you mean by "other
8  screening tools"?
9     A.  So, look, it's more than just child sexual
10  abuse images.  That is fairly straightforward.  But
11  there are other issues and tactics that predators use,
12  things like grooming, things like luring, you know, age
13  detection.  You know, you see in chat rooms these
14  predators.  They're savvy and they're keeping up with
15  what the laws and what the rules are.  They're keeping
16  up with what the companies are doing.
17          And it's why it's so important to have
18  the partnership, to look ahead and try to figure out the
19  best way to remove these images and to prevent these
20  crimes from happening and to make sure that we have
21  tough penalties when the crime does happen, as a
22  deterrent.  It's much more difficult to catch and
23  monitor luring and grooming crimes, especially if it's
24  someone lying about their age, lying about who they are.
25     Q.  So when private companies are able to gather

34

1  information like this, do you believe that that
2  information can be passed on to law enforcement?
3          MR. DISHER:  Objection, form.
4      A.  We know that they pass that information on to
5  law enforcement.
6      Q.  (BY MR. WALTON)  Is that a good thing?
7      A.  Yes.
8      Q.  Okay.  Let's go to Paragraph 8.  And here's
9  where we start getting into HB 20.  It says that, in
10  Paragraph 8 of your declaration, "If House Bill 20 is
11  allowed to go into effect, we are concerned it will be
12  harder to remove objectionable content online and to
13  keep children safe online."  What do you mean when you
14  say "we are concerned"?
15     A.  Well, we are confident that HB 20 injects
16  questions.  It's very vague, and we are very concerned
17  that -- there are just concerns of how platforms could
18  monitor the content if this bill were to go into effect.
19     Q.  When you say that you have a concern about
20  something being vague, what specifically do you believe
21  is vague?
22     A.  I think the bill is vague on the role of what
23  these platforms would need to do.
24     Q.  How do you believe HB 20 would make it harder
25  to remove objectionable content?

35

1      A.  I'm sorry.  Can you repeat the question?
2      Q.  Yeah, sure.  How do you believe that HB 20
3  will make it harder to remove objectionable content
4  online?
5      A.  I'm concerned that what it would do is it
6  would require groups like mine to be responsible for
7  reporting.  It would restrict and prohibit these
8  companies from removing content.  I'd be concerned
9  there'd be a fear, that they would be afraid of
10  lawsuits themselves and that, as a result, they
11  wouldn't be able to sufficiently monitor.
12         You know, look, they monitor.  I think
13  they do a lot of good.  I think they could still be
14  doing more.  The problem is just so prevalent,
15  they're -- they're -- you could spend, you know, teams
16  and teams and teams of people to be looking for this
17  objectionable content and trying to remove it; and it
18  still wouldn't be enough.
19     Q.  What are your concerns based on?  What I mean
20  by that is, if you're concerned that social media
21  platforms, these internet companies, you know, would
22  stop what they're currently doing or diminish what
23  they're currently doing to monitor objectionable
24  content, why do you believe that?
25         MR. DISHER:  Objection, form.

36

1      A.  I think that this law as written, the intent
2  is good; but it is too vague.  And I just don't think
3  that these companies could comply and that it would be
4  enforceable and it would -- it could cause real problems
5  to safety and to more children being harmed.
6      Q.  (BY MR. WALTON)  Have you had any
7  conversations with social media platforms regarding how
8  they would or would not change their practices if HB 20
9  went into effect?
10         MR. DISHER:  Objection, form.
11     A.  I have not.
12     Q.  (BY MR. WALTON)  Have you had any
13  conversations with e-mail service providers regarding
14  how they may or may not change their practices were they
15  required to comply with HB 20?
16     A.  I have not.
17     Q.  Okay.  Let's go down to Paragraph 10.  The
18  first sentence in Paragraph 10 says, "Similarly, HB 20's
19  disclosure requirements give child predators a roadmap
20  to escape detection."  What does that mean?
21     A.  It's my experience, especially working closely
22  with law enforcement, that predators are savvy.  They
23  know about technology.  They know what laws are being
24  passed.  They share information about how to try to get
25  around detection in an effort to post images and to

37

1  reach children; and I worry with these disclosure
2  requirements that any information we'd be requiring
3  these companies to put out is just another roadmap,
4  another tool that these predators would have to be able
5  to get around detection.
6      Q.  I'm assuming that you've read the disclosure
7  requirements that HB 20 lays out --
8      A.  Yes.
9      Q.  -- is that fair?
10     A.  Yes.
11     Q.  What is it about the material that HB 20
12  would require internet companies to disclose that you
13  are concerned about?
14         MR. DISHER:  Objection, form.
15     A.  I worry that it ties the companies' hands.  I
16  think anytime you're asking them to put out information,
17  all except maybe the very specific algorithm they use to
18  detect such images, the more information they make
19  available to the general public, the people who are
20  already trying to do children harm, the worse off that
21  children and families are.
22     Q.  (BY MR. WALTON)  Are you able to give me an
23  example of the specific type of information that a
24  predator would use to escape detection in specific
25  circumstances?

---

38

1          MR. DISHER:  Objection, form.
2      A.  I can tell you a story about 2008, 2009, when
3  we were first launching Stop Internet Predators, which
4  is a project to stop child predators, really was
5  focusing our efforts around internet safety; and one of
6  the main concerns that we had then was Google Street
7  View.  Google Street View, when it first came out, was a
8  very cool, innovative technology to allow people to
9  really see the whole world, right, street by street,
10  house by house.
11          What it did not do is cover or blur or in
12  any way, in the early version, any photos of children,
13  of families, someone getting out of their car, license
14  plate numbers.  It did not -- a swing set in someone's
15  backyard, a homeless shelter, or a rape counseling
16  center, a child -- children's advocacy center, any of
17  these types of places were all put out for anyone to
18  see.
19          What we were very concerned about at the
20  time is with very basic Google searches, you could look
21  out on Google, look out on Facebook, kids are putting
22  information out there about themselves; and someone who
23  was savvy could take their picture, could take their
24  address, could find things -- maybe they had posted
25  something for sale on Craigslist; maybe they had

---

39

1  something about a vacation on Facebook, harmless
2  information.  But when all that information, all of that
3  data is collected by the wrong person, we were very
4  concerned that a predator could take that information
5  and literally pinpoint where that child lived in the
6  house, where that child went to school, at least with
7  some very best guesses, how they got to school, the time
8  of day, maybe, when their parents came home from work.
9          When you are talking about so many
10  millions and millions of data points out for anyone to
11  be able to see, people who are trying to harm children,
12  these bad actors, they will stop at nothing to try and
13  get the information and figure out a way just around
14  detection.
15      Q.  Yeah.  So if I'm understanding you correctly,
16  that example you described was an example of how if
17  predators are able to have access to specific
18  information, they can put the pieces of the puzzle
19  together in order to harm people.  My question was more
20  specifically about the disclosure requirements of HB 20.
21          So if a social media platform were to
22  disclose what HB 20 requires them to disclose, how would
23  that specific technical information enable a predator to
24  escape detection?
25          MR. DISHER:  Objection, form.

---

40

1      A.  I think any kind of disclosure requirements
2  that are going to make it easier for a bad actor to
3  commit a bad act is something that we should be getting
4  away from.
5      Q.  (BY MR. WALTON)  Gotcha.  Okay.  So how does
6  the information that HB 20 requires be disclosed, how
7  does that help a bad actor?
8          MR. DISHER:  Objection, form.
9          Go ahead and answer.
10      A.  Bad actors are trying to circumvent the
11  process and trying to circumvent detection every chance
12  they get.  Any kind of bill, whether it's HB 20 or some
13  other bill that is going to force the hands of the
14  platforms of the technology companies to talk publicly
15  or disclose any kind of information about the inner
16  workings of how they create these algorithms and what
17  they do to try to combat this problem is giving a hand
18  up to the predators.
19      Q.  (BY MR. WALTON)  The -- so I -- let me back
20  up.  And there are -- let's see if we can do it this
21  way.  There are certain social media platforms that
22  disclose, at least to their users, a certain amount of
23  information about the way they collect and moderate
24  their content.  Would you agree with that?
25          MR. DISHER:  Objection, form.

---

41

1      A.  I'm not sure how that fits into HB 20 or the
2  declaration that I have drafted.
3      Q.  (BY MR. WALTON)  Sure.  I'm just -- I'm trying
4  to understand -- there are -- there are some of the ways
5  in which social media platforms moderate content that
6  they have affirmatively decided to disclose to their
7  users.  Are you familiar with that?
8          MR. DISHER:  Objection, form.
9      A.  What type of information are you asking about?
10      Q.  (BY MR. WALTONJ)  Well, just generally, are
11  you familiar with any social media platforms that give
12  disclosures to their users about how they moderate and
13  use content that their users decide to post on their
14  platform?
15      A.  Yes.
16      Q.  Okay.  Do you believe that there's anything in
17  what is currently being disclosed that is too much, that
18  helps enable predators to escape detection?
19          MR. DISHER:  Objection, form.
20      A.  I don't know that I have an opinion on that.
21      Q.  (BY MR. WALTON)  Okay.  Paragraph 11, the
22  first sentence there says, "Likewise, HB 20's onerous
23  obligations for account and content removal will likely
24  cause online platforms to moderate less aggressively."
25  What is your basis for saying that?

---

42

1    A.  If you are -- I think if you are asking these
2  companies to -- to not moderate content, that we are
3  opening ourselves up to more illicit material becoming
4  available online.  I want these companies to do more to
5  block this type of content.  I think they do a lot.  I
6  think they could do more.  I don't know exactly what
7  more they could do, but I think they could do more.
8    Q.  Have you -- maybe this will help provide some
9  clarity here:  Have you had any discussion with
10 companies that offer social media platforms regarding
11 what they would or wouldn't do if HB 20 went into
12 effect?
13      MR. DISHER:  Objection, form.
14    A.  No.
15      MR. WALTON:  Okay.  Let's see.  We've
16 been going for almost an hour.  How about we go ahead
17 and take a ten-minute break?
18      MR. DISHER:  Sure.  That's fine.
19      THE REPORTER:  We're going off the record
20 at 12:56 p.m.
21      (Off the record from 12:56 to 1:10 p.m.)
22      THE REPORTER:  We're back on the record
23 at 1:10 p.m.
24    Q   (BY MR. WALTON)  Ms. Rumenap, we are back
25 after a brief break.  Are you ready to proceed with your

43

1  deposition?
2    A.  I am.
3    Q.  All right.  I believe we had left off around
4  Paragraph 11 or 12 in walking through your declaration.
5      Let me ask you a question that's not
6  explicitly related to Paragraph 12.  Are you aware,
7  generally, that HB 20 permits social media platforms to
8  sensor material that is illegal?
9      MR. DISHER:  Objection, form.
10    A.  Yes.
11    Q   (BY MR. WALTON)  Okay.  Going to Paragraph 15,
12 I'm now on the last page of your declaration.
13      Oh, oops.  I got ahead of myself.
14 Paragraph 14 -- sorry -- still on the last page.  You
15 refer to "programatic efforts we have helped develop."
16 What are those?
17    A.  Primarily, we have worked with social media
18 companies with their government affairs teams, some with
19 their engineers, to better understand algorithms and
20 what processes are in place to be able to detect and
21 prevent this proliferation of sexual abuse images of
22 children.  What we have done is we have worked with
23 advocates and victims and parents of victims to really
24 do a deep dive of how their stories came to be, what
25 types of pitfalls did their children find themselves in

