IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a | ) | |
| NETCHOICE, a 501(c)(6) | ) | |
| DISTRICT OF COLUMBIA | ) | |
| ORGANIZATION, COMPUTER & | ) | |
| COMMUNICATIONS INDUSTRY | ) | |
| ASSOCIATION d/b/a CCIA, a | ) | |
| 501(c)(6) NON-STOCK VIRGINIA | ) | |
| CORPORATION, | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | 121-cv-00840-RP |
| | ) | |
| | ) | |
| VS. | ) | |
| | ) | |
| KEN PAXTON, in his official | ) | |
| capacity as Attorney General | ) | |
| of Texas, | ) | |
| Defendant. | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF

SERVANDO ESPARZA

NOVEMBER 15, 2021

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF SERVANDO

ESPARZA, produced remotely as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled and

numbered cause on the 15th day of November, 2021, from

2:03 p.m. to 3:40 p.m., before Ashley Cason, Apprentice

Reporter and Notary Public, reported by machine shorthand, via

Zoom, pursuant to the Federal Rules of Civil Procedure,

regarding the provisions stated on the record.

**Page 2**

```
1              APPEARANCES VIA ZOOM
2    For the Plaintiffs:
3      MATTHEW FREDERICK
       LEHOTSKY KELLER
4      919 Congress Avenue, Suite 1100
       Austin, Texas 78701
5      (512) 952-1731
       matt@lehotskykeller.com
6
     For the Defendant:
7
       BEN WALTON
8      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
       General Litigation Division
9      P.O. Box 12548,
       Ausin, Texas 78711
10     (512) 463-2120
       benjamin.walton@oag.texas.gov
11
12   Also Present:
13     JEREMY MALTZ
14
     Videotaped by:
15
       BRIAN CHRISTOPHER
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                 INDEX
                                  PAGE
2
     Appearances...............................   2
3
     WITNESS: SERVANDO ESPARZA
4
       Examination by BEN WALTON..............   4
5
     Signature and Changes......................   55
6
     Reporter's Certificate.....................   57
7
8
9
10
11               EXHIBITS
12   NUMBER   DESCRIPTION               PAGE
13   Exhibit 1  ....................................   19
         Technology Network's Declaration
14
     Exhibit 2  ....................................   31
15         House Bill 20
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1                 PROCEEDINGS
2         THE REPORTER:  Today's date is Monday, November
3    15th, 2021.  The time is 2:02 p.m.  This is the videotaped oral
4    deposition of Servando Esparza, and it is being conducted
5    remotely.  The witness is located in --
6         Where are you located, Mr. Esparza?
7         THE WITNESS:  Austin, Texas.
8         THE REPORTER:  The witness is located in Austin,
9    Texas.
10        My name is Ashley Cason, Apprentice Reporter.  I
11   am administering the oath and reporting the deposition remotely
12   by stenographic means from Hutto, Texas.
13        Would Counsel please state their appearances and
14   locations for the record, beginning with the Plaintiffs'
15   counsel.
16        MR. FREDRICK:  Yes.  Matthew Fredrick.  I am
17   located in Austin, Texas.
18        MR. WALTON:  Ben Walton from the Attorney
19   General's Office.  I'm physically located in Austin, Texas.
20   And I'm counsel for the Defendant.
21               SERVANDO ESPARZA,
22      having been first duly sworn, testified as follows:
23               EXAMINATION
24   BY MR. WALTON:
25      Q.  Good afternoon, Mr. Esparza.  Can you hear me all
```

**Page 5**

```
1    right?
2       A.  Yup.
3       Q.  Okay.  Wonderful.  We are -- we are under oath.
4    We're at a formal deposition, even though we're taking this
5    remotely, instead of all being physically present together.  I
6    want to go ahead and go over a couple of ground rules, just
7    housekeeping matters, just to make sure we're all on the same
8    page.  So bear with me for a minute if your attorney already
9    went over this with you.  I just want to make sure that all of
10   our expectations are the same.
11        First off, you do understand that having just
12   been sworn by the court reporter, you are under obligation
13   today to tell the truth just as you would be if you were in
14   front of a judge and a jury in a courtroom?
15      A.  Yup, I do.
16      Q.  Okay.  And also, the court reporter is taking down a
17   written record of everything that is said, so that means a
18   couple of things.  First is:  You and I need to not be talking
19   at the same time.  So I will do my best.  I know there's a lot
20   of glitches sometimes with -- with technology, but I'll do my
21   best to let you finish talking and answering a question before
22   I jump in with another question.  And if you could allow me to
23   finish my questions, even if you know where I'm going, just
24   allow me to finish the question before you start answering.
25   That'll make life a lot easier for our court reporter today.
```

Servando Esparza - 11/15/2021

6

1  Is that all right with you?
2      A.  Sounds like a plan.
3      Q.  And if at any time I do interrupt you, it will not be
4  on purpose, so please bring that to my attention and I will
5  stop talking and let you finish whatever it is you were about
6  to say.  It is not my intention to cut you off or talk over you
7  at any point today.  Okay?
8      A.  Okay.
9      Q.  And the second thing that -- that the written record
10  means is -- you've already been doing a good job of this --
11  we're going to have to actually use words instead of nodding
12  our heads or shaking our heads.  We'll have to use -- use words
13  such as yes, no, and other verbal descriptors, so that it comes
14  through clearly on a written transcript.  So you've been doing
15  a great job with that, but just please do remember to continue
16  to answer verbally instead of simply with body language or
17  physical queues; is that understood?
18      A.  Understood.
19      Q.  Thank you.  And if at any point I ask you a question
20  and you're not really sure what I'm talking about, feel free to
21  ask me to clarify.  That's what we're here for today, is not to
22  talk past each other, but to try to communicate clearly.  So
23  please bring it to my attention whenever you're not sure what
24  I'm talking about, and I'll try to rephrase and clarify for you
25  as best as possible.

7

1          And then last, if you want to take a break at
2  any time during the deposition, that is completely fine.  I
3  would simply ask that if I've asked a question, you go ahead
4  and answer the question.  And then at the end of any of your
5  answers, feel free to just say, I'd like to take a break now,
6  and we will certainly do that.  All right?
7      A.  Understood.
8      Q.  All righty.  The first question I have for you today
9  is:  Have you ever given a deposition before?
10      A.  No.
11      Q.  All right.  Well, welcome to the wonderful world of
12  depositions.  What -- what did you do to prepare for your
13  testimony here today?
14      A.  I reread House Bill 20.  I reread the declaration
15  that -- that I signed on behalf of TechNet, and met with our
16  attorneys a couple of times.
17      Q.  Sure.  Did you -- did you talk with anyone other than
18  your attorneys in preparation for your testimony here today?
19      A.  About what I would say?
20      Q.  Yes.
21      A.  No.  Other than just that it's happening and -- and
22  when it was occurring.
23      Q.  Okay.  What -- how did you come to write a -- a
24  declaration -- well, the declaration that you've entered in
25  this lawsuit.  We'll look at it in a minute, but I just want to

8

1  ask:  How did you come to write that declaration?
2      A.  We had written -- at TechNet, we had written a
3  declaration on a similar lawsuit in -- in Florida, and we filed
4  a declaration in that case.
5      Q.  Okay.  And so the declaration that you filed in the
6  Texas case, is it substantially similar to the declaration you
7  filed in the Florida case?
8      A.  Substantial?  No.  I would say, having not reviewed
9  the Florida one in a while, I would say it's -- I would say
10  very similar.
11      Q.  Okay.  Sure.  And -- and I'm not, you know, holding
12  to the details, but as you sit here today, to your
13  recollection, do you recall any differences between the Texas
14  and Florida declaration?
15          MR. FREDRICK:  Object to the form of the
16  question.
17          You -- you may answer.
18          THE WITNESS:  Answer?  Okay.
19      A.  I remember a couple of -- of things that would --
20  that I focused on in the Florida one that I didn't -- that it
21  wasn't included in the Texas bill, so I didn't include it.  So
22  there were several arguments that -- that were different.  So
23  will -- will you repeat the question again?
24      Q.  (BY MR. WALTON)  Yes.  I was just saying, do you
25  remember -- do you recall any differences between your Texas

9

1  declaration and your Florida declaration, so --
2      A.  Yeah.  I do, yeah.
3      Q.  Yeah.  Thank you for that answer.
4          Do you recall some of the specific material that
5  you chose to leave out of the Texas declaration that you had
6  included in the Florida declaration?
7          MR. FREDRICK:  Objection; form.
8          You may answer.
9      A.  I remember one thing that I specifically remember
10  calling out in the -- in the Florida one -- well, I actually --
11  if I would have it in front of me, I would be absolutely
12  certain.  I -- I would want to say that I intended to say that
13  in the Florida one, but without it in front of me, I don't want
14  to be -- I don't want to say one hundred percent sure.
15      Q.  (BY MR. WALTON)  Sure, and that's fine.  What else
16  did you do, if anything, to prepare the declaration in this
17  Texas case?
18      A.  Looked at the testimony that we provided.
19  Oftentimes, I would have notes that -- like, we would send a
20  letter to the committee of jurisdiction where the bill was --
21  was heard, I think in this case was a representative -- a
22  Chairman Ashby's committee, the select committee on
23  constitutional -- I can't remember the full term -- the full
24  name of it -- but based on the -- the -- what I sent to that
25  office and that committee, some of those notes which had our

10

1  arguments.  And what I did was kind of refer to the arguments
2  we made in that to -- to make sure and include in the
3  declaration.
4      Q.  I see.  Other than your communications with that
5  committee, did you have any other communications with the
6  legislature or part of the Texas legislature as HB 20 was being
7  considered?
8      A.  Yes.
9      Q.  And what were those communications?
10     A.  I met several times with the -- a -- several
11  legislators.  This House Bill 20, specifically, I had multiple
12  conversations with Chairman Hughes' office, his -- his actions
13  committee director.  I met with Representative Cain's chief of
14  staff a couple of times to provide feedback on the bill.  I
15  testified on -- on -- against HB 20 in committee, and I
16  answered questions from a couple of legislators who were on
17  that committee.
18     Q.  Okay.  Are there any other written communications
19  that you submitted to anyone in the Texas legislature regarding
20  HB 20?
21     A.  Yes.  I sent -- I sent a letter to the Senate State
22  Affairs Committee.  I sent -- I sent feedback to the committee
23  and some committee members ahead of, like, the hearing being
24  held.  Oftentimes provided copies of it and -- and -- and
25  this -- this was both on House Bill 20 and kind of the -- the

11

1  bills ahead of time; these sort of kept morphing.
2          And I should say, in the senate, it was a
3  companion bill that the name is escaping me right now, that was
4  the communication I -- I had with senate staff.  At that point,
5  it wasn't very clear that House Bill 20 was going to be the --
6  the vehicle, as -- as several bills were moving through the
7  process.  So feedback to the -- the members that stayed on
8  those committees.  I provided some additional feedback to --
9  like I mentioned, I met with Cain's office to provide some --
10  some recommendations that they -- they took into the bill.
11     Q.  I see.  The -- the material that is expressed in your
12  declaration for purposes of this lawsuit, are those the same --
13  the same facts and opinions that you presented to the Texas
14  legislature?
15     A.  They're similar --
16     Q.  Okay.
17     A.  -- they're not exact.
18     Q.  Sure.  Do -- do you recall including anything in this
19  declaration that you did not include in your communications
20  with the Texas legislature?
21     A.  Yes.  I -- there's a citation for the number of -- of
22  spam or something related to spam in the declaration.  I did
23  not use that number specifically for the communication on the
24  email provisions in House Bill 20.  I used some other numbers
25  but -- but I was going through -- I was kind of refining the

12

1  arguments I -- I used a different number so -- so that's a --
2  that's a discrepancy between, you know, what I provided
3  legislators and what was included in the declaration.
4      Q.  I see.  Any other differences that you recall?
5          MR. FREDRICK:  Object to the form the question.
6          You may answer.
7      A.  Nothing -- nothing major that I can recollect.
8  Everything else is just maybe the way that it's structured, so
9  nothing -- nothing else.
10     Q.  (BY MR. WALTON)  Okay.  Going back to the Florida
11  declaration, how did you decide to file a declaration in that
12  case?
13     A.  We have some check-in calls with other trade
14  associations and just in members in general just to kind of
15  catch up on a number of issues on -- on that one.  NetChoice
16  let us know that they were, you know, moving forward with the
17  case, and that would -- could happen is, you know, any entity
18  that wanted to participate, and in support of NetChoice and
19  CCIA's, you know, case, that one way that it could be helpful
20  is through a declaration.  And at TechNet, we decided to file a
21  declaration in support of -- with the Florida case that...
22     Q.  So walk me through a little bit, just generally,
23  what -- what is TechNet?
24     A.  Yeah.  TechNet -- Tech Association, it represents a
25  number of different types of tech -- tech companies.  And I

13

1  think at this point, the number sort of hovers sort of around
2  80 -- just kind of folks -- that just ebb and flows in terms of
3  the number of members, but just kind of ran -- runs through all
4  types of -- of segments of technology including sort of
5  traditional IT, you know, gig economy, delivery networks,
6  transportation, autonomous vehicles.  And so we just sort of
7  work -- telehealth, so just a number of sort of different types
8  of members that are members of -- of TechNet.  And -- and we
9  have -- we have a state team and a federal team.  And so we --
10  we sort of focus on, obviously, sort of similar issues on
11  behalf of those companies, but at two different levels.  My job
12  specifically is focused on the Southeast.
13         Apologies for that noise.
14         MR. WALTON:  No, that is fine.
15     Q.  (BY MR. WALTON)  What is your specific job title?
16     A.  It is executive director of Texas in the southeast.
17     Q.  And what does that mean?
18     A.  That means that my -- it's my responsibility to
19  provide updates, provide bill tracking, to provide reports
20  and -- and updates to -- to members and in the areas that I
21  represent, which are Texas -- and it recently changed
22  November 1st -- but essentially just -- just follow the coast
23  up to Virginia.  So it's been my responsibility to do bill
24  tracking, let -- hold some, what we call, public policy
25  committee meetings where I provide, you know, Here's what's

14

1  happening in these different states, summaries of -- of
2  legislative sessions, special sessions coming up. Here are the
3  bills that were filed this week, those -- those types of
4  updates that -- that members would like.
5      Q.  What does it mean to be a member of TechNet?
6      A.  That means a -- a company that pays dues into the
7  association and takes part in -- in the -- in sort of helping
8  shape policy and provides feedback to -- to the TechNet staff.
9      Q.  How is TechNet governed?
10         MR. FREDRICK:  Object -- Objection; form.
11         You may answer.
12     A.  Governed?  Help explain that.  Like, who is my boss
13  and what is sort of the structure of my boss?  Or who do we --
14  who do they sort of answer to?
15     Q.  (BY MR. WALTON)  Yeah.  What I'm trying to get at is
16  are they -- are they overseen by a board or is it just a
17  president or is there an executive director at the top that
18  calls all the shots, I guess?  What's the governing structure
19  internally of TechNet?
20     A.  So in terms of --
21         MR. FREDRICK:  Objection; form.
22         You can answer.
23     A.  Internally?  So there is a vice president of --
24  and -- and I may get the -- the job titles wrong, but generally
25  his title is in charge -- in charge of state policy.  And so

15

1  there's several regions like I mentioned.  Minus Texas and the
2  Southeast, there's other -- other executive directors we report
3  to.  His name is David Edmonson.  And then David Edmonson
4  reports directly to Linda Moore who's our president of the
5  association.
6      Q.  (BY MR. WALTON)  So who -- who decided that TechNet
7  was opposed to HB 20?
8          MR. FREDRICK:  Objection; form.
9          You can answer.
10     A.  It was -- part of it is members provide feedback.
11  It's been something that TechNet opposed a similar bill when it
12  was filed in Texas in 2019.  So it -- it's an issue that
13  TechNet, you know, opposes and has opposed.  And if nothing
14  sort of changes, unless some members say, you know, Hey, we --
15  somehow our opinion has changed on this, then TechNet was going
16  to be opposed to it and remains opposed to bills like that.
17     Q.  (BY MR. WALTON)  It -- is there a process that
18  TechNet uses to find out what its members think about certain
19  bills?
20     A.  A formal process, no.  It's largely -- largely
21  feedback -- informal feedback from members.
22     Q.  So how many members indicated to TechNet that they
23  would oppose or be opposed to HB 20?
24     A.  I don't have a specific number.  I would say it's a
25  handful of -- of members shared that they had concerns with the

16

1  bill.  Does -- yeah, you -- you asked a question, "opposed" I
2  would say, I had a lot of members who had a lot -- who had
3  concerns with the bill that may have not specifically said to
4  me, you know, we're -- we're opposed to it.  A lot of the
5  feedback I tend to get is, you know -- you know, half of the
6  company, we -- we have issues with facts, which lets me know
7  that -- to kind of include them in a general of idea who wants
8  TechNet to engage and why.
9      Q.  Got you.  So out of those -- out of those members
10  that were -- indicated some type of concern with HB 20, did
11  you -- am I correct in understanding, did you say there were a
12  handful of those?
13     A.  At least a handful, yes.
14     Q.  Oh, okay.  And not to pin you down for an exact
15  number, but just to make sure we're using language generally
16  the same way, would you say a handful is fewer than ten or more
17  than ten?
18     A.  That's a tough number.  I would say it's likely lower
19  than ten.
20     Q.  Okay.  Would you be more comfortable saying it was
21  likely lower than 15?
22     A.  Yeah.  Lower than 15, I feel comfortable -- well, I
23  would say, it -- it's got to be under 15, at least the ones
24  that shared a ton of -- that shared more feedback that sort of
25  was an issue that's -- that spoke directly to me, you know.

