**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **NETCHOICE, LLC d/b/a Netchoice, a** | § | |
| **501(c)(6) District of Columbia Organization** | § | |
| | § | |
| **and** | § | |
| | § | |
| **COMPUTER & COMMUNICATIONS** | § | |
| **INDUSTRY ASSOCIATION d/b/a CCIA,** | § | |
| **a 501(c)6) non-stock Virginia Corporation** | § | **Civil Action No. 1:21-cv-00840-RP** |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **Ken Paxton, in his official capacity as** | § | |
| **Attorney General of Texas,** | § | |
| | § | |
| *Defendant* | § | |

---

**BRIEF OF *AMICI CURIAE* THE BABYLON BEE, LLC, NOT THE BEE, LLC, GIGANEWS, INC. AND GOLDEN FROG GmbH IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

W. Scott McCollough
MCCOLLOUGH LAW FIRM, P.C.
2290 Gatlin Creek Rd.
Dripping Springs, TX 78620
Texas Bar No. 13434100
Tel: 512-633-3498
wsmc@dotlaw.biz

Evan M. Goldberg (*Pro Hac Vice pending*)
EVAN MILES GOLDBERG, PLLC
400 East 57th Street, Ste. 8F
New York, NY 10022
Tel: 212-888-6497
egoldberg@emlawfirm.com

*Counsel for Amici Curiae The Babylon Bee LLC and Not the Bee LLC, Giganews, Inc. and Golden Frog GmbH*

TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ....................................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................ 1

INTRODUCTION .......................................................................................................... 3

    The 1996 Internet was supposed to be open and provide user control: ............... 5

    The 2021 Internet: ................................................................................................. 5

        Social media platforms enjoy two-sided market dominance. ........................... 5

        The 1996 Congress did not bless THIS. ........................................................... 6

        Social media platforms suppress traditional religious viewpoints ................... 9

        Social media platforms selectively target *The Bee* and *Not the Bee*. .......... 12

        Platforms employ algorithmic sub-programs that implement "VIP" favoritism. ........... 16

SUMMARY OF THE ARGUMENT ............................................................................ 17

ARGUMENT .................................................................................................................. 19

    I.    This is Texas, not Florida. .......................................................................... 19

    II.   Social Media Companies Are The Modern Public Square. .......................... 19

    III.  H.B. 20 Section 2 Provides Consumer Protection And Addresses Social Media Platforms' Ongoing Deceptive And Unreasonable Business Practices. .................... 20

    IV.  Social Media Companies Are Common Carriers ......................................... 21

      A.Social media companies hold out to indiscriminately serve. ....................... 22

      B.Social media companies receive countervailing benefits. ........................... 24

    V.   H.B. 20 is Not Preempted by Section 230 Because it Targets Viewpoint-Based Actions Not Taken in Good Faith. ................................................... 24

      A.The Section 230(c)(2) affirmative defense is for voluntary, good faith removals ............. 24

      B."Otherwise Objectionable" is not boundless and does not grant complete removal discretion. ........................................................................................... 27

    VI.  Plaintiffs' First Amendment Claims Do Not Plead or Prove Overbreadth ....................... 28

    VII. Laws Granting Third-Party Access That Do Not Restrict or Compel Owner Speech and Regulate Conduct Do Not Violate the First Amendment ............. 28

    VIII.The Legislation Protects the Public and Social Media Platforms From Government Censorship Pressure. ................................................................ 30

CONCLUSION .............................................................................................................. 32

CERTIFICATE OF SERVICE ................................................................................... 33

# TABLE OF AUTHORITIES

## Federal Cases

*Abrams v. United States*, 250 U.S. 616 (1919) ...................................................................31

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc*, 140 S.Ct. 2082 (2020)..........................30

*Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373 (2021)..................................................25

*Anderson v. Edwards*, 514 U.S. 143 (1995) ......................................................................26

*Arizona v. United States*, 567 U.S. 387, 132 S.Ct. 2492 (2012) ...............................................26

*Begay v. United States*, 553 U.S. 137, 128 S.Ct. 1581 (2008)...................................................27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007) .............................................25

*Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S.Ct. 1220 (2021) .............21, 23

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302 (2001) .....................................27

*Darnaa, LLC v. Google, Inc.*, No. 15-cv-03221-RMW, 2016 U.S. Dist. LEXIS 152126
(N.D. Cal. Nov. 2, 2016).............................................................................................25

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th
Cir. 2008) .............................................................................................................28

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) ...........................................................24

*Goddard v. Google, Inc.*, No. C 08-2738 JF (PVT), 2008 U.S. Dist. LEXIS 101890 (N.D.
Cal. Dec. 17, 2008) ..................................................................................................27

*Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097 (N.D. Cal. 2011)................................24

*Kontrick v. Ryan*, 540 U.S. 443 124 S.Ct. 906, 918 (2004)......................................................24

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922 (1982) ........................................................31

*Mozilla Corp. v. FCC*, 940 F3d 1 (D.C.Cir., 2019) ..............................................................22

*Nat'l Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49 (D. Mass. 2019)..............................25

*Nat'l. Ass'n of Reg. Util. Com'rs v. FCC*, 525 F.2d 630 (D.C. Cir. 1976) *cert. den.*, 425 U.S.
992 ("*NARUC I*").............................................................................................6, 22, 23

*Nat'l. Ass'n of Reg. Util. Com'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976)("*NARUC II*")................23

*National Numismatic Certification, LLC. v. eBay, Inc.*, No. 6:08-cv-42-Orl-19GJK, 2008
U.S. Dist. LEXIS 109793, 2008 WL 2704404 (M.D. Fla. July 8, 2008) .....................................27

*NetChoice, LLC v. Moody*, No. 4:21cv220-RH-MAF, 2021 U.S. Dist. LEXIS 121951 (N.D.
Fla. June 30, 2021), interlocutory appeal pending, *NetChoice, LLC v. Attorney General,
State of Florida*, No. 21-12355 (11th Cir.) .......................................................................19

*Obergefell v. Hodges*, 576 U.S. 644 (2015)........................................................................9

*Ohio v. Am. Express Co.*, 138 S.Ct. 2274 (2018) .................................................................5

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) .........................................................19

*Pimrose v. Western Union Telegraph Co.*, 154 U.S. 1, 14 S.Ct. 1098 (1894) ...............................21

*Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980).........................................20, 23, 28

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ...................................................................31

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006)..............20, 29

*Song Fi Inc. v. Google*, 108 F.Supp 3d 876 (N.D. Cal. 2015).........................................25, 27

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, (1994) ..........................................29

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 114 S.Ct. 2445 (1994) ..........................23

*United States v. Ellis*, 984 F.3d 1092 (4th Cir. 2021)...................................................20

*United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095 (1987), ................................25, 26

*United States v. Stevens*, 559 U.S. 460, 130 S.Ct. 1577 (2010)...........................25, 27, 28

*Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014) ........................................................23

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 128 S.Ct. 1184 (2008) ..........................................................................................25

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) ........................................27

### Federal Statutes

47 U.S.C. §151 ......................................................................................21

47 U.S.C. §153(11) .................................................................................22

47 U.S.C. §153(24) .................................................................................21

47 U.S.C. §153(50) .................................................................................22

47 U.S.C. §153(51) .................................................................................21

47 U.S.C. §230..................................................................................*passim*

### Other Authorities

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989)......................8

*Black's Law Dictionary* 713 (8th ed. 2004)............................................................24

Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1 (2015) .....................................................................8

Merriam-Webster.com ................................................................................8

### Treatises

*5A* C. Wright & A. Miller, <u>Federal Practice and Procedure</u> §1347 (2d ed. 1990 ............................24

Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> (2012) .........27

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* The Babylon Bee, LLC, Not the Bee, LLC, Giganews, Inc. and Golden Frog, GmBH submit their different take on the case and in opposition to Big Tech's frontal assault on Texas H.B. 20. They do so on behalf of the millions of ordinary consumers, the *users* of social media platforms who depend on those platforms to carry their speech and be heard by the world, but are often mistreated and silenced because of their viewpoint.

**The Babylon Bee, LLC,** is a Christian satire website (https://babylonbee.com) (***The Bee***) that sheds light on faith, politics, and culture through humor and parody. **Not the Bee, LLC**, is a Christian news website (https://notthebee.com) (***Not the Bee***) that runs entirely accurate headlines one might expect to find in *The Bee*. *The Bee*'s and *Not the Bee*'s headlines highlight, among other things, social media platforms' viewpoint-based censorship of conservative groups, conservative leaders and traditional religious viewpoints.

