# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, | )<br>)<br>) |
| and | )<br>) |
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, | )<br>)<br>) |
| *Plaintiffs*, | )<br>)<br>) |
| v. | )<br>) |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | )<br>)<br>) |
| *Defendant*. | )<br>) |

Civil Action No. 1:21-cv-00840-RP

## PLAINTIFFS' OBJECTIONS TO AND MOTION TO STRIKE
## EXPERT WITNESS REPORT OF ADAM CANDEUB

## INTRODUCTION

Exceeding his extended, 50-page limit, Defendant attached to his opposition to Plaintiffs' motion for preliminary injunction a second legal brief styled as an "expert witness report" by Adam Candeub, a law professor at Michigan State University. Based on his claimed expertise on legal issues, Dkt.39-1 at 2, Candeub's so-called expert report attempts to offer nothing more than (incorrect) legal conclusions. As such, it is neither competent evidence admissible for any purpose nor an appropriate expert report under Federal Rule of Evidence 702. Plaintiffs object to its submission and request that the Court strike it from the record, as it violates the Court's briefing orders and because it presents improper and unreliable legal conclusions.

## STANDARD OF REVIEW

The proponent of expert testimony must establish that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). That is the "overarching concern" when assessing the admissibility of expert testimony. *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).

It is well-established that "an expert may never render conclusions of law." *Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009); *see also Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 & n.8 (5th Cir. 1996) ("We have repeatedly held that [Rule 704(a)] does not allow an expert to render conclusions of law.") (collecting cases). Experts also may not opine on how the law should be applied in a particular case. *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). Such

legal conclusions are neither relevant nor reliable *evidence* and, in any event, are the province of the Court. Therefore, courts exclude expert testimony on those bases. *E.g.*, *Arredondo v. Flores*, 2008 WL 11393147, at *7 (S.D. Tex. July 7, 2008) (rejecting purported expert opinion that defendants did not violate the First Amendment).

## ARGUMENT

### I. Candeub offers impermissible legal conclusions.

Candeub's report reads like a law review article or legal brief, which is unsurprising given that Candeub himself is *counsel of record* for an amicus curiae brief in the Florida case involving a similar state statute. *See* Brief of Amicus Curiae America First Policy Institute, *NetChoice, LLC v. Attorney General, State of Florida*, No. 21-12355 (11th Cir. Sept. 17, 2021). Candeub purports to offer this Court "the historical development and application of the common carrier doctrine and the regulatory powers of government over communications networks, public utilities, and the internet." Dkt.39-1 at 2. He is not a historian, nor does he purport to be one. Instead, he offers a legal standard based on what "courts," "legislatures," and "federal law" have supposedly required. *Id.* at 7. He assigns the burden of proof. *Id.* at 8. And he argues the meaning of doctrinal legal concepts. *Id.* at 10. He offers his legal conclusions that Plaintiffs' members are common carriers *as a matter of law*, that the State enjoys legal authority to regulate the Internet, and that failure to validate the State's authority would resurrect the legal framework under *Lochner v. New York*, 198 U.S. 45 (1905). *Id.* at 3.

Those are the exact legal holdings that Defendant hopes for in this case, which makes sense given that Candeub—true to his training as a lawyer and law professor—conducted nothing other than a (flawed) legal analysis. What's worse, Defendant relies on Candeub's "report" to pronounce the alleged legal standard that Defendant claims governs this Court's analysis. Dkt.39 at 3. In other words, Defendant hired a law professor to pronounce a self-serving and incorrect legal standard

that the Defendant now claims applies to the issues in the case. Not only is that improper and not allowed under the Federal Rules of Evidence and Civil Procedure, but the Court needs no such help from Candeub.

## II.     Candeub's opinion is unreliable.

Candeub's report is improper for the independent reason that he has not shown it to be "the product of reliable principles and methods," as required by Rule 702(c). An expert must identify the methodology employed and demonstrate that it is "reliable" and was "reliably applied." Fed. R. Evid. 702(c), (d). Establishing the reliability of an expert's testimony "requires some objective, independent validation of the expert's methodology." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The reliability of expert testimony may be assessed by many factors, including "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). An "expert's testimony must be reliable at each and every step or else it is inadmissible," and that reliability requirement "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation marks omitted).

