## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| NETCHOICE, LLC d/b/a NetChoice, a 501(c)(6) District of Columbia organization, | ) ) ) | |
| and | ) ) | |
| COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia Corporation, | ) ) ) | Civil Action No. 1:21-cv-00840-RP |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | ) ) ) | |
| *Defendant*. | ) ) | |
| ——————————————————————— | ) | |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................................. ii

INTRODUCTION ........................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.     Plaintiffs have standing............................................................................................................ 2

II.    H.B. 20 violates the First Amendment.................................................................................... 2

    A.    H.B. 20 abridges covered platforms' protected editorial discretion. ...................... 3

    B.    H.B. 20's content moderation ban is content- and viewpoint-based. .................... 9

    C.    H.B. 20's content- and speaker-based disclosure and operational requirements are unconstitutional. ........................................................................................... 12

    D.    H.B. 20 is unconstitutionally vague.................................................................... 14

    E.    H.B. 20 fails any level of First Amendment heightened scrutiny because Defendant has not offered a sufficient interest or demonstrated proper tailoring. ........................................................................................................... 15

    F.    Characterizing covered platforms as "common carriers" makes no constitutional difference—and is factually and legally wrong in all events. ........ 18

III.   H.B. 20 is preempted by the Communications Decency Act, 47 U.S.C. § 230................ 24

IV.   H.B. 20 violates the Commerce Clause. ........................................................................ 27

V.    H.B. 20 is facially invalid, overbroad, and cannot be saved by its severability clause. ... 29

VI.   The remaining factors favor a preliminary injunction. .................................................... 30

CONCLUSION.............................................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. Tex. Mut. Ins. Co.*,
   851 F.3d 507 (5th Cir. 2017) ................................................................24

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008).............................................................................26

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021)........................................................................13

*Ark. Educ. Television Comm'n v. Forbes*,
   523 U.S. 666 (1998).............................................................................15

*Ass'n for Accessible Medicines v. Frosh*,
   887 F.3d 664 (4th Cir. 2018) ..............................................................28

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963)................................................................................4

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ............................................................25

*Bayou Landing, Ltd. v. Watts*,
   563 F.2d 1172 (5th Cir. 1978) ..............................................................4

*Biden v. Knight First Amendment Inst.*,
   141 S. Ct. 1220 (2021)........................................................................20

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973)..............................................................................2

*Brown v. Entm't Merchs. Ass'n*,
   564 U.S. 786 (2011)..............................................................................6

*Brown-Forman Distillers Corp. v. New York State Liquor Authority*,
   476 U.S. 573 (1986)............................................................................28

*Buckley v. Valeo*,
   424 U.S. 1 (1976) (per curiam)...........................................................14

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997)..................................................................28

*Citizens United v. FEC*,
558 U.S. 310 (2010)..................................................................14

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)....................................................................8

*City of L.A. v. Patel*,
576 U.S. 409 (2015)..................................................................29

*Denver Area Educ. Telecomms. Consortium v. FCC*,
518 U.S. 727 (1996)..............................................................3, 16

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ...............................................19, 25

*Domen v. Vimeo, Inc.*,
433 F. Supp. 3d 592 (S.D.N.Y. 2020)......................................25

*E. Coast Test Prep LLC v. Allnurses.com, Inc.*,
307 F. Supp. 3d 952 (D. Minn. 2018).......................................25

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982)..................................................................28

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
946 F.3d 1040 (9th Cir. 2019) ..................................................26

*Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*,
916 F.3d 483 (5th Cir. 2019) ......................................................8

*FEC v. Wis. Right To Life, Inc.*,
551 U.S. 449 (2007)..................................................................20

*Freedom from Religion Found. v. Abbott*,
955 F.3d 417 (5th Cir. 2020) ....................................................11

*FTC v. Facebook, Inc.*,
2021 WL 2643627 (D.D.C. June 28, 2021)...............................21

*Golden State Transit Corp. v. Los Angeles*,
493 U.S. 103 (1989)..................................................................24

*Gooch v. United States*,
297 U.S. 124 (1936)..................................................................26

*Green v. Am. Online, Inc.*,
　318 F.3d 465 (3d Cir. 2003) ............................................................26

*hiQ Labs, Inc. v. LinkedIn Corp.*,
　273 F. Supp. 3d 1099 (N.D. Cal. 2017) ............................................23

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
　515 U.S. 557 (1995) .............................................................. *passim*

*Int'l Soc. for Krishna Consciousness v. Lee*,
　505 U.S. 672 (1992) .....................................................................4, 15

*Joseph Burstyn, Inc. v. Wilson*,
　343 U.S. 495 (1952) .........................................................................7

*King v. Facebook, Inc.*,
　2021 WL 5279823 (N.D. Cal. Nov. 12, 2021) ................................20

*Lewis v. BT Inv. Managers, Inc.*,
　447 U.S. 27 (1980) .....................................................................27, 28

*Lewis v. Google LLC*,
　461 F. Supp. 3d 938 (N.D. Cal. 2020) ............................................26

*Lewis v. Google LLC*,
　851 F.App'x 723 (9th Cir. 2021) .....................................................26

*Lloyd Corp. v. Tanner*,
　407 U.S. 551 (1972) .......................................................................23

*Maine v. Taylor*,
　477 U.S. 131 (1986) .......................................................................28

*Mance v. Sessions*,
　896 F.3d 699 (5th Cir. 2018) ..........................................................29

*Manhattan Cmty. Access Corp. v. Halleck*,
　139 S. Ct. 1921 (2019) .................................................3, 15, 21, 23

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
　138 S. Ct. 1719 (2018) .....................................................................6

*Matal v. Tam*,
　137 S. Ct. 1744 (2017) ...................................................................10

*Miami Herald Publ'g Co. v. Tornillo*,
　418 U.S. 241 (1974) .............................................................. *passim*

iv

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010)................................................................9

*Muir v. Ala. Educ. Television Comm'n*,
    656 F.2d 1012 (5th Cir. 1981) ...............................................4

*N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*,
    781 F.3d 182 (5th Cir. 2015) .................................................2

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001)..................................................27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ................................................27

*NetChoice, LLC v. Moody*,
    2021 WL 2690876 (N.D. Fla. June 30, 2021) ................. *passim*

*NIFLA v. Becerra*,
    138 S. Ct. 2361 (2018)..................................................1, 10, 12

*Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    475 U.S. 1 (1986).......................................................... *passim*

*Parker v. Paypal, Inc.*,
    2017 WL 3508759 (E.D. Pa. Aug. 16, 2017) ........................26

*Peter Scalamandre & Sons, Inc. v. Kaufman*,
    113 F.3d 556 (5th Cir. 1997) .................................................7

*Pharm. Research & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003)..............................................................28

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973)................................................................3

*Prager Univ. v. Google LLC*,
    951 F.3d 991 (9th Cir. 2020) .................................................9

*Prison Legal News v. Livingston*,
    683 F.3d 201 (5th Cir. 2012) .................................................4

*PruneYard Shopping Center v. Robins*,
    447 U.S. 74 (1980)................................................................23

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)..............................................................10

*Reno v. ACLU*,
    521 U.S. 844 (1997)......................................................................1, 16, 22

*Robinson v. Hunt Cnty.*,
    921 F.3d 440 (5th Cir. 2019) .......................................................10, 11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)...............................................................10, 11, 12

*Smith v. California*,
    361 U.S. 147 (1959)...........................................................................4, 7

*Sorrell v. IMS Health, Inc.*,
    564 U.S. 552 (2011)..............................................................................9

*South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080 (2018).......................................................................28

*S. Pacific Co. v. Arizona ex rel. Sullivan*,
    325 U.S. 761 (1945)...........................................................................28

*Sporhase v. Nebraska, ex rel. Douglas*,
    458 U.S. 941 (1982)...........................................................................28

*Thomas v. Review Bd.*,
    450 U.S. 707 (1981).............................................................................7

*Time Warner Cable, Inc. v. Hudson*,
    667 F.3d 630 (5th Cir. 2012) ...........................................................16

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994).................................................................4, 16, 24

*Turner v. Driver*,
    848 F.3d 678 (5th Cir. 2017) .............................................................6

*U.S. Telecom Ass'n v. FCC*,
    825 F.3d 674 (D.C. Cir. 2016) ....................................................19, 20

*U.S. Telecom Ass'n v. FCC*,
    855 F.3d 381 (D.C. Cir. 2017) (per curiam) ....................................19

*United States v. Coleman*,
    609 F.3d 699 (5th Cir. 2010) ...........................................................14

*United States v. Kaluza*,
    780 F.3d 647 (5th Cir. 2015) ...........................................................26

*United States v. Kerns*,
    9 F.4th 343 (6th Cir. 2021) ................................................26

*United States v. Martin*,
    438 F.3d 621 (6th Cir. 2006) ................................................25

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ................................................7

*W. Union Tel. Co. v. James*,
    162 U.S. 650 (1896) ................................................23

*Winter v. Facebook, Inc. et al.*,
    2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) ................................................25

