```
 1                UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
 2                    AUSTIN DIVISION

 3  NETCHOICE, LLC, ET AL      ) Docket No. A 21-CA-840 RP
                               )
 4  vs.                        ) Austin, Texas
                               )
 5  KEN PAXTON, IN HIS         )
    OFFICIAL CAPACITY AS       )
 6  ATTORNEY GENERAL OF TEXAS) November 29, 2021

 7

          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
 8           BEFORE THE HONORABLE ROBERT L. PITMAN

 9

10  APPEARANCES:

11  For the Plaintiff:        Mr. Todd L. Disher
                              Mr. Matthew H. Frederick
12                            Mr. Scott A. Keller
                              Lehotsky Keller, LLP
13                            919 Congress Avenue, Suite 1100
                              Austin, Texas 78701
14
                              Mr. Steven P. Lehotsky
15                            Lehotsky Keller, LLP
                              200 Massachusetts Avenue, NW
16                            Washington, D.C. 20001

17  For the Defendant:        Ms. Courtney B. Corbello
                              Mr. Benjamin S. Lyles
18                            Mr. Benjamin S. Walton
                              Texas Attorney General's Office
19                            P.O. Box 1548
                              Austin, Texas 78711
20

21  Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
22                            Austin, Texas 78701
                              (512)391-8792
23

24

25  Proceedings reported by computerized stenography,
    transcript produced by computer-aided transcription.
```

| | | |
|---|---|---|
| 08:59:48 | 1 | THE CLERK:  Court calls:  A 21-CV-840, <u>NetChoice</u> |
| 08:59:53 | 2 | <u>LLC and Others vs. Ken Paxton</u>. |
| 08:59:56 | 3 | THE COURT:  And announcements for the record, |
| 08:59:57 | 4 | please. |
| 08:59:59 | 5 | MR. KELLER:  Your Honor, Scott Keller for the |
| 09:00:02 | 6 | plaintiffs.  I also have at counsel table my colleagues, |
| 09:00:06 | 7 | Steve Lehotsky, Matt Frederick and Todd Disher. |
| 09:00:08 | 8 | THE COURT:  Good morning. |
| 09:00:10 | 9 | MS. CORBELLO:  Good morning, your Honor. |
| 09:00:11 | 10 | Courtney Corbello for defendant.  I also have Ben |
| 09:00:13 | 11 | Lyles and Ben Walton with me from the Attorney General's |
| 09:00:16 | 12 | Office. |
| 09:00:16 | 13 | THE COURT:  Good morning.  Thank you very much |
| 09:00:17 | 14 | for being here. |
| 09:00:18 | 15 | I would ask that as a matter of protocol, that if |
| 09:00:22 | 16 | you would both participants, spectators wear masks unless |
| 09:00:28 | 17 | you are in a speaking role.  Feel free to remove your mask |
| 09:00:33 | 18 | -- while we're still in a time of some concern and a |
| 09:00:39 | 19 | little uncertainty now that there seems to be a new |
| 09:00:41 | 20 | variant, and so, we're trying to be as responsible as we |
| 09:00:44 | 21 | can, minimizing the risk to all participants.  So I'd |
| 09:00:47 | 22 | appreciate that. |
| 09:00:48 | 23 | Second, it's my understanding that there has been |
| 09:00:50 | 24 | an agreement among the parties with regard to how you want |
| 09:00:53 | 25 | to use your time today.  Mr. Keller, can you tell me what |

| | | |
|---|---|---|
| 09:00:57 | 1 | discussions have been? |
| 09:00:59 | 2 | MR. KELLER:  Yes.  The parties have agreed that |
| 09:01:01 | 3 | we will each have one hour of time, and then, we will be |
| 09:01:04 | 4 | able to reserve rebuttal time among that hour. |
| 09:01:07 | 5 | THE COURT:  Okay.  Ms. Corbello, does that sound |
| 09:01:09 | 6 | right? |
| 09:01:10 | 7 | MS. CORBELLO:  Yes, your Honor.  That's correct. |
| 09:01:11 | 8 | THE COURT:  Okay.  Very good.  And then, Mr. |
| 09:01:14 | 9 | Keller, would you like to take the floor then? |
| 09:01:24 | 10 | MR. KELLER:  Thank you, your Honor.  May it |
| 09:01:39 | 11 | please the Court. |
| 09:01:39 | 12 | House Bill 20, Section 2 and 7, are |
| 09:01:46 | 13 | unconstitutional in all sorts of ways under the First |
| 09:01:49 | 14 | Amendment and the commerce clause.  Section 7 of House |
| 09:01:52 | 15 | Bill 20 is also preempted by the Communications Decency |
| 09:01:54 | 16 | Act, 47 U.S.C. 230.  The First Amendment interests here |
| 09:02:04 | 17 | are a wide array of doctrines at every turn protecting |
| 09:02:09 | 18 | social media platforms' dissemination of speech.  These |
| 09:02:12 | 19 | are inherently expressive products.  Websites themselves |
| 09:02:17 | 20 | are inherently expressive.  Under the First Amendment, a |
| 09:02:20 | 21 | whole host of cases that the defendant ignores, Hurley, |
| 09:02:25 | 22 | Tornillo, Pacific Gas, all hold that platforms retain |
| 09:02:31 | 23 | editorial discretion over the speech that they will |
| 09:02:35 | 24 | disseminate from others.  Compelled speech is not allowed |
| 09:02:40 | 25 | by our First Amendment. |

09:02:41  1          And yet, House Bill 20's Section 7 and Section 2

09:02:46  2  both would compel speech and pierce into the editorial

09:02:49  3  discretion that covered social media platforms have.  Now,

09:02:52  4  the defendant also says that somehow, the internet is

09:02:54  5  different.  The Supreme Court, a generation ago, in Reno

09:02:56  6  vs. ACLU, another case which defendant ignores, said the

09:03:02  7  exact opposite, that full First Amendment protection

09:03:04  8  applies on the internet.  And this is not some abstract

09:03:11  9  debate.

09:03:14  10          The defendant does not dispute, at least does not

09:03:17  11  seem to or won't take a position, that Section 7's text

09:03:21  12  which prohibits censoring, that is, content moderation or

09:03:26  13  even changing displays based on viewpoint, would require

09:03:30  14  social media platforms to disseminate pro-Nazi speech,

09:03:33  15  medical misinformation, terrorist propaganda, foreign

09:03:37  16  government disinformation, indeed, holocaust denial.  This

09:03:42  17  is a striking assertion of government power.  And not only

09:03:48  18  does this infringe on First Amendment-protected editorial

09:03:51  19  discretion and compelled speech, there is also a

09:03:54  20  content-based, indeed, viewpoint-based in Section 7, any

09:03:57  21  speaker-based law, all of which trigger strict scrutiny.

09:04:02  22          And when you get to the strict scrutiny analysis,

09:04:05  23  the defendant has posited two interests, both of which the

09:04:09  24  Supreme Court has already rejected.  And at the end of the

09:04:12  25  day, the state had an obvious alternative here which shows

| | |
|---|---|
| 09:04:16 | 1 |
| 09:04:19 | 2 |
| 09:04:22 | 3 |
| 09:04:25 | 4 |

1  that this law is not at all properly tailored.  The state

2  could have created its own government-run true public

3  forum that is government property that was a social media

4  platform run by the state.

5  Indeed, the legislature voted on that and

6  rejected it and, instead, passed House Bill 20, burdening

7  the rights of private entities disseminating speech on

8  expressive websites.  In addition, Section 230 and binding

9  Fifth Circuit precedent clearly provides that liability

10  cannot be imposed by a state on the basis of screening,

11  monitoring, or deleting content -- that's Doe vs. MySpace

12  -- and yet, that's exactly what Section 7 does.

13  The commerce clause arguments here, defendant

14  does not dispute that this would require social media

15  platforms to continue operating in Texas, even if they

16  would rather cease operations in Texas.  That's a blatant

17  commerce clause violation.  Also, this law is not just

18  limited to Texas users because the effect of this law

19  gives Texas users a right not only to post but, also, to

20  receive content that is not moderated on the basis of

21  viewpoint.  This requires worldwide dissemination of

22  speech.

23  So, your Honor, today, I'd like to walk through a

24  little bit more detail these doctrines, but as an

25  overview, this law's unconstitutional on all sorts of

09:05:41  1  ways.  It's preempted and the irreparable harm as the

09:05:46  2  Supreme Court and Fifth Circuit have noted from the loss

09:05:48  3  of First Amendment freedoms for even a small amount of

09:05:50  4  time is unquestionably irreparable harm.  The irreparable

09:05:55  5  harm, the public interest factors, they all collapse back

09:05:58  6  into the merits analysis here when we're talking about

09:05:59  7  core First Amendment-protected freedoms.

09:06:02  8          THE COURT:  Mr. Keller, if I could ask you, I'm

09:06:04  9  sure this is something you would contemplate addressing

09:06:06  10  later in your comments.  But just to set the stage,

09:06:08  11  because I think it's relevant to everything that we're

09:06:11  12  going to talk about today, can you elaborate a little bit

09:06:14  13  on this idea of sort of the editorial function of your

09:06:17  14  client or your clients' members.  It seems to me that

09:06:22  15  that's something that I really need to understand what

09:06:26  16  that function is and how it's distinct from -- whether it

09:06:30  17  is or isn't speech by -- especially protected by the First

09:06:36  18  Amendment.

09:06:36  19          You know, the response of the state to your

09:06:42  20  motion, the initial sort of position was sort of these

09:06:49  21  folks are trying to have it both ways.  On one hand, they

09:06:52  22  -- in the context where it benefits them, they say we're

09:06:55  23  simply a platform where we facilitate speech for other

09:06:59  24  people, and they use that position to insulate themselves

09:07:02  25  from certain liability for certain kinds of speech.

| | | |
|---|---|---|
| 09:07:06 | 1 | But then, sort of they want to have it both ways |
| 09:07:09 | 2 | in the context like this to say that, oh, but this |
| 09:07:13 | 3 | editorial function is actually speech.  And so, we need |
| 09:07:16 | 4 | the protections when we want them, but we want to sort of |
| 09:07:21 | 5 | be insulated from liability when we -- it serves us not to |
| 09:07:27 | 6 | describe our function as speech.  Can you unpack that a |
| 09:07:29 | 7 | little bit for me? |
| 09:07:30 | 8 | MR. KELLER:  I'd be happy to, your Honor.  And |
| 09:07:31 | 9 | there's no having it both ways here.  Social media |
| 09:07:35 | 10 | platforms disseminate speech.  The Fifth Circuit's Doe vs. |
| 09:07:40 | 11 | MySpace ruling, I, think, is very clear about this. |
| 09:07:42 | 12 | That's Section 230.  There's no having it both ways.  What |
| 09:07:45 | 13 | Doe vs. MySpace said was monitoring, screening and |
| 09:07:50 | 14 | deleting content is quintessentially a publisher's role. |
| 09:07:55 | 15 | Now, Section 230 says the liability can't be imposed on |
| 09:07:58 | 16 | that basis, but there's no having that both ways. |
| 09:08:02 | 17 | If websites were somehow not expressive, maybe |
| 09:08:05 | 18 | this would be very different; but Reno vs. ACLU, a |
| 09:08:09 | 19 | generation ago, said that they are.  Also, many of these |
| 09:08:13 | 20 | covered platforms have been very clear.  They do, in fact, |
| 09:08:16 | 21 | have hate speech policies.  There's no time have social |
| 09:08:20 | 22 | media platforms said that they are just dummy conduits |
| 09:08:24 | 23 | passing on all speech come through.  They've been very |
| 09:08:26 | 24 | clear about that.  In fact, there's this mismatch between |
| 09:08:29 | 25 | the purpose and the justification of House Bill 20.  On |

09:08:32  1  one hand, the purpose is, well, all of these users are

09:08:36  2  being treated differently because social media platforms

09:08:39  3  exercise content moderation at times; and yet, then, the

09:08:43  4  justification is somehow, well, social media platforms are

09:08:45  5  treating everybody the same and that's why they can be

09:08:47  6  deemed a common carrier, to be very clear about this.

09:08:50  7  Common carriers retain First Amendment rights.

09:08:53  8  Regardless, social media platforms are not common

09:08:55  9  carriers.

09:08:56  10      And to come to your Honor's questions about the

09:08:59  11  editorial function itself that is taking down content or

09:09:04  12  placing content in a different view, which is something

09:09:08  13  that the defendant doesn't want to focus on, but there's

09:09:10  14  no way that a social media platform can take all of the

09:09:12  15  user-submitted content and put it on one computer screen

09:09:15  16  at the same time.  That's impossible.  And yet, there's

09:09:17  17  this requirement of equal access, which I'm not even sure

09:09:21  18  how you would practically implement that.

09:09:23  19      But regardless, what Denver Area from the Supreme

09:09:27  20  Court said -- and I think this put it best in summarizing

09:09:29  21  this line of cases from Tornillo and Hurley and Pacific

09:09:32  22  Gas.  It said the editorial function itself is an aspect

09:09:35  23  of speech and so, even if a social media platform itself

09:09:40  24  is not generating the speech.  Hurley also confirms that

09:09:45  25  it doesn't have to be generated as an original matter,

| | |
|---|---|
| 09:09:48 | 1 |

it's still protected.  And it's still protected even if there's not a particularized message, even if a platform is lenient in allowing speech to be disseminated.

THE COURT:  What if the curation of that, of the third-party speech is driven by commercial considerations, rather than the particular viewpoint of the message? Because it seems obvious that most, if -- some, if not most, of the editorial sort of function is performed by algorithm, and it's based on what's going to drive the user's interest in the site and to -- and doesn't that seem a lot more commercial than expressive?  It's expressive, but in terms of sort of the fact that it's done by algorithm, doesn't that sort of undercut sort of the First Amendment interests of your client?

MR. KELLER:  No, not at all, your Honor.  And I'll take those in order.  I'll take commercial speech and then, algorithms.

So first of all, with commercial speech, the commercial speech doctrine is very narrow.  A profit motive does not strip communications of First Amendment protection.  That's the Fifth Circuit and the Supreme Court for quite some time.  So I think it's important when we're talking about commercial speech to focus on exactly what that doctrine would entail.  And what that doctrine entails is either -- the broadest definition is expression

09:11:18   1   related solely to the economic interests of the speaker

09:11:21   2   and audience.  That clearly doesn't pertain because social

09:11:26   3   media platforms distribute all sorts of speech.

09:11:27   4           This would be very fatally overbroad, even if the

09:11:29   5   state could point to an exact example of, say, a proposal

09:11:33   6   of a commercial transaction.  So the commercial speech

09:11:36   7   doctrine doesn't apply.  A profit motive or wanting viewer

09:11:40   8   engagement or fostering a community in presenting a

09:11:44   9   message of this is the speech that platform says is worthy

09:11:46   10  of presentation, to quote Hurley, that's all squarely

09:11:49   11  protected.

09:11:49   12          Now, to terms of the algorithms, first of all,

09:11:53   13  using technology to engage in First Amendment-protected

09:11:55   14  editorial discretion doesn't change the First Amendment

09:11:58   15  analysis whatsoever.  All the courts that have considered

09:12:01   16  this have held that.  That's our preliminary injunction

09:12:04   17  motion at page 17, collecting cases that, also, the

09:12:08   18  Northern District of Florida's opinion in joining similar

09:12:10   19  Florida law held the same, regardless.  Humans program the

09:12:15   20  computer algorithms that are enforcing the content

09:12:19   21  moderation policies.  Also, just to put this -- just view

09:12:24   22  the scale of what social media platforms actually do.  We

09:12:28   23  are talking about billions of pieces of content.

09:12:32   24          For instance, this is in our declaration number

09:12:37   25  three from YouTube at paragraph 56:  In quarter two of

| | | |
|--|--|--|
| 09:12:42 | 1 | 2020 alone, so three months this year, YouTube removed 9.5 |
| 09:12:46 | 2 | million videos and over 1.16 billion, with a B, comments. |
| 09:12:54 | 3 | The scale on which House Bill 20 and the defendant's |
| 09:13:00 | 4 | position that somehow algorithms take this out of First |
| 09:13:03 | 5 | Amendment protection would be -- it's staggering.  This is |
| 09:13:07 | 6 | just another example of how this bill is designed to |
| 09:13:11 | 7 | destroy and to limit what social media platforms can |
| 09:13:19 | 8 | actually be doing. |
| 09:13:19 | 9 | So whether we're talking about editorial |
| 09:13:22 | 10 | discretion and all of the protection it gets -- Manhattan |
| 09:13:26 | 11 | Community from the Supreme Court recently said the private |
| 09:13:28 | 12 | entities' rights to exercise editorial control over speech |
| 09:13:30 | 13 | and speakers on their properties or platforms is |
| 09:13:34 | 14 | protected. |
| 09:13:40 | 15 | If I can then turn to -- and that is our primary |
| 09:13:43 | 16 | argument, by the way.  Editorial discretion, no matter |
| 09:13:45 | 17 | even if this was a content-neutral law, First Amendment |
| 09:13:48 | 18 | protects that.  But it gets worse for the defendant |
| 09:13:54 | 19 | because this is a content- and speaker-based law.  Indeed, |
| 09:13:56 | 20 | it's a viewpoint-based law.  And I want to tackle this |
| 09:13:58 | 21 | point head on because there's some dispute in the briefing |
| 09:14:02 | 22 | about what viewpoint means and what viewpoint-based versus |
| 09:14:07 | 23 | content-based means. |
| 09:14:08 | 24 | So what the Fifth Circuit in Robinson said, |
| 09:14:11 | 25 | citing the Supreme Court's Mattel decision, is that if |

09:14:14   1   something is a subjective judgment that the content of

09:14:18   2   protected speech is offensive or inappropriate, that is a

09:14:22   3   viewpoint-based judgment.  In other words, if the judgment

09:14:25   4   is, this is speech that's offensive or inappropriate,

09:14:29   5   therefore, social media platform doesn't want to

09:14:32   6   disseminate it, that's viewpoint-based.  This goes back to

09:14:35   7   the Supreme Court's decision in <u>R.A.V. vs. City of St.</u>

09:14:38   8   <u>Paul</u>, which found a hate speech policy to be

09:14:41   9   viewpoint-based.

