**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| NETCHOICE; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, | ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-00840-RP |
| | ) | |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | ) ) | |
| | ) | |
| *Defendant*. | ) | |
| —————————————————————— | ) | |

**SECOND AMENDED COMPLAINT FOR
<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**

**INTRODUCTION**

1.     Plaintiffs seek a declaration that Texas House Bill 20 (2021) ("HB20") Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), certain provisions of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), and Texas House Bill 3133 (2025) Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) are unconstitutional, unlawful, and unenforceable.[1] Plaintiffs therefore seek an injunction prohibiting Defendant Texas Attorney General from enforcing these statutory provisions against members of

---

[1] Plaintiffs' Second Amended Complaint only challenges specific provisions of HB20 and HB3133: HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), a subset of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104). Because HB3133 amends HB20 in part, references to "HB20" refer to these challenged provisions of HB20 and HB3133 and not other provisions of HB20 or HB3133. This Complaint uses the shorthand "website" to refer to "Internet website[s]" and "application[s]" regulated by HB20. Tex. Bus. & Com.

Plaintiffs NetChoice and Computer & Communications Industry Association ("CCIA") that are regulated by HB20.

2.      The Supreme Court's decision in *Moody v. NetChoice, LLC* and *NetChoice, LLC v. Paxton*, 603 U.S. 707 (2024) ("*Moody*"), confirmed that the "editorial judgments influencing the content" that Plaintiffs' regulated members choose to display on their "social media" websites are "protected expressive activity. And Texas may not interfere with those judgments simply because it would prefer a different mix of messages." *Id.* at 744. Yet through the challenged Sections 2 and 7 of HB20, Texas attempts to do precisely that.

3.      The Supreme Court's analysis in *Moody* eliminates any doubt that the mandates in HB20 are unconstitutional. The Court held unequivocally that when websites curate and disseminate compilations of third-party speech posted on their services, they engage in constitutionally protected speech. *Id.*[2] The Court also explained that the First Amendment prohibits the government from interfering in such curation and dissemination even if its intent is "in improving, or better balancing, the marketplace of ideas." *Id.* at 732.

4.      For years, Defendant attempted to justify HB20 by arguing that it did not regulate protected speech at all, positing that "social media platforms" lack the First Amendment right of editorial discretion. *E.g.*, *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1105 (W.D. Tex. 2021)

---

Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4). Plaintiffs do not challenge any other provision of HB20 or HB3133.

[2] For purposes of this Amended Complaint, "curating and disseminating compilations of third-party speech" refers to, "allow[ing] users to upload content—messages, pictures, videos, and so on—to share with others," where "[t]hose viewing the content can then react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719. Or, as the Eleventh Circuit put it, it means "collect[ing] speech created by third parties" and posted on their services and "mak[ing] that speech available to . . . individuals who have chosen to 'follow' the 'post'-er or members of the general public." *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1203-04 (11th Cir. 2022), *vacated*, *Moody*, 603 U.S. 707.

("[T]he State advocates that social media platforms act as common carriers that may be compelled by the government to publish speech that is objectionable."). *Moody*, however, emphatically rejected Defendant's various arguments asserting that "social media platforms" lack the right to engage in editorial discretion.

5.    The question left open on remand, then, is whether HB20 is "facially" invalid, because a "substantial number of [HB20's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted); *see NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 497 (5th Cir. 2024) (order remanding case).

6.    HB20 is facially unconstitutional under that standard. The reason that much of the parties' arguments focused primarily on what the Supreme Court called the "heartland applications" of HB20—which the Court held unconstitutional—is that those applications "*are* the principal things regulated, and should have just that weight in the facial analysis." *Moody*, 603 U.S. at 726. HB20's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. Accordingly, this Court should declare HB20 unconstitutional and permanently enjoin Defendant from enforcing it against Plaintiffs' members.

7.    At a minimum, HB20 violates the First Amendment as applied to websites operated by NetChoice and CCIA members and covered by HB20 when they curate and disseminate compilations of third-party speech posted on their services.

8.    In addition, aspects of HB20 are unconstitutionally vague, violate the Commerce Clause, and are preempted by 47 U.S.C. § 230 ("Section 230").

9.    At bottom, "Texas does not like the way" Plaintiffs' covered members "are select-ing and moderating content, and wants them to create a different expressive product, communi-cating different values and priorities. But under the First Amendment, that is a preference Texas may not impose." *Moody*, 603 U.S. at 743.

## PARTIES AND STANDING

10.    **Plaintiffs NetChoice and CCIA and their member companies.** Plaintiff NetChoice is a non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code created in, and existing under, the laws of the District of Columbia. A list of NetChoice's members is publicly available at https://perma.cc/AV6A-SCRA. NetChoice's mission is directly related to this lawsuit: to promote online commerce and speech and to increase consumer access and options through the Internet, while minimizing burdens on businesses to make the Internet more accessible and useful. NetChoice serves the interests of its members, which share a commitment to the vital First Amendment protections that HB20 undermines.

11.    Plaintiff Computer & Communications Industry Association is a non-profit entity organized under Section 501(c)(6) of the Internal Revenue Code and incorporated in the Common-wealth of Virginia. A list of CCIA's members is publicly available at https://perma.cc/9BKB-RHXJ. CCIA's mission is directly related to this lawsuit: For more than 50 years, CCIA has pro-moted open markets, open systems, and open networks. CCIA serves the interests of its members, which share a commitment to the vital First Amendment protections that HB20 undermines.

12.    Plaintiffs NetChoice and CCIA regularly represent their members' interests in liti-gation challenging unconstitutional state regulation of online speech. *See, e.g.*, *NetChoice v. Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice,*

*LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

13.    Plaintiffs have standing to assert both their members' First Amendment rights and the First Amendment rights of their members' current and prospective users. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *Carr*, 2025 WL 1768621, at *4-7; *Yost*, 778 F. Supp. 3d at 938-46; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *CCIA*, 747 F. Supp. 3d at 1028-31; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *8-10 (W.D. Ark. Aug. 31, 2023).

14.    Plaintiffs have associational standing to bring this suit on behalf of their members that are regulated by HB20 because: (1) those members would have standing to sue in their own right, as they are "the object" of HB20's regulation and face substantial liability if they allegedly violate HB20, *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019); (2) challenging HB20 Sections 2 and 7 is germane to Plaintiffs' missions, as HB20 is fundamentally at odds with Plaintiffs' policies and objectives; and (3) members' "'individual participation'" as parties is not "necessary" because Plaintiffs seek "prospective [and] injunctive relief for [their] members," *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citation omitted).

15.    Several of Plaintiffs' members would have standing to challenge HB20 Sections 2 and 7 in their own right because: (1) many of their services are the direct targets of HB20, as reflected in HB20's definition of regulated "social media platform[s]," Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4); (2) these members exercise editorial judgments on their services that are prohibited or otherwise regulated by HB20; and (3) these

members will face serious legal consequences from allegedly failing to comply with HB20's requirements.

16.    In particular, Plaintiffs bring this challenge on behalf of websites operated by Plaintiffs' members when they curate and disseminate compilations of third-party speech posted on their services, including, *e.g.*, (1) Facebook (Meta); (2) Instagram (Meta); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Tumblr (Automattic); (7) X; and (8) YouTube.

17.    Websites like Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube are "social media platform[s]" as defined by HB20 because each is an "Internet website or application" that is "open to the public" and that "allows a user to create an account" to "communicate with other users for the primary purpose of posting information, comments, messages, or images"—and none of them qualifies for any statutory exclusions. Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4).

18.    Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube each "functionally has more than 50 million active users in the United States in a calendar month." Tex. Bus. & Com. Code § 120.002(b); Tex. Civ. Prac. & Rem. Code § 143A.004(c).

19.    This threshold itself demonstrates that HB20 targets websites whose editorial discretion the Supreme Court has recognized warrants First Amendment protection. *See Moody*, 603 U.S. at 724.

20.    Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube all "present[ ] a user with a continually updating stream of other users' posts"—including in a "News Feed" "homepage" or "near equivalents"—where "any user may upload a message, whether verbal or visual, with content running the gamut from 'vacation pictures from friends' to 'articles from

local or national news outlets.' And whenever a user signs on," each regulated service "delivers a personalized collection of those stories." *Id.* at 724, 734 (internal citation omitted).

21.    These feeds represent the core expressive activity that HB20 unconstitutionally restricts. *See id.* at 738-39 (describing how websites' content moderation creates "distinctive expressive offering").

22.    The Supreme Court has held that "the content-moderation choices reflected in these "feeds" are the kinds of "editorial choice[s]" that render the services "expressive product[s]." *Id.* at 726.

