**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

NETCHOICE, LLC; and
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION,

        *Plaintiffs*,

    v.

KEN PAXTON, in his official capacity as
Attorney General of Texas

        *Defendant*.

Civil Action No. 1:21-cv-00840-RP

**PLAINTIFFS' BRIEF REGARDING
<u>TEXAS HOUSE BILL 20 (2021) SECTIONS 2 AND 7'S SCOPE</u>**

## TABLE OF CONTENTS

Page

Introduction...................................................................................................................1

Argument .....................................................................................................................3

    I.   HB20 Sections 2 and 7 regulate a narrow set of "actors": large social media websites that engage in protected expressive curation of content posted to the services. ........................................................................................................... 3

        A.  HB20's central "social media platform" coverage definition is limited to social media websites. ............................................................................... 3

        B.  HB20's central coverage definition excludes the kinds of services over which the Supreme Court's decision in *Moody* and the Fifth Circuit's decision in *Paxton* reserved judgment. ................................................. 5

    II.  HB20 Sections 2 and 7 regulate essentially only "activities" *Moody* acknowledged to be protected by the First Amendment. ................................ 8

        A.  The "activities" covered by HB20 Section 2's notice, complaint, and appeal processes consist only of "removal" of "content" that has been publicly "posted by the user" on a "social media platform." ................................. 8

        B.  The "activities" covered by HB20 Section 7's restrictions on content moderation include any mechanism by which "users" either post or receive "expression." ......................................................................... 10

Conclusion .................................................................................................................14

## INTRODUCTION

Texas House Bill 20 (2021) Sections 2 and 7 ("HB20") prohibit a particular set of disfavored "social media platforms" from exercising editorial discretion over the expressive content that they curate, disseminate, and display to their users.[1] The Supreme Court held that the "editorial judgments influencing the content" that Plaintiffs' regulated members choose to display on their websites are "protected expressive activity. And Texas may not interfere with those judgments simply because it would prefer a different mix of messages." *Moody v. NetChoice, LLC*, 603 U.S. 707, 744 (2024). It also ruled that "Texas is not likely to succeed in enforcing its law against the platforms' application of their content-moderation policies to the feeds that were the focus of the proceedings below," namely curated feeds such as "Facebook's News Feed or YouTube's homepage." *Id.* at 734.

The Supreme Court and the Fifth Circuit remanded this case for this Court to apply that holding when conducting the First Amendment facial-challenge analysis anew. *Id.* at 745; *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 500 (5th Cir. 2024). As the Supreme Court directed, this Court must first "assess the state laws' scope. What activities, by what actors, do the laws prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724. Then, this Court must "decide which of the laws' applications violate the First Amendment," and "measure them against the rest." *Id.* at 725. Before the parties proceed to discovery, this Court should clarify HB20's regulatory scope,

---

[1] Plaintiffs' Second Amended Complaint challenges only specific provisions of HB20: HB20 Section 7 (Tex. Civ. Prac. & Rem. Code §§ 143A.001-.008), certain provisions of HB20 Section 2 (Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104), and Texas House Bill 3133 Section 3 (Tex. Bus. & Com. Code § 120.1015, to the extent that it requires disclosure of the challenged provisions of HB20 Section 2, Tex. Bus. & Com. Code §§ 120.101-.102(a), .103-.104). When this Brief uses "HB20," therefore, it refers to these challenged provisions and not other provisions of HB20 or HB3133. This Brief uses the shorthand "website" to refer to "Internet website[s]" and "application[s]" regulated by HB20. Tex. Bus. & Com. Code § 120.001(1); Tex. Civ. Prac. & Rem. Code § 143A.001(4).

as this will provide needed guidance for the course of the rest of the litigation. *See Paxton*, 121 F.4th at 497.

The answers to these questions are straightforward: HB20's plain text limits HB20's regulatory "scope" to cover (a) only "giant social-media platforms," as that phrase is commonly understood, and including the following services operated by Plaintiffs' members: (1) Facebook (Meta); (2) Instagram (Meta); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Tumblr (Automattic); (7) X; and (8) YouTube, *see* ECF 83 ¶ 16 (Second Amended Complaint); and (b) essentially only their "curated feeds" compiling user-generated speech that are "their best-known services." *Moody*, 603 U.S. at 718, 724. But HB20 does not regulate other services that lack such curated feeds, such as direct-messaging services, ride-sharing apps like Uber, payment services like PayPal, or email services like Gmail. *Id.* at 724-25. HB20 specifically limits its reach to websites that allow users to "communicate with other users *for the primary purpose* of *posting* information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1) (emphases added) (HB20 Section 2's central coverage definition); *see* Tex. Civ. Prac. & Rem. Code § 143A.001(4) (HB20 Section 7 incorporating Section 2's coverage definition). And HB20 further excludes multiple other kinds of services, including email and websites that "consist[] primarily of . . . content that . . . is preselected by the provider." Tex. Bus. & Com. Code § 120.001(1)(B)-(C). In other words, HB20 applies when the primary purpose of the website is to allow users to post speech on the services—that is, websites that are usually called "social media." Those are precisely the applications that *Moody* addressed and found fully protected. *See* 603 U.S. at 744.

