UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NETCHOICE, LLC, *et al.,* | | |
| *Plaintiffs,* | | |
| v. | | Case No. 1:21-cv-00840-RP |
| KEN PAXTON, in his official capacity as Attorney General of Texas, | | |
| *Defendant.* | | |

## DEFENDANT'S BRIEF REGARDING THE SCOPE OF HOUSE BILL 20

TABLE OF CONTENTS

Introduction ........................................................................................................................1

Argument ......................................................................................................................... 2

    I.  HB20 Sections 2 and 7 regulate a diverse array of social media platforms, and each of the many different services provided by those platforms. ............................................. 2

   II.  HB20 requires social media platforms to disclose their curation, promotion, and moderation practices, and prohibits such platforms from censoring users or their expression based upon the viewpoint of the user....................................................5

       a.  HB20 Section 2 requires social media platforms to notify users when a user's content has been removed and offer a system for complaints and appeals. ................... 6

       b.  HB20 Section 7 prohibits social media platforms from censoring users based upon their viewpoint or location within the State of Texas, or preventing users from receiving communications based upon the viewpoints contained therein. ...........7

       c.  Censorship of user expression by a social media platform—whether by AI, algorithm, or employee—falls under HB20.................................................................. 8

Conclusion .................................................................................................................... 11

Certificate of Service..................................................................................................... 11

Defendant, Ken Paxton, in his official capacity as Attorney General of the State of Texas, respectfully responds to the Court's invitation to brief the scope of HB20 (ECF No. 82) and would show the following:

INTRODUCTION

Determining the scope of HB20 requires determining both "what actors" are covered by HB20, followed by determining "what activities" by those actors are covered by HB20. *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024). Plaintiffs assert that determining the scope of the present action "consists largely of pure questions of law." Brief for Plaintiffs at 12. This is directly contrary to the guidance provided by both the Supreme Court and the Fifth Circuit, each of which emphasized the "fact-intensive" nature of the many questions necessary to resolve the facial challenge to HB20. *See NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 497 (5th Cir. 2024) ("Who is covered by [HB20]? For these actors, which activities are covered by [HB20]? For these covered activities, how do the covered actors moderate content . . . ? [T]hese are fact-intensive questions that must be answered by the district court in the first instance after thorough discovery . . . "); *Moody v. NetChoice, LLC*, 603 U.S. at 747 (Barrett, J., concurring) ("The answers in any given case might cast doubt on—or might vindicate—a social-media company's invocation of its First Amendment rights. Regardless, the analysis is bound to be fact intensive, and it will surely vary from function to function and platform to platform."). Determining the scope of the present action is the cost of Plaintiffs' choice to levy a facial challenge against HB20. *Moody v. NetChoice, LLC*, 603 U.S. at 723 (2024). And Plaintiffs bear the burden to show that HB20's "unconstitutional applications substantially outweigh its constitutional ones," should they wish to prevail in their facial challenge to HB20. *Id.* at 723–24. For the purposes of determining the scope of HB20, this Court should find that HB20 covers social media platforms which serve primarily as social media platforms and which have over 50 million users per month in the United States, and that the scope of HB20 prohibits covered social media platforms from censoring users based upon their or another person's viewpoint, in addition to requiring those platforms to provide a notice, complaint, and appeals process, whenever a user's posted content has been removed.

1

ARGUMENT

**I.    HB20 Sections 2 and 7 regulate a diverse array of social media platforms, and each of the many different services provided by those platforms.**

The Fifth Circuit emphasized on remand that even the initial question of determining "[w]ho is covered by [HB20]" is a "fact-intensive question[] that must be answered by the district court in the first instance after thorough discovery." *NetChoice, L.L.C. v. Paxton*, 121 F.4th at 497. HB20 applies to "social media platforms," defined by the statute as "an Internet website or application that is open to the public, allows a user to create an account, and enables users to communicate with other users for the primary purpose of posting information, comments, messages, or images." Tex. Bus. & Com. Code § 120.001(1). Texas agrees with Plaintiffs that the text of HB20 limits its applicability to those social media platforms with "more than 50 million active users in the United States in a calendar month." Tex. Bus. & Com. Code § 100.002(b) (applicability of HB20 Section 2); Tex. Bus. & Com. Code § 143A.004(c) (applicability of HB20 Section 7). Lastly, to be covered by HB20, a social media platform must choose to do business in Texas. Transcript of Oral Argument at 87–88, *NetChoice, LLC v. Paxton*, 603 U.S. 707 (No. 22-555). If a social media platform chooses to withdraw from doing business in Texas entirely, it may make that choice and so avoid coverage under HB20.