44

1  when they were exploited, to be able to share those
2  stories with social media companies for them to
3  understand the problem and to be part of coming up with
4  a solution.
5    Q.  Was SCP involved in developing any algorithms
6  as part of those efforts?
7    A.  No.
8      MR. DISHER:  Ob- -- never mind.  Go
9  ahead.
10    Q.  (BY MR. WALTON)  And when you say in the last
11 phrase there, "the covered 'social media platforms,'"
12 what are you referring to?
13    A.  Major internet companies.
14    Q.  Can you give any examples?
15    A.  Facebook.
16    Q.  Any other social media platforms?
17    A.  We have worked a lot with local schools on
18 their -- even on their websites and blogs over the
19 years.  People don't always think of a local school blog
20 or a PTO page as being a social media site; but if users
21 are generating content and photos of kids and activities
22 and updates about the school are being generated by
23 parents and by staff, we consider those to be social
24 media platforms.  They certainly don't have the users
25 that a Facebook or Instagram would have, but they

45

1  certainly do have users.  And so we have worked over the
2  years with PTOs and a couple of schools to try to just
3  be more mindful about the type of information that's
4  being posted on these platforms, with an eye, really, to
5  the privacy of the students.
6    Q.  For any of those websites or platforms that
7  are related to local schools, are you aware of any of
8  those sites that have 50 million active users per month?
9      MR. DISHER:  Objection, form.
10    Q.  (BY MR. WALTON)  I'm sorry.  What was your
11 answer?
12    A.  No.
13    Q.  Okay.  That's what I thought.
14      Okay.  Let's go now to Paragraph 15.  I
15 got ahead of myself earlier.  This paragraph says, "We
16 are concerned that the threat of countless lawsuits will
17 lead to under-enforcement of such policies."  What is
18 the basis for that concern?
19    A.  If you are tying the hands of these companies
20 in what they can and cannot moderate, our concern is
21 that the proliferation of child sexual abuse images will
22 be confounded; and as a result, families and individuals
23 and victims and others will sue the companies as part of
24 that.  And we want the companies to be able to do
25 everything they absolutely can to try to take down such

46

1  content and not restrict them in any way or in some way
2  make it -- make it easier for -- "easier" may not be the
3  right word -- make it more difficult for them to be able
4  to be a part of the solution.
5      Q.  Are you aware of anyone who intends to bring a
6  lawsuit under HB 20?
7          MR. DISHER:  Objection, form.
8      A.  I do not.
9      Q   (BY MR. WALTON)  Are you aware of anyone that
10  would bring a lawsuit against a social media platform
11  for censoring CSAM?
12          MR. DISHER:  Objection, form.
13      A.  I do not.
14      Q   (BY MR. WALTON)  You mentioned that you have
15  submitted a declaration in the Florida lawsuit; is that
16  correct?
17      A.  Yes.
18      Q.  How does -- well, does this declaration differ
19  from the Florida declaration?
20          MR. DISHER:  Objection, form.
21      A.  It's similar.
22      Q   (BY MR. WALTON)  Similar.  So I'm assuming,
23  you know, it would have a different date and so forth on
24  it; but as far as the substance, do you recall any
25  substantive differences in your two declarations?

47

1      A.  No.
2      Q.  Okay.  Have you had discussions with anyone --
3  and I'm not asking for discussions with your attorney,
4  okay?  So let's set aside attorney-client discussions.
5  But anyone who's not your attorney, have you had
6  discussions with them about the substance of the Florida
7  law?
8      A.  No.
9      Q.  And then the same thing for HB 20.  Here in
10  Texas, have you had discussions with anyone other than
11  your attorney about the substance of HB 20?
12      A.  I've had very minimal conversation about it
13  when we were writing the -- after we drafted the
14  declaration, to make sure that it was submitted, but not
15  a substantive conversation outside of what I have
16  included in the declaration.
17      Q.  Gotcha.  So your job title, your position
18  title, is President of SCP, right?
19      A.  Right.
20      Q.  Okay.  Does SCP have any other -- I don't know
21  what you would call them -- officers, directors, board
22  members, executive directors, anything like that?
23      A.  Yes.
24      Q.  Okay.  I guess describe for me a little bit
25  the chain there, the setup.  What are those other

48

1  positions called?
2      A.  We have an advisory board.  We also have a
3  board of directors; and then, on occasion, we have a
4  research fellow.
5      Q.  Have you discussed with the advisory board
6  HB 20?
7      A.  Yes.
8      Q.  What does the advisory board think about
9  HB 20?
10          MR. DISHER:  Objection, form.
11          (Simultaneous speakers.)
12          THE WITNESS:  Sorry, Todd.
13      Q.  (BY MR. WALTON)  I'm sorry.  I didn't hear
14  your answer.
15      A.  They are in agreement with the declaration.
16      Q.  Okay.  So they are aware that you submitted
17  this declaration then?
18      A.  Yes.
19      Q.  Other than the advisory board, did you talk to
20  anybody else at SCP about HB 20?
21      A.  No.
22      Q.  What about your declaration in the Florida
23  lawsuit, did you talk to the advisory board about that
24  declaration as well?
25      A.  Yes.

49

1      Q.  And were they in support of you providing that
2  declaration in the Florida lawsuit?
3      A.  Yes.
4      Q.  Did they have a chance to review or comment on
5  your declaration in the Florida lawsuit before you
6  signed it?
7      A.  No.
8      Q.  And did they have a chance to review or
9  comment on your declaration in this case before you
10  signed it?
11      A.  No.
12      Q.  Why is SCP not a plaintiff in this case?
13          MR. DISHER:  Objection, form.
14      A.  We're not a plaintiff simply because we just
15  don't have the staff and the resources to take on a big
16  lawsuit.  This was a way for us to get engaged and be
17  involved in the process and have our opinions known and
18  heard, but we just simply don't have the resources to be
19  able to file a lawsuit.
20      Q.  (BY MR. WALTON)  And if I ask you why you were
21  not a plaintiff in the Florida lawsuit, would your
22  answer be the same?
23      A.  Yes.
24      Q.  Okay.  I thought so.
25          We talked earlier about CSAM.  Are there

50

1 any other types of content that SCP believes would be
2 appropriate for social media platforms to flag and/or
3 remove?
4          MR. DISHER:  Objection, form.
5          Go ahead and answer.
6     A.  Our organization focuses strictly on
7 prevention of child exploitation.  We do not take an
8 opinion on other types of illicit material.
9     Q.  (BY MR. WALTON)  What information does a
10 person, an individual, provide to a social media
11 platform when they set up a user account?
12          MR. DISHER:  Objection, form.
13     A.  So it depends on if it's a child or someone
14 who's over the age of 18 what information is required of
15 them.  I couldn't tell you exactly every piece of
16 information for every social media company that someone
17 has to provide, but typically it is basic information
18 about the person that they can verify they are an actual
19 person.
20     Q.  (BY MR. WALTON)  Do you believe that it's
21 appropriate to have different requirements for a minor
22 to set up a social media account?
23          MR. DISHER:  Objection, form.
24     A.  I do.
25     Q   (BY MR. WALTON)  And why is that?

51

1          MR. DISHER:  Objection, form.
2     A.  Minors' brains just simply haven't developed
3 the way that they do as an adult.  They're not
4 completely cognizant of decisions that they're making,
5 and they don't always do the right thing or know the
6 right thing to do or to say.  When we are talking about
7 internet platforms, it's very easy for someone to say or
8 do things, put information out there about themselves
9 that they might not actually say to someone's face, say
10 or do in front of someone.  And when you're talking
11 about minors, they sometimes just don't know right from
12 wrong.  They don't always make the best decisions; and
13 so restricting some of their access and information that
14 is required or asked of them to make available is a good
15 thing in helping to keep them safe.
16     Q.  (BY MR. WALTON)  Okay.  Sorry.  I'm just
17 looking through my notes here to see if I missed
18 something.
19          All right.  Well, those are all the
20 questions I have at this time.
21          MR. WALTON:  So I will go ahead and pass
22 the witness.
23          MR. DISHER:  All right.
24                    *
25                    *

52

1                    EXAMINATION
2 BY MR. DISHER:
3     Q.  Ms. Rumenap, I just have a few questions for
4 you to clarify some things that I heard.
5          The first thing is in your prior
6 testimony, I heard you make a statement that, "The
7 intent was good."  Now, I want to just clarify for the
8 record, when you said, "The intent was good," were you
9 referring to what you think the intent of HB 20, as a
10 whole, is or what the intent of the specific carveout
11 regarding referrals from agencies like yours is?
12     A.  Thank you for allowing me to clarify that.  I
13 was referencing the intent of the carveout.  The intent
14 of the bill holistically, I do not agree with.  I do
15 agree with the intent of the carveout for allowing
16 groups like mine to be able to report and flag and
17 monitor child sexual abuse images.  I think that intent
18 is good, but that carveout simply doesn't go far enough.
19     Q.  Okay.  Thank you.
20          Now, my last question is regarding CSAM.
21 You have also mentioned material that is, you know,
22 intended to be grooming or somehow other -- you know, in
23 another way predatory towards children.  Would that type
24 of material fall under CSAM, or is that separate from
25 CSAM?

53

1     A.  It is separate from CSAM.
2     Q.  Okay.  Thank you.  Thank you for those
3 clarifications.
4          MR. DISHER:  I have nothing further.
5          FURTHER EXAMINATION
6 BY MR. WALTON:
7     Q.  When you were talking with Mr. Disher about
8 the carveout in terms of your reference to the intent,
9 just for clarification, were you talking about the
10 exception that is contained in -- well, what will be
11 codified as the Texas Commerce Code, Business Commerce
12 Code, Chapter 143A.006(a)(2)?
13          MR. WALTON:  Do I need to throw it up,
14 Todd?
15          MR. DISHER:  Yes.  Thank you.
16          MR. WALTON:  All right.  Just hold on.
17 Just give me a second.
18          Okay.  I've just sent through the chat
19 box a PDF file labeled HB 20, if the court reporter
20 could note that that will be Exhibit 2 to this
21 deposition.
22          (Exhibit 2 marked.)
23     Q.  (BY MR. WALTON)  And, Ms. Rumenap, just let me
24 know when you're able to open that document.
25     A.  I have it opened.