17

1      Q.  I see.  So for the other members of TechNet, do you
2  know whether they have concerns with HB 20?
3      A.  Some of them, you know, do not have social media
4  platforms as part of their business, so they just didn't weigh
5  in at all.  We also have a lot of other -- not a lot, but just
6  some members who -- it's fairly narrow, the scope with what
7  they -- what issues they engage with TechNet on.  I can, you
8  know, imagine a telemedicine-type company, they're really
9  not -- they're only going to pay attention to the sort of
10  telehealth-type issues, employment issues, gig economy stuff.
11  But they don't -- they wouldn't get involved in any
12  conversations that I would have on social media platforms or
13  they would not respond to, you know, an email request for
14  feedback on a bill, but on social platforms.
15     Q.  Okay.  What -- what is TechNet's relationship to the
16  Plaintiffs in this lawsuit?
17         MR. FREDRICK:  Object to form.
18         You can answer.
19     A.  NetChoice?  We worked really well with them on a
20  number of issues and just kind of collaborate on -- on sharing,
21  you know, in -- intel on the legislature proposals.
22  Oftentimes, we compare notes on, you know, specifically
23  problematic portions of bills and overall just share kind of
24  the key learnings that a lot of us are learn -- are seeing in
25  certain states.  Just kind of compare notes is what I would

18

1 say.

2    Q.  (BY MR. WALTON) Is -- is there a financial

3 relationship between NetChoice and TechNet?

4    A.  Not that I'm aware of.

5    Q.  And you mentioned NetChoice.  What about another

6 entity that is a plaintiff in this case, the computer and

7 communications industry association, abbreviated as CCIA, are

8 you familiar with that entity?

9    A.  Just in the name.

10    Q.  So you've never had any interactions with them in --

11 in your capacity as executive director at TechNet?

12    A.  Not that I can recall.  They may have been on a phone

13 call or like a -- like a group call, but I can't recall.  I --

14 I can't recall to you saying, Oh, I had a conversation with so

15 and so from CCIA.

16    Q.  Sure.  So I take it then that you're not aware of any

17 financial relationship between TechNet and CCIA?

18    A.  Not that I'm aware.

19    Q.  Okay.  What I'm going to do now -- and I think this

20 will work -- I'm going to send through the chat function a PDF

21 copy of your declaration in this case, just so that we all know

22 that we're referencing the same document.  I can briefly share

23 my screen to make sure that we are looking at the same document

24 and then I'll just let -- let each of us use our copy, but the

25 one I'll send through the chat function, feel free to refer to

19

1 that as much as you like.

2        MR. WALTON:  And I'll ask the court reporter to

3 mark it as Exhibit 1 to this deposition.

4        (Exhibit Number 1 was marked.)

5    Q.  (BY MR. WALTON) Okay.  Mr. Esparza, just let me know

6 when you are able to download and open the PDF file that I just

7 sent through the chat function.

8    A.  Okay.  I've opened it.

9    Q.  And is this PDF document a copy of the declaration

10 that you submitted in this case?

11    A.  Without doing kind of like a control/compare-type

12 deal, it looks like what I submitted.

13    Q.  Sure.  Okay.  I am going to briefly share my screen.

14        So we established we're looking at the same PDF

15 file.  Can you see my screen now, Mr. Esparza?

16    A.  Yes.

17    Q.  I have a document here, and then on page 2 of the PDF

18 file, and it appears to be the first page of your declaration

19 in this case.  Is that what it appears to you to be?

20    A.  Say that again, sir.  It cut off for me.

21    Q.  Yes.  This -- this appears to be the first page of

22 the declaration that you submitted in this lawsuit; is that

23 what it appears to you to be?

24    A.  Yes.  What you're showing me on the screen, yes.

25    Q.  All right.  Well, if I refer to Exhibit 1 or to your

20

1 declaration, that's the document that I'm referring to.  Feel

2 free to refer to it as needed throughout the rest of our time

3 this afternoon.  Okay?

4    A.  Okay.

5    Q.  Who drafted this document?

6    A.  I drafted it.

7    Q.  Did anyone provide feedback on it or review it before

8 you signed it?

9    A.  David Edmonson, who's my boss, looked at it.  I also

10 sent it to Trent Edwards in our team, who is responsible for

11 kind of our engagement with -- with cases.  I'm not entirely

12 sure if he reviewed it, but I know I -- I sent it to him.  And

13 then I also sent it to -- to Chris with NetChoice for his --

14 you know, for -- for making sure that the titles of those cases

15 were right and if he saw anything that was overlooked in it

16 or -- or -- or wrong in it, I should say.

17    Q.  And did either of those three individuals provide you

18 with any feedback?

19    A.  I can't remember if David provided feedback.  I know

20 that Chris provided some feedback on -- I think, my draft of it

21 said TechNet and didn't actually spell out our legal name, so

22 he suggested adding that.  He also, I believe, shared the --

23 the actual verbiage of what we're supposed to say the name

24 of the case in -- in that stuff.  Those two things, I can

25 definitely recall Chris from NetChoice mentioning in -- in

21

1 response to the draft that I sent him.

2    Q.  Sure.  Did Chris have any other suggestions?

3    A.  I -- I --

4        MR. FREDRICK:  Object to form.

5        You can answer.

6    A.  I -- it's not coming up what those were.  Those first

7 two I just remember were ones that were really clear on what I

8 modified.

9    Q.  (BY MR. WALTON) Sure.  And just to be clear, for the

10 record, are you saying that -- that you know Chris didn't make

11 any other suggestions, or just that you don't know whether he

12 did?

13        MR. FREDRICK:  Objection; form.

14        You can answer.

15    A.  That I don't know what those are.  I -- I believe

16 there were some others.  I can't recall what they were.

17    Q.  (BY MR. WALTON) Okay.  I understand now.  Thank you.

18        And then I believe there was a third person, I

19 can't remember the name, but that you said you may have sent it

20 to.  Did you get any other feedback from that other individual?

21    A.  From Trent Edwards in our team?  No, I don't believe

22 I received anything back from him.

23    Q.  Okay.  Did you receive any feedback from the

24 legislators or legislative offices that you were in

25 communication with while HB 20 was still a bill?

Servando Esparza - 11/15/2021

22

1   MR. FREDRICK: Objection; form.
2   You can answer.
3  A. Repeat the question.
4  Q. (BY MR. WALTON)  Sure.  While HB 20 was still under
5 consideration by the Texas legislature, did you receive any
6 feedback from the legislators that you expressed concerns to
7 about the bill?
8   MR. FREDRICK: Objection; form.
9   You can answer.
10  A. Yes.  I heard -- I heard some -- like I mentioned, I
11 met with Cain's office.  I -- I shared our concerns with --
12 with -- with them.  They agreed to make some adjustments to it
13 and that specifically his chief of staff would talk to
14 Representative Cain about making some additional changes.  At
15 that point I -- I believe I either -- I met with him at his
16 office and we had of went through the bill and I highlighted a
17 couple of issues and where those concerns were.
18   I also remember speaking with -- over the phone
19 with Drew Tedford who works as Senator Hughes' committee --
20 committee director, I -- I believe is his title.  But usually
21 he's kind of the go-to person in Senator Hughes' office on it.
22 Met with him and provided some feedback on -- on the bill.
23   I also spoke with representative -- what is her
24 name?  From Houston, Ann Johnson's team on -- specifically
25 asked for some feedback prior to the hearing.

23

1   I sent some additional potential questions
2 and -- and feedback on our concerns to Representative Bucy in
3 the House prior to the hearing, as he was interested in
4 potentially asking some questions on the bill.  So, yeah.  So
5 just throughout the process, I've provided some -- the feedback
6 throughout.
7  Q. (BY MR. WALTON)  Sure.  Do you know whether the bill
8 was modified or amended in any way as -- to reflect the
9 concerns that you shared with these different legislators?
10  A. Do I know if they made modifications based on some
11 feedback that TechNet provided specifically?
12  Q. Yes.
13  A. I -- I don't know that they made it at our request.
14 I know that -- and -- and the reason why is because I believe
15 other members were meeting with them, so I don't want to sort
16 of assume responsibility or take credit for -- for something
17 that I -- that maybe is kind of a group activity, you know.
18  Q. Sure.  Sure.  What were some of those changes that at
19 least were consistent with the terms that TechNet directly
20 expressed?
21  A. In -- in House Bill 20, with -- with Representative
22 Cain's office, we specifically worry -- were worried about
23 portions of the email provisions that were added on there.
24 There was concerns from several TechNet members that, without
25 some clarifications, that it would be easier to -- to sort of

24

1 spam or to -- to stop spam.  And so we had a couple of
2 recommendations that if they would clear it up, that it would
3 still target, you know, what -- what the bill was trying to
4 target, just not necessary -- and -- and while at the same
5 time, our members sort of mentioned that it would be -- they
6 would still maintain some control over being able to block some
7 spam.
8  Q. And what changes did you want to see to those
9 provisions?
10  A. Without the bill in front of me and -- and -- and
11 notes just showing the -- the comparison, you know, I can just
12 sort of talk generally about what -- what that was.
13  Q. That's totally fine.
14  A. So one of them was this -- this discussion of sort of
15 blocking and -- and electronic communications and -- and I
16 think we were -- we had discussed, based on content --
17 including the terms based on content to that so that it would
18 essentially let, you know, some TechNet members be able to use
19 sort of email history, either reckless sort of behavior,
20 mismanagement -- mismanagement of lists or in any sort of just
21 flags that are raised by email service providers that -- that
22 would say this -- this person, it seems like it mentioned a
23 nefarious user or has sent spam in the past.  And if that
24 change was on there, that the company would still be able to
25 block this person from sending something.  So some of that was

25

1 dealing with being able to leave as many controls for the email
2 service providers.
3  Q. I see.  Do you know whether any of those portions
4 of -- of the bill were changed and modified before it passed?
5  A. Sorry.  Yes.  That -- that portion, some changes
6 along the lines of what I mentioned was -- was made on the
7 email provisions.
8  Q. And is it TechNet's position that those changes were
9 sufficient or insufficient to meet the concerns of -- of the
10 members in the committee?
11   MR. FREDRICK: Objection; form.
12   You can answer.
13  A. It's insufficient and insufficient in what?  Say that
14 again.
15  Q. (BY MR. WALTON)  Sure.  The changes that were made
16 for the email service providers that you were just describing,
17 were those changes sufficient to address the concerns that
18 TechNet had with that portion of HB 20?
19   MR. FREDRICK: Same objection.
20  A. Not all concerns were alleviated, but it -- but it --
21 it was an improvement.
22  Q. (BY MR. WALTON)  Sure.  So as -- as you recall, what
23 concerns still remain?
24   MR. FREDRICK: Objection; form.
25   You can answer.

26

1    A.   Just generally why the need for the change all
2  together if -- if -- if there could be misuse of the provision
3  that would make it legal to send some spam, I think we just
4  didn't see the -- the need for the change at all.  Included
5  oftentimes when I had conversations with legislative staff and
6  members about the specific piece, no one was able to sort of
7  point to exactly what the -- the problem that we were fixing,
8  so the problem was generally why that was still in the bill.
9  That make sense?
10    Q.   (BY MR. WALTON)  Okay.  Looking at your declaration
11  here, I see in the first few paragraphs that you describe
12  TechNet, and I think you and I have gone over a basic
13  description of TechNet -- TechNet's functions, so I don't want
14  to spend too much more time on some of the earlier paragraphs,
15  but I do want to hit just a few more questions I have.
16        For -- for clarity, is TechNet itself a social
17  media platform?
18    A.   TechNet itself is not a social media platform.
19    Q.   And is TechNet itself an email service provider?
20    A.   No, TechNet is not an email service provider.
21    Q.   Pardon me.  Here, I'm running through my notes trying
22  to be efficient.
23        But back up in paragraph 1, I'm on page 2 of the
24  PDF file that I sent through the chat.  It's numbered page 1 at
25  the bottom, it's paragraph 1 of your declaration.  Do you see

27

1  that paragraph?
2    A.   Paragraph 1, yes.
3    Q.   The -- the last line refers to TechNet's agenda.
4  What do you mean by that?
5    A.   TechNet, we have state policy principles and -- and
6  the agenda is the policy principles.
7    Q.   And what are those policy principles?
8        MR. FREDRICK:  Objection; form.
9        You can answer.
10    A.   It is -- it is a set of -- we often describe it as
11  sort of like a constitution.  It's what -- and we have a state
12  one and a federal one.  So the state team, I look to those
13  state policy principles as sort of a guiding -- sort of a
14  principal for TechNet's engagement and -- and how we would
15  speak about it, why we would be involved, and -- and in
16  generally -- generally sort of look to that as sort of -- yeah,
17  like sort of our constitution.
18    Q.   (BY MR. WALTON)  Are those policy principles publicly
19  available?
20        MR. FREDRICK:  Objection; form.
21        You can answer.
22    A.   Yes, they're on our website.  We'll flag that they --
23  they -- they changed after our state policy conference was just
24  happened last week.
25    Q.   (BY MR. WALTON)  How often is that conference held?