As a company that not only documents social media censorship but suffers from it, *The Bee* has a direct interest in the outcome of this case. The censorship and shadow banning *The Bee* experiences from social media platforms would be remediable under the law at issue in this case. That means *The Bee* might be entitled to relief that would increase visibility and engagement with potential readers and resumed or increased advertising income that would help keep the lights on and the satire servers running. Because *Not the Bee*'s success relies almost entirely on *The Bee's* popularity, and because social media platforms' censorship and shadow-banning of

---

[1] Counsel for *Amici Curiae* authored this brief in its entirety. No party's counsel authored this brief, in whole or in part, or contributed money intended to fund the preparation or submission of this brief. No person other than *Amici Curiae*, their members, or their counsel contributed money fund preparation or submission of this brief. Counsel for all parties have consented to the filing of this brief.

*The Bee* have hampered Internet traffic to its site, *Not the Bee* likewise has an interest in this matter.

**Giganews LLC ("Giganews")** was founded in 1994 in Austin, Texas. It provides distributed discussion system or "Usenet" service.[2] Giganews is one of the largest global Usenet providers and has customers ("members") in over 170 countries. Unlike the technology giants that dominate Silicon Valley, Giganews offers a largely *unmoderated* forum for its news-going members. Members post and receive articles that are organized into topical categories known as "newsgroups," which are catalogued by hierarchy based on subject. Usenet articles are formatted and transmitted amongst members in ways somewhat similar to email messages. Giganews is not advertiser-supported. Members subscribe to and directly pay for use of the service. Customer data is not released absent court order. Giganews does not monitor members' online activities or monetize user data. Giganews has been around for a long time and is significantly different from those who came after, especially with regard to privacy and neutrality.

**Golden Frog GmBH ("Golden Frog")** is a privately-held, non-publicly traded company with offices in Austin, Texas and organized and existing under the privacy-protective laws of Switzerland. Golden Frog offers world-wide applications and services that preserve an open, privacy-enhancing and secure Internet experience. VyprVPN™ provides "virtual private network" (VPN) based online privacy and security from "man in the middle" monitoring or attacks by creating encrypted "tunnels" that ride on any Internet access connection. VyprVPN also offers Domain Name Server functionality. This feature is also privacy-enhancing because it

---

[2] The "Usenet" predates the World-Wide Web and its underlying Hypertext Transfer Protocol Service, and about the same age as Post Office Protocol employed for email. It relies on a separate set of transport and application layer protocols.

obscures user location and activity. User transactional data is retained for only short periods and is not monitored or monetized. We *never* look at the content.

Giganews and Golden Frog are affiliated through common ownership. Both companies' main offices are in Austin, Texas. Giganews, Golden Frog and their leadership are passionate about First Amendment principles along with user privacy and control over their own information. They truly value their users' privacy and individual rights.

*Amici* share a strong desire for an open Internet without powerful censorious gatekeepers. Ubiquitous access to information and social discourse. An intellectually diverse social media universe in which all Americans–including those of the center-right, with ethical and religious philosophies or just driven by reason–have an equal platform to advocate their views to people that seek to hear them. Each believes that *individual users* and *parents* rather than powerful corporations with obvious agendas should be able to control and exercise unhindered judgement regarding the information they post and receive on the Internet, consistent with the Congressional findings and purpose statements in 47 U.S.C. §230.

At a minimum, *Amici* want social media platforms to transparently announce and evenhandedly apply their moderation procedures and standards, and then reasonably treat their consumers as Texas H.B. 20 requires them to do.

## INTRODUCTION[3]

Social media platforms advertise a service available to the general public, open to all except a specifically identified few.[4] They do not have the practice of denying, nor do they

---

[3] *Amici* agree with the State that the court lacks jurisdiction because the Plaintiff associations have not demonstrated Article III standing.

[4] *See*, Facebook terms and conditions, https://www.facebook.com/legal/terms/update (accessed November 9, 2021):

We try to make Facebook broadly available to everyone, but you cannot use Facebook if:

reserve the right to deny, initial subscription and contract formation to potential end user customers other than an expressly-listed few "ineligibles." Nor do they reserve the right to, or have the practice of, negotiating individual contracts. Their adhesion contract is non-negotiable, unilateral and inalterable, except by them. All users enter into the same agreement.

Platforms reserve the right to remove or restrict access to material that "violates" their terms of service, and state they will "explain any options you have to request another review"[5] but do not disclose that what little due process they provide is impossible to navigate and the only available "option" for restoration is usually capitulation, a confession of error for thoughtcrimes, and an "agreement" to removal of the "objectionable" post.

Social media's user agreements promise objectivity, good faith, and fair dealing. The oracles of Silicon Valley declare an intent to "detect misuse of [their] Products, harmful conduct towards others, and situations where [they] may be able to help support or protect our community," provide that users may not use their product to "do or share anything … That is unlawful, misleading, discriminatory or fraudulent"[6] and say that "Content that threatens people has the potential to intimidate, exclude or silence others isn't allowed."[7] But in practice the firms unevenly enforce their standards against disfavored viewpoints and speakers. They do not disclose that they will arbitrarily, subjectively, and purposefully apply these standards in ways

---

- You are under 13 years old.
- You are a convicted sex offender.
- We've previously disabled your account for violations of our Terms or Policies.
- You are prohibited from receiving our products, services, or software under applicable laws.

[5] Facebook terms and conditions, available at https://www.facebook.com/legal/terms/update (accessed November 9, 2021).

[6] *E.g.*, Facebook terms and conditions, available at https://www.facebook.com/legal/terms/update (accessed November 9, 2021).

[7] Facebook Community Standards, https://transparency.fb.com/policies/community-standards/?from=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards (accessed November 9, 2021).

that favor certain viewpoints and disfavor and minimize others. They ban objectively truthful information that is inconvenient or embarrassing to their undeclared biases.

The 1996 Internet was supposed to be open and provide <u>user</u> control:

When Congress enacted the Communications Decency Act in 1996, it envisioned an Internet that "offer[s] a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. §230(a)(3). It contemplated an Internet where users enjoy "a great degree of control over the information they receive." §230(a)(2). Congress wanted to "maximize user control over what information is received by individuals, families, and schools…" §230(b)(3). Platform-level filtering was encouraged in certain circumstances, but the intention was to "empower parents." The <u>customer</u> was supposed to be in charge of the tools used to "limit[] access to material that is harmful to minors." §230(b)(4), (d). Congress believed the Internet was a place where platforms host user submissions according to standards that they evenhandedly enforce in "good faith." §230(c)(2)(A).

The 2021 Internet:

Social media platforms enjoy two-sided market dominance.

Social media platforms exercise an outsized role in consumers' everyday lives. They also control advertising. These firms are dominant on both sides of their two-sided market.[8] Facebook has about 2.9 billion users and generated over $85.9 billion dollars in 2020.[9] Facebook makes its money through digital advertising that exploits the content and transactional data they collect

---

[8] "[A] two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them." *Ohio v. Am. Express Co*., 138 S.Ct. 2274, 2280 (2018).
[9] *See*, Statistica Research Department, *Facebook, Statistics and Facts*, (November 8, 2021), https://www.statista.com/topics/751/facebook/#dossierKeyfigures (accessed Nov. 21, 2021).

from users, which they also sometimes independently sell to or use as barter with third parties. Facebook and Google's advertising market dominance leaves little room for smaller media outlets like *The Bee* and *Not the Bee,* who are also users and try to make money from their own advertising. In other words, smaller media outlets rely on social media platforms like Facebook to garner traffic to their websites. Facebook and Google can easily drive out competitors who also want to host ads. Tech companies permeate and dominate our lives. They feel like institutional monopolies, just those that performed similar functions in earlier days.[10]

The 1996 Congress did not bless THIS.

The online world Congress envisioned in 1996 is <u>not</u> what we virtually inhabit today. Consider the following ten recent headlines. They might prompt Hamlet to ask life's most fundamental question in the modern age: *The Bee*, or *Not the Bee*?

- Priorities: Twitter says Taliban terrorists can post propaganda on platform while Donald Trump remains banned.[11]

- Twitter suspended a Spanish politician for tweeting "A man cannot get pregnant. A man has no womb or eggs."[12]

- Twitter says calling the Syrian Muslim CO shooter a "white Christian terrorist" does not violate its policies on "misinformation" or "hate."[13]

- You know who doesn't get blocked on Twitter for spreading misinformation about Covid? The Chinese Communist Party.[14]

---

[10] Legislation imposing regulation on industries or companies affected by the public interest has been maintained based on the *quasi*-public nature of their activities even if individual participants lack market power. *See Nat'l. Ass'n of Reg. Util. Com'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976) *cert. den.*, 425 U.S. 992 ("*NARUC I*").

[11] *See* https://notthebee.com/article/priorities-donald-trump-is-banned-from-twitter-while-the-taliban-is-still-allowed-to-maintain-its-account (accessed Nov. 10, 2021).

[12] *See* https://notthebee.com/article/twitter-suspended-a-spanish-politician-for-tweeting-a-man-cannot-get-pregnant-a-man-has-no-womb-or-eggs (accessed Nov. 10, 2021).

[13] *See* https://notthebee.com/article/twitter-says-calling-the-syrian-muslim-co-shooter-a-white-christian-terrorist-does-not-violate-its-policies-on-misinformation-or-hate (accessed Nov. 10, 2021).