Candeub's report falls well short of this standard for several reasons.

Candeub offers no reliable, testable methodology for reaching his conclusions. The "tests" he purports to rely on—valid or not—are legal standards, not a testable methodology. Identifying the controlling legal standard is the role of the Court, and applying the controlling standard to facts is the role reserved for the factfinder. "An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable."

3

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Candeub uses a professional method—legal argument—but his conclusions cannot be verified, and they invade the province of the Court.

Candeub explicitly does what Defendant's 50 pages of briefing only suggests: he purports, over 14 single-spaced pages, to derive a comprehensive legal framework for common-carrier status from Justice Thomas's separate statement concurring in a vacatur of a court of appeals decision on an unrelated issue. *Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220, 1222-23 (2021) (Thomas J., concurring).[1] And the framework he derives is extraordinarily broad: He describes Justice Thomas's statement as if it sets out five independently sufficient tests for common-carrier status. Dkt.39-1 at 4 ("[U]nder any of these tests, a social media platform is properly classified as a common carrier."). So, according to Candeub, merely being a website (all of which receive Section 230's protections) or having "market power" or being the recipient of tax benefits makes private companies vulnerable to being stripped of their First Amendment rights. This is plainly incorrect, both generally and as applied to the facts of this case. *See, e.g.*, *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 392 (D.C. Cir. 2017) (Srinivasan & Tatel, JJ., concurring in the denial of rehearing en banc) ("[W]eb platforms such as Facebook, Google, Twitter, and YouTube" are "not considered common carriers that hold themselves out as affording neutral, indiscriminate access to their platform without any editorial filtering.").

Candeub's report is an extended exercise in question-begging. He argues, for instance, that platforms are common carriers because they are "affected with the public interest." Dkt.39-1 at 9. Then—in the same paragraph, he argues that platforms are affected with the public interest because they are common carriers. *Id.* (arguing that the "highly influential listing of industries affected

---

[1] Accordingly, there had been no briefing on this issue and thus Justice Thomas did not have the benefit of a full adversarial presentation of these issues.

4

with the public interest" in *Charles Wolff Packing Co. v. Court of Indus. Relations.*, 262 U.S. 522, 535-36 (1923), "includes both common carriers and public utilities").

Candeub's legal analysis is also internally inconsistent. He states that a common carrier is a business that holds itself out "to serve the public generally, making that his business, and in doing so assumed to serve all members of the public who should apply, and to serve them." Dkt.39-1 at 5 (internal quotation marks omitted). But if Plaintiffs' members were truly common carriers under that definition, H.B. 20 would serve no purpose—the targeted platforms would disseminate content indiscriminately, and the State would have no reason to forbid viewpoint discrimination. Of course, that is not the case—platforms allow users access only if they agree to abide by their terms of service and their other policies, which are their limits on the allowable content and viewpoints. YouTube Declaration of Alexandra N. Veitch, Dkt.12-3 ¶¶ 12-13; Facebook Declaration of Neil Potts, Dkt.12-4 ¶¶ 11, 13. And they allow users to post content only if the post meets particular the terms of service and the community standards agreed upon as a condition of access. YouTube Decl. ¶¶ 12-13; Facebook Decl. ¶ 11, 13.

As Candeub admits, "Anyone can join a social media platform on equal terms *as set forth in the platform's terms and conditions*." Dkt.39-1 at 10 (emphasis added). That is, social media platforms offer services only to those who agree to specific terms and conditions. For instance, YouTube has detailed policies about (1) COVID-19 vaccine information; (2) climate change; and (3) otherwise violative content for which "there is a compelling educational, documentary, scientific, or artistic reason" to continue disseminating the expression. YouTube Decl. ¶¶ 18 n.6, 30; YouTube, *Updating our ads and monetization policies on climate change* (Oct. 7, 2021), https://bit.ly/3oUp2SB. But if H.B. 20 becomes law, they will be prohibited from enforcing those

5

terms and conditions against users who violates them, provided that the violation of terms and conditions expresses any "viewpoint" on any issue.