*Winters v. People of State of New York*,
    333 U.S. 507 (1948) ................................................7

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ................................................18

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ................................................28

*Zango Inc. v. Kapersky Lab*,
    568 F.3d 1169 (9th Cir. 2009) ................................................25

*Zhang v. Baidu.com*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................21, 24

**Statutes**

28 U.S.C. § 2201 ................................................11

42 U.S.C. § 1983 ................................................24

47 U.S.C. § 223 ................................................22

47 U.S.C. § 230 ................................................ *passim*

Federal Internet Tax Freedom Act,
    Pub. L. No. 105-277, 112 Stat. 2681-719 (1998) ................................................21

Tex. Bus. & Com. Code § 120.001 ................................................9, 22

Tex. Bus. & Com. Code § 120.051 ................................................13

Tex. Bus. & Com. Code § 120.052 ................................................13

Tex. Bus. & Com. Code § 120.053 ..................................................................13

Tex. Bus. & Com. Code § 120.101 ..................................................................13

Tex. Bus. & Com. Code § 120.102 ..................................................................13

Tex. Bus. & Com. Code § 120.103 ..................................................................13

Tex. Bus. & Com. Code § 120.104 ..................................................................13

Tex. Civ. Prac. & Rem. Code § 143A.002 ...........................................11, 27, 28

Tex. Civ. Prac. & Rem. Code § 143A.004 ........................................................29

Tex. Civ. Prac. & Rem. Code § 143A.005 ........................................................29

Tex. Civ. Prac. & Rem. Code § 143A.006 ........................................................29

**Other Authorities**

Black's Law Dictionary (6th ed. 1990)..............................................................25

Black's Law Dictionary (11th ed. 2019)............................................................26

Bryan A. Garner, Garner's Modern English Usage (2016) ..............................25

Christopher S. Yoo, *The First Amendment, Common Carriers, and Public Accommodations*, 1 J. Free Speech L. 463 (2021)..................................19, 20, 21, 24

Merriam-Webster's Collegiate Dictionary (10th ed. 1993)...............................25

Phil Nichols, *Redefining "Common Carrier"*, 1987 Duke L.J. 501 ...........................20

Plfs. Memo. in Opp. to Mtn. to Transfer Venue, No. 2:21-cv-00778, *Louisiana v. Biden* (W.D. La. May 4, 2021), 2021 WL 2644609 ................................................29

**INTRODUCTION**

This is a straightforward First Amendment case. House Bill 20 ("H.B. 20") is a content-, speaker-, and viewpoint-based law regulating companies that are necessarily and primarily engaged in the moderation, organization, and display of expression. Such a law triggers strict scrutiny, and Defendant has failed to provide a compelling government interest or demonstrate narrow tailoring.

Defendant's scattershot opposition brief remarkably fails to respond to the leading cases Plaintiffs cited regarding the rights of privately owned platforms to exercise editorial control over their moderation, presentation, and distribution of others' speech. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 581 (1995); *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 12 (1986) (plurality op.) ("*PG&E*"); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Defendant also says nothing about the Supreme Court's holding that First Amendment rights on the Internet receive full protection. *Reno v. ACLU*, 521 U.S. 844, 871 (1997). Defendant further fails to respond to the leading case on disclosures chilling First Amendment rights. *NIFLA v. Becerra*, 138 S. Ct. 2361, 2378 (2018). And Defendant ignores the decision enjoining a similar law. *NetChoice, LLC v. Moody*, 2021 WL 2690876, at *12 (N.D. Fla. June 30, 2021). Instead of grappling with this caselaw, Defendant's main argument is a newly concocted common-carrier test—created by a paid purported "expert"—that has no basis in First Amendment law. Dkt.39 ("Opp.") at 3-9. Defendant claims that states can strip entities of their First Amendment rights by deeming them "common carriers." No court has ever adopted such an extreme position.

At base, Defendant defends a law very different from the one Texas enacted. Defendant pretends social-media platforms will be hardly affected by H.B. 20. But Defendant asserts inconsistent positions—that H.B. 20 is "content-neutral," Opp.21-23; while asserting H.B. 20 contains a "content"-based exception permitting "Platforms to choose which content it does [sic] not want on their platforms," Opp.11; and later positing H.B. 20 is "viewpoint"-based, Opp.18.

Tellingly, Defendant does not dispute H.B. 20 prohibits platforms from removing, for example, "pro-Nazi speech, medical misinformation, terrorist propaganda, and foreign government disinformation," or "Holocaust denial" and "vaccine misinformation." Dkt.12 ("Mot.") at 1, 19. H.B. 20 prohibits this content moderation based on viewpoints like these and there are all sorts of objectionable viewpoints platforms do not want to disseminate. H.B. 20 is an overbroad, content-, speaker-, and viewpoint-based law compelling the global dissemination of speech by out-of-state platforms. Plaintiffs respectfully request this Court grant a preliminary-injunction before H.B. 20 takes effect.

## ARGUMENT

### I. Plaintiffs have standing.

Defendant incorporates (Opp.44-45) his erroneous standing arguments, and Plaintiffs incorporate their standing arguments already raised in their opposition to Defendant's motion to dismiss, Dkt.28 ("Plfs. Standing Br."). Defendant still fails to respond to the caselaw Plaintiffs cited, Dkt.28 at 4-7, despite this second opportunity to do so here. Specifically, (1) Plaintiffs' members exercise their editorial judgment in a way H.B. 20 prohibits and burdens; (2) they are the direct object of H.B. 20's regulation; and (3) they will incur costs to comply with the law. *See* Ex.C ¶ 60; Ex.D ¶¶ 26, 34. Thus, Plaintiffs have (1) associational standing, because their members have standing; and (2) organizational standing. Plaintiffs also raise an "overbreadth" claim—a "departure from traditional rules of standing in the First Amendment area" allowing litigation for interests of "others not before the court." *Broadrick v. Oklahoma*, 413 U.S. 601, 612-13 (1973).[1]

### II. H.B. 20 violates the First Amendment.

H.B. 20 infringes editorial discretion, is content-based, imposes onerous disclosure and

---

[1] In response, many of Defendant's arguments rely on premature merits arguments. But "when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim." *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (cleaned up).

operational requirements, and is vague. *See infra* Parts II.A-II.D. Each of these triggers strict scrutiny, and H.B. 20 fails any form of heightened First Amendment scrutiny. *See infra* Part II.E. Defendant's main argument is that common carriers lacks First Amendment rights, but Supreme Court precedent dictates that common carriers retain First Amendment rights—and social media platforms are not common carriers in any event. *See infra* Part II.F.

### A. H.B. 20 abridges covered platforms' protected editorial discretion.

**1.** Defendant cites no case holding that Internet platforms lack the right to engage in editorial discretion, and every court to consider the issue has held otherwise. Defendant flatly ignores the principles established by *Tornillo*, *Hurley*, and *PG&E*. Those cases recognize the First Amendment protects privately owned entities' editorial discretion to decide what expression to disseminate via their platforms and how to present that expression. *See* Mot.14-18; *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) ("reaffirm[ing] unequivocally the protection afforded to editorial judgment" over "content or layout" of "stories or commentary"). The Supreme Court, therefore, has consistently recognized the right of private businesses to "exercise editorial discretion over [] speech and speakers," even when they "provide[] a forum for speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019).[2]

The Supreme Court has explained that *Tornillo*'s key insight—"the editorial function itself is an aspect of 'speech,'" *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 737 (1996) (plurality op.)—is not "restricted to the [traditional] press," but applies equally to "business corporations generally," as well as "ordinary people," *Hurley*, 515 U.S. at 574. Across the various factual scenarios of these cases, "compelling a private corporation to provide a forum for views"

---

[2] Defendant asserts that "Plaintiffs do not suggest that they challenge H.B. 20 on the ground that the Platforms can choose what content to permit or deny." Opp.12. But that is Plaintiffs' lead argument about editorial discretion. *See* Mot.14-18.

it finds objectionable, *PG&E*, 475 U.S. at 9, poses the "inherent risk" that the state seeks to "manipulate the public debate through coercion rather than persuasion," *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). That is impermissible, as the Northern District of Florida and several other courts uniformly recognize—which Defendant entirely ignores. *See* Mot.17; EFF Br.13-14 (collecting cases applying *Tornillo* to platforms); Chamber of Progress Br.5-12.

Defendant argues that First Amendment protection should differ for entities disseminating "the speech of others" versus "authors or editors engaged in their own publication." Opp.13. But *Tornillo*, *Hurley*, and *PG&E* involved speech created by others, and in each case the Supreme Court held that the government could not compel private entities to disseminate such speech. *Tornillo*, 418 U.S. at 247, 258; *Hurley*, 515 U.S. at 561, 576; *PG&E*, 475 U.S. at 5, 20-21.