09:14:42  10          So under the plain text of House Bill 20, the

09:14:45  11   term "viewpoint" if it means what the Supreme Court and

09:14:50  12   Fifth Circuit say it means, then anytime a social media

09:14:52  13   platform enforces a hate speech policy, that's a judgment

09:14:56  14   that speech is offensive and inappropriate, that's a

09:14:58  15   viewpoint-based determination, and Section 7 says covered

09:15:02  16   platforms can't do that.  Now, defendant's brief tries to

09:15:07  17   say that, well, that's some aspects of it.  At least

09:15:10  18   racism, for instance, might be viewpoint.

09:15:11  19          Now, they don't take a position on holocaust

09:15:14  20   denial.  They don't take a position on pro-Nazi speech.

09:15:17  21   They don't take a position on misinformation.  I would

09:15:20  22   assume they're going to concede that that is all

09:15:22  23   prohibited viewpoint discrimination, but I'll let the

09:15:25  24   defendant speak for himself.  Regardless, we've given

09:15:27  25   examples in our reply brief of even if, first of all,

09:15:29  1  racism is hate speech, it is viewpoint-based.  But even if

09:15:32  2  we're wrong about that, there's all sorts of other content

09:15:35  3  moderation that platforms would want to do.  And so, in

09:15:37  4  some ways, this debate about what precisely the line is

09:15:41  5  between viewpoint and content moderation, in some ways,

09:15:44  6  doesn't matter because whenever House Bill 20 would

09:15:47  7  prohibit viewpoint-based editorial discretion, that's

09:15:53  8  unconstitutional.

09:15:55  9        The reply brief, we gave examples of speech that,

09:15:57  10  you know, a terrorist organization, ISIS, is better than

09:16:01  11  America.  That's a viewpoint, it's a political viewpoint.

09:16:05  12  House Bill 20 says social media platforms have to

09:16:07  13  disseminate that.  We also gave examples of the content of

09:16:10  14  a terrorist video, an ISIS video, or even an Adolf Hitler

09:16:14  15  speech.  That content in some contexts, platforms

09:16:18  16  absolutely may want to moderate and not have to

09:16:20  17  disseminate, but in other contexts about newsworthy or

09:16:24  18  educational events, maybe they want to, but this also

09:16:27  19  shows why this is viewpoint-based.

09:16:29  20        House Bill 20 is also content-based because it

09:16:32  21  has three different exceptions.  It doesn't include

09:16:35  22  websites that are primarily of news, sports and

09:16:38  23  entertainment.  That's a content-based exception that

09:16:41  24  triggers strict scrutiny.  Also, this is a law that

09:16:45  25  singles out a small number of entities for onerous

09:16:51   1   treatment.  The Fifth Circuit has said that's inherently

09:16:53   2   suspect.  That's the Time Warner case.  This bill only

09:16:55   3   targets social media platforms with only 50 million active

09:16:59   4   U.S. users per month.  So it excludes some social media

09:17:02   5   platforms, like Parler and Gab and Gettr.  It includes

09:17:07   6   Facebook, YouTube, Pinterest, TikTok, and all sorts of

09:17:12   7   others.  Drawing that line and disfavoring treatment for a

09:17:16   8   small set of entities is inherently suspect under the

09:17:19   9   First Amendment.

09:17:20   10            Your Honor, I mentioned before, the defendant has

09:17:24   11  posited two interests here and neither is sufficient.  The

09:17:29   12  first interest they've posited is that there is a supposed

09:17:33   13  government interest in the free flow of information among

09:17:36   14  the public forums that are common carrier social media

09:17:40   15  platforms.  This is wrong in at least two ways.  First of

09:17:43   16  all, private platforms are not public forums.  Private

09:17:48   17  platforms are not government speech.  I'm sorry, are not

09:17:50   18  government property.

09:17:52   19            The public forum analysis is limited to when

09:17:57   20  government places restrictions on the use of its property

09:18:02   21  that's Krishna.  The Arkansas Education case said the

09:18:05   22  public forum analysis is limited to the historic confines

09:18:08   23  of what has been held in public trust.  In other words,

09:18:12   24  the public sidewalk, the public square.  Social media

09:18:15   25  platforms are privately owned.  They have never been held

| | | |
|---|---|---|
| 09:18:18 | 1 | in trust for the public. |
| 09:18:23 | 2 | Even if putting that aside that maybe the |
| 09:18:26 | 3 | defendant wants to take back its label of public forum, |
| 09:18:29 | 4 | turning to common carrier.  Common carrier labels are |
| 09:18:33 | 5 | irrelevant to the First Amendment analysis, and we know |
| 09:18:35 | 6 | this from Pacific Gas, Denver Area and Turner.  Pacific |
| 09:18:42 | 7 | Gas involved a state-sanctioned monopoly common carrier, |
| 09:18:46 | 8 | and the Supreme Court vindicated that common carrier's |
| 09:18:49 | 9 | First Amendment rights to not disseminate other speech |
| 09:18:53 | 10 | through its own platform.  Denver Area held cable |
| 09:18:57 | 11 | operators retain editorial discretion over the freedom to |
| 09:18:59 | 12 | pick and choose cable programming. |
| 09:19:01 | 13 | Turner recognized that cable operators also had |
| 09:19:06 | 14 | First Amendment rights, which is exactly why First |
| 09:19:08 | 15 | Amendment heightened scrutiny applied.  Now, there, that |
| 09:19:11 | 16 | was a content-neutral law, which is why only intermediate |
| 09:19:16 | 17 | scrutiny applied.  Of course, here, we have a |
| 09:19:17 | 18 | content-based law.  Also, that was a very unique fact |
| 09:19:19 | 19 | pattern where the law required carrying just a minimum |
| 09:19:22 | 20 | number of broadcast television channels.  So we're not |
| 09:19:25 | 21 | talking about all comers.  We're not talking about all |
| 09:19:27 | 22 | channels.  And there was also a physical bottleneck from |
| 09:19:31 | 23 | the physical cable that needed to be laid to be able to |
| 09:19:33 | 24 | operate those systems that would have destroyed an entire |
| 09:19:37 | 25 | speech medium that is free broadcast TV, that was the only |

09:19:40 1   television that 40 percent of Americans had, and the Fifth

09:19:44 2   Circuit's been clear that's the limits of the Turner

09:19:46 3   holding.

09:19:47 4        If there were any doubt about it, <u>Reno vs. ACLU</u>

09:19:51 5   said that this broadcast-specific television analysis has

09:19:54 6   no place on the internet.  That's 512 U.S. at 868 to 69.

09:19:59 7   So when you have Pacific Gas and you have Turner and you

09:20:02 8   have Denver Area on the books, Justice Thomas in his

09:20:05 9   separate opinion in Denver Area was absolutely right.

09:20:08 10  Labeling a law, quote, a common carrier scheme has no real

09:20:11 11  First Amendment consequences, unquote.

09:20:15 12       Put it slightly different, to quote Hurley,

09:20:19 13  government cannot declare expression dissemination as a

09:20:22 14  public accommodation that, therefore, can be coopted by

09:20:26 15  the government.  Even if the defendant was to try to

09:20:28 16  package this into a, well, we want to make sure that

09:20:31 17  certain voices are heard more, that itself in a score of

09:20:36 18  Supreme Court cases is not a sufficient governmental

09:20:38 19  interest to override First Amendment rights.  That's

09:20:40 20  <u>Buckley vs. Valeo</u>, and Tornillo, and Hurley, and Pacific

09:20:45 21  Gas.  Leveling is not a sufficient government interest.

09:20:47 22  That's Arizona Free Enterprise.

09:20:49 23       So the only interest, then, that the defendant is

09:20:52 24  left arguing is the second interest they bring up, which

09:20:55 25  is a general interest in antidiscrimination laws.  But the

09:20:59  1  Supreme Court in Hurley squarely rejected that, saying
09:21:02  2  that forbidding acts of discrimination among expressive
09:21:04  3  viewpoints is, quote, a decidedly fatal objective,
09:21:08  4  unquote, for the First Amendment's free speech commands.
09:21:12  5  That is not a sufficient basis on which government can
09:21:14  6  compel speech and pierce into editorial discretion.
09:21:17  7        Now, your Honor, let's say they can clear the
09:21:19  8  interest.  Let's say they have some sufficient
09:21:22  9  governmental interest.  We think strict scrutiny applies.
09:21:25 10  But even if exacting scrutiny or intermediate scrutiny
09:21:30 11  applies, the law still would have to be properly tailored
09:21:32 12  and it's not.  And we know that because the state could
09:21:35 13  have created its own government-run social media platform.
09:21:38 14  The legislature rejected doing that.
09:21:40 15        Also, this isn't tailored at all.  When House
09:21:44 16  Bill 20 size cut off to 50 million monthly users, that's
09:21:48 17  not at all tailored to the interest they're saying.  If
09:21:50 18  they actually would have an interest in, you know,
09:21:53 19  disseminating as much speech as possible on
09:21:55 20  antidiscrimination, then why does this only apply to the
09:21:57 21  biggest social media platforms out there?  To be clear, if
09:21:59 22  this were applying to all social media platforms, we still
09:22:03 23  believe that's unconstitutional as an infringement of
09:22:05 24  editorial discretion, but that just shows the many ways in
09:22:08 25  which the law is invalid.

09:22:10   1          Your Honor, if I can turn to the disclosure and

09:22:13   2   operational requirements because I think it's very

09:22:16   3   important that Section 2 not be lost in the debate.

09:22:19   4   Section 7, of course, is the provision that says you can't

09:22:22   5   do viewpoint-based content moderation.  Section 2, though,

09:22:24   6   has a slew of onerous operational and disclosure

09:22:28   7   requirements.  I also want to be clear about our position

09:22:30   8   on this.

09:22:30   9          Our position is that strict scrutiny or at least

09:22:35  10   exacting scrutiny, the same level that would apply in the

09:22:37  11   campaign finance disclosure context should apply because

09:22:41  12   this, too, burdens the exercise of editorial discretion.

09:22:45  13   It compels speech, it's also content-based.  For all

09:22:50  14   reasons I just mentioned, there's no sufficient government

09:22:52  15   interest.  This isn't tailored.

09:22:53  16          Just because it doesn't outright ban expression,

09:23:00  17   it absolutely still burdens it.  And we know from the

09:23:03  18   Playboy case, and Sorrell case, and Herbert vs. Lando that

09:23:07  19   you can burden First Amendment rights just like you can

09:23:09  20   even if you were just prohibiting.  But let's say we're

09:23:12  21   even wrong about strict scrutiny or exacting scrutiny

09:23:15  22   applying, at minimum, the intermediate scrutiny that would

09:23:19  23   apply in the commercial speech doctrine should apply.

09:23:22  24   Now, we talked about before, the commercial speech

09:23:23  25   doctrine doesn't apply.

09:23:24  1        So again, this is a backup to a backup argument.
09:23:27  2   But finally, as a backup to that third backup argument,
09:23:31  3   only then would the Court reach the Zauderer or NIFLA test
09:23:35  4   of whether these requirements are only purely factual,
09:23:40  5   noncontroversial, or unduly burdensome.  So again, your
09:23:43  6   Honor, we don't believe that you have to reach that test.
09:23:45  7   We've made the arguments because these are very unduly
09:23:49  8   burdensome.  But I think the state would have to satisfy
09:23:52  9   strict scrutiny or at least exacting scrutiny before you
09:23:54 10   even get to that.
09:23:56 11        But let's assume, your Honor, that you would get
09:23:59 12   to are these only purely factual, noncontroversial and
09:24:05 13   unduly burdensome.  These are very burdensome.  The
09:24:07 14   un-rebutted evidence that we cited in our reapply brief
09:24:09 15   is, these are going to require global changes to the
09:24:12 16   platforms' operations and completely redoing how editorial
09:24:18 17   discretion is performed.  All of these algorithms that the
09:24:21 18   various companies have spent years not only putting all
09:24:24 19   sorts of resources into, but tailoring to provide their
09:24:26 20   expressive communities and disseminating speech that they
09:24:29 21   deem is worthy of presentation.
09:24:31 22        I mean, imagine that there had been a slew of
09:24:34 23   these disclosure requirements for bookstores, or art
09:24:36 24   shows, or comedy clubs, or cable TV operators picking
09:24:40 25   their stations, newspaper op-ed boards.  That is an

09:24:45 1 incredible intrusion into the exercise of First Amendment

09:24:48 2 rights.  But I'd like to go provision by provision just so

09:24:53 3 your Honor has directly in front of you how these

09:24:57 4 provisions are so onerous.  I'm going to start with the

09:24:59 5 notice complaint and appeal process.  This is Business and

09:25:03 6 Commerce Code 120.101 to 104.

09:25:08 7         These provisions would require social media

09:25:11 8 platforms to give a notice and explanation each time they

09:25:15 9 remove content.  Each time.  Now, we're talking about all

09:25:18 10 content.  Mentioned before, our declaration three,

09:25:23 11 paragraph 56 from YouTube.  YouTube removed in three

09:25:27 12 months this year, again, 9.5 million videos and 1.16

09:25:32 13 billion comments.  What this provision says is, in each of

09:25:37 14 those instances, over a billion times, over a three-month

09:25:41 15 period, every single time, YouTube would have had to

09:25:44 16 provide notice to every single one of those users and an

09:25:47 17 explanation about why that content was being taken down.

09:25:51 18 Over one billion times.  That is a massive, massive

09:25:55 19 infringement on First Amendment rights.

09:25:58 20         And that's not all.  Then there's a complaint

09:26:03 21 procedure that's required; and then, the social media

09:26:05 22 platforms have to within 48 hours process these user-based

09:26:08 23 complaints.  That's going to be effectively a heckler's

09:26:11 24 veto.  If an individual complains about it and they have

09:26:14 25 this scale of complaints, what's a social media platform

| | | |
|---|---|---|
| 09:26:17 | 1 | supposed to do if they're going to have to process this |
| 09:26:19 | 2 | within two days?  After that, then there's an appeal |
| 09:26:21 | 3 | process that they're supposed to resolve in two weeks. |
| 09:26:24 | 4 | And then, they have to provide a notice of that decision |
| 09:26:27 | 5 | and reasons for any reversal.  I don't know how big of a |
| 09:26:33 | 6 | legal department and a compliance department you need to |
| 09:26:35 | 7 | do this, but we have testimony, including from Facebook -- |
| 09:26:39 | 8 | this is the Potts deposition -- it would be impossible to |
| 09:26:41 | 9 | comply with this three days from now, which is when House |
| 09:26:44 | 10 | Bill 20 is supposed to take effect.  So that's the notice |
| 09:26:47 | 11 | complaint and appeal process. |
| 09:26:48 | 12 | Go to the public disclosure provision.  This is |
| 09:26:51 | 13 | 120.051.  Social media platforms are required to publish, |
| 09:26:56 | 14 | quote, information regarding content management, data |
| 09:27:00 | 15 | management and business practices, unquote.  That's the |
| 09:27:03 | 16 | requirement.  They have to publish business practices. |
| 09:27:07 | 17 | What does that mean?  Well, the statute doesn't tell you. |
| 09:27:11 | 18 | What it says is then there's a non-exhaustive list |
| 09:27:14 | 19 | including how a platform curates content, places content, |
| 09:27:19 | 20 | moderates content, its algorithms, which are most likely |
| 09:27:23 | 21 | trade secrets, and performance data. |
| 09:27:24 | 22 | Again, this is an incredible intrusion on |
| 09:27:27 | 23 | editorial discretion, and it's going to give bad actors a |
| 09:27:30 | 24 | roadmap to evade whatever editorial discretion could |
| 09:27:33 | 25 | possibly be left by some of the exceptions that House Bill |

| | | |
|---|---|---|
| 09:27:36 | 1 | 20 carves out in its content-based manner. |
| 09:27:38 | 2 | I'll turn to the publishing acceptable use |
| 09:27:42 | 3 | policy.  This is 120.052.  This requires social media |
| 09:27:46 | 4 | platforms to reasonably inform users about the types of |
| 09:27:50 | 5 | content allowed and explain the steps that they ensure |
| 09:27:53 | 6 | compliance.  Now, look, this might not sound as bad as |
| 09:27:56 | 7 | some of the other provisions, but what does reasonably |
| 09:27:58 | 8 | inform mean?  What exact steps are supposed to be taken? |
| 09:28:03 | 9 | This is vague and it also invites arbitrary enforcement. |
| 09:28:08 | 10 | It would be one thing if the defendant were |
| 09:28:09 | 11 | saying, we believe that all covered social media platforms |
| 09:28:12 | 12 | are complying with this, and we're not going to enforce |
| 09:28:15 | 13 | this in a way that would, you know, be an onerous burden. |
| 09:28:18 | 14 | So, you know, yeah, we're -- we have not heard that from |
| 09:28:23 | 15 | the defendant.  And I'm not sure the defendant today is |
| 09:28:25 | 16 | going to disavow enforcement of this law.  But otherwise, |
| 09:28:28 | 17 | even under the NIFLA test, these editorial policies are |
| 09:28:31 | 18 | not factual.  They're not noncontroversial.  These are |
| 09:28:35 | 19 | judgments, not facts.  Also, this is a lot more than just |
| 09:28:38 | 20 | a few lines of text, like in NIFLA.  And NIFLA invalidated |
| 09:28:42 | 21 | that compelled speech requirement. |
| 09:28:44 | 22 | Finally, there's the biannual transparency |
| 09:28:47 | 23 | report.  This is 120.053.  This requires voluminous detail |
| 09:28:50 | 24 | on top of everything else that we've already talked about. |
| 09:28:53 | 25 | Social media platforms would need to publicly state |

09:28:56  1  through compelled speech the total number of instances

09:28:59  2  they were alerted to policy-violating content, broken down

09:29:03  3  by how they were alerted.  The number of instances that

09:29:05  4  they took action categorized by the rule violated, as in

09:29:09  5  they have to be reporting their internal policies and

09:29:12  6  broken down by how much every provision of their internal

09:29:15  7  policy is one of these instances where they took action.