23.    This protection extends to all aspects of websites' content moderation activity, including decisions about what content to "remove, alter, organize, prioritize, or disclaim." *Id.* at 718.

24.    The "editorial judgments influencing the content of" Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube's feeds "are . . . protected expressive activity." *Id.* at 744.

25.    When discussing Facebook's "News Feed" and "similar platforms," the Supreme Court held that HB20:

> prevents exactly the kind of editorial judgments this Court has previously held to receive First Amendment protection. It prevents a platform from compiling the third-party speech it wants in the way it wants, and thus from offering the expressive product that most reflects its own views and priorities. Still more, the law—again, in that specific application—is unlikely to withstand First Amendment scrutiny. Texas has thus far justified the law as necessary to balance the mix of speech on Facebook's News Feed and similar platforms; and the record reflects that Texas officials passed it because they thought those feeds skewed against politically conservative voices. But this Court has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to "un-bias" what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others.

*Id.* at 718-19.

26.    The Supreme Court recognized Facebook's content moderation on its "News Feed" as a quintessential example of protected editorial discretion. *See, e.g.*, *id.* at 734-40.

27.    So too with YouTube's content moderation on its homepage. *See, e.g.*, *id.*

28.    Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube all "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]," a "compilation of speech" (text, audio, images, and video) "originally created by others" for each user. *Id.* at 728.

29.    Facebook, Instagram, Nextdoor, Pinterest, YouTube, and X all engage in editorial discretion through "content moderation."

30.    Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube "use [their] content-moderation standards to remove, alter, organize, prioritize, or disclaim posts in" "feeds" on their services. *Id.* at 718.

31.    Some of the content-moderation policies and practices of Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube affect "a user, a user's expression, or a user's ability to receive the expression of another person based on: (1) the viewpoint of the user or another person; (2) the viewpoint represented in the user's expression . . . ; or (3) a user's geographic location in this state or any part of this state." Tex. Civ. Prac. & Rem. Code § 143A.002(a)(1)-(3).

32.    But HB20 seeks to meddle with those same First-Amendment-protected activities, on pain of regulatory sanction.

33.    The content-moderation policies and practices of Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube include actions taken to "block, ban, remove, deplat-form, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." *Id.* § 143A.001(1).

34.     The content-moderation policies and practices of Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube "implement" their "Community Standards" or similar editorial policies. *Moody*, 603 U.S. at 734-35.

35.     All of these Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube content-moderation policies and practices are created by humans.

36.     Meta "wants people to be able to talk openly about the issues that matter to them." Meta Transparency Center, Community Standards, https://perma.cc/M5AM-3SVG. But Meta also recognizes that "the internet creates new and increased opportunities for abuse." *Id.* It therefore restricts several categories of content that it finds objectionable, such as hate speech, bullying, and harassment. *Id.*

37.     Meta's Community Standards for Facebook and Instagram are publicly available at: https://perma.cc/M5AM-3SVG.

38.     Nextdoor's Community Guidelines explain that Nextdoor "want[s] everyone to feel welcome on Nextdoor" and that it "created the[] Guidelines to define the values of the community [it] want[s] to build" because its users are "connected . . . [by] a shared connection to a place—[users'] neighborhood." Nextdoor, Community Guidelines, https://perma.cc/8SX4-RDM2. Accordingly, Nextdoor does "not tolerate racism, hateful language, or discrimination of any kind." *Id.*

39.     Nextdoor's    Community    Guidelines    are    publicly    available    at: https://perma.cc/8SX4-RDM2.

40.     Pinterest's policies advise that "Pinterest isn't a place for antagonistic, explicit, false or misleading, harmful, hateful, or violent content or behavior." Pinterest, Community Guidelines, https://perma.cc/PSA2-RWPY. Pinterest therefore reserves the right to "remove, limit, or

block the distribution of such content and the accounts, individuals, groups and domains that create or spread it based on how much harm it poses." *Id.*

41.    Pinterest's    Community    Guidelines    are    publicly    available at: https://perma.cc/PSA2-RWPY.

42.    Reddit's policies explain:

Every community on Reddit is defined by its users. Some of these users help manage the community as moderators. The culture of each community is shaped explicitly, by the community rules enforced by moderators, and implicitly, by the upvotes, downvotes, and discussions of its community members. Please abide by the rules of communities in which you participate and do not interfere with those in which you are not a member.

Below the rules governing each community are the platform-wide rules that apply to everyone on Reddit. These rules are enforced by us, the admins.

Reddit and its communities are only what we make of them together, and can only exist if we operate by a shared set of rules. We ask that you abide by not just the letter of these rules, but the spirit as well.

Reddit, Reddit Rules, https://perma.cc/7T26-TE8N.

43.    The Reddit Rules are publicly available at: https://perma.cc/7T26-TE8N.

44.    Tumblr's policies explain:

As a global platform for creativity and self-expression, Tumblr is deeply committed to supporting and protecting freedom of speech. At the same time, we draw lines around a few narrowly defined but deeply important categories of content and behavior that jeopardize our users, threaten our infrastructure, and damage our community.

Tumblr User Guidelines, https://perma.cc/BSZ4-RU2S.

45.    Tumblr's User Guidelines are publicly available at: https://perma.cc/BSZ4-RU2S.

46.    X seeks to "empower people to understand different sides of an issue and encourage dissenting opinions and viewpoints to be discussed openly." X, Help Center, Our Approach to Policy Development and Enforcement Philosophy, https://perma.cc/BTV8-T8VV. So rather than

take a heavy handed approach to speech it finds objectionable, X prefers to "promote[] counter-speech: speech that presents facts to correct misstatements or misperceptions, points out hypocrisy or contradictions, warns of offline or online consequences, denounces hateful or dangerous speech, or helps change minds and disarm." *Id.* X also prohibits, among other things, (1) various kinds of "hateful conduct," X, Help Center, Hateful Conduct, https://perma.cc/VZ3D-AHQ6; (2) "hoping for others to die, suffer illnesses, tragic incidents, or experience other physically harmful consequences," X, Help Center, Violent Content, https://perma.cc/PK68-ACGW, and (3) "[p]osts that include manifestos or other similar material produced by perpetrators [of violent acts] . . . , even if the context is not abusive," X, Help Center, Perpetrators of Violent Attacks, https://perma.cc/C7CM-T7FX.

47.    These X policies and practices are publicly available at: https://perma.cc/R4PU-C6P2.

48.    YouTube's policies "aim to make YouTube a safer community while still giving creators the freedom to share a broad range of experiences and perspectives." YouTube, Community Guidelines, https://perma.cc/ULW4-QUUR. YouTube thus prohibits pornography, violent and graphic content, and more. *Id.*

49.    YouTube's    Community    Guidelines    are    publicly    available at: https://perma.cc/ULW4-QUUR.

50.    When moderating content, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube sometimes use "algorithms"—computer programs created by humans—which the services "write . . . to implement" their "Community Standards" and similar policies. *Moody*, 603 U.S. at 734-35.

51.     Algorithms are computer programs, which in themselves are recognized to have First Amendment protection. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 442 (2d Cir. 2001). "Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection." *Id*. at 446 (citing *Miller v. California*, 413 U.S. 15, 34 (1973) ("The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value[.]")).

52.     The content-moderation "algorithms" of Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube do not "respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at 736 n.5.

53.     **Defendant Ken Paxton, Attorney General of Texas.** Defendant Ken Paxton is the Attorney General of Texas. He is a resident of Texas. Attorney General Paxton is sued only in his official capacity as the state official responsible for HB20's enforcement. Tex. Bus. & Com. Code § 120.151; Tex. Civ. Prac. & Rem. Code § 143A.008.

54.     Defendant Paxton poses a "credible threat of enforc[ing]" HB20. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014); *CCIA*, 2024 WL 4051786, at *6.

### JURISDICTION AND VENUE

55.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

56.     This Court has personal jurisdiction over Defendant, because he resides in and/or conducts a substantial proportion of his official business in Austin, Texas.

57.     Defendant has not challenged this Court's personal jurisdiction.

58.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the only Defendant resides in, and the events giving rise to this civil action occurred in, Austin, Texas.

59.    Defendant has not challenged venue.

## FACTUAL BACKGROUND

60.    Plaintiffs' members' "platforms . . . are [] engaged in expression. In constructing

certain feeds, those platforms make choices about what third-party speech to display and how to

display it. They include and exclude, organize and prioritize—and in making millions of those

decisions each day, produce their own distinctive compilations of expression." *Moody*, 603 U.S.

at 716.