**ARGUMENT**

I.    **HB20 Sections 2 and 7 regulate a narrow set of "actors": large social media websites that engage in protected expressive curation of content posted to the services.**

The scope of this challenge consists largely of pure questions of law. The "actors" regulated by HB20 are a small and defined set of social media websites disseminating the kinds of expressive, curated feeds of user-posted content that the Supreme Court held are protected by the First Amendment. *Id.* at 724. HB20 does not regulate the other hypothetical "actors" beyond "social-media entities"—for which the Supreme Court questioned whether a different First Amendment editorial-discretion analysis might apply. *Id.* at 725.

A.    **HB20's central "social media platform" coverage definition is limited to social media websites.**

HB20's central coverage definition of "social media platform" includes multiple provisions that restrict the statute's scope to a handful of websites and applications engaging in the *public*, widespread dissemination of speech *posted* to the websites by users.[2] Put another way, "social media platform" as defined by HB20 matches the ordinary usage of the term: "[T]he term 'social media platforms' typically refers to websites and mobile apps that allow users to upload content—messages, pictures, videos, and so on—to share with others. Those viewing the content can then react to it, comment on it, or share it themselves." *Id.* at 719; *see Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (similar).

More specifically, HB20 regulates only those services whose "*primary purpose*" is displaying user-created "*post*[s]" for many to see. Tex. Bus. & Com. Code § 120.001(1) (emphases added) (Section 2); *see* Tex. Civ. Prac. & Rem. Code § 143A.001(4) (Section 7). HB20's coverage

---

[2] As used in this brief, "public" dissemination of content can mean (1) to the general public; (2) to registered users of a service; or (3) to a subset of registered users of a service. As explained below at p.7, HB20 does not apply to services that primarily provide private, person-to-person communications.

is further restricted to the largest such websites, as it "applies only to a social media platform that functionally has more than 50 million active users in the United States in a calendar month." Tex. Bus. & Com. Code § 120.002(b) (Section 2); Tex. Civ. Prac. & Rem. Code § 143A.004(c) (Section 7). Taken together, these two textual limitations restrict HB20's coverage to a small number of "actors," including services operated by Plaintiffs' members such as, *e.g.*, (1) Facebook (Meta); (2) Instagram (Meta); (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Tumblr (Automattic); (7) X; and (8) YouTube. *See* ECF 83 ¶ 16 (Second Amended Complaint).

HB20 defines a covered "social media platform" to mean: "an Internet website or application that is *open to the public*, allows a user to create an account, and enables users to communicate with other users for the *primary purpose* of *posting* information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1) (emphases added) (Section 2); *see* Tex. Civ. Prac. & Rem. Code § 143A.001(4) (Section 7).[3] So HB20 applies only to websites with a "primary purpose" of permitting users to "post" speech on the service. *See* ECF 77 ¶ 87 (Answer to First Amended Complaint) ("Defendant admits that Tex. Bus. & Com. Code § 120.001(1) has a 'primary purpose' requirement.").[4]

HB20 also incorporates the ordinary meaning of the term "post" and "posting," which denote pieces of content submitted to online services for multiple people to see. A "post" is ordinarily defined as "an electronic message or information that is put on a website in order to allow many people to see it." *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73; *Post*,

---

[3] HB20 regulates at the level of the "website or application." So it does not cover an entire company's operations just because that company may have one service covered by HB20.

[4] These criteria distinguish HB20's coverage criteria from Florida Senate Bill 7072's wholly distinct central coverage definition, which lacks similar limiting criteria: "'any information service, system, Internet search engine, or access software provider' that '[p]rovides or enables computer access by multiple users to a computer server, including an Internet platform or a social media site.'" *Moody*, 603 U.S. at 720 n.1 (quoting Fla. Stat. § 501.2041(1)(g)(1)).