Plaintiffs claim that much which is required to determine the scope of this case was "in large part already resolved by *Moody*." Brief for Plaintiffs at 8. This greatly overstates what was held in the majority opinion. The Court stated that "although these cases are here in a preliminary posture, the current record suggests that some platforms, in at least some functions, are indeed engaged in expression. *Moody v. NetChoice, LLC*, 603 U.S. at 716 (2024). So, while the majority opinion speculated that Facebook's News Feed and YouTube's Homepage likely helped the Plaintiffs' case against HB20, it acknowledged that "the *record is incomplete even as to the major social-media platforms' main feeds*, much less the other applications that must now be considered." *Moody v. NetChoice, LLC*, 603 U.S. at 734 (emphasis added). As such, "[t]he only binding holding in these decisions is that NetChoice has yet to prove that the Florida and Texas laws they

2

challenged are facially unconstitutional." *Moody v. NetChoice, LLC*, 603 U.S. at 798 (Alito, J., concurring in the judgment).

Plaintiffs claim that HB20 does not cover "the kinds of services over which the Supreme Court's decision in *Moody* and the Fifth Circuit in *Paxton* reserved judgment." Brief for Plaintiffs at 5. This statement is not accurate. Both courts declined to make conclusive judgments regarding *any* of the platforms and whether HB20 may permissibly regulate them. Even if it were to be assumed that the Court had pronounced a valid judgment regarding HB20's applicability to Facebook's News Feed and YouTube's homepage, such a judgment would not as a matter of course apply to the many other social media platforms covered by HB20, including Plaintiffs' members Instagram, Nextdoor, Pinterest, Reddit, Tumblr, and X, as well as other entities which may be covered such as Discord, TikTok, and Reddit. *See* Brief for Plaintiffs at 2 (listing platforms covered by HB20); *Moody v. NetChoice, LLC*, 603 U.S. at 787 (Alito, J., concurring in the judgment) (listing additional platforms which may be covered by HB20). Each of these platforms operates differently, with a variety of services offered and a diversity of approaches to news feeds, homepages, boards, and so on. And each, whether by algorithms, AI, actual human representatives of that social media platform, or some combination thereof, is "curated" in a different way. Because each platform (and likely, each service offered within the same platform) operates differently, it is possible that the Court may ultimately find HB20 to be constitutional as applied to all, some, or none of the variety of contexts. And in the context of a facial challenge, determining just how many of those applications are constitutionally permissible and how many are impermissible is the central focus.

HB20 may also cover a variety of "secondary" services offered through social media platforms covered by HB20, consistent with the primary purpose language of the statute. Plaintiffs clarify that "HB20 regulates at the level of 'website or application,'" and therefore HB20 "does not cover an entire company's operations just because that company may have one service covered by HB20." Brief for Plaintiffs at 4 n.3. This is true, but it is likewise true that HB20 applies to more than the primary feature of a covered application (e.g., those "heartland" applications which often take the character of "posts" in a public feed which may at any time be visible to any user). Many

3

social media platforms have multiple services or features within them, which may also be subject to HB20, as nothing in the language of HB20 suggests that its prohibition of censorship is limited to the primary purpose of social media platforms.

One common secondary service on many social media platforms is a form of group or individual posting or messaging. Users may, instead of posting for the whole social media platform to see, post instead to small groups, which may themselves be public or private, as well as send messages directly to single accounts or to multiple accounts. While it is arguable from the text of HB20 that such services might not meet the "primary purpose" test of HB20 were they offered as standalone services, no language suggests that secondary services on a covered social media platform are exempt from the regulations of HB20. Whether HB20 survives a facial challenge to its constitutionality can only be resolved through careful examination of the various social media entities, their platforms' many different features, and the algorithms and other tools used to moderate content therein.