---

**54**

```
1      Q.  All right.  Let me find the specific section
2   to which we are referring.
3           Okay.  In the PDF that I sent, Exhibit 2,
4   it should be on the twelfth page in that PDF document,
5   towards the bottom of page 12.  Do you see Line Number
6   17?
7      A.  Line 17, yes.
8      Q.  Okay.  And that Line 17 starts out with a
9   section number; and the section number is 143A.006,
10  correct?
11     A.  Correct.
12     Q.  And so what -- I believe what you and
13  Mr. Disher were talking about was Section (a)(2), which
14  is just -- begins on Line 22; and so I just wanted to
15  clarify that for the record.  Is that the specific
16  carveout that you say you approve the intent behind that
17  carveout?
18     A.  That is correct.
19     Q.  Okay.  And in the other question, Mr. Disher
20  asked you about CSAM and there being other illicit
21  material.  Okay.  How would you describe that other
22  material that falls outside the scope of CSAM?
23          MR. DISHER:  Objection, form.
24          But go ahead and answer.
25     A.  Well, it's nuanced; and it's hard to explain
```

**55**

```
1   or hard to see.  Typically, this is luring or grooming
2   of a child that can take place over days, weeks, months,
3   years sometimes.
4           We worked with a young woman out of
5   Pennsylvania, Alicia Kozakiewicz.  I don't know if
6   you've ever heard of her story, but she was one of the
7   very first stories to make national attention around a
8   young girl being online, talking to a stranger, someone
9   she thought she knew, someone who lied to her about who
10  she [sic] was; and she agreed to meet him.  Having
11  chatted with him online, she agreed to meet him in
12  person.  And she, fortunately, thanks to the FBI, was
13  rescued but, by all accounts, should have never --
14  should have never made it.
15          This is someone who she thought she knew,
16  she had spent quite a bit of time talking to; and when
17  she went to meet him, she said she knew immediately --
18  she was 14 years old at the time -- that she new
19  immediately, as she got closer to the car, that the
20  person was not who she had thought he was.  She thought
21  she was talking to an 18-year-old boy, at 14.
22          This guy was in his mid 30s and not a
23  good person; and as she turned to run, to try to run
24  back to her house -- she was in her own neighborhood
25  when she met him -- he grabbed her, threw her in the
```

**56**

```
1   trunk, kept her chained to a bed in his apartment for
2   days upon days.  He was posting photos of her of
3   terrible, terrible sex acts that he was committing
4   against her.  He was having friends come in and do the
5   same thing, and he was videotaping it and posting it.
6           And someone in an underground chat was so
7   disturbed by what was happening to this young girl, they
8   anonymously made a tip to the FBI; and the FBI was able
9   to go in and rescue her.  When they walked into the room
10  she was so petrified and she had been so traumatized
11  that she was hiding under the bed with a dog chain
12  around her neck and as far as she could go was under the
13  bed to try to get away from whom she thought was a
14  perpetrator.  It was the FBI.  They were able to rescue
15  her.  It took quite some time to convince her to even
16  come out, to get her out of that house, and then arrest
17  the perpetrator.
18          That is hard to describe.  That is hard
19  to police and monitor and report.  When it started, the
20  conversation between Alicia and this person, she thought
21  she was talking to an 18-year-old boy who was expressing
22  some interest in her.  He received sent pictures
23  of her.  He was telling her how beautiful she was.  She
24  wasn't getting this attention from somewhere else, and
25  she sought it from someone she didn't know.
```

**57**

```
1           That's what goes back to -- not all kids,
2   of course; certainly not all adults are bad -- but kids
3   do and say and post things that they don't necessarily
4   understand what they're doing or saying or who they're
5   even talking to when they're talking online.
6           And so when we're talking about that,
7   this is a story of a young girl who was groomed, was
8   lured into meeting him in person, and is sort of the
9   worst-case scenario.  She was abducted.  She was raped
10  repeatedly.  She was really left for dead had it not
11  been for someone so disgusted by what was happening to
12  actually report the person.  That's the type of thing we
13  are trying to prevent.
14          And we want to make sure that victims
15  have a seat at the table to tell their story so it
16  doesn't happen to another person, that law enforcement
17  has every resource at their disposal, so advocacy groups
18  like mine can try to come up with solutions.  And
19  internet companies can be part of the problem because
20  without all of us involved in the process, kids are the
21  ones who will lose out; and they are the ones who are
22  harmed.
23     Q.  (BY MR. WALTON)  Those grooming activities
24  through social media that took place, those were
25  illegal, right?
```

58

1        MR. DISHER:  Objection, form.

2        Go ahead.

3    A.   At the time when that happened, there were no

4  laws on the books to actually define what luring or

5  grooming online was.

6    Q.   (BY MR. WALTON)  Do those laws exist today?

7    A.   Yes.

8        MR. WALTON:  Pass the witness.

9        MR. DISHER:  I have nothing further.

10  Thank you for your time.

11        THE REPORTER:  Mr. Disher, do you need --

12        MR. WALTON:  We can go off the record.

13        THE REPORTER:  Do you need an expedited

14  copy of the transcript as well?

15        MR. DISHER:  Yes, ma'am.

16        THE REPORTER:  Okay.  This concludes the

17  deposition at 1:35 p.m.

18        (Deposition adjourned at 1:35 p.m.)

19        (Signature not requested.)

20              --ooOoo--

21

22

23

24

25

59

1  STATE OF TEXAS)

2        REPORTER'S CERTIFICATION

3        I, DEBBIE D. CUNNINGHAM, CSR, hereby certify

4  that the witness was duly sworn and that this transcript

5  is a true record of the testimony given by the witness.

6        I further certify that I am neither counsel

7  for, related to, nor employed by any of the parties or

8  attorneys in the action in which this proceeding was

9  taken.  Further, I am not a relative or employee of any

10  attorney of record in this cause, nor am I financially

11  or otherwise interested in the outcome of the action.

12        I further certify that pursuant to FRCP

13  Rule 30(f)(1) that the signature of the deponent was not

14  requested by the deponent or a party before the

15  completion of the deposition.

16        Subscribed and sworn to by me this day,

17  November 14, 2021.

18

19

20

21        _____

          Debbie D. Cunningham, CSR

22

23

24

25

### Numbers

**12-6** 23:10
**12:01** 5:4
**12:56** 42:20,21
**143A.006** 54:9
**143A.006a2** 53:12
**18-year-old** 55:21
  56:21
**1:10** 42:21,23
**1:35** 58:17,18
**2005** 10:15 11:24
**2006** 11:25
**2008** 15:9 38:2
**2009** 15:9 38:2
**2010** 15:9
**2021** 5:4
**2065** 5:10
**20's** 36:18 41:22
**230** 19:17 20:1,7,16,
  19,21,23,25 21:10
**30s** 55:22

### A

**abbreviated** 30:16
**abducted** 10:17 19:13
  57:9
**ability** 14:15 32:3
**able** 14:12 23:14,17,
  20 26:20 28:10
  30:3 31:12 33:25
  35:11 37:4,22
  39:11,17 43:20
  44:1 45:24 46:3
  49:19 52:16 53:24
  56:8,14
**Absolutely** 13:13
  45:25
**abuse** 14:23 19:18
  28:19 30:14 33:10
  43:21 45:21 52:17
**abused** 30:6
**accept** 13:14
**access** 23:18 39:17
  51:13
**account** 41:23 50:11,
  22
**accounts** 55:13

**accurate** 23:24
**acronym** 30:16,18,20
**acronyms** 32:22
**across** 13:4 14:12,18
**Act** 19:10 19:10 40:3
**active** 45:8
**activities** 44:21
  57:23
**actor** 40:2,7
**actors** 16:6 39:12
  40:10
**acts** 56:3
**actual** 50:18
**actually** 7:9 8:9
  14:2 16:13 17:13
  31:4 51:9 57:12
  58:4
**Adam** 19:10
**address** 20:22 38:24
**adjourned** 58:18
**administer** 27:2,5
**administering** 5:10
**adopter** 13:2
**adult** 16:12 51:3
**adults** 57:2
**advanced** 32:21,23
**advisor** 13:7
**advisory** 13:9 48:2,5,
  8,19,23
**advocacies** 18:7
**advocacy** 8:24 38:16
  57:17
**advocate** 31:7
**advocates** 20:12
  21:25 29:11 43:23
**affairs** 43:18
**affected** 12:19
**affirmative** 21:17
**affirmatively** 41:6
**afraid** 35:9
**after** 8:16 42:25
  47:13
**afternoon** 6:12 24:24
**again** 11:24 15:22
  17:1,15 31:6
**against** 46:10 56:4
**age** 33:12,24 50:14
**agencies** 52:11
**aggressively** 41:24
**ago** 10:4,7 17:16

  25:9 29:22
**agree** 40:24 52:14,15
**agreed** 55:10,11
**agreement** 48:15
**AG's** 17:12
**ahead** 6:19 16:5 17:4
  19:7,24 20:9 21:2
  23:2,3 24:20 26:15
  27:21 33:18 40:9
  42:16 43:13 44:9
  45:15 50:5 51:21
  54:24 58:2
**algorithm** 37:17
**algorithms** 32:21,24
  33:2 40:16 43:19
  44:5
**Alicia** 55:5 56:20
**alive** 10:19,20
**allow** 21:4 22:5 32:1,
  2 38:8
**allowed** 34:11
**allowing** 52:12,15
**alluded** 31:15
**almost** 10:4 42:16
**along** 9:19 13:11,15
**already** 11:19 26:16
  37:20
**also** 5:21,22 10:9
  20:20 48:2 52:21
**although** 16:22
**always** 6:9 21:15
  32:10 44:19 51:5,
  12
**amending** 21:10
**amount** 10:21 40:22
**and/or** 50:2
**anonymously** 56:8
**another** 7:20 8:8
  18:4 37:3,4 52:23
  57:16
**answer** 7:6 19:7
  20:22 22:10 23:1
  40:9 45:11 48:14
  49:22 50:5 54:24
**answered** 8:16
**answering** 7:19,25
**answers** 31:16
**anybody** 9:6 48:20
**anyone** 26:10,12
  38:17 39:10 46:5,9

47:2,5,10
anything 41:16 47:22
anytime 37:16
anywhere 17:18
apartment 56:1
app 22:14
appear 7:9
appearances 5:14
applaud 21:14
Apple 15:24
applies 28:19
applying 15:20
approached 10:4,10
appropriate 21:17
  50:2,21
approve 54:16
around 10:16 11:5
  12:9,12 15:13
  19:16,17 20:22
  29:3 36:25 37:5
  38:5 39:13 43:3
  55:7 56:12
arrest 56:16
art 13:12
article 9:2,10 29:21
Ashcroft 10:7
aside 47:4
ask 8:5,10,10 18:13
  23:11 31:18 43:5
  49:20
asked 8:16 51:14
  54:20
asking 7:25 9:25
  13:24 19:21 37:16
  41:9 42:1 47:3
aspects 14:1
Assistant 10:6
assuming 37:6 46:22
attention 10:21 55:7
  56:24
Attorney 5:20 6:18
  9:3,5 10:6 47:3,5,
  11
attorney-client
  47:4
Attorneys 17:10
Austin 5:12,21,23
authorities 32:20
available 37:19 42:4
  51:14

aware 27:15 43:6
  45:7 46:5,9 48:16
awareness 20:13
away 40:4 56:13

**B**

back 40:19 42:22,24
  55:24 57:1
back-end 28:18
backyard 38:15
bad 16:6 20:17 39:12
  40:2,3,7,10 57:2
based 35:19
basic 6:18 38:20
  50:17
basis 41:25 45:18
beautiful 56:23
become 10:23
becoming 42:3
bed 56:1,11,13
before 6:14 7:19,25
  9:23,25 25:16 49:5,
  9
beginning 5:14
begins 54:14
behind 10:12 29:12,
  15 54:16
being 5:7 7:14 14:9
  16:20 17:7 17:7
  19:13 29:22,23
  30:6 32:7 34:20
  36:5,23 41:17
  44:20,22 45:4
  54:20 55:8
believe 15:10 20:19,
  20 21:3,16,17 22:4
  32:8 34:1,20,24
  35:2,24 41:16 43:3
  50:20 54:12
believes 50:1
Ben 5:19 18:12
best 7:18 29:1,2
  33:19 39:7 51:12
better 28:18 32:4
  33:5 43:19
between 20:11 56:20
big 14:5 49:15
bigger 15:8
bill 9:13,19 14:19