28

1    A.   In normal years, once a year.  COVID, we had a
2  virtual conference instead.  But it's been -- it's -- it's --
3  we try to do it once a year.  I've only been here a year so
4  I've been to just two.
5    Q.   I see.  At either of the last couple of conferences
6  that you've had, has there been any explicit discussion of
7  HB 20 or that's similar to Florida law?
8    A.   Not that I recall.
9    Q.   And about how many of your members attend or maybe
10  participate virtually in those conferences?
11    A.   I don't have the number on -- on virtually.  The --
12  the number of TechNet members that -- that attended, it would
13  be between 80 to 100.  This last week I don't have the final
14  numbers just cause I -- I'm going with a -- a number that --
15  that I was told was 140-something, but that included TechNet
16  staff and legislators that attended, so it -- the -- the
17  dealt -- the difference would be the TechNet members that
18  attended.
19    Q.   How many of TechNet's members are social media
20  platforms?
21        MR. FREDRICK:  Object to the form of the
22  question.
23        You can answer.
24    A.   That own a social media platform that -- as described
25  by HB 20?

29

1    Q.   (BY MR. WALTON)  That's right.  How many of TechNet's
2  members are responsible for operating a social media platform
3  as described by HB 20?
4        MR. FREDRICK:  Objection; form.
5        You can answer.
6    A.   I -- I don't have a full number.  And then not -- not
7  to be evasive, it's just several members had mentioned that
8  they felt like they could be roped into the definition of
9  social media platform.  And -- and -- and so I don't know if to
10  count those as well, versus those that -- that -- that I think
11  a lot of folks assumed were included in the bill.  So I don't
12  want to be evasive but I -- I just can't give you a total
13  number because I'd -- I'd be wrong, likely.
14    Q.   (BY MR. WALTON)  Sure.  Can you -- can you tell me
15  whether there are any members of TechNet that you do know fall
16  within the definition of a social media platform under HB 20?
17    A.   Yes.
18    Q.   And what would those members be --
19        MR. FREDRICK:  Objection; form.
20    A.   -- that --
21        MR. FREDRICK:  You can answer.
22    A.   -- that I know that Facebook or Meta would -- would
23  fall under the definition for their -- what was -- you know,
24  what's been called Facebook, and I think the user threshold
25  will still capture them under Instagram.  The -- who else was

30

1   it?  I don't know the user threshold for, like, a Twitch.  And
2   so that is -- that -- I believe that's owned by Amazon, so that
3   might be -- it might be fathered into that definition.
4   Depending on the definition of users, I think Salesforce, you
5   know, may be included in it for some of the programs that they
6   have.  I think it's -- if you told the number of people that
7   can access some of their platforms, and they're considered
8   users -- licensees, they could be included in that.  It's hard
9   to tell just because a lot of these companies sort of change
10  ownership, so I -- I don't know very much about the -- the
11  other ones.  And without my notes that I had for -- kind of the
12  prep for some of the testimony I give on HB 20, that -- that
13  list I provided, it is sort of the ones I would call out.
14      Q.  (BY MR. WALTON)  I see.  And -- and -- and then a
15  similar question regarding email service providers, are there
16  any members of TechNet that you do believe would fall under the
17  requirements of HB 20?
18      A.  Without -- without the definition right in front of
19  me, I can only give you a sense of -- of -- of who provided
20  feedback on that portion.  I don't want to say they're
21  definitely in there without that -- without the definition
22  being in my face, especially because that one's the one that
23  had a lot of last-minute changes.
24      Q.  Sure.  Let me go ahead then and I'll send another PDF
25  document through the chat.  This will be the copy of HB 20, and

31

1   we can look at that together.
2        Okay.  While you're opening that document,
3   Mr. Esparza, I'll just note for the record that I will ask the
4   court reporter to label this document Exhibit 2 to your
5   deposition.
6        (Exhibit Number 2 was marked.)
7      Q.  (BY MR. WALTON)  And just let me know when you've
8   opened that up and are able to -- to scroll through that
9   document.
10     A.  Yup, I have it open.
11     Q.  If you would, Mr. Esparza, scroll down to page 9
12  using the PDF's internal page notion.  Page 9 of that PDF
13  document towards the bottom of the page, beginning at line 12,
14  it starts with section 5 of HB 20.  Do you see that portion?
15     A.  Section 5 on line 12, page 9, yes.
16     Q.  Yes, sir.  Do you see section 321.054 that begins on
17  line 14 of that same page?
18     A.  Yes.
19     Q.  What is your understanding regarding whether any of
20  TechNet's members are affected by this provision?
21        MR. FREDRICK:  Objection; form.
22        You can answer.
23     A.  It -- well, I -- I need to look at the definition of
24  email service provider, which is in that -- in that -- in
25  section 321 of the code, since it refers to a provider, but

32

1   the -- the definition's not on here.
2     Q.  (BY MR. WALTON)  Sure.  So as you sit here today,
3   you're not able to tell me whether any of TechNet's members
4   would be governed by section 321.054?
5        MR. FREDRICK:  Objection; form.
6        You can answer.
7     A.  And I would only -- I would only be guessing and --
8   and not be -- not feel -- not feel a hundred percent
9   comfortable...
10     Q.  (BY MR. WALTON)  Okay.  That's fine.
11        Let's go back to your declaration, Mr. Esparza,
12  Exhibit 1, and let's go to paragraph 4.  And that's on the
13  fourth PDF page in my version of the document.  Do you see
14  paragraph 4 of your declaration, sir?
15     A.  Yes.
16     Q.  The -- the first sentence under that paragraph begins
17  by stating:  Social media platforms understand that they have
18  an obligation to remove objectionable content.  What is that
19  obligation to remove the objectionable content?
20        MR. FREDRICK:  Objection; form.
21        You can answer.
22     A.  I -- my opinion would be that most -- that most of
23  these social media platforms want to be workplace friendly and
24  family friendly, so their -- their obligation would, you
25  know -- so that harmful content isn't, you know, readily

33

1   accessible on someone's feedback or -- whatever it's called
2   where -- where -- homepage or whatever.
3     Q.  (BY MR. WALTON)  So just to be clear, are you talking
4   about an obligation that arises from law?
5     A.  When I wrote this, no.  No specific law that forces
6   them to.
7     Q.  Is it an obligation that arises from some kind of --
8   of contract?
9        MR. FREDRICK:  Objection; form.
10       You can answer.
11    A.  As part of some contract?  I wouldn't -- I -- I -- I
12  don't know.  That doesn't make sense to me.  A contract with
13  whom?
14    Q.  (BY MR. WALTON)  Yeah.  Well, that's what I was
15  wondering, too.  I'm just wondering where this obligation comes
16  from.
17       MR. FREDRICK:  Object to the form of the
18  question.
19       But you can answer.
20    A.  I think it's just sort of common -- maybe -- my
21  opinion would be that they know that they -- that -- that it
22  would hurt the number of users it would get.  It wouldn't be an
23  attractive platform for -- for as -- for as many people as
24  possible.  That if they were, you know, I -- I think it's just
25  more of a social sort of a -- it would be the right thing to

34

1  do, instead of it -- and like an obligation to a specific
2  government entity or -- or individual of some sort.  That's
3  what I meant that -- when I -- when I wrote it that way.
4      Q.  (BY MR. WALTON)  Okay.  The -- the second sentence in
5  that paragraph states:  Companies take this responsibility
6  seriously, removing harmful content while keeping their
7  services open to their broad range of ideas.
8          What do you mean by "harmful content"?
9          MR. FREDRICK:  Object to the form.
10         You can answer.
11     A.  The -- the harmful content that I often refer to and
12 I -- and I described it in testimony, it's sort of a "lawful
13 but awful" is -- is the term that -- that we were using quite a
14 bit.  It's -- it's something that like harassment is
15 harassment, something that like Nazi propaganda or -- or claims
16 of that the holocaust didn't occur, or just, you know, awful --
17 awful, you know -- just overall content that is not
18 specifically banned by law, but that someone generally -- the
19 general public doesn't want to see it on its -- on its page.
20 It's -- it's tough to kind of sort of give a really refined
21 answer on that, because a lot of it is sort of when you see it,
22 you know, you would sort of -- may have objections to it.
23     Q.  (BY MR. WALTON)  And who determines whether the
24 content is harmful?
25         MR. FREDRICK:  Object to form.

35

1          You may answer.
2      A.  I think, generally, you know, every social media
3  platform functions differently.  I think they set a -- a
4  general guidelines, community standards, everybody -- every --
5  each company uses kind of a different name for it, but just
6  generally, here's -- here's what you can and can't do, can or
7  can't say on our platform, which is sort of ever-revolving, I
8  will note, just as -- as threats kind of evolve.
9      Q.  (BY MR. WALTON)  I guess, are -- are you aware -- are
10 you aware within TechNet's members who operates social media
11 platforms, whether they are evaluating content as harmful,
12 whether that is done by humans or whether it's done by some
13 sort of mechanistic process?
14         MR. FREDRICK:  Object to the form.
15         You can answer.
16     A.  Generally, I believe the TechNet members that are
17 social media platforms, use both a little -- a -- you know,
18 both.  I don't know kind of the equation to note what -- what
19 is done by AI versus what's done -- and how much -- how many
20 humans sort of help review that -- I apologize -- but I would
21 say it's a mixture both -- of both.
22     Q.  (BY MR. WALTON)  Sure.  And just to clarify for the
23 record, when you use the abbreviation AI, are you referring to
24 artificial intelligence?
25     A.  Yes.  Just sort of help -- yeah.

36

1      Q.  Okay.  And are you aware of -- are you aware of
2  within this world of content moderation, are you aware of what
3  role AI plays versus what role human input plays?
4          MR. FREDRICK:  Object to the form.
5          You can answer.
6      A.  You know, all these social media platforms are
7  different.  I -- I wouldn't be able to specifically say for any
8  of them, how specifically one way or the other.
9      Q.  (BY MR. WALTON)  Okay.  If that third sentence -- and
10 there again, we're still in paragraph 4 of your declaration.
11 That third sentence states:  In the overwhelming number of
12 cases, removal of offensive content is accomplished as
13 intended.
14         How do you know that?
15     A.  We base that on a general understanding that of the
16 number of the reports that are provided by some of the
17 companies, of how much they've removed that -- that is harmful.
18 You know, some of those reports show that the -- the sheer
19 number of posts and then the number of what they removed, we
20 sort of felt generally that they -- they do remove a lot of
21 the -- the -- the threats that -- that are -- of posts that
22 contain things that they would say they would remove.  "They"
23 being social media platforms.
24     Q.  Sure.  Do you know -- do you know what the ratio is
25 between offensive content that is successfully removed versus

37

1  the offensive content that is not removed?
2          MR. FREDRICK:  Objection; form.
3      A.  I -- I don't know that.  Like I mentioned, they're
4  all different.  I couldn't speak for every single one of them.
5      Q.  (BY MR. WALTON)  So when you say the
6  overwhelming number of cases, do you know whether that is more
7  than 50 percent or less than 50 percent?
8          MR. FREDRICK:  Objection; form.
9      A.  I don't -- I don't know that.  It was a long time ago
10 since I looked at the -- the types, sort of, recap reports that
11 the companies provide.
12     Q.  (BY MR. WALTON)  Okay.
13         MR. WALTON:  We've been going almost an hour.
14 How about we go ahead and take maybe a ten-minute break.
15         Is that okay with you, Matt?
16         MR. FREDRICK:  Sure.
17         THE REPORTER:  Okay.  Off the record.
18         (Recess was taken from 2:59 p.m. to 3:09 p.m.)
19         THE REPORTER:  The time is 3:09 p.m.  We're back
20 on the record.
21     Q.  (BY MR. WALTON)  Mr. Esparza, we are back after a
22 brief break.  Are you ready to proceed with your deposition?
23     A.  Yes.
24     Q.  Let's go look at paragraph 5 of your declaration now.
25 It begins at the bottom of the fourth page in my PDF file.  Are

38

1  you able to see paragraph 5 of your declaration, sir?
2      A.  Yes.
3      Q.  I'm actually going to go to a portion of paragraph 5
4  that is at the top of the next page.  We're about the sixth
5  line down from the top of that page or so.  It's the sentence
6  that begins with:  Content including threatening or
7  intimidating messages, conspiracy theories, anti-vaccine
8  misinformation, holocaust denial, and white supremacy is not
9  explicitly allowed to be removed by social media platforms.
10         Do you see that sentence?
11     A.  Yes.
12     Q.  What does threatening or intimidating messages mean?
13         MR. FREDRICK:  Object to the form.
14         But you can answer.
15     A.  I -- I mean, I would say it's -- it's if there's a --
16  a message or any kind of post that someone makes that the other
17  person receives at a -- as a potential threat or that the
18  message, it -- it intimidates that individual, that -- that
19  would be a threatening or intimidating message.
20     Q.  (BY MR. WALTON)  And who decides whether a particular
21  message is threatening or intimidating?
22         MR. FREDRICK:  Objection; form.
23         You may answer.
24     A.  I think the -- the recipient of whoever receives that
25  may feel like it is -- it is -- like it is a threat that they

39

1  receive or -- or it is meant to send intimidation.  I think
2  oftentimes -- yeah.  I think it's the recipient that's the main
3  one that -- that typically is the one that has that sort of a
4  reaction to a message like that.
5      Q.  (BY MR. WALTON)  So how -- how would a social media
6  platform know whether a particular message sent to a particular
7  individual or a group of individuals was or was not threatening
8  or intimidating?
9          MR. FREDRICK:  Objection; form.
10         You can answer.
11     A.  I think if the -- it -- it kind of depends.  It
12  depends on what the message is.  If the person said, I plan
13  to -- I hate all blank, I plan to shoot the next blank that I
14  see, that -- that could be seen as a -- as a threatening
15  message.  And -- and I think that -- kind of broad depending on
16  what the type of language -- yeah.
17         It's -- it's harder to sort of -- it's not sort
18  of a black and white, but if you see it, you definitely know
19  it's not a sort of -- there's some context.  And, you know, a
20  lot of times -- or I wouldn't say a lot of times -- sometimes
21  users will then flag it to the social media platform that a
22  message that was sent, it is threatening, they would not like
23  to see it, or it should be taken down.
24     Q.  (BY MR. WALTON)  Is it sufficient for a social media
25  platform to wait until a recipient receives a message and then

40

1  flags it and says this is threatening or intimidating and then
2  at that point take the message down?
3          MR. FREDRICK:  Objection; form.
4      A.  That was a -- a really long question.  Sort of --
5      Q.  (BY MR. WALTON)  Yeah.
6      A.  -- break that down for me.
7      Q.  Sure.  Sure.  I'm trying to -- to understand what --
8  what the proper role is, as you see it, as TechNet sees it, for
9  a social media platform is.  If there's a threatening or
10  intimidating message out there, should the social media
11  platform attempt to remove that threatening or intimidating
12  message before it reaches a recipient, or should the platform
13  wait until the recipient says, I received this, please remove
14  it, before they respond to remove the message?  Does that make
15  sense?
16     A.  Yes.
17         MR. FREDRICK:  Objection; form.
18     A.  It -- it -- yeah.  It makes a little bit more sense.
19  And I would respond it -- it depends on what that message is.
20  And then two, it depends on the platform itself.
21     Q.  (BY MR. WALTON)  Is there ever a situation where you
22  believe it would be appropriate for a social media platform to
23  remove a message that is deemed to be threatening or
24  intimidating before it reaches its intended recipient?
25     A.  Repeat the first part.  I followed you on the last

41

1  part, but...
2      Q.  Yeah.  It -- do you believe that there could be a
3  situation where a social media platform should remove a message
4  that is deemed to be threatening or intimidating before that
5  message reaches its intended recipient?
6      A.  Again, it would depend on -- on -- on the message.
7  Yeah.
8      Q.  I understand it -- it would depend on the message.
9  I'm just asking:  Would it ever be appropriate -- are there any
10  sorts of messages where it would be appropriate to remove them
11  before they reached the recipient?
12     A.  You know, I -- I -- I don't know.
13     Q.  What about the next phrase in that sentence after
14  "threatening or intimidates messages"?  You used the phrase
15  "conspiracy theories."  How does a social media platform
16  determine what is a conspiracy theory?
17         MR. FREDRICK:  Objection; form.
18     A.  I don't know exactly how -- how they do that.
19  Oftentimes they use the terms conspiracy theories in the sort
20  of community standards or the guidelines that I've talked about
21  before, but I don't know how they individually will say, you
22  know, X amount of activity is now -- now we consider a
23  conspiracy theory.  I -- I don't know.  I would imagine it
24  varied by company per platform.
25     Q.  (BY MR. WALTON)  Sure.  And does TechNet have a