[14] *See* https://notthebee.com/article/you-know-who-doesnt-get-blocked-on-twitter-for-spreading-misinformation-about-covid-the-chinese-communist-party (accessed Nov. 10, 2021.

- Former Twitter CEO says he'll "happily" watch as "capitalists are lined up and shot."[15]
- Twitter's Jack Dorsey caught red-handed saying something true: We are focused on one account right now, but this is going to be much bigger than just one account.[16]
- Facebook rejects police group's Officer of the Year ad.[17]
- Facebook whistleblowers say company is censoring "vaccine hesitant" content without users' knowledge but I'm sure it's for our own good.[18]
- Facebook, in all its wisdom and glory, will finally allow you to have an opinion on the origin of Covid-19. Thanks, Facebook![19]
- Quick! Check to see if Instagram is forcing you to follow The White House account![20]

There once was a quaint time when these headlines might have appeared in *The Babylon Bee*, "the world's best satire site."[21] But they did not. Instead, they ran in *Not the Bee*, the non-satire news site. They are entirely factual.[22]

---

[15] *See* https://notthebee.com/article/former-twitter-ceo-says-hell-happily-watch-as-capitalists-are-lined-up-and-shot (accessed Nov. 10, 2021).

[16] *See* https://notthebee.com/article/twitters-jack-dorsey-caught-red-handed-saying-something-true-we-are-focused-on-one-account-right-now-but-this-is-going-to-be-much-bigger-than-just-one-account (accessed Nov. 10, 2021).

[17] *See* https://notthebee.com/article/facebook-rejects-police-groups-officer-of-the-year-post-due-to-sensitive-social-issues- (accessed November 9, 2021).

[18] *See* https://notthebee.com/article/facebook-whistleblowers-say-company-is-censoring-content-according-to-how-vaccine-hesitant-it-is-suppressing-any-negative-posts-or-news-about-covid-19-vaccines (accessed Nov. 10, 2021).

[19] *See* https://notthebee.com/article/facebook-in-all-its-wisdom-and-glory-will-now-allow-you-to-have-an-opinion-about-the-origins-of-covid-19-thanks-facebook (accessed Nov. 10, 2021).

[20] *See* https://notthebee.com/article/quick-check-to-see-if-instagram-is-forcing-you-to-follow-the-white-house-account (accessed Nov. 10, 2021).

[21] *See What is The Babylon Bee?*, The Babylon Bee, https://babylonbee.com/about (accessed Nov. 10, 2021).

[22] Thus, the *New York Times* had to issue a retraction after mislabeling *Not the Bee* as publishing "misinformation." Of course, they did so only after legal threat, and of course it appeared in the back pages. See Corrections: June 12, 2021, N.Y. Times, https://www.nytimes.com/2021/06/11/pageoneplus/corrections-june-12-2021.html (accessed Nov. 10, 2021); Madeline Roth, *NY Times Corrects Story After Legal Threat, Admits Babylon Bee Is "Satirical Website" and Not "Misinformation*," Yahoo!, https://www.yahoo.com/now/ny-times-corrects-story-legal-001112181.html (June 14, 2021) (accessed Nov. 10, 2021).

As *Not the Bee* painstakingly documents in its headlines, America's social media titans have shattered Congress' expectations for a user-centric, free, and intellectually diverse Internet. They repeatedly target conservative and religious viewpoints for censorship through selective and inconsistent application of ever-shifting "standards."[23] *Amici* offer a few examples from Twitter.

Like most social media platforms, Twitter prohibits users from posting "hate."[24] Twitter uses any arguable open texture[25] in the term to silence conservative or religious viewpoints, even when the tweet contains objectively true facts. Twitter took down a politician's biologically correct statement that "A man has no womb or eggs" for "hate speech."[26] But it condoned a college professor's profoundly racist statement "I block white people" because "[t]here is nothing white people can say and do that is creative, profound, and intimidating."[27] To Twitter, biology is "hate," but unadorned racism–at least of a certain variety–is not.

Twitter's approach to "misinformation" is just as unbalanced. It deplatformed a whistleblowing Chinese scientist for suggesting that the novel coronavirus originated from a

---

[23] That social media companies often correctly denominate their policies as "standards" or "guidelines," rather than "rules," underscores the discretion that they confer to reach preferred, *ad hoc* outcomes. *See generally* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989) (contrasting rules with standards).

[24] *Webster's* informs that the ordinary meaning of "hate" is "intense hostility and aversion usually deriving from fear, anger, or sense of injury," "extreme dislike or disgust," or (tautologically) "a systematic and especially politically exploited expression of hatred." Merriam-Webster.com, *Hate*, https://www.merriam-webster.com/dictionary/hate (accessed Sept. 12, 2021).

[25] *See* Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 Notre Dame L. Rev. 1, 60–61 (2015) (discussing the notion of open texture).

[26] *Twitter suspended a Spanish politician for tweeting "A man cannot get pregnant. A man has no womb or eggs,"* Not the Bee, https://notthebee.com/article/twitter-suspended-a-spanish-politician-for-tweeting-a-man-cannot-get-pregnant-a-man-has-no-womb-or-eggs (accessed Nov. 10, 2021).

[27] *Check out this profoundly racist tweet from a college professor that Twitter allows for some reason*, Not the Bee, https://notthebee.com/article/check-out-this-profoundly-racist-tweet-that-twitter-allows-for-some-reason (accessed Nov. 10, 2021).

Chinese lab.[28] But it did nothing about the Chinese Communist Party tweet asserting "Further Evidence that the Virus Originated in the US."[29]

Social media platforms suppress traditional religious viewpoints.

Religious Americans hold traditional views on many issues of intense public debate. For example, many Christians, Jews, and Muslims believe marriage is the lifelong union of a man and a woman, God created mankind male and female and abortion is the wrongful taking of innocent human life. The Supreme Court recognized that these perspectives are held "in good faith by reasonable and sincere people." *Obergefell v. Hodges*, 576 U.S. 644, 657 (2015). Today's social media platforms see things differently. To them, these viewpoints are not dissenting views that deserve a voice, but hateful bigotry that must be silenced. They then abuse their outsized power over speech to accomplish their censorship goal.[30]

Even mainstream religious groups and leaders cannot escape Mark Zuckerberg's and Jack Dorsey's Eye of Sauron. Focus on the Family's *Daily Citizen* explained transgenderism for its unwoke followers by noting that a "transgender woman" is "a man who believes he is a woman." Twitter quickly banned the publication for posting "hate."[31] Facebook gave Pastor Franklin Graham a 24-hour timeout for "hate speech" after he criticized Bruce Springsteen's

---

[28] Anagha Srikanth, *Twitter suspends account of Chinese virologist who claimed coronavirus was made in lab*, The Hill, https://thehill.com/changing-america/well-being/prevention-cures/516754-twitter-suspends-account-of-chinese-virologist (accessed Nov. 10, 2021).

[29] *You know who doesn't get blocked on Twitter for spreading misinformation about Covid? The Chinese Communist Party*, Not the Bee, https://notthebee.com/article/you-know-who-doesnt-get-blocked-on-twitter-for-spreading-misinformation-about-covid-the-chinese-communist-party (accessed Nov. 10, 2021).

[30] Tyler O. Neil, PJ Media, *Instagram Bans Babylon Bee Founder's Pro-Life Cartoon As Hate Speech*, https://pjmedia.com/news-and-politics/tyler-o-neil/2019/04/10/instagram-bans-babylon-bee-founders-pro-life-cartoon-as-hate-speech-n65042 (accessed Nov. 11, 2021).

[31] *Twitter dropped the banhammer on a Christian magazine for this "hateful" sentence*, Not the Bee, https://notthebee.com/article/twitter-censors-focus-on-the-family-magazine-for-this-hateful-sentence (accessed November 10, 2021).

boycott of North Carolina and expressed support for the state's law prohibiting men from using women's restrooms and locker rooms. It later apologized, but only after backlash.[32] Instagram labeled popular Christian artist Sean Feucht's worship videos as "harmful or false information."[33] YouTube temporarily booted theologian John Piper's audiobook, *Coronavirus and Christ*, for "violating community guidelines."[34]

When Susan B. Anthony List ran ads describing then-candidate Joe Biden's position on late-term abortions, Facebook pulled them, giving a delayed reinstatement only after substantial pushback.[35] Twitter likewise took down as "inflammatory" a pro-life campaign ad by then-candidate Marsha Blackburn describing her efforts to halt Planned Parenthood's sale of aborted body parts.[36] TikTok banned the pro-life group Live Action, reinstating it only after a national backlash. It opaquely cited "human error."[37] TikTok and Instagram similarly censored Students

---

[32] Aris Folley, *Facebook temporarily banned evangelist Franklin Graham from site*, The Hill, https://thehill.com/policy/technology/423205-facebook-temporarily-banned-evangelist-franklin-graham-from-site (Dec. 29, 2018) (accessed November 10, 2021).