This highlights the contradiction in Candeub's legal conclusions and Defendant's arguments in this case. Candeub does not really mean that Plaintiffs' members *are* common carriers; he wishes they *would be* treated as common carriers. But if Plaintiffs' members are common carriers, Defendant has no complaint, and if they are not common carriers (and they are not), Defendant still has no complaint because the platforms never promised indiscriminate access to the service provided. In short, there is a fundamental inconsistency between saying that the platforms are "common carriers" that are open to the public, on the one hand, and arguing that H.B. 20 legitimately targets the platforms' admitted and clearly announced policy of excluding certain content based on the viewpoint expressed.

Even if Candeub's legal conclusion were correct, it would shed no light on the critical question: whether H.B. 20 violates the Constitution. Like Defendant, Candeub fails to engage—at all—with the leading cases recognizing the rights of disseminators of speech to exercise editorial control over the selection, presentation, and distribution of speech. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995); *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of California*, 475 U.S. 1, 10-12 (1986) (plurality op.) ("*PG&E*"); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). And *PG&E* was, of course, a Supreme Court decision *upholding the First Amendment rights of common carriers*—making it all the more surprising that a supposed expert such as Candeub would not address it given his purported grand-unified "theory" about common carriers and the First Amendment. Nor does he cite the leading case on the First Amendment's protections of the Internet, *Reno v. ACLU*, 521 U.S. 844, 870-71 (1997), or the Constitution's limitations on speech-chilling disclosures, *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372

6

(2018). These cases establish that the First Amendment protects privately owned entities' editorial discretion to decide what expression they disseminate and how to do so. *See* Preliminary Injunction Motion, Dkt.12 at 14-18; *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) ("reaffirm[ing] unequivocally the protection afforded to editorial judgment" over "content or layout" of "stories or commentary"). Across the various factual scenarios of those cases, "[c]ompelling a private corporation to provide a forum for views" it rejects or disapproves of, *PG&E*, 475 U.S. at 9, poses the "inherent risk" that the state seeks to "manipulate the public debate through coercion rather than persuasion," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). Like Defendant, Candeub does not cite a single case holding that Internet platforms lack the right to engage in editorial discretion.

And even assuming that Candeub is correct that the State of Texas has legal authority to declare by fiat that a private business is a "common carrier," he does not attempt to explain how this power would authorize the State to trample the purported common carrier's First Amendment rights. That is no accident. The First Amendment applies to common carriers, too, so "a common carrier scheme has no real First Amendment consequences." *E.g.*, *Denver Area Educ. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 824-26 (1996) (Thomas, J., concurring in the judgment in part and dissenting in part). And the Supreme Court has long held that the government may not designate private companies as passive receptacles of other people's speech, such that they lose their First Amendment protections. *See Hurley*, 515 U.S. at 573 (government cannot declare "speech itself to be the public accommodation").

## CONCLUSION

Plaintiffs object to the purported expert report of Candeub in consideration of Plaintiffs' motion for a preliminary injunction, and Plaintiffs respectfully move the Court to strike Dkt.39-1 and any related testimony or briefing from the record in this case.

7

| | |
|---|---|
| Dated: November 24, 2021 | Respectfully submitted, |
| | */s/ Scott A. Keller* |
| Steven P. Lehotsky* | Scott A. Keller (Texas Bar # 24062822) |
| steve@lehotskykeller.com | scott@lehotskykeller.com |
| Jonathan D. Urick* | Matthew H. Frederick (Texas Bar # 24040931) |
| jon@lehotskykeller.com | matt@lehotskykeller.com |
| Jeremy Evan Maltz (Texas Bar # 24102129) | Todd Disher (Texas Bar # 24081854) |
| jeremy@lehotskykeller.com | todd@lehotskykeller.com |
| Gabriela Gonzalez-Araiza* | LEHOTSKY KELLER LLP |
| gabriela@lehotskykeller.com | 919 Congress Ave. |
| LEHOTSKY KELLER LLP | Austin, TX 78701 |
| 200 Massachusetts Avenue, NW | T: (512) 693-8350 |
| Washington, DC 20001 | F: (833) 233-2202 |

*Admitted *pro hac vice*

## **CERTIFICATE OF SERVICE**

I certify that on November 24, 2021, the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

> */s/ Todd Disher*
> Todd Disher

## **CERTIFICATE OF CONFERENCE**

I certify that on November 24, 2021, I conferred with opposing counsel regarding this motion to strike. Defendant is opposed to this motion.

> */s/ Todd Disher*
> Todd Disher