Defendant's argument has no limit and would give government all sorts of power to control speech. Consider the wide swath of entities vital to disseminating others' speech—bookstores, book publishers, essay-compilation editors, theaters, newspaper letters to the editor and op-eds, live television guest interviews, cable television operators offering cable channels, art shows, community bulletin boards, and comedy clubs, just to name a few. According to Defendant, the government could compel them to disseminate (or block them from disseminating) certain speech authored by others. Case after case rejects this unlawful assertion of government power.[3]

**2.** Defendant argues that covered platforms' use of human-programmed computer "algo-

---

[3] *E.g.*, *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 702-03 (1992) ("right to distribute" expressive content "lies at the heart of the liberties guaranteed by the Speech and Press Clauses of the First Amendment") (O'Connor, J., concurring); *Smith v. California*, 361 U.S. 147, 150 (1959) ("free publication *and dissemination* of books *and other forms of the printed word* furnish very familiar applications of these constitutionally protected freedoms") (emphases added); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) ("the circulation of books"); *Prison Legal News v. Livingston*, 683 F.3d 201, 212 (5th Cir. 2012) (same); *Muir v. Ala. Educ. Television Comm'n*, 656 F.2d 1012, 1016 (5th Cir. 1981) ("speaking, book publishing, theatre presentations, pamphleteering"); *Bayou Landing, Ltd. v. Watts*, 563 F.2d 1172, 1175 (5th Cir. 1978) ("magazines[] and films").

rithmic" tools for exercising editorial discretion is unprotected conduct, rather than protected expression. Opp.14-17. But using technology to aid editorial judgment does not transform the covered platforms' protected content moderation, organization, and dissemination into unprotected conduct. After all, if a newspaper used an algorithm to weed out certain submissions, its decision whether to publish an op-ed is no less expressive. The same would be true of a bookstore's use of an algorithm to select books that would be most relevant for sale to its community. All witnesses from Plaintiffs and their members testified that covered platforms' content moderation is inherently expressive, as it conveys the included content is "worthy of presentation and quite possibly of support as well." *Hurley*, 515 U.S. at 575; *see* Dkt.39-2 ("Potts Dep.") 65:9-67:10; Dkt.39-4 ("Szabo Dep.") 68:16-69:4; Dkt.39-5 ("Schruers Dep.") 72:9-73:17; 74:20-76:4; Ex.C ¶¶24-27.[4]

In all events, Defendant ignores that the covered platforms' *human employees* create the "algorithmic" editorial tools to effectuate the covered platforms' policies regarding acceptable content and optimal organization plus display, and that the algorithms reflect the editorial judgments of these humans and platforms. Accordingly, as every court to consider the issue has held, the First Amendment equally protects "algorithms to screen all content for unacceptable material." *NetChoice*, 2021 WL 2690876, at *8; *see* Mot.17 (collecting cases); Plfs. Standing Br.1 n.11 (same).[5] Defendant makes no response to this caselaw. Even if human-programmed algorithms are a relatively new technology for exercising editorial discretion, "[g]overnmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental power." *Tornillo*, 418 U.S. at 256. Constitutional protections "do not vary when

---

[4] All citations to depositions reference the depositions that Defendant attached to his opposition.

[5] In addition to being constitutionally protected, the algorithms are necessary to moderate content (including removing unspeakable content like Child Sex Abuse Material) at scale. *See* Mot.3. The sheer volumes necessitates technological help: "500 hours of content are uploaded every minute" to YouTube. Dkt. No. 12-3, ¶ 3 (YouTube Decl.)."Users of Facebook's products share over a billion stories and over 100 billion messages, every day." Dkt. No. 12-4, ¶ 2 (Facebook Decl.).

a new and different medium for communication appears." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) (internal quotation marks omitted).

Just because expression "can be reduced to [its] constituent acts, and thus described as conduct," the expressive "end product" cannot be "disconnect[ed] . . . from the act of creation." *Turner v. Driver*, 848 F.3d 678, 689 (5th Cir. 2017). Whatever "conduct" covered platforms' content moderation entails, this is inextricably intertwined with constitutionally protected editorial discretion over the dissemination and display of speech.[6] For instance, a newspaper editorial is undoubtedly expressive even though it entails the "conduct" of writing and editing. Likewise, the "creation of custom wedding cakes is expressive"—notwithstanding the "conduct" of combining ingredients, baking, and decorating—because the result is expressive. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1743 (2018) (Thomas, J., concurring).

Defendant next argues that the First Amendment does not protect algorithm use because the algorithms are purportedly designed to maximize "profit" or user "engagement"—and not to effectuate the platforms' editorial policies. Opp.15-16. That is wrong, as the record indisputably establishes that the algorithms at issue here effectuate the platforms' policies. *E.g.*, Ex.A ¶ 19; Ex.C ¶ 7; Dkt.39-3 ("Veitch Dep.") 61:8-16; Potts Dep. 65:9-67:10; Szabo Dep. 68:16-69:4; Schruers Dep. 72:9-73:17; 74:20-76:4; 87:8-88:5; 167:11-168:8. Even assuming that the platforms may use other algorithmic means to increase user engagement, that is separate and apart from whether they also use algorithms to implement their content moderation policies.

Regardless, profit, viewership, and engagement motives are *permissible* editorial goals.

---

[6] Defendant's own hypothetical about car alarms is illustrative: Because few (if any) would use a car alarm expressively, the algorithm that makes the alarm function would generally not be protected expression. Opp.14 n.82. But in a movie or art installation in which an artist uses car alarms to express a message, that alarm (and everything necessary to make the alarm function) would be protected expression. The same is true here: regardless of whether there are contexts in which algorithms in the abstract are not expression, covered platforms use algorithms to exercise editorial discretion facilitating expression.

"[A] profit motive does not strip communications of constitutional protections." *Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997). That speech is "published and sold for profit does not prevent [it] from being a form of expression whose liberty is safeguarded by the First Amendment." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952); *e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (collecting examples of for-profit expression that does not qualify as "commercial speech"); *Smith*, 361 U.S. at 150 (collecting cases). Likewise, First Amendment protections are not "lessened by the fact that [expression is] designed to entertain as well as to inform," because the "'line between the informing and the entertaining is too elusive for the protection of that basic right (a free press).'" *Burstyn*, 343 U.S. at 501-02 (quoting *Winters v. People of State of New York*, 333 U.S. 507, 510 (1948)).

Finally, Defendant asserts that this Court cannot conclude that algorithms are (and facilitate) expression without itself reviewing and evaluating every single algorithm the platforms employ. Opp.15-17. This is a red herring and fundamentally misunderstands the First Amendment analysis, which does not depend on factual distinctions about how individual platforms choose to exercise editorial discretion or how the platforms' human-generated computer code implements those judgments.[7] The First Amendment protects *all* editorial discretion—whether inconsistent or arbitrary, "fair or unfair." *Tornillo*, 418 U.S. at 258. The platforms' moderation "need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981). Regardless, the undisputed facts in this case establish that platforms use the algorithms to effectuate their content-moderation policies and express the platforms' view about acceptable content. *See* Potts Dep. 65:9-67:10; Szabo Dep.

---

[7] Defendant cannot complain about the expedited discovery to which he believes he was entitled. As reflected in this Court's order, Defendant did "not negotiate[] with Plaintiffs or follow[] this Court's order in good faith" and "needlessly wasted its very limited time to seek discovery." Dkt.36 at 1-2.

68:16-69:4; Schruers Dep. 72:9-73:17; 74:20-76:4; Veitch Decl. ¶24 ("Machine learning is the product of human decision-making and is used to implement the standards set in our Community Guidelines, thereby reflecting YouTube's editorial judgments"); *see also* Exs. H, I (interrogatory responses regarding content-moderation policies). It does not matter whether the algorithms apply "automatically," or whether humans review decisions effectuated by the programs they created to apply policies at scale. Opp.15. These are tools to exercise editorial discretion, so the First Amendment protects them, as every court to date has held.

**3.** Defendant also argues that covered platforms' selection, arrangement, and presentation of content falls within the "commercial speech" doctrine deserving lesser scrutiny. Opp.18-21. There are at least two problems with this argument. *First*, like other speech compilations, expression disseminated by covered platforms does not come close to falling within the limited definition of the "commercial speech" doctrine. The Supreme Court's broadest definition of the "commercial speech" doctrine encompasses speech that only is "expression related solely to the economic interests of the speaker and its audience." *Express Oil Change, L.L.C. v. Miss. Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 488 n.2 (5th Cir. 2019) (cleaned up). At its narrowest, "the proposal of a commercial transaction" is "*the test* for identifying commercial speech." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (cleaned up). Neither definition is met here, and the law is fatally overbroad—as covered platforms disseminate all sorts of viewpoints having nothing to do with proposing a commercial transaction or solely the speaker's economic interests. Moreover, that the platforms remove objectionable content to foster, maintain, and protect their online communities and improve their services (which might incidentally make them more popular and profitable, addressed above at pp.6-7) does not constitute "commercial

speech.".[8]

*Second*, even assuming that covered platforms' speech dissemination somehow were commercial speech, H.B. 20 still would be subject to heightened "intermediate scrutiny." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 249 (2010); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011). H.B. 20 is not tailored to ban deceptive commercial speech or commercial speech related to illegal activity. *Id.* If anything, the opposite is true: H.B. 20 compels further speech from the platforms that they do not want to be disseminated.