09:29:18  8  The country of the user who provided the content, and this

09:29:20  9  is the kicker, a description of each tool, practice,

09:29:25  10  action, or technique used in enforcing the acceptable use

09:29:30  11  policy.  Again, a description of each action.  Every time

09:29:34  12  one of those 1.16 billion comments just for YouTube, just

09:29:37  13  for a three-month period this year, they would have to

09:29:40  14  provide a description of each action, tool, practice or

09:29:43  15  technique there.  This is a sweeping law.

09:29:50  16       Your Honor, I will briefly turn to Section 230

09:29:52  17  preemption and then, the commerce clause.  What I would

09:29:54  18  say as an initial matter about Section 230 is, I don't

09:29:58  19  believe that this is a case where constitutional avoidance

09:30:02  20  would suggest that the statutory argument needs to be

09:30:05  21  reached before the First Amendment argument, and there's

09:30:07  22  two reasons for that.

09:30:08  23       First of all, we have raised the exception 230

09:30:13  24  preemption argument for Section 7, the viewpoint-based

09:30:15  25  prohibition.  We have not raised the Section 230

09:30:18  1  preemption argument for Section 2, all the operational

09:30:19  2  disclosure arguments.  So you'd have to reach the First

09:30:21  3  Amendment issues regarding Section 2.  And those First

09:30:24  4  Amendment issues are going to include:  Do social media

09:30:28  5  platforms have protected editorial discretion?  They do

09:30:31  6  under Hurley and Tornillo and Pacific Gas.  And you're

09:30:34  7  going to have to also be evaluating it's the same social

09:30:39  8  media platform definition that's content-based that

09:30:41  9  trigger strict scrutiny.

09:30:42  10      So your Honor would have to address those

09:30:44  11  questions for Section 2, so there'd be nothing left to

09:30:46  12  then avoid in getting to the First Amendment analysis on

09:30:50  13  Section 7.  Regardless, turning to Section 230, defendant

09:30:54  14  has said that we lack a cause of action to raise Section

09:30:57  15  230 presumption.  That's not right.  We, of course, can

09:30:59  16  raise an Ex Parte: Young federal equity cause of action to

09:31:02  17  enjoin state officials from violating federal law

09:31:06  18  prospectively.  That's the Evac case from the Fifth

09:31:08  19  Circuit.

09:31:08  20      We also have a 42 U.S.C. 1983 cause of action.

09:31:12  21  We cite Golden State for that proposition.  Your Honor

09:31:14  22  need not decide that issue now, but we clearly have a

09:31:17  23  cause of action.  I mentioned Doe vs. MySpace, the Fifth

09:31:22  24  Circuit has said, quote, Section 230 specifically provides

09:31:24  25  liability for decisions relating to the monitoring,

09:31:27  1  screening and deletion of content from its network,

09:31:30  2  actions quintessentially related to a publisher's role.

09:31:37  3  Also, the text of 230(c)(2), protects content moderation

09:31:41  4  that a platform subjectively considers to be

09:31:43  5  objectionable.  And objectionable includes, again,

09:31:45  6  offensive and inappropriate.  These are viewpoint-based

09:31:47  7  concepts.

09:31:48  8          Defendant says, well, the ejusdem generis canon

09:31:52  9  should apply, but importantly, defendant does not offer an

09:31:55  10  alternative interpretation of what the statute should be.

09:31:58  11  The initial terms that it say need to be read to inform

09:32:01  12  what objectionable means don't offer a readily

09:32:04  13  identifiable genus.  The terms "obscene," "lewd,"

09:32:08  14  "lascivious," "filthy," "excessively violent,"

09:32:09  15  "harassing," there's no concept other than a broad

09:32:13  16  definition of objectionable they could possibly obtain

09:32:19  17  there.

09:32:19  18          Also, the defendant says 230 somehow would only

09:32:24  19  extend to damages claims.  No court has ever accepted

09:32:27  20  that.  230(e)(3) clearly says no cause of action, a

09:32:30  21  lawsuit can be brought under 230.  And the CDA provides

09:32:34  22  immunity from suit.  That's the Nemet case that we cited.

09:32:37  23          On the commerce clause provision, your Honor, we

09:32:41  24  think that this is clearly a First Amendment violation.

09:32:43  25  But if somehow the Court would need to get to the commerce

09:32:49  1   clause issues -- and we would recommend that the Court do

09:32:53  2   address all of the arguments we've raised -- is we don't

09:32:55  3   think the litigation is going to end after this phase.

09:33:00  4   The defendant doesn't dispute that this would compel

09:33:03  5   social media platforms to continue operating in Texas,

09:33:05  6   even if they would rather leave the state and not submit

09:33:07  7   to this onerous law.  To be very clear, social media

09:33:10  8   platforms want to be providing their beneficial services

09:33:14  9   to Texans without having to be burdened by this

09:33:18  10  unconstitutional law.

09:33:19  11        But the Second Circuit case we cited from -- or,

09:33:23  12  sorry, the National Electrical Manufacturers case from the

09:33:26  13  Second Circuit said the commerce clause prohibits states

09:33:28  14  from denying companies the choice to stay or leave.  And

09:33:30  15  yet, that's exactly what this provision would do by

09:33:32  16  prohibiting or denying access based on a user's geographic

09:33:37  17  location in this state or any part of the state.

09:33:39  18        Also, House Bill 20 would require the worldwide

09:33:42  19  dissemination of speech because this isn't just limited to

09:33:45  20  the Texas geographical boundaries.  Instead, it creates an

09:33:48  21  entitlement for Texas users to receive expression from

09:33:51  22  anywhere in the world that is not viewpoint-based

09:33:54  23  moderation of others' viewpoints.  This is a clear

09:33:58  24  extraterritorial regulation.  I mentioned the preliminary

09:34:01  25  injunction factors.  Loss of First Amendment freedoms for

09:34:03  1  even a moment is irreparable.  State has no interest in
09:34:06  2  enforcing an unlawful law.  And injunctions protecting the
09:34:09  3  First Amendment freedoms are always in the public
09:34:12  4  interest.  This law is facially invalid, it's overbroad.
09:34:15  5  It is an incredible intrusion on First Amendment-protected
09:34:18  6  editorial discretion.  It's content-based, it's speaker-
09:34:21  7  based, it's viewpoint-based.  Strict scrutiny is triggered
09:34:24  8  in all sorts of ways.  The law is vague.  Even then, the
09:34:27  9  state doesn't have a sufficient interest.  The two
09:34:28  10 interests it posited both have been rejected by the
09:34:31  11 Supreme Court.  The law is not at all tailored.  Common
09:34:34  12 carrier doesn't matter at all.  Common carriers retain
09:34:37  13 First Amendment rights.
09:34:38  14         Your Honor, with that, unless you have any
09:34:40  15 further questions.
09:34:41  16         THE COURT:  I do have one question.  Are there
09:34:44  17 any distinctions between any of your constituent members
09:34:50  18 that are relevant and would require a development or
09:34:56  19 factfinding prior to any imposition of relief in the case?
09:35:01  20         MR. KELLER:  No, your Honor.  Our legal arguments
09:35:03  21 are purely legal questions.  Tornillo is a facial
09:35:06  22 challenge case.  NIFLA's a facial challenge case.  There
09:35:09  23 are no legal arguments that we are raising that say, well,
09:35:13  24 since Facebook does editorial discretion in a certain way
09:35:17  25 and YouTube does it in a different way, that somehow that

09:35:20  1  there's -- there's a constitutional distinction that it

09:35:22  2  would be constitutional in one application and not the

09:35:25  3  other.  Rather, across the board, whenever Section 7 says

09:35:28  4  you cannot do viewpoint-based content moderation on

09:35:33  5  covered social media platforms, that's unlawful in all

09:35:35  6  applications.  Also, it's overbroad and the overbreadth

09:35:38  7  doctrine is another aspect of this that shows that there

09:35:40  8  would not be any factual development that's needed for a

09:35:43  9  particular social media platform.

09:35:45  10        We clearly have standing.  We're the object --

09:35:48  11  social media platforms are the object of this regulation.

09:35:51  12  They want to exercise viewpoint-based content moderation

09:35:55  13  at times, and House Bill 20 prohibits them from doing

09:35:57  14  that.  And they would have all sorts of costs in trying to

09:36:01  15  modify their systems to comply with this burdensome,

09:36:04  16  onerous law.

09:36:04  17        The irreparable injury collapses back to the

09:36:07  18  First Amendment analysis.  So you don't even need factual

09:36:10  19  development there.  So these are facial challenges.  The

09:36:11  20  law is unconstitutional on all applications or, at

09:36:14  21  minimum, it's overbroad.  There's no facts needed to

09:36:17  22  develop that that are specific to any platform versus a

09:36:21  23  different one.

09:36:21  24        THE COURT:  I'm not persuaded that the disclosure

09:36:25  25  requirements of the bill violate the First Amendment.

09:36:27   1   Have you advanced any other theory that would support the

09:36:33   2   relief that you're requesting?

09:36:36   3          MR. KELLER:  So the commerce clause arguments

09:36:38   4   would still apply to disclosure requirement.  But, your

09:36:42   5   Honor, what I would also say about, you know, the

09:36:45   6   disclosure requirements and the operational requirements

09:36:47   7   is, we urge your Honor to find First Amendment violations,

09:36:52   8   but because of all the onerous burden of having to do

09:36:55   9   notice and explanation, appellate review, disclosing all

09:36:58   10  of this information when there is no sufficient

09:37:01   11  governmental interest.

09:37:03   12         But to take your Honor's hypothetical on its

09:37:04   13  terms, if you were to say that there wasn't a First

09:37:07   14  Amendment violation, the commerce clause arguments

09:37:09   15  absolutely would still apply.  And again, this compels

09:37:12   16  social media platforms to remain operating in Texas; it

09:37:14   17  compels the worldwide dissemination speech; and it would

09:37:19   18  submit these companies to the extraterritorial regulation,

09:37:24   19  including Section 2's disclosure and operational

09:37:27   20  requirements.

09:37:27   21         THE COURT:  Thank you very much.

09:37:28   22         MR. KELLER:  I'll reserve the remaining balance

09:37:30   23  of my time for rebuttal.  Thank you.

09:37:32   24         THE COURT:  Thank you.

09:37:37   25         Ms. Corbello.

| | | |
|---|---|---|
| 09:37:41 | 1 | MS. CORBELLO:  Good morning, your Honor. |
| 09:37:44 | 2 | THE COURT:  Good morning. |
| 09:37:46 | 3 | MS. CORBELLO:  Your Honor, before I start, I just |
| 09:37:55 | 4 | want to make the Court aware that my co-counsel, Ben |
| 09:37:59 | 5 | Lyles, will be handling the commerce clause and preemption |
| 09:38:02 | 6 | clause portions of this argument.  If it's all right with |
| 09:38:05 | 7 | the Court, I'll be doing everything else. |
| 09:38:06 | 8 | THE COURT:  Great.  Thank you. |
| 09:38:07 | 9 | MS. CORBELLO:  H.B. 20 is constitutional because |
| 09:38:14 | 10 | it prohibits discrimination, discriminatory practices by |
| 09:38:19 | 11 | common carriers, and the platforms are common carriers. |
| 09:38:22 | 12 | As much as plaintiffs want to rely on a single line from |
| 09:38:25 | 13 | Justice Thomas' concurring opinion in Denver Area |
| 09:38:29 | 14 | Education and Telecommunications Consortium, that line |
| 09:38:33 | 15 | simply has no bearing in this case.  First reason why. |
| 09:38:36 | 16 | It's taken completely out of context within the scope of |
| 09:38:40 | 17 | that concurring opinion. |
| 09:38:42 | 18 | In that discussion that Justice Thomas is having, |
| 09:38:44 | 19 | he makes that comment -- he is making a comparison between |
| 09:38:49 | 20 | leased access channels and public access channels. |
| 09:38:52 | 21 | Because what the plaintiffs have done is tried to make a |
| 09:38:55 | 22 | point that leased access channels somehow have a lesser |
| 09:38:59 | 23 | right to decline to carry indecent channels because they |
| 09:39:02 | 24 | are common carriers.  And so, what Justice Thomas was |
| 09:39:05 | 25 | saying at that point was no.  Just simply because we name |

09:39:09  1   leased access channels common carriers doesn't mean that
09:39:11  2   they are any different from public access channels where
09:39:14  3   we've already said you don't have to carry indecent
09:39:17  4   channels that you don't want to.  It's the same thing.  It
09:39:19  5   has -- common carrier has no consequence for the First
09:39:22  6   Amendment when it comes to forcing that common carrier to
09:39:27  7   engage in speech it doesn't want to.
09:39:28  8        Here, the fundamental difference is, H.B. 20 does
09:39:31  9   not do that.  H.B. 20 prohibits viewpoint discrimination.
09:39:35  10  It does not prohibit content moderation.  That is clear
09:39:38  11  from the fact that it has an entire provision dictating
09:39:41  12  that the companies should create acceptable use policies
09:39:45  13  to the extent they don't already have them -- and it
09:39:47  14  appears they all already do -- and then, moderate their
09:39:50  15  content accordingly, again, as they already do.
09:39:53  16       It is only once the companies have decided on
09:39:56  17  their own what categories of content they want to moderate
09:40:00  18  and to prohibit that they can't then go back and
09:40:04  19  discriminate based on viewpoint.  It's a very common law
09:40:07  20  under the common carrier doctrine that common carriers
09:40:11  21  cannot discriminate against their users.
09:40:13  22       And so, contrary to what plaintiffs are talking
09:40:18  23  about, the Denver Area single quote from Justice Thomas
09:40:21  24  simply has no bearing here.  And strikingly, they don't
09:40:28  25  mention that Justice Thomas also authored the concurring

| | | |
|---|---|---|
| 09:40:32 | 1 | in <u>Biden vs. Knight First Amendment Institute at Columbia</u> |
| 09:40:34 | 2 | <u>University</u>, where he clearly recognized that the common |
| 09:40:37 | 3 | carrier doctrine has at least some bearing on First |
| 09:40:40 | 4 | Amendment rights, particularly when it comes to social |
| 09:40:43 | 5 | media platforms.  He engaged in a lengthy discussion of |
| 09:40:46 | 6 | all the various ways in which a common carrier can be |
| 09:40:49 | 7 | determined:  Market power, availability to the public, |
| 09:40:53 | 8 | countervailing government benefits. |
| 09:40:56 | 9 | And then, he said based on that, when someone is |
| 09:40:59 | 10 | deemed a common carrier, when a platform is deemed a |
| 09:41:02 | 11 | common carrier, it's going to be bound to serve -- quote, |
| 09:41:04 | 12 | bound to serve all customers alike without discrimination, |
| 09:41:08 | 13 | unquote.  So surely Justice Thomas has recognized that |
| 09:41:14 | 14 | common carrier status does, indeed, have First Amendment |
| 09:41:15 | 15 | consequences.  It doesn't in terms of forcing speech, but |
| 09:41:18 | 16 | it does in terms of prohibiting discrimination. |
| 09:41:20 | 17 | And just to go over the common carrier in much |
| 09:41:23 | 18 | more depth than plaintiffs want to, platforms are -- the |
| 09:41:27 | 19 | platforms are common carriers here in this function, their |
| 09:41:31 | 20 | function as hosts of user-generated content.  That is the |
| 09:41:33 | 21 | only function that this court has to declare them common |
| 09:41:37 | 22 | carriers in.  It does not have to declare them common |
| 09:41:39 | 23 | carriers in every function that they operate in.  It |
| 09:41:41 | 24 | doesn't have to declare them common carriers for when they |
| 09:41:43 | 25 | post their own speech on their platforms.  Only when |

| | | |
|---|---|---|
| 09:41:46 | 1 | hosting user-generated content are they operating as |
| 09:41:49 | 2 | common carriers. |
| 09:41:49 | 3 | First reason why is market power.  There is a |
| 09:41:53 | 4 | litany of cases that talk about market power when it comes |
| 09:41:57 | 5 | to common carriers, and Justice Thomas recognized that |
| 09:42:00 | 6 | that market power exists here for these platforms in <u>Biden</u> |
| 09:42:04 | 7 | <u>vs. First Amendment Knight</u>.  It can't be seriously |
| 09:42:07 | 8 | disputed, and as the Court might notice, it hasn't been |
| 09:42:10 | 9 | seriously disputed. |
| 09:42:10 | 10 | The second factor that this court can look at -- |
| 09:42:13 | 11 | and by the way, this is a fact-intensive inquiry.  All the |
| 09:42:17 | 12 | cases dictate that this is something that is |
| 09:42:20 | 13 | fact-intensive.  The Southern District in 2020 had the |
| 09:42:24 | 14 | common carrier issue and dictated that it was a |
| 09:42:27 | 15 | fact-intensive inquiry.  This is something that requires |
| 09:42:30 | 16 | evidence from all the platforms, requires a factual |
| 09:42:34 | 17 | analysis that simply isn't present in plaintiffs' |
| 09:42:37 | 18 | preliminary injunction motion. |
| 09:42:39 | 19 | The second fact that this court should require |
| 09:42:43 | 20 | evidence on and should require actual factual assertions |
| 09:42:47 | 21 | on are benefits from the government.  Plaintiffs have |
| 09:42:51 | 22 | stood up here today and said that Section 230 is not a |
| 09:42:54 | 23 | benefit that they receive from the government.  They've |
| 09:42:56 | 24 | said that it has no bearing in this case.  Section 230 is |
| 09:43:00 | 25 | undoubtedly a countervailing benefit that the companies |

09:43:05  1  receive that deem them common carriers.  Many common

09:43:08  2  carriers have similar freedom from liability for

09:43:13  3  third-party speech or actions that they host in their

09:43:16  4  functions as common carriers.