61.    **Editorial policies and scope of editorial activities.** NetChoice and CCIA mem-

bers moderate content "in conformity with content-moderation policies . . . . Those rules list the

subjects or messages the platform prohibits or discourages—say, pornography, hate speech, or

misinformation on select topics. The rules thus lead ['social media platforms'] to remove, disfavor,

or label various posts based on their content." *Id.* at 719-20; *see id.* at 735 ("Facebook's Commu-

nity Standards and YouTube's Community Guidelines detail the messages and videos that the

platforms disfavor. The platforms write algorithms to implement those standards—for example, to

prefer content deemed particularly trustworthy or to suppress content viewed as deceptive (like

videos promoting 'conspiracy theor[ies]')."); *id.* at 738 ("The Community Standards and Commu-

nity Guidelines set out in copious detail the varied kinds of speech the platforms want no truck

with.").

62.    **Prioritization and de-prioritization of content.** "In the face of" a "staggering

amount of content" submitted by users, "the major platforms cull and organize uploaded posts in

a variety of ways. A user does not see everything—even everything from the people she follows—

in reverse-chronological order. The platforms will have removed some content entirely; ranked or

otherwise prioritized what remains; and sometimes added warnings or labels." *Id.* at 719. "The key

to the scheme is prioritization of content, achieved through the use of algorithms. Of the billions

of posts or videos (plus advertisements) that could wind up on a user's customized feed or recommendations list, only the tiniest fraction do. The selection and ranking is most often based on a user's expressed interests and past activities. But it may also be based on more general features of the communication or its creator." *Id.* at 734-35.

63.     Covered websites exercise editorial discretion over even the most basic online functions that users may take for granted, such as searching for local businesses, movie showtimes, or weather reports based on what they predict is likely to be most relevant and useful.

64.     **Removal of content that contravenes members' policies.** "Facebook and YouTube exclude (not to mention, label or demote) lots of content from their News Feed and homepage. . . . In a single quarter of 2021, Facebook removed from its News Feed more than 25 million pieces of 'hate speech content' and almost 9 million pieces of 'bullying and harassment content.' Similarly, YouTube deleted in one quarter more than 6 million videos violating its Guidelines. And among those are the removals the Texas law targets." *Id.* at 738-39 (citations omitted).

65.     According to publicly available information, covered members individually remove millions of pieces of user-submitted content every quarter. *See* Meta, Community Standards Enforcement Report, https://perma.cc/LM9A-HXA2 (Facebook and Instagram); Nextdoor, Transparency Report 2023 (Feb. 2024), https://perma.cc/77A3-FFLN; Pinterest, Transparency Report, https://perma.cc/NZX6-RUNS; X, Global Transparency Report H1 2024, https://perma.cc/7V6C-JDKF; YouTube, YouTube Community Guidelines Enforcement, https://perma.cc/CR5C-QSSJ.

66.     **Labels.** "Beyond rankings lie labels. The platforms may attach 'warning[s], disclaimers, or general commentary'—for example, informing users that certain content has 'not been verified by official sources.' Likewise, they may use 'information panels' to give users 'context

on content relating to topics and news prone to misinformation, as well as context about who sub-mitted the content.'" *Moody*, 603 U.S. at 735 (citations omitted).

67.     **Termination or suspension of users who violate members' policies.** When a user account has repeatedly posted improper content or otherwise violated the website's rules, the web-site may decide to "bar[] a specific user from posting on the provider's site. This can happen, for example, when a user violates the provider's standards by engaging in fraud, spreading a foreign government's disinformation, inciting a riot or insurrection, providing false medical or public-health information, or attempting to entice minors for sexual encounters." *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1086 (N.D. Fla. 2021).

68.     **Positive experiences.** NetChoice and CCIA members also curate the content users post on their websites to provide safer experiences for users. One way to achieve this is via "age-gating," which is used by various members to restrict access to certain types of content. For exam-ple, age-gating might be used to restrict access to videos about a cannabis dispensary, sexually suggestive jokes that may not be appropriate for all users, content using vulgar language, and vid-eos with violent imagery. Covered members also provide tools that can be used by adults to protect their children, or by entities that want to limit the use of certain services on their network, while still allowing adults and others to find a wide range of content. YouTube, for example, offers a feature called "Restricted Mode," which is an optional setting users can activate to limit the content that will be displayed to them. Libraries, schools, and public institutions often use this feature. Videos containing adult content such as drug or alcohol use, sexual situations, or violence are not shown to users who have activated Restricted Mode. *See* YouTube, Your YouTube Content & Restricted Mode, https://perma.cc/RKC9-9FB7. Likewise, Meta is introducing Instagram "Teen Accounts," a service to "help keep teens safe on Instagram" by "limiting unwanted contact" and

"showing [them] content that's right for their age." See Meta, About Instagram Teen Accounts, https://perma.cc/C5RY-E48S.

### TEXAS HOUSE BILL 20 (2021) AND HOUSE BILL 3133 (2025)

69.    As relevant to this First Amended Complaint, HB20 contains two sets of challenged provisions regulating certain social media websites: (1) Section 7's anti-editorial-discretion provisions, prohibiting forms of editorial discretion; and (2) Section 2's notice, complaint, and appeals processes.

70.    HB3133 Section 3 amends HB20 Section 2 to add an additional notice requirement about HB20 Section 2's existing notice, complaint, and appeals processes.

71.    **HB20's central coverage definition and regulated actors.** HB20 applies to a content-based and speaker-based subset of state-disfavored "social media platforms." HB20's plain text limits HB20's "scope" to cover only (1) "giant social-media platforms" and (2) essentially only to their "curated feed[s]" compiling user-generated speech that are "their best-known services." *Moody*, 603 U.S. at 724.

72.    HB20 defines "social media platform" as an "Internet website or application" that is "*open to the public*" and that "allows a user to create an account" to "communicate with other users *for the primary purpose* of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1) (emphases added); Tex. Civ. Prac. & Rem. Code § 143A.001(4).

73.    HB20 Sections 2 and 7 "appl[y] only to a social media platform that functionally has more than 50 million active users in the United States in a calendar month." Tex. Bus. & Com. Code § 120.002(b); Tex. Civ. Prac. & Rem. Code § 143A.004(c).

74.    Accordingly, the "actors" covered by HB20 that are Plaintiffs' members include the largest "social-media platform[s]," such as, *e.g.*, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Tumblr, X, and YouTube.

75.   HB20 excludes smaller websites, such as Rumble, Gab, Parler, and Truth Social.

76.   Rumble, Gab, Parler, and Truth Social are websites perceived as exercising their editorial discretion in a manner that the State prefers.

77.   HB20's definition of "social media platform" tracks the ordinary usage of the term: "[T]he term 'social media platforms' typically refers to websites and mobile apps that allow users to upload content—messages, pictures, videos, and so on—to share with others. Those viewing the content can then react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719; *see Packingham v. North Carolina*, 582 U.S. 98, 104 (2017).

78.   HB20 also incorporates the ordinary meaning of the term "post" and "posting," which denote pieces of expressive content submitted to online services for multiple people to see.

79.   A "post" is ordinarily defined as "an electronic message or information that is put on a website in order to allow many people to see it." *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73.

80.   In addition, the "meaning of" defined statutory terms "is almost always closely related to the ordinary meaning of the word being defined." Antonin Scalia & Bryan Garner, Reading Law 228 (2012); *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 861 (2014) (considering "the ordinary meaning of a defined term" to determine the "fair reading" of the statute).

81.   The phrase "social media platform" is commonly understood to refer to websites and applications where users share content and interact with content shared by others.

82.   And the statute's use of "social media platform" conforms to the Legislature's finding that "social media platforms . . . are central public forums for public debate." Acts 2021, 87th Leg., 2nd C.S., ch. 3 (H.B. 20), § 1(3). Plaintiffs do not adopt or endorse that finding.

83.    Consequently, the challenged HB20 provisions here do not regulate other hypothetical actors beyond "social-media entities." *Moody*, 603 U.S. at 725.

84.    HB20's definition of covered "social media platform[s]" expressly contains content-based and speaker-based exceptions for websites that "consist[] primarily of news, sports, entertainment, or other information or content that is not user generated but is preselected by the provider," so long as user chats and comments are "incidental to" the "preselected" content. Tex. Bus. & Com. Code § 120.001(1)(C).

85.    Email services are not "social media platform[s]," as defined by Tex. Bus. & Com. Code § 120.001(1) and Tex. Civ. Prac. & Rem. Code § 143A.001(4).

86.    Email is expressly excluded from HB20. Tex. Bus. & Com. Code § 120.001(1)(B).

87.    The "primary purpose," *id.* § 120.001(1), of online marketplaces, payment services, and ride-sharing services, *Moody*, 603 U.S. at 725, is to engage in commercial transactions—separate from users publicly "posting information, comments, messages, or images," Tex. Bus. & Com. Code § 120.001(1).