Merriam-Webster.com Dictionary, https://perma.cc/5DS7-TP6E ("to publish (something, such as a message) in an online forum (such as an electronic message board)").

In addition, the "meaning of" defined statutory terms "is almost always closely related to the ordinary meaning of the word being defined." Antonin Scalia & Bryan Garner, Reading Law 228 (2012); *see, e.g.*, *Bond v. United States*, 572 U.S. 844, 861 (2014) (considering "the ordinary meaning of a defined term" to determine the "fair reading" of a statute). The phrase "social media platform" is commonly understood to refer to websites and applications where users share content and interact with content shared by others. *E.g.*, *Moody*, 603 U.S. at 719; *Packingham*, 582 U.S. at 104.

And HB20's use of "social media platform" conforms to the Legislature's finding that "social media platforms . . . are central public forums for public debate." Acts 2021, 87th Leg., 2nd C.S., ch. 3 (H.B. 20), § 1(3).[5]

## B.    HB20's central coverage definition excludes the kinds of services over which the Supreme Court's decision in *Moody* and the Fifth Circuit's decision in *Paxton* reserved judgment.

HB20 excludes the other kinds of services over which the Supreme Court and Fifth Circuit reserved judgment. *Moody*, 603 U.S. at 724-25; *Paxton*, 121 F.4th at 499. HB20 excludes these services through (1) its expressly enumerated exclusions, and (2) its "primary purpose" coverage test. HB20 Sections 2 and 7 therefore do not apply to other hypothetical actors beyond "social-media entities"—such as "email," "online marketplace[s]," "payment service[s]," "ride-sharing service[s]," "direct messaging service[s]," and search engines. *Moody*, 603 U.S. at 724-25; *see id.* at 745 (Barrett, J., concurring). Thus, any attempt by the State to use this litigation as a vehicle for

---

[5] Plaintiffs do not adopt or endorse that finding. But it reflects the Legislature's intent—as confirmed by the statutory text—for HB20 to regulate only "social media platforms" as that term is commonly and broadly understood.

extensive discovery into—or any other evaluation of—these exempted services is foreclosed by the plain text of HB20.

*Email.* HB20 Sections 2 and 7 do not apply to "email," as the Supreme Court and Fifth Circuit recognized. *Cf. id.* at 721 n.2, 725; *Paxton*, 121 F.4th at 499. Email is expressly excluded from regulation under HB20 Sections 2 and 7. Tex. Bus. & Com. Code § 120.001(1)(B) (Section 2); *see* Tex. Civ. Prac. & Rem. Code § 143A.001(4) (Section 7).

*Online marketplaces.* HB20 Sections 2 and 7 do not apply to "online marketplace[s] like Etsy." *Cf. Moody*, 603 U.S. at 725; *Paxton*, 121 F.4th at 499. Indeed, Defendant's counsel confirmed to the Supreme Court that an online marketplace like "Etsy" would not be covered by HB20. *See* Oral Argument Tr. at 62, No. 22-555, *NetChoice L.L.C. v. Paxton* (Feb. 26, 2024). HB20's plain text excludes online marketplaces: the "primary purpose" of online marketplaces is *not* to "enable[] users" to "post[] information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1). Rather, from the perspective of users, such marketplaces "enable[] users" primarily to engage in commercial transactions. *Id.*

*Payment and ride-sharing services.* Similarly, HB20 Sections 2 and 7 do not apply to "payment service[s]" and "ride-sharing service[s]." *Cf. Moody*, 603 U.S. at 724-25; *Paxton*, 121 F.4th at 499. The "primary purpose" of such services is to engage in commercial transactions and non-expressive services—separate from users "posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1). Likewise, such websites "consist[] primarily of . . . content that . . . is preselected by the provider," which is another expressly enumerated exclusion. *Id.* § 120.001(1)(C)(i).

*Direct messaging.* HB20 Sections 2 and 7 do not apply to websites or apps whose primary purpose is "direct messaging." *Cf. Moody*, 603 U.S. at 725; *Paxton*, 121 F.4th at 499. Those services do not enable communication "for the primary purpose of *posting* information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1) (emphasis added). The ordinary usage and dictionary definitions of "posting" involve the widespread dissemination of user-generated speech. *See supra* pp.4-5. In contrast, direct messaging (much like email) involves person-to-person communication. Accordingly, a website or app that primarily provides direct messaging does not qualify as a "social media platform" under HB20's definition.