Plaintiffs also assert that because of HB20's "primary purpose" language, HB20 does not apply to, for example, online marketplaces like Etsy. Brief for Plaintiffs at 6. While it may be the case that websites with a primary purpose of serving as a marketplace are not covered by HB20, this is less clear when applied to online marketplaces which are a feature of a website which serves primarily as a social media platform. For instance, on Facebook Marketplace, users may buy and sell goods as varied as electronics, clothing, toys, and cars, and even rent real estate, all from the same Facebook account which can be used to view and post to the Facebook NewsFeed.[1] While websites which are primarily online marketplaces may be not be covered by HB20, if a social media platform meets the primary purpose test of HB20, does HB20 reach that platform's marketplace also? Plaintiffs claim that HB20 similarly excludes other online services, like payment services. Brief for Plaintiffs at 6. But here again, the same question arises: what about Meta Pay (offered

---

[1] Facebook Help Center, Who Can Use Facebook Marketplace, https://www.facebook.com/help/1968285150185577/?helpref=related_articles ("Facebook Marketplace is available in many countries for adults with active Facebook accounts, and is available from the Facebook app for Android or iPhone.").

through Facebook and Instagram)? Similar issues arise for many of the other services offered by social media platforms, including secondary services like Facebook's dating service and fundraising services, Artificial Intelligence chatbots or assistants, like Instagram's many AI chatbots and X's AI "Grok", and so on. Ultimately, the Court must determine whether each one of these services falls within the scope of HB20 if it is to properly evaluate the facial challenge before it, and Texas argues that HB20 covers all such secondary services carried by covered social media platforms.

II.    **HB20 requires social media platforms to disclose their curation, promotion, and moderation practices, and prohibits such platforms from censoring users or their expression based upon the viewpoint of the user.**

The Supreme Court's majority opinion in *Moody* offers little conclusive guidance in determining the scope of HB20 with regard to the diverse moderation practices of the various social media platforms. "The holding in [*Moody*] is narrow: NetChoice failed to prove that the Florida and Texas laws they challenged are facially unconstitutional. Everything else in the opinion of the Court is nonbinding dicta." *Moody v. NetChoice, LLC*, 603 U.S. at 766 (Alito, J., concurring in the judgment). And the Fifth Circuit emphasized that there are "myriad possible applications of [HB20]." *NetChoice, L.L.C. v. Paxton*, 121 F.4th at 499.

The Supreme Court's majority opinion speculated as to the constitutionality of HB20 in only two contexts: Facebook's News Feed, and YouTube's homepage. Such speculation does not bind the lower courts to agreeing with the majority's conclusion that HB20 likely may impermissibly restrict those platforms' free expression, particularly if subsequent discovery provides evidence supporting contrary findings. In any event, the Supreme Court's majority opinion certainly does not require lower courts to generalize findings about those specific applications it discussed to other platforms, regardless of any surface level similarities. And, once more, the Fifth Circuit has underscored the need for discovery to answer questions about the scope of HB20, including "which activities are covered by [HB20]," "[f]or these covered activities, how do the covered actors moderate content," and "how much does requiring each covered actor to

explain its content-moderation decisions burden its expression," emphasizing that "[b]ecause these are fact-intensive questions that must be answered by the district court in the first instance after thorough discovery." *NetChoice, L.L.C. v. Paxton*, 121 F.4th at 497.

    **a. HB20 Section 2 requires social media platforms to notify users when a user's content has been removed and offer a system for complaints and appeals.**

    Under HB20 Section 2, when a covered social media platform removes a user's content, the platform must notify the user who provided the content that it was removed and provide a reason for the removal, allow the user to appeal the removal decision, and provide an ultimate determination and explanation regarding the disposition of the appeal. Tex. Bus. & Com. Code § 102.103(a).

    Plaintiffs argue that the process afforded to users by HB20 is limited to "public" posts with "widespread dissemination of speech for multiple users to see." Brief for Plaintiffs at 9. While we do agree that HB20 Section 2 protects users who make such posts, it is not clear based on the text of HB20 that such protections do not also extend to the secondary functions of social media platforms as well, which may not be public, and which may disseminate only to one or a few other users. As discussed *supra*, secondary functions of social media services beyond the "main feeds" seem to also be covered by HB20. Regardless, it can hardly be claimed that *Moody* conclusively "held" that social media platforms are fully protected when removing users' posts on the basis of viewpoint. *Compare* Brief for Plaintiffs at 9 ("*Moody* held that the First Amendment fully protects these websites' editorial judgment to remove such content from their social media services.") *with Moody v. NetChoice, LLC*, 603 U.S. at 744 ("*At least on the current record*, the editorial judgments influencing the content of [Facebook's News Feed and YouTube's homepage] are . . . protected expressive activity.") (emphasis added). And, even if the opining of the Court as to Facebook's News Feed and YouTube's homepage prove convincing to other courts going forward, this only addresses two functions of two social media platforms and provides minimal insight into the scope of HB20's applicability to other functions on those platforms, let alone its application to other platforms.