17:15 25:8,18,20,
  23 26:4 34:10,18,
  22 40:12,13 52:14
bills 12:23 16:9
bit 18:14 47:24
  55:16
block 42:5
blog 44:19
blogs 44:18
blur 38:11
board 13:9 47:21
  48:2,3,5,8,19,23
body 7:5
books 12:1,7 19:17
  58:4
both 8:7
bottom 54:5
box 23:4,10 24:14
  53:19
boy 55:21 56:21
brains 51:2
brand-new 17:2
break 8:15,18 42:17,
  25
breaking 16:24
bridge 20:10
brief 10:1 42:25
briefly 24:7
bring 20:12 30:8
  46:5,10
broken 16:19
brought 13:20
build 12:23
built 13:18 14:5
bullying 16:15
buried 10:20
business 29:9 53:11

**C**

California 10:23
  14:25 14:25 16:21,
  22 17:17 25:8,13,
  17
call 22:14 47:21
called 14:19 17:5
  48:1
calls 18:2
came 11:16 17:16
  30:18 38:7 39:8

43:24
can 8:9,17 10:1
13:16 13:16 15:24
21:15 23:5,6,22
24:8,10,12,14 26:7
29:10 30:9 31:24
32:10 33:2 34:2
35:1 38:2 39:18
40:20 44:14 45:20,
25 50:18 55:2
57:18,19 58:12
cannot 45:20
can't 11:17 17:16
29:8
capabilities 17:24
31:24
captured 10:18
car 38:13 55:19
Carolina 17:18
carveout 52:10,13,15,
18 53:8 54:16,17
Cary 10:22
case 12:6 12:6 16:10,
11 25:14 26:8 49:9,
12
catch 18:21 33:22
cause 36:4 41:24
censoring 46:11
Center 11:6 28:15
38:16 38:16
Central 5:4
certain 40:21,22
certainly 19:17 30:2
44:24 45:1 57:2
cetera 19:4 21:19
22:18
chain 47:25 56:11
chained 56:1
chairs 13:8
chance 40:11 49:4,8
change 13:21 15:4
27:9 36:8,14
Chapter 53:12
chat 23:4,9,18,20,22
24:14 33:13 53:18
56:6
chatted 55:11
Child 5:6 8:23 10:2,
11 12:22 13:19
15:1 17:5 19:18

20:2,12 21:25
26:22 29:3,11,12
30:5,7,14 32:17
33:4,9 36:19 38:4,
16 39:5,6 45:21
50:7,13 52:17 55:2
children 10:14 11:1,
6 15:12 16:8 17:6
19:4,9,14 21:14
22:1,18 28:16 32:5,
11,14 34:13 36:5
37:1,20,21 38:12
39:11 43:22,25
52:23
children's 28:25
29:6 38:16
Church 5:18
circumstances 37:25
circumvent 40:10,11
clarification 9:17
53:9
clarifications 53:3
clarify 8:5,11 30:11
31:3 52:4,7,12
54:15
clarity 42:9
clean 8:1
clear 31:7
clearly 7:9 8:8
client 10:10,12
closely 14:20 36:21
closer 55:19
coalition 13:19 14:5
coalitions 12:24
Code 53:11,12
codified 53:11
cognizant 51:4
collaborating 18:7
collect 40:23
collected 39:3
college 10:24
combat 40:17
come 10:5 14:18
18:12 25:3 56:4,16
57:18
comes 21:20 28:3
coming 44:3
comment 49:4,9
Commerce 53:11 53:11
commit 40:3

commitment 12:24
committing 16:17
56:3
communications 17:7
communities 15:13
companies 16:1 21:3,
6,13,24 22:8 28:17,
22 29:23 31:23
32:20 33:3,16,25
35:8,21 36:3 37:3,
12,15 40:14 42:2,4,
10 43:18 44:2,13
45:19,23,24 57:19
company 22:9,15 29:8
50:16
completely 51:4
comply 27:10 36:3,15
compromise 13:12
14:11
CompuServe 16:1
computer 18:13 24:5
33:1
concern 34:19 45:18,
20
concerned 34:11,14,
16 35:5,8,20 37:13
38:19 39:4 45:16
concerns 20:22,25
21:11 34:17 35:19
38:6
concludes 58:16
condition 16:24
conditions 16:25
conducted 5:7
conferences 29:3
confident 34:15
confounded 45:22
confused 29:16
connect 18:4
consider 44:23
contained 53:10
content 21:4,6,8,20
22:6 34:12,18,25
35:3,8,17,24 40:24
41:5,13,23 42:2,5
44:21 46:1 50:1
control 27:2,5 32:4
controls 32:2
controversial 12:4
conversation 15:14

20:11 47:12,15
56:20
**conversations** 15:25
27:8 29:1 36:7,13
**convince** 56:15
**convinced** 56:22
**cool** 16:7 38:8
**copy** 23:4 58:14
**Corbello** 5:22
**corporate** 15:21
**Correct** 30:15 46:16
54:10,11,18
**correctly** 16:12
39:15
**Could** 6:5 11:7,11
15:4 16:5 18:13
20:20 22:9,15
34:17 35:13,15
36:3,4 38:20,23,23,
24 39:4 42:6,7,7
53:20 56:12
**couldn't** 19:20 22:9
50:15
**Counsel** 5:13,15
**counseling** 38:15
**countless** 45:16
**country** 12:12 13:4,9
14:13
**couple** 14:9 24:25
45:2
**course** 9:3 57:2
**court** 7:3,13 8:1
23:5,11 26:1,2,3
53:19
**Courtney** 5:22
**courtroom** 6:25
**cover** 38:11
**covered** 44:11
**Craigslist** 38:25
**create** 40:16
**created** 22:15
**crime** 33:21
**crimes** 33:20,23
**criminal** 12:3 14:4
**critical** 31:20
**Cunningham** 5:9 7:3
**curious** 20:1
**current** 19:16 27:10
32:13
**currently** 20:25 32:7

35:22,23 41:17
**cyberbullying** 16:10

### D

**dangerous** 19:4
**dark** 17:8 17:8
**data** 39:3,10
**date** 5:3 46:23
**daughter** 16:13
**daughter's** 13:4
16:14
**day** 13:6 39:8
**days** 10:19 13:13
15:3 16:2 17:8,12
18:5 22:14 55:2
56:2 56:2
**dead** 57:10
**deal** 12:10
**dealt** 12:1
**death** 13:4
**debate** 25:3 25:3
**debates** 19:16
**Debbie** 5:9 18:12,18
**decade** 13:1
**decide** 25:1 41:13
**decided** 10:24 11:3
25:6 41:6
**decisions** 51:4,12
**declaration** 9:1,3,10,
24,25 19:25 23:4,7,
10 24:3,16 25:1,13,
24,25 26:10,12,19
28:10 31:13 34:10
41:2 43:4,12 46:15,
18,19 47:14,16
48:15,17,22,24
49:2,5,9
**declarations** 46:25
**deep** 43:24
**Defendant** 5:20
**define** 58:4
**Department** 10:6
**depends** 19:18 50:13
**deposition** 5:5,11
6:14 9:6,12 23:12
43:1 53:21 58:17,
18
**depositions** 6:17
**describe** 19:2 47:24

54:21 56:18
**described** 39:16
**description** 10:1
**destroyed** 11:1
**detect** 32:19 37:18
43:20
**detecting** 14:22
**detection** 33:13
36:20,25 37:5,24
39:14,24 40:11
41:18
**deterrent** 33:22
**develop** 22:6 28:24
29:16 32:20 33:2
43:15
**developed** 51:2
**developing** 28:21
32:23 44:5
**devices** 32:1
**dialogue** 7:10
**differ** 46:18
**difference** 12:20
**differences** 46:25
**different** 15:1,19
31:23 31:23,24,24
32:1 46:23 50:21
**difficult** 33:22 46:3
**diminish** 35:22
**directors** 47:21,22
48:3
**disclose** 28:2 37:12
39:22 39:22 40:15,
22 41:6
**disclosed** 40:6 41:17
**disclosure** 36:19
37:1,6 39:20 40:1
**disclosures** 41:12
**discuss** 26:12
**discussed** 48:5
**discussion** 42:9
**discussions** 47:2,3,4,
6,10
**disgusted** 57:11
**Disher** 5:16 23:17
53:7 54:13,19
58:11
**disposal** 57:17
**disturbed** 56:7
**dive** 43:24
**document** 23:7,10,15,

18 24:9,11,13,21,
22 31:12 53:24
54:4
documents 9:11,18,20
Does 8:2 20:6 27:2,5
28:13 29:15 31:7
33:21 36:20 40:5,7
46:18 46:18 47:20
48:8 50:9
doesn't 14:9,11
18:12 52:18 57:16
dog 56:11
doing 11:9,16 15:2
16:3,5 17:23 21:15
32:5,13 33:16
35:14,22,23 57:4
donations 27:22
done 17:7,8 19:9
21:15 32:10 43:22
donors 27:23
double 30:11
down 7:4,5,14 11:19
14:17 17:14 18:14
28:7 31:10 36:17
45:25
download 23:15 24:2
draft 26:10
drafted 41:2 47:13
due 7:17
duly 6:2
During 14:14

**E**

each 8:6 24:20
earlier 23:3 31:15
45:15 49:25
early 11:25 13:2,13
15:2,25 17:8,12
18:5 38:12
easier 7:15 40:2
46:2 46:2
easy 51:7
educating 14:21
education 20:13 32:3
educators 14:21 17:9
effect 27:11,16
34:11,18 36:9
42:12
efficient 8:9

effort 13:21 33:5
36:25
efforts 21:14 38:5
43:15 44:6
either 19:1
electronic 12:2,11
14:1
else 9:6 26:13 48:20
56:24
e-mail 26:23 27:5
28:5 36:13
enable 39:23 41:18
enact 13:24
encourage 29:4
encourages 29:14
end 16:20 25:17
endanger 22:18
ended 16:16,20,23
energy 15:17
enforce 28:24 29:16
enforceable 14:3
36:4
enforcement 13:22,24
18:8 20:12 22:1
28:16 29:10,25
30:21 33:4 34:2,5
36:22 57:16
enforcing 28:21
engaged 49:16
engineers 33:1 43:19
enhance 29:5
enough 14:10,11
29:25 30:1,2 35:18
52:18
entities 11:20,21
entitled 23:10
Erin 14:24
Erin's 19:11
escape 36:20 37:24
39:24 41:18
especially 13:23
17:22 33:23 36:21
Even 14:10 15:24
15:24 32:16 44:18
56:15 57:5
ever 6:13 14:18 55:6
every 19:20 30:5,6
40:11 50:15,16
57:17
everything 7:4,14