42

1 position as to what the criteria should be for determining
2 whether something is a conspiracy theory?
3     A.  We don't.
4     Q.  Okay.  And I guess just to save time, the other
5 categories in this sentence, does TechNet have stated criteria
6 for determining what does and does not constitute the various
7 types of information that you described in the sentence we're
8 looking at?
9     A.  Not that I know of.
10    Q.  Okay.  The last sentence in paragraph 5 states that
11 this would cause "real-world irreversible harm in Texas
12 communities and beyond."
13        What is the "real-world irreversible harm" that
14 you're talking about?
15    A.  What I -- what I meant with that was, you know, that
16 some of the -- the content in the categories that were listed
17 in -- in the -- higher up in the paragraph, can be -- can be
18 pretty shocking to a lot of people, can -- can be offensive.
19 You can imagine that someone that, you know -- that -- that
20 finds imagery of the holocaust or -- or any sort of those --
21 those details, that if they see content that is about the
22 denial of it or just Nazi propaganda or -- or use of that, that
23 they would be very -- they would not want to see that type of
24 content.
25        Same thing for like if a child sees some --

43

1 some -- something that is offensive.  What we meant there was
2 that social media platforms were going to be limited under HB
3 20 to remove some content, they would -- they would -- that
4 their users would potentially find offensive and -- and harmful
5 and that, it -- you know, this bill would make it harder for
6 them to remove some of that content.  And if a -- a user who
7 doesn't want to see that type of content interacts with it
8 or -- or views it with -- as -- on their feed or part of their
9 timeline, that it could cause harm to them, and leave the
10 platform all together because of what they saw.  That's kind of
11 generally what -- what I was discussing with that in that
12 sentence.
13    Q.  Well, that takes me into some of the questions I
14 wanted to ask about paragraph 6.  So let's go ahead and scroll
15 down to paragraph 6.  I'm still on page 5 of my PDF document of
16 the declaration, but regardless of what page it is for you, are
17 you able to see paragraph 6 of the declaration?
18    A.  Yes, I can see it.
19    Q.  The -- the first sentence there at the end refers
20 to -- well, it states:  It is critical for the business that
21 the platforms are safe and family and workplace friendly.
22        What does it mean for a social media platform to
23 be safe?
24    A.  To be safe?  That's kind of a tough question.  Are
25 you asking me if there's family or workplace friendly safe?

44

1     Q.  Well, those were going to be my next questions.
2     A.  Okay.
3     Q.  So it seems here in your sentence that you've used
4 three different terms that -- that's important to social media
5 platforms:  To be safe, to be friendly, and to be workplace
6 friendly.
7     A.  Yup.
8     Q.  So correct me if that was a misinterpretation of your
9 declaration, but assuming that is what you're trying to say,
10 can you walk me through what each of those three terms mean?
11        MR. FREDRICK:  Object to form.
12        You can answer.
13    A.  Yeah.  So in -- in drafting this, what -- I thought
14 about the -- the safety piece in some of the examples that --
15 that were used in -- in conversations was -- let me double
16 check -- states like there -- there's no sort of financial
17 scams or, you know, that there is some -- some talk -- and this
18 was sort of Florida.  That's where Florida sort of started,
19 where if you make it easier, if you let nefarious users know
20 how to give -- how to sort of circumvent any potential, you
21 know, ways to block their messages, that human traffickers will
22 often use -- sex-trafficking will use, you know, some of --
23 some of the sites to potentially, you know, groom or to
24 facilitate, you know, transactions.  I'm -- I'm not even sure
25 if I'm using the terms correctly.  But this -- this sort of

45

1 concern that -- that -- and so in the -- in using the word
2 "safe," we're just sort of saying from some of those threats,
3 make sure that social media platforms are able to remove some
4 of those risks.
5     Q.  (BY MR. WALTON)  I see.  So I heard a couple things
6 there that I just want to go back and clarify.  In talking
7 about -- you mentioned human traffickers, you know, trying to
8 avoid these roadblocks, and I'm wondering, is -- is that --
9 well, how does -- how does HB 20 in your understanding affect
10 the ability of human traffickers to utilize social media
11 platforms?
12    A.  The concern was in the provisions that require social
13 media platforms to report why something was blocked and then
14 provide some additional information on that.  The -- the
15 concerns then would say if -- if, you know, platform A just
16 blocked, you know -- said that, as part of their, you know,
17 content moderation processes, if they remove a post that says
18 the -- the term "sex-trafficking" or that it bumps that to
19 human review or -- or whatever, that there be something that
20 would then -- a nefarious user, in this case, a sex-trafficker,
21 would say, you know -- you know, if -- if you use these certain
22 terms, Facebook is more likely to double check your post or
23 not.
24        The -- the arguments we were making was sharing
25 more information about how that, you know, each -- each social

46

1 media platform runs their content moderation, could be seen as
2 a blueprint for nefarious users to -- to understand how to
3 evade that -- that moderation.
4    Q.   Okay.  What -- what then do you mean when you say,
5 "family and workplace friendly"?
6    A.   What I meant with that was, back to the -- you know,
7 our conversation about the -- the harmful content and -- and
8 that -- some of that content, again, may be legal to -- to post
9 and may be able to say or, you know -- but it -- but it's just
10 something that a traditional user may say, I don't want to see
11 it on my feed.  I don't want to be forced to -- to read about,
12 you know, some of the examples that I mentioned:
13 Misinformation about vaccines, or -- or holocaust, now, content
14 and if they're able to post.
15         And -- and -- and some of that, too, is schools
16 and workplaces, employers, oftentimes, you know, will block
17 certain sites that they think are offensive or that they've
18 received feedback.  I -- I typically don't know how this works,
19 but I know that it exists.  That's the kind of thing I'm
20 talking about, that clearly schools and employers want to make
21 sure that, you know, that their employers are -- are -- kind of
22 that -- that's where I was kind of going with that piece.  Is
23 that there -- there's some understanding of that.  Am I making
24 any sense with that.
25    Q.   I -- I think so.  I just want to clarify when you --

47

1 when you talk about schools and employers, are you aware of any
2 schools or employers that would be social media platforms or
3 email service providers regulated by HB 20?
4    A.   Any schools or employers?  Aside from, like, Facebook
5 that employs people in Texas, or the traditional ones that
6 we've talked about, you know, no.
7    Q.   Okay.  What if a user had the opportunity to
8 self-select, self-screen, the kind of material that they didn't
9 want to see?  So that instead of the platform doing it for
10 them, it was the user saying, Well, I don't want to see
11 anything like that, and so they -- they sort of activate that
12 option on the user's end to -- to moderate their own content,
13 would -- would TechNet have concerns with that?
14         MR. FREDRICK:  Objection; form.
15    A.   I -- I don't know that we -- that -- that's a tough
16 question to ask.  I have not been given any indication that
17 members want TechNet to weigh in specifically on something like
18 that.  But I just --
19    Q.   (BY MR. WALTON)  Okay.
20    A.   -- have not heard that concern.
21    Q.   So -- so as you sit here today, TechNet doesn't have
22 a position as to -- as to the -- the possibility of user
23 self-selection or self-moderation of content?
24         MR. FREDRICK:  Objection; form.
25    A.   That I'm aware of.

48

1         MR. FREDRICK:  Sorry.  You can -- you can
2 answer.
3    A.   That I'm aware of, I -- I don't believe our state
4 policy principles talked -- go into that.
5    Q.   (BY MR. WALTON)  Let's see.  Also in paragraph 6, in
6 the second sentence, you state:  If affected TechNet social
7 media platform members are unable to maintain a family- and
8 workplace-friendly platform, it will affect their ability to
9 attract advertisers that will not want to be associated with
10 objectionable content.
11         How do you know that?
12         MR. FREDRICK:  Objection; form.
13    A.   I don't.
14    Q.   (BY MR. WALTON)  Have you talked to any advertisers
15 about whether their advertisements will be affected by HB 20?
16    A.   Advertisers themselves, no.  Where I got -- received
17 this concern was kind of in conversations about what the
18 effects would be.  And -- and when I talked a little bit about
19 the -- the -- the content, I don't remember who sort of brought
20 up this sort of -- this idea that -- that, you know, you can
21 sort of imagine that if you have a -- you know, your -- your
22 landing page, and then you have sort of a -- an ad or whatever
23 company, that if there's some objectionable content, they may
24 not -- they're not going to love having their company banner or
25 whatever ad next to something people would find objectionable.

49

1    Q.   But you haven't conducted any surveys or other
2 research regarding what advertisers would or would not do if
3 required to comply with HB 20?
4    A.   No.
5         MR. FREDRICK:  Objection; form.
6    Q.   (BY MR. WALTON)  The next sentence states:
7 Additionally, users may decide to leave the platform if
8 objectionable content that they report is not removed.
9         How do you know that?
10    A.   I -- I don't know for sure.
11    Q.   So there again, have you done any research regarding
12 users' decision to leave a platform if required to comply with
13 HB 20?
14    A.   Typically, like if enacting HB 20, no, I have not
15 done research on that.
16    Q.   Let's see.  Paragraph 7 of your declaration, you talk
17 about section 230 of the Federal Communications Decency Act.  I
18 don't want to get bogged down into too many details, but
19 generally speaking, does TechNet believe that section 230 is a
20 good law?
21         MR. FREDRICK:  Objection; form.
22         You can answer.
23    A.   I don't know that we have an opinion on that.  I
24 would need to refer to the -- the state policy, principles.  I
25 have not looked at that one in a good -- in a good while on

50

1 that.
2     Q.  (BY MR. WALTON)  Do you believe that section 230
3 gives sufficient protection to media platforms?
4     A.  I --
5         MR. FREDRICK:  Objection to form.
6         You can answer.
7         THE WITNESS:  I'm sorry, Matthew.
8     A.  I personally, I -- I -- I don't know.
9     Q.  (BY MR. WALTON)  As you sit here today, do you have
10 any criticisms of section 230?
11        MR. FREDRICK:  Objection; form.
12     A.  I personally don't.
13     Q.  (BY MR. WALTON)  And are you aware whether TechNet
14 has any official criticisms of section 230?
15     A.  In my time at TechNet, I have not heard that TechNet
16 as an entity, has conveyed any concerns on section 230.
17     Q.  Okay.  Let's go to paragraph 8, then.  We're getting
18 close.  Paragraph 8 refers to threats.  I'm not going to take
19 the time to read every instance, but let me -- let me read one
20 example.  Is -- I believe it's the third sentence of
21 paragraph 8.  That's section 321.054, you say:  It will make it
22 difficult for email service providers to block spam and other
23 malicious threats as the exceptions in statute do not cover all
24 forms of threats.
25        What do you mean by "threats"?

51

1        MR. FREDRICK:  Objection; form.
2        You may answer.
3     A.  I apologize.
4        The -- the concern is on -- on this piece was
5 that we are trying to be pre -- pre -- prescriptive -- I
6 apologize -- on what those threats are.  And then -- and -- and
7 that if anything is left out, then -- and is not included in
8 there.  And so the concerns that I shared, especially to
9 Representative Cain's office, is if we're required to define it
10 and put it in statute now, what happens in the future where
11 there are, sort of, any other type of -- of online, you know --
12 we think in sort of -- that I think when I read that language
13 is sort of some phishing, some other sort of ransomware, some
14 other sort of duplicate code that -- that some of those threats
15 are included in those threats, but I don't know if someone's
16 going to invent something that doesn't fall under the specific
17 definition.  And by virtue of not including it, then it -- it's
18 not included there.  So that's kind of a convoluted way, just
19 sort of just left the door open for any sort of new type
20 of computer/online sort of threat.  Does that make sense?
21     Q.  (BY MR. WALTON)  I -- I think so, thank you.
22        The -- the sentence that begins at the bottom of
23 the page there, still in paragraph 8, and it's -- it continues
24 on to the top of the very last page.  It says, specifically:
25 With billions of spam emails sent each day, it is important

52

1 that email service providers are able to block emails that may
2 cause harm to email users and avoid the unintended consequences
3 that could result in an influx of spam and missed emails in
4 Texans inboxes.
5        First, what do you mean by "harm to email
6 users"?
7        MR. FREDRICK:  Objection; form.
8     A.  Just like we talked about.  Some, like, malicious
9 code or a, you know, virus or -- and -- and something that
10 would -- that would harm someone's computer or steal their
11 data.  That that kind of online threat or -- or harm is what I
12 was talking about there.
13     Q.  (BY MR. WALTON)  I see.  So is that the -- the same
14 idea as what you were describing as threats earlier in this
15 paragraph?
16     A.  Similar.  I -- the harm, like, sort of like, you can
17 steal your identity and identity fraud, and any theft would be
18 a harm, the threat would be the way that they get that
19 information from a phishing or it's -- yeah.
20     Q.  I see.
21     A.  Pretty much.
22     Q.  So the harm would be the -- the consequences that
23 result from the threats that you described earlier?
24     A.  Correct.
25     Q.  Okay.  All right.  Mr. Esparza, I'm just looking over

53

1 my notes real quick to make sure I didn't miss anything.  I
2 think we're getting close to the end here.
3        You mentioned -- we talked a little bit earlier
4 about how TechNet came to be involved in submitting a
5 declaration for purposes of the Florida lawsuit.  Why -- why is
6 TechNet not a plaintiff in that Florida lawsuit?
7        MR. FREDRICK:  Objection; form.
8     A.  I don't know the exact answer to that.  It could be
9 that we just were not equipped to do that, but we -- we mostly
10 focus on the law, being an advocacy portion of it -- of -- of
11 these issues.
12     Q.  (BY MR. WALTON)  Okay.  And then a similar question
13 for this lawsuit:  Why is TechNet not a plaintiff in this Texas
14 lawsuit?
15        MR. FREDRICK:  Objection; form.
16     A.  Similar answer.  It's just...
17     Q.  (BY MR. WALTON)  If a user of a social media platform
18 today, right now, is -- feels that they're being intimidated,
19 harassed, threatened by content, that they are receiving on
20 that social media platform, are you aware of any recourse that
21 that user may have?
22        MR. FREDRICK:  Objection; form.
23     A.  That the user may have on the social media platform
24 for not removing?
25     Q.  (BY MR. WALTON)  Yes.