[33] Andrea Morris, *Instagram Censors Worship Leader. s Praise Post, Labeling His Faith . False and Harmful.* , CBN News, https://www1.cbn.com/cbnnews/us/2020/june/instagram-censors-worship-leaders-praise-post-labeling-his-faith-false-and-harmful (June 24, 2020) (accessed November 10, 2021).

[34] Melissa Barnhart, *Youtube restores John Piper's Coronavirus and Christ audiobook after violation ban*, Christian Post, https://www.christianpost.com/news/youtube-restores-john-pipers-coronavirus-and-christ-audiobook-after-violation-ban.html (May 19, 2020) (accessed November 10, 2021).

[35] Press Release, Susan B. Anthony List, https://www.sba-list.org/newsroom/press-releases/update-facebook-apologizes-to-sba-list-then-takes-down-another-pro-life-ad (Nov. 1, 2018) (accessed November 10, 2021).

[36] Kevin Robillard, *Twitter pulls Blackburn Senate ad deemed "inflammatory"*, Politico, https://www.politico.com/story/2017/10/09/marsha-blackburn-twitter-ad-243607 (Oct. 9, 2017); https://thehill.com/opinion/healthcare/356012-twitters-suppression-of-pro-life-speech-must-stop (accessed November 10, 2021).

[37] Lila Rose, *Twitter's suppression of pro-life speech must stop*, The Hill, https://www.liveaction.org/news/live-action-banned-tiktok-app (Oct. 18, 2017) (accessed November 10, 2021).

for Life of America.[38] Planned Parenthood's pro-abortion political ads, meanwhile, are never censored.[39]

Some of these actions were later retracted, but many were not. And regardless, the sheer number of examples and obvious bias makes clear these episodes are targeted and intentional. Of course, when confronted about their biases, social media giants hide behind their algorithms. They pretend they did not foresee the viewpoint-based outcomes their algorithms generate. But at some point, consistent conservative and religious viewpoint suppression and failure to apply the same rules to platform's favored viewpoints makes clear that the algorithms' results come from intelligent and intentional design, not some big bang in a circuit board.

In today's social media culture Jesus–who by all accounts *should* check many of the progressive boxes for victimhood and powerlessness[40] and by many accounts advanced a host of their stated positions[41]–would be digitally crucified and sealed in a virtual cave. In other words,

---

[38] Brenna Lewis, *Instagram Just Censored this Pro-Life Post*, Students for Life of America, https://studentsforlife.org/2021/06/04/instagram-just-censored-this-pro-life-post (June 4, 2021) (accessed November 10, 2021); Brenna Lewis, *TikTok Censors Students for Life, Then Reinstates Video Without Explanation*, https://studentsforlife.org/2020/04/14/tiktok-censors-students-for-life-then-reinstates-video-without-explanation (Apr. 14, 2020) (accessed November 10, 2021).

[39] John Wesley Reid, *A Double Standard? Unpacking Twitter. s Pro-Life Ad Ban*, CBN News, https://www1.cbn.com/cbnnews/2017/june/a-double-standard-unpacking-twitters-pro-life-ad-ban (June 29, 2017) (accessed November 10, 2021).

[40] Jesus "definitely was not white," "live[d] in occupied territory and knows what it means to be from an oppressed people." https://www.nytimes.com/2021/10/16/opinion/jesus-black-james-cone.html (accessed Nov. 11, 2021). He was conceived out of wedlock and his birth-mother was destitute and homeless. Apparently, however, the problem is that "Jesus was a satirist." Jones, Jesus the Satirist, https://thejesusquestion.org/2011/06/10/jesus-the-satirist/ (June 10, 2011) (accessed Nov. 11, 2021), and thus disqualified from inclusion because his words and deeds are sometimes used to "expose the ridiculousness of human vices and follies" of modern-day Pharisees. *Id. See*, *Scholars Confirm Jesus Always Fist-Bumped Apostles After Absolutely Roasting Pharisees*, https://babylonbee.com/news/scriptural-scholars-confirm-jesus-pharisee-owning-parables-followed-by-fist-bumps-with-apostles (accessed November 14, 2021).

[41] *E.g*, *How did Jesus view women*, https://www.uncover.org.uk/questions/how-did-jesus-view-women/ (viewed Nov. 11, 2021); Glaser, *The Bible and Homosexuality: A Christian View*, © 2006,

he would be "canceled." His Christian followers are persistently cast into an on-line colosseum and subjected to *damnatio ad bestias* with no means for self-defense[42] merely because they refuse to submit to–and sometimes lampoon–hypocrisy and often irrational dictates imposed by those with other viewpoints.

Social media platforms selectively target *The Bee* and *Not the Bee*.

*The Bee* and *Not the Bee* document social media censorship like the headlines and examples listed above. So they are specifically targeted too. Facebook determined that *The Bee* "incit[ed] violence" by posting "Senator Hirono Demands ACB Be Weighed Against a Duck to See If She Is a Witch." When challenged, Facebook adhered to its determination.[43] Lost on Facebook was the essential fact that no ducks, judicial nominees, or members of Congress were harmed in the posting of that article, something the Facebook censors presumably would have known had they ever seen *Monty Python*.

Instagram shares its parent company's view that *The Bee* is a public menace, and it determined that *The Bee*'s CEO violated community guidelines against harmful false information and hate speech or symbols. His crime? Sharing a *Slate* article entitled "It's About Time for Us

---

https://assets2.hrc.org/files/assets/resources/The_Bible_and_Homosexuality.pdf (accessed Nov. 11, 2021).

[42] Facebook prohibits "Praise," "Substantive Support" and "speak[ing] favorably" of what it deems "hateful ideologies" but freely allows posters to "condemn" them. https://transparency.fb.com/policies/community-standards/dangerous-individuals-organizations/ (accessed Nov. 11, 2021). Thus, those who are (wrongly) accused of "hate" are subject to platform-encouraged attack but denied any online means to explain, clarify or justify their viewpoint.

[43] *AGAIN! Facebook censors and penalizes The Babylon Bee for the most ridiculous article ever*, Not the Bee, https://notthebee.com/article/again-facebook-is-censoring-the-babylon-bee-for-the-most-ridiculous-story-ever (accessed Nov. 10, 2021), *Facebook Demonetizes Satire Site Babylon Bee, Claims Monty Python Spoof "Incites Violence,"* https://thefederalist.com/2020/10/20/facebook-demonetizes-satire-site-babylon-bee-claims-monty-python-spoof-incites-violence/ (accessed Nov. 10, 2021).

to Stop Wearing Masks Outside," along with the comment "Sane people never did this."[44]

Meanwhile, *Slate* retains a robust social media presence even after promoting–and re-promoting–

a podcast episode advocating violent protest.[45] The Facebook tagline stated that "nice, peaceful

protest may not bring about desired social change."[46] Twitter let *Slate* directly state that "[n]on-

violence is an important tool for protests, but so is violence."[47] Despite substantial backlash,[48]

their violence-promoting publications remain on these sites.[49] Others can freely advocate

insurrection and the violent overthrow of our government.[50] An Antifa group recently tweeted its

hope that President Biden will "be the last" U.S. president, unambiguously calling for the end of

our constitutional republic.[51] This too remains uncensored.

---

[44] Babylon Bee CEO posted this to Instagram and they're now threatening to ban him for "harmful false information" and "hate speech." WHAT??, Not the Bee, https://notthebee.com/article/babylon-bee-ceo-posted-this-to-instagram-and-theyre-theyre-threatening-to-ban-him-for-harmful-false-information-and-hate-speech-or-symbols-what (accessed Nov. 10, 2021).

[45] *Best of 2020: A History of Violent Protest*, Slate, https://slate.com/podcasts/what-next/2020/12/does-violence-make-protest-more-effective-makes-an-effective-protest (Dec. 24, 2020); *A History of Violent Protest*, Slate, https://slate.com/podcasts/what-next/2020/06/protests-blm-movement-american-history (accessed Nov. 10, 2021).

[46] Slate, Facebook, https://www.facebook.com/Slate/posts/if-violent-protests-are-getting-your-attention-are-they-working/10158732609846438 (Dec. 24, 2020) (requires login).

[47] *Oops, looks like Twitter forgot to ban Slate for promoting violence*, Not the Bee, https://notthebee.com/article/oops-looks-like-twitter-forgot-to-ban-slate-for-promoting-violence (accessed Nov. 10, 2021).

[48] Joseph Wulfsohn, *Liberal site Slate faces backlash for saying "violence" is an "important tool for protests,"* Fox News, https://www.foxnews.com/media/slate-backlash-violence-is-an-important-tool-for-protests (accessed Nov. 10, 2021).

[49] Slate, Facebok.com, https://www.facebook.com/Slate/posts/if-violent-protests-are-getting-your-attention-are-they-working/10158732609846438 (Dec. 24, 2020) (requires login); Slate, Twitter.com, https://twitter.com/Slate/status/1268415955937513473?s=20 (June 4, 2020) (accessed Nov. 10, 2021).