**B.      H.B. 20's content moderation ban is content- and viewpoint-based.**

Where Defendant does not ignore the various ways that H.B. 20 is speaker-, content-, and viewpoint-based, he misportrays what the law requires of covered platforms. Opp.21-25.

**1.** Defendant makes the astonishing claim that H.B. 20 is "content- and speaker-neutral"—on the basis that H.B. 20 purportedly "regulates all social media platforms, regardless of political preferences, without reference to specific types of content or viewpoint in any way." Opp.22-23.

This ignores the actual text of H.B. 20 and grossly misunderstands the distinction between "viewpoint" and "content." *See* Mot.26-28. Defendant ignores that H.B. 20's central "social media platform" definition is clearly viewpoint-, speaker-, and content-based: (1) it covers only a select group of "social media platforms" with 50 million or more active monthly U.S. users, *see* Mot.27; (2) the "social-media-platform" definition is itself also content-based, excluding websites or applications that "consist[] primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider" where user chats and comments are "incidental to" the content posted by the website or application, Tex. Bus. & Com. Code

---

[8] If a covered platform advertised its own services, that advertisement might constitute commercial speech. But if a platform moderates speech it disseminates—which may result in more advertising revenue—that would not be "commercial speech." *E.g.*, *Prager Univ. v. Google LLC*, 951 F.3d 991, 999 (9th Cir. 2020) ("YouTube's statements concerning its content moderation policies do not constitute 'commercial advertising or promotion.'").

§ 120.001(1)(A)-(C); Mot.27; and (3) the enactment history shows covered platforms were targeted for perceived liberal bias, Mot.6-7; *see NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring) (noting that the "history of the Act's passage" confirms viewpoint discrimination).

Likewise, Defendant ignores that H.B. 20's central prohibition on "viewpoint"-based content moderation is content- and viewpoint-based. H.B. 20 carves out two categories of speech for favored treatment. Mot.9, 26-27. And Defendant himself identifies certain categories of content that covered platforms may purportedly moderate (although some, like "racism," are viewpoints covered by H.B. 20). Opp.11-13. These plainly make H.B. 20 content-based.

Defendant further obfuscates when he argues that H.B. 20's prohibition on "viewpoint"-based content moderation is not itself viewpoint-based, which is contrary to decades-old precedent and common sense. Opp.10-13. While some cases may present difficulties distinguishing viewpoint-based versus content-based restrictions, this is a straightforward case: Platforms' "hate speech" policies are plainly "viewpoint"-based under binding Supreme Court and Fifth Circuit precedent. As the Fifth Circuit recognized, the Supreme Court has held that the "subjective judgment that the content of protected speech is offensive or inappropriate is" based on "viewpoint." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017)). When a platform moderates hate speech (including "racism," Opp.11), it makes an expressive decision for which the "specific motivating ideology or the opinion or perspective of the speaker"—*i.e.*, the hateful opinion—"is the rationale" for the moderation. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (citation omitted).[9] It does not change the analysis that an "entire class of viewpoints" might be captured by a category like "hate speech."

---

[9] Content-based laws "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

*Id.* at 831. Indeed, content espousing white supremacist rhetoric plainly reflects the speaker's distinct "viewpoint"; the First Amendment protects platforms' decisions to remove such content.

**2.** Defendant asserts—contrary to H.B. 20's plain text—that H.B. 20 "permits the Platforms to continue doing the very content moderation they are doing already." Opp.13 (emphasis omitted).[10] Defendant is wrong and misapprehends H.B. 20's plain text and the distinction between "viewpoint" and "content."[11]

H.B. 20 forbids covered platforms from moderating content "based on . . . the viewpoint" of a user or "the viewpoint" expressed in the content. Tex. Civ. Prac. & Rem. Code § 143A.002(a). As just explained, platforms' enforcement of their hate-speech policies for content moderation would be prohibited by H.B. 20. That is because hate-speech policies reflect the "subjective judgment that the content of protected speech is offensive or inappropriate," and this is a judgment based on the expression's "viewpoint." *Robinson*, 921 F.3d at 447. So contrary to Defendant's position in its brief, platforms' moderation of speech espousing "racism," Opp.13, would be prohibited by H.B. 20's plain text and the accepted legal definition of "viewpoint."

There are countless other possible examples of posts that platforms might moderate based on viewpoint. Consider one of Defendant's own examples: While "terrorist speech" that simply presents a direct threat of violence might be "content"-based but not viewpoint -based, Opp.11, a

---

[10] Even if Defendant's atextual gloss on H.B. 20's plain text could be accepted, it is only because of Defendant's legal briefing in this case. Plaintiffs are still entitled to a preliminary injunction and declaration against H.B. 20's enforcement against them, which will prevent the chilling of their First Amendment rights. 28 U.S.C. § 2201(a); *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020).

[11] Neither Plaintiffs' nor their members' witnesses "attested to knowing the difference [between content and viewpoint]," in every possible case despite Defendant's apparent citations to the contrary. Opp.13. The line between viewpoint and content is not so clear as to provide covered platforms' any certainty (though Defendant misstates even where that murky line might be drawn). For instance, the cited testimony from the CCIA witness discusses how extoling the virtues of cannabis is very much expressing a viewpoint (which H.B. 20 would require the platforms to disseminate) even though it may fall within a broader content-based category of illegal-drug discussion. Schruers Dep. 78:9-79:7. And the testimony from the YouTube witness immediately preceding that cited by Defendant explained how certain categories can be both content-based and viewpoint-based. Veitch Dep. 43:14-44:5.

post of "terrorist propaganda" saying "ISIS is better than America" expresses a viewpoint covered by H.B. 20, Mot.1, 19. Similarly, platforms might moderate a video depicting ISIS acts if the viewpoint promotes ISIS, while they might disseminate this video if it espouses a newsworthy viewpoint documenting harms caused by ISIS. Or consider a post with a video of a speech by Adolf Hitler. Platforms might moderate this content in some situations but not in others, and it could depend on the viewpoint espoused. If the surrounding context clarifies that the post espouses a viewpoint promoting Naziism or genocide, then platforms could moderate this speech based on that viewpoint. But if the speech is presented for historical documentaries or evidence that the Holocaust was real, platforms may choose to disseminate this content to further the educational message about the atrocities of the Nazis and the Holocaust. *E.g.*, Ex.C ¶ 30.

All of this accords with the distinction that the Supreme Court has drawn between viewpoint- and content-based regulation. As described above, viewpoint concerns "perspective," while content concerns "the general subject matter." *Rosenberger*, 515 U.S. at 831. If the Texas Legislature wanted "viewpoint" to mean something besides what the Supreme Court and Fifth Circuit say it means, then it should have defined this term. It did not. And Defendant's briefing only confirms, if not increases, this statute's vagueness.

### C. H.B. 20's content- and speaker-based disclosure and operational requirements are unconstitutional.

In a single paragraph that does not respond to *NIFLA* or *Washington Post*, Defendant asserts that H.B. 20's disclosure and operational requirements are constitutional. Opp.25-26. But as Plaintiffs explained (Mot.23-26), these "unduly burdensome disclosure requirement[s]" are designed to chill First Amendment rights. *NIFLA*, 138 S. Ct. at 2378. "Indeed, some of the disclosure provisions seem designed not to achieve any governmental interest but to impose the maximum available burden on the social media platforms." *NetChoice*, 2021 WL 2690876, at *11.

Importantly, Defendant does not dispute that H.B. 20 imposes onerous disclosure and operational requirements—such as requiring platforms to provide excruciating detail about moderation decisions they make billions of times each day (Tex. Bus. & Com. Code §§ 120.051-.053), and mandating a public notice-and-complaint-appeal process for content moderation with very short deadlines (*id.* § 120.101-.104). Mot.23-26. The unrebutted evidence demonstrates the burden of meeting these requirements, as they will require global changes to the platforms' operations. Potts Dep. 156:8-162:17; Potts Dep. 179:14-180:24; Szabo Dep. 115:14-116:1; Schruers Dep. 119:14-122:5; Ex.A ¶¶ 42-44; Ex.B ¶¶ 16-18, 23; Ex.C ¶¶ 55-58; Ex.D ¶¶ 26, 28-33. Furthermore, providing more information will only aid predators, who can use every incremental piece of information to better evade moderation. Dkt.39-6 ("Rumenap Dep.") 40:5-18.