09:43:25  5          This court asked plaintiffs' counsel a moment ago

09:43:29  6  to talk about this argument of wanting it both ways.

09:43:32  7  Section 230 and this argument against H.B. 20 is surely

09:43:36  8  wanting it two ways.  Under Section 230, the platforms

09:43:39  9  fought long and hard through their lobbying firms with

09:43:43  10  this point of we are not liable for this speech because we

09:43:46  11  aren't engaging in this speech.  We aren't expressing

09:43:48  12  anything when we host user-generated content, and we don't

09:43:51  13  take ownership of anything that is being posted on our

09:43:54  14  platforms by our users.

09:43:55  15          And now, what this court inherently has to find

09:43:59  16  if it rules H.B. 20 unconstitutional is that the platforms

09:44:02  17  are engaging in this speech.  They are agreeing with the

09:44:06  18  viewpoints that their users post on their platforms, and

09:44:11  19  they are taking ownership of them.  And they want to

09:44:15  20  engage in the speech when it benefits them, and they want

09:44:18  21  to pretend that they aren't when it doesn't.  That is

09:44:21  22  exactly wanting it both ways.

09:44:24  23          Other benefits from the government, currently all

09:44:27  24  they get are benefits without regulation.  Aside from

09:44:30  25  Section 230, they successfully lobby against almost any

09:44:34  1  other government regulation.  And they receive billions of

09:44:37  2  dollars from states every year in subsidies.  These are

09:44:41  3  the types of benefits, again, looking at any case where a

09:44:46  4  common carrier is discussed are benefits that those common

09:44:49  5  carriers receive.

09:44:53  6          THE COURT:  What's the magic of the number 50

09:44:56  7  million?  I mean, what is the state's interest in imposing

09:45:02  8  these types of regulations for folks who have 50 million

09:45:06  9  users and not 40, or 30, or 20?  I mean, if they're that

09:45:13 10  powerful state interests, shouldn't they equally -- I

09:45:16 11  mean, 20 million is not insubstantial.

09:45:18 12          MS. CORBELLO:  I'm sorry, what was that last

09:45:20 13  number?

09:45:20 14          THE COURT:  Twenty million is not insubstantial,

09:45:23 15  in other words, in terms of the effect.  If they're trying

09:45:25 16  to give effect to some compelling state interest, why 50

09:45:28 17  million?

09:45:29 18          MS. CORBELLO:  Your Honor, I'm not privy to all

09:45:32 19  of the legislative discussions on the number, however, as

09:45:35 20  this court can see, based on plaintiffs' members, that

09:45:38 21  number does encompass all of what we generally as the

09:45:42 22  public know to be social media platforms.  It encompasses

09:45:46 23  particularly those social media platforms that impact our

09:45:49 24  society day in, day out, impact our children, impact our

09:45:52 25  lives.

09:45:54    1          THE COURT:  It coincidentally identifies

09:45:58    2    particular companies that tend to skew a certain way that

09:46:04    3    legislators and state executives have expressed viewpoint

09:46:08    4    problems with.

09:46:10    5          MS. CORBELLO:  Your Honor, that's not by virtue

09:46:12    6    of the fact that they have 50 million users.  Those

09:46:17    7    platforms perhaps skew a certain way, however, if you look

09:46:21    8    at the other platforms, I think plaintiffs mentioned

09:46:25    9    Parler and Gab, while those platforms may skew a different

09:46:28    10    way and they also have less than 50 million users, the

09:46:30    11    reason they have less than 50 million users is because

09:46:32    12    these platforms have so much market power that they're

09:46:35    13    able to make those platforms essentially obsolete.  And

09:46:38    14    so, they are the ones creating the market where they all

09:46:42    15    lean a certain way.  It's not the 50 million.

09:46:44    16          THE COURT:  They're creating the space.  Their

09:46:47    17    users are creating the market.  I mean, it seems to me,

09:46:51    18    what you're doing is saying the people can choose the

09:46:57    19    sites that they want to participate on and they've done

09:47:02    20    that, and the state has a problem with the ones who are

09:47:08    21    particularly popular, and so, they want to somehow

09:47:11    22    regulate them and not the ones that are -- that have not

09:47:16    23    achieved that kind of popular success.

09:47:18    24          Why shouldn't people have -- choose, without

09:47:23    25    state regulation, the platform on which they want to

09:47:28 1 communicate and receive information and have information

09:47:32 2 curated for them?  Why shouldn't they have the ability to

09:47:35 3 do that without state interference?

09:47:36 4          MS. CORBELLO:  Nothing in H.B. 20 prevents a user

09:47:39 5 from choosing which platform it wants to use.  All H.B. 20

09:47:43 6 does is protect those users when they use social media

09:47:46 7 platforms that have 50 million or more users from

09:47:49 8 discriminating against them.

09:47:50 9          THE COURT:  But don't you think that part of the

09:47:52 10 appeal of these platforms is that they curate in ways that

09:47:58 11 would be prevented by this legislation?

09:48:01 12          MS. CORBELLO:  Nothing in H.B. 20 prevents

09:48:02 13 curation of content, your Honor.  Again, what H.B. 20 does

09:48:06 14 is prevent viewpoint discrimination.

09:48:08 15          THE COURT:  Yeah, unpack that for me.

09:48:10 16          MS. CORBELLO:  Sure.  The Supreme Court has been

09:48:13 17 very clear in its definitions of content and viewpoint and

09:48:16 18 distinguishing those two things.  H.B. 20 very clearly

09:48:19 19 never mentions that platforms cannot discriminate based on

09:48:24 20 content.  It permits platforms to continue to choose:  We

09:48:28 21 would like this list of content on our platforms, and we

09:48:31 22 would like to prohibit this list of content on our

09:48:33 23 platforms.  It is only then that you cannot discriminate

09:48:37 24 based on the viewpoint within that content.  If you have a

09:48:39 25 category of permitted content, discrimination cannot

09:48:44  1  occur.  It's the same as in any sort of university

09:48:49  2  protected by Title IX, any sort of labor act where

09:48:53  3  discrimination is prohibited.  Once you are allowing

09:48:57  4  employees, members of the public, users, anyone onto your

09:49:01  5  platform and giving them terms and services to abide by,

09:49:04  6  you can't then go in and treat them differently based on

09:49:07  7  their viewpoint, discriminate against them.

09:49:09  8         It's a very common regulation by the government,

09:49:11  9  and it's something that is entirely permitted here.

09:49:15  10        THE COURT:  So the smaller ones can do it, but

09:49:18  11 the bigger ones can't.  Why make that distinction in terms

09:49:21  12 of the numbers of users?

09:49:24  13        MS. CORBELLO:  It goes back to the common carrier

09:49:26  14 status, your Honor.  Governments are entirely permitted to

09:49:30  15 deem certain industries common carriers.  A common

09:49:35  16 carrier, since one of the characteristics they have to

09:49:37  17 have is market power and being open to a large portion of

09:49:40  18 the public, it simply wouldn't make sense to have small

09:49:44  19 companies that aren't open to a large portion of the

09:49:47  20 public.

09:49:48  21        THE COURT:  Well, they're open -- just because

09:49:50  22 they don't happen to have that many, they're open to them.

09:49:53  23        MS. CORBELLO:  They are, your Honor, but they

09:49:54  24 also don't have the market power that these platforms have

09:49:57  25 to make sure that those platforms never succeed, that they

09:50:00  1  don't appear on any of their application stores so that
09:50:03  2  users can't access them as carefully.  And again, market
09:50:07  3  power, monopoly power is a very key characteristic of
09:50:12  4  common carriers, and it's something that clearly the
09:50:14  5  smaller user companies aren't going to have.
09:50:16  6          Moving on to the First Amendment argument unless
09:50:34  7  this court has any more questions about common carriage.
09:50:37  8          THE COURT:  I don't.  Thank you.
09:50:39  9          MS. CORBELLO:  I just want to be clear, this
09:50:40  10 court doesn't even have to reach the First Amendment
09:50:43  11 analysis if it deems the platforms to be common carriers
09:50:46  12 and their function as host of user-generated content.
09:50:51  13 That holding would allow H.B. 20 to go forward, would
09:50:54  14 allow H.B. 20 to prohibit viewpoint discrimination.  If
09:50:57  15 this court reaches First Amendment analysis, though,
09:51:00  16 plaintiffs have still not shown a likelihood of success on
09:51:02  17 that claim.
09:51:07  18          Plaintiffs spent a long time up here talking
09:51:10  19 about editorial discretion and the fact that they moderate
09:51:15  20 content, but as has been the theme throughout this lawsuit
09:51:17  21 so far, there's been no specific examples of how that
09:51:21  22 occurs.  This court even specifically asked, can you
09:51:23  23 detail for me what that editorial discretion looks like?
09:51:26  24 But again, all plaintiffs can do is just say, we moderate
09:51:30  25 content and it expresses a viewpoint.  We don't know what

09:51:34  1  content that is.  We don't know how these algorithms

09:51:38  2  engage in both moderation of content and their admitted

09:51:40  3  moderation of content to achieve user engagement and to

09:51:44  4  achieve ad revenue.

09:51:46  5      There has been no distinguishing between what

09:51:48  6  those practices are.  There's been -- we asked for many

09:51:52  7  hours at depositions how the human interaction with

09:51:56  8  content and the AI interaction with content works.  And

09:52:02  9  plaintiffs in their platforms either didn't know the

09:52:05  10 answer and someone else did, which we were not allowed to

09:52:07  11 depose, or they could only give, again, broad assertions

09:52:11  12 of we moderate content and it expresses our view.  We want

09:52:15  13 our platforms to look a certain way, say a certain thing.

09:52:18  14 We don't know what that is.

09:52:20  15      THE COURT:  Well, but that's -- I mean, to

09:52:21  16 dispute that is to dispute one of the fundamental purposes

09:52:26  17 of this -- stated purpose of this legislation and that is,

09:52:31  18 they've been successful in positioning themselves in ways

09:52:34  19 that people who are legislators and state executives have

09:52:40  20 not liked because they skew a certain way.  So the fact

09:52:44  21 that -- I mean, the proof is in the pudding.  They are

09:52:49  22 what they are and that's why people have a problem with

09:52:51  23 them, right?

09:52:52  24      So to say, oh, it's not a real thing that you're

09:52:56  25 not really exercising this editorial but then, to hold

09:52:59  1  them accountable for the editorial position that they've
09:53:01  2  achieved, right?  I mean, they have -- the reason that
09:53:05  3  these platforms have become offensive to some is that they
09:53:10  4  have achieved a certain place on the political spectrum
09:53:14  5  perhaps or social spectrum, and then, to say yeah, but
09:53:18  6  that's not a real thing, well, it is a real thing.  That's
09:53:22  7  precisely why you have a problem with them, right?

09:53:25  8         MS. CORBELLO:  I apologize if I've misstated,
09:53:27  9  your Honor.  We're not arguing that it's not a real thing
09:53:29  10  and not ever.  What we're arguing is at this stage, at the
09:53:33  11  PI stage where plaintiffs have to show likelihood of
09:53:35  12  success by presenting facts and evidence, there are none.
09:53:39  13  Simply claiming we have editorial discretion has never --
09:53:42  14  in all of the cases plaintiff cite has never been enough
09:53:46  15  for the Court.  That's never where it ends.

09:53:47  16         The plaintiff is required to explain how that
09:53:49  17  editorial discretion occurs.  And like your Honor asked,
09:53:52  18  what is the aim of editorial discretion?  Because if it is
09:53:56  19  -- if the primary aim is to achieve more revenue, more
09:54:01  20  user engagement, then yes that is a different kind of
09:54:04  21  speech: that's commercial speech.  It's not we're
09:54:06  22  expressing a viewpoint, we like safety, we like this
09:54:09  23  certain sort of speech.  Those things matter.  It's not
09:54:12  24  that they don't matter.  It's that we don't know what that
09:54:16  25  is at this point.

09:54:16   1        And for the extraordinary remedy of a preliminary

09:54:19   2   injunction for a law that hasn't even gone into effect

09:54:23   3   yet.  Plaintiff should be required to show more than

09:54:25   4   simply standing up here and saying editorial discretion

09:54:27   5   numerous times.

09:54:42   6        The viewpoint discrimination and the content

09:54:44   7   discrimination is also relevant to the First Amendment

09:54:46   8   analysis but not in the way that plaintiffs have spoken to

09:54:49   9   this court about.  Plaintiffs take a lot of issue with the

09:54:54   10  fact that they don't know every single distinction between

09:54:57   11  content and viewpoint, and there are fuzzy lines that

09:55:00   12  would exist with H.B. 20.

09:55:01   13       The Supreme Court in <u>Reed vs. Town of Gilbert</u>,

09:55:05   14  576 U.S. 155, has been clear that there is a distinction

09:55:08   15  between those two terms.  And simply because fuzzy lines

09:55:11   16  exist at some part of that distinction does not invalidate

09:55:15   17  an entire law.

09:55:16   18       What this court should do is require those fuzzy

09:55:22   19  lines to be supported by facts and evidence, and again,

09:55:24   20  there are none.  Plaintiffs want to claim that they won't

09:55:27   21  be able to moderate, for example, Nazi speech.  Where in

09:55:32   22  Section -- where in H.B. 20 does it require that?  H.B. 20

09:55:34   23  says you can get rid of any content you want.  You can

09:55:37   24  prohibit any content you want.  You can't prohibit content

09:55:41   25  based on viewpoint discrimination.

| | | |
|---|---|---|
| 09:55:52 | 1 | THE COURT:  So tell me how they would come up |
| 09:55:57 | 2 | with their rules on content that would capture -- in the |
| 09:56:08 | 3 | context of pro or anti-Nazi, how would they articulate |
| 09:56:18 | 4 | their rules that would -- give me an example of how they |
| 09:56:22 | 5 | would come up with a rule addressing that. |
| 09:56:26 | 6 | MS. CORBELLO:  Well, I think the platforms -- |
| 09:56:27 | 7 | THE COURT:  Distinguishing between content and |
| 09:56:30 | 8 | viewpoint. |
| 09:56:30 | 9 | MS. CORBELLO:  Yes, your Honor.  The first point |
| 09:56:32 | 10 | is, I think the platforms can be expected by this court to |
| 09:56:36 | 11 | follow Supreme Court precedent in being able to |
| 09:56:38 | 12 | distinguish between content and viewpoint in that sort of |
| 09:56:41 | 13 | category.  We briefed somewhat as an example, the racism. |
| 09:56:46 | 14 | Racism is a content category.  It was agreed to by |
| 09:56:51 | 15 | plaintiffs and the platforms in their depositions that |
| 09:56:53 | 16 | that would be a content category.  Racism would include |
| 09:56:57 | 17 | Nazi speech.  It would include other forms of racist |
| 09:57:00 | 18 | speech. |
| 09:57:01 | 19 | So it would only be then that, for example, |
| 09:57:04 | 20 | plaintiffs can't discriminate against users who post Nazi |
| 09:57:09 | 21 | speech and don't post -- and don't discriminate against |
| 09:57:12 | 22 | users who post speech about that's antiwhite or something |
| 09:57:17 | 23 | like that.  And so, that would be one way to distinguish |
| 09:57:21 | 24 | it.  But again, to the extent plaintiffs stand back up |
| 09:57:24 | 25 | here and say, well, no.  It's still a fuzzy line to us, |

09:57:27  1   those fuzzy lines don't invalidate H.B. 20, and those

09:57:30  2   fuzzy lines don't make it likely to succeed on the merits

09:57:35  3   of their claims.  What plaintiffs have to do is present

09:57:37  4   evidence of why those fuzzy lines are so complicated.  We

09:57:41  5   don't know what those algorithms actually look for.  We

09:57:44  6   know what they say to this court that they look for.  They

09:57:46  7   say, well, we moderate for Nazi speech.  What does that

09:57:49  8   mean?

09:57:49  9       I barely know what an algorithm does.  But in my

09:57:53  10  basic knowledge of what it does, it's very complex and

09:57:56  11  it's not so simple as pressing a button that says go find

09:57:59  12  all the Nazi speech.  It moderates for a lot of different

09:58:04  13  things.  It screens for a lot of different things other

09:58:07  14  than just one piece, one type of content.  And for this

09:58:09  15  court to not know what it's screening for, what the

09:58:11  16  categories are, how is it being trained, how is it

09:58:15  17  learning to be trained, what's being added to the data

09:58:18  18  sets in order for it to be trained, there's nowhere to

09:58:22  19  start with the fuzzy lines until we get that information.