88.    Online marketplaces are not "social media platform[s]," as defined by Tex. Bus. & Com. Code § 120.001(1) and Tex. Civ. Prac. & Rem. Code § 143A.001(4).

89.    Payment services are not "social media platform[s]," as defined by Tex. Bus. & Com. Code § 120.001(1) and Tex. Civ. Prac. & Rem. Code § 143A.001(4).

90.    Ride-sharing services are not "social media platform[s]," as defined by Tex. Bus. & Com. Code § 120.001(1) and Tex. Civ. Prac. & Rem. Code § 143A.001(4).

91.    Presumably, these exceptions are why Defendant's counsel told the Supreme Court that an online marketplace like "Etsy" would not be covered by HB20. *See* Oral Argument Tr. at 62, No. 22-555, *NetChoice L.L.C. v. Paxton* (Feb. 26, 2024) ("*Paxton* Tr.").

92.    Internet search engines are not "social media platform[s]," as defined by Tex. Bus. & Com. Code § 120.001(1) and Tex. Civ. Prac. & Rem. Code § 143A.001(4).

93.    A search engine's "primary purpose" is to direct users to websites generated by third parties that match the search parameters input by the users—rather than allowing users to publicly post speech and interact. Tex. Bus. & Com. Code § 120.001(1); *see Moody*, 603 U.S. at 745 (Barrett, J., concurring).

94.    **HB20 Section 7's restrictions on editorial discretion (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008).** As the Supreme Court recognized:

> [T]he law's central provision prohibits the large social-media platforms . . . from "censor[ing]" a "user's expression" based on its "viewpoint." § 143A.002(a)(2). The law defines "expression" broadly, thus including pretty much anything that might be posted. *See* § 143A.001(2). And it defines "censor" to mean "block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." § 143A.001(1). That is a long list of verbs, but it comes down to this: The platforms cannot do any of the things they typically do (on their main feeds) to posts they disapprove—cannot demote, label, or remove them—whenever the action is based on the post's viewpoint. And what does that "based on viewpoint" requirement entail? Doubtless some of the platforms' content-moderation practices are based on characteristics of speech other than viewpoint (*e.g.*, on subject matter).

*Moody*, 603 U.S. at 736-37.

95.    Thus, "if Texas's law is enforced, the platforms could not—as they in fact do now—disfavor posts because they:"

- support Nazi ideology;

- advocate for terrorism;

- espouse racism, Islamophobia, or anti-Semitism;

- glorify rape or other gender-based violence;

- encourage teenage suicide and self-injury;

- discourage the use of vaccines;

• advise phony treatments for diseases;

• advance false claims of election fraud.

The list could continue for a while. The point of it is not that the speech environment created by Texas's law is worse than the ones to which the major platforms aspire on their main feeds. The point is just that Texas's law profoundly alters the platforms' choices about the views they will, and will not, convey.

*Id.* at 737.

96.     HB20 Section 7 makes it unlawful for a "social media platform" to "censor a user, a user's expression, or a user's ability to receive the expression of another person based on: (1) the viewpoint of the user or another person; (2) the viewpoint represented in the user's expression . . . ; or (3) a user's geographic location in this state or any part of this state." Tex. Civ. Prac. & Rem. Code § 143A.002(a)(1)-(3).

97.     A "user" is a person who "posts, uploads, transmits, shares, or otherwise publishes or receives expression through a social media platform." *Id.* § 143A.001(6); Tex. Bus. & Com. Code § 120.001(2) (similar). This includes "a person who has a social media platform account that the social media platform has disabled or locked." Tex. Civ. Prac. & Rem. Code § 143A.002(6).

98.     Users who live in the state of Texas, do business in Texas, or "share[] or receive[] content on a social media platform" in Texas are covered by HB20. *Id.* § 143A.004(a)-(b); Tex. Bus. & Com. Code § 120.002(a)(3).

99.     Because users "receive" content posted by users located all over the globe, HB20 essentially applies world-wide. Tex. Bus. & Com. Code § 120.002(a)(3); Tex. Civ. Prac. & Rem. Code § 143A.004(a)-(b).

100.     HB20 Section 7 does not define "viewpoint," and being undefined, it is vague enough to encompass vast amounts of expression. For instance:

The Texas solicitor general explained at [Supreme Court] oral argument that the Texas law allows the platforms to remove "categories" of speech, so long as they

20

> are not based on viewpoint. The example he gave was speech about Al-Qaeda. Under the law, a platform could remove all posts about Al-Qaeda, regardless of viewpoint. But it could not stop the "pro-Al-Qaeda" speech alone; it would have to stop the "anti-Al-Qaeda" speech too. So again, the law, as described by the solicitor general, prevents the platforms from disfavoring posts because they express one view of a subject.

*Moody*, 603 U.S. at 737 n.8 (citations omitted); *see Paxton* Tr. at 70-71 ("You can't—you could—you can't very well say you can have the, you know, anti-Al-Qaeda but not the pro-Al-Qaeda.").

101.    HB20 defines "censor" to encompass many editorial tools available to the covered websites: "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." Tex. Civ. Prac. & Rem. Code § 143A.001(1).

102.    HB20 does not provide any guidance as to what any of these component parts of the "censor" definition mean.

103.    Plaintiffs and their members disagree with the pejorative and inaccurate labeling of their protected editorial discretion as "censor[ship]."

104.    The Texas Legislature enacted two content-based exceptions to HB20 Section 7's general prohibition on editorial discretion.

105.    *First*, Section 7 states that HB20 does not apply to services exercising editorial discretion over content "that is the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment." *Id.* § 143A.006(a)(2).

106.    *Second*, the prohibition on purported "censorship" does not apply to services exercising editorial discretion over "expression that directly incites criminal activity or consists of specific threats of violence targeted against a person or group because of their race, color, disability,

religion, national origin or ancestry, age, sex, or status as a peace officer or judge." *Id.*
§ 143A.006(a)(3).

107.    The Legislature appeared to acknowledge that at least some applications of HB20
contravene federal law, adding a provision stating that HB20 "does not subject a social media
platform to damages or other legal remedies to the extent the social media platform is protected
from those remedies under federal law." *Id.* § 143A.005. Similarly, Section 7 provides that it
should not be construed to prohibit a "social media platform" from "censoring expression" that it
"is specifically authorized to censor by federal law." *Id.* § 143A.006(a)(1). But rather than save
HB20 from challenge, these provisions serve merely to highlight its irremediable defects.

108.    HB20 Section 7 is enforceable by both private lawsuits brought by users for declar-
atory and injunctive relief, *id.* § 143A.007; and by the Attorney General for injunctive relief, *id.*
§ 143A.008. Notably, the Attorney General may "bring an action to *enjoin* a violation *or potential
violation*." *Id.* § 143A.008(b) (emphases added). Both private plaintiffs and the Attorney General
may recover reasonable costs and attorneys' fees. *Id.* §§ 143A.007(b)(1), 143A.008(b). Although
HB20 does not expressly provide for monetary penalties, it permits courts to hold covered services
in civil contempt—including unspecified daily penalties—in the event a service does not
"promptly" comply with a court order. *Id.* § 143A.007(c).

109.    **Section 2's notice, complaint, and appeal provisions (Tex. Bus. & Com. Code
§§ 120.101-.102(a), .103-.104).** HB20 complements Section 7's direct restrictions on editorial
judgment with Section 2's notice, complaint, and appeal provisions designed to burden the exer-
cise of editorial discretion.

110.    These HB20 Section 2 notice-complaint-appeal provisions will chill the exercise of
editorial discretion.

111.    These HB20 Section 2 notice-complaint-appeal provisions require covered services to have systems to accept and respond to user complaints, provide users notice of all content removals, and allow users to appeal or challenge services' decisions to remove content.

112.    HB20 Section 2 mandates that covered services must provide users with a complaint system about content on the service. If a covered service receives "notice of illegal content or illegal activity" on the service, it must (1) "enable a user to submit a complaint in good faith and track the status of the complaint"; and (2) "make a good faith effort to evaluate the legality of the content or activity within 48 hours of receiving the notice." Tex. Bus. & Com. Code § 120.102(a).

113.    HB20 Section 2 also mandates that covered websites must provide users with notice for removed content, requiring individualized explanations about removal decisions. If a service removes content based on a violation of its acceptable use policy, it must "(1) notify the user who provided the content of the removal and explain the reason the content was removed"; (2) "allow the user to appeal the decision to remove the content to the platform"; and (3) "provide written notice to the user who provided the content" of the determination of the appeal requested or of the reason for the reversal of the platform's decision, if there is a reversal. *Id.* § 120.103(a).