*Search engines.* Similarly, HB20 Sections 2 and 7 do not cover internet search engines like "Google Search." *Cf. Moody*, 603 U.S. at 745 (Barrett, J., concurring). A search engine's "primary purpose" is to direct users to other websites that match the search parameters input by the users—rather than allowing users to publicly "post" speech interacting with one another. Tex. Bus. & Com. Code § 120.001(1). Search engine users do not "post" content for others to "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719. And they do not "enable[] users to communicate with other users for the primary purpose of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1). Rather, search engines index websites and other online content, displaying relevant and helpful information in a custom order responding to a user's query. Since this technology does not involve any posts by a user, it self-evidently does not involve a "social media platform" within the meaning of HB20. Further, search engines are excluded from HB20 Sections 2 and 7 because they disseminate content that is "preselected by the provider" (rather than primarily "user generated" content) through search prioritization and advertising algorithms. *Id.* § 120.001(1)(C)(i). And any "interactive functionality" with those search

results is "dependent on the provision of the content" by the search engine. *See id.*
§ 120.001(1)(C)(ii).

At bottom, HB20's "primary purpose" coverage requirement excludes websites even if
they allow some amount of user-generated speech postings, such as product reviews or messages
appended to particular transactions. These applications would not be covered by HB20 because
these user postings would not be the website's "primary purpose." *Id.* § 120.001(1). And the web-
site would be exempted as consisting "primarily" of "content that is not user generated" even if it
allowed users some "chat, comments, or interactive functionality." *Id.* § 120.001(C).[6]

## II.    HB20 Sections 2 and 7 regulate essentially only "activities" *Moody* acknowledged to be protected by the First Amendment.

Just as the challenged provisions of HB20 apply only to a narrowly defined set of targeted
websites ("actors"), these provisions also govern a narrow set of online "activities." *Moody*, 603
U.S. at 724. So the scope of Plaintiffs' claims is narrow and in large part already resolved by
*Moody*.

### A.    The "activities" covered by HB20 Section 2's notice, complaint, and appeal processes consist only of "removal" of "content" that has been publicly "posted by the user" on a "social media platform."

HB20 Section 2's notice, complaint, and appeal processes apply only when covered web-
sites remove content that users have posted to regulated services and that could appear in regulated

---

[6] In all events, if HB20 were interpreted to apply to such websites on the ground that they
engage in "content moderation" of user-generated speech—*i.e.*, making choices "about what
third-party speech to display and how to display it," *Moody*, 603 U.S. at 716—the First Amend-
ment's editorial-discretion protections under *Moody* would fully apply.

The same goes for any content moderation by a search engine, as prioritizing the display
order of speech created by others is precisely what a search engine does. *See Zhang v. Baidu.com,
Inc.*, 10 F. Supp. 3d 433, 440 (S.D.N.Y. 2014) ("'[t]here can be no disagreement' that [a search
engine] is 'engage[d] in and transmit[s] speech'"; the search engine "'exercise[s] editorial discre-
tion' over its search results" (citations omitted; alterations in original)); *Langdon v. Google, Inc.*,
474 F. Supp. 2d 622, 629-30 (D. Del. 2007) (Google Search has First Amendment right not to
publish unwanted ads).

websites' "feeds" and "distinctive compilations of expression." *Id.* at 716. Accordingly, these provisions would burden and restrict removals made only in circumstances where the Supreme Court has concluded the First Amendment's protections for editorial discretion apply—a website "using its content-moderation standards to remove . . . posts in its News Feed (or homepage)." *Id.* at 718.

Specifically, Section 2's notice-complaint-appeals processes apply only to "content removal" when that "content" had been publicly "posted by the user" on a "social media platform." Tex. Bus. & Com. Code § 120.101(2) (requiring complaint procedure for "a decision made by the social media platform to remove content posted by the user"); *see id.* § 120.103(a)(1) (requiring notice of removal to "the user who provided the content"); *id.* § 120.104 (requiring appeal process for complaints about "removal from the platform of content provided by the user"). As explained above, the term "posted" denotes widespread dissemination of speech for multiple users to see. *See supra* pp.4-5. Consequently, the "activities" covered by this provision are cabined to users posting content on a social media website to be seen by multiple other users (including in posts and comments), which then removes that content. *Moody*, 603 U.S. at 724. And *Moody* held that the First Amendment fully protects these websites' editorial judgment to remove such content from their social media services. *Id.* at 744. Conversely, HB20 Section 2's notice-compliant-appeals requirements therefore do not apply when covered websites remove private messages or other content that is not "posted" to websites. That means any such removals are outside the scope of the law and should not be the subject of any discovery—let alone part of the First Amendment analysis.