To determine whether HB20's required notice and appeal processes for removal of user content from social media platforms should be upheld as consistent with the First Amendment, social media platforms and their associated applications must be considered as part of the scope of activities which HB20 regulates.

**b. HB20 Section 7 prohibits social media platforms from censoring users based upon their viewpoint or location within the State of Texas, or preventing users from receiving communications based upon the viewpoints contained therein.**

HB20 Section 7 prohibits social media platforms from censoring users, their expression, or their ability to receive the expression of other persons, on the basis of the user or another person's viewpoint, the viewpoint represented within the expression, or the user's location within the state of Texas. Tex. Bus. & Com. Code § 143A.002(a). This prohibition applies whether the viewpoint triggering censorship is expressed on the social media platform or elsewhere. Tex. Bus. & Com. Code § 143A.002(b). Censor is defined as a platform's action to "block, ban, remove, deplatform, demonetize, de-boost, restrict, deny equal access or visibility to, or otherwise discriminate against expression." Tex. Bus. & Com. Code § 143A.001(1). Finally, HB20 Section 7 applies to all expression that is "shared or received in [Texas]." Tex. Bus. & Com. Code § 143A.004(b).

While HB20 prevents social media platforms from discriminating against users based upon their geographic location within the State of Texas, this prohibition only applies to the extent that HB20 as a whole applies to the social media platform, i.e., that the platform has chosen to direct business to Texas. Transcript of Oral Argument at 87–88, *NetChoice, LLC v. Paxton*, 603 U.S. 707 (No. 22-555) ("If you choose to do business in Texas, then this provision kicks in, and you can't discriminate against people after you've chosen to do business in Texas based upon the status that they're in Texas"). Platforms are free to choose not to do business in Texas at all, if they so wish, and would thereby exempt themselves from compliance with HB20. *Id.* at 88 ("If you don't want to do business in Texas at all . . . you can get out of Texas."); *cf.* Brief for Plaintiffs at 11 n.8 ("HB20's "geographic location" provision appears to be designed to prevent targeted websites from withdrawing from the Texas market—in other words, to force covered websites to operate in

7

Texas subject to HB20.")

    **c.**  **Censorship of user expression by a social media platform—whether by AI, algorithm, or employee—falls under HB20.**

    As many of the social media platforms covered by HB20 use AI, algorithms, or other programs to sort and filter the massive amounts of information posted to their platforms and deliver that content to users, it is also necessary to consider the implications of whether the actions of an AI, algorithm, or other program may trigger HB20 Section 7's prohibition on viewpoint censorship. *Moody v. NetChoice, LLC*, 603 U.S. at 795 (Alito, J., concurring in the judgment) ("the vast bulk of the 'curation' and 'content moderation' carried out by platforms is not done by human beings. . . . many of the biggest platforms are beginning to use AI algorithms to help them moderate content."). There is no statutory language to suggest that this matters regarding the scope of HB20, as the text of the statute primarily measures the end result for the user. *See, e.g.,* Tex. Com. & Bus. Code § 143A.002 ("A platform may not censor a user, a user's expression, or a *user's ability to receive the expression* of another person . . . .") (emphasis added).

    If an AI, algorithm or similar program is explicitly designed or "instructed" to censor certain viewpoints, it seems plain that such censorship would be disallowed by HB20. But it would assume a great deal to take for granted that viewpoint censorship undertaken by AI or algorithms is knowable or predictable, much less that such a tool would be explicitly programmed to do so. *See Moody v. NetChoice, LLC*, 603 U.S. at 795 (Alito, J., concurring in the judgment) ("when AI algorithms make a decision, 'even the researchers and programmers creating them don't really understand why the models they have built make the decisions they make.') (*citing* T. Xu, AI Makes Decisions We Don't Understand—That's a Problem, (Jul. 19, 2021), https://builtin.com/artificial-intelligence/ai-right-explanation).