45:25
exactly 17:23 42:6
50:15
example 14:18 37:23
39:16 39:16
examples 44:14
except 37:17
exception 53:10
excuse 30:25
executive 47:22
exhaustive 19:20
exhibit 23:5,11,13
53:20,22 54:3
exist 58:6
expectations 6:21
expedited 58:13
experience 8:23
36:21
expert 22:8
explain 54:25
explicit 22:17,21
explicitly 43:6
exploitation 29:13
50:7
Exploited 11:6 19:14
28:15 30:6 44:1
expressing 56:21
eye 45:4

**F**

face 51:9
Facebook 15:22 28:17
38:21 39:1 44:15,
25
failed 12:7
fair 37:9
fairly 33:10
fall 52:24
falling 16:15
Falls 5:18 54:22
familiar 41:7,11
families 15:12 37:21
38:13 45:22
family 12:8
far 14:10,11 19:5
46:24 52:18 56:12
father 6:9 12:17
fear 35:9
feature 23:21

federal 19:19
fellow 48:4
felt 11:7,11 12:5
few 6:19 29:22 52:3
figure 17:3 33:18
    39:13
figured 11:21
file 23:23 26:19
    28:9 49:19 53:19
filtering 31:20,22
    32:6
filters 32:1
find 38:24 43:25
    54:1
finding 13:23
fine 8:2 42:18
fingers 18:21
finish 7:19,23,25
fire 18:21
firm 10:8,9 11:15
first 6:22 8:21
    16:10 24:25 31:18
    36:18 38:3,7 41:22
    52:5 55:7
firsthand 33:3
fits 41:1
flag 50:2 52:16
Florida 10:17 12:6
    13:1,3 17:15 25:8,
    10,20,23 26:4,8
    46:15,19 47:6
    48:22 49:2,5,21
focuses 14:21 50:6
focusing 38:5
followed 25:4
follows 6:2
force 29:2 40:13
forces 12:25
form 19:6 20:8,18
    21:1,12,22 22:7,23
    27:12,18,20 29:7
    30:25 32:9,15,25
    34:3 35:25 36:10
    37:14 38:1 39:25
    40:8,25 41:8,19
    42:13 43:9 45:9
    46:7,12,20 48:10
    49:13 50:4,12,23
    51:1 54:23 58:1
format 7:17

forth 46:23
fortunately 55:12
foundations 27:23
frankly 19:15
Friday 5:3 6:12
friend 13:7
friends 16:14 56:4
from 5:11,20 6:21
    11:20 14:3 24:14
    27:25 28:3,5 29:23
    30:4 31:7 33:20
    35:8 39:8 40:4
    42:21 46:19 51:11
    52:11,24 53:1
    56:13,24,25
front 6:24 9:1 23:16
    51:10
fully 30:4
funded 27:19,22
funding 27:25 28:3,5
further 53:4 58:9

## G

games 18:3
gaming 32:1
gather 33:25
General 10:7 10:7
    17:10 19:21 24:25
    37:19
generally 30:20
    41:10 43:7
General's 5:20
generated 21:5 44:22
generating 44:21
Georgetown 10:9
get 9:20,23 10:1,2
    16:5 17:4 18:3
    19:24 30:10 36:24
    37:5 39:13 40:12
    49:16 56:13,16
getting 8:20 14:2
    15:5 18:17,19 34:9
    38:13 40:3 56:24
girl 10:17 16:16
    55:8 56:7 57:7
give 10:1 23:8 36:19
    37:22 41:11 44:14
    53:17
given 6:13

giving 40:17
glitches 7:17
goes 57:1
going 7:6 11:3,24
    15:11 16:6,7 24:3,
    8,20 40:2,13 42:16,
    19 43:11
gone 6:18
good 9:16 16:14
    20:16 32:12 34:6
    35:13 36:2 51:14
    52:7,8,18 55:23
Google 15:23 28:17
    38:6,7,20,21
gosh 13:10
got 6:11 11:23 16:13
    23:19 24:6 39:7
    43:13 45:15 55:19
Gotcha 31:10 40:5
    47:17
government 43:18
government's 31:16,
    19
grabbed 55:25
great 6:12 14:17
groomed 57:7
grooming 17:5 33:12,
    23 52:22 55:1
    57:23 58:5
ground 6:18,20
group 11:5,23 12:19
groups 35:6 52:16
    57:17
grow 15:14
guess 9:13,23 26:18
    29:15 47:24
guesses 39:7
guy 55:22

## H

hadn't 11:21
hand 25:18 33:2,3
    40:17
handing 17:25
handle 30:1
hands 37:15 40:13
    45:19
happen 33:21 57:16
happened 10:25 58:3

happening 15:8 25:2
    30:4 33:20 56:7
    57:11
happy 8:11
hard 15:9 54:25 55:1
    56:18 56:18
harder 34:12,24 35:3
harm 16:8 37:20
    39:11,19
harmed 19:13 36:5
    57:22
harmless 39:1
has 6:18 12:18 14:19
    18:9 20:10,14 25:3
    28:23 50:17 57:17
haven't 51:2
having 6:2 55:10
    56:4
head 7:8
hear 16:2 48:13
heard 49:18 52:4,6
    55:6
held 21:5
help 8:1 26:10 40:7
    42:8
helped 43:15
helpful 18:24 18:24
helping 19:1 51:15
helps 41:18
hence 15:5
here 6:21 8:22 19:25
    23:4 24:5,24 27:14
    32:22 42:9 47:9
    51:17
here's 34:8
Hey 8:17 17:21
hiding 56:11
higher 29:24
history 10:2
hold 53:16
holistically 52:14
home 39:8
homeless 38:15
hope 29:9
horrific 10:15
hour 42:16
hours 18:21
House 34:10 38:10
    38:10 39:6 55:24
    56:16

housed 16:21
however 24:22

I

I'd 8:17 35:8
idea 12:9
I'll 8:11 24:22
    31:18
illegal 30:23 31:4
    43:8 57:25
illicit 42:3 50:8
    54:20
I'm 6:17 11:14,15,16
    14:17 15:23 20:1
    21:23 22:10 24:7,
    20 29:15 32:22
    35:1,5 37:6 39:15
    41:1,3,3 43:12
    45:10 46:22 47:3
    48:13 51:16
image 30:6
images 17:6 19:18
    28:19 29:21,22
    30:5,13 33:10,19
    36:25 37:18 43:21
    45:21 52:17
immediately 55:17,19
impact 11:7,12 15:12
implement 21:19
importance 31:20
important 33:17
inadvertently 7:21
included 47:16
incredible 11:9 13:7
    13:7
individual 22:8
    27:23 50:10
individuals 45:22
industry 10:24 18:8
    20:11 27:24 29:10
    30:2
information 17:20
    34:1,2,4 36:24
    37:2,16,18,23
    38:22 39:2 39:2,4,
    13,18,23 40:6,15,
    23 41:9 45:3 50:9,
    14,16,17 51:8,13
initiatives 15:1

injects 34:15
Injunction 24:18
inner 40:15
innovation 16:7
innovative 38:8
input 14:2
ins 22:2
Instagram 44:25
instead 7:7
intended 52:22
intends 46:5
intent 36:1 52:7,8,9,
    10,13,13,15,17
    53:8 54:16
interaction 14:22
interest 56:22
interested 11:18
internet 15:10,20
    17:4,13,24 18:6
    21:3,6,13,18,24
    22:5 28:18 31:8
    35:21 37:12 38:3,5
    44:13 51:7 57:19
interrupt 7:16,18,22
into 9:23 10:1 11:24
    15:18 17:11 18:6
    19:24 27:11,16
    34:9,11,18 36:9
    41:1 42:11 56:9
    57:8
involved 10:3 15:5
    16:13 19:1 20:13
    32:23 44:5 49:17
    57:20
issue 10:14 16:22
    30:1
issues 17:4 33:11
it's 13:14 15:9 22:4
    23:23 23:23 29:24
    33:9,17,17,22,23
    34:16 36:21 40:12
    46:21 50:13,20
    51:7 54:25 54:25
its 21:7 27:10
itself 9:19 12:3
I've 8:16 24:6 47:12
    53:18

J

**Jenna** 14:17
**Jenna's** 14:19 15:19
  19:11
**Jeremy** 5:17
**Jessica** 10:16 10:16
  14:16
**Jessica's** 12:9,17
  13:2 14:7 15:18
  19:11
**job** 7:15 32:12 47:17
**join** 12:25
**judge** 6:25
**jump** 7:19 28:7
**jury** 6:25
**just** 6:20,23,24 8:10
  10:20 11:16,20
  13:6 15:8 16:2
  17:1,20 18:2,13,14,
  14 19:21 22:24
  23:8,9,18,23 24:8,
  14,20 30:11 31:2,6,
  17 32:3 33:9 34:17
  35:14 36:2 37:3
  39:13 41:3,10 45:2
  49:14,18 51:2,11,
  16 52:3,7 53:9,16,
  17,18,23 54:14
  54:14
**Justice** 10:6 12:3
  14:4

### K

**keep** 8:1 13:8 16:19
  21:14 22:1 24:21
  34:13 51:15
**keeping** 21:7 33:14,
  15
**kept** 10:19 56:1
**kid** 17:25
**kids** 14:22 17:23
  38:21 44:21 57:1,2,
  20
**kind** 20:1 40:1,12,15
**Klaas** 14:25
**knew** 10:5 11:14
  12:22,23 55:9,15,
  17
**know** 7:5,16,21,22
  10:24 11:2,15,17

  12:18,21,21,22
  13:13,17 14:18
  15:3,10,22 16:1,7,
  11 17:2,3,23,25
  18:12,16,19,20,25
  19:3 22:2,10,25
  29:21,23 31:3,4,25
  32:2 33:12,13 34:4
  35:12,15,21 36:23
  36:23 41:20 42:6
  46:23 47:20 51:5,
  11 52:21,22 53:24
  55:5 56:25
**known** 49:17
**Kozakiewicz** 55:5