---

**54**

```
1       A.   I -- I'm not aware.
2            MR. WALTON:  All right.  Well, thank you for
3  your patience, sir.
4            I will, at this time, just take it I have no
5  further questions at the moment and pass the witness.
6            MR. FREDRICK:  Plaintiffs reserve any questions.
7            THE REPORTER:  Okay.  Mr. Fredrick, do you need
8  to order a copy?
9            MR. FREDRICK:  Yes, please.
10           THE REPORTER:  Okay.  Off the record.
11           (Proceedings concluded at 3:40 p.m.)
12
13
14
15           (Per Federal Rule of Civil Procedure 30(e)(1),
16  signature was not requested before the completion of the
17  deposition by Counsel nor the Deponent and, therefore, was
18  waived)
19
20
21
22
23
24
25
```

---

**55**

```
1            CHANGES AND SIGNATURE
2  WITNESS NAME: SERVANDO ESPARZA  DATE: NOVEMBER 15, 2021
3  Reason Codes:  (1) to clarify the record; (2) to conform to the
4  facts; (3) to correct a transcription error; (4) others (Please
5  explain)
6  PAGE  LINE  CHANGE          REASON CODE
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 ____Signature: _____ Date: _____
24       ACKNOWLEDGMENT OF DEPONENT
25
```

---

**56**

```
1            I, SERVANDO ESPARZA, do hereby certify that I have read
2  the foregoing pages and that the same is a correct
3  transcription of the answers given by me to the questions
4  therein propounded, except for the corrections or changes in
5  form or substance, if any, noted on the attached errata page.
6
7
8
9            _____
             SERVANDO ESPARZA          DATE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**57**