[50] *But see*, 18 U.S.C. §§2383, 2385.

[51] "*Antifa group openly hopes that Biden is the last U.S. president EVER and promotes inauguration-day violence, but is still allowed on Twitter* 🤣," Not the Bee, https://notthebee.com/article/antifa-group-openly-hopes-that-biden-is-the-last-us-president-ever-and-promotes-inauguration-day-violence-but-is-still-allowed-on-twitter (accessed Sept. 12, 2021) (accessed Nov. 10, 2021).

Left-of-center groups and publications may expressly advocate violence, but Heaven forbid a right-of-center publication imply that outdoor mask-wearers (or a Senator from Hawaii) are out-of-touch with reality. Nor can the Libertarian Party of Kentucky tweet "Watching this trial, it's ever more obvious that Kyle Rittenhouse did nothing wrong" even though that was obviously fair comment given that a jury has now agreed.[52] These, evidently, cross the opaque but obviously slanted line when it comes to opinions that do and do not "advocate violence."

Sometimes social media and news media work together to suppress conservative viewpoints, or at least *The Bee*. After social media titans began censoring what they label "misinformation," the *New York Times* ran an article that claiming *The Bee* has "trafficked in misinformation," linking to a prior *New York Times* article that actually *refuted* the claim by acknowledging *The Bee* purveys legitimate satire.[53] As noted above, the *Times* ultimately had to retract the article. But they have not learned their lesson. Facebook recently announced it will censor satire that "punches down." Unsurprisingly, soon thereafter, *Slate* ran an article that accused *The Bee* of–you guessed it–punching down.[54] They did not see the irony in a large online publication dubiously accusing a much smaller one of "punching down." *Not the Bee* therefore exposed the fact that Twitter freely allows major corporations in charge of definitions

---

[52] Garcia, *Twitter locked Libertarian party account over a tweet saying Kyle Rittenhouse did nothing wrong*, https://www.theblaze.com/news/rittenhouse-tweet-lock-censor#toggle-gdpr (November 10, 2021) (accessed Nov. 11, 2021).

[53] Seth Dillon, *How The Babylon Bee Is Fighting Back*, National Review, https://www.nationalreview.com/2021/07/how-the-babylon-bee-is-fighting-back (July 3, 2021) (accessed Nov. 10, 2021).

[54] Brian Flood, *Babylon Bee CEO says satirical site "punching back" against liberal media, Big Tech censorship*, Fox News, https://www.foxnews.com/media/babylon-bee-ceo-punching-back-against-censorship (June 29, 2021) (accessed Nov. 10, 2021).

and a millionaire professional athlete to "punch down" on an 18-year old (and now acquitted) criminal defendant facing lifetime confinement.[55]

The most pernicious viewpoint censorship, however, happens below the social media surface at the algorithm level, where *The Bee* is shadow-banned[56] by Facebook. Over the past year, *The Bee* has seen a marked increase in its Facebook followers. But over the same time period, (beginning with the 2020 election season) it has suffered a "drastic, steady decline in reach and engagement" on Facebook.[57] Historically, 80% of its website traffic came from Facebook, and its articles often went viral. Today, it gets only 30% of its traffic from Facebook, and its articles no longer go viral. A recent post to *The Bee*'s Facebook page reached only 11 users and had one "like."[58] It is implausible that over a million followers would scroll past an article entitled, "Least masculine society in human history decides masculinity is a growing threat"[59] if they had been able to see it.

---

[55] Daniel Payne, *A major corporation just openly mocked Kyle Rittenhouse for breaking down while reliving the worst trauma of his life. This is the society we live in now,* https://notthebee.com/article/a-major-corporation-just-openly-mocked-kyle-rittenhouse-for-breaking-down-while-reliving-the-worst-trauma-of-his-life-this-is-the-society-we-live-in-now (Nov. 11, 2021); Hamilton Porter, *Coward LeBron James accuses Kyle Rittenhouse of fake crying on the stand ... and gets lit up for it,* https://notthebee.com/article/lebron-accused-kyle-rittenhouse-of-fake-crying-on-the-stand--and-gets-lit-up-for-it (Nov. 11, 2021). The Bee is on it. *Liberals Accuse Rittenhouse Of Trying To Avoid Punishment Through Legal Loophole Known As "Trial,"* https://babylonbee.com/news/liberals-accuse-rittenhouse-of-trying-to-avoid-punishment-through-legal-loophole-known-as-trial (accessed November 12, 2021).

[56] Barbara Ortutay, *AP Explains: What is shadow banning,*" (September 5, 2018), https://apnews.com/article/north-america-technology-business-ap-explains-donald-trump-8ee05a6abfe54131874428b0671b1e15. Facebook admitted on January 27, 2021 that it "hides" certain content. https://www.facebook.com/4/posts/10112734959725421/?d=n (requires login).

[57] Jennifer Graham, *Is Facebook censoring the Babylon Bee, or does Mark Zuckerberg just not get the jokes?,* Deseret News, https://www.deseret.com/2021/8/23/22638183/is-facebook-censoring-the-babylon-bee-or-does-the-mark-zuckerberg-just-not-get-jokes-conservatives (Aug. 23, 2021) (accessed Nov. 10, 2021).

[58] *Id.*

[59] *See* https://babylonbee.com/news/least-masculine-society-in-human-history-decides-masculinity-is-a-growing-threat (accessed Nov. 10, 2021).

Platforms employ algorithmic sub-programs that implement "VIP" favoritism.

The rabbit hole goes even deeper than algorithms that identify suspect words or subjects. It also includes surreptitious *user*-based algorithms. Recently-leaked Facebook internal documents revealed a Facebook program called Xcheck that exempts "high-profile users from some or all of [Facebook's] rules" and shields "millions of VIP users from the company's normal enforcement process."[60] A Facebook internal review stated that this white-listing is both "widespread" and "not publicly defensible." The review admitted "[w]e are not actually doing what we say we do publicly," and acknowledged the program is "a breach of trust."[61] Facebook misled its users and its own Oversight Board. The troubling nature of the program was patent, even to its employees: "having different rules on speech for different people is very troubling to me," and "decision-making on content policy is influenced by political considerations."[62] The platforms claim all this is just algorithmic over-exuberance. But algorithms are devised and set in motion by people with specific and describable ends. Social media algorithms and their design are products of social media companies' own efforts, targeted at humans with as much psychological precision and force as their data mining activities will allow.

These platforms publicly declare dedication to free speech and equality but surreptitiously censor or shadow-ban online discourse in a way that perpetuates existing power structures. This jeopardizes civil liberties, like freedom of expression and the right to assemble.

---

[60] Jeff Horowitz, *Facebook Says Its Rules Apply to All. Company Documents Reveal a Secret Elite That's Exempt*, Wall Street Journal, https://www.wsj.com/articles/facebook-files-xcheck-zuckerberg-elite-rules-11631541353 (Sept. 13, 2021).

[61] *Id*.

[62] *Id*.

It exposes vulnerable groups with less political clout to online and offline abuses like online

silencing, doxing[63] and even real-world violence.[64]

## SUMMARY OF THE ARGUMENT

Americans rely on social media giants like Facebook, Twitter, and YouTube for news,

political and associational activity, and interpersonal connection. They are the virtual equivalent

of yesterday's public square. Much of what was previously broadcast on radio and television or

transmitted via cable, telephone, or telegraph is now available in social media user and news

feeds. The social media market is dominated by a few large, powerful firms.

Texas H.B. 20[65] is fundamentally a social media consumer protection bill. Section 2, like

many other consumer unfair and deceptive trade practices laws, provides transparency through

required disclosures,[66] and requires fair, nondiscriminatory, and neutral standards and a

meaningful private dispute resolution procedure so consumers can usually obtain relief without

having to resort to litigation.

Texas' law is different from Florida's S.B. 7072. The legislation merely holds social

media platforms to the image of neutrality they publicly proclaim and contractually promise.

Section 7 does not restrict social media companies' own speech or force them to engage in

---

[63] Doxing is the nonconsensual and hostile online posting of a person's personal information, such as home address, e-mail address, and place of employment.

[64] *See* Laura Hecht-Felella, *A call for Legislated Transparency of Facebook's Content Moderation*, Brennan Center for Justice, https://www.brennancenter.org/our-work/analysis-opinion/call-legislated-transparency-facebooks-content-moderation (Sep. 28, 2021) (accessed Nov. 17, 2021).

[65] H.B. 20 will be codified in Tex. Bus. & Com. Code §§120.001-003, 120.051-053; 120.101-104, 120.151 and Tex. Civ. Prac. & Rem. Code §§143A.001-008.