Defendant does not contest that the disclosure and operational requirements only apply to a subset of "social media platforms" on the Internet. Nor does he contest that such disclosure and operational requirements would be wholly inappropriate as applied to any other speech disseminator like bookstores, art shows, newspapers, theaters, and many more. Mot.23-24. Instead, Defendant likens H.B. 20's disclosures of editorial practices to disclosing "country-of-origin," "calorie counts," and "hazardous material" disclosures. Opp.25. But none of these involve intrusions on the dissemination of expression and the exercise of editorial judgment, as they only implicate the sale of non-expressive products. The closest Defendant gets to substantively responding is presenting a parade of horribles about securities and campaign-finance disclosure laws. But SEC disclosures generally do not burden editorial discretion over disseminating expression. And campaign-finance disclosures *do* burden expression and association, which triggers First Amendment heightened scrutiny. *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021).[12]

---

[12] In the unique campaign-finance context, less-than-strict scrutiny has been justified for disclosure laws on the

### D. H.B. 20 is unconstitutionally vague.

Defendant argues that none of Plaintiffs' witnesses expressed any vagueness concerns. But they did: (1) H.B. 20's use of "viewpoint" is vague, *e.g.*, Potts Dep. 124:19-125:17; Schruers Dep. 79:8-16; 80:3-16; (2) they were unsure about how to comply with the law, *e.g.*, Ex.C ¶ 51; Potts Dep. 129:18-130:6; (3) they do not know how to implement the user-directed blocking, *e.g.*, *id.* 118:18-119:19; (4) the statutory definition of "social media platform" is vague, *e.g.*, Szabo Dep. 96:12-21; (5) other forms of moderation might be covered, *e.g.*, Schruers Dep. 84:7-85:5; and (6) moderation and expression will be chilled as a result, *e.g.*, *id.* 76:5-77:9. At any rate, whether a law is void for vagueness is a "question of law." *United States v. Coleman*, 609 F.3d 699, 706 (5th Cir. 2010).

In addition, Defendant has further ignored Plaintiffs' arguments from their motion.[13] *First*, Defendant contends Plaintiffs failed to demonstrate H.B. 20's prohibition on denying "equal access or visibility to" content is vague. Opp.28. But covered platforms plainly moderate content in part by displaying and arranging content, and it would be near impossible for platforms to understand much less operationalize this requirement across billions of pieces of content. *E.g.*, *NetChoice*, 2021 WL 2690876, at *11. *Second*, Defendant (Opp.28) offers no clarity about the meaning of the "social media platform" definition and responds to none of Plaintiffs' arguments. *See* Mot.29. To be sure, *some* platforms can reasonably conclude that they are covered by H.B. 20.

---

basis that they further the government interests in preventing quid pro quo "corruption" and providing the "electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office." *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (per curiam) (footnote omitted). Neither is present with the dissemination of speech by social-media platforms.

[13] Plaintiffs properly raised facial challenges, contrary to Defendant's insinuations, Opp.14, 17, 29. Any possible difference between facial, overbreadth, and as-applied claims does not matter here. *See* Plfs. Standing Br.17-18; *e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("[O]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly 'as-applied' cases.") (internal quotation marks omitted).

But many others lack any insight into whether they will be subject to the law's draconian require-ments. *Third*, Defendant (Opp.28) offers no clarity about when the Texas Attorney General may sue for a "potential violation," and fails to respond to Plaintiffs' argument that this language is anomalous in Texas statutes (instead citing to a single federal whistleblower statute). *Fourth*, De-fendant (Opp.28) does not respond to Plaintiffs' argument that H.B. 20's disclosure provisions provide non-exhaustive lists of materials to disclose, which would subject covered platforms to liability at the whim of the Texas Attorney General. *See* Mot.11, 30. *Finally*, Defendant relies on his erroneous understanding of the distinction between "content" and "viewpoint," Opp.29, but his continued confusion only makes H.B. 20's use of "viewpoint" even vaguer.

**E.    H.B. 20 fails any level of First Amendment heightened scrutiny because De-fendant has not offered a sufficient interest or demonstrated proper tailoring.**

**1.** Defendant posits two interests. Both interests are not compelling, much less important.

**a.** Defendant first asserts an interest in "the free and unobstructed use of public forums and of the information conduits provided by common carriers." Opp.23. This fails for multiple reasons. *First*, privately owned platforms are not "public forums," *id.*, as they are not government property. *E.g.*, *Manhattan Cmty.*, 139 S. Ct. at 1932 ("private entities' rights to exercise editorial control over speech and speakers on their properties or platforms"); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998) (public-forum analysis limited to "historic confines"); *Krishna*, 505 U.S. at 678 ("government seeks to place [restrictions] on the use of its property").

*Second*, Defendant cites no case recognizing a *governmental* interest in "free and unob-structed use . . . of the information conduits provided by common carriers." Opp.23. In fact, *PG&E*, *Denver Area*, and *Turner all* involved common carriers, and the Supreme Court did not recognize such a governmental interest. *PG&E* involved a state-sanctioned energy monopoly com-mon carrier, and the Supreme Court held that the business retained editorial discretion and could

not be compelled to use its platform to disseminate others' speech. 475 U.S. at 17-18 n.14. *Denver Area* ruled that cable operators retained "editorial discretion" over the "freedom to pick and to choose programming." 518 U.S. at 738 (plurality op.).

*Turner* recognized that cable companies had First Amendment rights implicated by their selection of channels they curated for their users. *Turner*, 512 U.S. at 622, 659, 661.[14] And *Turner* applied heightened First Amendment scrutiny because the law "interfere[ed] with cable operators' editorial discretion," while requiring cable operators to carry just a few "certain minimum number of broadcast stations"—but nothing close to all cable channels irrespective of content. *Id.* at 643-44, 662. Indeed, *Turner* would have been an easy case if the government had a sufficient interest in commandeering common carriers into disseminating speech (in fact, that interest would have compelled cable television operators to carry a lot more than just broadcast channels). Instead, *Turner*'s holding turned on the narrow rationale that cable operators must abide by a content-neutral law requiring them to carry the few broadcast channels—to prevent "the 40 percent of Americans without cable" from losing "access to free television programming" of broadcast channels, which the federal government had spent decades cultivating. *Id.* at 646; *see* Mot.33-34; *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 640 (5th Cir. 2012). As *Reno* held, this broadcast-television-specific analysis has no place in evaluating Internet First Amendment protections. 512 U.S. at 870. In all events, covered platforms are not common carriers, as discussed below (at pp.18-24).

Justice Thomas was therefore correct when he noted that labeling a law "a common carrier scheme has no real First Amendment consequences." *Denver Area*, 518 U.S. at 825 (Thomas, J.,

---

[14] Unlike the must-carry-broadcast-channel rule in *Turner*, H.B. 20 is content-based and cannot survive heightened scrutiny. Defendants do not respond to many of Plaintiffs' arguments on *Turner*. Mot.33-34.

concurring in judgment in part and dissenting in part).[15] In short, the government may not designate private companies as passive receptacles of other people's speech, such that they lose their First Amendment protections. *See Hurley*, 515 U.S. at 573 (government cannot declare "speech itself to be the public accommodation").

*Finally*, Defendant's interest is merely a reformulated version of the interest *Tornillo* rejected, and "state authority to regulate speech has not increased" since *Tornillo* was decided. *NetChoice*, 2021 WL 2690876, at *7 (rejecting similar interest). Whatever general interest the government has in the public having access to information, it lacks a specific interest in commandeering private actors to facilitate that interest. *Tornillo*, 418 U.S. at 247-48; Mot.31 (collecting cases). The state cannot mandate such "enforced access"—even in the name of "enhanc[ing]" speech, promoting "fairness," or addressing supposedly "vast accumulations of unreviewable power in the modern media empires." *Tornillo*, 418 U.S. at 245, 250-51. And that is hardly the only context in which the Court has rejected the idea that the state may restrict First Amendment rights to enhance the speech of others. Mot.31 (collecting cases).

**b.** Defendant contends that a second interest justifies H.B. 20: Preventing "discrimination" by platforms. Opp.24. But the Supreme Court has rejected this interest: Even given a State's general interest in anti-discrimination laws, "forbidding acts of discrimination" is "a decidedly fatal objective" for the First Amendment's "free speech commands." *Hurley*, 515 U.S. at 578-79.

**2.** H.B. 20 is far from properly tailored. Defendant does not contest that the State had an obvious alternative. If the State were truly interested in providing a public forum for speech, it could have created its own social-media platform. But the Legislature expressly rejected that opportunity to instead burden private actors. Mot.35-36. There is an easy explanation for this: Based

---

[15] Defendant asserts it is "curious" that Plaintiffs have cited this decision and a "singular line plucked from a single Justice's separate opinion." Opp.10 n.62. But this reflects the Supreme Court's precedents above.

on the statements made by legislators and the Governor, H.B. 20's true interest is in promoting conservative speech on platforms that legislators perceive as "liberal"—not the "free flow" of all information. Defendant concedes this in positing a "problem" on the platforms: "There is a skewed exchange of ideas in the Platforms that prevents such a search for the truth." Opp.20. But "where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977).

### F. Characterizing covered platforms as "common carriers" makes no constitutional difference—and is factually and legally wrong in all events.

Defendant's lead "common carrier" argument (Opp.2-10) misses the mark in many ways.[16]

Common carriers retain First Amendment protection, as discussed above (at pp.15-17). Defendant cites no case supporting the proposition that government can declare covered platforms "common carriers" and eliminate their First Amendment rights. *See* TechFreedom Br.2.