09:58:26  20      And I think that speaks, again, to the fact that

09:58:33  21  the primary -- the primary function of these algorithms,

09:58:38  22  again, is user engagement.  Both Mr. Potts and Ms. Veitch

09:58:43  23  explain that that is where the majority of their revenue

09:58:44  24  comes from.  Eighty to 100 percent of the revenue from

09:58:48  25  Facebook comes from advertisement, which advertisement

09:58:50  1    revenue increases because of user engagement.

09:58:53  2            This court actually doesn't need to look much

09:58:56  3    further to see that these are engagement algorithms and

09:58:59  4    not content moderation algorithms than plaintiffs' own PI

09:59:04  5    motion, which explains that how they moderate content now

09:59:07  6    is to create this safe environment that users like and

09:59:12  7    advertisers want to stay a part of.  And they say that

09:59:15  8    H.B. 20 is going to cause those users and those

09:59:17  9    advertisers to leave.

09:59:18  10           Well, the only reason that that's the main

09:59:22  11   concern, then, is because the users and advertisers are

09:59:24  12   what create their revenue or what create their

09:59:26  13   profitability.  Their concern is profit.  Their primary

09:59:30  14   and majority concern is profit, and that's what makes

09:59:34  15   these algorithms commercial speech under either definition

09:59:37  16   that plaintiffs have posited.  Plaintiff said expression

09:59:39  17   related solely to the economic interests of the speaker

09:59:41  18   and its audience.  All of their content moderation

09:59:43  19   algorithms are motivated by that.  They've said so

09:59:45  20   themselves.  They're motivated to keep their users on the

09:59:48  21   platforms.  In order to keep those users on the platforms,

09:59:51  22   they moderate content in a certain way, and when they

09:59:53  23   stay, the advertisers engage more and they get more

09:59:56  24   revenue.

09:59:56  25           THE COURT:  And what if there's a close

09:59:58 1   correlation between the viewpoints of their users and the

10:00:02 2   users' willingness to use the site and then, the value of

10:00:08 3   those user hits to an advertiser?  I mean, it's -- that's

10:00:13 4   viewpoint driven, right?

10:00:16 5        MS. CORBELLO:  I'm sorry, your Honor, I'm a

10:00:17 6   little confused on your question.

10:00:18 7        THE COURT:  Yeah.  I just mean it is commercial

10:00:21 8   but it's -- to the extent that an advertiser wants to

10:00:26 9   advertise on a certain platform, it might be because that

10:00:30 10  attracts a certain kind of user and a certain kind of user

10:00:33 11  who has certain views about certain things.  And that's

10:00:36 12  why they're motivated to post -- to have algorithm that

10:00:44 13  drives certain viewpoints, right?

10:00:46 14       MS. CORBELLO:  Well, your Honor, two things.

10:00:48 15  First, we don't have any evidence of that.  Again, we

10:00:51 16  asked those questions in deposition.  We asked about the

10:00:55 17  basis for their knowledge of whether advertisers want to

10:00:57 18  stay, when they want to leave, how do you know that, and

10:01:00 19  we weren't able to get any answers on that.  And

10:01:02 20  plaintiffs themselves didn't know enough about the

10:01:05 21  platforms to give us those answers.

10:01:08 22       Secondly, again, while -- this is a common theme

10:01:12 23  here, while the platforms claim that their advertisers

10:01:16 24  want certain types of viewpoints show -- you know,

10:01:18 25  viewpoints that create safety and peace and love, there's

| 10:01:21 | 1 | plenty of evidence on the outside world that dictates that |
| 10:01:24 | 2 | that's not really what's happening.  And as we've seen, |
| 10:01:26 | 3 | advertisers aren't exactly leaving these platforms in |
| 10:01:30 | 4 | droves at the moment.  There was a recent story out of NBC |
| 10:01:33 | 5 | news about an AI that was created to become a user on |
| 10:01:39 | 6 | Facebook and started expressing right-leaning sorts of |
| 10:01:42 | 7 | views, and Facebook's content moderation algorithms |
| 10:01:45 | 8 | actually matched that person with more extremist |
| 10:01:48 | 9 | right-wing views to the point that they're clearly meant |
| 10:01:52 | 10 | to only incite and do nothing more.  These advertisers |
| 10:01:55 | 11 | know that that's what's going on.  Users come onto these |
| 10:01:58 | 12 | platforms with all sorts of viewpoints and they don't |
| 10:02:01 | 13 | leave.  The advertisers don't leave because of it. |
| 10:02:03 | 14 | So to the extent we have evidence, it's contrary |
| 10:02:06 | 15 | to that position, but again, we really don't have any at |
| 10:02:10 | 16 | this point other than what whistleblowers or the media |
| 10:02:13 | 17 | says and what the platforms want to say on their |
| 10:02:15 | 18 | self-serving websites. |
| 10:02:19 | 19 | To the extent any of these algorithms rotely |
| 10:02:24 | 20 | apply their speech, they're not chilled by H.B. 20. |
| 10:02:28 | 21 | Again, H.B. 20 is about preventing discriminatory |
| 10:02:31 | 22 | practices.  Platforms state publicly that they don't |
| 10:02:34 | 23 | discriminate based on viewpoint.  So it's hard to see how |
| 10:02:37 | 24 | H.B. 20 would chill speech that they claim that they're |
| 10:02:39 | 25 | not engaging in. |

| | | |
|---|---|---|
| 10:02:42 | 1 | Their motion evidence asserts only that they're |
| 10:02:44 | 2 | having to moderate content in a different way, and that's |
| 10:02:47 | 3 | how it will chill their speech; but again, H.B. 20 doesn't |
| 10:02:50 | 4 | require them to do that.  H.B. 20 says continue to have |
| 10:02:53 | 5 | your policies, continue to prohibit the content you want |
| 10:02:56 | 6 | to and just don't discriminate against people.  To be |
| 10:03:01 | 7 | clear, this law is content neutral.  The law doesn't |
| 10:03:07 | 8 | purport to regulate any sort of specific type of speaker, |
| 10:03:11 | 9 | of viewpoint, of content.  It very broadly states content, |
| 10:03:14 | 10 | viewpoint, user. |
| 10:03:16 | 11 | The Supreme Court -- or the Fifth Circuit said -- |
| 10:03:20 | 12 | I apologize.  This court said as affirmed by the Fifth |
| 10:03:23 | 13 | Circuit in Defense Distributed, 121 Federal Supplement 3d, |
| 10:03:30 | 14 | 680. |
| 10:03:31 | 15 | THE COURT:  Anytime you say this court, it was |
| 10:03:33 | 16 | affirmed by the Fifth Circuit, I'm thinking which one was |
| 10:03:35 | 17 | that. |
| 10:03:40 | 18 | MS. CORBELLO:  I'll give you a copy, your Honor. |
| 10:03:42 | 19 | THE COURT:  There's a 23-page dissent, though. |
| 10:03:45 | 20 | MS. CORBELLO:  That's true.  We won't talk about |
| 10:03:47 | 21 | that. |
| 10:03:49 | 22 | The discrimination of whether regulation of |
| 10:03:51 | 23 | speech was content-based, quote, requires the Court to |
| 10:03:53 | 24 | consider whether a regulation of speech on its face draws |
| 10:03:56 | 25 | distinctions based on the message a speaker conveys. |

10:03:59   1   There's no distinction here.  The only prohibition is

10:04:03   2   viewpoint discrimination.  Doesn't matter what that

10:04:06   3   viewpoint is.  It doesn't matter who's saying it.  The

10:04:09   4   platforms cannot discriminate against their users.

10:04:11   5        Plaintiffs' counsel made the argument that this

10:04:19   6   is a viewpoint-based law because it attempts to regulate

10:04:26   7   speech that is offensive.  Again, they still don't

10:04:29   8   identify what that speech is, so it would be difficult for

10:04:31   9   this court to find that there is a speech that is being

10:04:33  10   targeted here when we don't know what it is.

10:04:36  11        Again, all H.B. 20 does is state you're

10:04:41  12   prohibited from viewpoint discrimination.  Plaintiffs'

10:04:44  13   argument is that because viewpoint discrimination includes

10:04:47  14   certain viewpoints, then it is a viewpoint-based,

10:04:51  15   non-content-neutral law.  That's simply not so.  Any sort

10:04:57  16   of viewpoint discrimination regulation would necessarily

10:05:00  17   require a -- any viewpoint underneath that to be

10:05:04  18   prohibited from discrimination.  It certainly doesn't make

10:05:08  19   the law itself a viewpoint-based restriction on the

10:05:13  20   platforms.  And so, intermediate scrutiny applies and H.B.

10:05:17  21   20 passes.

10:05:18  22        Plaintiffs have made the curious argument that

10:05:21  23   the law hasn't been properly tailored because the

10:05:24  24   government could simply just make its own platform.

10:05:28  25   Again, I have probably the most limited knowledge of

| | |
|---|---|
| 10:05:32 | 1 |
| 10:05:34 | 2 |
| 10:05:38 | 3 |
| 10:05:41 | 4 |
| 10:05:44 | 5 |
| 10:05:47 | 6 |
| 10:05:52 | 7 |
| 10:05:56 | 8 |
| 10:05:59 | 9 |
| 10:06:01 | 10 |
| 10:06:03 | 11 |
| 10:06:06 | 12 |
| 10:06:11 | 13 |
| 10:06:14 | 14 |
| 10:06:15 | 15 |
| 10:06:17 | 16 |
| 10:06:26 | 17 |
| 10:06:30 | 18 |
| 10:06:34 | 19 |
| 10:06:37 | 20 |
| 10:06:43 | 21 |
| 10:06:49 | 22 |
| 10:06:54 | 23 |
| 10:06:58 | 24 |
| 10:07:00 | 25 |

anyone in this room of how that would occur, but it
doesn't seem like a proper tailoring that should have to
occur in order for H.B. 20 to survive.  Certainly
plaintiffs have cited no case where a court has said,
well, government, you should just go into this field or
this function in order for this law to be properly
tailored.  And certainly there wouldn't be one.  That's
not something that's required under intermediate scrutiny.
H.B. 20 has been significantly tailored because, again, it
tailors those social media platforms that have the market
power, have the openness to the public, have the
countervailing government benefits that require them to be
common carriers and require them to operate in a way
that's nondiscriminatory.

THE COURT:  They also, because of the volume they
have, have the vulnerability of having to deal with all of
these regulation of reporting, appeals, processes on a
level and in a magnitude that other people don't.  And if
I were to believe them, it makes it virtually impossible
for them to operate if they have to deal with all of the
instances where their decisions are being complained of,
appealed.  And they operate on a scale that that, in
itself, is going to make it impossible for them really to
operate.

MS. CORBELLO:  Just to be clear, your Honor,

| | |
|---|---|
| 10:07:01 | 1 |
| 10:07:03 | 2 |
| 10:07:06 | 3 |
| 10:07:10 | 4 |
| 10:07:12 | 5 |
| 10:07:13 | 6 |
| 10:07:16 | 7 |
| 10:07:18 | 8 |
| 10:07:23 | 9 |
| 10:07:27 | 10 |
| 10:07:30 | 11 |
| 10:07:32 | 12 |
| 10:07:35 | 13 |
| 10:07:37 | 14 |
| 10:07:40 | 15 |
| 10:07:43 | 16 |
| 10:07:47 | 17 |
| 10:07:50 | 18 |
| 10:07:53 | 19 |
| 10:07:57 | 20 |
| 10:07:59 | 21 |
| 10:08:01 | 22 |
| 10:08:04 | 23 |
| 10:08:06 | 24 |
| 10:08:10 | 25 |

speaking specifically about the disclosure requirements?

THE COURT:  Yes.  And everything that they have to do to document the actions they take in response to -- so yeah.

MS. CORBELLO:  I understand, your Honor, that the platforms' position is that this would be impossible.  The disclosure requirements would be impossible to meet, but again, there's no evidence of that.  Again, we asked both plaintiffs and both platforms at their depositions what in H.B. 20 would be burdensome in terms of the disclosure requirements, and we didn't get an answer.

And I'll go, again, one-by-one as counsel did. The notice and complaint and appeal portions, the disclosures each time you remove content, plaintiffs' counsel stood up here and said that's burdensome.  Didn't provide a reason why.  Didn't say, you know, what evidence they have that the companies can't comply with this.  And, indeed, what Facebook and YouTube told us is that they already have a content removal policy where they notify users when they remove content, and they give them the opportunity to appeal.

Facebook also tells their users why they've removed the content.  So these are things they're already doing.  And what Facebook told us, Mr. Potts, his deposition at deposition 99, 23 to 25, is, it takes 24

10:08:15  1    hours for Facebook to do this notice, notice of content

10:08:18  2    removal, and give them the opportunity to appeal.  So at

10:08:21  3    least for Facebook, it doesn't appear that there's any

10:08:23  4    sort of burden for at least this first disclosure

10:08:26  5    requirement.

10:08:27  6            And for plaintiffs to have as-applied relief in

10:08:31  7    this case, they'd have to show that this requirement as

10:08:34  8    applied to Facebook is burdensome, and Mr. Potts has said

10:08:38  9    it's not.  When it comes to the appeal process, again,

10:08:41  10   Facebook already offers that.  YouTube already offers

10:08:44  11   that.  Facebook, again, said Mr. Potts said they do it in

10:08:47  12   24 hours usually.  Potts at page 111, 6 through 19, again,

10:08:54  13   there's a difference between the platforms.

10:08:55  14           We don't know how long it takes, for example,

10:08:58  15   Pinterest to do a notice and appeal requirement.  And for

10:09:01  16   this law to be -- for this court to hold that this law is

10:09:04  17   burdensome on Pinterest based on these sections, we have

10:09:08  18   to know those things.  And we need evidence from the

10:09:11  19   platforms.

10:09:14  20           Business practices, plaintiffs complained about

10:09:16  21   the disclosure of business practices.  And again, just

10:09:19  22   broadly stated, it's intrusive and it informs bad actors.

10:09:23  23   Again, how?  As to the bad actors, we asked those

10:09:27  24   questions in depositions.  We couldn't quite get an idea

10:09:30  25   of what information specifically they're scared that bad

| | | |
|---|---|---|
| 10:09:33 | 1 | actors are going to get a hold of. |
| 10:09:35 | 2 | And in terms of intrusion, as this court may |
| 10:09:38 | 3 | notice, the platforms have copious amounts of transparency |
| 10:09:45 | 4 | reports on their website.  They also submit reporting to |
| 10:09:47 | 5 | their investors.  And between those two, again, we asked |
| 10:09:51 | 6 | at deposition, what is the difference in what H.B. 20 |
| 10:09:54 | 7 | requires you to do and what you're already doing with your |
| 10:09:57 | 8 | transparency reports and what you're already doing for the |
| 10:09:59 | 9 | Feds?  And again, we couldn't get a single answer as to |
| 10:10:03 | 10 | what portion of that business practices requirement is so |
| 10:10:07 | 11 | burdensome that they don't already engage in it. |
| 10:10:10 | 12 | THE COURT:  One of the things they're saying is |
| 10:10:11 | 13 | that the statute would require them potentially to |
| 10:10:16 | 14 | disclose the details of the algorithms that they use, |
| 10:10:20 | 15 | which I think would suggest -- I mean, common sense would |
| 10:10:25 | 16 | suggest that that being a big part of the commercial |
| 10:10:29 | 17 | success of these operations would be if not a trade |
| 10:10:34 | 18 | secret, something that looks a lot like it.  What's your |
| 10:10:36 | 19 | position with regard to that allegation? |
| 10:10:38 | 20 | MS. CORBELLO:  Your Honor, if you look at the |
| 10:10:39 | 21 | text of H.B. 20, in no way does it require disclosure of |
| 10:10:43 | 22 | algorithms.  In fact, the word "algorithms" is preceded by |
| 10:10:47 | 23 | the word "or" because it's a list of ways in which the |
| 10:10:50 | 24 | company could provide a certain type of information as to |
| 10:10:53 | 25 | how it's moderating content.  One of which could be |

10:10:56   1   algorithms if they deem some of those algorithms to not be

10:11:00   2   trade secrets.  But in no way -- and I'll point out to the

10:11:02   3   Court that plaintiffs never quoted from H.B. 20 anywhere

10:11:05   4   where it says these algorithms are required by law to be

10:11:09   5   disclosed.  They're absolutely not.  It's one way in which

10:11:13   6   the platforms could choose to comply, but they don't have

10:11:16   7   to.

10:11:21   8          In terms of the transparency reports, too, I'd

10:11:23   9   urge this court to review them because they do provide a

10:11:28   10  lot of the information, not only that H.B. 20 requires but

10:11:31   11  beyond that.  Plaintiffs have used it to their advantage

10:11:33   12  when necessary in order to explain to the Court how much

10:11:38   13  pieces of certain content have been removed, how quickly

10:11:41   14  it gets removed, AI removal versus human removal.  And so,

10:11:45   15  clearly, this data is actually at the fingertips of the

10:11:49   16  platforms and is in some way retrievable.

10:11:51   17         We asked both platforms, well, could you create

10:11:55   18  an algorithm to deal with any sort of the burdens that you

10:11:57   19  might have in disclosing the business practices or pieces

10:12:00   20  of content moderated for, things like that.  They didn't

10:12:04   21  know.  So at this point, we don't have those facts that

10:12:07   22  support any sort of burden claim based on either one of

10:12:10   23  the disclosure requirements, the notice and appeal, or the

10:12:14   24  business practices.