114.    HB20 Section 2 also mandates that covered services must have appeals systems for users to challenge the services' content removals. Each "social media platform" must set up an "easily accessible" system. *Id.* § 120.101. If a "social media platform" receives a user complaint that the platform removed content "provided by the user that the user believes was not potentially policy-violating content," then the platform has 14 days (excluding weekends) from when it receives the complaint to: (1) "review the content"; (2) "determine whether the content adheres to

the platform's acceptable use policy"; (3) "take appropriate steps based on the determination"; and (4) "notify the user regarding the determination made . . . and the steps taken." *Id.* § 120.104.

115.    These HB20 Section 2 notice-complaint-appeal provisions are enforceable through an action brought by the Texas Attorney General against a "social media platform" to enjoin violations of any of the foregoing provisions. If successful, the Attorney General may recover costs incurred, including reasonable attorneys' fees and investigative costs. *Id.* § 120.151(a)-(b).

116.    **HB3133 Section 3's notice requirements about Section 2's notice, complaint, and appeals processes (Tex. Bus. & Com. Code § 120.1015).** HB3133 Section 3 amends HB20 Section 2, to require covered websites to provide notice about HB20 Section 2's notice-complaint-appeal provisions.

117.    Covered websites must:

(a) . . . provide notice on the platform of the complaint system and procedures described by this subchapter.

(b) Notice under this section:

    (1) must be clear and conspicuous to a user;

    (2) must be written using plain language;

    (3) must describe the duties of a social media platform under Section 120.102;

    (4) must describe the process by which a user may submit a complaint; and

    (5) may be provided on another Internet web page to which a user may navigate through the use of a clear and conspicuous hyperlink.

*Id.* § 120.1015.

118.    This lawsuit only challenges HB3133 Section 3 to the extent that it requires disclosure or notice of the notice-complaint-appeal provisions in Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104.

\*        \*        \*

119.    The Supreme Court recounted "the stated views of those who enacted" HB20: "The law's main sponsor explained that the 'West Coast oligarchs' who ran social-media companies were 'silenc[ing] conservative viewpoints and ideas.' The Governor, in signing the legislation, echoed the point: The companies were fomenting a 'dangerous movement' to 'silence' conservatives. . . . '[S]ilencing conservative views is un-American, it's un-Texan and it's about to be illegal in Texas.'" *Moody*, 603 U.S. at 741 (citation omitted).

120.    HB20's effective date was December 2, 2021. The provisions challenged in this lawsuit remain enjoined.

## CLAIMS

121.    Plaintiffs raise both (1) a facial challenge to HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), HB20 Section 2's notice-complaint-appeal provisions (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), and HB3133 Section 3's notice provisions (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104); and (2) a challenge to these same provisions as applied to members' covered services when they curate and disseminate compilations of third-party speech posted on their services, such as the services identified in ¶ 16.

122.    For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [HB20's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). At a minimum, HB20 is invalid to the extent it regulates websites when they curate and disseminate compilations of third-

party speech posted on their services, including as applied to Plaintiffs' members' regulated services identified in ¶ 16. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

123.     On the basis of the exclusions set forth in paragraphs 78-87, Plaintiffs' as-applied challenge does not extend to websites when they operate direct messaging, email, online marketplace services, ride-sharing services (*e.g.*, Uber and Lyft), and payment-processing services (*e.g.*, PayPal and Square).

## COUNT I
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT
## (HB20 SECTION 7, TEX. CIV. PRAC. & REM. CODE §§ 143A.001-.008)

124.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

125.     The First Amendment to the U.S. Constitution provides that government "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The protections of the First Amendment have been incorporated against the States through the Due Process Clause of the Fourteenth Amendment to the Constitution.

126.     The First Amendment protects "publish[ing]," *Reno v. ACLU*, 521 U.S. 844, 852-53 (1997); "disseminat[ing]," *303 Creative v. Elenis*, 600 U.S. 570, 594 (2023); and "creating, distributing, [and] consuming" speech, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 792 n.1 (2011).

127.     The Supreme Court reaffirmed that, when a private party like a "social media platform" curates and disseminates compilations of third-party speech, it engages in speech activity fully protected by the First Amendment. "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity." *Moody*, 603 U.S. at 731. The Court rejected attempts to characterize websites as mere conduits for others' speech, holding instead that their editorial choices create "distinctive

expressive product[s]" deserving full constitutional protection. *See id.* at 743-44. When a private entity engages in that expressive activity, the First Amendment protects its editorial choices about what speech to display and how to display it. "When the government interferes with such editorial choices—say, by ordering the excluded to be included—it alters the content of the compilation." *Id.* at 731-32. "And in so doing—in overriding a private party's expressive choices—the government confronts the First Amendment." *Id.* at 732.

128.    For these reasons, HB20 Section 7 violates the First Amendment.

129.    **HB20 Section 7 regulates and burdens protected speech.** HB20 Section 7 infringes covered websites' right to editorial discretion.

130.    The Supreme Court has distilled its myriad precedents protecting editorial discretion under the First Amendment into three principles: (1) "the First Amendment offers protection when an entity engaging in expressive activity, including compiling and curating others' speech, is directed to accommodate messages it would prefer to exclude"; (2) "none of that changes just because a compiler includes most items and excludes just a few"; and (3) "the government cannot get its way just by asserting an interest in improving, or better balancing, the marketplace of ideas." *Id.* at 731-32 (collecting cases).

131.    In short, the "government may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey." *Id.* at 734.

132.    As relevant to "social media" websites, therefore, "restrictions on the platforms' selection, ordering, and labeling of third-party posts . . . interfere with expression." *Id.* at 727. The "content choices the major platforms make for their main feeds are" "speech"—therefore "States" cannot "regulate them free of the First Amendment's restraints." *Id.* at 726-27.

133.    Here, HB20 Section 7 "targets those expressive choices—in particular, by forcing the major platforms to present and promote content on their feeds that they regard as objectionable." *Id.* at 738. It "requires the platforms to carry and promote user speech that they would rather discard or downplay. The platforms object that the law thus forces them to alter the content of their expression—a particular edited compilation of third-party speech." *Id.* at 728.

134.    HB20 Section 7 violates covered websites' right to engage in editorial discretion through "content moderation—to filter, prioritize, and label the varied messages, videos, and other content their users wish to post." *Id.* at 717.

135.    HB20 Section 7 is an unconstitutional regulation of "editorial judgments [the Supreme] Court has previously held to receive First Amendment protection" because Section 7 "prevents a platform from compiling the third-party speech it wants in the way it wants, and thus from offering the expressive product that most reflects its own views and priorities." *Id.* at 718.

136.    "When the platforms use their Standards and Guidelines to decide which third-party content those feeds will display, or how the display will be ordered and organized, they are making expressive choices. And because that is true, they receive First Amendment protection." *Id.* at 740. Given that HB20 "prohibits the large social-media platforms (and maybe other entities) from 'censor[ing]' a 'user's expression' based on its 'viewpoint,'" it "interfere[s] with protected speech." *Id.* at 736, 738.

137.    HB20 Section 7's "restrictions on the platforms' selection, ordering, and labeling of third-party posts . . . interfere with expression." *Id.* at 727.

138.    HB20 Section 7 unconstitutionally compels covered websites to disseminate speech in Texas.

139.    **HB20 Section 7 triggers strict scrutiny, or at a minimum heightened First Amendment scrutiny.** HB20 Section 7 triggers strict scrutiny in several ways.

140.    All HB20 provisions challenged in this lawsuit trigger strict scrutiny by discriminating based on content, speaker, and viewpoint due to the statute's central "social media platform" coverage definition. *See* Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4).

141.    A law "is facially content based . . . if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

142.    When the government differentiates based on "content"—such as by treating speech about "news, sports, [or] entertainment," Tex. Bus. & Com. Code § 120.001(1)(C)(i); Tex. Civ. Prac. & Rem. Code § 143A.001(4), more favorably than speech about political, social, or religious matters—the law is "particularly repugnant to First Amendment principles." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987). "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *CCIA*, 2024 WL 4051786, at *10.

143.    HB20 is also speaker-based. Laws that "discriminate among media, or among different speakers within a single medium," present very real "dangers of suppression and manipulation" of the medium and risk "distort[ing] the market [of] ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659-60, 661 (1994) (citation omitted).

144.    The State declined, however, to regulate state-favored "social media" services such as Rumble, Gab, Parler, and Truth Social—even though those services also engage in editorial discretion.

145.    HB20's central "social media platform" coverage definition is integral to all provisions challenged in this lawsuit. Without this central definition, no other challenged provision could operate, and thus all provisions challenged herein require invalidation.