9

**B.      The "activities" covered by HB20 Section 7's restrictions on content moderation include any mechanism by which "users" either post or receive "expression."**

Likewise, for HB20 Section 7, HB20's restrictions on content moderation apply almost exclusively when a covered website "us[es] its content-moderation standards to remove . . . posts in its News Feed (or homepage)." *Id.* at 718.

Section 7's content-moderation restrictions apply to any function offered by a covered website on which "users" post "expression." Tex. Civ. Prac. & Rem. Code § 143A.002(a). These are precisely the "heartland applications" that the Supreme Court's analysis emphasized. *Moody*, 603 U.S. at 724.

The statute provides, in relevant part:

> A social media platform may not censor a user, a user's expression, or a user's ability to receive the expression of another person based on:
> (1) the viewpoint of the user or another person;
> (2) the viewpoint represented in the user's expression or another person's expression; or
> (3) a user's geographic location in this state or any part of this state.

Tex. Civ. Prac. & Rem. Code § 143A.002(a). Section 7 defines the operative terms as follows:

- "'Censor' means to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." *Id.* § 143A.001(1).

- "'Expression' means any word, music, sound, still or moving image, number, or other perceivable communication." *Id.* § 143A.001(2).

- "'Receive,' with respect to an expression, means to read, hear, look at, access, or gain access to the expression." *Id.* § 143A.001(3).

- "'User' means a person who posts, uploads, transmits, shares, or otherwise publishes or receives expression, through a social media platform." *Id.* § 143A.001(6).

HB20 Section 7 thus provides that disfavored websites may not engage in a wide variety of content-moderation actions (what the State calls "censor").[7] *Moody* made clear that protected "content moderation" editorial decisions include much more than merely content "removal"—as protected editorial choices also include "personaliz[ation]," "customiz[ation]," and "individualiz[ation]." *Moody*, 603 U.S. at 734, 740. HB20 Section 7 is triggered any time either "a person" (*i.e.*, "user") or expressive content (*i.e.*, "expression") is subject to such content moderation based on (1) "the viewpoint of the user or another person"; (2) "the viewpoint represented in the user's expression or another person's expression"; or (3) "a user's geographic location in this state or any part of this state." Tex. Civ. Prac. & Rem. Code §§ 143A.001(1)-(2), (6), 143A.002(a).[8] So HB20 applies when a covered website restricts users' ability to "read, hear, look at, access, or gain access to the expression." *Id.* § 143A.001(3).

Where HB20 Section 7 does *not* apply is similarly important to the facial-challenge analysis, because that analysis "consider[s] only applications of the statute in which it actually authorizes or prohibits conduct." *City of L.A. v. Patel*, 576 U.S. 409, 418 (2015); *see Moody*, 603 U.S. at 724-25.

Even if a website is covered by HB20, Section 7 does not prevent it from moderating content on any basis other than "viewpoint" or "geographic location." Other types of content moderation—and any other activities not prohibited—are not potential applications of Section 7's content-moderation ban. So these would not be considered in the facial-challenge analysis. According to Defendant, Section 7's ban does not apply, for instance, to "block[ing] *categories* of

---

[7] Plaintiffs and their members disagree with the pejorative and inaccurate labeling of their protected editorial discretion as "censorship."

[8] HB20's "geographic location" provision appears to be designed to prevent targeted websites from withdrawing from the Texas market—in other words, to force covered websites to operate in Texas subject to HB20. This would present its own constitutional problems.

content." Brief for Respondent, *NetChoice, LLC v. Paxton*, No. 22-555, 2024 WL 210234, at *9 (U.S. Jan. 16, 2024). Moreover, Section 7 expressly permits covered websites to moderate content that (1) may be "censor[ed] under federal law"; (2) is referred by an organization concerned with "preventing the sexual exploitation of children and protecting survivors of sexual abuse from on-going harassment"; (3) incites criminal activity or contains "specific threats of violence" based on "race, color, disability, religion, national origin or ancestry, age, sex, or status as a peace officer or judge"; or (4) contains unlawful expression. Tex. Civ. Prac. & Rem. Code § 143A.006(a)(1)-(4). And it allows covered websites to "authoriz[e]" and "facilitat[e]" "censor[ship]" for any reason on a "user's platform or page at the request of that user." *Id.* § 143A.006(b).