    Justice Barrett raises the interesting question of whether algorithms which merely present content which the algorithm "thinks" the user will like, such as content similar to those posts with which a user has previously engaged, would be covered under HB20. *Moody v. NetChoice, LLC*, 603 U.S. at 746 (Barrett, J., concurring). Plaintiffs dismiss these concerns as outside of the scope

of HB20: "An algorithm based solely on user-preference is not covered by Section 7, because it selects and displays content based on an individual user's choices—and not based on 'viewpoint.'" Brief for Plaintiffs at 12. This assumes a great deal about algorithms—and especially in the context of artificial intelligence algorithms, as seen above, these are tools we know quite little about, particularly regarding the covered platforms, a scarce record, and minimal discovery. But even with minimal information, it is possible to consider just how many decision points a "solely user preference algorithm" might face, each of which present openings for the injection of viewpoint discrimination.

Consider how Justice Barrett's example of a "solely user preference" algorithm might work in the context of a social media platform which allows for the sharing of video content. If a user watches a video of a dog and proceeds to provide some input suggesting that the user would like to see more of that kind of content, a "user preference" algorithm may correctly identify that the user would like to see more "dog" videos. There is, to start, the a priori problem of how such an algorithm would know whether a video contains a dog in the first place. Maybe there seems to be little room to inject viewpoint bias regarding "dogs," perhaps, but what if the user wants to see videos of "justice?" It is easier to see how justice may look quite different based upon an individual's viewpoint, where what is "justice" to one user may be a deep injustice to another.

Going further, even if we additionally assume that the "solely user preference" algorithm has no potential viewpoint bias in the initial identification of the category of "dog" posts the user would like to see, and we further assume that the algorithm can do so accurately, how would the algorithm handle videos of dogs appearing alongside political individuals like Joe Biden or Vladimir Putin? These questions (each which represent a decision the algorithm must navigate) branch out infinitely from there. And, even avoiding the complexities of variations from the original category of video of a dog stretching, the algorithm must also decide which "dog" video will appear next, and after that, and so on. Perhaps an algorithm will produce the next most recently posted video, or the next most popular video in the category, or might even turn to a random or pseudorandom selection from the category—but perhaps other factors are also considered, which are likewise far

beyond merely reflecting user input or observed preferences. Are certain users who post "dog" videos more or less likely to have their videos shown to other users if that poster interacts with favored or disfavored political accounts? And again, the questions multiply exponentially from there.

It is unsettled whether such outcomes resulting from the output of an AI, algorithm, or similar program are considered "expression" and therefore protected by the First Amendment. Justice Barrett expressed uncertainty in this context: "What if a platform's owners hand the reins to an AI tool and ask it simply to remove "hateful" content? . . . has a human being with First Amendment rights made an inherently expressive "choice . . . not to propound a particular point of view"? *Moody v. NetChoice, LLC*, 603 U.S. at 746 (Barrett, J., concurring). Similarly, Justice Alito asks "Are [decisions made by AI algorithms] equally expressive as the decisions made by humans? Should we at least think about this?" *Moody v. NetChoice, LLC*, 603 U.S. at 795 (Alito, J., concurring in the judgment).

What this means for the constitutionality of HB20 for each of the various AI and algorithms used to moderate content is uncertain. Justice Barrett notes that "technology may attenuate the connection between content-moderation actions (e.g., removing posts) and human beings' constitutionally protected right[s]," *Moody v. NetChoice, LLC*, 603 U.S. at 746 (Barrett, J., concurring). Surely, all of this uncertainty underscores the need for thorough discovery regarding the mechanisms by which the various social media platforms conduct content moderation and removal actions. Whether such censorship actions, when taken by entities such as AI or algorithms, constitute protected curation expression under the First Amendment is a question left for a later step of the inquiry.

However, for the sake of determining the scope of actions which HB20 prohibits, it suffices to say that HB20 applies whenever a covered censorship action occurs on a social media platform covered by HB20, as the end result is that a user's expression or access to expression has been curtailed on the basis of viewpoint.

CONCLUSION

Consistent with direction from the U.S. Supreme Court and the Fifth Circuit that the record is underdeveloped as to which "actors" and "activities" are covered by HB20, the Court should allow the parties to conduct discovery of all information relevant to determining what platforms, what methods of content moderation, and what forms of censorship of users are covered by HB20 to determine whether Plaintiffs can succeed in their facial challenge to the Constitutionality of the statute.

Date: September 10, 2025

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

Respectfully submitted.

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998
ryan.kercher@oag.texas.gov

*/s/ Zachary W. Berg*
ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706
zachary.berg@oag.texas.gov

COUNSEL FOR DEFENDANT

CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 10, 2025 and that all counsel of record were served by CM/ECF.

*/s/ Zachary W. Berg*
ZACHARY W. BERG