### L

**labeled** 53:19
**language** 7:5
**laptop** 31:25
**last** 43:12,14 44:10
  52:20
**launched** 18:5
**launching** 38:3
**law** 10:5,8,9,9 11:13,
  15 12:9,11,16 13:2,
  22,24 14:7,12,19,
  19 15:4,18,19
  16:19 18:7,8 19:11
  19:11,12,20 20:11,
  16,17 21:25 28:16
  29:10,25 30:21
  33:4 34:2,5 36:1,
  22 47:7 57:16
**lawmakers** 13:21 18:8
  20:11 22:1
**laws** 10:13 12:1,7
  14:7 15:1,6,19
  16:18 18:25 19:5,8,
  10,12,17 33:15
  36:23 58:4,6
**lawsuit** 24:18 26:4
  46:6,10,15 48:23
  49:2,5,16,19,21
**lawsuits** 35:10 45:16
**lays** 37:7
**lead** 45:17
**leading** 28:12
**learned** 8:25 13:10,

  12,15 14:10
**least** 39:6 40:22
**left** 43:3 57:10
**legal** 11:20
**Legislature** 25:16,17,
  23 26:1,4
**less** 41:24
**lessons** 13:10
**let** 7:18,22,23 11:18
  18:11 23:3 24:20
  28:22 31:17 40:19
  43:5 53:23 54:1
**Let's** 8:20 22:12
  23:2 24:10 26:15
  26:15 28:7 31:10
  34:8 36:17 40:20
  42:15 45:14 47:4
**level** 13:24 19:19
**levels** 14:6
**license** 38:13
**lied** 55:9
**life** 13:14
**like** 7:8 8:14,17
  10:25 11:5,8,11
  12:5 14:3 16:9,14,
  16 18:21 19:10
  22:20 24:16,22
  25:8 28:17 29:20
  30:3 33:12 33:12
  34:1 35:6 47:22
  52:11,16 57:18
**likely** 41:23
**Likewise** 41:22
**limited** 31:17,19
**Line** 54:5,7,8,14
**list** 19:19
**listen** 11:14 12:18
**literally** 39:5
**litigated** 16:21
**little** 11:10 18:14
  47:24
**live** 6:25 26:7
**lived** 39:5
**lives** 11:1
**living** 10:22
**loan** 10:24
**lobby** 19:2
**local** 14:6 44:17,19
  45:7
**located** 5:8

locations 5:14
long 13:25 17:16
    19:19
look 14:3,25 26:15
    33:9,18 35:12
    38:20,21
looked 9:20 11:5
    12:5
looking 16:4,9 29:19
    35:16 51:17
looks 24:16
lose 57:21
lot 7:15 8:24 11:25
    12:22 13:10,22
    17:6,11 19:8,9
    21:13 26:16,17
    35:13 42:5 44:17
love 6:11
Lunsford 10:16 12:6,
    17
lured 57:8
luring 17:5 33:12,23
    55:1 58:4
lying 33:24 33:24

M

ma'am 58:15
machine 11:8
made 12:24 55:14
    56:8
main 38:6
Major 44:13
make 6:20 8:6,7,11
    12:20 13:21 23:6
    24:8 33:20 34:24
    35:3 37:18 40:2
    46:2 46:2,3 47:14
    51:12,14 52:6 55:7
    57:14
makes 7:14
making 18:2 23:23
    51:4
Maltz 5:17
mandatory 12:4,10
many 19:12,14 24:4
    29:11 32:22 39:9
map 15:24
Marc 14:25
Mark 12:17 13:19

23:5,11
marked 23:13 53:22
material 19:3 21:21
    22:17 22:17,22
    30:13,14 37:11
    42:3 43:8 50:8
    52:21,24 54:21,22
may 26:17 30:11,12
    36:14 36:14 46:2
maybe 13:15,16 37:17
    38:24,25 39:8 42:8
McCollum 17:15
mean 22:24 33:7
    34:13 35:19 36:20
means 5:11
media 10:16 13:21
    15:15 18:4 22:13,
    14,15,19 26:25
    27:2 28:1,23 29:5
    35:20 36:7 39:21
    40:21 41:5,11
    42:10 43:7,17 44:2,
    11,16,20,24 46:10
    50:2,10,16,22
    57:24
meet 55:10,11,17
meeting 57:8
meetings 29:2
members 47:22
mentioned 9:11 19:11,
    25 25:10 31:16
    46:14 52:21
mentor 13:7
met 55:25
mid 55:22
might 18:21 51:9
million 29:22 45:8
millions 39:10 39:10
mind 44:8
mindful 45:3
mine 30:3 35:6 52:16
    57:18
minimal 47:12
minor 50:21
Minors 51:2,11
missed 51:17
Missing 11:6 19:13
    28:15
mission 12:15
Missouri 16:12,22

moderate 40:23 41:5,
    12,24 42:2 45:20
moderated 22:16
moderation 21:20
    22:6 31:20,21 32:6
mom 16:15,23
monitor 30:9 33:23
    34:18 35:11,12,23
    52:17 56:19
monitoring 12:2,11
    14:1
month 45:8
months 55:2
more 8:15 11:10 19:9
    21:15 25:10 28:22
    32:4 32:4,10 33:9,
    22 35:14 36:5
    37:18 39:19 42:3,4,
    6,7,7 45:3 46:3
most 9:24 14:12
    24:23 27:23
Motion 24:17
motions 7:8
much 15:8 29:11,24
    33:22 41:17
murdered 19:14
must 32:20
myself 43:13 45:15
MySpace 16:11,21

N

naive 12:13 15:3
name 5:9 6:5
nap 6:10
national 10:16 11:6
    28:15 55:7
necessarily 18:1
    57:3
neck 56:12
need 6:10 21:24
    34:23 53:13 58:11,
    13
needed 20:21
needs 19:9
neighborhood 55:24
never 44:8 55:13,14
New 9:2,10 12:4 14:9
    15:11,13,22 16:7,
    10 29:21 55:18

next 28:9
nicely 19:22
nine-year-old 10:17
nonprofit 12:20
nonprofits 18:7
North 17:17
note 7:13 53:20
Noted 18:22
notes 51:17
nothing 39:12 53:4
   58:9
November 5:4
now 8:18 11:24 15:10
   17:3 24:11 43:12
   45:14 52:7,20
nuanced 54:25
Number 5:10 54:5,9,9
numbers 29:24 38:14

O

oath 5:10 6:23
Objection 19:6 20:8,
   18 21:1,12,22 22:7,
   23 27:12,18,20
   29:7 30:24,25 32:9,
   15,15,25 34:3
   35:25 36:10 37:14
   38:1 39:25 40:8,25
   41:8,19 42:13 43:9
   45:9 46:7,12,20
   48:10 49:13 50:4,
   12,23 51:1 54:23
   58:1
objectionable 34:12,
   25 35:3,17,23
obligates 6:23
obligations 41:23
occasion 48:3
off 23:6 24:9 37:20
   42:19,21 43:3
   58:12
offender 10:18
offenders 12:2
offense 13:17
offer 42:10
Office 5:20 17:12
officers 47:21
Ohio 17:18
old 55:18

once 15:2
one 7:15,20 8:8
   10:25 14:2,9 15:3,
   4 16:14 18:4 22:9
   29:8 30:5 31:15
   38:5 55:6
onerous 41:22
ones 57:21 57:21
online 17:23 19:3
   28:12 32:5,17,20
   34:12,13 35:4
   41:24 42:4 55:8,11
   57:5 58:5
only 7:15
onto 18:3
ooOoo 58:20
oops 43:13
open 23:15,20,22
   24:4,21 53:24
opened 24:14 53:25
opening 23:23 42:3
operate 22:19
operating 6:21 23:6
   24:9
operations 27:10,16
   28:14,18
opinion 21:23 41:20
   50:8
opinions 49:17
opportunities 32:2
opportunity 25:5
oral 5:5
order 21:10 27:10
   29:5 32:19 39:19
organization 10:3,11
   11:11,22 12:9,15
   20:3,10 26:17,23
   30:3 50:6
organizations 33:4
organize 12:23
original 15:2
other 8:7 9:5,9,9,11,
   20 13:20 14:16
   15:5 18:7 21:21
   25:4,7 32:21,24
   33:7,11 40:13
   44:16 47:10,20,25
   48:19 50:1,8 52:22
   54:19,20,21
others 30:3 45:23

ourselves 42:3
out 8:20 10:5,15
   11:16,21 12:6
   13:18 14:24,25
   15:21 16:12,15,21
   17:3,17,20 19:1,5
   31:3 33:18 37:3,7,
   16 38:7,13,17,21,
   21,22 39:10,13
   51:8 54:8 55:4
   56:16 56:16 57:21
outdated 20:19
outs 22:2
outside 9:18 47:15
   54:22
over 6:18 13:9 14:20
   17:10 26:4 28:14
   44:18 45:1 50:14
   55:2
overview 18:24
own 10:9,14 11:5
   22:6,13 55:24

P

p.m 5:4 42:20,21,23
   58:17,18
page 8:8,12 26:18
   28:9 28:9 31:11
   43:12,14 44:20
   54:4,5
Paragraph 26:16,19
   28:8,9,10,20 31:11,
   12 34:8,10 36:17,
   18 41:21 43:4,6,11,
   14 45:14,15
parental 32:1
Parents 15:14 17:22
   17:22 32:3 39:8
   43:23 44:23
part 9:6 13:25 14:12
   44:3,6 45:23 46:4
   57:19
partnering 17:12
partners 15:21
partnership 29:10
   33:18
pass 12:23 14:7,12
   15:4 19:2 25:20
   34:4 51:21 58:8

passed 12:11 14:7
  26:5 34:2 36:24
passing 12:9,16
  15:18 25:18
past 8:6
pauses 7:17
peer-to-peer 17:7
penalties 12:1 33:21
Pennsylvania 17:18
  55:5
people 14:21 15:22
  16:18 20:13 30:1,3,
  8,8 35:16 37:19
  38:8 39:11,19
  44:19
per 45:8
perfect 20:22
period 14:14
permits 43:7
permitted 22:19
perpetrator 56:14,17
person 7:15 13:8
  39:3 50:10,18,19
  55:12,20,23 56:20
  57:8,12,16
perspective 11:20
  14:4
petrified 56:10
phone 17:25 18:2
  18:2 31:25
photos 38:12 44:21
  56:2
phrase 44:11
physically 5:21,22
picture 38:23
pictures 56:22
pie 22:25
piece 50:15
pieces 39:18
pinpoint 39:5
pitched 12:17
pitfalls 43:25
place 21:18 43:20
  55:2 57:24
placed 6:23
places 11:5 38:17
plaintiff 49:12,14,
  21
Plaintiffs 5:15
  24:17

plate 38:14
platform 14:15 21:8
  22:13,19 26:25
  27:3 39:21 41:14
  46:10 50:11
platforms 15:16 21:4,
  19 28:1,13,23 29:5
  34:17,23 35:21
  36:7 40:14,21 41:5,
  11,24 42:10 43:7
  44:11,16,24 45:4,6
  50:2 51:7
play 10:15 18:3 21:7
please 5:13 6:5 7:7,
  21 8:5
point 7:20 8:4,14
  15:25 18:25
points 29:21 39:10
police 56:19
policies 21:20 22:6
  28:21,24 29:6,17,
  18,19 45:17
pornography 17:6
position 20:6,14,16
  47:17
positions 48:1
possible 14:2 16:4
  29:12
post 22:16 36:25
  41:13 57:3
posted 38:24 45:4
posting 56:2,5
power 18:1
practices 29:2 36:8,
  14
predation 32:17
predator 37:24 39:4,
  23
Predators 5:6 10:2
  13:19 19:5 20:3
  26:22 33:11,14
  36:19,22 37:4 38:3,
  4 39:17 40:18
  41:18
predatory 52:23
Preliminary 24:18
premise 10:12
preparation 9:12
prepare 8:21
preparing 9:6 26:13