```
1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
2                     AUSTIN DIVISION
3  NETCHOICE, LLC d/b/a        )
   NETCHOICE, a 501(c)(6)      )
4  DISTRICT OF COLUMBIA        )
   ORGANIZATION, COMPUTER &    )
5  COMMUNICATIONS INDUSTRY     )
   ASSOCIATION d/b/a CCIA, a   )
6  501(c)(6) NON-STOCK VIRGINIA )
   CORPORATION,                )    CIVIL ACTION NO.
7       Plaintiffs,  )    121-cv-00840-RP
                             )
8                            )
   VS.                       )
9                            )
   KEN PAXTON, in his official  )
10 capacity as Attorney General )
   of Texas,                 )
11      Defendant.   )
12
13 **********************************************
14        REPORTER'S CERTIFICATION
15     DEPOSITION OF SERVANDO ESPARZA
16         NOVEMBER 15, 2021
17 **********************************************
18       I, Ashley Cason, Apprentice Reporter and Notary
19 Public in and for the State of Texas, hereby certify to the
20 following:
21       That the witness, SERVANDO ESPARZA, was duly sworn
22 by the officer and that the transcript of the oral deposition
23 is a true record of the testimony given by the witness;
24       That the original deposition was delivered to BEN
25 WALTON, Custodial Attorney;
```

---

58

1        That a copy of this certificate was served on all

2    parties and/or the witness shown herein on

3    _____.

4

5        I further certify that pursuant to FRCP No.

6    30(f)(i), the signature of the deponent:

7

8        _____ was requested by the deponent or a party

9    before the completion of the deposition and that the signature

10   is to be returned within 30 days from date of receipt of the

11   transcript.  If returned, the attached changes and Signature

12   page contains any changes and the reasons therefor;

13

14       ___X___ was not requested by the deponent or a party

15   before the completion of the deposition and that it is being

16   delivered to.

17

18       I further certify that I am neither counsel for,

19   related to, nor employed by any of the parties or attorneys in

20   the action in which this proceeding was taken.  Further, I am

21   not a relative or employee of any attorney on record in this

22   case, nor am I financially or otherwise interested in the

23   outcome of the action.

24

25

---

59

1    Certified to by me this 15th of November, 2021.

2

3        _____

         Ashley Cason, Texas ACR No. 10732

4        Expiration Date: 05/31/2023

         INTEGRITY LEGAL SUPPORT SOLUTIONS

5        Firm Registration No. 528

         PO BOX 245

6        Manchaca, Texas 78652

         512-320-8690

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Numbers

**100** 28:13
**140-something** 28:15
**15th** 4:3
**1st** 13:22
**2019** 15:12
**2021** 4:3
**230** 49:17,19 50:2,10,
  14,16
**2:02** 4:3
**2:59** 37:18
**30e1** 54:15
**321** 31:25
**321.054** 31:16 32:4
  50:21
**3:09** 37:18,19
**3:40** 54:11

## A

**abbreviated** 18:7
**abbreviation** 35:23
**ability** 45:10 48:8
**able** 19:6 24:6,18,24
  25:1 26:6 31:8
  32:3 36:7 38:1
  43:17 45:3 46:9,14
  52:1
**absolutely** 9:11
**access** 30:7
**accessible** 33:1
**accomplished** 36:12
**Act** 49:17
**actions** 10:12
**activate** 47:11
**activity** 23:17 41:22
**actual** 20:23
**actually** 6:11 9:10
  20:21 38:3
**added** 23:23
**adding** 20:22
**additional** 11:8
  22:14 23:1 45:14
**Additionally** 49:7
**address** 25:17
**adjustments** 22:12
**administering** 4:11
**advertisements**

48:15
**advertisers** 48:9,14,
  16 49:2
**advocacy** 53:10
**Affairs** 10:22
**affect** 45:9 48:8
**affected** 31:20 48:6,
  15
**after** 27:23 37:21
  41:13
**afternoon** 4:25 20:3
**again** 8:23 19:20
  25:14 36:10 41:6
  46:8 49:11
**against** 10:15
**agenda** 27:3,6
**ago** 37:9
**agreed** 22:12
**ahead** 5:6 7:3 10:23
  11:1 30:24 37:14
  43:14
**alleviated** 25:20
**allow** 5:22,24
**allowed** 38:9
**almost** 37:13
**along** 25:6
**already** 5:8 6:10
**also** 5:16 17:5 20:9,
  13,22 22:18,23
  48:5
**Amazon** 30:2
**amended** 23:8
**amount** 41:22
**Ann** 22:24
**another** 5:22 18:5
  30:24
**answer** 6:16 7:4 8:17,
  18 9:3,8 12:6
  14:11,14,22 15:9
  17:18 21:5,14 22:2,
  9 25:12,25 27:9,21
  28:23 29:5,21
  31:22 32:6,21
  33:10,19 34:10,21
  35:1,15 36:5 38:14,
  23 39:10 44:12
  48:2 49:22 50:6
  51:2 53:8,16
**answered** 10:16
**answering** 5:21,24

**answers** 7:5
**anti-vaccine** 38:7
**anyone** 7:17 10:19
  20:7
**anything** 9:16 11:18
  20:15 21:22 47:11
  51:7 53:1
**Apologies** 13:13
**apologize** 35:20 51:3,
  6
**appearances** 4:13
**appears** 19:18,19,21,
  23
**Apprentice** 4:10
**appropriate** 40:22
  41:9,10
**areas** 13:20
**arguments** 8:22 10:1
  10:1 12:1 45:24
**arises** 33:4,7
**around** 13:1
**artificial** 35:24
**Ashby's** 9:22
**Ashley** 4:10
**Aside** 47:4
**ask** 6:19,21 7:3 8:1
  19:2 31:3 43:14
  47:16
**asked** 7:3 16:1 22:25
**asking** 23:4 41:9
  43:25
**associated** 48:9
**Association** 12:24
  14:7 15:5 18:7
**associations** 12:14
**assume** 23:16
**assumed** 29:11
**assuming** 44:9
**attempt** 40:11
**attend** 28:9
**attended** 28:12,16,18
**attention** 6:4,23
  17:9
**Attorney** 4:18 5:8
**attorneys** 7:16,18
**attract** 48:9
**attractive** 33:23
**Austin** 4:7,8,17,19
**autonomous** 13:6
**available** 27:19

avoid 45:8 52:2
aware 18:4,16,18
    35:9,10 36:1 36:1,
    2 47:1,25 48:3
    50:13 53:20 54:1
awful 34:13,16,17

**B**

back 12:10 21:22
    26:23 32:11 37:19,
    21 45:6 46:6
banned 34:18
banner 48:24
base 36:15
based 9:24 23:10
    24:16,17
basic 26:12
bear 5:8
before 5:21,24 7:9
    20:7 25:4 40:12,14,
    24 41:4,11,21
    54:16
beginning 4:14 31:13
begins 31:16 32:16
    37:25 38:6 51:22
behalf 7:15 13:11
behavior 24:19
being 4:4 5:5 10:6,
    23 24:6 25:1 30:22
    36:23 53:10,18
believe 20:22 21:15,
    18,21 22:15,20
    23:14 30:2,16
    35:16 40:22 41:2
    48:3 49:19 50:2,20
Ben 4:18
best 5:19,21 6:25
between 8:13,25 12:2
    18:3,17 28:13
    36:25
beyond 42:12
Bill 7:14 8:21 9:20
    10:11,14,25 11:3,5,
    10,24 13:19,23
    15:11 16:1,3 17:14
    21:25 22:7,16,22
    23:4,7,21 24:3,10
    25:4 26:8 29:11
    43:5

billions 51:25
bills 11:1,6 14:3
    15:16,19 17:23
bit 12:22 34:14
    40:18 48:18 53:3
black 39:18
blank 39:13 39:13
block 24:6,25 44:21
    46:16 50:22 52:1
blocked 45:13,16
blocking 24:15
blueprint 46:2
board 14:16
body 6:16
bogged 49:18
boss 14:12,13 20:9
both 10:25 35:17,18,
    21
bottom 26:25 31:13
    37:25 51:22
break 7:1,5 37:14,22
    40:6
brief 37:22
briefly 18:22 19:13
bring 6:4,23
broad 34:7 39:15
brought 48:19
Bucy 23:2
bumps 45:18
business 17:4 43:20

**C**

Cain 22:14
Cain's 10:13 11:9
    22:11 23:22 51:9
call 13:24 18:13
    18:13 30:13
called 29:24 33:1
calling 9:10
calls 12:13 14:18
came 53:4
Can 4:25 12:7 14:22
    15:9 17:7,18 18:12,
    22 19:15 20:24
    21:5,14 22:2,9
    24:11 25:12,25
    27:9,21 28:23 29:5,
    14,14,21 30:7,19
    31:1,22 32:6,21

33:10,19 34:10
    35:6 35:6,15 36:5
    38:14 39:10 42:17
    42:17,18,18,19
    43:18 44:10,12
    48:1 48:1,20 49:22
    50:6 52:16
can't 9:23 18:13,14
    20:19 21:16,19
    29:12 35:6,7
capacity 18:11
capture 29:25
case 8:4,6,7 9:17,21
    12:12,17,19,21
    18:6,21 19:10,19
    20:24 45:20
cases 20:11,14 36:12
    37:6
Cason 4:10
catch 12:15
categories 42:5,16
cause 28:14 42:11
    43:9 52:2
CCIA's 12:19
certain 9:12 15:18
    17:25 45:21 46:17
certainly 7:6
Chairman 9:22 10:12
change 24:24 26:1,4
    30:9
changed 13:21 15:15
    25:4 27:23
changes 15:14 22:14
    23:18 24:8 25:5,8,
    15,17 30:23
charge 14:25 14:25
chat 18:20,25 19:7
    26:24 30:25
check 44:16 45:22
check-in 12:13
chief 10:13 22:13
child 42:25
chose 9:5
Chris 20:13,20,25
    21:2,10
circumvent 44:20
citation 11:21
Civil 54:15
claims 34:15
clarifications

23:25
clarify 6:21,24
  35:22 45:6 46:25
clarity 26:16
clear 11:5 21:7,9
  24:2 33:3
clearly 6:14,22
  46:20
close 50:18 53:2
coast 13:22
code 31:25 51:14
  52:9
collaborate 17:20
come 7:23 8:1
comes 6:13 33:15
comfortable 16:20,22
  32:9
coming 14:2 21:6
committee 9:20,22,22,
  25 10:5,13,15,17,
  22,22,23 13:25
  22:19,20 25:10
committees 11:8
common 33:20
communicate 6:22
communication 11:4,
  23 21:25
communications 10:4,
  5,9,18 11:19 18:7
  24:15 49:17
communities 42:12
community 35:4 41:20
companies 12:25
  13:11 30:9 34:5
  36:17 37:11
companion 11:3
company 14:6 16:6
  17:8 24:24 35:5
  41:24 48:23,24
compare 17:22,25
comparison 24:11
completely 7:2
completion 54:16
comply 49:3,12
computer 18:6 52:10
computer/online
  51:20
concern 16:10 45:1,
  12 47:20 48:17
  51:4

concerns 15:25 16:3
  17:2 22:6,11,17
  23:2,9,24 25:9,17,
  20,23 45:15 47:13
  50:16 51:8
concluded 54:11
conducted 4:4 49:1
conference 27:23,25
  28:2
conferences 28:5,10
consequences 52:2,22
consider 41:22
consideration 22:5
considered 10:7 30:7
consistent 23:19
conspiracy 38:7
  41:15,16,19,23
  42:2
constitute 42:6
constitution 27:11,
  17
constitutional 9:23
contain 36:22
content 24:16,17
  32:18,19,25 34:6,8,
  11,17,24 35:11
  36:2,12,25 37:1
  38:6 42:16,21,24
  43:3,6,7 45:17
  46:1,7,8,13 47:12,
  23 48:10,19,23
  49:8 53:19
context 39:19
continue 6:15
continues 51:23
contract 33:8,11,12
control 24:6
control/compare-type
  19:11
controls 25:1
conversation 18:14
  46:7
conversations 10:12
  17:12 26:5 44:15
  48:17
conveyed 50:16
convoluted 51:18
copies 10:24
copy 18:21,24 19:9
  30:25 54:8

correct 16:11 44:8
  52:24
correctly 44:25
could 5:22 12:17,19
  26:2 29:8 30:8
  39:14 41:2 43:9
  46:1 52:3 53:8
couldn't 37:4
Counsel 4:13,15,20
  54:17
count 29:10
couple 5:6,18 7:16
  8:19 10:14,16
  22:17 24:1 28:5
  45:5
court 5:12,16,25
  19:2 31:4
courtroom 5:14
cover 50:23
credit 23:16
criteria 42:1,5
critical 43:20
criticisms 50:10,14
cut 6:6 19:20

D

data 52:11
date 4:2
David 15:3 15:3 20:9,
  19
day 51:25
deal 19:12
dealing 25:1
dealt 28:17
Decency 49:17
decide 12:11 49:7
decided 12:20 15:6
decides 38:20
decision 49:12
declaration 7:14,24,
  24 8:1,3,4,5,6,14
  9:1 9:1,5,6,16
  10:3 11:12,19,22
  12:3,11,11,20,21
  18:21 19:9,18,22
  20:1 26:10,25
  32:11,14 36:10
  37:24 38:1 43:16,
  17 44:9 49:16 53:5

deemed 40:23 41:4
Defendant 4:20
define 51:9
definitely 20:25
    30:21 39:18
definition 29:8,16,
    23 30:3,4,18,21
    31:23 51:17
definition's 32:1
delivery 13:5
denial 38:8 42:22
depend 41:6,8
Depending 30:4 39:15
depends 39:11,12
    40:19,20
Deponent 54:17
deposition 4:4,11
    5:4 7:2,9 19:3
    31:5 37:22 54:17
depositions 7:12
describe 26:11 27:10
described 28:24 29:3
    34:12 42:7 52:23
describing 25:16
    52:14
description 26:13
descriptors 6:13
details 8:12 42:21
    49:18
determine 41:16
determines 34:23
determining 42:1,6
difference 28:17
differences 8:13,25
    12:4
different 8:22 12:1,
    25 13:7,11 14:1
    23:9 35:5 36:7
    37:4 44:4
differently 35:3
difficult 50:22
directly 15:4 16:25
    23:19
director 10:13 13:16
    14:17 18:11 22:20
directors 15:2
discrepancy 12:2
discussed 24:16
discussing 43:11
discussion 24:14

28:6
document 18:22,23
    19:9,17 20:1,5
    30:25 31:2,4,9,13
    32:13 43:15
does 13:17 14:5 16:1
    38:12 40:14 41:15,
    25 42:5,6,6 43:22
    45:9 45:9 49:19
    51:20
doesn't 33:12 34:19
    43:7 47:21 51:16
doing 6:10,14 19:11
    47:9
done 35:12 35:12,19,
    19 49:11,15
door 51:19
double 44:15 45:22
down 5:16 16:14
    31:11 38:5 39:23
    40:2,6 43:15 49:18
download 19:6
draft 20:20 21:1
drafted 20:5,6
drafting 44:13
Drew 22:19
dues 14:6
duly 4:22
duplicate 51:14
during 7:2

**E**

each 6:22 18:24 35:5
    44:10 45:25 45:25
    51:25
earlier 26:14 52:14,
    23 53:3
easier 5:25 23:25
    44:19
ebb 13:2
economy 13:5 17:10
Edmonson 15:3 15:3
    20:9
Edwards 20:10 21:21
effects 48:18
efficient 26:22
either 20:17 22:15
    24:19 28:5
electronic 24:15

else 9:15 12:8,9
    29:25
email 11:24 17:13
    23:23 24:19,21
    25:1,7,16 26:19,20
    30:15 31:24 47:3
    50:22 52:1,2,5
emails 51:25 52:1,3
employers 46:16,20,
    21 47:1,2,4
employes 47:5
employment 17:10
enacting 49:14
end 7:4 43:19 47:12
    53:2
engage 16:8 17:7
engagement 20:11
    27:14
entered 7:24
entirely 20:11
entity 12:17 18:6,8
    34:2 50:16
equation 35:18
equipped 53:9
escaping 11:3
Esparza 4:4,6,25
    19:5,15 31:3,11
    32:11 37:21 52:25
especially 30:22
    51:8
essentially 13:22
    24:18
established 19:14
evade 46:3
evaluating 35:11
evasive 29:7,12
even 5:4,23 44:24
ever 7:9 40:21 41:9
ever-revolving 35:7
every 35:2,4 37:4
    50:19
everybody 35:4
everything 5:17 12:8
evolve 35:8
exact 11:17 16:14
    53:8
exactly 26:7 41:18
example 50:20
examples 44:14 46:12
exceptions 50:23

executive 13:16
  14:17 15:2 18:11
Exhibit 19:3,4,25
  31:4,6 32:12
exists 46:19
expectations 5:10
explain 14:12
explicit 28:6
explicitly 38:9
expressed 11:11 22:6
  23:20

### F

face 30:22
Facebook 29:22,24
  45:22 47:4
facilitate 44:24
facts 11:13 16:6
fairly 17:6
fall 29:15,23 30:16
  51:16
familiar 18:8
family 32:24 43:21,
  25 46:5 48:7
fathered 30:3
federal 13:9 27:12
  49:17 54:15
feed 43:8 46:11
feedback 10:14,22
  11:7,8 14:8 15:10,
  21,21 16:5,24
  17:14 20:7,18,19,
  20 21:20,23 22:6,
  22,25 23:2,5,11
  30:20 33:1 46:18
feel 6:20 7:5 16:22
  18:25 20:1 32:8
  32:8 38:25
feels 53:18
felt 29:8 36:20
few 26:11,15
fewer 16:16
file 12:11,20 19:6,
  15,18 26:24 37:25
filed 8:3,5,7 14:3
  15:12
final 28:13
financial 18:2,17
  44:16

find 15:18 43:4
  48:25
finds 42:20
fine 7:2 9:15 13:14
  24:13 32:10
finish 5:21,23,24
  6:5
first 4:22 5:11,18
  7:8 19:18,21 21:6
  26:11 32:16 40:25
  43:19 52:5
fixing 26:7
flag 27:22 39:21
flags 24:21 40:1
Florida 8:3,7,9,14,
  20 9:1,6,10,13
  12:10,21 28:7
  44:18 44:18 53:5,6
flows 13:2
focus 13:10 53:10
focused 8:20 13:12
folks 13:2 29:11
follow 13:22
followed 40:25
follows 4:22
forced 46:11
forces 33:5
form 8:15 9:7 12:5
  14:10,21 15:8
  17:17 21:4,13 22:1,
  8 25:11,24 27:8,20
  28:21 29:4,19
  31:21 32:5,20 33:9,
  17 34:9,25 35:14
  36:4 37:2,8 38:13,
  22 39:9 40:3,17
  41:17 44:11 47:14,
  24 48:12 49:5,21
  50:5,11 51:1 52:7
  53:7,15,22
formal 5:4 15:20
forms 50:24
forward 12:16
fourth 32:13 37:25
fraud 52:17
Fredrick 4:16 54:7