[66] As defined in Texas H.B. 20, a "social media platform" is "an Internet website or application that is open to the public, allows a user to create an account, and enables users to communicate with other users for the primary purpose of posting information, comments, messages, or images." *See* Tex. Civ. Prac. & Rem. Code §120A.001.

speech. It simply codifies what is already expressly and impliedly promised in all contracts and user agreements–good faith and fair dealing. H.B. 20 requires that social media platforms disclose–and evenhandedly apply–reasonable, nondiscriminatory and viewpoint-neutral moderation standards.

The accountability this enactment requires is sorely needed. Social media platforms systematically target conservative users and messages for censorship, selectively invoke vague policies against "hate" and "misinformation," purposefully stunt the free flow of disfavored information and silence conservative voices. The examples are legion and egregious. This bad faith conduct finds no sanctuary in 47 U.S.C. §230 or the First Amendment, especially given how social media platforms hold themselves out to the general public. In sum, H.B. 20 is a facially valid[67] exercise of the State of Texas' authority to protect the public from deceptive and unreasonable corporate conduct.

H.B. 20 is facially consistent with Section 230 and the First Amendment and advances the core purposes of both. It does so by fostering the free flow of information over the Internet, providing end user and parental control, and ensuring that all viewpoints, including conservative and religious ones, receive equal and fair treatment. The law also protects both the public and social media platforms from improper government officials' demands for targeting of viewpoints they do not like.

Plaintiffs' motion for a preliminary injunction should be denied.

---

[67] The Plaintiff associations insist their complaint asserts only facial challenges. Dkt. 28, PACER pp.8, 19-22. The State disagrees (Dkt. 37, p. 11). *Amicii* will assume *arguendo* they have voluntarily limited their preliminary injunction case to a facial challenge only.

**ARGUMENT**

**I.      This is Texas, not Florida.**

Plaintiffs use the presently-enjoined Florida's social media platform bill by that state's

panhandle to beat on Texas.[68] But the two states' pans have different ingredients; Florida S.B.

7072 and Texas H.B. 20 are materially and meaningfully different.

Texas did not carve out the Magical Kingdom.[69] Nor did Texas give special treatment to

the press and political candidates.[70] Section 7 of the Texas bill affords only injunctive relief,

court costs and fees. It does not allow statutory or economic damages.[71] Finally, Section 7 does

not force social media platforms to speak or prohibit them from speaking. Florida did both.[72] In

Texas everyone gets to say their piece or keep their peace, according to conscience. In sum, H.B.

20 does not burden speech. It is neutral, narrowly tailored, and not overly restrictive.

**II.     Social Media Companies Are The Modern Public Square.**

The Internet is similar to a public forum; user access to social media is protected under

the First Amendment. The Internet, and social media platforms specifically, have been

analogized to "the modern public square" by courts and critics.[73] Social media has radically

---

[68] *NetChoice, LLC v. Moody*, No. 4:21cv220-RH-MAF, 2021 U.S. Dist. LEXIS 121951 (N.D. Fla. June 30, 2021), interlocutory appeal pending, *NetChoice, LLC v. Attorney General, State of Florida*, No. 21-12355 (11th Cir.) (enjoining Florida S.B. 7072).

[69] *But see* Florida S.B. 7072, adding Florida Statutes Section 504.2041(g) (excluding companies operating a theme park or entertainment complex). 2021 U.S. Dist. LEXIS 121951 *4, *6, *8, *32, *36.

[70] *C.f.*, Florida Statutes Sections 501.2041(2)(j), 106.072; 2021 U.S. Dist. LEXIS 121951 *9-*13, -15-*16, *19, *22-*24, *29-*32.

[71] *But see* Florida S.B. 7072, creating Florida Statutes Section 501.2041 (affording damages); 2021 U.S. Dist. LEXIS 121951*19-*20, *34-*35.

[72] 2021 U.S. Dist. LEXIS 121951 *28, *35.

[73] *Packingham v.North Carolina*, 137 S.Ct. 1730, 1737 (2017).

altered how society interacts, and thus equitable access to it is critical.[74] The Supreme Court has upheld laws that require private platforms to give access to speakers when they become important to First Amendment activity and values.[75]

### III.    H.B. 20 Section 2 Provides Consumer Protection And Addresses Social Media Platforms' Ongoing Deceptive And Unreasonable Business Practices.

H.B. 20 Sections 2 and 7 represent Texas' effort to protect its consumers from dominant social media platforms' adhesion contracts and their ongoing deceptive and unreasonable business practices. Section 2 is part of Tex. Bus. & Com. Code Title 5, Subtitle C, and creates new "Regulation[s] of Businesses and Services." Social Media Platforms now have specific treatment alongside other specific businesses the Legislature has legitimately found require regulation in the public interest.

Section 2 is expressly allowed by 47 U.S.C. §230(e)(3) and immune from any First Amendment challenge. It does not regulate speech; rather it addresses contract formation, and post-contract conduct. This part of the bill requires that covered social media platforms "disclose accurate information regarding its content management, data management, and business practices,"[76] have a clear acceptable use policy and a transparent and fair noticing and internal dispute resolution process.[77] This is well within the state's traditional police power. Texas has every right to protect its consumer-citizens by remediating unequal bargaining power, imposing contract formation pre-requisites, requiring that social media platforms have and equally apply

---

[74] *See United States v. Ellis*, 984 F.3d 1092, 1104 (4th Cir. 2021).

[75] *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47 (2006); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980).

[76] Tex. Bus. & Com. Code §120.051.

[77] Tex. Bus. & Com. Code §120.052, 120.121-104.

transparent standards, and giving users a meaningful process to work through disputes without having to go to court.

### IV.      Social Media Companies Are Common Carriers.

Communications companies have long been recognized–and sometimes <u>statutorily</u> regulated as–as common carriers since their services are affected by the public interest. As Justice Thomas noted in *Knight*,[78] "whatever has been said of other industries, there is clear historical precedent for regulating . . . communication networks in a similar manner as traditional common carriers."[79] Social media platforms "are at bottom communications networks, and they 'carry' 'information from one user to another.'" Social media companies "hold themselves out as organizations that focus on distributing the speech of the broader public." Telegraphs, "resemble[d] railroad companies and other common carriers," and were "bound to serve all customers alike, without discrimination."[80]

It is true that social media platforms are not "telecommunications carriers"[81] for purposes of the federal Communications Act.[82] They are instead providers of "information service."[83] But that does not mean they are not *common law* common carriers. It is possible to be a

---

[78] *Biden v. Knight First Amendment Institute at Columbia Univ.*, 141 S.Ct. 1220, 1224 (2021) (Thomas, J., concurring).

[79] *Knight,* 141 S.Ct. at 1223. Justice Thomas articulated the considerations that have historically been used to classify an entity as a common carrier. These include: (a) market power; (b) whether an industry is "affected with the public interest"; (c) whether the entity is part of the communications industry; (d) whether the actor holds itself out as providing service to all; and (e) whether the entity receives countervailing benefits from the government. *Knight*, 141 S.Ct. at 1224.

[80] 141 S.Ct. at 1224, *citing Pimrose v. Western Union Telegraph Co.*, 154 U.S. 1, 14, 14 S.Ct. 1098 (1894).

[81] *See* 47 U.S.C. §153(51).

[82] 47 U.S.C. §151 *et seq*.

[83] *See* 47 U.S.C. §153(24).

Communications Act "common carrier"[84] and offer "telecommunications" [85] as part of a service suite without being treated as a "telecommunications carrier" for purposes of the Communications Act. These platforms are merely *deemed* to be "private carriers" under the Act and by FCC rule. They *can* negotiate individual contracts and even discriminate. *Or,* they can hold out to offer service on a uniform, nondiscriminatory basis and still remain outside FCC Title II regulation. The fact that a communications firm is not FCC regulated does not mean that it is not, at common law, a common carrier. It just means it is not underlined subjected to *statutory* **FCC Communications Act Title II** regulation. But this exemption *does not* preempt state action over the same activity, even insofar as it may have interstate components.[86]

        A.      Social media companies hold out to indiscriminately serve.

        The common law common carrier doctrine imposed a greater standard of care. The rationale was that by holding themselves out to the public at large, otherwise private carriers took on a *quasi*-public character. This feature, along with the lack of control shippers or travelers have over the safety of their transport, was deemed sufficient to warrant common carrier status.[87] "It is not necessary that a carrier be required to serve all indiscriminately; it is enough that its practice is, in fact, to do so."[88] Holding out to provide indiscriminate service is the key distinguishing factor between common and private carriers. Further, the caselaw makes clear that common carriers need not serve the entire public. A "carrier whose service is of possible use to only a fraction of the population may nonetheless be a common carrier if he holds himself out to

---

[84] *See* 47 U.S.C. §153(11).

[85] *See* 47 U.S.C. §153(50).

[86] *See Mozilla Corp. v. FCC*, 940 F3d 1, 74-85 (D.C. Cir., 2019).

[87] *NARUC I*, 525 F.2d at 640.

[88] *NARUC I*, 525 F.2d at 641.

serve indifferently all potential users."[89] So the fact that some social media platforms have lists of "ineligibles" means nothing.