In any event, covered platforms are not common carriers, as they do not "provid[e] speech conduits for the public." Opp.9. There is an irreconcilable tension between H.B. 20's purpose (to prevent perceived different treatment of users and expression by limiting editorial discretion) and H.B. 20's justification (that covered platforms are indifferent as to users). This dooms the law.

**1.** Covered platforms are not common carriers under the centuries-old definition as they "discriminate" both as to users and to content. Indeed, the judges who jointly authored the primary case Defendant cites (Opp.3)—for the proposition that covered platforms are common carriers without First Amendment rights—observed *exactly the opposite*: "web platforms such as Facebook, Google, Twitter, and YouTube . . . are not considered common carriers that hold themselves

---

[16] Defendant supports these common-carrier arguments with reference to an additional legal brief that Defendant calls an "expert report." *See* Dkt.39-1. Plaintiffs have moved to strike this brief as it is not an admissible expert report. *See* Dkt.43. Nevertheless, where necessary, Plaintiffs respond to the legal arguments presented in that brief.

out as affording neutral, indiscriminate access to their platform without any editorial filtering." *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 392 (D.C. Cir. 2017) ("*USTA II*") (per curiam) (Srinivasan & Tatel, JJ., concurring in the denial of reh'g en banc); *accord id.* at 433 (Kavanaugh, J., dissenting from denial of reh'g en banc); *see U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 741 (D.C. Cir. 2016) (Tatel & Srinivasan, JJ.) ("*USTA I*").

To the contrary, covered platforms maintain detailed terms and conditions plus community standards, and they require users to agree to and abide by those terms and standards as a condition of access. They enforce those terms and standards routinely, making individualized decisions about what content to display or restrict, which users to grant, deny, or remove access, and how to adapt their standards to changing circumstances, while constantly engaging in "editorial filtering." Accordingly, "social media companies exercise too much discretion over the content they host to be regarded as common carriers or public accommodations." Christopher S. Yoo, *The First Amendment, Common Carriers, and Public Accommodations*, 1 J. Free Speech L. 463, 504 (2021).

In fact, Congress through 47 U.S.C. § 230(c)(2) underscored and sought to promote covered platforms' protected right to exclude speakers and speech through content moderation. *See Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). Congress wanted service providers to continue making editorial judgments that weed out objectionable content, and Congress enacted Section 230 to ensure that fear of liability would not force providers to act as mere common carriers. Just as Congress intended, online service providers have not displayed all materials, but have built their own communities according to their own values.

**2.** Defendant contends that this Court should apply a different, non-exhaustive, multifactor

test to evaluate whether covered platforms are "common carriers" lacking First Amendment protections. Opp.3 (citing *USTA I*, 825 F.3d at 741).[17] But there is no basis in law for this test (or set of tests). Plus, such a non-exhaustive, multi-factor test is inappropriate in the First Amendment context, which "must eschew 'the open-ended rough-and-tumble of factors.'" *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (controlling op. of Roberts, C.J.).

**3.** Even under Defendant's preferred test, covered platforms are not common carriers.

*First*, Defendant declares that the platforms' alleged "market power" justifies treating them as common carriers. But common-carrier status turns on offering service under non-discriminatory yet reasonable terms to all members of the public and all content—not "market power." "[N]one of the standard judicial definitions of common carriage depend on the presence of market power." Yoo, *Common Carriers*, 1 J. Free Speech L. at 467; *accord* Phil Nichols, *Redefining "Common Carrier"*, 1987 Duke L.J. 501, 517-18.

That is why the Supreme Court rejected the idea that the Miami Herald's market power in *Tornillo* justified the state's right-of-reply law. *Tornillo* held that government could not infringe First Amendment rights of even a "noncompetitive and enormously powerful" company with a "monopoly" on the "marketplace of ideas" to promote "fairness" or address "vast accumulations of unreviewable power in the modern media empires." 418 U.S. at 249, 250-51. And *PG&E* vindicated First Amendment rights of even a state-sanctioned monopoly. 475 U.S. at 17-18 & n.14 (plurality op.); TechFreedom Br.10-11.

Defendant effectively asserts that—by successfully creating and fostering large communities according to their unique values—covered platforms lose the right to continue to shape them

---

[17] This test seems to be drawn from Justice Thomas's separate certiorari-stage statement concurring in the vacatur of a court of appeals decision based on mootness. *Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220, 1226 (2021). The underlying *Knight* case was dismissed as moot at the certiorari stage before merits briefing could occur. *Knight* is not a binding precedent. *Cf. King v. Facebook, Inc.*, 2021 WL 5279823, at *14 (N.D. Cal. Nov. 12, 2021).

to those values. Opp.7. But the "enviable" "size and success" of covered platforms does not "support[] a claim that [the covered platforms] enjoy an abiding monopoly of access to spectators." *Hurley*, 515 U.S. at 577-78. As the Supreme Court has long recognized, those "who open their property for speech" retain "the ability to exercise what they deem to be appropriate editorial discretion within that open forum." *Manhattan Cmty.*, 139 S. Ct. at 1930-31. Private platforms would otherwise be faced with "the unappetizing" and unconstitutional "choice of allowing all comers or closing the platform altogether." *Id.* at 1931.

In all events, the Legislature made no legislative findings about market power. Opp.3. And Defendant must do more than cite one judicial opinion to show that all covered platforms have sufficient "market power." *See FTC v. Facebook, Inc.*, 2021 WL 2643627, at *12 (D.D.C. June 28, 2021) ("bare assertions . . . too conclusory to plausibly establish market power in any context"). Moreover, no platform possesses "the physical power to silence anyone's voices, no matter . . . their alleged market shares." *Zhang v. Baidu.com*, 10 F. Supp. 3d 433, 437, 441 (S.D.N.Y. 2014).

*Second*, covered platforms do not receive any particular "countervailing benefit" from the government sufficient to make them common carriers. Opp.4-5. They certainly do not receive such a benefit from Texas—the State purporting to impose common-carrier regulation. *See* Yoo, *Common Carriers*, 1 J. Free Speech L. at 504 ("Any deal implicit in that statute must be internal to the statue itself."). Defendant's conclusory assertions that covered platforms receive tax benefits fail to include (1) which platforms receive such benefits; (2) what the qualifications for such benefits are; and (3) how receipt of such tax benefits confirms common carrier status as a matter of law. The examples that Defendant does provide cannot carry his burden. For instance, the federal Internet Tax Freedom Act provided a moratorium on "taxes on Internet access." Pub. L. No. 105-277, 112 Stat. 2681-719 (1998). Defendant and his expert do not explain precisely how this affects

covered platforms relative to anyone else that provides "Internet access." In fact, H.B. 20 explicitly excludes Internet service providers. Tex. Bus. & Com. Code § 120.001(1)(A).

Regarding Section 230 benefits, Congress itself has disclaimed any intent that Section 230 "be construed to treat interactive computer services"—all websites and applications—"as common carriers." 47 U.S.C. § 223. Defendant is thus flatly wrong to argue that Congress imposed common-carrier "treatment" on covered platforms (or the rest of the Internet). Opp.9.

*Third*, Defendant argues (Opp.5-6) that covered platforms are common carriers because they "are open to the public," in that they allow people to sign up for their communities. But, again, common carrier status turns on providing a service under non-discriminatory yet reasonable terms, not whether members of the public can apply for the service. Defendant concedes that social-media platforms are not "traditional public forums," but nevertheless contends that the Internet has changed the relevant analysis. Opp.5. This too ignores *Reno*'s holding that there is "no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." 521 U.S. at 870. And of course, bookstores, theaters, and art museums are all open to the public as well, but that does not convert them into common carriers.

Fundamentally, Defendant ignores that users can sign up for and use covered platforms' services *only* after agreeing to the platforms' respective terms of service and other policies. This confirms that platforms do not passively take all comers, and they only disseminate speech meeting their policies for acceptable content. *E.g.*, Potts Dep. 35:5-6; Potts Dep. 40:24-41:11; Veitch Dep. 16:11-17:22; Szabo Dep. 75:6-21; Szabo Dep. 76:10-77:6; YouTube Decl. ¶ 12 n.1; Facebook Decl. ¶ 11. In other words, the only access covered platforms permit is access that complies with the platforms' subjective policies governing acceptable expression and conduct—and they remove

users who fail to comply. Potts Dep. 36:18-38:21, 39:23-41:11; Schruers Dep. 55:2-7.[18] Further-more, platforms bar certain people from their platforms irrespective of those people's compliance with particular policies about permissible expression. *E.g.*, Ex.C ¶ 53 (YouTube age restrictions); Veitch Dep. 21:7-15 (limitations on new YouTube accounts); Potts Dep. 35:5-16, 36:18-37 (Facebook restrictions on age, specific criminal history, and affiliations with terrorist organizations); Schruers Dep. 51:14-52:10; Szabo 76:10-77:6. This is not "indifferent" service of users, as common-carrier status requires.[19] Moreover, even if platforms act "indifferently" as to *users* (and they do not), they still engage in editorial discretion over user-submitted *content*—so the platforms cannot be "common carriers" as to dissemination of expression.[20]

    *Fourth*, Defendant remarkably asserts that a single state legislature may strip businesses of First Amendment rights by merely declaring the businesses common carriers. Opp.8-9. Not surprisingly, no cases Defendant cites stand for the proposition that the government may strip those engaged in the dissemination of speech of their First Amendment rights. In each case, businesses that served customers *indifferently* were recognized and regulated as common carriers. In *W. Union Tel. Co. v. James*, 162 U.S. 650, 653-54 (1896), for instance, the Supreme Court did not consider

---

[18] Contrary to Defendant's assertion (Opp.7), Facebook did not testify that there are "billions" of fake accounts at any given time. Potts Dep. 39:12-22.