10:12:15   25         THE COURT:  So that I'm clear just -- you may

| | | |
|---|---|---|
| 10:12:18 | 1 | have addressed this already sufficiently, but to what |
| 10:12:21 | 2 | extent does a finding that these entities are common |
| 10:12:29 | 3 | carriers, to what extent is that important from your |
| 10:12:33 | 4 | perspective in the bill's ability to survive a First |
| 10:12:40 | 5 | Amendment challenge? |
| 10:12:41 | 6 | MS. CORBELLO:  Your Honor, the common carriage |
| 10:12:44 | 7 | doctrine is essential to the First Amendment challenge. |
| 10:12:47 | 8 | It's why it's the threshold issue that we've briefed to |
| 10:12:49 | 9 | the Court, and why we've continued to brief it to the |
| 10:12:52 | 10 | Court, and why we have an expert on it.  It dictates the |
| 10:12:55 | 11 | rest of this suit in terms of the First Amendment inquiry. |
| 10:12:59 | 12 | Again, while common carriers can't be forced |
| 10:13:02 | 13 | under the First Amendment to host certain types of speech |
| 10:13:05 | 14 | or cable channels, or anything like that, certainly under |
| 10:13:09 | 15 | the common carrier doctrine, governments can come in and |
| 10:13:12 | 16 | say you're not allowed to discriminate against people. |
| 10:13:14 | 17 | That's what H.B. 20 is doing, which is why if this court |
| 10:13:17 | 18 | finds that the legislature was within its right to declare |
| 10:13:20 | 19 | the platforms common carriers as it has done for centuries |
| 10:13:24 | 20 | and that they are common carriers by virtue of the fact |
| 10:13:27 | 21 | that they share every characteristic with every common |
| 10:13:30 | 22 | carrier that has come before them, then this court doesn't |
| 10:13:32 | 23 | need to reach the First Amendment inquiry.  Certainly not |
| 10:13:36 | 24 | to the extent that we've discussed it today.  But again, |
| 10:13:38 | 25 | it doesn't need to reach it because they aren't allowed to |

10:13:41  1  discriminate against people, and H.B. 20 is -- prohibits

10:13:43  2  that discrimination and nothing more.

10:13:52  3      As we've noted in our briefing, plaintiffs have

10:13:55  4  turned their requested relief from an as-applied to a

10:14:00  5  facial challenge.  I'll point out for the Court that

10:14:03  6  plaintiffs' counsel at no time explained why all aspects

10:14:06  7  of Sections 2 and 7 are facially unconstitutional in all

10:14:12  8  of their applications.  And certainly when there's not

10:14:14  9  even evidence as to how it's invalid as to each one of the

10:14:18 10  platforms, it's hard to see how there could be a finding

10:14:20 11  that it's invalid in all of its applications to all

10:14:23 12  platforms that are covered.

10:14:26 13      In terms of as-applied relief, the case law is

10:14:28 14  very clear.  Plaintiffs are required to show for

10:14:31 15  as-applied relief how each one of the platforms is

10:14:34 16  burdened.  How each one of the platforms engages in

10:14:37 17  speech.  Why each one of the platforms shouldn't be

10:14:39 18  considered common carriers.  Why each one of the platforms

10:14:42 19  are engaging in speech and how that speech looks and how

10:14:48 20  the disclosure requirements would burden them.  Again, we

10:14:52 21  have no evidence of that, despite declarations and

10:14:55 22  depositions and interrogatories.  At no time has

10:14:58 23  plaintiffs provided us the as-applied relief that would be

10:15:01 24  necessary for each one of the platforms under each section

10:15:04 25  that they -- and provision that they challenge.

| | | |
|---|---|---|
| 10:15:12 | 1 | This law, H.B. 20 is not overbroad.  What |
| 10:15:15 | 2 | plaintiff must do in order to show likelihood of success |
| 10:15:18 | 3 | on that claim is show that either every application of the |
| 10:15:21 | 4 | statute creates an impermissible risk of the suppression |
| 10:15:23 | 5 | of ideas or that the statute is substantially overbroad, |
| 10:15:27 | 6 | meaning there's a realistic danger that the statute itself |
| 10:15:30 | 7 | will significantly compromise First Amendment protections |
| 10:15:32 | 8 | of third parties. |
| 10:15:33 | 9 | There's no impermissible risk of the suppression |
| 10:15:37 | 10 | of ideas here.  Again, H.B. 20 allows platforms to |
| 10:15:40 | 11 | continue to choose the content they want to host and only |
| 10:15:44 | 12 | refrain from discriminating against viewpoints once they |
| 10:15:47 | 13 | choose that content to host.  It certainly doesn't |
| 10:15:50 | 14 | compromise First Amendment protection of third parties. |
| 10:15:53 | 15 | If anything, it provides a plethora of more ideas than |
| 10:15:59 | 16 | currently exist under any sort of viewpoint discrimination |
| 10:16:02 | 17 | practices the platforms are already engaging in.  And it |
| 10:16:05 | 18 | protects their rights.  It protects users' rights to |
| 10:16:08 | 19 | engage in speech on their platforms. |
| 10:16:11 | 20 | As we've done in our brief, I'll incorporate the |
| 10:16:14 | 21 | arguments made in the motion to dismiss.  Plaintiffs are |
| 10:16:17 | 22 | unlikely to succeed on the merits because they don't have |
| 10:16:20 | 23 | associational standing in this case.  I think I've |
| 10:16:23 | 24 | mentioned many times, the lack of evidence that we have in |
| 10:16:26 | 25 | this case and where that evidence needs to come from.  We |

10:16:29  1  anticipate an extensive amount of discovery from the

10:16:32  2  platforms on every one of the causes of action and claims

10:16:36  3  and burdens that plaintiffs have made in this case, and it

10:16:39  4  will require much more than plaintiffs themselves for

10:16:42  5  these platforms to participate.

10:16:44  6          Plaintiffs' counsel didn't mention the

10:16:53  7  severability portion of our argument, but I'll just point

10:16:55  8  out that H.B. 20 does have a severability clause.  The

10:16:58  9  Supreme Court noted in Ayotte at 546 U.S. 320 that courts

10:17:03  10  must only enjoin the unconstitutional applications of a

10:17:06  11  statute while leaving the other applications in force.

10:17:09  12          And so, should this court find that any specific

10:17:11  13  provisions are unconstitutional as applied to any

10:17:13  14  particular platforms, we'd ask that the severability

10:17:18  15  clause be honored as it's required to be by the Supreme

10:17:21  16  Court.  And that any injunction be limited to the actual

10:17:24  17  scope of harm that the platforms have shown.  Again, it's

10:17:27  18  defense's position that there isn't any harm shown at this

10:17:30  19  point.  All there is is broad, vague allegations that harm

10:17:34  20  might occur based on engaging in some sort of unknown,

10:17:39  21  unidentified speech.

10:17:48  22          As to the other prongs of preliminary injunction

10:17:51  23  analysis, even if this court finds that plaintiffs are

10:17:55  24  likely to succeed on any of the merits of any of their

10:17:57  25  claims, which, again, Mr. Lyles will come up and talk

10:18:00  1  about preemption and commerce clause in a moment, there's

10:18:03  2  overwhelming equitable and practical concerns that

10:18:06  3  outweigh any sort of relief at this stage of the

10:18:08  4  litigation.

10:18:09  5       Again, there's no evidence of injury here.

10:18:12  6  Plaintiffs have not only shown -- failed to show

10:18:15  7  irreparable harm, they've failed to show any harm.  And

10:18:19  8  where an as-applied challenge has been made, that's

10:18:21  9  something that has to be shown in order for this court to

10:18:24  10 grant relief.  They will still have content moderation

10:18:27  11 policies when H.B. 20 goes into effect.  They will still

10:18:30  12 be able to determine what those policies say and how they

10:18:33  13 operate and how their algorithms engage in the policies

10:18:36  14 that they set.

10:18:38  15      Again, the only thing they have to refrain from

10:18:43  16 doing is discriminating against users once they've decided

10:18:46  17 to host particular content.  They have to provide

10:18:50  18 disclosures, in no particular fashion, in a way that at

10:18:53  19 least the platforms we were able to depose said they were

10:18:57  20 able to do already or they don't know how it would be

10:18:59  21 difficult to do for some of the provisions.

10:19:01  22      And any evidence of harm is undermined by the

10:19:08  23 fact that the recently filed amicus brief of some of

10:19:12  24 plaintiffs' other members have stated that H.B. 20 is not

10:19:14  25 harmful to them, that it's something that they can comply

| | | |
|---|---|---|
| 10:19:17 | 1 | with, and that is the law that doesn't provide any sort of |
| 10:19:20 | 2 | burden on them.  Alternatively, or comparatively, the |
| 10:19:25 | 3 | state is undoubtedly harmed if this court were to enjoin a |
| 10:19:28 | 4 | state statute. |
| 10:19:29 | 5 | The Fifth Circuit said in <u>Veasey v. Perry</u> at 769 |
| 10:19:33 | 6 | F. 3d 890, when a statute is enjoined, the state |
| 10:19:36 | 7 | necessarily suffers the irreparable harm of denying the |
| 10:19:39 | 8 | public interest in the enforcement of its laws.  And so, |
| 10:19:42 | 9 | that harm has undoubtedly been shown here. |
| 10:19:45 | 10 | And again, not to mention the harm to the public, |
| 10:19:47 | 11 | which has been, I believe, the theme from the defense and |
| 10:19:52 | 12 | for good reason, the public is the reason that H.B. 20 |
| 10:19:57 | 13 | exists, why H.B. 20 was passed.  There's harm to the |
| 10:20:01 | 14 | public currently happening because these platforms go |
| 10:20:05 | 15 | completely unregulated.  They are allowed to insulate |
| 10:20:08 | 16 | themselves from any sort of liability from anyone and |
| 10:20:12 | 17 | continue to operate behind the curtains, without any sort |
| 10:20:16 | 18 | of ability to figure out what's going on. |
| 10:20:20 | 19 | They impact our lives at the most granular level. |
| 10:20:24 | 20 | At times, they do detriment to our society, and they do so |
| 10:20:30 | 21 | while still asking this court to continue to allow them to |
| 10:20:33 | 22 | do so; to continue to let their lobbying firms stand in |
| 10:20:37 | 23 | their place that they don't have to be subject to any sort |
| 10:20:40 | 24 | of litigation or litigation obligations, and allow them to |
| 10:20:43 | 25 | continue going unregulated, continue to engage in whatever |

10:20:47   1   discriminatory practices they want to because they engage

10:20:50   2   in some form of editorial speech.

10:20:52   3        H.B. 20 prevents this sort of practice from

10:20:56   4   continuing on, and we'd ask this court to deny the motion

10:20:59   5   for preliminary injunction.

10:21:00   6        THE COURT:  I do have one question, if you don't

10:21:02   7   mind.

10:21:02   8        MS. CORBELLO:  Sure.

10:21:03   9        THE COURT:  Are there relevant distinctions

10:21:04  10   between a Texas statute and the Florida statute that would

10:21:08  11   in your mind explain the injunction in that case, or did

10:21:10  12   the Court just get that wrong?

10:21:12  13        MS. CORBELLO:  Yes, your Honor.  There are

10:21:14  14   distinctions between the Florida law and the Texas law

10:21:16  15   here.  The Court will notice if it reads that statute that

10:21:21  16   that statute actually does regulate content.  It doesn't

10:21:24  17   mention viewpoint.  It states -- it prohibits social media

10:21:29  18   platforms from using post-prioritization or shadow-banning

10:21:32  19   algorithms for content posted by or about a user.

10:21:35  20        So again, there's the distinction between content

10:21:38  21   and viewpoint.  There's also very clear -- they're clearly

10:21:45  22   -- I'm sorry, I didn't even read the whole quote:  Content

10:21:47  23   posted by or about a user who's known by a platform to be

10:21:50  24   a candidate for office.  So this is not only content-

10:21:52  25   based, but it's also based on candidates for office,

| | | |
|---|---|---|
| 10:21:55 | 1 | which, of course, H.B. 20 doesn't regulate content and |
| 10:21:58 | 2 | certainly doesn't regulate anything about candidates for |
| 10:22:01 | 3 | office.  It also, again, regulates -- prohibits the |
| 10:22:04 | 4 | censorship, de-platforming, or shadow-banning of a |
| 10:22:07 | 5 | journalistic enterprise which the law defines based on the |
| 10:22:11 | 6 | content of its publication or broadcast.  Again, these are |
| 10:22:14 | 7 | all content-based -- not content-based, but the Florida |
| 10:22:18 | 8 | law is focused on content as opposed to H.B. 20, which is |
| 10:22:21 | 9 | focused on viewpoint. |
| 10:22:22 | 10 |         Mr. Lyles might get into this in more detail, but |
| 10:22:27 | 11 | the statute also permits monetary damages where H.B. 20 |
| 10:22:30 | 12 | does not.  And as the Court knows, one of the preemption |
| 10:22:32 | 13 | arguments is that H.B. 20 is an equitable relief statute, |
| 10:22:36 | 14 | and so, it does not actually contradict Section 230 or run |
| 10:22:40 | 15 | up against it in any way.  While the Florida statute does, |
| 10:22:43 | 16 | in fact, allow significant fines for violation of that |
| 10:22:47 | 17 | law. |
| 10:22:47 | 18 |         THE COURT:  Thank you very much. |
| 10:22:59 | 19 |         MS. CORBELLO:  Yes, your Honor. |
| 10:23:05 | 20 |         MR. LYLES:  Good morning, your Honor.  Benjamin |
| 10:23:07 | 21 | Lyles for the defendant. |
| 10:23:09 | 22 |         As Ms. Corbello pointed out, I'll be addressing |
| 10:23:11 | 23 | the commerce clause and the 230 preemption issue.  I think |
| 10:23:14 | 24 | I'm running out of time, so I'll make this fast. |
| 10:23:17 | 25 |         THE COURT:  Take your time. |

10:23:18  1          MR. LYLES:  With respect to the allegation by the

10:23:23  2     plaintiffs that it's -- H.B. 20 is unconstitutional under

10:23:28  3     the commerce clause, I'd just like to begin by noting that

10:23:32  4     plaintiffs venture no argument as to how H.B. 20

10:23:36  5     discriminates against out-of-state commerce.  That is

10:23:39  6     what's required for the facially invalid claim.  And what

10:23:43  7     they would have to do is bring up an in-state interest and

10:23:49  8     an out-of-state interest, similarly situated ones, and

10:23:53  9     show that the in-state interest is discriminated in favor

10:23:56  10    of, at the expense of the out-of-state interests.

10:23:59  11    Plaintiffs don't do that.  They hang their whole hat on

10:24:02  12    the argument that H.B. 20 is excessively burdensome on

10:24:08  13    interstate commerce, and that's not the case.

10:24:10  14          So the two arguments that you just heard from

10:24:14  15    counsel for plaintiffs with respect to that are that H.B.

10:24:18  16    20 would force them to either comply with an

10:24:24  17    extraordinarily burdensome law or leave Texas, and they

10:24:27  18    can't leave Texas and they can't comply with the law.  The

10:24:32  19    second argument was that H.B. 20 will require worldwide

10:24:37  20    dissemination of speech, and that was an impermissible

10:24:43  21    extraterritorial regulation.  Neither of these are the

10:24:45  22    case.

10:24:45  23          With respect to the first, the Supreme Court in

10:24:48  24    Exxon made it clear that the transnational structure of a

10:24:54  25    market does not shield a participant in that market from

| | |
|---|---|
| 10:24:58 | 1 |
| 10:25:03 | 2 |
| 10:25:08 | 3 |
| 10:25:12 | 4 |
| 10:25:16 | 5 |

1   state regulation.  So the fact that H.B. 20 would subject

2   these transnational companies to regulation within Texas

3   is in no way dispositive.  What it becomes is a matter of

4   degree whether that's excessively burdensome enough to

5   make them have to leave the state.

6           And as Ms. Corbello pointed out, that's really

7   something that we need more discovery on and, also, that

8   plaintiffs have provided in their depositions evidence of

9   they're perfectly capable of complying with.  To a certain

10  extent, they are already engaging in the -- in various

11  modes of disclosure transparency reporting.  The sorts of

12  things that they say are so onerous that H.B. 20's

13  imposition on them would force them to leave the state.

14          I'd just like to address a bit of the authority

15  plaintiffs cite in their reply for their proposition.

16  It's a case called Lewis vs. BT Investments for this idea

17  that it violates the commerce clause when the burden is

18  too great.  And that was a completely different burden

19  that this Florida law placed on these out-of-state banks.

20  Basically what it said was, if you're an out-of-state

21  bank, you just can't do business in Florida, meaning the

22  burden would be -- become a Florida bank in order to do

23  business here.  Whether what -- whereas what House Bill 20

24  seeks to do is simply regulate these companies in a way

25  that they're perfectly capable of complying with, or if

10:26:38  1   they're not, that needs to be shown in discovery.

10:26:41  2         And just to your Honor's point earlier where you

10:26:45  3   mentioned -- you asked Ms. Corbello if the scale of these

10:26:50  4   companies, right, makes it impossible for them to deal

10:26:53  5   with these requirements because they're getting so many

10:26:56  6   complaints, I would also venture that the very scale is

10:27:00  7   what makes them the most powerful and massively resourced

10:27:03  8   companies in the world, which gives them tools that nobody

10:27:06  9   else has for dealing with these things.  It's sort of like

10:27:10  10  the Roman Empire complaining about having to police the

10:27:13  11  Roman Empire with all the resources it stripped from the

10:27:17  12  Roman Empire.