146.    HB20 Section 7's restrictions on editorial discretion independently trigger strict scrutiny.

147.    For instance, HB20 Section 7 compels speech dissemination, which necessarily alters the content of covered websites' curated compilations. *See Moody*, 603 U.S. at 738 ("Like the editors, cable operators, and parade organizers this Court has previously considered, the major social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering. The individual messages may originate with third parties, but the larger offering is the platform's. It is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality." (citation omitted)); *see also Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988) (compelled speech triggers strict scrutiny).

148.    In addition, HB20 Section 7 has two content-based exemptions from its prohibition on editorial discretion. *See* Tex. Civ. Prac. & Rem. Code § 143A.006(a)(2)-(3).

149.    Finally, HB20 Section 7 is viewpoint-based.

150.    Viewpoint discrimination is a particularly "egregious form of content discrimination" and is virtually *per se* unconstitutional. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

151.    As revealed by Texas legislators' public statements about the websites that HB20 targets, HB20 restricts the editorial discretion of Plaintiffs' covered members over their services because of the members' perceived political views.

152.    In addition, by restricting covered websites' ability to moderate based on the "viewpoint" of content posted on the services, HB20 restricts covered websites' ability to exercise their own viewpoints about what content should be allowed on their services. Tex. Civ. Prac. & Rem. Code § 143A.002(a).

153.    **HB20 Section 7 fails strict scrutiny and any form of heightened First Amendment scrutiny.** HB20 does not satisfy strict scrutiny, which requires a law to be "narrowly tailored" to advance a "compelling" governmental interest. *Reed*, 576 U.S. at 171.

154.    "Even assuming that the less stringent form of First Amendment review applies, Texas's law does not pass." *Moody*, 603 U.S. at 740.

155.    The State cannot "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up); *see FEC v. Cruz,* 596 U.S. 289, 307 (2022) (speculation about "anticipated harm" insufficient "to carry a First Amendment burden") (citation omitted).

156.    Texas lacks a legitimate interest in "balanc[ing] the mix of speech on Facebook's News Feed and similar platforms": The Supreme "Court has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others." *Moody*, 603 U.S. at

718-19; *id.* at 727 ("Texas's interest in changing the content of the platforms' feeds" is not "valid"); *id.* at 741 ("[A] State may not interfere with private actors' speech to advance its own vision of ideological balance.").

157.    In other words, the State lacks a "valid [] interest in changing the content of the platforms' feeds." *Id.* at 727.

158.    Plus, individuals who reside in Texas can still express their personal views in a variety of mediums without the need for state intervention, regardless of private services' content moderation practices.

159.    In any event, HB20 Section 7 is not properly tailored, as it is both overinclusive and underinclusive. *Brown*, 564 U.S. at 799.

160.    **HB20 Section 7 is facially invalid.** A law is "facially invalid" when it cannot "withstand strict scrutiny." *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 441 (5th Cir. 2014).

161.    The "content-moderation choices reflected in Facebook's News Feed and YouTube's homepage" and the "near equivalents" "*are* the principal things regulated, and should have just that weight in the facial analysis." *Moody*, 603 U.S. at 724, 726. The Supreme Court focused on Facebook's "News Feed" and YouTube's homepage because those are among the principal applications that the parties contested in their briefing. But the Supreme Court's reasoning applies just the same to all websites when they curate and disseminate collections of third-party speech posted on their services.

162.    HB20 does not regulate other services for which the Supreme Court questioned whether a different analysis might apply, such as direct-messaging services, ride-sharing apps like Uber, payment services like PayPal, or email services like Gmail. HB20 specifically limits its

reach to websites that allow users to "communicate with other users *for the primary purpose* of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1) (emphasis added); Tex. Civ. Prac. & Rem. Code § 143A.001(4). In other words—HB20 applies when the primary purpose of the website allows users to post speech on the services. Those are precisely the applications that *Moody* addressed.

163.    To the extent HB20's definition of "social media platform" might be read to reach some other types of services, Section 7 would still be facially unconstitutional. That is because Section 7 applies only when the covered websites "censor a user, a user's expression, or a user's ability to receive the expression of another person based on" "viewpoint." Tex. Civ. Prac. & Rem. Code § 143A.002(a)(2). The Act defines "censor" to include actions to "block, ban, remove, de-platform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." *Id.* § 143A.001(1). In other words, Section 7 applies only when the covered websites curate and disseminate third-party content posted on their services—*i.e.*, when such websites engage in speech activity protected by the First Amendment, as explained in *Moody*.

164.    To the extent Defendant can hypothesize some applications of Section 7 that do not interfere with covered websites' protected speech activity, Section 7 is still unconstitutional on its face because it "prohibits a substantial amount of protected speech relative to" any "legitimate sweep" it may have. *Moody*, 603 U.S. at 744 (citations omitted).

165.    Regardless, the facial-challenge analysis should not "speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (citation omitted).

166.    The core, if not sole, application of each challenged provision is to regulate the editorial judgments of websites when they are curating and disseminating collections of third-party speech posted on their services.

167.    **Section 7 is invalid as applied to Plaintiffs' covered members when they curate and disseminate third-party speech posted on their covered services.** At a minimum, HB20 is unconstitutional as applied to Plaintiffs' covered members when they curate and disseminate third-party speech posted on their services that HB20 attempts to regulate.

168.    HB20 Section 7 is unconstitutional to the extent it regulates how covered websites can display curated compilations of third-party speech, where the content in that compilation is determined by application of the websites' editorial policies.

169.    The Supreme Court has made clear that HB20 Section 7 is unconstitutional as "applied [] to the curated feeds offered by the largest and most paradigmatic social-media platforms," *Moody*, 603 U.S. at 718, such as Plaintiffs' covered members identified above at ¶ 16.

170.    HB20 Section 7 is unconstitutional to the extent it regulates "the content-moderation practices that giant social-media platforms use on their best-known services to filter, alter, or label their users' posts." *Moody*, 603 U.S. at 724.

171.    HB20 Section 7 is unconstitutional when it "regulate[s] the content-moderation practices used in" and "applie[d] to Facebook's News Feed and YouTube's homepage"—and "near equivalents." *Id.*

172.    HB20 Section 7 is unconstitutional when it "prevent[s] Facebook (or YouTube) from using its content-moderation standards to remove, alter, organize, prioritize, or disclaim posts in its News Feed (or homepage)." *Id.* at 718.

173.    HB20 Section 7 is unconstitutional under the First Amendment when it requires covered members to disseminate speech in Texas.

174.    Although the Supreme Court's *Moody* opinion focused on Facebook's "News Feed" and YouTube's homepage, its reasoning extends beyond those websites to include any online service when the service curates and disseminates collections of third-party speech posted by users on that service.

175.    For example: Pinterest publishes curated feeds of user content posted to the service, including through its "Home" and "Today" tabs. "Home" is a feed of Pins (images submitted by users) that have been picked for the user based on the boards the user creates, Pins the user engages with, and things the user has searched for on Pinterest. The "Today" tab is a curated collection of ideas based on what is trending on Pinterest. Pinterest, Help Center, Explore the Home Feed, https://perma.cc/WS5Q-QPKK. To help determine the content selected for these feeds and other-wise displayed on its platform, Pinterest has robust content and editorial policies and reserves the right to "remove, limit, or block the distribution of such content and the accounts, individuals, groups and domains that create or spread it based on how much harm it poses." Pinterest, Community Guidelines, https://perma.cc/PSA2-RWPY.

176.    X makes all sorts of editorial choices when it filters and labels third-party speech posted to the service on its "For You" and "Following" feeds, including by providing users with curated compilations of posts based in part on X's judgment that it should be "easier and faster to find content that contributes to the conversation in a meaningful way, such as content that is rele-vant, credible, and safe." X, Help Center, About Your For You Timeline on X,

https://perma.cc/XQG2-VK6G. X also "promotes counterspeech" via addenda dubbed "community notes" that "correct misstatements" and "point[] out hypocrisy." X, Help Center, Our Approach to Policy Development and Enforcement Philosophy, https://perma.cc/BTV8-T8VV.

177.    Nextdoor publishes curated feeds of user content posted to the service on the Nextdoor Newsfeed, sometimes "show[ing] the posts first that [Nextdoor] think[s] will be the most relevant and interesting to" users and sometimes "show[ing] [users] posts only from [their] nearby neighborhoods." Nextdoor Help Center, Sort and Customize Your Nextdoor Newsfeed, https://perma.cc/BGZ2-3WUF.