For similar reasons, Section 7's content-moderation ban does not apply to the potential use of "algorithms" based on considerations other than viewpoint or geographic location in Texas. *Cf. Paxton*, 121 F.4th at 499 ("[O]ne of the principal factual deficiencies in the current record, according to the Supreme Court, concerns the algorithms used by plaintiffs' members."). Consider the example, mentioned in *Moody*, of "algorithms" based "*solely*" on user preference without also implementing content-moderation community guidelines. *Moody*, 603 U.S. at 736 n.5 (emphasis added); *see id.* (reserving judgment about "feeds whose algorithms respond *solely* to how users act online—giving them the content they appear to want" (emphasis added)); *see also id.* at 746 (Barrett, J., concurring) (suggesting distinct "First Amendment implications" of an algorithm that "just presents automatically to each user whatever the algorithm thinks the user will like"). An algorithm based solely on user-preference is not covered by Section 7, because it selects and displays content based on an individual user's choices—and not based on "viewpoint." Tex. Civ. Prac. & Rem. Code § 143A.002(a). Moreover, Defendant has insisted that HB20 "specifically allows platforms to facilitate user choice as to what they want to hear and from whom, thus ensuring that no one is

forced to hear anything they would rather not." Brief for Respondent, *NetChoice, LLC v. Paxton*, No. 22-555, 2024 WL 210234, at *2 (U.S. Jan. 16, 2024). That follows from an additional statutory phrase, too. HB20's definition of "censor"—*i.e.*, "to block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression"—does not include a website's effort to provide users with content believed to match users' preferences. Because user-preference algorithms do not moderate content based on viewpoint, Section 7's content-moderation ban does not apply to them at all.

Section 7's content-moderation restrictions are also cabined by HB20's general coverage provisions, *see supra* pp.3-8, which target only a handful of the largest social media websites while leaving all others unregulated. As a practical matter, this means that Section 7 does not apply to any activities on the majority of all social media services on the internet, many of which are unregulated by HB20. So any website that Texas has not targeted through HB20—every website with as many as 49.9 million monthly users, for instance—remains free to remove, restrict, or reorganize any user-provided content based on viewpoint, geographic location, or any reason at all.

HB20 Section 7 *may* apply to direct messaging when offered by a covered website as a secondary function in addition to the primary function of curated feeds—although Defendant has never taken this position. *See Moody*, 603 U.S. at 724-25. (If direct messaging were the website's primary purpose, that website would be excluded under HB20's primary-purpose test. *See supra* pp.2-4, 7.) Arguably, moderating direct messages could restrict a "user's ability to receive the expression of another person." Tex. Civ. Prac. & Rem. Code § 143A.002(a). But the Legislature's enactment of HB20 was designed to regulate "social media platforms" as the "public square." *See supra* p.5. So it is unclear whether HB20 Section 7 covers any form of direct messaging. Regardless, even if HB20 Section 7 covered the secondary function of direct messaging on websites with

a primary purpose of curated feeds, Section 7 still would apply only to these covered websites' direct messaging if these websites moderated the content of direct messages based on "viewpoint" or "geographic location in this state." Tex. Civ. Prac. & Rem. Code § 143A.002(a). Neither the Legislature nor Defendant has identified a single example of this ever occurring. And if a website does *not* moderate direct messages based on viewpoint or geographic location in Texas, its direct-messaging function is outside the scope of Section 7's content-moderation ban.

## CONCLUSION

Before the Court authorizes parties to proceed to the merits and discovery in this litigation, it should confirm HB20 Sections 2 and 7's narrow reach to only the "actors" and "activities" covered by the plain text of the statute.

Dated: August 11, 2025                           Respectfully submitted,

                                                 */s/ Scott A. Keller*
                                                 Scott A. Keller (Texas Bar # 24062822)
Steven P. Lehotsky*                              scott@lkcfirm.com
steve@lkcfirm.com                                Todd Disher (Texas Bar # 24081854)
Jeremy Evan Maltz (Texas Bar # 24102129)         todd@lkcfirm.com
jeremy@lkcfirm.com                               LEHOTSKY KELLER COHN LLP
LEHOTSKY KELLER COHN LLP                         408 West 11th Street, 5th Floor
200 Massachusetts Avenue, NW                     Austin, TX 78701
  Suite 700                                      T: (512) 693-8350
Washington, DC 20001                             F: (512) 727-4755


*Admitted *pro hac vice*

14

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on August 11, 2025, the foregoing was filed electronically via the Court's

CM/ECF system, causing electronic service upon all counsel of record.

*<u>/s/ Jeremy Evan Maltz</u>*
Jeremy Evan Maltz