present 5:21,22
President 5:6 20:4
  47:18
pretty 15:11,13
  16:10
prevalent 35:14
prevent 14:23 29:20
  30:4,9 33:6,19
  43:21 57:13
prevention 29:12,15
  50:7
primarily 29:2 43:17
prior 52:5
prioritize 28:24
privacy 45:5
private 27:22 31:20,
  21 32:6 33:25
probably 6:18 13:10
problem 12:12,14
  15:7 22:3 29:24
  32:17 33:6 35:14
  40:17 44:3 57:19
problems 33:5 36:4
proceed 42:25
process 13:25 15:18
  40:11 49:17 57:20
processes 43:20
productive 8:9
professor 10:5,8
  11:14
professors 18:8
programatic 43:15
prohibit 22:21 35:7
project 11:17 38:4
proliferation 29:20
  43:21 45:21
properly 23:1
prosecuting 16:23
protect 32:11,13
protecting 19:8
provide 26:7 42:8
  50:10,17
provider 26:23 27:6
providers 21:19 22:5
  28:5 36:13
providing 49:1
PTOs 45:2
public 37:19
publicly 40:14
pulled 9:1

**put** 15:18 22:13
  27:15 29:11,15
  37:3,16 38:17
  39:18 51:8
**putting** 17:20 38:21
**puzzle** 39:18

## Q

**qualified** 22:10
**question** 7:6,7,19,25
  8:16,17,21 22:11
  28:4 35:1 39:19
  43:5 52:20 54:19
**questions** 8:5 24:25
  26:18 30:12 34:16
  51:20 52:3
**Quinn** 14:17
**quite** 10:7 14:10,11
  55:16 56:15

## R

**rally** 14:6
**rape** 38:15
**raped** 10:18 57:9
**reach** 37:1
**reaching** 15:21
**read** 8:25 31:18 37:6
**ready** 9:20 42:25
**real** 15:8,19 29:24
  36:4
**realized** 15:3,7
**really** 11:11 12:1,7,
  13,18 13:18 14:5,
  20 15:7 16:2,3
  17:19,22 18:6 30:8
  38:4,9 43:23 45:4
  57:10
**recall** 46:24
**receive** 27:25 28:5
**received** 10:20
**recently** 25:11
**recognized** 30:21
**recollection** 10:13
**record** 5:14 6:6 7:10
  42:19,21,22 52:8
  54:15 58:12
**refer** 28:13 43:15
**reference** 53:8

**referencing** 52:13
**referrals** 52:11
**referring** 20:2 30:13
  44:12 52:9 54:2
**reflect** 21:10
**reforms** 20:20
**regarding** 20:7,16
  25:23 36:7,13
  42:10 52:11,20
**regulation** 22:20
**regulations** 21:18
**related** 21:21 43:6
  45:7
**remainder** 24:23
**remember** 15:24 16:11,
  12 17:16
**remote** 7:17
**remotely** 5:7,11
**removal** 31:7 41:23
**remove** 33:19 34:12,
  25 35:3,17 50:3
**removing** 35:8
**repeat** 35:1
**repeatedly** 10:19
  57:10
**report** 32:20 52:16
  56:19 57:12
**reported** 29:23
**reporter** 7:3,13 8:1
  23:5,11 53:19
**reporting** 5:10 35:7
**requested** 58:19
**require** 35:6 37:12
**required** 27:9 28:2
  36:15 50:14 51:14
**requirements** 27:15
  36:19 37:2,7 39:20
  40:1 50:21
**requires** 22:21 39:22
  40:6
**requiring** 21:18 37:2
**rescue** 56:9,14
**rescued** 55:13
**research** 48:4
**resource** 57:17
**resources** 29:12,15
  31:17,19 49:15,18
**respond** 7:6
**responsible** 21:5,8
  35:6

**restrict** 35:7 46:1
**restricting** 51:13
**result** 35:10 45:22
**re-victimized** 30:7
**review** 9:11 49:4,8
**rid** 30:10
**right** 6:16 7:11 8:18
  9:15,16,16 13:15
  16:24 17:19 26:15
  38:9 43:3 46:3
  47:18,19 51:5,6,11,
  19,23 53:16 54:1
  57:25
**roadmap** 36:19 37:3
**role** 21:6 34:22
**room** 56:9
**rooms** 33:13
**roughly** 25:20
**rules** 6:19,20 33:15
**rum** 6:10
**Rumenap** 5:6 6:7,8,8,
  9,10,13 18:23
  23:10,14 24:10
  31:13 42:24 52:3
  53:23
**run** 29:8 55:23 55:23
**Runnion** 14:24

## S

**safe** 21:7,14 22:1
  34:13 51:15
**safety** 8:23 10:11
  12:22 15:1,13 17:4,
  13 18:6 20:12 21:3
  28:19,21,24,25
  29:3,6,6,11,16
  33:4 36:5 38:5
**said** 7:4,14 11:14,24
  13:13 52:8 55:17
**sake** 28:8
**sale** 38:25
**same** 6:21 8:7,12
  15:17 23:7 24:9,13
  28:4 47:9 49:22
  56:5
**sat** 11:19
**save** 23:23
**savvy** 33:14 36:22
  38:23

saw 17:11
say 6:9 8:17 14:9
    17:21 20:2 22:12
    29:16 30:9 31:17
    34:14,19 44:10
    51:6,7,9,9 54:16
    57:3
saying 7:24 12:18
    16:18 18:20 41:25
    57:4
says 28:12 32:19
    34:9 36:18 41:22
    45:15
scenario 57:9
school 14:21 17:13
    39:6,7 44:19,22
schools 17:11,14
    44:17 45:2,7
scientists 33:1
scope 54:22
SCP's 20:24
scrappy 11:10
screen 24:8,11
screening 32:21,24
    33:8
scroll 24:21
searches 38:20
seat 21:24 57:15
second 13:17 23:8
    32:18 53:17
Section 19:17 20:1,7,
    16,19,21,23,25
    21:10 54:1,9,9,13
see 8:20 11:7,12,18
    24:10 24:10 25:17
    26:20 28:7,10
    29:18 31:12 32:16
    33:13 38:9,18
    39:11 40:20 42:15
    51:17 54:5 55:1
seen 33:3
send 23:3,8 56:22
sensor 43:8
sent 23:9,18 53:18
    54:3
sentence 31:18 32:18
    36:18 41:22
sentences 12:4 13:25
    14:1
sentencing 12:10

separate 52:24 53:1
service 16:25 21:18
    26:23 27:6 28:5
    36:13
set 6:21 38:14 47:4
    50:11,22
setting 19:22
setup 47:25
sex 10:18 12:2 56:3
sexual 19:4,18 28:19
    30:14 33:9 43:21
    45:21 52:17
sexually 22:17,21
share 14:15 24:8
    36:24 44:1
shared 30:7
sharing 17:5
shelter 38:15
she's 7:4 18:16
    18:16,19
shot 6:10
should 21:4 22:19,20
    29:9 31:4 40:3
    54:4 55:13,14
show 17:2
sic 55:10
signal 7:22
Signature 58:19
signed 49:6,10
signs 14:23
similar 25:3,20,24,
    25 46:21,22
Similarly 36:18
simply 7:7 8:17
    49:14,18 51:2
    52:18
Simultaneous 48:11
since 7:13 19:25
single 19:20
sir 24:15
sit 27:14
site 44:20
sites 45:8
six 10:14,25
skip 31:10
sky 22:25
slow 18:14
small 11:11 12:20
smart 30:8
smartphone 15:15

social 15:15 18:4
    22:13 22:13,15,19
    26:25 27:2 28:1,23
    29:5 35:20 36:7
    39:21 40:21 41:5,
    11 42:10 43:7,17
    44:2,11,16,20,23
    46:10 50:2,10,16,
    22 57:24
sole 12:15
solely 21:5,8
solution 44:4 46:4
solutions 57:18
solve 12:12,14 22:2
some 6:18 10:7 11:4
    16:19 17:4,10
    20:20,24 27:23
    39:7 40:12 41:4
    42:8 43:18 46:1
    51:13 52:4 56:15,
    22
somehow 52:22
someone 33:24 38:13,
    22 50:13,16 51:7,
    10 55:8,9,15 56:6,
    25 57:11
someone's 38:14 51:9
something 7:21 8:10
    10:25 11:10 34:20
    38:25 39:1 40:3
    51:18
sometimes 7:16 51:11
    55:3
somewhere 56:24
soon 19:25
sorry 9:13 14:17
    18:11,15,18 30:25
    35:1 43:14 45:10
    48:12,13 51:16
sort 13:15 17:8
    22:24 25:8 57:8
sought 56:25
sound 8:2
sounds 22:24
sourced 9:2
space 15:20 16:5
    18:6
speakers 48:11
speaking 7:23
specific 21:19 26:18

28:22 29:17 37:17,
  23,24 39:17,23
  52:10 54:1,15
**specifically** 29:4
  34:20 39:20
**spend** 9:24 35:15
**spent** 55:16
**Stacie** 5:6 6:7 18:11
  23:20
**staff** 44:23 49:15
**stage** 19:22
**Standard** 5:5
**stands** 20:25
**start** 6:12 7:25
  10:10 11:4 13:16
  13:16 34:9
**started** 11:19 12:8,
  15 14:16 15:2,5,20,
  21 16:9 17:9 56:19
**starting** 10:8,9
  11:15 26:18
**starts** 54:8
**state** 5:13 6:5 12:16
  12:16 13:23 14:6
  19:3,18
**statement** 52:6
**states** 14:8 25:4,7
**stenographic** 5:11
**still** 11:8 13:6
  15:10,13 35:13,18
  43:14
**Stop** 5:6 7:23 10:2
  13:18 20:2 26:22
  35:22 38:3,4 39:12
**stories** 13:20 14:15
  43:24 44:2 55:7
**story** 10:15,20 12:5,
  18 38:2 55:6 57:7,
  15
**straightforward**
  33:10
**stranger** 55:8
**strangle** 18:13
**Street** 38:6,7,9,9
**strictly** 50:6
**students** 45:5
**stuff** 22:16
**subject** 22:20
**submit** 25:1,13,22
**submitted** 24:17