free 6:20 7:5 18:25
  20:2
friendly 32:23,24
  43:21,25 44:5,6

46:5
from 4:12,18 10:16
  15:21 18:15 20:25
  21:20,21,22,23
  22:6,24 23:24
  24:25 33:4,7,16
  37:18 38:5 45:2
  47:4 52:19,23
front 5:14 9:11,13
  24:10 30:18
full 9:23 9:23 29:6
function 18:20,25
  19:7
functions 26:13 35:3
further 54:5
future 51:10

### G

general 12:14 16:7
  34:19 35:4 36:15
generally 12:22
  14:24 16:15 24:12
  26:1,8 27:16 27:16
  34:18 35:2,6,16
  36:20 43:11 49:19
General's 4:19
get 14:15,24 16:5
  17:11 21:20 33:22
  49:18 52:18
getting 50:17 53:2
gig 13:5 17:10
give 29:12 30:12,19
  34:20 44:20
given 7:9 47:16
gives 50:3
glitches 5:20
going 5:23 6:11 11:5,
  25 12:10 15:15
  17:9 18:19,20
  19:13 28:14 37:13
  38:3 43:2 44:1
  46:22 48:24 50:18
  51:16
gone 26:12
Good 4:25 6:10 49:20,
  25,25
Got 16:9,23 48:16
go-to 22:21
governed 14:9,12

32:4
**governing** 14:18
**government** 34:2
**great** 6:15
**groom** 44:23
**ground** 5:6
**group** 18:13 23:17
  39:7
**guess** 14:18 35:9
  42:4
**guessing** 32:7
**guidelines** 35:4
  41:20
**guiding** 27:13

### H

**half** 16:5
**handful** 15:25 16:12,
  13,16
**happen** 12:17
**happened** 27:24
**happening** 7:21 14:1
**happens** 51:10
**harassed** 53:19
**harassment** 34:14,15
**hard** 30:8
**harder** 39:17 43:5
**harm** 42:11,13 43:9
  52:2,5,10,11,16,18,
  22
**harmful** 32:25 34:6,8,
  11,24 35:11 36:17
  43:4 46:7
**has** 15:13,15 24:23
  28:6 39:3 50:14,16
**hate** 39:13
**haven't** 49:1
**having** 4:22 5:11 8:8
  48:24
**heads** 6:12 6:12
**hear** 4:25
**heard** 9:21 22:10
  22:10 45:5 47:20
  50:15
**hearing** 10:23 22:25
  23:3
**held** 10:24 27:25
**Help** 14:12 35:20,25
**helpful** 12:19

**helping** 14:7
**here** 6:21 7:13,18
  8:12 14:2 19:17
  26:11,21 28:3 32:1,
  2 44:3 47:21 50:9
  53:2
**Here's** 13:25 35:6
  35:6
**he's** 22:21
**Hey** 15:14
**higher** 42:17
**highlighted** 22:16
**history** 24:19
**hit** 26:15
**hold** 13:24
**holding** 8:11
**holocaust** 34:16 38:8
  42:20 46:13
**homepage** 33:2
**hour** 37:13
**House** 7:14 10:11,25
  11:5,24 23:3,21
**housekeeping** 5:7
**Houston** 22:24
**hovers** 13:1
**Hughes** 10:12 22:19,
  21
**human** 36:3 44:21
  45:7,10,19
**humans** 35:12,20
**hundred** 9:14 32:8
**hurt** 33:22
**Hutto** 4:12

### I

**I'd** 7:5 29:13 29:13
**idea** 16:7 48:20
  52:14
**ideas** 34:7
**identity** 52:17 52:17
**I'll** 5:20 6:24 18:24,
  25 19:2 30:24 31:3
**I'm** 4:19,20 5:23
  6:20,24 8:11 14:15
  18:4,18,19,20 20:1,
  11 26:21,23 28:14
  33:15 38:3 40:7
  41:9 43:15 44:24
  44:24,25 45:8

46:19 47:25 48:3
  50:7,18 52:25 54:1
**imagery** 42:20
**imagine** 17:8 41:23
  42:19 48:21
**important** 44:4 51:25
**improvement** 25:21
**inboxes** 52:4
**include** 8:21 10:2
  11:19 16:7
**included** 8:21 9:6
  12:3 26:4 28:15
  29:11 30:5,8 51:7,
  15,18
**including** 11:18 13:4
  24:17 38:6 51:17
**indicated** 15:22
  16:10
**indication** 47:16
**individual** 21:20
  34:2 38:18 39:7
**individually** 41:21
**individuals** 20:17
  39:7
**industry** 18:7
**influx** 52:3
**informal** 15:21
**information** 42:7
  45:14,25 52:19
**input** 36:3
**Instagram** 29:25
**instance** 50:19
**instead** 5:5 6:11,16
  28:2 34:1 47:9
**insufficient** 25:9,13,
  13
**intel** 17:21
**intelligence** 35:24
**intended** 9:12 36:13
  40:24 41:5
**intention** 6:6
**interactions** 18:10
**interacts** 43:7
**interested** 23:3
**internal** 31:12
**internally** 14:19,23
**interrupt** 6:3
**intimidated** 53:18
**intimidates** 38:18
  41:14

**intimidating** 38:7,12,
  19,21 39:8 40:1,10,
  11,24 41:4
**intimidation** 39:1
**into** 11:10 14:6 29:8
  30:3 43:13 48:4
  49:18
**invent** 51:16
**involved** 17:11 27:15
  53:4
**irreversible** 42:11,
  13
**isn't** 32:25
**issue** 15:12 16:25
**issues** 12:15 13:10
  16:6 17:7,10,10,20
  22:17 53:11
**it's** 7:21 8:9 12:8
  13:18,23 15:11,12,
  20,24 16:18,23
  17:6 21:6 25:13
  26:24,25 27:11
  28:2 28:2 28:2
  29:7 30:6,8 33:1,
  20,24 34:12,14,14,
  20,20 35:12,21
  38:5,15,15 39:2,17,
  17,17,19 46:9
  50:20 51:17,23
  52:19 53:16
**its** 15:18 34:19
  34:19 40:24 41:5
**itself** 26:16,18,19
  40:20
**I've** 7:3 19:8 23:5
  28:3,4 41:20

**J**

**job** 6:10,15 13:11,15
  14:24
**Johnson's** 22:24
**judge** 5:14
**jump** 5:22
**jurisdiction** 9:20
**jury** 5:14
**just** 5:6,7,9,11,13,
  23 6:15 7:5,21,25
  8:24 12:8,14,14,22
  13:2 13:2,3,6,7,22,

22 14:16 16:15
  17:4,5,20,23,25
  18:9,21,24 19:5,6
  21:7,9,11 23:5
  24:4,11,11,20
  25:16 26:1,3,15
  27:23 28:4,14 29:7,
  12 30:9 31:3,7
  33:3,15,20,24
  34:16,17 35:5,8,22,
  25 41:9 42:4,22
  45:2,6,15 46:9,25
  47:18 51:18,19
  52:8,25 53:9,16
  54:4

**K**

**keeping** 34:6
**kept** 11:1
**key** 17:24
**kind** 10:1,25 11:25
  12:14 13:2,3 16:7
  17:20,23,25 19:11
  20:11 22:16,21
  23:17 30:11 33:7
  34:20 35:5,8,18
  38:16 39:11,15
  43:10,24 46:19,21,
  22 47:8 48:17
  51:18 52:11
**know** 5:19,23 8:11
  12:2,16,16,17,19
  13:5,25 15:13,14
  16:4,5,5,6,25 17:2,
  3,8,13,21,22 18:21
  19:5 20:12,14,19
  21:10,11,15 23:7,
  10,13,14,17 24:3,
  11,18 25:3 29:9,15,
  22,23 30:1,5,10
  31:7 32:25 32:25
  33:12,21,24 34:16,
  17,22 35:2,17,18
  36:6,14,18,24,24
  37:3,6,9 39:6,18,
  19 41:12 41:12,18,
  21,22,23 42:9,15,
  19 43:5 44:17,19,
  21,22,23,24 45:7,

15,16,16,21,21,25
  46:6,9,12,16,18,19,
  21 47:6,15 48:11,
  20,21 49:9,10,23
  50:8 51:11,15 52:9
  53:8

**L**

**label** 31:4
**landing** 48:22
**language** 6:16 16:15
  39:16 51:12
**largely** 15:20 15:20
**last** 7:1 27:3,24
  28:5,13 40:25
  42:10 51:24
**last-minute** 30:23
**law** 28:7 33:4,5
  34:18 49:20 53:10
**lawful** 34:12
**lawsuit** 7:25 8:3
  11:12 17:16 19:22
  53:5,6,13,14
**learn** 17:24
**learnings** 17:24
**least** 16:13,23 23:19
**leave** 9:5 25:1 43:9
  49:7,12
**left** 51:7,19
**legal** 20:21 26:3
  46:8
**legislative** 14:2
  21:24 26:5
**legislators** 10:11,16
  12:3 21:24 22:6
  23:9 28:16
**legislature** 10:6
  10:6,19 11:14,20
  17:21 22:5
**less** 37:7
**let** 5:21 6:5 12:16
  13:24 18:24 18:24
  19:5 24:18 30:24
  31:7 44:15,19
  50:19 50:19
**lets** 16:6
**Let's** 32:11,12 37:24
  43:14 48:5 49:16
  50:17

letter 9:20 10:21
levels 13:11
licensees 30:8
life 5:25
like 6:2 7:5 9:19
    10:23 11:9 14:4,12
    15:1,16 18:13
    18:13 19:1,11,12
    22:10 24:22 27:11,
    17 29:8 30:1 34:1,
    14,15 37:3 38:25
    38:25 39:4,22
    42:25 44:16 47:4,
    11,17 49:14 52:8
    52:8,16,16
likely 16:18,21
    29:13 45:22
limited 43:2
Linda 15:4
line 27:3 31:13,15,
    17 38:5
lines 25:6
list 30:13
listed 42:16
lists 24:20
little 12:22 35:17
    40:18 48:18 53:3
located 4:5,6,8,17,
    19
locations 4:14
long 37:9 40:4
look 7:25 27:12,16
    31:1,23 37:24
Looked 9:18 20:9
    37:10 49:25
looking 18:23 19:14
    26:10 42:8 52:25
looks 19:12
lot 5:19,25 16:2
    16:2,4 17:5 17:5,
    24 29:11 30:9,23
    34:21 36:20 39:20
    39:20 42:18
love 48:24
lower 16:18,21,22

**M**

made 10:2 23:10,13
    25:6,15

main 39:2
maintain 24:6 48:7
major 12:7
make 5:7,9,25 10:2
    16:15 18:23 21:10
    22:12 26:3,9 33:12
    40:14 43:5 44:19
    45:3 46:20 50:21
    51:20 53:1
makes 38:16 40:18
making 20:14 22:14
    45:24 46:23
malicious 50:23 52:8
many 15:22 25:1 28:9,
    19 29:1 33:23
    35:19 49:18
mark 19:3
marked 19:4 31:6
material 9:4 11:11
    47:8
Matt 37:15
matters 5:7
Matthew 4:16 50:7
may 8:17 9:8 12:6
    14:11,24 16:3
    18:12 21:19 30:5
    34:22 35:1 38:23,
    25 46:8,9,10 48:23
    49:7 51:2 52:1
    53:21,23
maybe 12:8 23:17
    28:9 33:20 37:14
mean 13:17 14:5 27:4
    34:8 38:12,15
    43:22 44:10 46:4
    50:25 52:5
means 4:12 5:17 6:10
    13:18 14:6
meant 34:3 39:1
    42:15 43:1 46:6
mechanistic 35:13
media 17:3,12 26:17,
    18 28:19,24 29:2,9,
    16 32:17,23 35:2,
    10,17 36:6,23 38:9
    39:5,21,24 40:9,10,
    22 41:3,15 43:2,22
    44:4 45:3,10,13
    46:1 47:2 48:7
    50:3 53:17,20,23

meet 25:9
meeting 23:15
meetings 13:25
member 14:5
members 10:23 11:7
    12:14 13:3,8,8,20
    14:4 15:10,14,18,
    21,22,25 16:2,9
    17:1,6 23:15,24
    24:5,18 25:10 26:6
    28:9,12,17,19 29:2,
    7,15,18 30:16
    31:20 32:3 35:10,
    16 47:17 48:7
mentioned 11:9 15:1
    18:5 22:10 24:5,22
    25:6 29:7 37:3
    45:7 46:12 53:3
mentioning 20:25
message 38:16,18,19,
    21 39:4,6,12,15,22,
    25 40:2,10,12,14,
    19,23 41:3,5,6,8
messages 38:7,12
    41:10,14 44:21
met 7:15 10:10,13
    11:9 22:11,15,22
Meta 29:22
might 30:3 30:3
Minus 15:1
minute 5:8 7:25
misinformation 38:8
    46:13
misinterpretation
    44:8
mismanagement 24:20
    24:20
miss 53:1
missed 52:3
misuse 26:2
mixture 35:21
moderate 47:12
moderation 36:2
    45:17 46:1,3
modifications 23:10
modified 21:8 23:8
    25:4
moment 54:5
Monday 4:2
Moore 15:4

**more** 16:16,20,24
  26:14,15 33:25
  37:6 40:18 45:22,
  25
**morphing** 11:1
**most** 32:22 32:22
**mostly** 53:9
**moving** 11:6 12:16
**much** 19:1 26:14
  30:10 35:19 36:17
  52:21
**multiple** 10:11

---

**N**

**name** 4:10 9:24 11:3
  15:3 18:9 20:21,23
  21:19 22:24 35:5
**narrow** 17:6
**Nazi** 34:15 42:22
**necessary** 24:4
**need** 5:18 26:1,4
  31:23 49:24 54:7
**needed** 20:2
**nefarious** 24:23
  44:19 45:20 46:2
**NetChoice** 12:15,18
  17:19 18:3,5 20:13,
  25
**networks** 13:5
**never** 18:10
**new** 51:19
**next** 38:4 39:13
  41:13 44:1 48:25
  49:6
**nodding** 6:11
**noise** 13:13
**nor** 54:17
**normal** 28:1
**note** 31:3 35:8,18
**notes** 9:19,25 17:22,
  25 24:11 26:21
  30:11 53:1
**Nothing** 12:7 12:7,9,
  9 15:13
**notion** 31:12
**November** 4:2 13:22
**now** 7:5 11:3 18:19
  19:15 21:17 37:24
  41:22 41:22 46:13

---

51:10 53:18
**number** 11:21,23 12:1,
  15,25 13:1,3,7
  15:24 16:15,18
  17:20 19:4 28:11,
  12,14 29:6,13 30:6
  31:6 33:22 36:11,
  16,19,19 37:6
**numbered** 26:24
**numbers** 11:24 28:14

---

**O**

**oath** 4:11 5:3
**Object** 8:15 12:5
  14:10 17:17 21:4
  28:21 33:17 34:9,
  25 35:14 36:4
  38:13 44:11
**Objection** 9:7 14:10,
  21 15:8 21:13 22:1,
  8 25:11,19,24 27:8,
  20 29:4,19 31:21
  32:5,20 33:9 37:2,
  8 38:22 39:9 40:3,
  17 41:17 47:14,24
  48:12 49:5,21 50:5,
  11 51:1 52:7 53:7,
  15,22
**objectionable** 32:18,
  19 48:10,23,25
  49:8
**objections** 34:22
**obligation** 5:12
  32:18,19,24 33:4,7,
  15 34:1
**obviously** 13:10
**occur** 34:16
**occurring** 7:22
**off** 5:11 6:6 19:20
  37:17 54:10
**offensive** 36:12,25
  37:1 42:18 43:1,4
  46:17
**Office** 4:19 9:25
  10:12 11:9 22:11,
  16,21 23:22 51:9
**offices** 21:24
**official** 50:14
**often** 27:10,25 34:11

---

44:22
**Oftentimes** 9:19
  10:24 17:22 26:5
  39:2 41:19 46:16
**once** 28:1,3
**one** 8:9,20 9:9,10,13,
  14 12:15,19 18:25
  24:14 26:6 27:12
  27:12 30:22 36:8
  37:4 39:3 39:3
  49:25 50:19
**ones** 16:23 21:7
  30:11,13 47:5
**one's** 30:22
**online** 51:11 52:11
**only** 17:9 28:3 30:19
  32:7 32:7
**open** 19:6 31:10 34:7
  51:19
**opened** 19:8 31:8
**opening** 31:2
**operates** 35:10
**operating** 29:2
**opinion** 15:15 32:22
  33:21 49:23
**opinions** 11:13
**opportunity** 47:7
**oppose** 15:23
**opposed** 15:7,11,13,
  16,16,23 16:1,4
**opposes** 15:13
**option** 47:12
**oral** 4:3
**order** 54:8
**other** 6:13,22 7:17,
  21 10:4,5,18 11:24
  12:4,13 15:2 15:2
  17:1,5 21:2,11,20,
  20 23:15 30:11
  36:8 38:16 42:4
  49:1 50:22 51:11,
  13,14
**others** 21:16
**out** 9:5,10 15:18
  16:9 16:9 20:21
  30:13 40:10 51:7
**over** 5:6,9 6:6 22:18
  24:6 26:12 52:25
**overall** 17:23 34:17
**overlooked** 20:15

overseen 14:16
overwhelming 36:11
   37:6
own 28:24 47:12
owned 30:2
ownership 30:10

**P**

p.m 4:3 37:18 37:18,
   19 54:11
page 5:8 19:17,18,21
   26:23,24 31:11,12,
   12,13,15,17 32:13
   34:19 37:25 38:4,5
   43:15,16 48:22
   51:23,24
paragraph 26:23,25
   27:1,2 32:12,14,16
   34:5 36:10 37:24
   38:1,3 42:10,17
   43:14,15,17 48:5
   49:16 50:17,18,21
   51:23 52:15
paragraphs 26:11,14
Pardon 26:21
part 10:6 14:7 15:10
   17:4 33:11 40:25
   41:1 43:8 45:16
participate 12:18
   28:10
particular 38:20
   39:6 39:6
pass 54:5
passed 25:4
past 6:22 24:23
patience 54:3
pay 17:9
pays 14:6
PDF's 31:12
people 30:6 33:23
   42:18 47:5 48:25
per 41:24 54:15
percent 9:14 32:8
   37:7 37:7
person 21:18 22:21
   24:22,25 38:17
   39:12
personally 50:8,12
phishing 51:13 52:19

phone 18:12 22:18
phrase 41:13,14
physical 6:17
physically 4:19 5:5
piece 26:6 44:14
   46:22 51:4
pin 16:14
plaintiff 18:6 53:6,
   13
Plaintiffs 4:14
   17:16 54:6
plan 6:2 39:12,13
platform 26:17,18
   28:24 29:2,9,16
   33:23 35:3,7 39:6,
   21,25 40:9,11,12,
   20,22 41:3,15,24
   43:10,22 45:15
   46:1 47:9 48:7,8
   49:7,12 53:17,20,
   23
platforms 17:4,12,14
   28:20 30:7 32:17,
   23 35:11,17 36:6,
   23 38:9 43:2,21
   44:5 45:3,11,13
   47:2 50:3
plays 36:3 36:3
please 4:13 6:4,15,
   23 40:13 54:9
point 6:7,19 11:4
   13:1 22:15 26:7
   40:2
policy 13:24 14:8,25
   27:5,6,7,13,18,23
   48:4 49:24
portion 25:5,18
   30:20 31:14 38:3
   53:10
portions 17:23 23:23
   25:3
position 25:8 42:1
   47:22
possibility 47:22
possible 6:25 33:24
post 38:16 45:17,22
   46:8
posts 36:19,21
potential 23:1 38:17
   44:20

potentially 23:4
   43:4 44:23
pre 51:5 51:5
prep 30:12
preparation 7:18
prepare 7:12 9:16
prescriptive 51:5
present 5:5
presented 11:13
president 14:17,23
   15:4
pretty 42:18 52:21
principal 27:14
principles 27:5,6,7,
   13,18 48:4 49:24
prior 22:25 23:3
problem 26:7,8
problematic 17:23
Procedure 54:15
proceed 37:22
Proceedings 54:11
process 11:7 15:17,
   20 23:5 35:13
processes 45:17
programs 30:5
propaganda 34:15
   42:22
proper 40:8
proposals 17:21
protection 50:3
provide 10:14 11:9
   13:19 13:19 13:19,
   25 15:10 20:7,17
   37:11 45:14
provided 9:18 10:24
   11:8 12:2 20:19,20
   22:22 23:5,11
   30:13,19 36:16
provider 26:19,20
   31:24,25
providers 24:21 25:2,
   16 30:15 47:3
   50:22 52:1
provides 14:8
provision 26:2 31:20
provisions 11:24
   23:23 24:9 25:7
   45:12
public 13:24 34:19
publicly 27:18

purpose 6:4
purposes 11:12 53:5
put 51:10

## Q

question 5:21,22,24
  6:19 7:3,4,8 8:16,
  23 12:5 16:1 22:3
  28:22 30:15 33:18
  40:4 43:24 47:16
  53:12
questions 5:23 10:16
  23:1,4 26:15 43:13
  44:1 54:5,6
queues 6:17
quick 53:1
quite 34:13

## R

raised 24:21
ran 13:3
range 34:7
ransomware 51:13
ratio 36:24
reached 41:11