As Justice Thomas noted, "digital platforms provide avenues for historically unprecedented amounts of speech, including speech by government actors. Also unprecedented, however, is the concentrated control of so much speech in the hands of a few private parties."[90] If market power alone is not sufficient to categorize large social media platforms as common carriers, then the fact that social media companies hold themselves out to the public as open to all comers subjects these companies to classification as common carriers. The long history in this country and in England of prohibiting discrimination by common carriers and places of public accommodation means lower constitutional scrutiny applies, especially where regulation does not prohibit the company from speaking or force the company to endorse the speech.[91]

Social media companies are common carriers because they hold themselves out as offering services to the public, as opposed to making individualized business decisions.[92] Social media companies offer their services to all comers (with limited exceptions). They do not negotiate individual contracts; everyone has the same terms and conditions. Anyone can sign up for Facebook or Instagram. All comers (except for those specifically listed as being ineligible) are welcome if they agree to the standard (and inalterable) terms of service. This is classic common law common carrier "holding out" to "indiscriminately serve."[93]

---

[89] *Nat'l. Ass'n of Reg. Util. Com'rs v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976)("*NARUC II*").

[90] *Knight,* 141 S.Ct. at 1221.

[91] *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 684, 114 S.Ct. 2445 (1994) (O'Connor, J., concurring in part and dissenting in part); *Pruneyard Shopping Center*, *supra*.

[92] *NARUC I, supra*.

[93] *Verizon v. FCC*, 740 F.3d 623, 651 (D.C. Cir. 2014).

    B.  Social media companies receive countervailing benefits.

Common carriers and public accommodations enjoy lower constitutional speech

protections and are subject to more pervasive governmental regulation. But there is a benefit too,

and it is provided by, among other things, §230. Platforms receive a measure of immunity: they

are not treated as speakers or publishers when they host third party speech, or even when they

engage in good faith removal of user-supplied material. This is one of the features of common

carriage highlighted by Justice Thomas.

### V.  H.B. 20 is Not Preempted by Section 230 Because it Targets Viewpoint-Based Actions Not Taken in Good Faith.

   Section 230(c)(1) grants non-publisher status when a social media site *hosts* third party

"information." It has nothing to do with removal of "material" or access minimization to that

"material." Removal of user-supplied material is covered by §230(c)(2) and it shields only

"*voluntary*" "*good faith*"[94] removal of "obscene, lewd, lascivious, filthy, excessively violent,

harassing, or otherwise objectionable" material.

    A.  The Section 230(c)(2) affirmative defense is for <u>voluntary</u>, <u>good faith</u> removals.

   Section 230(c)(2) provides an affirmative defense[95] that must be pleaded under Fed. R.

Civ. P. 8(c).[96] If a plaintiff's complaint seeks liability for wrongful removal and contains

---

[94] The ordinary meaning of "good faith" is "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage." *Black's Law Dictionary* 713 (8th ed. 2004). "Good faith" is a mixed question of law and fact and has subjective and objective components.

[95] *See Force v. Facebook, Inc.*, 934 F.3d 53, 72 (2d Cir. 2019); *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011); *Edwards v. Wyatt*, No. A-07-CA-1008 RP, 2009 U.S. Dist. LEXIS 139978, at *20 (W.D. Tex. July 6, 2009) (Pittman, Magistrate, presiding under 28 U.S.C. §636(c)).

[96] *See Kontrick v. Ryan*, 540 U.S. 443, 459, 124 S.Ct. 906, 918 (2004), *citing 5A* C. Wright & A. Miller, <u>Federal Practice and Procedure</u> §1347, p 184 (2d ed. 1990). A §230-based affirmative defense can "support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint. … the

*Twombly*-compliant plausible claims of a lack of "good faith" then it is not subject to dismissal under Fed. R. Civ. P.12(b).[97] The well-pled facts in each case really matter. In this situation Plaintiffs' facial challenge cannot succeed. Plaintiffs here must, but cannot, "establish that no set of circumstances exists under which the [law] would be valid."[98] or show that the law lacks "a plainly legitimate sweep."[99]

The Texas law does not target removals or restrictions to material that are taken in good faith pursuant to 47 U.S.C. §230(c)(2)(A). Section 7 of the Texas bill is directed toward actions *not* "taken in good faith." Each prohibited activity falls outside the natural and ordinary meaning of "good faith." Censoring, deplatforming, and shadow-banning targeted viewpoints through inconsistent application of vague standards is hardly motivated by "honesty in belief or purpose." It certainly doesn't align with what social media companies tell the public. Nowhere in Twitter's, Facebook's, or Instagram's user agreements will one find a provision announcing that their standards will be applied one way for conservatives and another way for everyone else. Systematically inconsistent censorship under cover of supposedly neutral standards is

---

facts establishing that defense must: (1) be "definitively ascertainable from the complaint and other allowable sources of information," and (2) "suffice to establish the affirmative defense with certitude..." *Nat.l Ass. n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 68 (D. Mass. 2019) (cleaned up, internal citations omitted).

[97] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955 (2007)). *See, e.g.*, *Darnaa, LLC v. Google, Inc.*, No. 15-cv-03221-RMW, 2016 U.S. Dist. LEXIS 152126, at *25 (N.D. Cal. Nov. 2, 2016); *Song Fi Inc. v. Google*, 108 F.Supp 3d 876, 883-884 (N.D. Cal. 2015).

[98] *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095 (1987),

[99] *Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2387 (2021) (internal quotation marks omitted), *citing Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, 128 S.Ct. 1184 (2008). Plaintiffs' preemption claims cannot rely on "a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473, 130 S.Ct. 1577 (2010) (internal quotation marks omitted). That is addressed below.

dishonesty, plain and simple. The Texas bill directly targets this evil by merely holding these companies to what they say they already do: exercise viewpoint neutrality.

The foregoing real-world examples of social media's bad-faith targeting of conservatives more than sufficiently demonstrate numerous circumstances where the Texas law can be applied without abridging §230's immunity for "good faith" actions. That alone dooms the Plaintiff associations' claim that the legislation is facially preempted.[100]

Texas' law centers on a real and increasing consumer-protection and public policy problem. Given recent events, the Texas Legislature reasonably noted there is an especially high risk of inconsistent censorship against specific viewpoints and that this is an evil to be remedied to the extent allowed by federal law. H.B. 20 Section 7 grants relief for non-voluntary, bad faith removals and there can be no argument that aspect is pre-empted. Thus, there are clearly circumstances where the law will be valid.

The statute falls under preemption principles only if, and only to the extent, it imposes liability for voluntary, good faith removals of material within the list contained in §230(c)(2), thereby impermissibly negating the federally-allowed affirmative defense. Civ. Prac. & Rem. Code Sec. 143A.004(d) expressly states that "this chapter applies … no further than the maximum extent permitted by the United States Constitution and the laws of the United States" and Sec. 143A.006(1) provides that "this chapter...does not prohibit a social media platform from censoring expression that … the social media platform is specifically authorized to censor by federal law." So the legislation clearly does not interfere with the federal defense against liability.

---

[100] *See Arizona v. United States*, 567 U.S. 387, 425, 132 S.Ct. 2492, 2515 (2012) (Scalia, J., concurring in part and dissenting in part); *Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (applying *Salerno* in a preemption case).

Every contested removal will necessarily turn on the facts of each case and the Plaintiff associations have not presented a shred of evidence that covered social media platforms <u>always</u> act in good faith. They have not shown the legislation is preempted by Section 230 in all circumstances.[101]

      B.    "Otherwise Objectionable" is not boundless and does not grant complete removal discretion.

Social media platforms misuse the phrase "or otherwise objectionable." The social media platforms contend it is unbounded and means whatever they want regardless how extreme or whatever the actual purpose. That may merit an article by *The Bee*, and *Not the Bee* could truthfully report it is nonsense. The applicable canon here is *ejusdem generis* since the statute sets out a series of specific categories ("obscene," "lewd," "lascivious," "filthy," "excessively violent," "harassing" that are followed by the more general category of "or otherwise objectionable."[102] When a general term follows specific terms, courts presume that the general term is limited by the preceding terms.[103] The courts have specifically applied the canon in the §230 context.[104]

---

[101] *Stevens*, 559 U.S. at 473.

[102] Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 199-213 (2012) (discussing this canon at length).

[103] *Begay v. United States*, 553 U.S. 137, 128 S.Ct. 1581, 1584-85 (2008).

[104] *Circuit City Stores, Inc. v. Adam*s, 532 U.S. 105, 115, 121 S.Ct. 1302 (2001); *Zango, Inc. v. Kaspersky Lab, Inc*., 568 F.3d 1169, 1178 (9th Cir. 2009) (Fisher, J., concurring); *Song Fi Inc. v. Google, Inc*., 108 F. Supp. 3d at 883-884; *Goddard v. Google, Inc*., No. C 08-2738 JF (PVT), 2008 U.S. Dist. LEXIS 101890, at *23 (N.D. Cal. Dec. 17, 2008), *citing National Numismatic Certification, LLC. v. eBay, Inc*., No. 6:08-cv-42-Orl-19GJK, 2008 U.S. Dist. LEXIS 109793, 2008 WL 2704404 at *25 (M.D. Fla. July 8, 2008).