[19] Defendant rightfully relegates *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), to a footnote. Opp.8 n.46. Defendant ignores Plaintiffs' distinctions of *PruneYard*. *See* Mot.22-23; TechFreedom Br.11, 13-14 n.4. Instead, Defendant argues that *PruneYard* confirms the government can force private businesses to "host" others' speech. Opp.8 n.46. But Defendant has no answer to the fact that, in *PruneYard*, "the [mall] owner did not even allege that he objected to the content of the [speech]; nor was the access right content based." *PG&E*, 475 U.S. at 12; *see Hurley*, 515 U.S. at 580. That is why *PruneYard*—in contrast to *Tornillo* and others—involved no "intrusion into the function of editors." 447 U.S. at 88 (internal quotation marks omitted). In other words, requiring the mall to "host" others' expression had no impact on the mall's (nonexistent) expression. *Id.* at 88. Other courts have recognized *PruneYard*'s limited application, especially to the Internet. *E.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1116 (N.D. Cal. 2017).

[20] Defendant cites *Lloyd Corp. v. Tanner*, 407 U.S. 551 (1972), for the proposition that private property made open to the public becomes a public forum. Opp.7. This is wrong for two reasons. First, *Lloyd* rejected a hand-biller's claim of a First Amendment right to access others' private property. *Id.* at 570. Second, as the Supreme Court made clear recently, those "who open their property for speech" retain "the ability to exercise what they deem to be appropriate editorial discretion within that open forum." *Manhattan Cmty.*, 139 S. Ct. at 1930-31.

a First Amendment challenge

*Fifth*, covered platforms do not play the same role in the "communications industry" as railways, phone providers, or cable providers. Opp.3 n.13, 25 n.141. *Turner* recognized "unique physical characteristics" that give cable companies a natural monopoly over physical infrastructure, and thus "bottleneck, or gatekeeper, control" over what consumers can access. 512 U.S. at 639, 656; *see* Mot.33-34. Defendant ignored Plaintiffs' argument that no such natural monopolies exist here. *See Zhang*, 10 F. Supp. 3d at 441 (platforms lack "the physical power to silence anyone's voices"). Plus, the *Denver Area* cable companies retained their First Amendment rights, as addressed above (at p.16). "[A]ny definition of communication broad enough to include social media would also encompass actors such as newspapers that clearly enjoy full First Amendment protection." Yoo, *Common Carriers*, 1 J. Free Speech L. at 503.

*Finally*, H.B. 20 is not a common-carrier statute because it imposes requirements beyond reasonable nondiscrimination. *See* TechFreedom Br.14-15. H.B. 20's central prohibition against content moderation based on viewpoint would forbid covered platforms from (as Defendant says at Opp.7) "deny[ing] service to unruly" users like Nazis who wish to spew their hate speech.

## III.  H.B. 20 is preempted by the Communications Decency Act, 47 U.S.C. § 230.

Defendant first argues Plaintiffs lack a cause of action to raise Section 230 preemption. Opp.31. But Plaintiffs highlighted their causes of action under both *Ex Parte Young* and federal equity as well as 42 U.S.C. § 1983. *See* Plfs. Standing Br.13 & n.12 (citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 n.4 (1989); *Air Evac EMS, Inc. v. Tex. Mut. Ins. Co.*, 851 F.3d 507, 516-17 (5th Cir. 2017)). Defendant offered no response.

None of Defendant's arguments on Section 230 preemption are persuasive.

Defendant ignores binding Fifth Circuit precedent interpreting Section 230(c)(1) that "Section 230 'specifically proscribes liability'" for a service's "decisions relating to the monitoring,

screening, and deletion of content from its network." *Doe*, 528 F.3d at 420; *see* Mot.38. Indeed, Defendant disregards Section 230(c)(1) altogether in its brief. Section 230(c)(1) alone preempts H.B. 20. *E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 307 F. Supp. 3d 952, 964 (D. Minn. 2018); *Winter v. Facebook, Inc. et al.*, 2021 WL 5446733, at *5 (E.D. Mo. Nov. 22, 2021); *Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 600 (S.D.N.Y. 2020); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009).

Defendant's arguments specific to Section 230(c)(2) are also flawed. Defendant asserts (Opp.31-33) that Section 230(c)(2) only protects moderation of objectively "objectionable" content—not decisions based on subjective "viewpoint." But Section 230(c)(2) unambiguously protects moderation of content that the services *subjectively* "consider[] to be," among other things, "objectionable. " 47 U.S.C. § 230(c)(2); *see United States v. Martin*, 438 F.3d 621, 630 (6th Cir. 2006); *Zango Inc. v. Kapersky Lab*, 568 F.3d 1169, 1173 (9th Cir. 2009). In many cases, this will turn on the viewpoint expressed by the user's content.[21] *See* EFF Br.16-18. Congress used "objectionable" to capture a broad range of expression. *E.g.*, Bryan A. Garner, Garner's Modern English Usage 642 (2016) ("open to objection; unacceptable; offensive"); Merriam-Webster's Collegiate Dictionary (10th ed. 1993) ("Undesirable, offensive.").

Defendant next asserts the *ejusdem generis* canon narrows Section 230's reach (Opp.32-33). But that contravenes both the limitations of that canon and Section 230's express text, which says "otherwise objectionable," not "similarly objectionable." The word "otherwise" means in "a different manner," "another way," or "other ways," Black's Law Dictionary (6th ed. 1990), which suggests that Congress meant to cover content that is distinct from the type of content in Section

---

[21] For example, a platform is likely to find content that disparages minority groups to be harassing, but not content that praises those same groups. The difference between lascivious content versus useful health information could turn on viewpoint. The state's "distinction" thus does not hold, even ignoring the language in § 230(c)(2)(A).

230(c)(2)'s laundry list of adjectives. *See Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1051-52 (9th Cir. 2019) ("enumerated categories are not similar, [and] they provide little or no assistance in interpreting the more general category."). And both courts and dictionaries recognize that "otherwise" has an "expansive reach," bringing within a statute all types of the item—in all its prodigious variety—to which the law refers (here, "objectionable" material). *United States v. Kerns*, 9 F.4th 343, 351 (6th Cir. 2021); *Gooch v. United States*, 297 U.S. 124, 128 (1936) ("broad term"); Black's Law Dictionary (11th ed. 2019) ("quite broad in scope."). Furthermore, Defendant conspicuously does not provide an alternative interpretation. Instead, Defendant says that "otherwise objectionable" only reaches content "similar to" the preceding categories—which is a recitation of the canon, not an interpretation that the canon helps produce.

Defendant's purported application of *ejusdem generis* has more problems. *First*, *ejusdem generis* "is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty"—not a mechanism for rewriting an unambiguous statute. *United States v. Kaluza*, 780 F.3d 647, 661 (5th Cir. 2015) (citation omitted); *accord Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008). *Second*, Defendant misapplies the *ejusdem generis* canon. Opp.32-33. Rather than look to the "initial terms" in Section 230(c)(2)(A)'s enumerated categories for a "readily identifiable genus," he instead asks this Court to seek out a common theme from the rest of the statute. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 199 (2012). Defendant does not explain what exactly that common theme is, though.

Defendant argues Section 230 is (or could be) unconstitutional. Opp.33 & n.189. Defendant does not cite any case so holding. Section 230 is constitutional, as many courts have ruled.[22]

---

[22] *Lewis v. Google LLC*, 851 F.App'x 723, 724 n.2 (9th Cir. 2021); *Green v. Am. Online, Inc.*, 318 F.3d 465, 472 (3d Cir. 2003); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 952-53 (N.D. Cal. 2020); *Parker v. Paypal, Inc.*, 2017 WL 3508759, at *7 (E.D. Pa. Aug. 16, 2017).

Finally, Defendant argues that Section 230's preemptive scope is narrow, extending only to damages. Opp.34. But Section 230 preempts all inconsistent cases, as it provides that "*[n]o cause of action may be brought* and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3) (emphasis added). This provision plainly provides protection from both suit *and* any eventual liability—not merely damages. The phrase "held liable" covers all legal violations—not just the remedy of money damages, as numerous courts have held. *E.g.*, *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (CDA "immunity" is "an immunity from suit rather than a mere defense to liability") (internal quotation marks omitted).