10:27:18  13         With respect to the argument that H.B. 20 would

10:27:24  14  disseminate speech worldwide and that is an impermissible

10:27:30  15  extraterritorial regulation on speech, the Supreme Court

10:27:34  16  has made clear that in Walsh that just because a state

10:27:39  17  regulation has extraterritorial effects, that doesn't mean

10:27:43  18  it violates the dormant commerce clause.  It's a matter

10:27:48  19  what is being regulated.  And plaintiffs have cited no

10:27:53  20  authority for the fact that what's being

10:27:56  21  extraterritorially regulated here means H.B. 20

10:28:01  22  impermissibly does so.

10:28:03  23         And the Fifth Circuit in Allstate has made clear

10:28:06  24  that what the dormant commerce clause does is, it protects

10:28:10  25  the structure of interstate markets, not the methods of

| | |
|---|---|
| 10:28:15 | 1 |
| 10:28:18 | 2 |
| 10:28:23 | 3 |
| 10:28:29 | 4 |
| 10:28:32 | 5 |
| 10:28:36 | 6 |
| 10:28:37 | 7 |
| 10:28:40 | 8 |
| 10:28:45 | 9 |
| 10:28:50 | 10 |
| 10:28:53 | 11 |
| 10:28:56 | 12 |
| 10:29:00 | 13 |
| 10:29:05 | 14 |
| 10:29:08 | 15 |
| 10:29:12 | 16 |
| 10:29:19 | 17 |
| 10:29:23 | 18 |
| 10:29:29 | 19 |
| 10:27:22 | 20 |
| 10:29:45 | 21 |
| 10:29:51 | 22 |
| 10:29:58 | 23 |
| 10:30:02 | 24 |
| 10:30:05 | 25 |

operation in that market.  So plaintiffs aren't complaining that H.B. 20 somehow interferes with the interstate internet market for social media platforms. They're basically arguing it is going to force them to change their method of operation which doesn't violate the dormant commerce clause.

The Fifth Circuit has also made clear in Allstate that simply by, you know, involving the internet, this doesn't mean that you are -- you're insulated from all regulation by the dormant commerce clause.  I think that a case out of the Western District, which was affirmed by the Fifth Circuit, put it very nicely and that was that, you know, you get -- if anybody could insulate themselves from a state regulation simply by tieing their transactions to the internet, that this would be ridiculous.

I'm going to run briefly through a few -- actually not.  I'm going to move on to the 230 in the interest of time.  So plaintiffs argue that 230 preempts H.B. 20 in two ways.  First, that Section 230 says you can't get damages and -- well, let me back up for a second.  Section 230 doesn't preempt H.B. 20 because H.B. 20 does not provide for a damages remedy.  It only provides for an injunctive remedy.

Section 230 insulates platforms against only

| | | |
|---|---|---|
| 10:30:14 | 1 | liability, that is, liability for damages.  And the only |
| 10:30:19 | 2 | sort of pushback you just heard from plaintiffs on that is |
| 10:30:23 | 3 | a quote from a case that they claim defines immunity as |
| 10:30:30 | 4 | immunity from suit and immunity from liability.  But I ask |
| 10:30:35 | 5 | your Honor to take note that nowhere does Section 230 use |
| 10:30:39 | 6 | the word "immunity."  So it uses the terms "no liability |
| 10:30:46 | 7 | shall attach."  So defining immunity to include immunity |
| 10:30:52 | 8 | from non-damages causes of action is a little bit |
| 10:30:57 | 9 | disingenuous and doesn't link up with 230 at all. |
| 10:31:04 | 10 | Plaintiffs' other argument is that 230 preempts |
| 10:31:10 | 11 | H.B. 20 because 230(c)(1), the part of the statute that |
| 10:31:15 | 12 | deals explicitly with not treating interactive community |
| 10:31:25 | 13 | services as -- or internet services as publishers of |
| 10:31:27 | 14 | information has been found by the Fifth Circuit to |
| 10:31:31 | 15 | prescribe suits over moderating content. |
| 10:31:34 | 16 | Now, I'd point out that if -- that's not the |
| 10:31:38 | 17 | relevant part of the statute to argue is preempting H.B. |
| 10:31:42 | 18 | 20.  If H.B. 20 were preempted by that, it would have to |
| 10:31:47 | 19 | talk about how, yes, these platforms are publishers, |
| 10:31:53 | 20 | right?  And H.B. 20 doesn't do that.  It seeks to create a |
| 10:31:58 | 21 | cause of action for a much narrow set of acts than what a |
| 10:32:05 | 22 | publisher actually does, and that's viewpoint |
| 10:32:08 | 23 | discrimination.  It doesn't try to give a right of action |
| 10:32:12 | 24 | for the full panoply of various torts and other things |
| 10:32:16 | 25 | that publishers are subjected to in which that section of |

| | | |
|---|---|---|
| 10:32:20 | 1 | 230 insulates them from. |
| 10:32:25 | 2 | With respect to plaintiffs' other argument about |
| 10:32:29 | 3 | why 230 preempts H.B. 20, this is where they take issue |
| 10:32:33 | 4 | with our ejusdem generis canon argument.  They say that we |
| 10:32:46 | 5 | don't offer up an argument for why otherwise objectionable |
| 10:32:53 | 6 | at the end of the various categories of speech that 230 |
| 10:32:57 | 7 | says there will be a -- you can't bring a suit over, that |
| 10:33:03 | 8 | we don't explain what unifies those things. |
| 10:33:06 | 9 | Well, the Communications Decency Act, which 230 |
| 10:33:10 | 10 | is a part of, is replete with other categories of content |
| 10:33:18 | 11 | that provide that unifying interest, and sort of at a meta |
| 10:33:24 | 12 | level, that unifying interest is really content.  I think |
| 10:33:29 | 13 | that's all the time I have, your Honor. |
| 10:33:32 | 14 | THE COURT:  I think I show you to have another |
| 10:33:35 | 15 | five minutes if you want to. |
| 10:33:37 | 16 | MR. LYLES:  Okay.  So I'll run through a few |
| 10:33:39 | 17 | other things that were not addressed up here but were -- I |
| 10:33:44 | 18 | would like to make. |
| 10:33:45 | 19 | THE COURT:  Sure. |
| 10:33:47 | 20 | MR. LYLES:  So the dormant commerce clause, it |
| 10:33:49 | 21 | only applies when, you know, there's dormancy.  Here, |
| 10:33:56 | 22 | there is no dormancy.  230 regulates what we're talking |
| 10:34:02 | 23 | about, right, internet communications and moderating them, |
| 10:34:07 | 24 | and it does so with an explicit carve-out for state |
| 10:34:12 | 25 | regulation.  So because, you know, there's no dormancy, |

| | | |
|---|---|---|
| 10:34:18 | 1 | dormant commerce clause doesn't apply. |
| 10:34:20 | 2 | Also, the dormant commerce clause, at most, only |
| 10:34:24 | 3 | indirectly regulates commerce, which means that the |
| 10:34:28 | 4 | dormant commerce clause does not apply.  And the Supreme |
| 10:34:31 | 5 | Court has made clear in a number of decisions, Lopez and |
| 10:34:34 | 6 | Morrison, that the dormant commerce clause analysis is not |
| 10:34:37 | 7 | sort of -- you can't just get in there if commerce is not |
| 10:34:41 | 8 | directly or more than indirectly affected.  And as I just |
| 10:34:49 | 9 | argued, even if the dormant commerce clause applies, H.B. |
| 10:34:53 | 10 | 20 does not violate it.  Okay.  That's all I have, your |
| 10:35:19 | 11 | Honor. |
| 10:35:19 | 12 | THE COURT:  Thank you very much. |
| 10:35:24 | 13 | Mr. Keller, I show you have 23 minutes on the |
| 10:35:33 | 14 | clock. |
| 10:35:34 | 15 | MR. KELLER:  Thank you, your Honor. |
| 10:35:44 | 16 | Governments have tried, time and time again, to |
| 10:35:49 | 17 | limit the First Amendment rights of private entities and |
| 10:35:52 | 18 | to compel speech.  In many of the arguments you've just |
| 10:35:55 | 19 | heard, the Supreme Court has rejected, whether it's in |
| 10:35:58 | 20 | Tornillo or Hurley.  But at base, I'll start very directly |
| 10:36:03 | 21 | because their primary argument is what they have called |
| 10:36:05 | 22 | the common carriage doctrine.  There is no common carriage |
| 10:36:09 | 23 | doctrine that overrides First Amendment rights.  They've |
| 10:36:12 | 24 | made it up. |
| 10:36:16 | 25 | The lead case that they cite for this proposition |

10:36:21   1    about common carriage is a D.C. Circuit opinion, the

10:36:25   2    U.S.C.A. case.  The authors of that decision were judges

10:36:30   3    Srinivasan and Tatel, and here's what they said in a

10:36:34   4    statement concurring the denial of rehearing from en banc

10:36:36   5    from their opinion.  Quote, web platforms such as

10:36:40   6    Facebook, Google, Twitter and YouTube are not considered

10:36:44   7    common carriers that hold themselves out as affording

10:36:46   8    neutral indiscriminate access to their platform without

10:36:49   9    any editorial filtering.

10:36:52  10          They have terms of service that users have to

10:36:54  11    sign up for when they crate an account.  Those terms of

10:36:57  12    service include content moderation policies that are

10:37:02  13    exactly at issue.  The idea that somehow covered platforms

10:37:06  14    have been common carriers or accepting all indifferently

10:37:08  15    is just factually inaccurate.  I mean, think about adult

10:37:12  16    content or pornography on most covered platforms.  Think

10:37:15  17    about not allowing users of certain ages or criminal

10:37:18  18    histories or terrorist organization affiliations.

10:37:21  19          Also, congress in Section 230 expressly addressed

10:37:23  20    this and allowed platforms to moderate content, to remove

10:37:29  21    otherwise objectionable content.  Whatever that phrase

10:37:32  22    means and it should mean something that a platform

10:37:36  23    subjectively considers to be offensive or inappropriate,

10:37:38  24    definitely includes that.  But whatever that means, it

10:37:40  25    shows that platforms aren't common carriers.

10:37:44   1          And what you've heard from the defendant, before

10:37:51   2   I even get to their legal doctrine, think about the point

10:37:54   3   about YouTube removing 1.16 billion comments in three

10:37:59   4   months in 2021.  How is that a common carrier offering

10:38:03   5   indifferent all-comer service is just a dummy pipe passing

10:38:06   6   speech through.  That's not at all the case.  On the legal

10:38:10   7   doctrine, they have proposed a open-ended multifarious,

10:38:16   8   multifactor test.  The chief justice's controlling opinion

10:38:19   9   in Wisconsin Right To Life said the First Amendment must

10:38:22  10   eschew the opened-ended rough-and-tumble of factors.  So

10:38:25  11   whatever this piece-together doctrine is about common

10:38:32  12   carriage, which no court has ever adopted as a basis to

10:38:34  13   overturn First Amendment rights, has to at least have some

10:38:38  14   grounding in precedent, but there is none.

10:38:40  15          Take Turner.  I think Turner's a great case for

10:38:43  16   us.  In Turner, the common carrier nature of a cable

10:38:50  17   company, intermediate scrutiny would still apply.  The

10:38:53  18   defendant's saying no First Amendment scrutiny at all

10:38:56  19   should apply.  In Turner, intermediate scrutiny applied,

10:38:58  20   and the only reason that statute was upheld was because of

10:39:01  21   the longstanding nature of federal government support of

10:39:04  22   broadcast television and 40 percent of Americans would

10:39:07  23   have lost that entire speech medium.

10:39:10  24          If an individual cannot go to a social media

10:39:15  25   platform and post exactly what speech they want to on this

| | | |
|---|---|---|
| 10:39:17 | 1 | private website, there are plenty of other opportunities |
| 10:39:21 | 2 | on the internet.  As <u>Reno vs. ACLU</u> said, the internet is |
| 10:39:24 | 3 | not a scarce commodity.  So there's not going to be this |
| 10:39:29 | 4 | destruction of an entire speech medium.  Even under |
| 10:39:32 | 5 | defendant's test, plaintiffs are not common carriers.  You |
| 10:39:35 | 6 | heard a lot about market power.  Well, first of all, |
| 10:39:39 | 7 | Pacific Gas was a state-sanctioned monopoly.  As much |
| 10:39:44 | 8 | market power as you could get.  And the Supreme Court |
| 10:39:46 | 9 | vindicated Pacific Gas' First Amendment rights and said |
| 10:39:50 | 10 | you do not have to disseminate the speech on someone else. |
| 10:39:53 | 11 | That case squarely forecloses their argument. |
| 10:39:55 | 12 | But if you needed anything else, take Tornillo. |
| 10:39:58 | 13 | The same argument the defendant is making was rejected by |
| 10:40:00 | 14 | the Supreme Court in Tornillo.  Tornillo said the First |
| 10:40:03 | 15 | Amendment protects even a, quote, noncompetitive and |
| 10:40:06 | 16 | enormously powerful company with a monopoly on the |
| 10:40:11 | 17 | marketplace of ideas. |
| 10:40:13 | 18 | Hurley said the enviable size and success of a |
| 10:40:17 | 19 | platform can't eviscerate First Amendment rights and |
| 10:40:20 | 20 | cannot show the platform has an abiding monopoly of access |
| 10:40:23 | 21 | to spectators.  This comes back to the point the internet |
| 10:40:27 | 22 | has all sorts of ways to communicate.  Individuals can go |
| 10:40:30 | 23 | to all sorts of different websites, various other social |
| 10:40:33 | 24 | media platforms. |
| 10:40:33 | 25 | They brought up the countervailing benefit issue. |

| | | |
|---|---|---|
| 10:40:37 | 1 | First of all, this is no basis on which to overturn First |
| 10:40:41 | 2 | Amendment rights.  But regardless, your Honor, I direct |
| 10:40:44 | 3 | you to 47 U.S.C., Section 223.  Congress here disclaimed |
| 10:40:49 | 4 | any intent to treat platforms and websites as common |
| 10:40:55 | 5 | carriers.  When they enacted Section 230, they were not |
| 10:40:58 | 6 | trying to impose common carriage liability.  It would be |
| 10:41:02 | 7 | unconstitutional if they did try, but they didn't even |
| 10:41:05 | 8 | try. |
| 10:41:07 | 9 | The defendant has brought up, multiple times, |
| 10:41:14 | 10 | Justice Thomas' separate opinion in Biden vs. Knight, and |
| 10:41:17 | 11 | I will take that head on.  First of all, that statement |
| 10:41:19 | 12 | was a cert stage, certiorari stage statement about a |
| 10:41:24 | 13 | different issue in which the Supreme Court vacated a lower |
| 10:41:27 | 14 | Court's opinion on mootness.  Merits briefing was not |
| 10:41:31 | 15 | received. |
| 10:41:31 | 16 | And that statement by Justice Thomas, I think, is |
| 10:41:33 | 17 | revealing because at various times, this is not a |
| 10:41:36 | 18 | definitive statement that a particular doctrine does, in |
| 10:41:39 | 19 | fact, exist.  Rather, it's saying, well, look, maybe |
| 10:41:42 | 20 | there's some market power issues regarding the lower |
| 10:41:47 | 21 | court's holding about whether an individual user that's a |
| 10:41:50 | 22 | government official could block other users from |
| 10:41:54 | 23 | retweeting or from commenting on that social media |
| 10:41:59 | 24 | platform.  Well, these are private forums.  And the issue |
| 10:42:01 | 25 | before the Court, even at that certiorari stage briefing, |

|         |    |                                                          |
|---------|----|----------------------------------------------------------|
| 10:42:05 | 1  | was nothing at all like this as to whether government   |
| 10:42:06 | 2  | could compel the dissemination of speech, whether        |
| 10:42:09 | 3  | government could infringe editorial discretion and       |
| 10:42:12 | 4  | certainly in a content-based way.                        |
| 10:42:13 | 5  | So whether we're talking about market power,    |
| 10:42:15 | 6  | which we absolutely do dispute and that's in our reply   |
| 10:42:18 | 7  | brief, but at base, to return to the Wisconsin Right To  |
| 10:42:22 | 8  | Life opinion from the chief justice, we shouldn't have to|
| 10:42:24 | 9  | have an antitrust trial to retain our First Amendment    |
| 10:42:27 | 10 | rights.  First Amendment doctrines are supposed to be    |
| 10:42:31 | 11 | clear, precisely to be able to resolve these issues      |
| 10:42:34 | 12 | without getting into extensive discovery fights and      |
| 10:42:37 | 13 | factual disputes.                                        |
| 10:42:38 | 14 | When the state passes a content-based law,      |
| 10:42:40 | 15 | indeed, a viewpoint-based law, they need a really good   |
| 10:42:45 | 16 | reason.  Strict scrutiny requires that because the First |
| 10:42:49 | 17 | Amendment does not allow government to come and tell     |
| 10:42:54 | 18 | private entities what they can and can't do unless they  |
| 10:42:56 | 19 | have a very good reason when it comes to expression and  |
| 10:42:59 | 20 | dissemination of expression.                             |
| 10:43:00 | 21 | You heard defendant mention something about how, |
| 10:43:03 | 22 | well, social media platforms aren't adopting or agreeing |
| 10:43:06 | 23 | with the speech of their users.  That's completely       |
| 10:43:09 | 24 | irrelevant to the First Amendment analysis.  I mean, think|
| 10:43:12 | 25 | about the number of entities in our society that         |