178.    Unless declared invalid and enjoined, HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) will unlawfully deprive Plaintiffs' covered members of their fundamental First Amendment rights and irreparably harm Plaintiffs, covered members, and Internet users.

**COUNT II**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES THROUGH THE FOURTEENTH AMENDMENT**
**(HB20 SECTION 2, TEX. BUS. & COM. CODE §§ 120.101-.102(a), .103-.104 AND HB3133 SECTION 3, TEX. BUS. & COM. CODE § 120.1015)**

179.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

180.    HB20 Section 2's notice-complaint-appeals provisions in Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104 and HB3133 Section 3's notice requirements in Tex. Bus. & Com. Code § 120.1015 (to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) violate the First Amendment and cannot satisfy any form of First Amendment scrutiny.

181.    "[I]ndividualized-explanation provisions," as the Supreme Court called them, "unduly burden expression." *Moody*, 603 U.S. at 725.

182.    HB20's complaint system for "illegal content or illegal activity" is an improper attempt to direct covered websites' editorial discretion and burden them with time-sensitive response obligations that compel speech. Tex. Bus. & Com. Code § 120.101. HB20 requires covered websites to "make a good faith effort to evaluate the legality of the content or activity within 48 hours of receiving the notice, excluding hours during a Saturday or Sunday." *Id.* § 120.102(a).

183.    HB20's notice requirement is an improper attempt to direct covered websites' editorial discretion and burden them with time-sensitive response obligations. HB20's notice provision will require individualized explanations about millions of editorial decisions. *Id.* § 120.103(a).

184.    In addition, because HB20's notice provision requires the covered websites to provide individualized explanations of content-removal decisions, it compels the covered websites to speak, which violates the First Amendment.

185.    HB20's appeals requirement for removed content is an improper attempt to direct covered websites' editorial discretion and burden them with time-sensitive response obligations. HB20's appeals provision for removed content will require individualized explanations about millions of editorial decisions. *Id.* § 120.104.

186.    In addition, because HB20 requires the covered websites to provide individualized explanations of content-removal decisions, it compels the covered websites to speak, which violates the First Amendment.

187.    All three of these requirements will, as a practical matter, compel speech dissemination at a massive scale by significantly burdening the exercise of protected editorial discretion.

188.    Having to provide notices and appeals for millions of content removals will chill covered websites from removing speech and burden covered websites' exercise of editorial discretion to remove content.

189.    HB20 Section 2's notice-complaint-appeal provisions trigger strict scrutiny because they rely on the Act's content-based and speaker-based "social media platform" definition.

190.    HB20 Section 2's notice-complaint-appeal provisions independently trigger strict scrutiny because they infringe covered services' First Amendment right to editorial discretion over their websites. *See Moody*, 603 U.S. at 740-41.

191.    HB20 Section 2's notice-complaint-appeal provisions independently trigger strict scrutiny because they compel speech and speech dissemination. *Id.*; *Riley*, 487 U.S. 781, 795 (compelled speech triggers strict scrutiny).

192.    HB20 Section 2's notice-complaint-appeal provisions fail any form of First Amendment scrutiny.

193.    The speech that is regulated by Section 2's notice-complaint-appeal provisions is not commercial speech.

194.    Accordingly, the standard of scrutiny articulated in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985), does not apply to Plaintiffs' challenges to HB20.

195.    *Zauderer* is limited to efforts to "combat the problem of inherently misleading commercial advertisements" by mandating "only an accurate statement." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010).

196.    The HB20 provisions challenged in this lawsuit have nothing to do with "commercial speech." *Zauderer*, 471 U.S. at 651.

197.    HB20 Section 2's notice-complaint-appeal provisions are not regulating "misleading" commercial speech. *Id.* at 644.

198.    HB20 Section 2's notice-complaint-appeal provisions do far more than simply mandate disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available." *Nat'l Inst. of Fam. Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018) (citation omitted); *see Zauderer*, 471 U.S. at 651.

199.    HB20 Section 2's notice-complaint-appeal provisions require websites to disclose sensitive information about their editorial policies and judgments.

200.    Even if HB20 Section 2's notice-complaint-appeal provisions regulated commercial speech, these provisions would still violate the First Amendment because each provision imposes undue burdens, and none is reasonably related to preventing consumer deception.

201.    HB20 Section 2's notice-complaint-appeal provisions are facially unconstitutional, for many of the reasons explained above.

202.    Much like the right-of-reply statute burdening the exercise of editorial discretion in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), by requiring newspapers to run opposing views if they chose to criticize a political candidate, *see id.* at 256-57, HB20 Section 2's notice-complaint-appeal requirements impose onerous burdens on covered websites to explain the often complex editorial judgments they make in choosing to arrange or limit the dissemination of third-party speech. A website "might well conclude that the safe course is to avoid controversy" by not exercising editorial discretion at all. *Id.* at 257. HB20 forcing such a choice onto covered websites will chill protected expressive editorial discretion.

203.    At a minimum, HB20 Section 2's notice-complaint-appeal provisions are unconstitutional as applied to Plaintiffs' covered members (including those identified above at ¶ 16).

204.    HB3133 Section 3's notice requirements, Tex. Bus. & Com. Code § 120.1015 (to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. &

Com. Code §§ 120.101-.102(a), .103-.104), are not severable from HB20 Section 2's notice-com-plaint-appeals provisions.

205.    HB3133 Section 3's notice requirements, Tex. Bus. & Com. Code § 120.1015 (to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), also unconstitutionally compel speech for the same reasons as HB20 Section 2.

206.    HB3133 Section 3's notice requirements, Tex. Bus. & Com. Code § 120.1015 (to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), do not regulate or compel commercial speech for the same reasons as HB20 Section 2.

207.    Unless declared invalid and enjoined, HB20 Section 2's notice-complaint-appeal provisions (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) and HB3133 Section 3's no-tice requirements (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) will unlawfully deprive Plaintiffs' covered members of their fundamental First Amendment rights and irreparably harm Plaintiffs, covered members, and Internet users.

### COUNT III
### 42 U.S.C. § 1983
### VOID FOR VAGUENESS
### (HB20 SECTION 7, TEX. CIV. PRAC. & REM. CODE §§ 143A.001-.008)

208.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

209.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it "fails to provide a

person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it author-izes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.

210.   In the free-speech context, "stricter standards of permissible statutory vagueness" apply to laws that have a "potentially inhibiting effect on speech." *Smith v. California*, 361 U.S. 147, 151 (1959) (citation omitted). Therefore, "vagueness may be grounds for a pre-enforcement challenge insofar as [a law] chills protected speech under the First Amendment"—even if the law is not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 & n.32 (5th Cir. 2024).

211.   Key portions of HB20 Section 7 are unconstitutionally vague and would deprive the members of Plaintiffs covered by HB20 of their rights to fair notice under the Due Process Clause and the First Amendment to the U.S. Constitution.

212.   The scope of speech that HB20 Section 7 seeks to regulate is unclear. The statute does not define what constitutes a protected "viewpoint," which—without limitation—could en-compass essentially all expression.

213.   Similarly, the scope of editorial discretion that HB20 Section 7 would prohibit is unclear. HB20's definition of "censor" contains terms that lack clear definition and thus threatens to encompass even the basic functions that Plaintiffs' members use to display content. In particular, it is unclear what forms of editorial discretion would "de-boost," "deny equal access or visibility to, or otherwise discriminate against expression" under the statute. Tex. Civ. Prac. & Rem. Code § 143A.001(1).

214.    HB20's "censor" and "viewpoint" terms are integral to each of the Act's operative speech regulations, including Section 2's notice-complaint-appeal provisions. They cannot be severed. Without these central terms, no other challenged HB20 provision could operate.

215.    Exacerbating the problem, HB20 Section 7 says that the Texas Attorney General may "bring an action to *enjoin* a violation *or a potential violation*." *Id.* § 143A.008(b) (emphases added). This language, by its plain terms, may allow courts to enjoin "potential violations" of the statute's anti-editorial-discretion provisions. Even assuming for the sake of argument that "viewpoint" and "censor" were not vague, the fact that the statute may apply to situations beyond those terms' requirements means that Plaintiffs' members have no guidance about what editorial discretion they may lawfully exercise. And it would grant the Attorney General incredibly broad enforcement authority—raising serious concerns about arbitrary or discriminatory enforcement.

216.    Additionally, HB20 Section 7 permits covered websites to "authoriz[e]" or "facilitat[e] a user's ability to censor specific expression on the user's platform or page at the request of that user." *Id.* § 143A.006(b). But it is unclear what this provision entails. For instance, if a user wants to block hate speech, HB20 does not explain whether the covered "social media platform" may label certain posts as hate speech to "facilitat[e]" its users' desires to avoid hate speech—or if that labeling would "censor" the hate speech.