25:15,25 26:3
  46:15 47:14 48:16
**substance** 46:24 47:6,
  11
**substantive** 46:25
  47:15
**success** 11:4
**successful** 10:23
**such** 22:18 37:18
  45:17,25
**sue** 45:23
**sufficient** 22:5 32:8
**sufficiently** 35:11
**suggest** 21:9
**suicide** 16:17
**summits** 29:3
**support** 14:6 24:17
  27:24 49:1
**sure** 6:17,20 8:6,7,
  10,12 15:24 21:23
  23:6 24:8 33:20
  35:2 41:1,3 42:18
  47:14 57:14
**swing** 38:14
**sworn** 6:2
**system** 12:3,6 14:22
**systems** 17:13

---

### T

**table** 21:25 57:15
**tactics** 33:11
**take** 6:10 8:15,17
  11:4,17 13:1,3
  17:19 20:15 38:23
  38:23 39:4 42:17
  45:25 49:15 50:7
  55:2
**taken** 18:9
**taking** 7:4,5,14
  11:18
**talk** 9:5 28:20 31:4
  40:14 48:19,23
**talked** 9:3 11:13
  13:22 26:16 49:25
**talking** 7:15 8:6
  15:11 17:9 30:12
  39:9 51:6,10 53:7,
  9 54:13 55:8,16,21
  56:21 57:5 57:5,6

**task** 29:2
**teach** 17:13
**teaching** 11:15
**teamed** 12:16 13:5
  14:24
**teams** 35:15,16,16
  43:18
**tech** 20:11
**technical** 30:8 39:23
**technically** 14:8
**technologies** 31:21,
  22,24 32:7,8,13
**technology** 12:3
  15:15 16:4 36:23
  38:8 40:14
**teen** 16:13,14
**tell** 6:24 13:20 17:2
  19:20 24:14 28:3
  29:8 38:2 50:15
  57:15
**telling** 12:21 56:23
**ten-minute** 42:17
**terms** 16:23,24,24
  53:8
**terrible** 56:3 56:3
**testified** 6:2 25:16
**testimony** 8:22 25:15,
  22 26:7 52:6
**Texas** 5:12,21,23
  13:1,3 14:17 17:17
  25:3 47:10 53:11
**text** 9:19
**than** 8:15 9:5,9,9
  15:8 29:24 33:9
  47:10 48:19
**Thank** 18:23 19:23
  52:12,19 53:2 53:2,
  15 58:10
**thanks** 55:12
**That's** 6:11 7:14
  9:16 12:14 19:4
  24:3,22 30:20 31:3
  42:18 43:5 45:3,13
  57:1,12
**their** 5:13 10:14
  11:4 13:20 14:2
  17:23,25 21:8,14
  22:6,13 29:5,8
  32:5 33:24 36:8,14
  38:13,23,23 39:8

40:22,24 41:6,12,
13,13 43:18,19,24,
25 44:18 44:18
51:13 57:15,17
**theme** 19:12
**themselves** 22:5
35:10 38:22 43:25
51:8
**then** 6:10 7:21,24
8:14,16 9:18 15:21
17:5,15 25:10 28:4
31:18 38:6 47:9
48:3,17 56:16
**there** 7:17 9:19 11:7,
25 15:1 19:1,5,8,
16 20:20 22:12,14
24:5 27:8 29:17,22
31:3,6 32:18 33:11
34:17 38:22 40:20,
21 41:4 41:4,22
44:11 47:25 49:25
51:8 54:20 58:3
**there'd** 35:9
**there's** 14:8 19:12,
14,17 21:15 31:3
32:10 41:16
**these** 10:13 11:16
13:24,25 14:7,15
15:25 16:2,6 17:4,
6,21 19:12 22:14
29:20,23 30:5,11,
13 31:17 33:3,13,
19,19 34:23 35:7,
21 36:3 37:1,3,4
38:17 39:12 40:16
42:1,4 45:4,19
**They're** 33:14 33:14,
15 35:15 35:15,22,
23 51:3,4 57:4
57:4,5
**thing** 34:6 47:9 51:5,
6,15 52:5 56:5
57:12
**things** 8:1 11:16
15:5 24:4 29:17,19
33:12 33:12 38:24
51:8 52:4 57:3
**think** 12:14 15:4
19:22 21:6,13,24
22:10,18 31:15

32:10,13,16 34:22
35:12,13 36:1,2
37:16 40:1 42:1,5,
6,7 44:19 48:8
52:9,17
**those** 6:20 8:25 9:18
17:11 18:5 21:11
29:18,19 32:8,13
43:16 44:1,6,23
45:6,8 47:25 51:19
53:2 57:23,24 58:6
**though** 14:10
**thought** 8:24 12:8,11
45:13 49:24 55:9,
15,20,20 56:13,20
**threat** 45:16
**three** 10:19
**threw** 55:25
**through** 8:24,25,25
13:18,19 17:7 18:9,
12 23:3,7,9 24:14,
21,23,23 27:22,23
43:4 51:17 53:18
57:24
**throw** 53:13
**ties** 37:15
**time** 5:4,5 7:16 9:25
10:7,23 11:25
12:13,21 14:14
15:14 17:16 24:24
28:8 30:6 38:20
39:7 51:20 55:16,
18 56:15 58:3,10
**Times** 9:2,10 29:21
**tip** 56:8
**title** 47:17,18
**today** 5:18 7:10 8:5,
9,22 9:7,12,21
15:23 18:9 27:14
32:14,23 58:6
**Today's** 5:3
**Todd** 5:16 9:4 48:12
53:14
**together** 11:23 13:9
17:14 22:13 30:8
39:19
**too** 19:14 24:4 32:22
36:2 41:17
**took** 15:17 56:15
57:24

**tool** 37:4
**tools** 32:21,24 33:8
**top** 31:11
**touch** 13:8
**tough** 12:1 33:21
**towards** 52:23 54:5
**trainings** 17:21
**transcript** 7:9 58:14
**traumatized** 56:10
**traveled** 13:9
**tremendous** 10:21
**tried** 20:10
**trunk** 56:1
**trust** 12:25
**truth** 6:24
**try** 7:16 16:5,6
21:14 30:7 31:6
33:4,5,18 36:24
39:12 40:17 45:2,
25 55:23 56:13
57:18
**trying** 13:1,3 14:23
17:3,21 18:16
35:17 37:20 39:11
40:10,11 41:3
57:13
**turned** 55:23
**twelfth** 54:4
**twelve-year-old**
16:16
**twice-convicted**
10:18
**two** 15:7 18:20 46:25
**tying** 45:19
**type** 15:17 37:23
41:9 42:5 45:3
52:23 57:12
**types** 38:17 43:25
50:1,8
**typically** 50:17 55:1

---

**U**

---

**ultimately** 10:20
16:16
**under** 6:23 10:7 46:6
52:24 56:11,12
**under-enforcement**
45:17
**underground** 56:6

underscore 31:19
understand 6:22 7:1
    8:4 17:24 18:1
    20:4 28:18 33:5
    41:4 43:19 44:3
    57:4
understanding 8:8
    32:4 39:15
updates 44:22
updating 21:10
upon 27:15 56:2
use 16:6,8,25 32:21
    33:11 37:17,24
    41:13
used 6:9
user 50:11
user-generated 21:4
users 21:5,7 22:15
    40:22 41:7,12,13
    44:20,24 45:1,8
using 7:8 32:22
Usually 28:2
utilized 32:7

## V

vacation 39:1
vague 22:24 30:24
    34:16,20,21,22
    36:2
vain 13:5
valid 20:21
verbally 7:7
verify 50:18
version 38:12
very 12:4,19 15:3,25
    16:6 17:15 19:19
    24:7 34:16 34:16
    37:17 38:8,19,20
    39:3,7 47:12 51:7
    55:7
victims 13:20 14:16
    43:23 43:23 45:23
    57:14
videos 29:22
videotaped 5:5
videotaping 56:5
View 38:7 38:7
Virginia 5:18
voice 6:19

## W

wait 7:24
walk 23:7
walked 56:9
walking 24:23 43:4
Walsh 19:10
Walton 5:19
want 6:19 8:6,7 9:24
    12:20 17:21 28:7
    42:4 45:24 52:7
    57:14
wanted 11:9,10 31:2
    54:14
wants 29:17
Washington 5:8,17
wasn't 15:23 18:2
    19:21 56:24
watched 10:15
watching 25:2
way 6:12 8:20 13:11,
    15 18:3 18:3,4,9
    20:2 22:16 27:9
    32:22 33:19 38:12
    39:13 40:21,23
    46:1 46:1 49:16
    51:3 52:23
ways 41:4
web 17:8
websites 31:8 44:18
    45:6
we'd 32:16 37:2
weeks 55:2
weigh 25:5
weighed 25:5,7
welcome 6:16 8:15
Well 6:16 9:13 11:14,
    24 14:16 16:18
    25:4 28:22 32:19
    34:15 41:10 46:18
    48:24 51:19 53:10
    54:25 58:14
we'll 19:24
well-oiled 11:8
went 17:11,14,17,17
    25:15 27:11,16
    36:9 39:6 42:11
    55:17
we're 6:20 8:6,7,8,

12 11:24 23:6 24:9
    28:2 29:19 30:12
    42:19,22 49:14
    57:6
weren't 11:25
we've 14:10,12,19,24
    26:16 28:16 42:15
whatever 7:23 22:14
whether 20:16 40:12
which 9:1,2,24 12:10
    14:20 16:10 19:11,
    22 20:3 27:9 31:11
    38:3 41:5 54:2,13
while 26:13
who 5:18,22 10:5
    10:5,12,17 14:22
    15:22 16:16 17:19
    33:2,24 37:19
    38:22 39:11 46:5
    55:9 55:9,15,20
    56:21 57:4,7,21,21
whole 12:19 38:9
    52:10
whom 11:14 56:13
who's 47:5 50:14
why 15:5 33:17 35:24
    49:12,20 50:25
wife 10:14,22
will 7:8,16,18,23
    8:1,18 20:2 23:8
    23:8,11 28:3 34:11
    35:3 39:12 41:23
    42:8 45:16,21,23
    51:21 53:10,20
    57:21
without 32:16 57:20
witness 5:7 51:22
    58:8
woman 11:17 16:13
    55:4
wonderful 6:17
won't 13:14
word 46:3
words 7:8
work 8:11 11:9 21:25
    21:25 28:12 29:10
    33:3 39:8
worked 14:20 17:10
    28:15,16,17,23,23
    33:2 43:17,22

44:17 45:1 55:4
**working** 14:16 17:14
36:21
**workings** 40:16
**world** 6:17 15:9,19
30:21 38:9
**worry** 37:1,15
**worse** 32:16 37:20
**worst-case** 57:9
**wouldn't** 11:1 35:11,
18 42:11
**writing** 47:13
**written** 7:10 19:13
36:1
**wrong** 39:3 51:12

| Y |
|---|

**years** 8:23,25 10:4
13:14,16 14:20
17:10 25:9 28:14
29:22 44:19 45:2
55:3,18
**York** 9:2,10 14:9
29:21
**you'd** 24:22
**young** 55:4,8 56:7
57:7
**you're** 7:6,24 8:10
18:20 35:20 37:16
51:10 53:24
**yours** 52:11
**you've** 6:23 8:16
14:18 19:1 37:6
55:6