reaches 40:12,24
  41:5
reaction 39:4
read 46:11 50:19
  50:19 51:12
readily 32:25
ready 37:22
real 53:1
really 6:20 17:8,19
  21:7 34:20 40:4
real-world 42:11,13
reason 23:14
recall 8:13,25 9:4
  11:18 12:4 18:12,
  13,14 20:25 21:16
  25:22 28:8
recap 37:10
receive 21:23 22:5
  39:1
received 21:22 40:13
  46:18 48:16
receives 38:17,24
  39:25

receiving 53:19
recently 13:21
Recess 37:18
recipient 38:24 39:2,
  25 40:12,13,24
  41:5,11
reckless 24:19
recollect 12:7
recollection 8:13
recommendations
  11:10 24:2
record 4:14 5:17 6:9
  21:10 31:3 35:23
  37:17,20 54:10
recourse 53:20
refer 10:1 18:25
  19:25 20:2 34:11
  49:24
referencing 18:22
referring 20:1 35:23
refers 27:3 31:25
  43:19 50:18
refined 34:20
refining 11:25
reflect 23:8
regarding 10:19
  30:15 31:19 49:2,
  11
regardless 43:16
regions 15:1
regulated 47:3
related 11:22
relationship 17:15
  18:3,17
remain 25:23
remains 15:16
remember 6:15 8:19,
  25 9:9 9:9,23
  20:19 21:7,19
  22:18 48:19
remotely 4:5,11 5:5
removal 36:12
remove 32:18,19
  36:20,22 40:11,13,
  14,23 41:3,10 43:3,
  6 45:3,17
removed 36:17,19,25
  37:1 38:9 49:8
removing 34:6 53:24
repeat 8:23 22:3

40:25
rephrase 6:24
report 15:2 45:13
  49:8
Reporter 4:10 5:12,
  16,25 19:2 31:4
reporting 4:11
reports 13:19 15:4
  36:16,18 37:10
represent 13:21
representative 9:21
  10:13 22:14,23
  23:2,21 51:9
represents 12:24
request 17:13 23:13
requested 54:16
require 45:12
required 49:3,12
  51:9
requirements 30:17
reread 7:14 7:14
research 49:2,11,15
reserve 54:6
respond 17:13 40:14,
  19
response 21:1
responsibility
  13:18,23 23:16
  34:5
responsible 20:10
  29:2
rest 20:2
result 52:3,23
review 20:7 35:20
  45:19
reviewed 8:8 20:12
right 5:1 6:1 7:6,11
  11:3 19:25 20:15
  29:1 30:18 33:25
  52:25 53:18 54:2
righty 7:8
risks 45:4
roadblocks 45:8
role 36:3 36:3 40:8
roped 29:8
Rule 54:15
rules 5:6
running 26:21
runs 13:3 46:1

**S**

**safe** 43:21,23,24,25
    44:5 45:2
**safety** 44:14
**said** 5:17 16:3 20:21
    21:19 39:12 45:16
**Salesforce** 30:4
**same** 5:7,10,19 11:12,
    13 16:16 18:22,23
    19:14 24:4 25:19
    31:17 42:25 52:13
**save** 42:4
**saw** 20:15 43:10
**say** 6:6 7:5,19 8:8,9,
    9 9:12 9:12,14
    11:2 15:14,24 16:2,
    11,16,18,23 18:1
    19:20 20:16,23
    24:22 25:13 30:20
    35:7,21 36:7,22
    37:5 38:15 39:20
    41:21 44:9 45:15,
    21 46:4,9,10 50:21
**saying** 8:24 16:20
    18:14 21:10 45:2
    47:10
**says** 40:1,13 45:17
    51:24
**scams** 44:17
**schools** 46:15,20
    47:1,2,4
**scope** 17:6
**screen** 18:23 19:13,
    15,24
**scroll** 31:8,11 43:14
**second** 6:9 34:4 48:6
**section** 31:14,15,16,
    25 32:4 49:17,19
    50:2,10,14,16,21
**see** 10:4 11:11 12:4
    17:1 19:15 24:8
    25:3 26:4,11,25
    28:5 30:14 31:14,
    16 32:13 34:19,21
    38:1,10 39:14,18,
    23 40:8 42:21,23
    43:7,17,18 45:5
    46:10,14 47:9,10
    48:5 49:16 52:13,

**20**

**seeing** 17:24
**seems** 24:22 44:3
**seen** 39:14 46:1
**sees** 40:8 42:25
**segments** 13:4
**select** 9:22
**self-moderation**
    47:23
**self-screen** 47:8
**self-select** 47:8
**self-selection**
    47:23
**Senate** 10:21 11:2,4
**Senator** 22:19,21
**send** 9:19 18:20,25
    26:3 30:24 39:1
**sending** 24:25
**sense** 26:9 30:19
    33:12 40:15,18
    46:24 51:20
**sent** 9:24 10:21
    10:21,22,22 19:7
    20:10,12,13 21:1,
    19 23:1 24:23
    26:24 39:6,22
    51:25
**sentence** 32:16 34:4
    36:9,11 38:5,10
    41:13 42:5,7,10
    43:12,19 44:3 48:6
    49:6 50:20 51:22
**seriously** 34:6
**Servando** 4:4
**service** 24:21 25:2,
    16 26:19,20 30:15
    31:24 47:3 50:22
    52:1
**services** 34:7
**sessions** 14:2 14:2
**set** 27:10 35:3
**several** 8:22 10:10
    10:10 11:6 15:1
    23:24 29:7
**sex-trafficker**
    45:20
**sex-trafficking**
    44:22 45:18
**shaking** 6:12
**shape** 14:8

**share** 17:23 18:22
    19:13
**shared** 15:25 16:24
    16:24 20:22 22:11
    23:9 51:8
**sharing** 17:20 45:24
**sheer** 36:18
**shocking** 42:18
**shoot** 39:13
**shots** 14:18
**should** 11:2 20:16
    39:23 40:10,12
    41:3 42:1
**shouldn't** 39:20
**show** 36:18
**showing** 19:24 24:11
**signature** 54:16
**signed** 7:15 20:8
**similar** 8:3,6,10
    11:15 13:10 15:11
    28:7 30:15 52:16
    53:12,16
**simply** 6:16 7:3
**since** 31:25 37:10
**single** 37:4
**sir** 31:16 32:14 38:1
    54:3
**sit** 8:12 32:2 47:21
    50:9
**sites** 44:23 46:17
**situation** 40:21 41:3
**sixth** 38:4
**social** 17:3,12,14
    26:16,18 28:19,24
    29:2,9,16 32:17,23
    33:25 35:2,10,17
    36:6,23 38:9 39:5,
    21,24 40:9,10,22
    41:3,15 43:2,22
    44:4 45:3,10,12,25
    47:2 48:6 53:17,20,
    23
**some** 9:4,25 10:23
    11:8,9,10,24 12:13
    13:24 15:14 16:10
    17:3,6 20:20 21:16
    22:10,12,14,22,25
    23:1,4,5,10,18,25
    24:6 24:6,18,25
    25:5 26:3,14 30:5,

7,12 33:7,11 34:2
35:12 36:16,18
39:19 42:16,25
43:1,3,6,13 44:14,
17,17,22,23 45:2,3,
14 46:8,12,15,23
48:23 51:13 51:13
51:13,14 52:8
**somehow** 15:15
**someone** 34:18 38:16
42:19
**someone's** 33:1 51:15
52:10
**something** 11:22
15:11 23:16 24:25
34:14,15 42:2 43:1
45:13,19 46:10
47:17 48:25 51:16
52:9
**sometimes** 5:20 39:20
**sorry** 19:20 25:5
48:1 50:7
**sort** 11:1 13:1 13:1,
4,6,7,10,10 14:7,
13,14 15:14 16:24
17:9 23:15,25 24:5,
12,14,19,19,20
26:6 27:11,13,13,
16,16,17 30:9,13
33:20,25 34:2,12,
20,21,22 35:7,13,
20,25 36:20 37:10
39:3,17,17,19 40:4
41:19 42:20 44:16,
18,18,20,25 45:2
47:11 48:19,20,21,
22 51:11,12,13,13,
14,19,19,20 52:16
**sorts** 41:10
**Sounds** 6:2
**Southeast** 13:12,16
15:2
**spam** 11:22 11:22
24:1 24:1,7,23
26:3 50:22 51:25
52:3
**speak** 27:15 37:4
**speaking** 22:18 49:19
**special** 14:2
**specific** 9:4 13:15

15:24 26:6 33:5
34:1 51:16
**specifically** 9:9
10:11 11:23 13:12
16:3 17:22 22:13,
24 23:11,22 34:18
36:7,8 47:17 51:24
**spell** 20:21
**spend** 26:14
**spoke** 16:25 22:23
**staff** 10:14 11:4
14:8 22:13 26:5
28:16
**standards** 35:4 41:20
**start** 5:24
**started** 44:18
**starts** 31:14
**state** 4:13 10:21
13:9 14:25 27:5,11,
12,13,23 48:3,6
49:24
**stated** 42:5
**states** 14:1 17:25
34:5 36:11 42:10
43:20 44:16 49:6
**stating** 32:17
**statute** 50:23 51:10
**stayed** 11:7
**steal** 52:10,17
**stenographic** 4:12
**still** 21:25 22:4
24:3,6,24 25:23
26:8 29:25 36:10
43:15 51:23
**stop** 6:5 24:1
**structure** 14:13,18
**structured** 12:8
**stuff** 17:10 20:24
**submitted** 10:19
19:10,12,22
**submitting** 53:4
**Substantial** 8:8
**substantially** 8:6
**successfully** 36:25
**such** 6:13
**sufficient** 25:9,17
39:24 50:3
**suggested** 20:22
**suggestions** 21:2,11
**summaries** 14:1

**support** 12:18,21
**supposed** 20:23
**supremacy** 38:8
**sure** 5:7,9 6:20,23
7:17 8:11 9:14,15
10:2 11:18 16:15
18:16,23 19:13
20:12,14 21:2,9
22:4 23:7,18,18
25:15,22 29:14
30:24 32:2 35:22
36:24 37:5,16 40:7
40:7 41:25 44:24
45:3 46:21 49:10
53:1
**surveys** 49:1
**sworn** 4:22 5:12

---

**T**

**take** 7:1,5 18:16
23:16 34:5 37:14
40:2 50:18 54:4
**taken** 37:18 39:23
**takes** 14:7 43:13
**taking** 5:4,16
**talk** 6:6,22 7:17
22:13 24:12 44:17
47:1 49:16
**talked** 41:20 47:6
48:4,14,18 52:8
53:3
**talking** 5:18,21 6:5,
20,24 33:3 42:14
45:6 46:20 52:12
**target** 24:3,4
**team** 13:9 13:9 20:10
21:21 22:24 27:12
**Tech** 12:24,25,25
**TechNet** 7:15 8:2
12:20,23,24 13:8
14:5,8,9,19 15:6,
11,13,15,18,22
16:8 17:1,7 18:3,
11,17 20:21 23:11,
19,24 24:18 25:18
26:12,13,16,18,19,
20 27:5 28:12,15,
17 29:15 30:16
35:16 40:8 41:25

42:5 47:13,17,21
48:6 49:19 50:13,
15,15 53:4,6,13
**TechNet's** 17:15 25:8
26:13 27:3,14
28:19 29:1 31:20
32:3 35:10
**technology** 5:20 13:4
**Tedford** 22:19
**telehealth** 13:7
**telehealth-type**
17:10
**telemedicine-type**
17:8
**tell** 5:13 29:14 30:9
32:3
**ten** 16:16,17,19
**tend** 16:5
**ten-minute** 37:14
**term** 9:23 34:13
45:18
**terms** 13:2 14:20
23:19 24:17 41:19
44:4,10,25 45:22
**testified** 4:22 10:15
**testimony** 7:13,18
9:18 30:12 34:12
**Texans** 52:4
**Texas** 4:7,9,12,17,19
8:6,13,21,25 9:5,
17 10:6,19 11:13,
20 13:16,21 15:1,
12 22:5 42:11 47:5
53:13
**than** 7:17,21 10:4
16:16,17,19,21,22
37:7 37:7
**Thank** 6:19 9:3 21:17
51:21 54:2
**That'll** 5:25
**That's** 6:21 9:15
12:1,2 16:18,25
20:1 24:13 28:7
29:1 30:2 32:10,12
33:14 34:2 39:2
43:10,24 44:4,18
46:19,22 47:15
50:21 51:18
**theft** 52:17
**their** 4:13 17:4

29:23 30:7 32:24
32:24 34:6,7 43:4,
8,8 44:21 45:16
46:1,21 47:12 48:8,
15,24 52:10
**themselves** 48:16
**then** 7:1,4 15:3,15
18:16,24 19:17
20:13 21:18 29:6
30:14,24 36:19
39:21,25 40:1,20
45:13,15,20 46:4
48:22 50:17 51:6,7,
17 53:12
**theories** 38:7 41:15,
19
**theory** 41:16,23 42:2
**there** 8:22 10:18
14:17,23 15:17
16:11 18:2 21:16,
18 23:23,24 24:24
26:2 28:6 29:15
30:15,21 36:10
40:10,21 41:2,9
43:1,19 44:16,17
45:6,19 46:23
49:11 51:8,11,18,
23 52:12
**therefore** 54:17
**there's** 5:19 11:21
15:1,2 38:15 39:19
40:9 43:25 44:16
46:23 48:23
**these** 11:1 14:1 23:9
30:9 32:23 36:6
45:8,21 53:11
**They're** 11:15,17
17:8,9 27:22 30:7,
20 37:3 46:14
48:24 53:18
**they've** 36:17 46:17
**thing** 6:9 9:9 33:25
42:25 46:19
**things** 5:18 8:19
20:24 36:22 45:5
**think** 9:21 13:1
15:18 18:19 20:20
24:16 26:3,12
29:10,24 30:4,6
33:20,24 35:2,3

38:24 39:1,2,11,15
46:17,25 51:12
51:12,21 53:2
**third** 21:18 36:9,11
50:20
**those** 9:25 10:9 11:8,
12 13:11 14:3 14:3
16:9 16:9,12 20:14,
17,24 21:6 21:6,15
22:17 23:18 24:8
25:3,8,17 27:7,12,
18 28:10 29:10
29:10,18 36:18
42:20,21 44:1,10
45:2,4 51:6,14,15
**though** 5:4
**thought** 44:13
**threat** 38:17,25
51:20 52:11,18
**threatened** 53:19
**threatening** 38:6,12,
19,21 39:7,14,22
40:1,9,11,23 41:4,
14
**threats** 35:8 36:21
45:2 50:18,23,24,
25 51:6,14,15
52:14,23
**three** 20:17 44:4,10
**threshold** 29:24 30:1
**through** 6:14 11:6,25
12:20,22 13:3
18:20,25 19:7
22:16 26:21,24
30:25 31:8 44:10
**throughout** 20:2 23:5,
6
**time** 4:3 5:19 6:3
7:2 11:1 20:2 24:5
26:14 37:9,19 42:4
50:15,19 54:4
**timeline** 43:9
**times** 7:16 10:10,14
39:20 39:20
**title** 13:15 14:25
22:20
**titles** 14:24 20:14
**today** 5:13,25 6:7,21
7:8,13,18 8:12
32:2 47:21 50:9

53:18
**Today's** 4:2
**together** 5:5 26:2
    31:1 43:10
**told** 28:15 30:6
**ton** 16:24
**too** 26:14 33:15
    46:15 49:18
**took** 11:10
**top** 14:17 38:4,5
    51:24
**total** 29:12
**totally** 24:13
**tough** 16:18 34:20
    43:24 47:15
**towards** 31:13
**tracking** 13:19,24
**trade** 12:13
**traditional** 13:5
    46:10 47:5
**traffickers** 44:21
    45:7,10
**transactions** 44:24
**transcript** 6:14
**transportation** 13:6
**Trent** 20:10 21:21
**truth** 5:13
**try** 6:22,24 28:3
**trying** 14:15 24:3
    26:21 40:7 44:9
    45:7 51:5
**Twitch** 30:1
**two** 13:11 20:24 21:7
    28:4 40:20
**type** 16:10 39:16
    42:23 43:7 51:11,
    19
**types** 12:25 13:4,7
    14:3 37:10 42:7
**typically** 39:3 46:18
    49:14

---

U

---

**unable** 48:7
**under** 5:3,12 16:23
    22:4 29:16,23,25
    30:16 32:16 43:2
    51:16
**understand** 5:11

21:17 32:17 40:7
    41:8 46:2
**understanding** 16:11
    31:19 36:15 45:9
    46:23
**understood** 6:17,18
    7:7
**unintended** 52:2
**unless** 15:14
**until** 39:25 40:13
**updates** 13:19,20
    14:4
**use** 6:11,12,12 11:23
    18:24 24:18 35:17,
    23 41:19 42:22
    44:22 44:22 45:21
**used** 11:24 12:1
    41:14 44:3,15
**user** 24:23 29:24
    30:1 43:6 45:20
    46:10 47:7,10,22
    53:17,21,23
**users** 30:4,8 33:22
    39:21 43:4 44:19
    46:2 49:7,12 52:2,
    6
**user's** 47:12
**uses** 15:18 35:5
**using** 16:15 31:12
    34:13 44:25 45:1
**usually** 22:20
**utilize** 45:10

---

V

---

**vaccines** 46:13
**varied** 41:24
**various** 42:6
**vehicle** 11:6
**vehicles** 13:6
**verbal** 6:13
**verbally** 6:16
**verbiage** 20:23
**version** 32:13
**versus** 29:10 35:19
    36:3,25
**very** 8:10 11:5 30:10
    42:23 51:24
**vice** 14:23
**videotaped** 4:3

**views** 43:8
**Virginia** 13:23
**virtual** 28:2
**virtually** 28:10,11
**virtue** 51:17
**virus** 52:9

---

W

---

**wait** 39:25 40:13
**waived** 54:18
**walk** 12:22 44:10
**Walton** 4:18
**want** 5:6,9 7:1,25
    9:12,13,14 23:15
    24:8 26:13,15
    29:12 30:20 32:23
    34:19 42:23 43:7
    45:6 46:10,11,20,
    25 47:9,10,17 48:9
    49:18
**wanted** 12:18 43:14
**wants** 16:7
**wasn't** 8:21 11:5
**way** 12:8,19 16:16
    23:8 34:3 36:8
    51:18 52:18
**ways** 44:21
**website** 27:22
**week** 14:3 27:24
    28:13
**weigh** 17:4 47:17
**welcome** 7:11
**We'll** 6:12 7:25
    27:22
**Well** 7:11,24 9:10
    16:22 17:19 19:25
    29:10 31:23 33:14
    43:13,20 44:1 45:9
    47:10 54:2
**went** 5:9 22:16
**We're** 5:4 5:4,7 6:11,
    21 16:4 16:4,15
    18:22 19:14 20:23
    36:10 37:19 38:4
    42:7 45:2 50:17
    51:9 53:2
**We've** 37:13 47:6
**whatever** 6:5 33:1,2
    45:19 48:22,25

**what's** 13:25 14:18
    29:24 35:19
**whenever** 6:23
**whether** 17:2 21:11
    23:7 25:3 29:15
    31:19 32:3 34:23
    35:11,12,12 37:6
    38:20 39:6 42:2
    48:15 50:13
**which** 9:25 13:21
    16:6 31:24 35:7
**while** 8:9 21:25 22:4
    24:4 31:2 34:6
    49:25
**white** 38:8 39:18
**who** 10:16 14:12,13,
    14 15:6 15:6 16:2
    16:2,7 17:6 20:5,
    10 22:19 29:25
    30:19 34:23 35:10
    38:20 43:6 48:19
**whoever** 38:24
**whom** 33:13
**who's** 15:4 20:9
**why** 16:8 23:14 26:1,
    8 27:15 45:13 53:5
    53:5,13
**will** 5:19 6:3,4 7:6
    8:23 8:23 18:20
    29:25 30:25 31:3
    35:8 39:21 41:21
    44:21,22 46:16
    48:8,9,15 50:21
    54:4
**within** 29:16 35:10
    36:2
**without** 9:13 19:11
    23:24 24:10 30:11,
    18,18,21,21
**witness** 4:5,8 54:5
**Wonderful** 5:3 7:11
**wondering** 33:15
    33:15 45:8
**word** 45:1
**words** 6:11,12
**work** 13:7 18:20
**worked** 17:19
**workplace** 32:23
    43:21,25 44:5 46:5
**workplace-friendly**

    48:8
**workplaces** 46:16
**works** 22:19 46:18
**world** 7:11 36:2
**worried** 23:22
**worry** 23:22
**wouldn't** 17:11 33:11,
    22 36:7
**write** 7:23 8:1
**written** 5:17 6:9,14
    8:2 8:2 10:18
**wrong** 14:24 20:16
    29:13
**wrote** 33:5 34:3

---

**Y**

**year** 28:1,3,3
**years** 28:1
**you're** 6:20,23 18:16
    19:24 31:2 32:3
    42:14 44:9
**you've** 6:10,14 7:24
    18:10 28:6 31:7
    44:3
**Yup** 5:2,15 31:10
    44:7