"Otherwise objectionable" is not boundless or entirely subject to the social media platforms' own subjective and arbitrary whims regarding users' viewpoint expressions.[105]

## VI.   Plaintiffs' First Amendment Claims Do Not Plead or Prove Overbreadth.

The second *Stevens* test applies only to First Amendment claims. The Plaintiff associations must both plead and prove the Texas law is "overbroad" and "a substantial number" of its applications are unconstitutional, "judged in relation to the statute's plainly legitimate sweep."[106] The Plaintiffs fail at all levels. Neither the Complaint nor the Motion for Preliminary Injunction specifically plead overbreadth as a basis for invalidation and none of the other averments give a hint of that concern. Nor do the Plaintiff associations make any effort to assess their claimed harms against the statute's legitimate sweep, especially Texas' obvious interest in protecting and advancing wide information availability, social discourse, its citizens' ability to speak and receive information from others and its legitimate power to prohibit bad faith, unfair dealing and unreasonable or deceptive business practices.

## VII.   Laws Granting Third-Party Access That Do Not Restrict or Compel Owner Speech and Regulate Conduct Do Not Violate the First Amendment.

40 years ago some students sought to distribute literature in a big shopping center, but the property owners objected.[107] The *Pruneyard* question was whether the government-imposed obligation to allow public free speech violated the property-owners' property or speech rights. The Court held there was no violation. The property was public, big, and the physical invasion was transitory and localized. The retail center owners' interest paled in comparison to freedom of

---

[105] *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164, 11780 (9th Cir. 2008).

[106] *Stevens*, 559 U.S. at 473.

[107] *Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980).

speech. Allowing students to exercise free speech and petition on shopping center property did not constitute an unlawful taking because such activity would not adversely affect the property's value or ability to operate as a retail complex. However, the shopping center could limit expressive activity through time, place, and manner restrictions reasonably designed to minimize interference with the shopping center's commercial operations.

In *Rumsfeld*,[108] military recruiters were denied entry to law schools, citing the military's policy of prohibiting openly gay people from serving in the military. The question was whether compelled hosting of military recruiters at law schools violated the law schools' First Amendment freedoms of speech and association. The Court unanimously held that the law schools' First Amendment rights of freedom of expression and association were not violated by requiring them to give open access to military recruiters. The Court reasoned that that the law did not restrict the law schools' ability to express their own opinions on military policy. The law merely prohibited discrimination against military recruiters and served a vital government purpose.

Cable providers were required by the Cable Television Consumer Protection and Competition Act of 1992 to allocate a certain number of their channels to the broadcasting of local broadcast television stations. The Act limited cable companies by reducing the number of channels that they control, making it more difficult for the companies to compete for remaining channels. *Turner*[109] concerned whether a "must-carry" regime violated the cable companies' freedom of speech or press. The court held it did not. The law made no distinction between the substance of speech and the costs or advantages conferred by it. The only constraint was the

---

[108] *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006).

[109] *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, (1994).

number of channels available via a cable operator. Any government regulation that limits speech because of its content is subject to the "most exacting scrutiny while those that are unrelated to content are subject to an intermediate level of scrutiny." The law made no attempt to impose a viewpoint on the watching audience or to restrict access to specific points of view. As a result, it was both content and constitutionally neutral.

As Justice Breyer observed in a different case without disagreement from the rest of the Court,[110] "[r]equiring someone to host another person's speech is often a perfectly legitimate thing for the Government to do." Government can act to increase the amount and diversity of speech when there is little danger that the public will attribute the speech to the private entity or think the entity endorses the third-party speech.[111]

### VIII.   The Legislation Protects the Public and Social Media Platforms From Government Censorship Pressure.

Texas' law is a lawful consumer-protection measure. But it protects more than just the public; it also protects social media platforms from improper government pressure to censor. While *amici* are concerned about and seek protection from these platform's consistent suppression of conservative and religious viewpoints, the legislation does not single out any type of viewpoint for special treatment. It is expressly and clearly *viewpoint neutral*. Marsha Blackburn and Planned Parenthood each get to participate.

By ensuring standards will not be inconsistently applied to target disfavored viewpoints, including traditional religious viewpoints, the legislation helps keep the Internet "a forum for a true diversity of political discourse," 47 U.S.C. §230(a)(3), and promotes the "marketplace of

---

[110] *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc*, 140 S.Ct. 2082 (2020). (Breyer, J., dissenting, joined by Ginsburg & Sotomayor, JJ.)

[111] *See* Alan Z. Rozenshtein, *Silicon Valley Speech: Technology Giants and the Deregulatory First Amendmen*t, 1 J. OF FREE SPEECH L. 337, 369 (2021).

ideas" that the First Amendment protects.[112] Thus, it comports with Section 230 and the First

Amendment and serves their core purposes.

The First Amendment bans government viewpoint-based censorship of private speech.[113]

In recent months, however, government officials–including the President of the United States–

have pressured social media platforms to censor messages these officials want suppressed.[114] It

does not take a rocket (or political) scientist to foresee the very grave First Amendment concerns

that this phenomenon poses. Government officials with vast regulatory power over social media

companies using their bully pulpit to rail against them for allowing disfavored expressions can

easily lead to coerced indirect governmental censorship that these officials cannot directly

exercise. The social media platform's extreme interpretation of §230 would lead to serious

constitutional questions about the Act itself because it could mean the platforms have effectively

become "state actors."[115]

The Texas law protects against inappropriate government intimidation. If government

officials demand that platforms stifle debate on a particular issue or censor expressions or

inconvenient facts the officials prefer not be raised in the virtual public square, the platforms can

refuse and cite their obligations under the Texas law. In other words, this legislation offers social

---

[112] *See Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

[113] *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015).

[114] *See, e.g.*, Joe Concha, *Hypocritical Psaki leads chilling effort to flag "misinformation*," The Hill, https://thehill.com/opinion/white-house/563547-hypocritical-psaki-leads-chilling-effort-to-flag-misinformation, (July 18, 2021) (accessed November 10, 2021); Rebecca Klar, *Feds step up pressure on social media over false COVID-19 claims*, The Hill, https://thehill.com/policy/technology/563470-administration-puts-new-pressure-on-social-media-to-curb-covid-19 (July 18, 2021) (accessed November 10, 2021).

[115] *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

media platforms a valid reason to rebuff inappropriate government pressure to censor *all* disfavored viewpoints and expressions.

H.B. 20 provides a needed prophylactic means to advance a core First Amendment protection. This benefits social media platforms just as much as it does the public.

## CONCLUSION

Congress did not give Big Tech a get-out-of-jail card in §230 and neither does the First Amendment. H.B. 20 holds social media platforms accountable for their own words, deeds, omissions, and failures. They remain immune when hosting third-party speech. H.B. 20 does not inhibit good faith moderation consistent with the platform's stated terms. H.B. 20 goes after lack of transparency and disparate and arbitrary treatment. Social media companies cannot hide behind the Section 230 "Good Samaritan" provisions when they de-platform or shadow-ban a user in bad faith because §230(c)(2) only protects *good faith* actions.[116] Texas H.B. merely codifies what the common law already requires: that contracting parties follow the covenant of good faith and *fair* dealing. Section 230(c)(2) expressly allows the Texas approach.

H.B. 20 ensures that these massive companies will not mess with Texas or Texans. Neither §230 nor the First Amendment stand in the way. Silicon Valley can operate in Texas but they need to treat *all* Texans fairly and respect, not silence, their viewpoints.

*Amicus curiae* respectfully request that Plaintiffs' motion to enjoin H.B. 20 Sections 2 and 7 be in all ways denied.

---

[116] Such conduct also does not comport with Jesus' instruction to the lawyer in Luke 10:25-37, the parable of the Good Samaritan.

Respectfully submitted,


 /s/
W. Scott McCollough
MCCOLLOUGH LAW FIRM, P.C.
2290 Gatlin Creek Rd.
Dripping Springs, TX 78620
Texas Bar No. 13434100
Tel: 512-888-1112
wsmc@dotlaw.biz

Evan M. Goldberg (*Pro Hac Vice pending*)*
EVAN MILES GOLDBERG, PLLC
400 East 57th Street, Ste. 8F
New York, NY 10022
Tel: 212-888-6497
egoldberg@emglawfirm.com

*Counsel for Amici Curiae The Babylon Bee LLC and Not the Bee LLC, Giganews, Inc. and Golden Frog GmbH*

*Not yet admitted to the Bar of this Court; Application for *pro hac vice* pending.

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Western District of Texas by using the CM/ECF system on November 22, 2021. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/_____
W. Scott McCollough