## IV.     H.B. 20 violates the Commerce Clause.

Defendant does not dispute that H.B. 20 compels covered platforms to continue operating in Texas, even if they wanted to cease Texas operations instead of complying with H.B. 20's onerous restrictions. Mot.41. H.B. 20 prohibits covered platforms from denying access based on "a user's geographic location in this state or any part of this state." Tex. Civ. Prac. & Rem. Code § 143A.002(a)(3). This is a blatant Commerce Clause violation that facially "discriminate[s]" in favor of "in-state" interests. Opp.30. The Commerce Clause "prohibit[s]" Texas from denying companies "the choice to stay or leave." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 111 (2d Cir. 2001). Punishing businesses for preferring to leave Texas and do business in other states unconstitutionally discriminates against them "according to the extent of their contacts with the local economy." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 (1980).

Nor does Defendant dispute that H.B. 20 restricts how covered platforms may moderate user-submitted content worldwide. H.B. 20 creates an entitlement for Texas users (regardless of where they are located at any given time) not only to post but also to "receive the expression of

another person"—located anywhere in the world—that cannot be moderated based on "the view-point of . . . another person." Mot.9, 40 (quoting Tex. Civ. Prac. & Rem. Code § 143A.002(a)(3)).[23]

Defendant argues that the Commerce Clause does not preclude H.B. 20 Texas's regulation of social-media platforms because Congress enacted Section 230 (which Defendant has suggested is unconstitutional). Opp.34-36.[24] Nothing in Section 230 allows a state to compel a covered plat-form to continue operating in the state if the platform would rather cease in-state operations than change its entire business model due to an onerous state law. Furthermore, Defendant concedes that "Section 230 does not authorize . . . state law[s]." Opp.35.[25]And a federal statute must contain "unmistakably clear" and "unambiguous indication of congressional intent . . . before a federal statute will be read to authorize otherwise invalid state legislation." *Maine v. Taylor*, 477 U.S. 131,

---

[23] Defendant attacks a strawman by suggesting that Plaintiffs' members seek to be "immune to state regulation" because they operate online. Opp.42-44. Defendant does not dispute that H.B. 20 has the "practical effect" of regulat-ing beyond Texas's borders, because H.B. 20 compels platforms to distribute Texans' posts worldwide and restricting how platforms moderate content posted worldwide by non-Texas users.

Defendant wrongly argues that Plaintiffs "sidestep[ ] the traditional dormant Commerce Clause analysis." Opp. at 39. The rule against extraterritorial state regulation is a well-established "variation[ ]" of that analysis. *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (citing *Brown-Forman Distillers Corp. v. New York State Liquor Au-thority*, 476 U.S. 573 (1986)). Defendant dismisses that rule as only applicable to regulations of out-of-state *prices*. Opp.41-42 (citing *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003) (plurality op.)). But *Walsh* "does not suggest that" the extraterritoriality principle "applies *exclusively* to 'price control or price affirmation stat-utes.'" *Ass'n for Accessible Medicines v. Frosh*, 887 F.3d 664, 670 (4th Cir. 2018). *Walsh* did not arbitrarily limit that principle but simply found that the challenged law would not actually affect out-of-state prices. 538 U.S. at 669; *see Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.) (striking down extraterritorial anti-takeover statute); *S. Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775 (1945) (striking down extraterritorial train-length regula-tion).

[24] Defendant also argues that the Commerce Clause does not restrict H.B. 20 because the statute does not regulate commerce. Opp.36-38, 44. That is wrong because, as Defendant concedes, "Congress now has a Commerce Clause power over communication and information." Opp.37. Defendant insists, without citation, that the scope of those state restrictions should not mirror the modern scope of Congress's affirmative power to regulate under the Commerce Clause. Opp. at 36-38. But the Supreme Court has emphatically rejected such a "two-tiered definition of commerce." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 574 (1997) (internal quotation marks omitted). "The definition of 'commerce' is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation." *Id.* (citation omitted).

[25] Section 230(e)(3)'s generic saving clause merely "defines the extent of the federal legislation's pre-emptive effect on state law," and thus "do[es] not indicate that Congress wished to remove federal constitutional constraints on such state laws." *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 959-60 (1982); *accord Wyoming v. Okla-homa*, 502 U.S. 437, 457-58 (1992); *Lewis*, 447 U.S. at 48-49.

139 (1986).[26]

## V. H.B. 20 is facially invalid, overbroad, and cannot be saved by its severability clause.

Defendant contends that H.B. 20 is not overbroad because it does not prohibit content moderation. Opp.30. This argument relies both on Defendant's misunderstanding of what constitutes "viewpoint" and his erroneous assertion that common carriers lack First Amendment rights, which are addressed above, at pp.9-11, 15-17. Covered platforms engage in content moderation based on "viewpoint," and H.B. 20 prohibits all such content moderation—while imposing onerous disclosure and operational requirements. That makes H.B. 20 unlawful in all applications and overly overbroad.

Contrary to Defendant's assertion (Opp.45-48), H.B. 20's severability clause does not save the law from facial invalidation, nor does the severability clause require this Court to parse each individual subsection of the law to invalidate Sections 2 and 7. Mot.37.[27] H.B. 20's central defective definitions permeate the challenged sections: "social media platform" applies to both Sections 2 and 7; "censor" applies to Section 7; and both are unconstitutional content- and speaker-based infringements on editorial discretion that fail heightened First Amendment scrutiny. In all circumstances when H.B. 20's restrictions apply (*i.e.*, all disclosure and operational requirements and all content moderation based on "viewpoint"), Sections 2 and 7 are unlawful. *See Mance v. Sessions*, 896 F.3d 699, 705 n.23 (5th Cir. 2018) (citing *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015)). "There is nothing that could be severed and survive." *NetChoice*, 2021 WL 2690876, at *11.

---

[26] Defendant faults Plaintiffs for failing to address *Pike* balancing. Opp.41. Plaintiffs pleaded it in their complaint but do not invoke it for preliminary injunctive relief.

[27] Defendant does not dispute that H.B. 20's saving clauses (Tex. Civ. Prac. & Rem. Code §§ 143A.004(d); 143A.005; 143A.006(a)(1)) do not preclude judicial review. *See* Mot.36-37. In fact, Defendant himself—relying on the same cases Plaintiffs cited in their motion—has recognized in another case that purported saving clauses "do[ ] not immunize [laws] from judicial review" and argued the existence of such clauses "suggests that the [law] is unenforceable." Plfs. Memo. in Opp. to Mtn. to Transfer Venue, No. 2:21-cv-00778, *Louisiana v. Biden* (W.D. La. May 4, 2021), 2021 WL 2644609, n.3 (citations omitted).

**VI.    The remaining factors favor a preliminary injunction.**

Defendant does not dispute that a violation of the First Amendment necessarily results in irreparable injury. Mot.43. Nor does he dispute the evidence that covered platforms will have to expend unrecoverable funds to comply with the law. Mot.44. H.B. 20 would require some of the world's largest websites to completely alter their business models to allow far more objectionable speech to be disseminated across the globe—a boon to hate speakers and misinformation peddlers, at the expense of the broader public and the platforms' goodwill with their users.

Defendant pretends that H.B. 20 will not cause users to "encounter more offensive view-points." Opp.49. But Defendant's brief does not disavow his enforcement of H.B. 20 against cov-ered platforms. And Defendant refuses to address whether he believes that H.B. 20 prohibits cov-ered platforms from moderating content with objectionable, offensive viewpoints—like Holocaust denial, pro-Nazi speech, terrorist propaganda, and misinformation.

Defendant does not dispute that "injunctions protecting First Amendment freedoms are always in the public interest." Mot.45. Instead, Defendant complains that covered platforms should either lose Section 230 protection "for the content they decide to publish" or be treated as "com-mon carriers." Mot.50. The former is a policy argument for Congress. The latter runs squarely into the First Amendment, which protects social-media platforms' decisions *not* to publish speech. And no federal or state statute can alter that established constitutional principle.

## CONCLUSION

Plaintiffs respectfully request that this Court preliminarily enjoin the Texas Attorney Gen-eral from enforcing Sections 2 and 7 of H.B. 20 against Plaintiffs and their members.

Dated: November 24, 2021

Respectfully submitted,

/s/ Scott A. Keller

Steven P. Lehotsky*
steve@lehotskykeller.com
Jonathan D. Urick*
jon@lehotskykeller.com
Jeremy Evan Maltz (Texas Bar # 24102129)
jeremy@lehotskykeller.com
Gabriela Gonzalez-Araiza*
gabriela@lehotskykeller.com
LEHOTSKY KELLER LLP
200 Massachusetts Avenue, NW
Washington, DC 20001

Scott A. Keller (Texas Bar # 24062822)
scott@lehotskykeller.com
Matthew H. Frederick (Texas Bar # 24040931)
matt@lehotskykeller.com
Todd Disher (Texas Bar # 24081854)
todd@lehotskykeller.com
LEHOTSKY KELLER LLP
919 Congress Ave.
Austin, TX 78701
T: (512) 693-8350
F: (833) 233-2202

*Admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that on November 24, 2021, the foregoing was filed electronically via the Court's

CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Todd Disher*
Todd Disher