10:43:13    1    disseminate speech created by others.  Tornillo was a
10:43:18    2    newspaper op-ed case about disseminating speech from
10:43:21    3    others.  Pacific Gas was about a monopoly disseminating
10:43:24    4    speech in envelope mail inserts.  Hurley was a case about
10:43:28    5    a parade organizer disseminating the speech of putative
10:43:32    6    parade participants.  I could go down the list,
10:43:35    7    bookstores, book publishers, essay compilation editors,
10:43:37    8    theaters, newspaper letters to the editor, live television
10:43:41    9    guest interviews, cable television operators, picking
10:43:43   10    cable channels, art shows, community bulletin boards,
10:43:47   11    comedy clubs.  They all have First Amendment rights.  And
10:43:48   12    the theory that you're hearing today is the state can come
10:43:51   13    in and say:  You're a common carrier.  You now have to
10:43:55   14    disseminate the speech that the state wants.  That is a
10:43:58   15    limitless theory of government power.
10:44:02   16            Coming to editorial discretion.  I wrote this
10:44:05   17    down when it was said.  You heard defense say, quote -- or
10:44:10   18    the platforms can, quote, continue to prohibit the content
10:44:14   19    you want to, unquote.  And, your Honor, we're trying to
10:44:19   20    address this argument as directly as we can.  The text
10:44:22   21    that the legislature passed in House Bill 20 says that we
10:44:26   22    cannot engage in viewpoint-based censorship, which is, you
10:44:30   23    know, blocking, banning, removing, de-platforming,
10:44:32   24    demonetizing, all these different words, treating
10:44:34   25    differently.

| | | |
|---|---|---|
| 10:44:34 | 1 | And I can't tell if the state is trying to argue |
| 10:44:37 | 2 | that the viewpoint-based problem with the statute goes to |
| 10:44:42 | 3 | the identity of the user as in, like, if you're a |
| 10:44:45 | 4 | registered democrat, you can't be treated differently. |
| 10:44:48 | 5 | I'm having a very hard time understanding exactly where |
| 10:44:51 | 6 | their argument goes.  But the text of the statute says the |
| 10:44:54 | 7 | viewpoint of the user or another person, but it also says |
| 10:44:56 | 8 | the viewpoint represented in the user's expression.  In |
| 10:45:01 | 9 | other words, this is not a situation where the law is only |
| 10:45:08 | 10 | a antidiscrimination law about identities of people.  It |
| 10:45:12 | 11 | is going to the expression. |
| 10:45:14 | 12 | The state has tried to say, or at least defendant |
| 10:45:19 | 13 | has tried to say, that viewpoint-based is something other |
| 10:45:25 | 14 | than the Supreme Court and what the Fifth Circuit has |
| 10:45:28 | 15 | said.  Now, they say that, well, maybe there's some fuzzy |
| 10:45:32 | 16 | lines.  This is not fuzzy.  R.A.V. vs. City of St. Paul is |
| 10:45:35 | 17 | directly on point.  The statute there, the City of St. |
| 10:45:38 | 18 | Paul passed a hate speech law, and the Supreme Court said |
| 10:45:40 | 19 | this is not only content-based, this is viewpoint |
| 10:45:43 | 20 | discrimination. |
| 10:45:44 | 21 | Robinson, citing Mattel, it's the Fifth Circuit |
| 10:45:47 | 22 | citing the Supreme Court, said when the subjective |
| 10:45:50 | 23 | judgment is this is being made for -- that it is offensive |
| 10:45:54 | 24 | or inappropriate and that's why speech is being taken |
| 10:45:57 | 25 | down, that is a viewpoint-based judgment.  Now, look, if |

10:46:01  1   the defendant is trying to say that all content moderation

10:46:04  2   policies by covered platforms are valid, then why don't

10:46:11  3   they disavow enforcement of this statute?  I mean, you

10:46:15  4   heard this litany of purported public harms, and yet,

10:46:18  5   they're also saying that, well, you can continue to do

10:46:21  6   exactly what you can do.  That is not the text of this

10:46:24  7   statute.  And I think defendant's position in its briefing

10:46:26  8   has only made the statute more vague than it already was.

10:46:29  9           Also, editorial discretion is completely

10:46:32  10  protected, even if it's fair or unfair or inconsistent.

10:46:37  11  The fair or unfair language comes from Hurley.  The

10:46:39  12  inconsistent language comes from Thomas.  Also, the fact

10:46:45  13  that this is a viewpoint-based law that says whenever a

10:46:49  14  platform would want to moderate content based on viewpoint

10:46:52  15  and the state steps in and says no, you must disseminate

10:46:56  16  that viewpoint, that only makes the law worse.

10:46:58  17  Viewpoint-based laws are presumptively unconstitutional.

10:47:02  18  Content-based laws trigger strict scrutiny.

10:47:05  19  Viewpoint-based laws are even worse and that's exactly

10:47:07  20  what we have here.

10:47:08  21          I'll also return to try to address this argument

10:47:12  22  about the example of the Nazi video that I mentioned

10:47:15  23  before.  Take a video that's a speech of Adolf Hitler,

10:47:20  24  same content.  In one context, if that viewpoint is

10:47:24  25  disseminating that speech to try to promote genocide and

| | | |
|---|---|---|
| 10:47:27 | 1 | Nazism, absolutely platforms can moderate that content, |
| 10:47:33 | 2 | and there's no way government can make them spread that |
| 10:47:35 | 3 | message. |
| 10:47:37 | 4 | Now, if the platform, same video but in context |
| 10:47:41 | 5 | is being spread because it's a documentary about World War |
| 10:47:44 | 6 | II, or it's speech trying to point out the atrocities of |
| 10:47:49 | 7 | the holocaust, well, then, maybe platforms can make -- |
| 10:47:52 | 8 | they will make that determination possibly to disseminate |
| 10:47:54 | 9 | that.  That's a viewpoint.  It's the same content and in |
| 10:47:59 | 10 | one case, it's being disseminated, and in the other case, |
| 10:48:02 | 11 | it's being moderated.  House Bill 20 prohibits that. |
| 10:48:05 | 12 | Also, the declarations are clear on how content |
| 10:48:07 | 13 | moderation works.  I'd point your Honor to the Veitch |
| 10:48:12 | 14 | YouTube declaration, paragraphs 24 to 30, and the Potts |
| 10:48:16 | 15 | declaration, Facebook, paragraph 14 to 19. |
| 10:48:20 | 16 | Turning to the point about advertisers.  A profit |
| 10:48:26 | 17 | motive is a completely legitimate motive.  Also, too, you |
| 10:48:31 | 18 | heard from the defendants that, well, advertisers wouldn't |
| 10:48:34 | 19 | change their policies.  That is completely incorrect.  I'd |
| 10:48:37 | 20 | point you to the NetChoice declaration at paragraph 17. |
| 10:48:41 | 21 | What this provision says, in 2017, Google lost millions of |
| 10:48:46 | 22 | dollars in advertising revenue from YouTube after many |
| 10:48:50 | 23 | companies took down their ads after seeing them |
| 10:48:52 | 24 | distributed next to videos containing extremist content |
| 10:48:55 | 25 | and hate speech.  And in 2020, very similar phenomenon |

10:48:57  1   happened to Facebook.  That's because the speech that is

10:49:00  2   disseminated on social media platform is absolutely being

10:49:03  3   identified and associated with the platforms themselves.

10:49:07  4   That was the express purpose of House Bill 20, as your

10:49:10  5   Honor has noted.

10:49:15  6          Coming to the disclosure provisions, you heard

10:49:18  7   from the defendants say that, well, the disclosure

10:49:21  8   provisions can be complied with in no particular fashion.

10:49:24  9   I don't know what that means.  The platforms don't know

10:49:27  10  how to comply with these laws.  What does having to turn

10:49:30  11  over all of your business practices and data content

10:49:33  12  management mean?  You know, they say, well, this doesn't

10:49:37  13  include algorithms.  They asked for platforms' algorithms

10:49:41  14  in discovery in this case.

10:49:49  15         You heard them mention that, well, YouTube has an

10:49:52  16  appeal process already.  That's particularly misleading.

10:49:56  17  This is the YouTube declaration at paragraph 55.  YouTube

10:49:59  18  does have an appeal process for videos that are being

10:50:02  19  moderated but not for comments.  And House Bill 20 covers

10:50:05  20  not only videos, it covers all comments.  And remember,

10:50:08  21  your Honor, in three months in 2021, YouTube took down

10:50:11  22  about nine million videos.  Those would have went through

10:50:16  23  an appellate process.  The 1.16 billion comments that were

10:50:19  24  taken down during that time, those weren't part of

10:50:22  25  YouTube's appellate process.  The declaration here says

10:50:24  1  that YouTube would have to ramp up a 100X effort to comply

10:50:28  2  with these.

10:50:30  3       Also, you heard from the defendant that there was

10:50:32  4  no evidence, no evidence about the burden on this and that

10:50:39  5  complying with disclosure would be no big deal.  The Potts

10:50:41  6  deposition, page 179, line 22 to page 180, 24, quote, what

10:50:48  7  I think would be impossible is for us to comply with

10:50:50  8  anything by December 1st, unquote.  That is the deposition

10:50:53  9  testimony that they elicited.

10:50:59  10      On bad actors point, you heard about that.  The

10:51:05  11  Rumenap declaration from the Stop Child Predators.  Sorry,

10:51:09  12  the deposition, page 40, lines 10 to 8, listed that every

10:51:13  13  additional piece of information that bad actors get about

10:51:16  14  how social media platforms exercise editorial discretion,

10:51:20  15  engage in content moderation that provides, yet, more

10:51:23  16  insight to evade what editorial discretion is left.

10:51:28  17      Briefly on the commerce clause arguments, you did

10:51:31  18  not hear from the defendant any dispute that this would

10:51:33  19  compel platforms to continue operating in the state of

10:51:36  20  Texas.  That is a commerce clause violation.  You cannot

10:51:42  21  -- a government cannot drag a company unwillingly into a

10:51:47  22  state to then regulate it.  You have to under the commerce

10:51:51  23  clause give a company the chance to leave if it wants to.

10:51:55  24      You also didn't hear any dispute that it compels

10:51:58  25  -- that House Bill 20 compels worldwide dissemination of

10:52:02  1  speech.  Defendant attacks a straw man in saying that

10:52:07  2  somehow we're arguing that just because this is online, we

10:52:10  3  can't be regulated.  No.  It's the text of H.B. 20 that

10:52:12  4  extends the right not to just within the territorial

10:52:14  5  borders of Texas, but that viewpoint discrimination based

10:52:18  6  on any other user, even outside of Texas, that, all of a

10:52:22  7  sudden, that has to be disseminated and that there's a

10:52:26  8  hook between Texas users and speech across the globe.

10:52:30  9  That's the commerce clause problem.

10:52:32  10         On Section 230, the text of 233(e)(3) says no

10:52:36  11  cause of action shall be brought.  That could not be more

10:52:38  12  clearer.  A lawsuit cannot be brought.  Whether the

10:52:41  13  lawsuit raises injunctive relief or damages relief, this

10:52:43  14  is another example.  No court has ever adopted a position

10:52:48  15  trying to draw that line.  Even then, on a plain text

10:52:51  16  reading of what a liability means, liability does not just

10:52:54  17  mean money damages.  One is liable if they violate the

10:52:58  18  law, even if the remedy happens to be injunctive relief.

10:53:02  19         So basically, your Honor, House Bill 20's onerous

10:53:08  20  disclosure requirements and its requirement that platforms

10:53:12  21  would have to disseminate viewpoints that they do not want

10:53:15  22  to infringe editorial discretion under Hurley, Tornillo,

10:53:20  23  Pacific Gas, Manhattan Community.  Reno vs. ACLU says the

10:53:25  24  internet's not any different.  In fact, the internet gets

10:53:28  25  full protection.  Distinguishing this case from Turner.

```
10:53:30   1   This is a content-based law, a speaker-based law, indeed,
10:53:33   2   a viewpoint-based law.  All of that triggers strict
10:53:37   3   scrutiny.  The vagueness of this law has only heightened
10:53:40   4   in the context of seeing defendant's opposition to the
10:53:43   5   preliminary injunction motion.
10:53:45   6        The defendants have not posited a sufficient
10:53:50   7   governmental interest recognized by the Supreme Court.
10:53:52   8   They're making up this common carriage doctrine that has
10:53:55   9   no basis in law that no court has ever adopted.  This is
10:53:58  10   not properly tailored.  The government could have created
10:54:00  11   its own social media platform.  The government did not
10:54:06  12   have to draw a statute that only swept in platforms of 50
10:54:08  13   million or more active monthly users, excluding others.
10:54:13  14   That's favoring some social media platforms and it's
10:54:15  15   disfavoring.  And all you have to do is look to the
10:54:18  16   enactment history as to why that was.  This is not about
10:54:21  17   disseminating all speech.  This is about platforms
10:54:25  18   perceived to have bias and the government reacting against
10:54:28  19   them.  The First Amendment does not allow that.
10:54:31  20        And, your Honor, I would just end with this.  You
10:54:35  21   heard from the defendant today that they expect extensive
10:54:40  22   discovery in this case.  This is, yet, another way in
10:54:45  23   which government is trying to use its power to chill First
10:54:49  24   Amendment rights.  What discovery do we need to determine
10:54:54  25   whether Hurley, Tornillo and Pacific Gas protect the
```

| | | |
|---|---|---|
| 10:54:56 | 1 | editorial discretion of social media platforms?  Reno vs. |
| 10:55:03 | 2 | ACLU already said it. |
| 10:55:05 | 3 | What possible factual discovery do we need to |
| 10:55:07 | 4 | determine whether this made-up common carriage doctrine |
| 10:55:10 | 5 | can override First Amendment rights when Pacific Gas |
| 10:55:13 | 6 | involved a monopoly and its First Amendment rights were |
| 10:55:16 | 7 | vindicated?  What facts do we need to determine whether |
| 10:55:19 | 8 | this is content-based law?  We can look on the face of the |
| 10:55:21 | 9 | law.  What facts do we need to determine whether the two |
| 10:55:23 | 10 | interests that they have posited are rejected by the |
| 10:55:25 | 11 | Supreme Court?  What possible facts do we need to know |
| 10:55:28 | 12 | whether Section 230 preemption applies?  These are purely |
| 10:55:31 | 13 | legal questions. |
| 10:55:33 | 14 | And as I mentioned before, the loss of First |
| 10:55:35 | 15 | Amendment freedoms for even an instant is per se |
| 10:55:39 | 16 | irreparable injury.  The state has no sufficient interest |
| 10:55:41 | 17 | in enforcing an unlawful law.  And injunctions upholding |
| 10:55:45 | 18 | First Amendment rights are always in the public interest. |
| 10:55:48 | 19 | We would ask your Honor that you preliminarily enjoin |
| 10:55:51 | 20 | Section 2 and Section 7 of House Bill 20 before they take |
| 10:55:54 | 21 | effect later this week. |
| 10:55:56 | 22 | If there are no further questions, we'd ask for |
| 10:56:00 | 23 | that relief.  Thank you, your Honor. |
| 10:56:01 | 24 | THE COURT:  Thank you.  All right. |
| 10:56:08 | 25 | Before we close out, is there any need to |

10:56:11  1  supplement the record?  Or is everything in the record

10:56:15  2  that needs to be?

10:56:20  3          MR. DISHER:  Yes, your Honor.  Thank you.  Todd

10:56:20  4  Disher for plaintiffs.

10:56:21  5          We have filed all of the exhibits that we are

10:56:23  6  relying on in our moving for preliminary injunction, in

10:56:26  7  addition to citing to the exhibits filed by the

10:56:29  8  defendants.

10:56:30  9          THE COURT:  Very good.  Anything additionally

10:56:31  10  from the state?

10:56:32  11          MS. CORBELLO:  Nothing further to supplement,

10:56:33  12  your Honor.

10:56:33  13          THE COURT:  Okay.  Very good.  Thank you very

10:56:34  14  much.  All right.

10:56:35  15          This has been very helpful.  Thank you very much.

10:56:37  16  I know this is an issue of great importance.  And

10:56:40  17  especially keeping in mind the timelines involved, I've

10:56:45  18  tried to accommodate the need for discovery and limited

10:56:50  19  discovery in the case with the urgency of having this

10:56:53  20  decided.  I appreciate very much your arguments today and

10:56:58  21  your previous briefing.  I will take this under

10:57:01  22  advisement.  I will do my best to get something out one

10:57:06  23  way or the other expeditiously, but obviously there are

10:57:09  24  important issues that need careful consideration.  So all

10:57:12  25  I can do is tell you, as always, we will do our best and

10:57:16  1  thank you all very much.

10:57:18  2          MR. KELLER:  Thank you, your Honor.

3          MS. CORBELLO:  Thank you, your Honor.

4          (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              *  *  *  *  *  *

2

3

4    UNITED STATES DISTRICT COURT  )

5    WESTERN DISTRICT OF TEXAS)

6

7        I, LILY I. REZNIK, Certified Realtime Reporter,

8    Registered Merit Reporter, in my capacity as Official

9    Court Reporter of the United States District Court,

10   Western District of Texas, do certify that the foregoing

11   is a correct transcript from the record of proceedings in

12   the above-entitled matter.

13       I certify that the transcript fees and format comply

14   with those prescribed by the Court and Judicial Conference

15   of the United States.

16       WITNESS MY OFFICIAL HAND this the 16th day of January,

17   2022.

18

19                              /s/Lily I. Reznik
                                LILY I. REZNIK, CRR, RMR
20                              Official Court Reporter
                                United States District Court
21                              Austin Division
                                501 West 5th Street,
22                              Suite 4153
                                Austin, Texas 78701
23                              (512)391-8792
                                SOT Certification No. 4481
24                              Expires:  1-31-23

25