217.    These vague terms and provisions of HB20 Section 7 provide constitutionally insufficient notice. They also invite arbitrary and discriminatory enforcement against content, viewpoints, and speakers the State disfavors.

218.    Unless declared unconstitutionally vague and enjoined, HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) will unlawfully deprive Plaintiffs' covered members of

their fundamental First Amendment and Due Process Clause rights and irreparably harm Plaintiffs, covered members, and Internet users.

## COUNT IV
### 42 U.S.C. § 1983
### UNCONSTITUTIONAL REQUIREMENT TO DO BUSINESS IN STATE
### (PART OF HB20 SECTION 7, TEX. CIV. PRAC. & REM CODE § 143A.002(A)(3))

219.   Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

220.   Through various textual and structural provisions, the Constitution limits States' authority to regulate extraterritorial conduct and impede or otherwise burden interstate commerce.

221.   HB20 Section 7, Tex. Civ. Prac. & Rem. Code § 143A.002(a)(3), contravenes this constitutional precept.

222.   The "horizontal separation of powers" and the "equal sovereignty" principle recognize the fundamental principle that States cannot interfere with the regulatory authority of other States. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & n.1 (2023) (citation omitted); *id.* at 408-09 (Kavanaugh, J., concurring in part).

223.   Several clauses of the U.S. Constitution either directly impose or presuppose such limits on States' authority. *E.g.*, U.S. Const. art. I, § 8, cl. 3 (Commerce Clause); art. I, § 10, cl. 2 (Import-Export Clause); art. IV, § 1 (Full Faith and Credit Clause); art. IV § 2, cl. 1 (Privileges and Immunities Clause); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 149-152 (2023) (Alito, J., concurring in part).

224.   Individual guarantees of due process provide that States may regulate transactions only with which they have "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (citation omitted).

225.    HB20 Section 7 violates these constitutional commands when it compels regulated websites to serve Texas users and do business in Texas.

226.    States lack the authority to mandate that companies do business in their State.

227.    HB20 Section 7 prohibits covered websites from discriminating based on "a user's geographic location in [Texas] or any part of [Texas]," penalizing companies that would prefer to engage in interstate commerce outside Texas. Tex. Civ. Prac. & Rem Code § 143A.002(a)(3). In other words, HB20 reaches beyond Texas's borders and effectively mandates that out-of-state social media services enter Texas to engage in commerce in the State.

228.    Unless declared invalid and enjoined, Tex. Civ. Prac. & Rem Code § 143A.002(a)(3) will unlawfully deprive Plaintiffs' covered members of their fundamental rights and irreparably harm Plaintiffs, covered members, and Internet users.

## COUNT V
### FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,
### 42 U.S.C. § 1983, SUPREMACY CLAUSE, AND
### *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION
### (HB20 SECTION 7, TEX. CIV. PRAC. & REM. CODE §§ 143A.001-.008)

229.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

230.    Plaintiffs invoke federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

231.    HB20 Section 7, Tex. Civ. Prac. & Rem. Code § 143A.001-.008, is preempted by Section 230, 47 U.S.C. § 230.

232.    "Congress provided broad immunity under [Section 230] to Web-based service providers for all claims stemming from their *publication of information created by third parties*." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (cleaned up; quoting *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 286 (5th Cir. 2024)).

233.    Under Section 230, any "social media platform" regulated by HB20—including Plaintiffs' regulated members' services identified in ¶ 16—is an "interactive computer service": "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).

234.    Section 230 provides: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). Section 230 preempts liability for a website's "'decisions relating to monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.'" *Salesforce*, 123 F.4th at 794 (citations omitted). As explained by Congress through its definition of "access software provider," protected "publisher" activities include efforts to "filter, screen, allow, or disallow content," "pick, choose, analyze, or digest content," or "transmit, receive, display, forward, … organize, reorganize, or translate content." 47 U.S.C. §230(f)(4).

235.    Section 230 also protects websites and applications from state laws imposing liability for actions to restrict access to or availability of content that they consider objectionable. *Id.* § 230(c)(2), (e)(3). The statute specifically provides that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* § 230(c)(2).

236.    Section 230 similarly prohibits liability for "any action taken to enable or make available to information content providers or others the technical means to restrict access to" ob-

jectionable material. *Id.* § 230(c)(2)(B). This provision applies to tools that online service providers make available to users to help them avoid or limit their exposure to potentially objectionable content.

237.    Under Section 230, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). This provision expressly preempts inconsistent state laws that seek to hold online service providers liable for engaging in editorial discretion protected by Section 230(c). Preemption applies equally to private causes of action and public enforcement actions.

238.    HB20 Section 7 is inconsistent with Section 230 because it imposes liability on websites covered by Section 230 for taking actions explicitly protected by Section 230—and is thus expressly preempted. *Id.* § 230(c)-(e).

239.    For similar reasons, HB20 Section 7 is impliedly preempted by Section 230 because it poses an insurmountable obstacle to the federal policy enacted by Section 230.

240.    Unless declared preempted, HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) will cause Plaintiffs, their members, and Internet users irreparable harm.

## COUNT VI
## EQUITABLE RELIEF

241.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

242.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

243.    For the reasons discussed above, HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-

.102(a), .103-.104) violate federal law and thereby deprive Plaintiffs and their members of enforceable rights secured by federal law.

244.    Federal courts of equity have the power to enjoin unlawful actions by state officials. Such equitable relief has traditionally been available in the federal courts to enforce federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

245.    This Court can and should exercise its equitable power to enter an injunction precluding Defendant from enforcing HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) against Plaintiffs' members.

## COUNT VII
### 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
### DECLARATORY RELIEF

246.    Plaintiffs incorporate all preceding paragraphs as though fully set forth herein.

247.    For the reasons discussed above, HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) violate the First Amendment and Due Process Clause of the Constitution and thereby deprive Plaintiffs and their members of enforceable rights.

248.    Furthermore, Tex. Civ. Prac. & Rem Code § 143A.002(a)(3) violates the Commerce Clause, the Due Process Clause, and the Full Faith and Credit Clause.

249.    HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) is preempted by Section 230.

250.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

251.    This Court may and should exercise its equitable power to enter a declaration that HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) are unconstitutional and otherwise unlawful.

252.    In the alternative, the Court should enter a declaration stating that, within the meaning of Tex. Civ. Prac. & Rem. Code §§ 143A.005 and 143A.006, federal law protects covered websites from enforcement of HB20's remedies for violations of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) and has the effect of specifically authorizing them to exercise editorial discretion over user content, and that the services are therefore not subject to enforcement of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) is unlawful as applied to Plaintiffs' regulated members, including those identified in ¶ 16, and when those regulated members curate and disseminate compilations of third-party speech posted on their services;

B. Declare that HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104) is facially unlawful;

C. Declare that HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) is unlawful as applied to Plaintiffs' regulated members, identified in ¶ 16, and when those regulated members curate and disseminate compilations of third-party speech posted on their services;

D. Declare that HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) is facially unlawful;

E. Declare that HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008) is preempted by federal law;

F. Declare that HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015), to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104, is unlawful as applied to Plaintiffs' regulated members, identified in ¶ 16, and when those regulated members curate and disseminate compilations of third-party speech posted on their services;

G.  Declare that HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015), to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104, is facially unlawful;

H.  Declare that federal law protects Plaintiffs' members from enforcement of HB20's remedies for violation of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015), to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104, and specifically authorizes them to exercise editorial discretion over user content, and that Plaintiffs' members are therefore not subject to enforcement of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015), to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104;

I.  Preliminarily and permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), and HB3133 Section 3 (Tex. Bus. & Com. Code § 120.1015), to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104, against Plaintiffs' members, including those identified in ¶ 16;

J.  Enter judgment in favor of Plaintiffs;

K.  Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including

attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims

against state officials; and

L.  Award Plaintiffs all other such relief as the Court deems proper and just.

Dated: August 11, 2025                                 Respectfully submitted.


                                                      */s/ Scott A. Keller*

Steven P. Lehotsky*                                   Scott A. Keller (Texas Bar # 24062822)
steve@lkcfirm.com                                     scott@lkcfirm.com
Jeremy Evan Maltz (Texas Bar # 24102129)              Todd Disher (Texas Bar # 24081854)
jeremy@lkcfirm.com                                    todd@lkcfirm.com
LEHOTSKY KELLER COHN LLP                              LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700               408 W. 11th Street, 5th Floor
Washington, DC 20001                                  Austin, TX 78701
                                                      T: (512) 693-8350
                                                      F: (512) 727-4755

*Admitted *pro hac vice*